BRIAN M. DAUCHER, Cal. Bar No. 174212
ROBERT S. BEALL, Cal. Bar. No. 132016
JOSEPH H. TADROS, Cal. Bar. No. 239379
ASHLEY E. MERLO, Cal. Bar. No. 247997
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1993
Telephone: (714) 513-5100
Facsimile: (714) 513-5130
bdaucher@sheppardmullin.com
jtadros@sheppardmullin.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAFFICSCHOOL.COM, INC., a California corporation; DRIVERS ED DIRECT, LLC., a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>EDRIVER, INC., ONLINE GURU, INC., FIND MY SPECIALIST, INC., and SERIOUSNET, INC., California corporations; RAVI K. LAHOTI, an individual; RAJ LAHOTI, an individual; DOES 1 through 10,<br><br>Defendants. | Case No. CV 06-7561 PA (CWx)<br><br>*The Hon. Percy Anderson*<br><br>**AMENDED TRIAL DECLARATION OF KENNETH HOLLANDER**<br><br>(Notice of Filing, explaining amendments, filed contemporaneously)<br><br>Complaint Filed: November 28, 2006<br>Bench Trial: November 6, 2007 |

# DECLARATION OF KENNETH A. HOLLANDER

I, Kenneth A. Hollander, hereby declare the following:

1. I am President of Kenneth Hollander Associates, Inc, a firm specializing in consumer research. I have personal knowledge of the facts hereinafter stated and, if sworn as a witness, could and would testify competently thereto.

## QUALIFICATIONS

2. I graduated from The Ohio State University with a Bachelor of Science degree in Marketing. I then obtained a Masters of Business Administration degree in Marketing from the University of Missouri.

3. Prior to starting the Company, my employment history included the following:

    (a) Research Brand Manager, The Procter & Gamble Company in which I served in a two-man Experimental Research and technique Development team responsible for all unique, non-recurring research issues concerning all P&G brands.

    (b) Associate Research Director, Hallmark Cards in which I was responsible for all greeting card research as well as acquisitions and mergers explorations. Much of my professional activity centered on issues of communications research.

(c) Director of Research, Young & Rubicam, Chicago in which I was responsible for all research for all of the agency's clients: Allied Van Lines, American Paper Corporation, Armour Dial, International Harvester, and U.S. Naval Recruiting. Much of my professional activity centered on issues of communications research.

(d) Vice President, Director of Communications Planning Group, The Interpublic Group of Companies in which I was responsible for all communications research for the Coca-Cola Company, both domestic and international.

4. I have lectured on marketing research applications and methods at the Graduate Schools of Business at Emory University and Georgia State University in Atlanta, Georgia; the University of Georgia in Athens, Georgia; and Stanford University in Palo Alto, California.

5. At the University of Georgia, I was Chairman of the Board of Advisors for the Masters of Marketing research Program, and a Distinguished Practitioner Lecturer in the Department of Marketing.

6. I was a Contributing Editor to the textbook, Advertising, and have spoken at events sponsored by the American Marketing Association, The Association of National Advertisers, The Advertising Research Foundation, and the Marketing Research Association.

7. I have conducted over 3,000 consumer surveys for many of the world's largest and most prominent companies including but not limited to:

Anheuser Busch, Bank of America, The Coca-Cola Company, Delta Air Lines, Exxon, Ford Motor Company, General Electric, Hallmark Cards, IBM, Johnson & Johnson, Kimberly-Clark, Lever Brothers, Mattel, No Nonsense, Mattel, O.M. Scott, Pillsbury, Quaker Oats, Ralston-Purina, Standard Oil, Texas Instruments, Union Carbide, Viceroy, Xerox, and Zenith.

8. I am have served as an expert witness in the United States Federal Court System on matters pertaining to survey research, having conducted, critiqued, or counseled on over 100 intellectual property surveys.

## THE SURVEY

9. I have been asked by counsel for the Defendants to conduct a rebuttal survey that addresses and corrects the several major defects in the surveys conducted for the Plaintiffs by Thomas J. Maronick. These surveys purported to determine consumers' perception of whose website the DMV.ORG Internet address/link directs them to, and whether DMV.ORG is endorsed by or sponsored by any governmental agency.

10. [redacted]

11. Trial Exhibit 188 shows the questions (both prescreening and survey) given to respondents. A respondent to this survey could return to prior questions or stimuli during the survey, consistent with the high involvement nature of Internet browsing. And, where stimuli were presented, a respondent could scroll

down the page, just as if the respondent were sitting at a computer browsing the Internet.

12. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ Conversely, my rebuttal survey takes the respondents through four separate DMV.ORG web pages they could reasonably encounter, and makes it possible to refer to them during the interview (including scrolling up and down). I determined to use four pages based upon the fact that the average visitor to the DMV.ORG website sees five pages. (See Moretti Trial Decl., ¶ 10.) I used as a final page the first page of an advertiser's website because the question is whether the advertisements on DMV.ORG influence the purchasing decision, which does not happen until a visitor clicks off of the DMV.ORG website and into the third party advertiser's website (and completes a number of steps there). Thus, the rebuttal survey stimuli more closely mimics "real life."

13. Trial Exhibits 183, 184, 186, and 187, in that order, show the four pages that we showed to California respondents to the Test (not Control, discussed below) portion of my survey. (For display, the pages are reduced to a single 8.5x11 sheet; but in the survey, respondents saw only such top portion as they would see on a normal monitor, with the ability to scroll down the page.)

14. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Conversely, my rebuttal survey asked <u>if</u> respondents perceived that <u>any</u> of the entities shown on the

1  four pages was affiliated with, or sponsored or endorsed by, anyone else, or not.
2  (Trial Exhibit 188.) If a respondent did perceive affiliation or sponsorship, the
3  rebuttal survey follow-up question was "With whom?" (Trial Exhibit 188.) These
4  questions are not leading, and the first question includes the <u>negation</u> choice of none
5  of the entities being somehow connected. Thus, ███████████████████, the
6  rebuttal survey asked non-leading questions.

7
8      15.   <u>Experimental Control</u>. ██████████████████████████
9  ████████████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████
13 ████████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████████████
15 ██████████████████████████████████████████, this rebuttal
16 survey employed a Test and Control protocol in order to account for what survey
17 researchers refer to as "noise," that is, any exogenous and unmeasureable respondent
18 issues such as guessing, going-in knowledge and/or preconceived opinions.

19
20     16.   ██████████████████████████████████████████"
21 ████████████████████████████████████████████████████████████,
22 ██████████████████████████████████████████████████). For
23 example, it is reasonable to assume that some portion of the relevant universe may
24 believe that <u>any</u> website providing motor vehicle information, including advertising
25 for traffic schools, is in some way affiliated with a state agency such as the
26 California Department of Motor Vehicles. If this is so, and the rebuttal survey
27 appears to show that it is (see below), then we must first account for this erroneous
28

belief by (a) <u>measuring it</u> and (b) <u>subtracting it</u> from the belief caused by the litigated domain name DMV.ORG.

17. In this survey, certain respondents (the Test Group) saw the Defendant's four "DMV.ORG" pages (Trial Exhibits 183, 184, 186, 187) and others (the Control Group) saw exactly the same four web pages except in every instance, the name "CAR.ORG" replaced the Defendants' "DMV.ORG" nomenclature. By using CAR.ORG we retained the relevance of the name of the domain to the subject matter, while removing what plaintiffs assert is the offensive use of the term DMV. Thus, because the stimuli were identical except for the disputed domain name, the difference in response to DMV.ORG and CAR.ORG is an improved measure of any confusion or misunderstanding that can be attributed to use of the DMV.ORG domain, should it exist. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the rebuttal survey used a control.

18. Trial Exhibits 196, 197, 198, and 187 (187 common to both Test and Control), in that order, show the control pages that we showed to the distinct group of California control respondents.

19. <u>Possible Guessing.</u> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ My rebuttal survey instructed respondents not to guess. (Trial Exhibit 188.) Therefore, the rebuttal survey did not suffer from the defect of guessing.

20. The rebuttal survey was also conducted by means of an Internet panel. There were a total of 834 respondents: 490 in the Test Group seeing "DMV.ORG" and 344 in the Control Group seeing "CAR.ORG." Of these, 58% (483) were conducted with California residents and 42% (351) with residents of

Alabama, Arizona, Maryland, and New Mexico (states whose state agency does not use the abbreviation DMV).

21. These respondents were prescreened to ensure that, among other things, all were drivers over the age of 18 who, were they to receive a traffic ticket, would (a) opt to go to an online traffic school and (b) use Google or Yahoo to search for the on-line traffic school. Trial Exhibit 188, pp. 2-3 shows the full set of screening questions.

22. The questions asked of these 834 respondents were as follows:

Question 1:

> "If you have an opinion, do you think that any of the entities shown on these four pages is <u>affiliated</u>, with anyone else, or that none of them are affiliated with anyone else?" (emphasis added.)

Those thinking that there was an affiliation were asked on the next page question 1A:

> "Which entity is affiliated with someone else?"

and then on the next page asked question 1B:

> "With whom is it affiliated?"

-72-

Those with no opinion on question 1 <u>and</u> those thinking none were affiliated on question 1 were also asked on a new page <u>question 2</u>:

> "And if you have an opinion, do you think that any of the entities shown on these four pages is <u>endorsed</u> or <u>sponsored</u> by anyone else, or do you think that none of them is endorsed or sponsored by anyone else?"
> (emphasis added.)

Those thinking that there was an endorsement or sponsorship were asked on the next page <u>question 2A</u>:

> "Which entity is endorsed or sponsored by someone else?"

and then on the next page asked <u>question 2B</u>:

> "Who endorses or sponsors it?"

23. Because of the open-ended nature of the 1A/AB and 2A/2B questions, we then worked to tabulate the data into meaningful categories. I chose the following categories based upon the nature of the open-ended responses I saw: (1) DMV/state/government; (2) other; (3) don't know/not sure/guessing; (4) none; (5) Geico/Progressive/insurance companies; (6) DMV.ORG; (7) CAR.ORG. I then tabulated the responses and prepared an excel chart showing the results by question (more below on this), then sorted in six columns as follows:

(a) <u>Totals</u>. The first two columns report total numbers on a percentage basis for each question for the Test Group and Control Group respectively, across all states tested.

(b) <u>CA Only</u>. The third and fourth columns reported on a percentage basis for each question for the Test Group (DMV.ORG viewers) and Control Group (CAR.ORG viewers) respectively in California only.

(c) <u>All States Other Than CA</u>. The fourth and fifth columns reported on a percentage basis for each question for the Test Group (DMV.ORG respondents) and Control Group (CAR.ORG respondents) respectively for all states <u>other</u> <u>than</u> California (combined).

Trial Exhibit 193 constitutes this excel sheet and represents a true and correct summary of the responses to my survey.

24. Because questions 1A/1B and 2A/2B are open-ended (Who is the affiliated entity/with whom), respondents could identify the affiliated entities in either of two orders. For example, if based upon the stimuli presented, a respondent perceived DMV.ORG to be affiliated with or sponsored by the DMV/state/government, the respondent could report that perception either by: (a) identifying DMV.ORG in response to question 1A and then identifying DMV or state or government (any of these three was deemed a DMV/state/government response) in response to 1B; OR (b) identifying DMV/state/government in response to question 1A and then identifying DMV.ORG in response to 1B. Either way, a respondent reporting such a result is expressing a perceived affiliation between

DMV.ORG, on the one hand, and the DMV/state/government, on the other hand, that we want to measure and report.

25. As a result, once the answers to questions 1, 1A/1B, 2, and 2A/2B were reported, we needed to report those instances in which DMV.ORG was deemed affiliated with the DMV/state/government, again regardless of the order of reported affiliation. Trial Exhibit 193 reports this data in the rows entitled "Q1A&B" (page 1, middle) and "Q2A&B" (page 2). The key results are as follows:

    (a) In both the Test Group (DMV.ORG stimuli) and Control Group (CAR.ORG stimuli), between 45-50% of respondents reported perceiving <u>some</u> affiliation (not leading them to the type of affiliation Maronick wanted to report). Approximately 35% in both groups reported no opinion and approximately 20% in both groups reported no perceived affiliation.

    (b) But, when the reported affiliations are probed, only 1.0% of California respondents (3/286) for the Test Group (DMV.ORG stimuli) identified DMV.ORG as affiliated with the DMV/state/government (again, in either direction). Notably, not one single respondent in the four other "non-DMV" states reported a perception that DMV.ORG was affiliated with the government.

    (c) Critically, 2.5% of California respondents (5/197) for the Control Group (CAR.ORG stimuli) identified CAR.ORG as affiliated with the DMV/state/government. And, 2.0% of respondents in other states (3/147) for the Control Group

-75-

(CAR.ORG stimuli) identified CAR.ORG as affiliated with the DMV/state/government. By <u>subtracting</u> the Control Group findings from the Test Group findings, we find no confusion that can reasonably be attributed to the use of the DMV.ORG domain name.

(d) As for question 2, whether respondents perceived a sponsorship, not one single respondent in either the Test Group or the Control Group reported perceiving a sponsorship between DMV.ORG or CAR.ORG, respectively, and the government.

26. It may be noted that in <u>both</u> the Test Group and Control Groups across all states, between 5-15% perceived the DMV/state/government as affiliated with someone, but in most cases <u>not</u> DMV.ORG or even CAR.ORG. Two points should be noted here: (a) only 1.0% of total respondents (3 people) perceived that DMV.ORG was affiliated with the DMV/state/government; and (b) the Control Group findings are identical meaning that whatever drives respondents to identify DMV/state/government as an affiliated entity, it is <u>not</u> attributable to the use of the DMV.ORG domain name. (<u>See</u> control discussion, <u>supra</u>, at ¶ 16.)

27. Trial Exhibits 172 and 173 constitute my original report and addendum thereto in this matter, reporting these same facts.

W02-WEST:NA6\400489575.1

28. My opinion in this matter is that this impartial survey (using proper stimuli, asking non-leading questions, using a control group, and with the absence of guessing) demonstrates conclusively that the DMV.ORG website is not perceived by the relevant universe of users to be affiliated with or endorsed by any State agency.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this declaration on October 21, 2007 in Mendocino, California.

*/s/ Kenneth A. Hollander*
KENNETH A. HOLLANDER

| | |
|---|---|
| 1 | <div align="center">PROOF OF SERVICE</div> |
| 2 | <div align="center">STATE OF CALIFORNIA, COUNTY OF ORANGE</div> |

I, the undersigned, declare that I am, and was at the time of service of the papers herein referred to, employed in the County of Orange; over the age of eighteen years and not a party to the within entitled action or proceeding. My business address is 650 Town Center Drive, 4th Floor, Costa Mesa, California 92626-1993.

On **November 9, 2007**, I served the following document(s) described as: **AMENDED TRIAL DECLARATION OF KENNETH HOLLANDER** on the interested party(ies) in this action by placing ☒ true copies/☐ originals thereof enclosed in sealed envelopes and/or packages addressed as follows:

David N. Makous, Esq.
Mina I. Hamilton, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
221 North Figueroa Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

☒ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Costa Mesa, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile pursuant to Rule 2.306 of the California Rules of Court. The telephone number of the sending facsimile machine was 714-513-5130. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The sending facsimile machine (or the machine used to forward the facsimile) issued a transmission report confirming that the transmission was complete and without error. Pursuant to Rule 2.306(g)(4), a copy of that report is attached to this declaration.

☐ **BY HAND DELIVERY:** I personally delivered such envelope(s) by hand while attending a hearing on the above-captioned matter.

☒ **FEDERAL:** I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **November 9, 2007**, at Costa Mesa, California.

*/s/ C. Dubienny*
Carole Dubienny