# EXHIBIT A

8/16/2007  Maronick, Thomas

1
               UNITED STATES DISTRICT COURT

2
               CENTRAL DISTRICT OF CALIFORNIA

3

4
TRAFFICSCHOOL.COM, INC.,        )

   a California corporation;    )

5
DRIVERS ED DIRECT, LLC,        )

   a California limited liability  )

6
company,                  ) CASE NO.

                        ) CV 06-7561 PA

7
            Plaintiffs,     ) (CWx)

                        )

8
        vs.                )

                        )

9
EDRIVER, INC., ONLINE GURU, INC., )

   FIND MY SPECIALIST, INC., and   )

10
SERIOUSNET, INC., California     )

   corporations; RAVI K. LAHOTI, an   )

11
individual; DOES 1 to 10,       )

                        )

12
           Defendants.     )

                        )

13

14

15

16
        DEPOSITION OF THOMAS MARONICK, DBA, taken on

17
        behalf of the defendants at 333 South Hope

18
        Street, 48th Floor, Los Angeles, California,

19
        beginning at 9:41 A.M., and ending at

20
        3:58 P.M., on Thursday, August 16, 2007,

21
        before Lena Mescall, Certified Shorthand

22
        Reporter No. 13018.

23

24

25

EXHIBIT A
PAGE 8

8/16/2007  Maronick, Thomas

```
1              APPEARANCES:

2

3              FOR THE PLAINTIFFS:

4                     LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

5                     BY:  DAVID N. MAKOUS, ESQ.

6                     221 N. Figueroa Street, Suite 1200

7                     Los Angeles, California 90012

8                     (213) 250-1800

9

10             FOR THE DEFENDANTS:

11                    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP

12                    BY:  BRIAN M. DAUCHER, ESQ.

13                    650 Town Center Drive, 4th Floor

14                    Costa Mesa, California 92626

15                    (714) 513-5100

16

17             ALSO PRESENT:  Eric Creditor

18

19

20

21

22

23

24

25
```

EXHIBIT A
PAGE 9

**8/16/2007  Maronick, Thomas**

```
1                               I N D E X

2            WITNESS                                    PAGE

3            Thomas Maronick, DBA

4

5            Examination by Mr. Daucher                  5

6

7                              EXHIBITS

8    MARKED            DESCRIPTION            PAGE

9    141     Amended Notice of Deposition of
             Dr. Thomas J. Maronick and Request
10           for Production of Documents        16

11   142     Expert Report of Dr. Itamar Simonson    27

12   142A    Expert Report of Dr. Itamar Simonson
             with annotations                  148

13

     143     Advertising Research Issues from FTC
14           versus Stouffer Foods Corporation,
             Journal of Public Policy and Marketing  49

15

     144     Expert Report of
16           Thomas J. Maronick, DBA, JD        67

17   145     A Reading Test or a Memory Test;
             Which Survey Methodology is Correct?
18           Trademark Reporter                 105

19   146     E-mail dated 6-18-2007             223

20   147     Expert Report of
             Thomas J. Maronick, DBA, JD        229

21

     148     Rebuttal of Expert Report of
22           Daniel S. Janal                    233

23   149     Declaration of Kenneth A. Hollander  252

24   150     Declaration of Kenneth A. Hollander
             Addendum to August 5, 2007,
25           Declaration                        252
```

EXHIBIT A
PAGE 10

1    into your study the assumption that people wouldn't

2    spend very much time on any Web site; is that correct?

3        A.   No.  That's not correct.

4        Q.   Did you make any assumption about the amount of

5    time that a visitor would spend on the DMV.org Web site

6    in constructing your study?

7        A.   I didn't make an assumption.  I gave them

8    directions to -- in my study, in designing the study, to

9    read it carefully, to take as much time as they needed

10   to read it.  So I wasn't making an assumption how long

11   they'd do it.  I gave them directions to read it

12   carefully.

13       Q.   A single page; correct?

14       A.   The page that they saw.

15       Q.   Actually, only a portion of a single page;

16   correct?

17       A.   The page that they saw.

18       Q.   Was it only a portion of the page, or could

19   they see the whole page?

20       A.   They saw only the top part of it, but the later

21   part of it was basically a whole lot of white space.  So

22   they had all -- in my judgment, all the relevant

23   information.

24       Q.   You're aware that the bottom of the page

25   includes a disclaimer; correct?

EXHIBIT  A
PAGE  11

**8/16/2007  Maronick, Thomas**

1      A.    I am.

2      Q.    And that was not visible to the respondents to

3    your study; correct?

4      A.    That's correct.

5      Q.    And you're aware that it's possible that

6    visitors to the DMV.org Web site won't visit more than

7    one Web page while they're on that site; correct?

8      A.    It depends on how they get to it.

9      Q.    Well, even if they come directly to the

10   California Traffic School page that you use, it's

11   possible they could visit other pages; correct?

12     A.    It's --

13           MR. MAKOUS:  You'd see it before or after?

14           MR. DAUCHER:  Yeah.  Before -- yeah.  After

15   coming to that page, yes.

16           THE WITNESS:  After that page, yes.  Before

17   that page, no.  Because of the way, again, the study,

18   the approach that was taken, which was to go use the

19   DMV.org link to go directly to the Traffic School page.

20   BY MR. DAUCHER:

21     Q.    There are other ways to arrive at that page on

22   the DMV.org Web site.  You're aware of that; correct?

23     A.    Yes.

24     Q.    Do you know what percentage of DMV.org visitors

25   that view the California Traffic School page view that

EXHIBIT A
PAGE 12

1       A.    No.  I don't recall discussing with counsel.

2       Q.    Do you believe you did not discuss it with

3    counsel, or you just don't know?

4       A.    I don't recall.  I simply don't recall.

5       Q.    But for whatever reason, you declined to use a

6    control in this case; correct?

7       A.    I chose to not use one because I -- quite

8    frankly, I couldn't think of one that would meet -- even

9    using Simonson's language, would be a proper "control."

10   I couldn't conceive of one that would be an appropriate

11   control in this case.

12      Q.    There's literature on what an appropriate

13   control is; correct?

14      A.    Yes.

15      Q.    You've written literature on what a proper

16   control is; correct?

17      A.    Yes.

18      Q.    One way to do a proper control is to change the

19   portion of the advertisement which contains the

20   allegedly misleading information; correct?

21      A.    Yes.

22      Q.    Did you consider doing that in this case?

23      A.    Yes, I did.  But, again, my problem was I

24   couldn't think of something that would change it in a

25   way that would still be relevant to the target market --

EXHIBIT  A
PAGE  13

1    namely, people considering an online traffic school --

2    and would also deal with the issue of the Department of

3    Motor Vehicles.  I couldn't conceive of something that

4    would be realistic for this target market, and that's

5    where my problem was.

6         Q.   And this is a Lanham Act case.  You understand

7    that; correct?

8         A.   Yes.

9         Q.   Do you -- are you familiar with the Lanham Act?

10        A.   Yes.

11        Q.   Do you know which -- you're familiar that

12   Section 1125(a) of the Lanham Act has two prongs;

13   correct?

14        A.   I don't recall the individual sections of it.

15   It's been a long time since I've actually reviewed the

16   Lanham Act specifically.

17        Q.   Do you believe that this is a sponsorship or

18   endorsement case?

19        A.   I'm sorry.  I don't --

20             MR. MAKOUS:  Objection.  It calls for a legal

21   conclusion.  Beyond the scope of his expert opinion.

22   BY MR. DAUCHER:

23        Q.   Did you have an understanding during your work

24   on this case as to whether this case was brought as a

25   sponsorship or an endorsement type case?



EXHIBIT A
PAGE 14

**8/16/2007 Maronick, Thomas**

1    BY MR. DAUCHER:

2        Q.   That's the fifth question, "Whose Web site do

3    you think this is?"

4             MR. MAKOUS:   Which survey is this?

5             MR. DAUCHER:   It's the third survey.

6             THE WITNESS:   Survey 3.

7             MR. MAKOUS:   It's the last survey here?  Okay.

8             THE WITNESS:   Yes.  That's it.

9    BY MR. DAUCHER:

10       Q.   And then you asked the question which gets to

11   this case, "Is this Web site endorsed by a government

12   agency"; correct?

13       A.   Again, my -- your question to me do I -- did I

14   start with a closed-end question?  The answer is no.

15   Question 5 is an open-ended question.

16       Q.   But it doesn't get to the question whether

17   there's sponsorship or endorsement in this case, does

18   it?

19       A.   It starts -- it identifies whether the

20   respondents to this study identify DMV.org, the Web

21   site, this Study 3, the Web page, as being of a Web page

22   of the Department of Motor Vehicles.  So to that extent,

23   it gets to the issue of whose Web site it is.

24       Q.   But then Question 6 you would agree is a

25   closed-end question, "Is this Web site endorsed by any



EXHIBIT A
PAGE 15

**8/16/2007  Maronick, Thomas**

```
 1      government agency?"
 2          A.   That's correct.  But keep in mind that question
 3      follows Question 5, which was the open-ended question.
 4          Q.   I got it.
 5               Now, at the same time the viewer is answering
 6      Question 6, they can see Question 7 on the screen;
 7      correct?
 8          A.   I believe they can.
 9          Q.   And Question 7 reads, "What government agency";
10      correct?
11          A.   Yes.
12          Q.   And even if the viewer checks "no" on
13      Question 6, you're still asking them to answer
14      Question 7; correct?
15          A.   I don't believe that's the case.  I think if
16      they -- if they click "no," they didn't answer
17      Question 7.  I don't recall that, though.
18          Q.   Okay.  Looking at these materials which you
19      produced today, can you tell me how many people, how
20      many numbers-wise, people answered Question 6 "yes"?
21          A.   Question 6 "yes"?  One hundred.
22          Q.   Okay.  So you would only expect that 100 of
23      those 100 people would be asked Question 7; correct?
24          A.   That's what I would expect.
25          Q.   And can you flip back to the answers to
```

EXHIBIT A
PAGE 16

1    Question 7, please.  How many responses?

2         A.    One hundred.

3         Q.    Can I see that, please.  So if they answer

4    Question 6 "no," they skip to Question 8?

5         A.    That's the way I designed it.

6         Q.    Okay.  But you designed it so that they could

7    see Question 7 while they're answering Question 6?

8         A.    That's correct.

9         Q.    Is that normal to put two questions up at the

10   same time?

11        A.    In this kind of a context where the first

12   question is a screener question, in effect, a filtered

13   question, it is an acceptable procedure, yes.

14        Q.    In your view it's an acceptable procedure?

15        A.    That's correct.

16        Q.    You don't think there's any chance that by

17   putting that Question 7 up there, below Question 6, that

18   that's going to bias the answers that people are going

19   to give to Question 6?  Any chance?

20        A.    No.  I don't think so.

21        Q.    You could have put Question 7 on a different

22   page; correct?

23        A.    That's correct.

24        Q.    Okay.  Will you turn to page 9 of Simonson's

25   report, please, paragraph 21.



EXHIBIT A
PAGE 17

**8/16/2007  Maronick, Thomas**

1      A.    Twenty-one, yes.

2      Q.    Simonson quotes -- or says, "As

3    Professor McCarthy points out, survey questions must not

4    be slanted or leading, and it is improper to suggest a

5    business relationship when the respondent might

6    previously have had no thought on such a connection."

7            Do you see that?

8      A.    Yes.

9      Q.    Do you generally agree with those statements?

10     A.    I agree with the statement that a survey

11   question must not be slanted or leading.  Yes.  I agree

12   with that.

13     Q.    Do you believe it's improper to suggest a

14   business relationship when the respondent might

15   previously have no thought on such a connection?

16     A.    I agree with that.

17     Q.    And did you follow those principals, in your

18   view --

19     A.    I believe I did, yes.

20     Q.    --  in this study?

21     A.    Yes, I did.

22     Q.    So you believe that your Question 6, where you

23   ask, "Is this Web site endorsed by any government

24   agency," is not a leading question?

25     A.    Again, Question 6 follows Question 5 where they



EXHIBIT _A_
PAGE _18_

**8/16/2007 Maronick, Thomas**

1    were asked, first of all, what government agency.  So by

2    getting -- if a respondent says that it is the

3    Department of Motor Vehicles, then they were likely in

4    that question to say, "Yes, it was."

5            And so I don't believe it's leading because

6    you're really focusing on responses after the open-ended

7    questions.

8        Q.   So you don't believe Question 6 is a leading

9    question?

10       A.   No.  Again, because it follows Question 5.

11   It's what's called a "funneling approach," and I don't

12   believe it's a lead-in question at all.

13       Q.   Funneling.  Now, regardless of what answer

14   someone gives to 5, they're still going to answer 6;

15   correct?

16       A.   That's correct.

17       Q.   So there is no screening out of people from 5

18   to 6; correct?

19       A.   That's correct.

20       Q.   So does the word -- does the funneling concept

21   really apply in that case?

22       A.   Yes, it does.

23       Q.   Are you familiar with the concept of "demand

24   effects" --

25       A.   Yes.

EXHIBIT A
PAGE 19

1    Question 7.

2       Q.  As far as I could tell, this is the only point

3    in the survey where there are two questions on one page;

4    is that correct?

5          MR. MAKOUS:  You mean Survey 3, Counsel?

6          MR. DAUCHER:  Yeah.  Survey 3.

7          THE WITNESS:  In both -- I think the same is

8    true with 8 and 9.

9    BY MR. DAUCHER:

10      Q.  Similar type of situation, what government

11    agency?

12      A.  That's correct.

13      Q.  Why did you put them together?

14      A.  It just seemed to me that was the most

15    realistic way for someone to say -- if they're thinking

16    about is this endorsed by a government agency, for them

17    to know I'm going to ask them which one.  It makes it

18    more likely for them to think about it.

19      Q.  So you do want them to be thinking about

20    Question 7 while they are answering Question 6; correct?

21      A.  I'm sorry.  I want them to do what?

22      Q.  You want them to be thinking about Question 7

23    while they're answering Question 6.  That's what you

24    just said.

25      A.  Question 6 is, "Is it" -- I want them to be

EXHIBIT A
PAGE 20

1  thinking about question -- Question 6, "Is this endorsed

2  by a government agency?"  I want them to be thinking

3  about that.

4      Q.   No, sir.  My question was you want them to be

5  thinking about Question 7 while they're answering

6  Question 6.  Isn't that true?

7      A.   No.  I want them to be thinking about the Web

8  site.  The Question 6 asks a very straightforward

9  question, "Is this Web site endorsed by a government

10  agency?"  That's a discrete question.

11          And then knowing that if they say "yes," or

12  when they say "yes" to that, they're going to be asked

13  what government agency.

14      Q.   When they say "yes"; right?

15      A.   That's correct.  If they say "yes."  If they

16  say "yes," not when.  If they say "yes."

17      Q.   Will you look at page 10 of Dr. Simonson's

18  report, paragraph 24.

19      A.   Yes.

20      Q.   He cautions, "Accordingly," in the second

21  sentence, "it is a standard survey procedure to

22  explicitly instruct respondents not to guess, and such

23  an instruction decreases, though does not eliminate, the

24  tendency to guess."

25          Do you agree with those general principals?

EXHIBIT A
PAGE 21

1      A.    It depends on the nature of the survey.

2      Q.    You gave no such instruction in this case;

3    correct?

4      A.    Again, because of the nature of the survey.

5      Q.    Just yes or no.

6      A.    No.  I did not give it because of the nature of

7    the survey.

8      Q.    So you think in some surveys it's not a

9    standard procedure to explicitly instruct respondents

10   not to guess as to the answer?

11     A.    That's correct.

12     Q.    Now, in this survey you thought that procedure

13   would be inappropriate?

14     A.    I thought it was unnecessary because of the

15   nature of the study, which is a perception study.  This

16   isn't -- you normally would ask -- tell a respondent not

17   to guess if you're asking factual questions from an ad.

18   Here I'm asking simply for their perceptions of what

19   they see or take away from the -- in this case either

20   the Web page or the Internet link.  So I don't believe

21   it's appropriate or necessary to say -- to tell them not

22   to guess.

23     Q.    This Question 6 -- isn't that a factual

24   question, "Is this Web site endorsed by any government

25   agency?"



EXHIBIT A
PAGE 22

1       A.    That's correct.

2       Q.    Did you write an article entitled "Advertising

3    Research Issues from FTC versus Stouffer Foods

4    Corporation"?

5       A.    Yes, I did.

6       Q.    I'll show you a document which we'll have

7    marked for identification as 143.

8             (Exhibit 143 was marked for

9             identification by the reporter and is

10            attached herewith.)

11   BY MR. DAUCHER:

12      Q.    Sir, can you confirm for me that 143 is a

13   correct copy of the article I referenced, "Advertising

14   Research Issues from FTC versus Stouffer Foods

15   Corporation"?

16      A.    Yes.

17      Q.    And it lists you as an author.  So you were an

18   author of this article; correct?

19      A.    That's correct, yes.

20      Q.    It was published in 1995.  Have survey

21   standards changed dramatically since then?

22            MR. MAKOUS:  Objection.  Vague as to

23   "dramatically."  Argumentative.

24            THE WITNESS:  Have research issues changed?

25   Research methodologies have changed because of the



EXHIBIT A
PAGE 23

1    advent of the Internet, which was not predominant in

2    1995.

3    BY MR. DAUCHER:

4        Q.   In terms of the conclusions of the article,

5    though, have any of these conclusions been, to your

6    knowledge, discredited since the time of the publication

7    of this article?

8        A.   I don't recall what the conclusions were.

9        Q.   Well, will you look to page 302 of the article,

10   which is the second page of this exhibit, in the

11   right-hand column, it says:   "General Standards for FTC

12   Advertising Copy Tests."

13       A.   Yes.

14       Q.   It says, "The standard the Commission uses in

15   evaluating advertising claims is the," quote, "'overall

16   net impression made by the ad,'" unquote.

17           Do you see that?

18       A.   Yes.

19       Q.   Do you agree with that?

20       A.   Yes.

21       Q.   And do you agree that in the context of a false

22   advertising case, that that is the proper standard to be

23   applied?

24       A.   The overall net impression, yes.

25       Q.   On page 303, under "Design Issues," the first



EXHIBIT A
PAGE 24

**8/16/2007 Maronick, Thomas**

1    sentence says, "One study design issue, receiving

2    perhaps the most recent attention by the FTC, is that of

3    the appropriate controls," in italics, "to use to

4    enhance the validity of the results."

5            You wrote that?

6      A.   Yes.

7      Q.   You wrote, "The use of a control ad group, e.g.

8    respondents who see a control rather than a test ad, may

9    help to ensure that responses to the challenged ad

10   claims are not due to factors other than the challenged

11   ad claims in question."

12           Do you agree with that statement?

13     A.   Correct.

14     Q.   You wrote that; correct?

15     A.   Yes.

16     Q.   "In addition, certain copy test questions may

17   prompt biasing, such as a yea-saying response."

18           Do you see that sentence?

19     A.   Yes.

20     Q.   What is a "yea-saying response"?

21     A.   A tendency for respondents to say yes.

22     Q.   Isn't it true that Question 6 that we were

23   looking at is a yea-saying question?

24     A.   I don't think that at all.

25     Q.   Isn't it true that you could have written


EXHIBIT A
PAGE 25

8/16/2007 Maronick, Thomas

1   responses are tabulated, but I was able to go through

2   and see if there were any problems with it with the

3   different skip patterns. I also had made it possible

4   for counsel to look at it to see if they saw any

5   problems with it. Again, not to change content, but

6   just to make sure the procedures are correct.

7       Q.   And you would agree, based on your writing,

8   that leading questions would be a problem in a survey;

9   correct?

10      A.   That's correct.

11      Q.   But your contention is that this survey does

12  not contain leading questions? Survey 3?

13      A.   That's correct. As I said numerous times now,

14  because of two things. Number one, it follows

15  Question 5, which is an open-ended question. And

16  Question 6 simply asks a very straightforward -- six --

17  yes -- "Is it endorsed by a government agency," with the

18  option of them saying "no" or "don't know."

19      Q.   And you also wrote in the final paragraph,

20  above "Experience Counts," on page 303, that it is -- or

21  quoted the ALJ that, "It is not appropriate to start a

22  copy test with closed-ended questions"; correct?

23      A.   Yes. And that's why my study started with the

24  open-ended question.

25      Q.   In your opinion.

EXHIBIT A
PAGE 26

1              MR. MAKOUS:  Objection.  Multiple questions

2      again.  Compound.

3              THE WITNESS:  I can't say.

4      BY MR. DAUCHER:

5         Q.   And let's say that a user could theoretically

6      still write an answer for 7 even if they put "no" or

7      "not sure" for 6.  Okay?

8              Now, in that case, it's also true that a user

9      could go back and change their answer to 6 -- correct --

10     before hitting the "Submit" button?

11             MR. MAKOUS:  Okay.  Wait, wait, wait.

12     Objection.  That's six questions.

13             Dr. Maronick, have counsel ask you one question

14     and answer it.  Stop with this colloquy, both of you.

15     This is vague and ambiguous.  You can't answer all six

16     of the questions that are posed there in your answer.

17             So I ask counsel to withdraw the question --

18             MR. DAUCHER:  I do not.

19             MR. MAKOUS:  -- and ask one question.

20             MR. DAUCHER:  It's very clear on the record.

21             MR. MAKOUS:  It is not clear at all.

22     BY MR. DAUCHER:

23        Q.   Do you understand the question?

24        A.   No.  I don't understand the question.

25        Q.   Okay.  I'm asking you to assume a couple of



EXHIBIT   A
PAGE  27