8/16/2007  Maronick, Thomas

```
1    things.  One is that the respondent says "no" or "not
2    sure" to 6.  Okay?
3            Do you understand that?
4       A.   Yes.
5       Q.   The second is that they then typed some sort of
6    answer to what government agency, Question 7.  Okay?
7    Assume that.
8       A.   Yes.
9       Q.   The -- now, my question is isn't it true that
10   after having typed something to 7, the respondent could
11   go back and change their answer to 6?
12      A.   I believe it -- yes.  It's possible that they
13   could do that.
14      Q.   And you have no way of tracking that in your
15   data; correct?
16      A.   Whether they changed their answer?
17      Q.   That's right.
18      A.   No, I do not.
19      Q.   Do you know if, in terms of generating reports
20   on the -- on Question 7, you had the option to print a
21   report solely related to those folks who had said "yes"
22   to Question 6?
23      A.   No.  I could not do that.  I mean, I could
24   manually.  And actually, I did.  It's in here.  I
25   manually went -- looked at those answers.  As a matter
```

EXHIBIT A
PAGE 28

8/16/2007 Maronick, Thomas

1  Q.  Now, I see this as a five-page report with 172
2  responses.  Do you agree?
3  A.  Yes.
4  Q.  So does that change your opinion that, as,
5  number 1, whether a person who answered something other
6  than "yes" to Question 6 could type a response to
7  Question 7?
8  A.  Apparently, they could.
9  Q.  And does that refresh your recollection then
10 that you, in fact, took no steps to preclude that from
11 happening?
12 A.  Yes.  I did take steps to preclude it.
13 Apparently, I overlooked this one.  I missed this one.
14 Q.  And the same with respect to Question 9, which
15 is the same, "What government agency," question.  And
16 Question 9 we see, I think, 167 responses --
17 A.  Yes.
18 Q.  -- to that question?
19 A.  Yes.
20 Q.  And that's -- you would agree that's greater
21 than the number of people that answered "yes" to
22 Question 8?
23 A.  Yes.  Apparently, I just -- that this is what's
24 called "skip patterns" were either -- were -- didn't --
25 weren't effective.  But, yes, that's correct.  They all

EXHIBIT A
PAGE 29

8/16/2007 Maronick, Thomas

```
 1   answered that question.
 2        Q.   Was there anything in the way the Zoomerang
 3   survey operates that would preclude a respondent, after
 4   they had submitted one page of answers, from going back
 5   to that prior page?
 6        A.   I'm sorry.  Were they precluded from going
 7   back?
 8        Q.   Right.
 9        A.   Yes.
10        Q.   So if you had separated 6 and 7 into different
11   pages, then a respondent -- even if they saw Question 7,
12   they would not have been able to go back and change
13   Question 6; correct?
14        A.   That's correct.
15        Q.   But the way you set it up, with both questions
16   on the same page, that safeguard was not in place;
17   correct?
18        A.   That's correct.
19        Q.   If you would refer back to Exhibit 143 for a
20   moment, the article?
21        A.   Yes.
22        Q.   Turning now to page 305, on the left-hand
23   column, there's a subsection entitled, "The Nature of
24   Controls."
25             Do you see that?
```


EXHIBIT A
PAGE 30

8/16/2007  Maronick, Thomas

```
1     A.   Yes.
2     Q.   It says, "In any study, it is important to have
3  the ability to control the situation in which the study
4  is being conducted so as to eliminate the role of
5  extraneous forces and competing explanations."
6          Do you see that?
7     A.   Yes.
8     Q.   You wrote that; correct?
9     A.   Yes.
10    Q.   That's not qualified by any statement that in a
11 perception study a control is unnecessary; correct?
12    A.   As I wrote it then, that was my view.
13    Q.   And your view has changed now?
14    A.   Yes.  I think, as I said in earlier testimony,
15 that it really depends on the nature of the -- the
16 study.  And I think if you read more in here --
17    Q.   Well, let's read some more.  In the same
18 paragraph, after the parenthetical to Cohen, you wrote,
19 "The control ad group" -- and what does that mean, "the
20 control ad group"?
21    A.   I'm sorry.  Where are you?
22    Q.   Same paragraph, under the heading, "The Nature
23 of Controls," about halfway down that paragraph, after
24 the parenthetical.
25    A.   Yes.  Yes.  Okay.
```



8/16/2007 Maronick, Thomas

1  Q. It says "the control ad group." Can you --
2  A. Yes.
3  Q. Just so we're all clear, can you tell us what
4  that means?
5  A. That would be a group that would see the
6  control ad, as opposed to seeing the test ad.
7  Q. The test ad would be what a layman might call
8  "the real thing"?
9  A. What's -- "the real thing," the ad that --
10 Q. That you want to test.
11 A. That's correct, yes.
12 Q. And the control is the advertisement that you
13 used to filter out other explanations; correct?
14 A. That's correct.
15 Q. All right. It says, "The control ad group, to
16 which respondents are randomly assigned, receives a
17 control ad with as few differences from the challenged
18 test ad as possible -- with the exception of a
19 challenged claim"; correct?
20 A. That's correct.
21 Q. And that is the primary accepted method of
22 constructing a control, is it not?
23 A. If you can do it. As I said in -- earlier this
24 morning, you can't always do that.
25    And one of the critical things -- go back to

EXHIBIT A
PAGE 32

8/16/2007 Maronick, Thomas

1    one of the things you noted in Simonson, it has to be, I
2    think, the proper -- the word was a "proper" control.
3    It has to be possible to have a control. And as I said,
4    it isn't -- it isn't always possible to have a control
5    at all because it may not be appropriate or proper for
6    the subject being studied.
7        Q.   And you concluded in this case that we're here
8    today about that that was not possible to conduct a --
9    construct a control?
10       A.   That met the test of being a proper control
11   and -- and equivalent to the test ad, or in this case,
12   test Web page. The critical term there is "proper and
13   equivalent."
14       Q.   You wrote -- well, you quoted an argument made
15   by Stouffer, which I take it was the respondent to an
16   FTC claim; is that correct?  That Stouffer was a
17   respondent?
18       A.   Yes.
19       Q.   You wrote, "Stouffer argued that the FTC has
20   made abundantly clear that a control ad is required to
21   be used for both open-ended --
22       A.   I'm sorry.  I'm sorry.  Where are you?
23       Q.   Under "Control Ad Groups and Open-Ended
24   Questions."
25       A.   Okay.

EXHIBIT A
PAGE 33

8/16/2007 Maronick, Thomas

```
 1   nothing requiring a control ad for open-ended questions;
 2   correct?
 3        A.   That's correct.
 4        Q.   However, you concluded this paragraph with this
 5   statement, "However, it is noteworthy that this
 6   standard, namely, that a control ad is not necessary, is
 7   likely to be inconsistent with certain --
 8        A.   Wait, wait, wait.  Where are you now?
 9        Q.   The last sentence on this page?
10        A.   Okay.
11        Q.   Let me start over.
12        A.   I'm with you.  Okay.
13        Q.   You ended this section with the statement,
14   "However, it is noteworthy that this standard, namely,
15   that a control ad is not necessary, is likely to be
16   inconsistent with certain Lanham Act cases involving
17   exploiting misleadingness, in which the court has said
18   that," quote, "'a control mechanism would likely be,'"
19   quote, "'indispensable,'" unquote; correct?
20        A.   Yes.
21        Q.   You were aware of that authority when you
22   constructed your survey; correct?
23        A.   That's correct.  And you might just -- and you
24   might also go on in the next page, on page 306, is where
25   I identify some of the problems with having a control.
```

EXHIBIT A
PAGE 34

11/8/2007 7:19 AM 75

8/16/2007 Maronick, Thomas

```
 1        Q.   So in your -- you're aware that Hollander
 2   created a control for his survey; correct?
 3        A.   Yes, I am.
 4        Q.   And you know exactly what he did to establish
 5   that control, namely, substituting Car.org for DMV.org
 6   everywhere it appeared?
 7        A.   Yes.
 8        Q.   Correct?
 9        A.   Yes.
10        Q.   And that doesn't meet your test of a proper
11   control?
12        A.   No, it does not.
13        Q.   And why not?
14        A.   Because it's neither -- it's not equivalent.  I
15   mean, it's not -- it -- again, remember, the target
16   market for online traffic schools is people who would
17   consider going to those.  So it had to be something that
18   is somehow related to traffic schools or online traffic
19   schools.  And I don't believe that car- -- or Cars.org
20   is something that a consumer, if they were looking for
21   an online traffic school, would think, "Gee, that's the
22   Web site," or the Internet link that they would use to
23   go to find a traffic school.  So I don't believe it's
24   appropriate or equivalent at all.
25        Q.   If it's not an appropriate control, then the
```



EXHIBIT A
PAGE 35

8/16/2007  Maronick, Thomas

1  procedures that led to those results.
2  BY MR. DAUCHER:
3  Q.  Well, he did remove the potentially misleading
4  claim from the control group; correct?
5  A.  He substituted Car.org for the DMV.org, yes.
6  Q.  And thereby removed the potentially misleading
7  claim?
8  A.  He substituted Car.org for that, yes.
9  Q.  Now, you wrote on this page 306, in the first
10  full paragraph, on the second column --
11      MR. MAKOUS:  Page 306?
12      MR. DAUCHER:  Yes.
13      THE WITNESS:  Okay.
14  BY MR. DAUCHER:
15  Q.  That -- for example, the first approach in
16  that refers to purging the misleading claim; correct?
17  A.  Yes.
18  Q.  You wrote that, "The first approach, using the
19  purged or cleansed ad control, may be the best choice
20  when the control ad is virtually identical to the
21  challenged or test ad, with the exception that the
22  challenged claim is excised"; correct?
23  A.  Yes.
24  Q.  Isn't that exactly what Hollander did in this
25  case?


EXHIBIT A
PAGE 36

8/16/2007 Maronick, Thomas

```
 1       A.   No.  I don't believe so.  He substituted
 2  something else that, in my judgment, is likely to
 3  confuse consumers, make -- as I said more than once this
 4  morning, in my judgment, it doesn't meet the test of a
 5  proper control.
 6       Q.   Because consumers looking at a Car.org control
 7  are also going to draw an affiliation to the government
 8  in your view?
 9       A.   I don't know what they're going to do.
10            MR. MAKOUS:  Let's take a break, Counsel.
11            MR. DAUCHER:  There's a question pending.
12            MR. MAKOUS:  We've been going two hours.
13            MR. DAUCHER:  Let him finish the question
14  then.
15            MR. MAKOUS:  All right.  Let me just hear the
16  question back.
17            (The record was read.)
18            THE WITNESS:  I don't believe they are.  As a
19  matter of fact, I don't -- I can't imagine that they're
20  going to be making any kind of an affiliation to -- to
21  any government agency.
22  BY MR. DAUCHER:
23       Q.   Let me -- just one follow-up, please.
24            Wouldn't then that indicate that the use of
25  Car.org would be an effective control in this case
```



8/16/2007  Maronick, Thomas

```
 1    because there's no possibility in your view of an
 2    affiliation?
 3              MR. MAKOUS:  Objection.  Asked and answered.
 4              THE WITNESS:  As I said, I don't believe
 5    it's -- it's an appropriate control because it's -- it's
 6    not in any way related to traffic schools or online
 7    traffic schools.  So I don't believe that -- that the
 8    respondents would -- that would have any effect on them.
 9              MR. DAUCHER:  Okay.  We'll take a break.
10              MR. MAKOUS:  Thank you.
11              (A break was taken.)
12              MR. DAUCHER:  Okay.  Let's go back on the
13    record.
14    BY MR. DAUCHER:
15         Q.   So if you refer to 144, the expert report, on
16    page 3, you -- under "Scope of Engagement," the first
17    sentence, it says you were retained by Lewis, Brisbois,
18    attorneys representing plaintiffs, to provide expert
19    opinions on consumers' perceptions of the ownership
20    and/or sponsorship of an Internet address/link to the
21    DMV.org Web site and the Web site belonging to DMV.org.
22              That's the scope of your assignment as you
23    understood it; correct?
24         A.   That's correct.
25         Q.   You indicated, in your discussion with
```


EXHIBIT A
PAGE 38

8/16/2007 Maronick, Thomas

```
 1    Mr. Creditor, that he advised you that their target
 2    market was 18 to 50 years old; correct?
 3         A.   That's correct.
 4         Q.   But the study that you conducted was 18 to 60;
 5    is that correct?
 6         A.   That's correct.
 7         Q.   So why did you not try to conform the study to
 8    the information you received from Mr. Creditor?
 9         A.   As I recall, in the discussion I said -- you
10    know, I think he said that -- he didn't say this is
11    their only target market.  He said, "Most of our
12    customers are within this range."  So I just made it a
13    little bit broader.
14         Q.   And with respect to the studies that you did,
15    you studied the traffic school results, but you made no
16    efforts to study drivers ed result -- education results;
17    correct?
18         A.   That's correct.
19         Q.   You were -- did you ever have any discussion
20    about doing a companion study on drivers education?
21         A.   There was some initial discussion about that,
22    but then it was a time issue.  So they said because of
23    the timing, we could only focus on one.
24         Q.   And you gave no -- you give no opinion in this
25    case as to drivers education; correct?
```



EXHIBIT A
PAGE 39

8/16/2007 Maronick, Thomas

1   A.   That's correct.

2   Q.   On page 5, at the bottom, the last sentence
3   there says, "Those who were qualified, i.e. answered
4   affirmatively to the screening questions, were then
5   asked a series of closed-end and open-end questions
6   related to different aspects of the issues studied."
7        You wrote that; correct?
8   A.   Yes.
9   Q.   And that's an accurate description of what you
10  did; correct?
11  A.   That's correct.
12  Q.   Okay. With respect to Study 2, the Google
13  result study, can we refer to it that way?
14  A.   That's fine.
15  Q.   You showed them -- after qualifying them, you
16  showed them a Google result. And then you focused their
17  attention on the DMV.org result; correct?
18  A.   That's correct. I showed them a page of
19  results from Google and then focused on that one
20  Internet link.
21  Q.   And then you described the next question as,
22  quote, "They were then asked" -- and I'm on page 7,
23  going over to page 8 -- "They were then asked, with an
24  open-end question," comma, "whose Web site the link
25  directs them to."



8/16/2007  Maronick, Thomas

```
 1    know" according to your report here on page 8 of the
 2    declaration?
 3              MR. MAKOUS:  Put it together.  Right.
 4              THE WITNESS:  What number?  Yes.  Okay.  That's
 5    fine.
 6              I'm sorry.  Where are you now?
 7    BY MR. DAUCHER:
 8         Q.   On --
 9         A.   Yes.  That's correct.
10         Q.   Okay.  Isn't that a low number, based on your
11    experience, for a "don't know" response?
12              MR. MAKOUS:  Objection.  Argumentative.
13              THE WITNESS:  It really is a function of the
14    claim that's being made and the consumers' perception of
15    it.  If I were to ask someone a brand name -- like, I
16    would say to them, "Here's a box of cereal," and it's
17    got Cheerios on it, and I ask them what brand it is, I
18    would get virtually none saying it.  So it really --
19              MR. MAKOUS:  None saying what?
20              THE WITNESS:  I don't know.
21              MR. MAKOUS:  Okay.
22              THE WITNESS:  So it really is a function of the
23    claim that's made.
24    BY MR. DAUCHER:
25         Q.   You didn't tell people not to guess; correct?
```


EXHIBIT A
PAGE 41

1    A.   That's correct.

2    Q.   And you didn't give them the affirmative choice
3    of "not sure"?

4    A.   Again, I said to them that -- I asked for
5    their perceptions.  And their perceptions was for -- for
6    57 percent of them -- that they answered the question,
7    "Whose Web site it links" -- "directs them
8    to," 57 percent on an unaided basis said the
9    "Department of Motor Vehicles."  And as you've noted,
10   a few said "California Department of Motor Vehicles."
11   And some -- many said "DMV."

12   Q.   In reporting your answers for Study 2, you
13   never broke out "California" results, specific
14   "California" results, from general "DMV" or "Department
15   of Motor Vehicle" results; correct?

16   A.   That's correct.  I didn't see a need to do
17   that.

18   Q.   All the respondents were Californians, though?

19   A.   That's correct.

20   Q.   Now, on Study 2, Question 6 and 7, "Is this
21   Web site link endorsed by any government agency," and
22   then the familiar question, "What government agency,"
23   for 7.

24   A.   Yes.

25   Q.   Are those questions appearing on the same page

8/16/2007  Maronick, Thomas

```
 1      again?
 2             MR. MAKOUS:  Make sure we're on the right thing
 3      here.  Let's try to get the right document in front of
 4      witness here so we're -- the trouble is not the
 5      defendants' fault because we don't have exhibit tabs in
 6      the photocopies here and it's hard to locate these tabs.
 7             THE WITNESS:  And it's --
 8             MR. MAKOUS:  What would you like?
 9             THE WITNESS:  Study 2.  You're asking about
10      Study 2?
11      BY MR. DAUCHER:
12         Q.  Yes.
13             MR. MAKOUS:  What I'm placing before the
14      witness is Study 2, working copy.
15             THE WITNESS:  Yes.
16      BY MR. DAUCHER:
17         Q.  And so the same answers would apply that we
18      discussed with Study 3, namely, that first of all,
19      somebody looking at Question 6 sees Question 7 at the
20      same time; correct?
21         A.  That is correct.
22         Q.  Nothing prohibits someone who answers
23      Question 6 "no" or "not sure" from responding to
24      Question 7?
25         A.  I don't recall whether it -- they -- they
```


EXHIBIT A
PAGE 43

8/16/2007  Maronick, Thomas

```
 1    unusual.
 2        Q.   The only questions that you did that with in
 3    Study 2 were Questions 6 and 7 and 8 and 9; correct?
 4        A.   That's correct.
 5        Q.   And the only questions you did that with on
 6    Study 3 were Questions 6 and 7 and 8 and 9; correct?
 7        A.   That's correct.
 8        Q.   And it's your opinion, with respect to all
 9    those, that that did not prime an answer to the first
10    question in each sequence?
11        A.   No.  I don't believe it did.
12        Q.   And it's your opinion that that did not bias
13    the answers to the first questions?
14        A.   No.  Quite the contrary.  I think it -- it --
15    no.  It didn't bias them, but it made them think about
16    it and provide a realistic answer because they knew that
17    in answering 6 -- take that 6 and 7 sequence, that "Yes,
18    and now I've got to think what government agency I think
19    this relates to."
20             And, again, if I can continue, they also had
21    the -- the Internet link before them when they made that
22    decision, when they answered that question.
23        Q.   So in this case, you actually conducted what's
24    known as a reading test; correct?
25             MR. MAKOUS:  Objection.  Which case?
```


EXHIBIT A
PAGE 44

```
 1              MR. DAUCHER:  With respect to the Google test
 2   result.
 3              THE WITNESS:  It's a -- it's a perception
 4   study.
 5   BY MR. DAUCHER:
 6        Q.   Do you understand what I mean by "reading
 7   test"?
 8        A.   Yes.
 9        Q.   What's your understanding of that?
10        A.   When you ask a question, that you can refer to
11   information in the ad.
12        Q.   So in other words, a stimuli is before the
13   respondent when they're asking the question?
14        A.   That's correct.
15        Q.   And not taken away?
16        A.   That's correct.
17        Q.   When it's taken away, it's called a "memory
18   test"?
19        A.   Or a "perception study."  I mean, it's -- it
20   can be a memory study.  But in this case, the intent
21   behind it was to give them this information.  It's
22   clearly not a lot of information for them to go back and
23   look at.  The information is very discrete.  It's simply
24   the Web link.
25        Q.   Why, with respect to Study 2, did you leave the
```

EXHIBIT A
PAGE 45

8/16/2007 Maronick, Thomas

```
 1   stimuli before the viewer, but not in Study 3?
 2        A.   Because Study 3, I think, was -- it would have
 3   made it a memory test.
 4        Q.   To leave the --
 5        A.   No -- I'm sorry.  I'm sorry -- it would have
 6   made it -- would made it -- to have -- would have made
 7   it into simply a reading -- reading test.
 8        Q.   Are you familiar with the authority that's been
 9   published in Trademark Reporter about reading and memory
10   tests?
11             MR. MAKOUS:  Objection.  Overbroad.
12   BY MR. DAUCHER:
13        Q.   Let me lay some foundation.
14             Do you know what the Trademark Reporter is as a
15   journal?
16        A.   Yes.
17        Q.   Do you subscribe to it?
18        A.   No.
19        Q.   Have you read the articles in there related to
20   reading and memory tests published in the last year?
21        A.   No, I have not.
22        Q.   When, in your view, is it appropriate to do a
23   reading test versus a memory test?
24        A.   I don't believe it's ever appropriate to do a
25   reading test.  I think it should always be a memory test
```


EXHIBIT A
PAGE 46

8/16/2007  Maronick, Thomas

```
 1    where the stimuli is taken away, at least in the
 2    first -- if you want someone to look for a specific
 3    aspect of a claim, that's certainly appropriate on a
 4    second exposure to have a reading test.  But the first
 5    test, it should be without the stimuli present.
 6         Q.   But in Study 2 the stimuli is present.  So you
 7    do conduct a reading test in Study 2?
 8         A.   Again, because of the nature of the stimuli,
 9    which is simply a straightforward Internet link, it
10    doesn't have -- it doesn't make any express or implied
11    claims other than here is a link coming right off of a
12    Google search page.  It simply makes that statement.
13         Q.   Didn't you just testify that a reading test was
14    never appropriate in your view?
15         A.   I said that it's -- there are times when you
16    would do -- when what you want them to do is look at the
17    stimuli and react to it.  And that's what I had them do
18    in Study 2.
19         Q.   Isn't it true, in the context of surveys, that
20    a reading test is generally more appropriate with a
21    higher involvement decision?
22              MR. MAKOUS:  Objection.  Vague.  Lacks
23    foundation.
24              THE WITNESS:  No.  I don't believe that -- that
25    a reading test, if -- even if it's a high involvement
```



EXHIBIT A
PAGE 47