1    decision, that the appropriate methodology would be a

2    reading test.  But, again, it really depends on the

3    nature of the stimuli, what kind of information is in

4    the stimuli that you are attempting to obtain from

5    consumers' perceptions are.

6    BY MR. DAUCHER:

7        Q.   Just so the record's clear, you understand what

8    I meant by "high involvement decision"; correct?

9        A.   Yes.

10       Q.   Can you basically describe that for me?

11       A.   It's a decision that usually involves

12   substantial amount of money and/or substantial amount of

13   some kind of risk, whether it be physical risk or social

14   risk or something else.  So the respondent is likely to

15   take more time in making and evaluating it and

16   responding to it.

17       Q.   So you would say that most Internet activity by

18   consumers is not high involvement under that definition?

19       A.   At the search stage, no, it's not.

20       Q.   Would you -- what about in viewing the DMV.org

21   site?  Was your assumption that that process for a

22   visitor would be a high involvement or low involvement

23   process?

24       A.   In my judgement it's a low involvement.

25       Q.   Let me show you a document, which we'll have


EXHIBIT A
PAGE 48

1          MR. DAUCHER:   That's correct.

2     BY MR. DAUCHER:

3          Q.   Did you inquire -- is it your view that that's

4     a casual decision?

5          MR. MAKOUS:   What?   Objection.   Overbroad.

6     Vague.

7     BY MR. DAUCHER:

8          Q.   The decision to purchase a certain online

9     traffic school's program?

10         A.   I don't know.

11         Q.   So you had no information about that when you

12    determined how to structure your study?

13         A.   No, I didn't.   But that's one of the reason --

14    because I didn't know, that's one of the reasons that in

15    my instructions to the respondents, when they saw the

16    page that the DMV.org -- the Web page in Study 3, I said

17    read -- you know, read it, take as much time as you need

18    to read so as to deal with the issue of that they're not

19    simply quickly glancing at it.   And I've directed them

20    to read it carefully.

21         Q.   So in making that instruction, your assumption

22    is that someone who really was involved in that process,

23    someone who had a traffic ticket, would take the time to

24    read it carefully; correct?

25         A.   That's correct, yes.



EXHIBIT A
PAGE 49

1    Q.    In this article on page 880, in the second

2    paragraph, in the second sentence of that paragraph, it

3    says, "A memory test, on the other hand, is

4    inappropriate to prove or disprove confusion under

5    circumstances where consumers exercise care in

6    purchasing decisions."

7          Do you see that?

8    A.    I do.

9    Q.    Do you disagree with that?

10   A.    As it relates to this study, yes.

11   Q.    So even though, in a context of traffic

12   schools, it's your view that consumers exercise care,

13   you still feel it's appropriate to conduct a memory

14   test?

15   A.    Because the purpose of this study was to get

16   their perceptions of this Web site and whose Web site it

17   was.  Again, the purpose of the first question was --

18   again, we're dealing with Study 3 -- is looking at this,

19   taking as much time as they want to take to do it, and

20   then simply to ask them based on that, "What is your

21   perception?"  I don't think that should be a memory

22   test.  I think that should be -- excuse me -- it should

23   be a memory test.  It shouldn't be a reading test.

24   Q.    You knew that if you conducted a reading test

25   in Study 3, that a visitor would be more likely to

EXHIBIT A
PAGE 50

1    notice the disclaimers; correct?

2         A.    Yes.   That's correct.

3         Q.    And so you didn't want to do a reading test,

4    did you?

5         A.    That's not the reason I didn't want to do it.

6    I wanted to do it because I was looking to measure

7    consumers' perceptions of the Web site, not to gather

8    any particular information.   And the way -- the only way

9    you can do a perception study, as opposed to a memory

10   study, is by taking the stimuli away.

11        Q.    You're drawing a distinction now between a

12   perception study and a memory study?

13        A.    They are really the same thing.   But, again,

14   what I was trying to get from them is really

15   perceptions, not what they remembered, but what was the

16   net impression that they drew, having looked at this Web

17   site.

18        Q.    And you were okay with doing a reading test as

19   to the Google search result; correct?

20        A.    That's correct.

21        Q.    And the reason is because you didn't see an

22   express disclaimer in the Google search result; correct?

23        A.    That's not the reason, no.   I simply -- I did

24   it simply because it provided basic information about a

25   Web site link or a Web link that didn't provide any kind


EXHIBIT A
PAGE 51

1   traffic school.  Secondly, on average they spend at

2   least two minutes looking at the Web site before making

3   a purchase decision.  Third, on average they see at

4   least five pages before making the purchase decision.

5          Now, with those assumptions in mind, would --

6   if those facts were true, would that alter your

7   understanding of the level of sophistication that a

8   consumer brings to this purchase decision?

9          MR. MAKOUS:  Same objections.  And irrelevant

10  also.

11         THE WITNESS:  No, it wouldn't.  And I think

12  that just because someone looks at multiple pages or

13  multiple Web sites doesn't necessarily make them, A,

14  sophisticated, or, B, make it a high-involvement

15  process.  Because it is a search process.  That's the

16  beauty of the Internet.

17  BY MR. DAUCHER:

18     Q.   And your view is that the Internet is a

19  low-involvement process?

20     A.   I can't say the Internet is a low-involvement

21  process.  It really depends on what the issue is, what

22  the consumers are focusing on, what kind of risks are

23  involved, what kind of moneys are involved.  All of

24  those are factors that come into the determination of

25  level of involvement.  It's not -- you can't make a

EXHIBIT A
PAGE 52

1    blanket statement as to the Internet being high- or

2    low-involvement.

3        Q.   But your working assumption in the context of

4    this case was high- or low-involvement?

5        A.   I didn't really have an assumption.  But the

6    intent behind it was, by asking the respondents to take

7    as much time as they needed to answer the questions,

8    that it's mimicking a high involvement, that they would

9    spend the time to look at it carefully.

10       Q.   Okay.  Now, we've talked about these questions

11   in Study 2 and 3 that are combined -- 6 and 7, 8 and

12   9 -- in each study?

13       A.   Yes.

14       Q.   Did you have any discussions with counsel about

15   the decision to combine those questions on the same

16   page?

17       A.   No, I did not.

18       Q.   Did you ever have a version of the study in

19   which those questions were separated?

20       A.   I don't believe so, no.

21       Q.   And those were the only questions, in any of

22   the four studies, that are combined into one page;

23   correct?

24       A.   To the best of my knowledge, yes.

25       Q.   Okay.  Now, turning for a moment to the last

EXHIBIT A
PAGE 53

1     study.  In this study, the fourth study, although
2     it's -- it's under Exhibit G to your declaration -- you
3     were seeking to determine what?
4          A.   I'm sorry.  What is your question?
5          Q.   What were you seeking to establish by this
6     study?
7          A.   Simply which factors, if any -- as indicated in
8     Question 2, which factors, if any, would be important to
9     a respondent in a decision as to which traffic school
10    course to use.
11         Q.   Now, in selecting these possible factors, what
12    information did you rely on?
13         A.   I didn't rely on anyone.  I just seemed to say,
14    "Here's some factors that seem to be possibilities or
15    factors that come into play."
16         Q.   So, basically, you thought of these yourself?
17         A.   That's correct, yes.
18         Q.   And did anyone else provide input to that
19    process?
20         A.   Not that I recall.
21         Q.   I take it you did run a version of Question 2
22    on this fourth study by counsel; correct?
23         A.   Yes, I did.
24         Q.   Were any changes made as a result of that
25    review?

EXHIBIT A
PAGE 54

1      A.    I don't believe so.  Unless, perhaps --

2    although, I probably corrected before -- the "offer

3    online programs," the fact that in one of the other

4    studies, I had put a hyphen in there.  But other than

5    that, I don't recall any changes being made.  And

6    certainly none by counsel.  No recommendation by

7    counsel.

8      Q.    And you provided a total of eight possible

9    answers to Question 2; correct?

10     A.    In Question 2 that's correct, yes, eight.  And

11   then Question 3, of course, is an open-ended, "Any other

12   factors in your decision?"

13     Q.    And why did you not just ask an open-ended

14   question for 2?

15          MR. MAKOUS:  Objection.  Vague.

16          THE WITNESS:  It -- it just seemed that -- that

17   it was the kind of thing that would lend itself more

18   easily to a closed-end question, a "select all that

19   apply" question, particularly since the question says,

20   "Which of the following, if any, would be important," so

21   that, in effect, they had the option of saying "none."

22          (Mr. Creditor leaves the proceedings.)

23   BY MR. DAUCHER:

24     Q.    But in response to each -- the way you set this

25   up, first of all, "recommended by DMV" was always



EXHIBIT A
PAGE 55

1    BY MR. DAUCHER:

2        Q.   That's the factor that you thought would help

3    the plaintiffs establish materiality in this case;

4    correct?

5        A.   To the extent that respondents said "yes," that

6    was important.  I believe it does establish -- or help

7    establish materiality.

8        Q.   Now, in setting up this study, you forced every

9    respondent to answer "yes," "no," or "don't know" to

10   each factor; correct?

11           MR. MAKOUS:  Objection.  "Forced" is

12   argumentative.

13           THE WITNESS:  I'm sorry.  By force them, I gave

14   them those three options.  I didn't force them to give

15   any answers because it wasn't mandatory.  They didn't

16   have to answer any of these because the question says,

17   "Which of the following, if any, would be important to

18   you?"  So a respondent wasn't forced to answer any of

19   them.  They could have simply skipped out of all of it

20   or said some are important or left some of them blank.

21   BY MR. DAUCHER:

22       Q.   Is it then coincidence that we have 374

23   responses to each of the eight questions?

24           MR. MAKOUS:  You mean each of the eight

25   categories?

EXHIBIT A
PAGE 56

1          MR. DAUCHER:  Yeah.  Each of the eight options.

2          THE WITNESS:  Is it coincidental?

3     BY MR. DAUCHER:

4          Q.   Yes.

5          A.   That simply says that the respondents consider

6     these factors to have some relevance to them.  And so

7     they were able -- so they felt appropriate to answer for

8     each of them.  They didn't all say "important" clearly.

9          Q.   And 374 correspond exactly to the number of

10    qualified respondents to Question 2; correct?

11              You should keep the results side by side.

12         A.   So 374 people answered that question "yes."

13         Q.   Answered Question 1 "yes."  And --

14         A.   That's correct.

15         Q.   And based upon that, were sent along to

16    Question 2?

17         A.   That's correct.

18         Q.   And if you didn't answer Question 1 "yes," then

19    you were not sent along to more questions?

20         A.   That's correct.

21         Q.   Okay.

22         A.   You were sent along to the -- you were sent

23    simply to the demographics.

24         Q.   Okay.  Now, do you know whether the DMV

25    approves online traffic schools in California?

EXHIBIT A
PAGE 57

1    A.    Very rarely I had one actually from California.

2    No.  They're not Californians.

3    Q.    Apart from asking those two questions, whether

4    they'd been to traffic school, and if so, how did they

5    locate that -- or how would they -- how would they go

6    about locating it?

7    A.    That's correct.

8    Q.    Did you ask them what factors would be

9    important to them in selecting a traffic school?

10   A.    No, I did not.

11   Q.    Why not?

12   A.    It wasn't -- when I was asking that question, I

13   wasn't focusing on study No. 4.  I was really focusing

14   on studies No. 2 and 3.

15   Q.    So -- okay.

16   A.    Just to get a better -- I'm trying to get a

17   better understanding of the mind-set of the

18   respondent -- of people who are in the -- at least

19   partially in the target market for traffic schools.

20   Q.    So this discussion with your class had nothing

21   to do with Survey 4?

22   A.    That's correct.

23   Q.    You've been a teacher for how long?

24   A.    A long time.

25   Q.    Ten years?


EXHIBIT A
PAGE 58

1      A.   Oh, no.   No.   About 30 years, 25 years.

2      Q.   You have a pretty good insight, I suspect, into

3  the mind-set of college-age students; correct?

4      A.   I'm not sure anybody has that, but certainly I

5  have had a lot of experience with college students.

6      Q.   Now, based upon that experience, wouldn't you

7  say that if I, a college student, faces a ticket, then

8  their goal is to get out of that ticket as cheaply and

9  quickly as possible?

10      A.   Typically, that would be the way that they

11  would do it.   You know, what -- you know, what's it

12  going to cost me?   How long until I can get it behind

13  me?

14      Q.   And so long as that -- if that involved traffic

15  school, isn't it true -- wouldn't it be reasonable to

16  say, with that mind-set in mind, that the only thing

17  they would care about, with respect to the state, was

18  whether the state would accept their having gone to a

19  particular program?

20           MR. MAKOUS:   Objection.   Speculative.   Lacks

21  foundation.

22           THE WITNESS:   I can't speculate what would be

23  the factors important to them.

24  BY MR. DAUCHER:

25      Q.   Beyond -- okay.   The words "recommended by the

EXHIBIT A
PAGE 59

1    DMV" -- what did you mean by that?

2        A.   Just the words themselves?

3        Q.   Well, did you mean to imply that that meant

4    that the DMV would accept that schoolwork as in

5    compliance with their traffic dismissal --

6            MR. MAKOUS:  Schoolwork?

7    BY MR. DAUCHER:

8        Q.   -- program.

9            MR. DAUCHER:  Can you let me finish my

10   question?

11           MR. MAKOUS:  Okay.  Sorry.  Schoolwork?

12           MR. DAUCHER:  Course work.  Schoolwork.

13           MR. MAKOUS:  What's schoolwork have to do with

14   traffic courses?

15           MR. DAUCHER:  You know what?  If you can let me

16   finish my question, we can get done.

17           MR. MAKOUS:  Go ahead.  Go ahead.  Go ahead.

18           MR. DAUCHER:  Then it's all over.

19           MR. MAKOUS:  I'll withdraw my comments.  Go

20   ahead.  I'm sorry.  Ask your question.

21   BY MR. DAUCHER:

22       Q.   In using the phrase "recommended by the DMV,"

23   did you mean to imply that the DMV would accept that

24   traffic school's course work in satisfaction of their

25   requirements?



EXHIBIT  A
PAGE  60

1        MR. MAKOUS:  Objection.  Irrelevant.

2    Speculative.  Lacks foundation.

3        THE WITNESS:  I don't recall having -- you

4    know, having spent any great deal of time thinking about

5    that.  It's just that the implication is that if this is

6    recommended by the DMV, then it would serve to remove

7    the points, or whatever.  That's the intent behind it.

8    BY MR. DAUCHER:

9        Q.   Yeah.  The primary point of "recommended by the

10   DMV" is to ensure that it would serve to remove the

11   points as you've said; correct?

12       A.   That would --

13            MR. MAKOUS:  Same objections.

14            THE WITNESS:  That's -- as I think about it

15   now, that's really the direction I was looking at.

16   BY MR. DAUCHER:

17       Q.   And it's also fair to say, isn't it, that if

18   there were two courses, both of which would serve to

19   remove the points, but one of which -- only one of which

20   was, quote, "recommended by the DMV," unquote, then that

21   additional incremental recommendation was not what you

22   were after in this survey?

23       A.   I'm sorry.  I don't understand what you were

24   just asking me.

25       Q.   You understand the concept that -- well, you

EXHIBIT A
PAGE 61

**8/16/2007 Maronick, Thomas**

1    reflects reality in perception studies."

2            And further down --

3        Q.    Wait.  Just stop right there.

4            So in a perception study that you conducted,

5    the reality is that respondents are guessing in your

6    view?

7            MR. MAKOUS:  Objection.  Mischaracterizes his

8    testimony.

9    BY MR. DAUCHER:

10       Q.    That's what you wrote, isn't it?

11       A.    No.  I didn't say that.  I said it reflects --

12    guessing reflects reality; that some respondents, some

13    people, when looking at an ad, they're looking at it and

14    they're making a judgment as to what they perceive from

15    it.

16            And they can say, "Yes.  This is what I know it

17    to believe or what I think it is."  That's why the

18    reality is that in a perception study, consumers are

19    going to -- some consumers may, in fact, guess.  But

20    that reflects the reality as they see it.

21       Q.    And you made no effort in your study to trim

22    out that subpart of responses, namely, those viewers who

23    were just guessing basically?

24       A.    No.  I wouldn't want to.  Because, quite

25    frankly, they are part of the market.  People whose --


EXHIBIT A
PAGE 60

1    if they guess that this is a particular Web site,

2    belongs to someone, then that is the reality as far as

3    they're concerned.  And their reactions -- and their

4    actions are going to be based on that.

5        Q.   Sometimes a guess can be induced by a question;

6    correct?

7             MR. MAKOUS:  Objection.  Overbroad.

8    BY MR. DAUCHER:

9        Q.   In the context of surveys; right?

10            MR. MAKOUS:  Vague.

11            THE WITNESS:  Yes, it can.

12   BY MR. DAUCHER:

13       Q.   And sometimes, when you ask a question that

14   induces a guess, what you're really doing is bringing up

15   a topic that the visitor has not contemplated; correct?

16            MR. MAKOUS:  Objection.  Overbroad.  Vague.

17   Incomplete hypothetical.

18            THE WITNESS:  Yes.  That's true.  And that's

19   one of the reasons why, when you're asking those kinds

20   of questions, you ask the screener question, like I did

21   in 6, for example, in one of the -- in both the studies,

22   Studies 2 and 3.

23            I'm asking whether, "Is this endorsed by a

24   government agency," in Question 6.  So I'm asking

25   whether that is something that they thought about, or

EXHIBIT A
PAGE 63

**8/16/2007  Maronick, Thomas**

1    A.    Relates to paragraph 49.

2    Q.    And now this covers Survey 3, to be clear?

3    A.    Yes.

4    Q.    Okay.

5    A.    His comment, "They were then presented with

6    part of the Web page, excluding pertinent disclaimers

7    that appear at the bottom of the page."  And then he

8    quotes what I said.

9          And my annotation is, quote, "Consumers don't

10   read footnote disclaimers.  Material below not related

11   to traffic schools."

12         And that was -- goes back to my experience at

13   the FTC and all the studies that I've done that

14   consumers simply don't read footnote disclaimers.

15   Q.    Now, when we go to pull the record in the

16   U-Haul case, are we going to find that U-Haul had some

17   footnote disclaimers?

18   A.    I don't believe so.  I don't recall.

19   Q.    You wouldn't have testified differently in the

20   U-Haul case than you would here about footnote

21   disclaimers; right?

22   A.    No, I wouldn't.

23   Q.    So based upon your view that consumers don't

24   read footnotes, you decided not to even put that before

25   the viewer of Survey 3; correct?



EXHIBIT  A
PAGE  64

1    A.    That wasn't the reason.  The reason that I did

2    it was for two reasons:  No. 1, there is a disclaimer on

3    the top of the page, on the DMV.org Web page, that they

4    viewed.  There was a disclaimer there.  And based on the

5    studies I have done and watching consumers, the material

6    after the traffic school dealt with other issues, such

7    as insurance and whatever.  And I believe they would

8    then -- that they'd see that, and they'd say, "Okay.

9    I'm going to make a decision and go forward."

10   Q.    Okay.  You built those assumptions into your

11   test.  That's all I want to know.

12   A.    That's correct, yes.

13   Q.    Okay.

14         MR. MAKOUS:  Counselor, can I take a bathroom

15   break real quick.

16         MR. DAUCHER:  Sure.

17         (A break was taken.)

18         (Mr. Creditor leaves the proceedings.)

19   BY MR. DAUCHER:

20   Q.    Okay.  So what's the comment we were -- the

21   next comment?

22   A.    Okay.  My comment -- my annotation is, first of

23   all, they don't read footnote disclaimers.

24         Secondly, DMV.org was on the first page of

25   the -- of Google.  This is it, I guess.  "Study 1,"

EXHIBIT A
PAGE 65

1       Q.    But you would agree that if what we are after

2    in this case is to determine who is misled into

3    purchasing a traffic school service online by the use of

4    the DMV.org domain name, your survey does not get at

5    that question; correct?

6       A.    No.   I don't agree at all.   Not at all.

7    Because in response to the open-ended question in both

8    studies -- in Question 5 in both Study 2 and Study 3,

9    57 percent of the people, when asked an unbiased,

10   open-ended question, "Whose Web site is this," their

11   response, unaided by anything I said to them or any cues

12   I gave them, was Department of Motor Vehicles.

13      Q.    But you just said that an Internet user who

14   has a traffic ticket -- remember him?  Got a ticket --

15   right -- is going to hunt around on a variety of sites

16   before making a decision; correct?

17      A.    They are likely to, yes.

18      Q.    And that may even mean visiting the DMV.org

19   path multiple times; correct?

20           MR. MAKOUS:  Objection.  Speculative.

21           THE WITNESS:  I don't know whether they would

22   do it more than one time.  They may -- they may not --

23   they may not -- again, I'm speculating.  I have no

24   idea -- but they may get -- have looked at some and get

25   to that site and say, "Gee, this is the one.   That is

EXHIBIT A
PAGE 66

**8/16/2007  Maronick, Thomas**

1   the Department of Motor Vehicles Web site.  So that's

2   the one I'm going to go with."

3          So depending on where they started, whether

4   they started with someone else and got to them or

5   whether they got to them, clearly based on Study 2 and,

6   more importantly, Study 3, 57 percent, substantial

7   majority of the respondents, said that it was the --

8   their perception was that that Web site was the

9   Department of Motor Vehicles.

10  BY MR. DAUCHER:

11      Q.   But you testified that when it comes down to

12  the point where they're going to make a decision,

13  they're going to be more careful; correct?

14      A.   Yes.

15      Q.   And your thesis is, though, based on the work

16  you've done, that that DMV.org name is likely to mislead

17  people into buying traffic school courses.  Is that -- I

18  mean, I don't see that conclusion in your survey

19  anywhere.  You've not given that opinion; correct?

20      A.   I'm not sure what you just asked me.

21      Q.   Okay.  Well --

22      A.   I'm sorry.

23      Q.   Your opinions are in your reports; so -- let me

24  ask you this way.

25          MR. MAKOUS:  Objection.



EXHIBIT A
PAGE 67

1  STATE OF CALIFORNIA        }
                             }  ss.
2  COUNTY OF LOS ANGELES      }

3

4          I, <u>Rafael Herrera</u> , hereby certify:

5          I am an employee of Barkley Court Reporters,

6  duly authorized agent for the deposition officer that

7  stenographically recorded the testimony in the foregoing

8  proceeding and authorized to execute this copy

9  certificate.

10          The foregoing is a true and correct copy of

11  the original transcript of the stated proceeding.

12

13  Dated   8/24/07   .

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A
PAGE 68

BARKLEY
Court Reporters