BRIAN M. DAUCHER, Cal. Bar No. 174212
ROBERT S. BEALL, Cal. Bar No. 132016
JOSEPH H. TADROS, Cal. Bar No. 239379
ASHLEY E. MERLO, Cal. Bar No. 247997
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1993
Telephone: (714) 513-5100
Facsimile: (714) 513-5130
bdaucher@sheppardmullin.com
jtadros@sheppardmullin.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAFFICSCHOOL.COM, INC., a California corporation; DRIVERS ED DIRECT, LLC., a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>EDRIVER, INC., ONLINE GURU, INC., FIND MY SPECIALIST, INC., and SERIOUSNET, INC., California corporations; RAVI K. LAHOTI, an individual; RAJ LAHOTI, an individual; DOES 1 through 10,<br><br>Defendants. | Case No. CV 06-7561 PA (CWx)<br><br>*The Hon. Percy Anderson*<br><br>**DEFENDANTS' COUNTER DESIGNATIONS TO PLAINTIFFS' DEPOSITION DESIGNATIONS OF EXPERTS HOLLANDER AND SIMONSON**<br><br>Complaint Filed: November 28, 2006<br>Trial: October 30, 2007 |

# DEFENDANTS' COUNTER DESIGNATIONS
# OF DEPOSITION TESTIMONY

Defendants hereby submit their counter designations to Plaintiffs' deposition testimony designations for experts Hollander and Simonson:

1. **DEPONENT: KENNETH HOLLANDER**

1.1. **Testimony offered by Plaintiffs**

(83:15 -- 84:6)

Page 83

15      Each respondent in all five states is presented
16   with the relevant state material to the state in which
17   they resided.
18      Q   So what was the point of having the US map up
19   there first?
20      A   Because that's the way everybody starts.
21      Q   Is it your belief that all of the traffic to the
22   DMV.ORG website comes through the United States home page
23   with a map?
24      A   No, sir, it is not.
25      Q   When you meant everybody starts that way,

Page 84

1   everybody in your survey starts that way, not everybody
2   in the real world, correct?
3      A   Yes, you are right. And it seemed to me that of
4   the many ways that one could navigate through these
5   various websites, that was not an unreasonable starting
6   place, so I selected it.Each respondent in all five states is presented

| | |
|---|---|
| 1 | with the relevant state material to the state in which |
| 2 | they resided. |
| 3 | |
| 4 | **AND (85: 4-14)** |
| 5 | Page 85 |
| 6 | 4   Q   Would it have been reasonable if you had been |
| 7 | 5   told that only one percent of the traffic comes in |
| 8 | 6   through that United States top page?  Would that still be |
| 9 | 7   a reasonable assumption on your part? |
| 10 | 8   A   Had I been told that, I have no idea what I |
| 11 | 9   would have done.  I didn't ask people to make a decision |
| 12 | 10   on the first page.  I asked them to make a series of |
| 13 | 11   decisions, series of judgments, to express a series of |
| 14 | 12   opinions after they had navigated, had been exposed to |
| 15 | 13   four separate pages, three of which had DMV.ORG on them, |
| 16 | 14   three of which had CAR.ORG on them. |
| 17 | |
| 18 | **AND (86: 7-15)** |
| 19 | Page 86 |
| 20 | 7   Q   Then you must have looked at some website, |
| 21 | 8   traffic information to determine the reliability of your |
| 22 | 9   assumption, correct? |
| 23 | 10   A   No, sir, I did not.  To repeat myself, I went |
| 24 | 11   where I started.  It was the United States map, then I |
| 25 | 12   clicked my way through as a resident of California and |
| 26 | 13   these were the screens that came up and they came up in |
| 27 | 14   that order and it made sense to me to use these four |
| 28 | |

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

15  screens.

**Counter-Designations by Defendants**

(84:7 -- 85:3)

Page 84

7   Q   Did Mr. Daucher or anybody give you information
8   that indicated the actual traffic to that website and how
9   it enters, the reality of that?
10   A   I believe that I was told that there are many
11   ways that people can get into that website and maneuver
12   through it and that there was no one set way.
13   Q   Who told you that?
14   A   I believe Mr. Daucher. I don't know who else
15   would tell me there are many ways through it. I selected
16   a -- I selected a series of screens that I thought would
17   be reasonably representative of the issues at hand that
18   would display the litigated issue as a reasonably prudent
19   respondent or consumer may see it when reasonably
20   browsing those websites. So those are my decisions. Is
21   that the only way people could have gotten there? No, it
22   was not the only way that people could have gotten there.
23   Q   In your professional opinion, it's your judgment
24   as to what is reasonable and correct in designing a
25   survey?

Page 85

1   A   My judgment is that this was a reasonable way to
2   introduce the issue in an unbiased fashion presenting all
3   of the issues that were relevant.

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

```
 1        AND (85:15-22)
 2        Page 85
 3        15    Q   Why did you select four pages, not six, not one,
 4        16   not 17?
 5        17    A   It was in my judgment a reasonable compromise
 6        18   between the potential number that could clearly exceed
 7        19   four and I didn't want to fatigue the respondents. It
 8        20   was certainly more than one. It was in my judgment, my
 9        21   sole professional judgment, this was a reasonable way to
10        22   present the issue.
11
12   **Grounds for counter-designations**:
13        Completeness, Fed. Rule Evid. 106.
14
15   **1.2.   Testimony offered by Plaintiffs**
16        (94:6 -- 95:13)
17        Page 94
18        6     Q   As I sit here today, there's no way for you to
19        7    tell me what the perceptions of any one of those four
20        8    states was, Alabama, Maryland, Arizona, New Mexico. You
21        9    can't separate those states out; is that correct?
22        10    A   That's correct.
23        11    Q   Did Mr. Daucher tell you which of those four
24        12   states has a DMV and which does not as its motor vehicle
25        13   group?
26        14    A   The reason that those states were selected was
27        15   that California has a DMV, and to the best of my
28
```

W02-WEST:NA6\400522815.1

16  knowledge, the other four states do not have a DMV
17  nomenclature.
18    Q   You didn't disclose that anywhere in your
19  report. Is there a particular reason why you didn't make
20  an issue of that in preparing your report?
21    A   You have to help me.
22    Q   Is there a particular reason you chose --
23    A   I heard you.
24    Q   Let me withdraw the question.
25        Is there a particular reason you didn't disclose

Page 95

1  that particular issue in your analysis?
2    A   That the residents of Alabama, Arizona, Maryland
3  and New Mexico do not have a DMV?
4    Q   Yes, sir.
5    A   There was no reason at all.
6    Q   What's the point of having them in there at all?
7    A   To repeat what I told you earlier, sir, to get
8  the responses of people who do not have a DMV in their
9  state, to see whether or not they responded differently
10 to a DMV.ORG list.
11   Q   Did you come to any conclusion on that point?
12   A   I came to a conclusion that there's no
13 difference.

**AND (96:24 -- 97:3)**

Page 96

24   Q   Okay. Do you think that 87 respondents is

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

25   statistically reliable respondents to ascertain the

Page 97

1   perception of people in the state of Alabama?

2   A   I didn't attempt to report the results of the

3   state of Alabama. I did look at respondents in four

**Counter-Designation by Defendants**

**(96:3-11)**

Page 96

3   Q   Okay. Is it your view that your survey, if

4   properly designed, comes to the conclusion or supports

5   the opinion that people who live in states where there is

6   no DMV have the same level of recognition of the term DMV

7   as those that live in the state that does have a DMV?

8   A   If I understood what you just said, the answer

9   to your question is, yes, I believe I saw no difference

10   between the California respondents and the aggregated

11   non-California respondents.

**AND (228:10 – 229:16)**

Page 228

10   Q   Okay. Now, if you look at the question 1-A,

11   DMV, slash, state, slash, government. Look at the

12   results that go across in the six columns. Would you

13   agree that the results for the non-DMV states indicate a

14   lower affiliation opinion than California?

15   A   I would.

16   Q   Yet you combined those non-DMV states with
17   California to formulate your opinion, didn't you?
18   A   I did.
19   Q   Would you agree that the numbers in the non-DMV
20   states lower the total number of people in the entire
21   test group and control group that found an affiliation?
22   A   They were lower in both the test and control
23   group, true.
24   Q   When you combine them with California, would you
25   agree that the net result was to lower the overall

Page 229

1   result?
2   A   Yes. I would agree with that.
3   Q   Now, does it concern you to have so many
4   controls that are in excess in this chart of the test
5   groups? For example, question 1-B, your control of 14.7
6   exceeds 12.6 on the DMV, slash, state, slash, government
7   line, meaning that the control, it's a negative. I mean,
8   we have a control group that's supposedly measuring
9   noise, you're assuming the entire test group and some.
10   What does that mean?
11   A   It means what I've been trying to tell you it
12   means, sir, that anything that appears on those pages
13   dealing with the subject of traffic schools may, in fact,
14   be thought to have some relationship, affiliations,
15   sponsorship or endorsement with an official governmental
16   agency. I have been saying that consistently.

-8-

**Grounds for counter-designation:**

Completeness, Fed. Rule Evid. 106.

### 1.3. Testimony offered by Plaintiffs

**(97:21 -- 98-5)**

Page 97

21   Q   Of the 834, 490 were in the test group and only
22  344 were in the control group. Do you have an
23  explanation for the considerable disparity between those
24  two numbers?
25   A   I had originally intended to talk to 300 in the

Page 98

1  test group in California and 200 in the control group in
2  California. When I decided to add individual states, I
3  decided to add 50/50 in each state, which led me to the
4  disparity -- some of that disparity is simply response
5  disparity over which I had no control.

**Counter-Designation by Defendants**

**(98:6-20)**

Page 98

6   Q   Okay. Is there a particular reason that you
7  felt it unnecessary to try to equalize those two groups,
8  the test group and the control group? You said a second
9  ago you wanted originally 300 in the test and 200 in the
10  control. That's a 35-percent difference. Why did you

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

```
11  design the survey with fewer in control by design than --
12  fewer than the number in the test group?
13     A   Because the control is -- I have to be very
14  careful with my response. It's more important that I be
15  able to, if I need to, drill down deeper in the test
16  group than the control group. As it turns out, it was
17  not necessary to drill down into either of those two
18  groups. I specifically and usually, if I have a choice,
19  elect to interview more people in a test group than I do
20  in a control group.
```

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

### 1.4. Testimony offered by Plaintiffs

(99:21 – 100:7)

Page 99

```
21     Q   Of the 483 that were Californians, how many of
22  those were in the test group and how many were in the
23  control group?
24     A   I did not report that.
25     Q   Okay. And how many of the 351 that are
```

page 100

```
1  non-California are in the test group and how many are in
2  the control group?
3     A   Once again, I have not reported.
```

W02-WEST:NA6\400522815.1
DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

```
 4   Q   How many residents of the state of Alabama were
 5   in the control group and how many were in the test group?
 6   A   I can give you a blanket response. I did not
 7   report that in any of the five states.
```

**Counter-Designation by Defendants**

But see Trial Exhibit 193 (breaking out number of California participants in test and control groups) (authenticated at Amended Hollander Declaration, ¶ 25).

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

### 1.5.  Testimony offered by Plaintiffs

(109:4-14)

Page 109
```
 4   Q   Okay. Are you isolating DMV.ORG from the
 5   content it's contained in, the pages on which it's
 6   presented as part of your consideration?
 7       MR. DAUCHER: Vague.
 8       THE WITNESS: I want to answer your question,
 9   but I'm not certain what you mean by isolating that. I
10   presented respondents with four pages and I asked
11   their -- take away their gestalt opinion after viewing
12   these four pages. One of the elements was DMV.ORG. Many
13   of the elements were not.
```

AND (111:5-24)

Page 111

5  Did you attempt to test the belief of the public
6  about whose website the DMV.ORG website is?
7  A  Whose website? Well, it seems to me that
8  tangentially I certainly did by asking if this website or
9  any elements upon it were affiliated, sponsored or
10  endorsed by anyone else. I guess the answer to your
11  question is yes. Did I ask them a direct question whose
12  website this is? I did not.
13  Q  Why not?
14  A  Because that was not the issue.
15  Q  Really?
16  A  That was not my understanding of the issue,
17  Counselor.
18  Q  Is it possible your understanding is confused on
19  that issue?
20  A  It is always possible that I'm confused.
21  Q  You did not ask anywhere in any of your
22  questions whose website is if it, did you?
23      MR. DAUCHER: Asked and answered.
24      THE WITNESS: I did not.

**AND (112:19 -- 113:12)**

Page 112

19  Q  Tell me where it says -- tell me where it says,

```
20  Mr. Hollander, you're testing the belief of the public as
21  to whose website they are looking at.
22     A   I never said I did.  I repeatedly told you in
23  this deposition, I have not.
24     Q   Why not? Why didn't you test that?
25     A   Because as I understood the issue, it was what a
```

Page 113

```
1   reasonably prudent potential buyer --
2          MR. MAKOUS:  I apologize for pointing, Brian.
3          THE WITNESS: -- believe that DMV.ORG is
4   affiliated with or endorsed or sponsored by the
5   Department of Motor Vehicles or some other state entity.
6   That is the question I set out to answer.
7   BY MR. MAKOUS:
8      Q   But you didn't ask the direct question, who
9   endorses this website, if anyone, or who sponsors this
10  website, if anyone, or who owns this website, if anyone,
11  did you?
12     A   Asked and answered.  No, I didn't.
```

**Counter-Designation by Defendants**

**(109:14 -- 110:15)**

Page 109

```
14  BY MR. MAKOUS:
15     Q   Uh-huh.  So did you come to an opinion about
16  what DMV.ORG actually communicates to the purchasing
17  public?
```

18    A    What DMV or DMV.ORG?
19    Q    DMV.ORG, the website name and domain name
20  actually communicate to the purchasing public.
21    A    I concluded it does not communicate affiliation
22  in connection with sponsorship or endorsement.
23    Q    By anybody?
24    A    By darn close to that, but certainly by the
25  Department of Motor Vehicles, the state or other

Page 110

1  governmental agencies.
2    Q    Okay. And in your view, did you test the
3  perception of the purchasing public as to its
4  understanding of the domain name DMV.ORG?
5    A    I believe that I fairly tested whether or not it
6  was perceived to be affiliated, sponsored or endorsed by
7  any entities specifically by the state --
8    Q    Okay.
9    A    -- or by the Department of Motor Vehicles.
10    Q    Did you attempt to test the perception of the
11  consuming public as to the DMV.ORG website?
12    A    I'm not -- I believe that's -- that in the main,
13  that's what I attempted to do, and in the main, I believe
14  that's what I succeeded in doing by giving them a fair
15  representation of that website.

**AND (112:1-11)**

Page 112

1    Q    In fact, your first question after the screening

-14-

```
 2  question was, as I read it in your report, quote, if you
 3  have an opinion, do you think that any of the entities
 4  shown on these four pages is affiliated, comma, with
 5  anyone else, comma, or that none of them are affiliated
 6  with anyone else, question mark.  Correct?
 7     A   Correct.
 8     Q   Okay.  That's not testing ownership of the
 9  website at all, is it?
10     A   That is not asking a question about ownership.
11  It is asking a question about affiliation.
```

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

### 1.6. Testimony offered by Plaintiffs

**(125:10 -- 126:12)**

Page 125

```
10     Q   Now, the next paragraph after the list of things
11  says, we're going to show you four web pages and ask you
12  some questions about them, close quote.
13         Is that your work?  Did you write that?
14     A   Yes, I did.
15     Q   So you're sensitizing the respondents as to what
16  they expect to see; is that correct?
17     A   I'm going to object to the use of the word
18  "sensitized."  Sir, I'm telling the respondents that they
19  were going to be seeing more than one page.
```

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON