1  BRIAN M. DAUCHER, Cal. Bar No. 174212
   ROBERT S. BEALL, Cal. Bar. No. 132016
2  JOSEPH H. TADROS, Cal. Bar. No. 239379
   ASHLEY E. MERLO, Cal. Bar No. 247997
3  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
4     Including Professional Corporations
   650 Town Center Drive, 4th Floor
5  Costa Mesa, California  92626-1993
   Telephone:  (714) 513-5100
6  Facsimile:  (714) 513-5130
   bdaucher@sheppardmullin.com
7  jtadros@sheppardmullin.com

8  Attorneys for Defendants

9

## UNITED STATES DISTRICT COURT

10

## CENTRAL DISTRICT OF CALIFORNIA

11

| 12  TRAFFICSCHOOL.COM, INC., a California corporation; DRIVERS ED DIRECT, LLC., a California limited liability company, | Case No. CV 06-7561 PA (CWx) |
|---|---|
| | *The Hon. Percy Anderson* |
| Plaintiffs, | **DEFENDANTS' COUNTER DESIGNATIONS TO PLAINTIFFS' DEPOSITION DESIGNATIONS OF EXPERTS HOLLANDER AND SIMONSON** |
| v. | |
| EDRIVER, INC., ONLINE GURU, INC., FIND MY SPECIALIST, INC., and SERIOUSNET, INC., California corporations; RAVI K. LAHOTI, an individual; RAJ LAHOTI, an individual; DOES 1 through 10, | Complaint Filed:  November 28, 2006 Trial:  October 30, 2007 |
| Defendants. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-1-

1        **DEFENDANTS' COUNTER DESIGNATIONS**

2        **OF DEPOSITION TESTIMONY**

3        Defendants hereby submit their counter designations to Plaintiffs'

4 deposition testimony designations for experts Hollander and Simonson:

5

6 **1.**      **DEPONENT: KENNETH HOLLANDER**

7 **1.1.**    **Testimony offered by Plaintiffs**

8       **(83:15 -- 84:6)**

9       Page 83

10      15       Each respondent in all five states is presented

11      16   with the relevant state material to the state in which

12      17   they resided.

13      18    Q   So what was the point of having the US map up

14      19   there first?

15      20    A   Because that's the way everybody starts.

16      21    Q   Is it your belief that all of the traffic to the

17      22   DMV.ORG website comes through the United States home page

18      23   with a map?

19      24    A   No, sir, it is not.

20      25    Q   When you meant everybody starts that way,

21      Page 84

22      1   everybody in your survey starts that way, not everybody

23      2   in the real world, correct?

24      3    A   Yes, you are right.  And it seemed to me that of

25      4   the many ways that one could navigate through these

26      5   various websites, that was not an unreasonable starting

27      6   place, so I selected it.Each respondent in all five states is presented

28

-2-

1    with the relevant state material to the state in which

2    they resided.

3

4    **AND (85: 4-14)**

5    Page 85

6    4    Q    Would it have been reasonable if you had been

7    5    told that only one percent of the traffic comes in

8    6    through that United States top page?  Would that still be

9    7    a reasonable assumption on your part?

10    8    A    Had I been told that, I have no idea what I

11    9    would have done.  I didn't ask people to make a decision

12    10    on the first page.  I asked them to make a series of

13    11    decisions, series of judgments, to express a series of

14    12    opinions after they had navigated, had been exposed to

15    13    four separate pages, three of which had DMV.ORG on them,

16    14    three of which had CAR.ORG on them.

17

18    **AND (86: 7-15)**

19    Page 86

20    7    Q    Then you must have looked at some website,

21    8    traffic information to determine the reliability of your

22    9    assumption, correct?

23    10    A    No, sir, I did not.  To repeat myself, I went

24    11    where I started.  It was the United States map, then I

25    12    clicked my way through as a resident of California and

26    13    these were the screens that came up and they came up in

27    14    that order and it made sense to me to use these four

28

1   15   screens.

2   **Counter-Designations by Defendants**

3   **(84:7 -- 85:3)**

4   Page 84

5   7    Q    Did Mr. Daucher or anybody give you information

6   8   that indicated the actual traffic to that website and how

7   9   it enters, the reality of that?

8   10    A    I believe that I was told that there are many

9   11   ways that people can get into that website and maneuver

10   12   through it and that there was no one set way.

11   13    Q    Who told you that?

12   14    A    I believe Mr. Daucher.  I don't know who else

13   15   would tell me there are many ways through it.  I selected

14   16   a -- I selected a series of screens that I thought would

15   17   be reasonably representative of the issues at hand that

16   18   would display the litigated issue as a reasonably prudent

17   19   respondent or consumer may see it when reasonably

18   20   browsing those websites.  So those are my decisions.  Is

19   21   that the only way people could have gotten there?  No, it

20   22   was not the only way that people could have gotten there.

21   23    Q    In your professional opinion, it's your judgment

22   24   as to what is reasonable and correct in designing a

23   25   survey?

24   Page 85

25   1    A    My judgment is that this was a reasonable way to

26   2   introduce the issue in an unbiased fashion presenting all

27   3   of the issues that were relevant.

28

-4-

1  **AND (85:15-22)**

2  Page 85

3  15   Q   Why did you select four pages, not six, not one,

4  16  not 17?

5  17   A   It was in my judgment a reasonable compromise

6  18  between the potential number that could clearly exceed

7  19  four and I didn't want to fatigue the respondents.  It

8  20  was certainly more than one.  It was in my judgment, my

9  21  sole professional judgment, this was a reasonable way to

10  22  present the issue.

11

12  **Grounds for counter-designations**:

13  Completeness, Fed. Rule Evid. 106.

14

15  **1.2.   Testimony offered by Plaintiffs**

16  **(94:6 -- 95:13)**

17  Page 94

18  6   Q   As I sit here today, there's no way for you to

19  7  tell me what the perceptions of any one of those four

20  8  states was, Alabama, Maryland, Arizona, New Mexico.  You

21  9  can't separate those states out; is that correct?

22  10   A   That's correct.

23  11   Q   Did Mr. Daucher tell you which of those four

24  12  states has a DMV and which does not as its motor vehicle

25  13  group?

26  14   A   The reason that those states were selected was

27  15  that California has a DMV, and to the best of my

28

-5-

16   knowledge, the other four states do not have a DMV

17   nomenclature.

18      Q   You didn't disclose that anywhere in your

19   report.  Is there a particular reason why you didn't make

20   an issue of that in preparing your report?

21      A   You have to help me.

22      Q   Is there a particular reason you chose --

23      A   I heard you.

24      Q   Let me withdraw the question.

25         Is there a particular reason you didn't disclose

Page 95

1   that particular issue in your analysis?

2      A   That the residents of Alabama, Arizona, Maryland

3   and New Mexico do not have a DMV?

4      Q   Yes, sir.

5      A   There was no reason at all.

6      Q   What's the point of having them in there at all?

7      A   To repeat what I told you earlier, sir, to get

8   the responses of people who do not have a DMV in their

9   state, to see whether or not they responded differently

10   to a DMV.ORG list.

11      Q   Did you come to any conclusion on that point?

12      A   I came to a conclusion that there's no

13   difference.

**AND (96:24 -- 97:3)**

Page 96

24      Q   Okay.  Do you think that 87 respondents is

-6-

1    25  statistically reliable respondents to ascertain the

2    Page 97

3     1  perception of people in the state of Alabama?

4     2    A   I didn't attempt to report the results of the

5     3  state of Alabama.  I did look at respondents in four

6

7    **Counter-Designation by Defendants**

8    **(96:3-11)**

9    Page 96

10     3   Q   Okay.  Is it your view that your survey, if

11     4  properly designed, comes to the conclusion or supports

12     5  the opinion that people who live in states where there is

13     6  no DMV have the same level of recognition of the term DMV

14     7  as those that live in the state that does have a DMV?

15     8    A   If I understood what you just said, the answer

16     9  to your question is, yes, I believe I saw no difference

17    10  between the California respondents and the aggregated

18    11  non-California respondents.

19

20    **AND (228:10 – 229:16)**

21    Page 228

22    10   Q   Okay.  Now, if you look at the question 1-A,

23    11  DMV, slash, state, slash, government.  Look at the

24    12  results that go across in the six columns.  Would you

25    13  agree that the results for the non-DMV states indicate a

26    14  lower affiliation opinion than California?

27    15    A   I would.

28

-7-

16   Q   Yet you combined those non-DMV states with

17   California to formulate your opinion, didn't you?

18   A   I did.

19   Q   Would you agree that the numbers in the non-DMV

20   states lower the total number of people in the entire

21   test group and control group that found an affiliation?

22   A   They were lower in both the test and control

23   group, true.

24   Q   When you combine them with California, would you

25   agree that the net result was to lower the overall

Page 229

1   result?

2   A   Yes.  I would agree with that.

3   Q   Now, does it concern you to have so many

4   controls that are in excess in this chart of the test

5   groups?  For example, question 1-B, your control of 14.7

6   exceeds 12.6 on the DMV, slash, state, slash, government

7   line, meaning that the control, it's a negative.  I mean,

8   we have a control group that's supposedly measuring

9   noise, you're assuming the entire test group and some.

10   What does that mean?

11   A   It means what I've been trying to tell you it

12   means, sir, that anything that appears on those pages

13   dealing with the subject of traffic schools may, in fact,

14   be thought to have some relationship, affiliations,

15   sponsorship or endorsement with an official governmental

16   agency.  I have been saying that consistently.

-8-

1

2 **Grounds for counter-designation**:

3     Completeness, Fed. Rule Evid. 106.

4

5 **1.3.**     **Testimony offered by Plaintiffs**

6     **(97:21 -- 98-5)**

7     Page 97

8     21    Q   Of the 834, 490 were in the test group and only

9     22  344 were in the control group. Do you have an

10    23  explanation for the considerable disparity between those

11    24  two numbers?

12    25    A   I had originally intended to talk to 300 in the

13     Page 98

14    1   test group in California and 200 in the control group in

15    2   California. When I decided to add individual states, I

16    3   decided to add 50/50 in each state, which led me to the

17    4   disparity -- some of that disparity is simply response

18    5   disparity over which I had no control.

19

20 **Counter-Designation by Defendants**

21     **(98:6-20)**

22     Page 98

23    6    Q   Okay. Is there a particular reason that you

24    7   felt it unnecessary to try to equalize those two groups,

25    8   the test group and the control group? You said a second

26    9   ago you wanted originally 300 in the test and 200 in the

27    10  control. That's a 35-percent difference. Why did you

28

11  design the survey with fewer in control by design than --

12  fewer than the number in the test group?

13    A   Because the control is -- I have to be very

14  careful with my response.  It's more important that I be

15  able to, if I need to, drill down deeper in the test

16  group than the control group.  As it turns out, it was

17  not necessary to drill down into either of those two

18  groups.  I specifically and usually, if I have a choice,

19  elect to interview more people in a test group than I do

20  in a control group.

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

**1.4.**   **Testimony offered by Plaintiffs**

**(99:21 – 100:7)**

Page 99

21    Q   Of the 483 that were Californians, how many of

22  those were in the test group and how many were in the

23  control group?

24    A   I did not report that.

25    Q   Okay.  And how many of the 351 that are

page 100

1  non-California are in the test group and how many are in

2  the control group?

3    A   Once again, I have not reported.

4   Q   How many residents of the state of Alabama were

5   in the control group and how many were in the test group?

6   A   I can give you a blanket response.  I did not

7   report that in any of the five states.

**Counter-Designation by Defendants**

But see Trial Exhibit 193 (breaking out number of California participants in test and control groups) (authenticated at Amended Hollander Declaration, ¶ 25).

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

**1.5.   Testimony offered by Plaintiffs**

**(109:4-14)**

Page 109

4   Q   Okay.  Are you isolating DMV.ORG from the

5   content it's contained in, the pages on which it's

6   presented as part of your consideration?

7       MR. DAUCHER:  Vague.

8       THE WITNESS:  I want to answer your question,

9   but I'm not certain what you mean by isolating that.  I

10   presented respondents with four pages and I asked

11   their -- take away their gestalt opinion after viewing

12   these four pages.  One of the elements was DMV.ORG.  Many

13   of the elements were not.

**AND (111:5-24)**

-11-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 111

5        Did you attempt to test the belief of the public

6   about whose website the DMV.ORG website is?

7      A    Whose website?  Well, it seems to me that

8   tangentially I certainly did by asking if this website or

9   any elements upon it were affiliated, sponsored or

10  endorsed by anyone else.  I guess the answer to your

11  question is yes.  Did I ask them a direct question whose

12  website this is?  I did not.

13     Q    Why not?

14     A    Because that was not the issue.

15     Q    Really?

16     A    That was not my understanding of the issue,

17  Counselor.

18     Q    Is it possible your understanding is confused on

19  that issue?

20     A    It is always possible that I'm confused.

21     Q    You did not ask anywhere in any of your

22  questions whose website is if it, did you?

23        MR. DAUCHER:  Asked and answered.

24        THE WITNESS:  I did not.

**AND (112:19 -- 113:12)**

Page 112

19     Q    Tell me where it says -- tell me where it says,

W02-WEST:NA6\400522815.1

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

20   Mr. Hollander, you're testing the belief of the public as

21   to whose website they are looking at.

22       A   I never said I did.  I repeatedly told you in

23   this deposition, I have not.

24       Q   Why not?  Why didn't you test that?

25       A   Because as I understood the issue, it was what a

Page 113

1   reasonably prudent potential buyer --

2       MR. MAKOUS:  I apologize for pointing, Brian.

3       THE WITNESS:  -- believe that DMV.ORG is

4   affiliated with or endorsed or sponsored by the

5   Department of Motor Vehicles or some other state entity.

6   That is the question I set out to answer.

7   BY MR. MAKOUS:

8       Q   But you didn't ask the direct question, who

9   endorses this website, if anyone, or who sponsors this

10   website, if anyone, or who owns this website, if anyone,

11   did you?

12       A   Asked and answered.  No, I didn't.


**Counter-Designation by Defendants**

**(109:14 -- 110:15)**

Page 109

14   BY MR. MAKOUS:

15       Q   Uh-huh.  So did you come to an opinion about

16   what DMV.ORG actually communicates to the purchasing

17   public?

-13-

DEFENDANTS' COUNTER DESIGNATIONS TO
PLAINTIFFS' DEPOSITION DESIGNATIONS FOR
HOLLANDER AND SIMONSON

18     A    What DMV or DMV.ORG?

19     Q    DMV.ORG, the website name and domain name

20   actually communicate to the purchasing public.

21     A    I concluded it does not communicate affiliation

22   in connection with sponsorship or endorsement.

23     Q    By anybody?

24     A    By darn close to that, but certainly by the

25   Department of Motor Vehicles, the state or other

Page 110

1   governmental agencies.

2     Q    Okay.  And in your view, did you test the

3   perception of the purchasing public as to its

4   understanding of the domain name DMV.ORG?

5     A    I believe that I fairly tested whether or not it

6   was perceived to be affiliated, sponsored or endorsed by

7   any entities specifically by the state --

8     Q    Okay.

9     A    -- or by the Department of Motor Vehicles.

10     Q    Did you attempt to test the perception of the

11   consuming public as to the DMV.ORG website?

12     A    I'm not -- I believe that's -- that in the main,

13   that's what I attempted to do, and in the main, I believe

14   that's what I succeeded in doing by giving them a fair

15   representation of that website.

**AND (112:1-11)**

Page 112

1     Q    In fact, your first question after the screening

-14-

2   question was, as I read it in your report, quote, if you

3   have an opinion, do you think that any of the entities

4   shown on these four pages is affiliated, comma, with

5   anyone else, comma, or that none of them are affiliated

6   with anyone else, question mark.  Correct?

7     A   Correct.

8     Q   Okay.  That's not testing ownership of the

9   website at all, is it?

10    A   That is not asking a question about ownership.

11   It is asking a question about affiliation.

**Grounds for counter-designation**:

Completeness, Fed. Rule Evid. 106.

**1.6.**   **Testimony offered by Plaintiffs**

**(125:10 -- 126:12)**

Page 125

10    Q   Now, the next paragraph after the list of things

11   says, we're going to show you four web pages and ask you

12   some questions about them, close quote.

13        Is that your work?  Did you write that?

14    A   Yes, I did.

15    Q   So you're sensitizing the respondents as to what

16   they expect to see; is that correct?

17    A   I'm going to object to the use of the word

18   "sensitized."  Sir, I'm telling the respondents that they

19   were going to be seeing more than one page.

-15-