1  DAVID N. MAKOUS (State Bar # 082409)
   makous@lbbslaw.com
2  DANIEL C. DECARLO (State Bar # 160307)
   decarlo@lbbslaw.com
3  MINA I. HAMILTON (State Bar # 213917)
   hamilton@lbbslaw.com
4  LEWIS BRISBOIS BISGAARD & SMITH LLP
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012-2601
   Telephone: (213) 250-1800
6  Facsimile: (213) 250-7900

7  Attorneys for Plaintiffs
   TRAFFICSCHOOL.COM, INC. and
8  DRIVERS ED DIRECT, LLC, California companies.

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13

14  TRAFFICSCHOOL.COM, INC.,          ) Case No. CV 06-7561 PA (CWx)
    a California corporation; DRIVERS ED )
15  DIRECT, LLC, a California limited  ) The Honorable Percy Anderson
    liability company,                 )
16                                     ) PLAINTIFFS' **COUNTER-**
                  Plaintiffs,          ) **DESIGNATIONS** TO DEFENDANTS'
                                       ) DEPOSITION DESIGNATIONS OF
17       vs.                           ) CROSS EXAMINATION OF DR.
                                       ) MARONICK
18  EDRIVER, INC., a California        )
    corporation; ONLINE GURU, INC.,    )
19  FIND MY SPECIALIST, INC., and      )
    SERIOUSNET, INC., California       )
20  corporations; RAVI K. LAHOTI, an   ) Trial:          Nov. 6, 2007
    individual; RAJ LAHOTI, an individual; )
21  and DOES 1 through 10,             )
                                       )
22                Defendants.          )
                                       )
23  ──────────────────────────────────)

24

25

26

27

28

   4825-4130-8418.1
   ─────────────────────────────────────────────────────────
   PLAINTIFFS' COUNTER DESIGNATIONS TO DEFENDANTS' DEPOSITION DESIGNATIONS OF CROSS OF
                              DR. MARONICK

Dockets.Justia.com

1    Plaintiffs hereby submit their Counter-Designations for completeness of the

2    Cross-Examination Designations of Dr. Maronick. Plaintiffs note that while they

3    dispute many of the Defendants' *characterizations* of Dr. Maronick's testimony as set

4    forth in Defendants' "Summary of Deposition Testimony for Cross-Examination of Dr.

5    Maronick by Subject Matter," where the testimony itself is properly referenced (i.e.,

6    by page and line number), the disputed *characterization* of it is simply argument by

7    Defendants and thus is not addressed by Plaintiffs herein.

8    **A.    Defendants' Designations and Plaintiffs' Counter-Designations:**

9    1.   *Defendants' Designation*: Pp. 50:14-50:24 (relating to net impression of

10    ad).

11    **Plaintiffs' Counter-Designations:** Pp. 49:8-50:13 (context is relating to

12    FTC Advertising Copy Tests).

13    2.   *Defendants' Designation*: Pp. 198:23-199:12 (relating to "footnote

14    disclaimers").

15    **Plaintiffs' Counter-Designations:** Pp. 198: 9-22 (relating to Dr.

16    Maronick's experience about consumers not reading "footnote disclaimers").

17    3.   *Defendants' Designation*: Pp. 49:2-19; 75:13-23; 50:25-51:15; 70:19-

18    71:12; 72:12-20; 80:18-23 (relating to use of "control ad").

19    **Plaintiffs' Counter-Designations:** Pp. 74:25-76:13 (relating to why in

20    this case a control ad was *not* appropriate).

21    4.   *Defendants' Designation*: Pp. 78:1-24 (relating to Dr. Maronick's

22    problems with CAR.ORG as a proper control ad).

23    **Plaintiffs' Counter-Designations:** Pp. 77:13-25; 80:25-81:5 (relating to

24    Dr. Maronick's problems with CAR.ORG as a proper control ad).

25    5.   *Defendants' Designation*: Pp. 54:7-10 (relating to use of leading

26    questions being a problem in a survey).

27    **Plaintiffs' Counter-Designations:** Pp. 54:11-56:15 (relating to Dr.

28    Maronick's use of an open-ended, non-leading question "Whose Web site do you

PLAINTIFFS' COUNTER DESIGNATIONS TO DEFENDANTS' DEPOSITION DESIGNATIONS OF CROSS OF
DR. MARONICK

think this is?" before asking any closed-ended questions).

6. *Defendants' Designation*: Pp. 41:22-42:19 (relating to Dr. Maronick's use of the funneling approach in this case).

**Plaintiffs' Counter-Designations:** Pp. 42:20-22 (relating to the funneling approach being proper in this case).

7. *Defendants' Designation*: Pp. 45:17-46:22 (relating to Dr. Maronick's procedure regarding instructing respondents about guessing).

**Plaintiffs' Counter-Designations:** Pp. 46:23-48:3 (relating to guessing and the option of respondents to select "don't know" and thus not give an answer).

8. *Defendants' Designation*: Pp. 103:6-12; 110:18-20 (relating to reading/memory tests).

**Plaintiffs' Counter-Designations:** Pp. 103:13-18; 110:21-111:3 (relating to having respondents look at stimuli and react to it as being appropriate).

9. *Defendants' Designation*: Pp. 102:22-103:5 (relating to reading/memory tests).

**Plaintiffs' Counter-Designations:** Pp. 103:6-12 (relating to having respondents look at stimuli and react to it as being appropriate).

10. *Defendants' Designation*: Pp. 137:23-138:13 (relating to college students' goals with traffic tickets).

**Plaintiffs' Counter-Designations:** Pp. 138:22-23 (relating to Dr. Maronick's express statement that he "can't speculate what would be the factors important to [college students]).

DATED: November 12, 2007     LEWIS BRISBOIS BISGAARD & SMITH LLP

By _____
DAVID N. MAKOUS
DANIEL C. DECARLO
MINA I. HAMILTON
Attorneys for Plaintiffs



# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRAFFICSCHOOL.COM, INC.,<br>etc., et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. |
| | ) | CV 06-7561 PA |
| EDRIVER, INC., et al., | ) | (CWx) |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF THOMAS MARONICK, DBA

August 16, 2007

247970



**BARKLEY**
Court Reporters

(310) 207-8000 Los Angeles    (949) 955-0400 Irvine    (415) 433-5777 San Francisco
(212) 808-8500 New York    (916) 922-5777 Sacramento    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas    (658) 455-5444 San Diego    (951) 686-0606 Riverside    (818) 702-0202 Woodland Hills

```
 1      A.    Twenty-one, yes.

 2      Q.    Simonson quotes -- or says, "As

 3  Professor McCarthy points out, survey questions must not

 4  be slanted or leading, and it is improper to suggest a

 5  business relationship when the respondent might

 6  previously have had no thought on such a connection."

 7            Do you see that?

 8      A.    Yes.

 9      Q.    Do you generally agree with those statements?

10      A.    I agree with the statement that a survey

11  question must not be slanted or leading.  Yes.  I agree

12  with that.

13      Q.    Do you believe it's improper to suggest a

14  business relationship when the respondent might

15  previously have no thought on such a connection?

16      A.    I agree with that.

17      Q.    And did you follow those principals, in your

18  view --

19      A.    I believe I did, yes.

20      Q.    -- in this study?

21      A.    Yes, I did.

22      Q.    So you believe that your Question 6, where you

23  ask, "Is this Web site endorsed by any government

24  agency," is not a leading question?

25      A.    Again, Question 6 follows Question 5 where they
```

41

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

1  were asked, first of all, what government agency. So by

2  getting -- if a respondent says that it is the

3  Department of Motor Vehicles, then they were likely in

4  that question to say, "Yes, it was."

5       And so I don't believe it's leading because

6  you're really focusing on responses after the open-ended

7  questions.

8       Q.   So you don't believe Question 6 is a leading

9  question?

10      A.   No.  Again, because it follows Question 5.

11  It's what's called a "funneling approach," and I don't

12  believe it's a lead-in question at all.

13      Q.   Funneling.  Now, regardless of what answer

14  someone gives to 5, they're still going to answer 6;

15  correct?

16      A.   That's correct.

17      Q.   So there is no screening out of people from 5

18  to 6; correct?

19      A.   That's correct.

20      Q.   So does the word -- does the funneling concept

21  really apply in that case?

22      A.   Yes, it does.

23      Q.   Are you familiar with the concept of "demand

24  effects" --

25      A.   Yes.


42

BARKLEY
Court Reporters

1    thinking about question -- Question 6, "Is this endorsed

2    by a government agency?" I want them to be thinking

3    about that.

4        Q.   No, sir. My question was you want them to be

5    thinking about Question 7 while they're answering

6    Question 6. Isn't that true?

7        A.   No. I want them to be thinking about the Web

8    site. The Question 6 asks a very straightforward

9    question, "Is this Web site endorsed by a government

10   agency?" That's a discrete question.

11       And then knowing that if they say "yes," or

12   when they say "yes" to that, they're going to be asked

13   what government agency.

14        Q.   When they say "yes"; right?

15        A.   That's correct. If they say "yes." If they

16   say "yes," not when. If they say "yes."

17        Q.   Will you look at page 10 of Dr. Simonson's

18   report, paragraph 24.

19        A.   Yes.

20        Q.   He cautions, "Accordingly," in the second

21   sentence, "it is a standard survey procedure to

22   explicitly instruct respondents not to guess, and such

23   an instruction decreases, though does not eliminate, the

24   tendency to guess."

25       Do you agree with those general principals?

45

BARKLEY
Court Reporters

1    A.    It depends on the nature of the survey.

2    Q.    You gave no such instruction in this case;

3  correct?

4    A.    Again, because of the nature of the survey.

5    Q.    Just yes or no.

6    A.    No.   I did not give it because of the nature of

7  the survey.

8    Q.    So you think in some surveys it's not a

9  standard procedure to explicitly instruct respondents

10  not to guess as to the answer?

11    A.    That's correct.

12    Q.    Now, in this survey you thought that procedure

13  would be inappropriate?

14    A.    I thought it was unnecessary because of the

15  nature of the study, which is a perception study.   This

16  isn't -- you normally would ask -- tell a respondent not

17  to guess if you're asking factual questions from an ad.

18  Here I'm asking simply for their perceptions of what

19  they see or take away from the -- in this case either

20  the Web page or the Internet link.   So I don't believe

21  it's appropriate or necessary to say -- to tell them not

22  to guess.

23    Q.    This Question 6 -- isn't that a factual

24  question, "Is this Web site endorsed by any government

25  agency?"

46

```
1      A.   I think that's still a perception.  Again, it
2  follows Question 5, which is, "Whose Web site is this?"
3  And then the -- in their perception, is this endorsed by
4  a government agency.
5           So I believe these -- this -- both of these --
6  this whole series -- 5, 6, 7 -- is measuring their
7  perceptions of, A, whose Web site it is, and then their
8  perception of whether it's endorsed by a government and
9  what government agency.  So I believe that's a
10 perception statement.
11     Q.   And not factual inquiries?
12     A.   What's that?
13     Q.   So you believe these questions 5, 6, and 7 are
14 not factual inquiries?
15     A.   No, I don't.  I believe they're perceptions.
16     Q.   And because they're perceptions, you believe it
17 was appropriate to exclude an instruction not to guess?
18     A.   Because if you -- when you say to someone not
19 to guess, what you're normally doing -- again, it's
20 going to be in a factual situation.
21          And secondly, it's going to be in a situation
22 where the respondents don't see the response options
23 open to them.  And here they have open to them; that
24 they see the "don't know" response category as an
25 option.
```

47

1    And in my experience, when someone sees that,

2  if they don't have an answer, rather than give one, they

3  have the option of saying "don't know."

4    Q.   And in constructing Question 6 and Question 8,

5  which is a similar question, the first response in each

6  case is "yes"; correct?

7    A.   That's correct.

8    Q.   And that did not vary across respondents.  In

9  other words, some respondents wouldn't see "don't know,

10  not sure" as the first response; correct?  Everyone saw

11  "yes" as the first response?

12    A.   The generally accepted procedure is always

13  "yes," "no," "don't know, not sure."

14    Q.   I'm just trying to get -- to figure out what

15  people saw first.  Every single person that took

16  Survey 3 saw "yes" as the first choice?

17    A.   That's correct.

18    Q.   For 6 and 8?

19    A.   That's correct.  Which is the generally

20  accepted procedure of format for a yes/no question.

21    Q.   Do you know whether it's possible within the

22  Zoomerang format to have them rotate the choices of

23  response?

24    A.   Yes.  It is possible.

25    Q.   And you chose not to do that?

48

THOMAS MARONICK, DBA

1     A.    That's correct.

2     Q.    Did you write an article entitled "Advertising

3 Research Issues from FTC versus Stouffer Foods

4 Corporation"?

5     A.    Yes, I did.

6     Q.    I'll show you a document which we'll have

7 marked for identification as 143.

8           (Exhibit 143 was marked for

9           identification by the reporter and is

10          attached herewith.)

11 BY MR. DAUCHER:

12    Q.    Sir, can you confirm for me that 143 is a

13 correct copy of the article I referenced, "Advertising

14 Research Issues from FTC versus Stouffer Foods

15 Corporation"?

16    A.    Yes.

17    Q.    And it lists you as an author.  So you were an

18 author of this article; correct?

19    A.    That's correct, yes.

20    Q.    It was published in 1995.  Have survey

21 standards changed dramatically since then?

22          MR. MAKOUS:  Objection.  Vague as to

23 "dramatically."  Argumentative.

24          THE WITNESS:  Have research issues changed?

25 Research methodologies have changed because of the

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

| | |
|---|---|
| 1 | advent of the Internet, which was not predominant in |
| 2 | 1995. |
| 3 | BY MR. DAUCHER: |
| 4 | Q. In terms of the conclusions of the article, |
| 5 | though, have any of these conclusions been, to your |
| 6 | knowledge, discredited since the time of the publication |
| 7 | of this article? |
| 8 | A. I don't recall what the conclusions were. |
| 9 | Q. Well, will you look to page 302 of the article, |
| 10 | which is the second page of this exhibit, in the |
| 11 | right-hand column, it says: "General Standards for FTC |
| 12 | Advertising Copy Tests." |
| 13 | A. Yes. |
| 14 | Q. It says, "The standard the Commission uses in |
| 15 | evaluating advertising claims is the," quote, "'overall |
| 16 | net impression made by the ad,'" unquote. |
| 17 | Do you see that? |
| 18 | A. Yes. |
| 19 | Q. Do you agree with that? |
| 20 | A. Yes. |
| 21 | Q. And do you agree that in the context of a false |
| 22 | advertising case, that that is the proper standard to be |
| 23 | applied? |
| 24 | A. The overall net impression, yes. |
| 25 | Q. On page 303, under "Design Issues," the first |

BARKLEY
Court Reporters

1   responses are tabulated, but I was able to go through

2   and see if there were any problems with it with the

3   different skip patterns.  I also had made it possible

4   for counsel to look at it to see if they saw any

5   problems with it.  Again, not to change content, but

6   just to make sure the procedures are correct.

7       Q.   And you would agree, based on your writing,

8   that leading questions would be a problem in a survey;

9   correct?

10      A.   That's correct.

11      Q.   But your contention is that this survey does

12  not contain leading questions?  Survey 3?

13      A.   That's correct.  As I said numerous times now,

14  because of two things.  Number one, it follows

15  Question 5, which is an open-ended question.  And

16  Question 6 simply asks a very straightforward -- six --

17  yes -- "Is it endorsed by a government agency," with the

18  option of them saying "no" or "don't know."

19      Q.   And you also wrote in the final paragraph,

20  above "Experience Counts," on page 303, that it is -- or

21  quoted the ALJ that, "It is not appropriate to start a

22  copy test with closed-ended questions"; correct?

23      A.   Yes.  And that's why my study started with the

24  open-ended question.

25      Q.   In your opinion.

54

1          MR. MAKOUS:  In anyone's opinion, Counselor.

2          THE WITNESS:   Question 5 --

3     BY MR. DAUCHER:

4          Q.   A throw-away open-ended question.  Is that a

5     good faith?

6          A.   I'm sorry.  I'm sorry.

7          Q.   Let me ask the questions, and you can give the

8     answers.  If you want -- if your counsel wants to ask

9     you some questions afterwards, then he can do that.

10    Okay?

11         A.   That's fine.

12         Q.   Your opinion is that Question 5 is starting

13    this survey with an open-ended question and that,

14    therefore, you have license to go ahead and ask

15    closed-ended questions from that point forward in the

16    survey; correct?

17         MR. MAKOUS:  Objection.  Asked and answered.

18    Argumentative.  Vague as to "license."

19         THE WITNESS:  It is -- it's my judgement that

20    you start with an open-ended question like that, and the

21    responses to that then lead to the -- or then you have

22    closed-end, what are called "directed questions," that

23    follow that.

24    BY MR. DAUCHER:

25         Q.   Is that --

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

1     A.   And just because it's a closed-end question

2  doesn't necessarily make it a leading question.   Those

3  two terms are not synonymous.

4     Q.   And your opinion is that "Whose Web site do you

5  think this is" is an open-ended question?

6     A.   Yes.   That's Question 5.

7     Q.   Doesn't it lead them to the question of

8  association in the advertisement?

9          MR. MAKOUS:   Objection.   Vague and ambiguous.

10         THE WITNESS:   I don't think it leads them to

11 anything.   It simply asks them what is their net

12 impression of the ad -- I'm sorry -- the Web page, whose

13 Web site is this, whose Web site do you think this is.

14 It's asking for their net impression of whose Web site

15 it is.

16 BY MR. DAUCHER:

17    Q.   You're assuming that in the context of viewing

18 that page that the viewer is building into their net

19 impression an idea of whose Web site it is that they're

20 looking at; is that right?

21    A.   I'm sorry.   I don't understand your question.

22         MR. DAUCHER:   Can you read it back, please.

23         (The record was read.)

24         THE WITNESS:   Yes.   That's what the question

25 before it -- "Please review this as you would if you

56

1      Q.   On the right-hand side now.

2      A.   Okay.  All right.  Well, you have to show me

3   where you were.

4      Q.   I'm in the first paragraph, about five, six

5   lines down.  And now I'm quoting Stouffer.  Okay?

6   You're just summarizing what Stouffer argued here.  So

7   I'm not attributing this to you.

8      A.   Okay.  Okay.

9      Q.   But I'm quoting Stouffer as having argued that,

10  "The FTC has made abundantly clear that a control ad is

11  required to be used for both open-ended and closed-ended

12  questions."

13          Stouffer presented that argument; correct?

14     A.   Yes.

15     Q.   But the commission did not accept -- the ALJ

16  did not accept that view; correct?  In Stouffer?

17     A.   That's correct.

18     Q.   Instead -- well, it's a little weird.

19          In the second paragraph here it says, "In its

20  decision in Stouffer Foods, the Commission indicated" --

21  shouldn't that be the ALJ indicated?

22     A.   Yes.

23     Q.   Because ALJ is the one making the decision?

24     A.   That's correct.

25     Q.   Okay.  So the ALJ indicated that there was


74

1  nothing requiring a control ad for open-ended questions;

2  correct?

3      A.  That's correct.

4      Q.  However, you concluded this paragraph with this

5  statement, "However, it is noteworthy that this

6  standard, namely, that a control ad is not necessary, is

7  likely to be inconsistent with certain --

8      A.  Wait, wait, wait.  Where are you now?

9      Q.  The last sentence on this page?

10     A.  Okay.

11     Q.  Let me start over.

12     A.  I'm with you.  Okay.

13     Q.  You ended this section with the statement,

14  "However, it is noteworthy that this standard, namely,

15  that a control ad is not necessary, is likely to be

16  inconsistent with certain Lanham Act cases involving

17  exploiting misleadingness, in which the court has said

18  that," quote, "'a control mechanism would likely be,'"

19  quote, "'indispensable,'" unquote; correct?

20     A.  Yes.

21     Q.  You were aware of that authority when you

22  constructed your survey; correct?

23     A.  That's correct.  And you might just -- and you

24  might also go on in the next page, on page 306, is where

25  I identify some of the problems with having a control.

75

BARKLEY
Court Reporters

1    As I said on page 306, "In practice, difficult
2 trade-offs and decisions must be made in selection of an
3 appropriate control ad."
4    Q.   All right.
5    A.   In practice, the situation may arise when
6 almost everything in the ad is part of the -- a
7 challenged claim.   Therefore, in effect, you can't have
8 a control.
9    And that's really the kind of issue that I
10 was dealing with here -- my inability to create a
11 control that -- that meets -- as I said, met the test
12 of appropriate -- or excuse me -- proper and
13 equivalent.
14    Q.   In your notes, when you were engaged in this
15 matter, you wrote down what you were told from
16 Mina Hamilton about this case; correct?
17    A.   Yes.
18    Q.   All right.   I'm just going to put it in front
19 of you.
20    And isn't it true, sir, what you were told was
21 that they believed that the DMV.org name misled people
22 as to an affiliation with the government?
23    A.   That's what they said, and that was what was in
24 the amended complaint that I reviewed.
25    Q.   And you were never told about any other

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

1  misleading content from the DMV.org Web site itself;

2  correct?

3      A.    I'm not sure I understand your question.

4      Q.    In other words, they told you that the name was

5  misleading.  We've established that.  But they didn't

6  identify any other misleading claims?

7      A.    Again, looking at my notes from 4-24, they had

8  said DMV.org suggests it is an official state DMV Web

9  site.  They didn't say it is misleading.  They said it

10  suggests that.

11      Q.    By the use of the name "DMV.org"?

12      A.    That's correct.

13      Q.    So isn't it true that by changing the name

14  DMV.org to something else, that you could establish a

15  control that purges the potentially misleading claim?

16      A.    If you can find one that meets the tests of

17  being proper and equivalent.  That was -- that's what

18  I've been saying all morning; that you simply can't take

19  out -- take that out and put something else in and --

20  and it automatically, quote/unquote, "purges" it.  It

21  simply becomes then a word association.  It really -- it

22  doesn't purge it unless it is something that is proper

23  and equivalent.

24          And that's where my problem was, that -- that I

25  couldn't think of anything that met those standards.

77

1     Q.   So in your -- you're aware that Hollander

2  created a control for his survey; correct?

3     A.   Yes, I am.

4     Q.   And you know exactly what he did to establish

5  that control, namely, substituting Car.org for DMV.org

6  everywhere it appeared?

7     A.   Yes.

8     Q.   Correct?

9     A.   Yes.

10     Q.   And that doesn't meet your test of a proper

11  control?

12     A.   No, it does not.

13     Q.   And why not?

14     A.   Because it's neither -- it's not equivalent.  I

15  mean, it's not -- it -- again, remember, the target

16  market for online traffic schools is people who would

17  consider going to those.  So it had to be something that

18  is somehow related to traffic schools or online traffic

19  schools.  And I don't believe that car- -- or Cars.org

20  is something that a consumer, if they were looking for

21  an online traffic school, would think, "Gee, that's the

22  Web site," or the Internet link that they would use to

23  go to find a traffic school.  So I don't believe it's

24  appropriate or equivalent at all.

25     Q.   If it's not an appropriate control, then the

78

BARKLEY
Court Reporters

1  procedures that led to those results.

2  BY MR. DAUCHER:

3     Q.  Well, he did remove the potentially misleading

4  claim from the control group; correct?

5     A.  He substituted Car.org for the DMV.org, yes.

6     Q.  And thereby removed the potentially misleading

7  claim?

8     A.  He substituted Car.org for that, yes.

9     Q.  Now, you wrote on this page 306, in the first

10 full paragraph, on the second column --

11       MR. MAKOUS:  Page 306?

12       MR. DAUCHER:  Yes.

13       THE WITNESS:  Okay.

14 BY MR. DAUCHER:

15    Q.  That -- for example, the first approach in

16 that refers to purging the misleading claim; correct?

17    A.  Yes.

18    Q.  You wrote that, "The first approach, using the

19 purged or cleansed ad control, may be the best choice

20 when the control ad is virtually identical to the

21 challenged or test ad, with the exception that the

22 challenged claim is excised"; correct?

23    A.  Yes.

24    Q.  Isn't that exactly what Hollander did in this

25 case?

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

1     A.    No.  I don't believe so.  He substituted

2   something else that, in my judgment, is likely to

3   confuse consumers, make -- as I said more than once this

4   morning, in my judgment, it doesn't meet the test of a

5   proper control.

6     Q.    Because consumers looking at a Car.org control

7   are also going to draw an affiliation to the government

8   in your view?

9     A.    I don't know what they're going to do.

10        MR. MAKOUS:  Let's take a break, Counsel.

11        MR. DAUCHER:  There's a question pending.

12        MR. MAKOUS:  We've been going two hours.

13        MR. DAUCHER:  Let him finish the question

14   then.

15        MR. MAKOUS:  All right.  Let me just hear the

16   question back.

17        (The record was read.)

18        THE WITNESS:  I don't believe they are.  As a

19   matter of fact, I don't -- I can't imagine that they're

20   going to be making any kind of an affiliation to -- to

21   any government agency.

22   BY MR. DAUCHER:

23     Q.    Let me -- just one follow-up, please.

24        Wouldn't then that indicate that the use of

25   Car.org would be an effective control in this case

81

```
 1    stimuli before the viewer, but not in Study 3?

 2         A.   Because Study 3, I think, was -- it would have

 3    made it a memory test.

 4         Q.   To leave the --

 5         A.   No -- I'm sorry. I'm sorry -- it would have

 6    made it -- would made it -- to have -- would have made

 7    it into simply a reading -- reading test.

 8         Q.   Are you familiar with the authority that's been

 9    published in Trademark Reporter about reading and memory

10    tests?

11              MR. MAKOUS:  Objection.  Overbroad.

12    BY MR. DAUCHER:

13         Q.   Let me lay some foundation.

14              Do you know what the Trademark Reporter is as a

15    journal?

16         A.   Yes.

17         Q.   Do you subscribe to it?

18         A.   No.

19         Q.   Have you read the articles in there related to

20    reading and memory tests published in the last year?

21         A.   No, I have not.

22         Q.   When, in your view, is it appropriate to do a

23    reading test versus a memory test?

24         A.    I don't believe it's ever appropriate to do a

25    reading test.  I think it should always be a memory test
```

THOMAS MARONICK, DBA

1    where the stimuli is taken away, at least in the

2    first -- if you want someone to look for a specific

3    aspect of a claim, that's certainly appropriate on a

4    second exposure to have a reading test.  But the first

5    test, it should be without the stimuli present.

6         Q.   But in Study 2 the stimuli is present.  So you

7    do conduct a reading test in Study 2?

8         A.   Again, because of the nature of the stimuli,

9    which is simply a straightforward Internet link, it

10   doesn't have -- it doesn't make any express or implied

11   claims other than here is a link coming right off of a

12   Google search page.  It simply makes that statement.

13        Q.   Didn't you just testify that a reading test was

14   never appropriate in your view?

15        A.   I said that it's -- there are times when you

16   would do -- when what you want them to do is look at the

17   stimuli and react to it.  And that's what I had them do

18   in Study 2.

19        Q.   Isn't it true, in the context of surveys, that

20   a reading test is generally more appropriate with a

21   higher involvement decision?

22        MR. MAKOUS:  Objection.  Vague.  Lacks

23   foundation.

24        THE WITNESS:  No.  I don't believe that -- that

25   a reading test, if -- even if it's a high involvement

103

1    notice the disclaimers; correct?

2        A.    Yes.   That's correct.

3        Q.    And so you didn't want to do a reading test,

4    did you?

5        A.    That's not the reason I didn't want to do it.

6    I wanted to do it because I was looking to measure

7    consumers' perceptions of the Web site, not to gather

8    any particular information.   And the way -- the only way

9    you can do a perception study, as opposed to a memory

10   study, is by taking the stimuli away.

11       Q.    You're drawing a distinction now between a

12   perception study and a memory study?

13       A.    They are really the same thing.   But, again,

14   what I was trying to get from them is really

15   perceptions, not what they remembered, but what was the

16   net impression that they drew, having looked at this Web

17   site.

18       Q.    And you were okay with doing a reading test as

19   to the Google search result; correct?

20       A.    That's correct.

21       Q.    And the reason is because you didn't see an

22   express disclaimer in the Google search result; correct?

23       A.    That's not the reason, no.   I simply -- I did

24   it simply because it provided basic information about a

25   Web site link or a Web link that didn't provide any kind


                          110

BARKLEY
Court Reporters

```
 1   of claims whatsoever, positive or negative.  It simply

 2   said, "Here is a Web site.  Whose Web site" -- excuse

 3   me -- Internet link.  "Whose link is that?"

 4        Q.  Your client testified in deposition that prior

 5   to making a purchase on --

 6             MR. MAKOUS:  He doesn't have a client.  You

 7   mean plaintiffs?

 8             MR. DAUCHER:  Yeah.  He does have a client.

 9   He's engaged in the case.

10             MR. MAKOUS:  He's engaged --

11             MR. DAUCHER:  Okay.

12             MR. MAKOUS:  No.  He does not have a client.

13             MR. DAUCHER:  Fine.  I don't care.

14   BY MR. DAUCHER:

15        Q.  Plaintiffs have testified in this case that

16   prior to making a purchasing decision on their Web

17   sites, a visitor spends three to ten minutes and sees

18   more than five different pages.

19             Does that surprise you?

20             MR. MAKOUS:  Okay.  Objection.

21   Mischaracterizes the evidence.  Assumes facts not in

22   evidence.  Calls for speculation.  Argumentative.

23             THE WITNESS:  I really haven't thought about

24   it.  I'm not aware of that testimony, and I haven't

25   thought about it.
```

111

1    A.    Oh, no.   No.   About 30 years, 25 years.

2    Q.    You have a pretty good insight, I suspect, into

3    the mind-set of college-age students; correct?

4    A.    I'm not sure anybody has that, but certainly I

5    have had a lot of experience with college students.

6    Q.    Now, based upon that experience, wouldn't you

7    say that if I, a college student, faces a ticket, then

8    their goal is to get out of that ticket as cheaply and

9    quickly as possible?

10    A.    Typically, that would be the way that they

11    would do it.   You know, what -- you know, what's it

12    going to cost me?   How long until I can get it behind

13    me?

14    Q.    And so long as that -- if that involved traffic

15    school, isn't it true -- wouldn't it be reasonable to

16    say, with that mind-set in mind, that the only thing

17    they would care about, with respect to the state, was

18    whether the state would accept their having gone to a

19    particular program?

20        MR. MAKOUS:   Objection.   Speculative.   Lacks

21    foundation.

22        THE WITNESS:   I can't speculate what would be

23    the factors important to them.

24    BY MR. DAUCHER:

25    Q.    Beyond -- okay.   The words "recommended by the

138

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

1      A.    Relates to paragraph 49.

2      Q.    And now this covers Survey 3, to be clear?

3      A.    Yes.

4      Q.    Okay.

5      A.    His comment, "They were then presented with

6    part of the Web page, excluding pertinent disclaimers

7    that appear at the bottom of the page."  And then he

8    quotes what I said.

9           And my annotation is, quote, "Consumers don't

10    read footnote disclaimers.  Material below not related

11    to traffic schools."

12           And that was -- goes back to my experience at

13    the FTC and all the studies that I've done that

14    consumers simply don't read footnote disclaimers.

15      Q.    Now, when we go to pull the record in the

16    U-Haul case, are we going to find that U-Haul had some

17    footnote disclaimers?

18      A.    I don't believe so.  I don't recall.

19      Q.    You wouldn't have testified differently in the

20    U-Haul case than you would here about footnote

21    disclaimers; right?

22      A.    No, I wouldn't.

23      Q.    So based upon your view that consumers don't

24    read footnotes, you decided not to even put that before

25    the viewer of Survey 3; correct?

THOMAS MARONICK, DBA

BARKLEY
Court Reporters

**PROOF OF SERVICE**

Trafficschool.com, Inc. v. Edriver, Inc. - File No. 25162-14

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is . I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On November 12, 2007, I served the following document(s):

PLAINTIFFS' **COUNTER-DESIGNATIONS** TO DEFENDANTS' DEPOSITION DESIGNATIONS OF CROSS EXAMINATION OF DR. MARONICK

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

Brian M. Daucher, Esq.
Joseph H. Tadros, Esq.
Amy Merlo, Esq.
SHEPPARD MULLIN RICHTER & HAMPTON
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1925
Telephone: (714) 513-5100
bdaucher@sheppardmullin.com
jtadros@sheppardmullin.com
amerlo@sheppardmullin.com

The documents were served by the following means:

[X]  (BY E-MAIL OR ELECTRONIC TRANSMISSION)  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 12, 2007, at Los Angeles, California.

Mina Hamilton