Kenneth Hollander - 8/21/2007

1 respect?

2 A No, because I selected four pages. I elected to
3 use four pages.

4 Q That information was not factored at all into
5 your survey design?

6 A Sure it was, in the sense that had I been told
7 that everybody went -- that everybody navigated in one
8 specific way, that would have altered my thinking about
9 what stimulus or stimuli to present. My recollection is
10 I was told that they navigate in many different ways and
11 on average five or six different pages are viewed. I
12 elected to use four pages.

13 Q And how did you choose the states of
14 California, Alabama, Arizona, Maryland and New Mexico?

15 A California was a fait accompli. I was told the
16 issue was relevant to the state of California. In
17 subsequent conversations, I think it was I who asked are
18 all states DMV states, and the answer was no, some states
19 are not DMV states, they are, like, DOT states or some
20 other nomenclature.

21 So it seemed reasonable to expand the inquiry to
22 see if people residing in, as it were, non-DMV states
23 took a different view of life than people who resided in
24 a DMV state.

25 Q Is California a DMV state?

Page 91

Kenneth Hollander - 8/21/2007

```
 1      Q    Are you aware that Maryland does not have online
 2   traffic schools?
 3      A    I'm not aware of that.
 4      Q    Would that have affected your surveys in any
 5   way?
 6      A    I don't know.
 7      Q    Now, we've picked 42 percent, or 351 people, in
 8   paragraph 13 of your report in the so-called rebuttal
 9   survey portion.  You will see -- I'll quote it for the
10   record, make it clear.
11           Quote, there were a total of 834 respondents,
12   490 in the test group seeing DMV.ORG and 344 in the
13   control group seeing CAR.ORG.  Of these, 58 percent, or
14   483, were conducted with California residents and 42
15   percent minus 351 with residents of Alabama, Arizona,
16   Maryland and New Mexico, close quote.
17           How many of those 351 were in the state of
18   Alabama?
19      A    As I sit here today, I don't know.  I would
20   reasonably hazard a guess that roughly one fourth of
21   them.
22      Q    Okay.  So approximately 87 respondents?
23      A    Approximately one fourth, sure.
24      Q    87?
25      A    Five.
```

Page 93

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

```
1    Q    I'm just rounding it.  You can quibble --
2    A    I have no intention of quibbling.  I did not
3    report them seperately.
4    Q    You did not?
5    A    I did not.
6    Q    As I sit here today, there's no way for you to
7    tell me what the perceptions of any one of those four
8    states was, Alabama, Maryland, Arizona, New Mexico.  You
9    can't separate those states out; is that correct?
10   A    That's correct.
11   Q    Did Mr. Daucher tell you which of those four
12   states has a DMV and which does not as its motor vehicle
13   group?
14   A    The reason that those states were selected was
15   that California has a DMV, and to the best of my
16   knowledge, the other four states do not have a DMV
17   nomenclature.
18   Q    You didn't disclose that anywhere in your
19   report.  Is there a particular reason why you didn't make
20   an issue of that in preparing your report?
21   A    You have to help me.
22   Q    Is there a particular reason you chose --
23   A    I heard you.
24   Q    Let me withdraw the question.
25        Is there a particular reason you didn't disclose
```

Page 94

Kenneth Hollander - 8/21/2007

1 that particular issue in your analysis?

2     A    That the residents of Alabama, Arizona, Maryland
3 and New Mexico do not have a DMV?

4     Q    Yes, sir.

5     A    There was no reason at all.

6     Q    What's the point of having them in there at all?

7     A    To repeat what I told you earlier, sir, to get
8 the responses of people who do not have a DMV in their
9 state, to see whether or not they responded differently
10 to a DMV.ORG list.

11     Q    Did you come to any conclusion on that point?

12     A    I came to a conclusion that there's no
13 difference.

14     Q    Your survey, if it's acceptable, is of the
15 opinion that people in a state with no DMV have no
16 greater degree of recognition than people in a state that
17 has a DMV?

18     MR. DAUCHER: Objection. Vague.

19 BY MR. MAKOUS:

20     Q    Is that correct?

21     A    No greater recognition? What do you mean by
22 "recognition"?

23     Q    You can say, "I don't understand your question."
24 That's all right. If you don't understand my question,
25 you can say so. It's all right.

Kenneth Hollander - 8/21/2007

1    A    I don't understand what you mean by the term "recognition."

3    Q    Okay. Is it your view that your survey, if properly designed, comes to the conclusion or supports the opinion that people who live in states where there is no DMV have the same level of recognition of the term DMV as those that live in the state that does have a DMV?

8    A    If I understood what you just said, the answer to your question is, yes, I believe I saw no difference between the California respondents and the aggregated non-California respondents.

12    Q    Okay. Did you, in fact, add up the non-California respondents with the California respondents in coming to your conclusions?

15    A    Yes. They are in the 843.

16    Q    So you didn't separate, and as I understand your testimony today, you can't tell me how those 351 impacted your conclusions of the total 843 -- 834; is that right?

19    A    No, sir, that's not right.

20    Q    Okay.

21    A    Had I -- when I looked at the data in the spreadsheet screen differences, I would have reported and discussed the differences. I saw no differences.

24    Q    Okay. Do you think that 87 respondents is statistically reliable respondents to ascertain the

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

1 perception of people in the state of Alabama?
2    A   I didn't attempt to report the results of the
3 state of Alabama. I did look at respondents in four
4 states that were non-DMV, states a total of 344 of them.
5 I did not intend to, nor did I report or comment, nor
6 intend to comment, on Alabamians.
7    Q   Let's look at your report, paragraph 14. Is
8 there an error in the number that you've identified 1. --
9 you say 344. Let me withdraw the question.
10       Let's go through the various numbers. First
11 total you identified is 834 respondents. Those are
12 people who went through the screen on the Internet,
13 accepted the willingness to do the Internet survey as the
14 first requirement, correct --
15    A   Correct.
16    Q   -- that qualified through the screening
17 questions that you had prepared, correct?
18    A   Correct.
19    Q   Total 834?
20    A   834 respondents completed the survey.
21    Q   Of the 834, 490 were in the test group and only
22 344 were in the control group. Do you have an
23 explanation for the considerable disparity between those
24 two numbers?
25    A   I had originally intended to talk to 300 in the

1  test group in California and 200 in the control group in
2  California. When I decided to add individual states, I
3  decided to add 50/50 in each state, which led me to the
4  disparity -- some of that disparity is simply response
5  disparity over which I had no control.
6  Q  Okay. Is there a particular reason that you
7  felt it unnecessary to try to equalize those two groups,
8  the test group and the control group? You said a second
9  ago you wanted originally 300 in the test and 200 in the
10 control. That's a 35-percent difference. Why did you
11 design the survey with fewer in control by design than --
12 fewer than the number in the test group?
13 A  Because the control is -- I have to be very
14 careful with my response. It's more important that I be
15 able to, if I need to, drill down deeper in the test
16 group than the control group. As it turns out, it was
17 not necessary to drill down into either of those two
18 groups. I specifically and usually, if I have a choice,
19 elect to interview more people in a test group than I do
20 in a control group.
21 Q  Why?
22 A  Because I may have to analyze, drill down deeper
23 into, pull apart the data in the test group, and I want
24 to make sure I have respondents to do so.
25     MR. DAUCHER: Counselor, can we take a lunch

Kenneth Hollander - 8/21/2007

1   break?
2        MR. MAKOUS:  Just let me stay with this one
3   area, then we will take a break.
4   BY MR. MAKOUS:
5        Q    Mr. Hollander, are you doctor or Mr.?
6        A    I'm Mr.
7        Q    Don't want to misaddress you.
8             I'm going to write down what I'm understanding
9   from this so-called rebuttal survey.  I'm going to write
10  down a list and try and get this squared away here.
11            There's 844 total, 490 in the test group and 344
12  in the control group; is that correct?
13       A    Yes.
14       Q    All right.  Now, the next cluster of data as
15  identified in the report is 483 were conducted with
16  California residents, is that right, and 351 with
17  nonresidents of California, right?
18       A    Okay.
19       Q    And that totals 834, those two numbers, correct?
20       A    Yes.
21       Q    Of the 483 that were Californians, how many of
22  those were in the test group and how many were in the
23  control group?
24       A    I did not report that.
25       Q    Okay.  And how many of the 351 that are

Kenneth Hollander - 8/21/2007

1  non-California are in the test group and how many are in
2  the control group?
3      A    Once again, I have not reported.
4      Q    How many residents of the state of Alabama were
5  in the control group and how many were in the test group?
6      A    I can give you a blanket response. I did not
7  report that in any of the five states.
8      Q    Okay. That will save me some questions.
9           Let's take a lunch break.
10          (Lunch break.)
11          MR. MAKOUS: Back on.
12 BY MR. MAKOUS:
13     Q    You are still under oath, sir. You recognize
14 that you are still under oath?
15     A    Yes, I do.
16     Q    Have you ever used Zoomerang as an Internet
17 panel?
18     A    No, I have not.
19     Q    Do you have a criticism of Dr. Maronick using
20 Zoomerang?
21     A    I do not.
22     Q    Now, in the process of selecting and designing
23 your survey, selecting your stimuli and designing your
24 survey, did you have any discussions with Mr. Daucher
25 about testing the disclaimer on any of the pages --

Kenneth Hollander - 8/21/2007

```
 1     Q    For what purpose?
 2     A    To the end purpose of what does DMV.ORG
 3  communicate.
 4     Q    Okay.  Are you isolating DMV.ORG from the
 5  content it's contained in, the pages on which it's
 6  presented as part of your consideration?
 7          MR. DAUCHER:  Vague.
 8          THE WITNESS:  I want to answer your question,
 9  but I'm not certain what you mean by isolating that.  I
10  presented respondents with four pages and I asked
11  their -- take away their gestalt opinion after viewing
12  these four pages.  One of the elements was DMV.ORG.  Many
13  of the elements were not.
14  BY MR. MAKOUS:
15     Q    Uh-huh.  So did you come to an opinion about
16  what DMV.ORG actually communicates to the purchasing
17  public?
18     A    What DMV or DMV.ORG?
19     Q    DMV.ORG, the website name and domain name
20  actually communicate to the purchasing public.
21     A    I concluded it does not communicate affiliation
22  in connection with sponsorship or endorsement.
23     Q    By anybody?
24     A    By darn close to that, but certainly by the
25  Department of Motor Vehicles, the state or other
```

Kenneth Hollander - 8/21/2007

1  Q    Did he say you were doing a good job in keeping
2  up?
3  A    Something like that.
4  Q    Usual punch booster speech from counsel.
5       Did you attempt to test the belief of the public
6  about whose website the DMV.ORG website is?
7  A    Whose website?  Well, it seems to me that
8  tangentially I certainly did by asking if this website or
9  any elements upon it were affiliated, sponsored or
10 endorsed by anyone else.  I guess the answer to your
11 question is yes.  Did I ask them a direct question whose
12 website this is?  I did not.
13 Q    Why not?
14 A    Because that was not the issue.
15 Q    Really?
16 A    That was not my understanding of the issue,
17 Counselor.
18 Q    Is it possible your understanding is confused on
19 that issue?
20 A    It is always possible that I'm confused.
21 Q    You did not ask anywhere in any of your
22 questions whose website is if it, did you?
23      MR. DAUCHER:  Asked and answered.
24      THE WITNESS:  I did not.
25 BY MR. MAKOUS:

Page 111

Kenneth Hollander - 8/21/2007

```
 1      Q    In fact, your first question after the screening
 2   question was, as I read it in your report, quote, if you
 3   have an opinion, do you think that any of the entities
 4   shown on these four pages is affiliated, comma, with
 5   anyone else, comma, or that none of them are affiliated
 6   with anyone else, question mark.  Correct?
 7      A    Correct.
 8      Q    Okay.  That's not testing ownership of the
 9   website at all, is it?
10      A    That is not asking a question about ownership.
11   It is asking a question about affiliation.
12      Q    Not of the website though, correct?
13           MR. MAKOUS:  Don't say a word.
14           MR. DAUCHER:  Don't point your finger at me.
15           MR. MAKOUS:  Don't coach.
16           MR. DAUCHER:  Don't point.
17           THE WITNESS:  I truly don't need coaching.
18   BY MR. MAKOUS:
19      Q    Tell me where it says -- tell me where it says,
20   Mr. Hollander, you're testing the belief of the public as
21   to whose website they are looking at.
22      A    I never said I did.  I repeatedly told you in
23   this deposition, I have not.
24      Q    Why not?  Why didn't you test that?
25      A    Because as I understood the issue, it was what a
```

Page 112

Kenneth Hollander - 8/21/2007

1  reasonably prudent potential buyer --
2        MR. MAKOUS:  I apologize for pointing, Brian.
3        THE WITNESS:  -- believe that DMV.ORG is
4  affiliated with or endorsed or sponsored by the
5  Department of Motor Vehicles or some other state entity.
6  That is the question I set out to answer.
7  BY MR. MAKOUS:
8     Q    But you didn't ask the direct question, who
9  endorses this website, if anyone, or who sponsors this
10 website, if anyone, or who owns this website, if anyone,
11 did you?
12    A    Asked and answered.  No, I didn't.
13    Q    All right.  Is this a confusing question, the
14 first question there?
15    A    Which one?
16    Q    The first question you answered.
17    A    Is my question confusing?
18    Q    Mr. Hollander, I understand this is a
19 litigation.  We both have to let other people finish.
20 We're going to argue.  Let's agree to disagree.  Let me
21 finish -- let me withdraw the partial question.
22        Do you believe that, Mr. Hollander, your
23 question is confusing, the question being, quote, if you
24 have an opinion, do you think that any of the entities
25 shown on these four pages is affiliated, comma, with

Page 113

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

```
 1   anyone else, comma, or that none of them are affiliated
 2   with anyone else, question mark.
 3           Do you believe that's confusing?
 4   A    I do not.
 5   Q    It's compound though, isn't it?
 6   A    It is a single with a negation of the single
 7   statement.
 8   Q    It's a what?
 9   A    It's a single statement with a negation of it or
10   a question with a negation of it.
11   Q    Do you believe that it's double-loaded?
12   A    I don't know what double-loaded means.
13   Q    You're an expert and you don't know what
14   double-loaded means?  I know that's argumentative.
15   A    In answer to this question, I believe it's
16   clear, unavoidably clear and not confused.
17   Q    You had a lot of people that couldn't answer it,
18   though, didn't you?  You've got a lot of people that
19   couldn't answer it at all in your survey results, didn't
20   you?
21   A    Help me with that, please, sir.
22   Q    You had 34 percent had no opinion.  34 percent
23   of your survey couldn't answer the first question, they
24   had no opinion?
25   A    Right, exactly.  They had no opinion.
```

Page 114

Kenneth Hollander - 8/21/2007

1  Q   Now, do you find that to be a tarnishment, if
2  you will, of your survey methodology?
3  A   Not even close.
4  Q   They couldn't even say "I don't know." They
5  couldn't say they had just no opinion. You can't say,
6  can you?
7  A   Now may I answer?
8  Q   Yes.
9  A   I think there's a question there and I'm going
10 to answer the question I think is in there. Before the
11 survey began, I gave them explicit instructions not to
12 guess and to tell me if they have no opinion; hence, why
13 should I be surprised that some people didn't have an
14 opinion when, in fact, they didn't have an opinion.
15 Q   Did you ever attempt to determine if the public
16 that you screened understood what the word entities
17 means?
18 A   Did I conduct a separate test of the meaning of
19 the word entities? No, I did not.
20 Q   If entities was inherently confusing, you would
21 agree that your survey is flawed, wouldn't you?
22 A   Actually no, because I have no evidence, nor is
23 there any evidence that the word entity is confusing.
24 Q   If I submit to you that it turns out it is
25 confusing, you would agree then that your entire survey