Kenneth Hollander - 8/21/2007

1    BY MR. MAKOUS:

2        Q    Okay.  So it's -- just to get off this

3    particular topic, you don't care how many people have no

4    opinion in this survey, you just accept it as the way it

5    is?

6             MR. DAUCHER:  Argumentative.  Multiple

7    questions.

8             MR. MAKOUS:  All right.  I will withdraw.

9    BY MR. MAKOUS:

10       Q    Do you care how many people have no opinion in

11   any survey design you've had ever?

12       A    If I have cast my question carefully and if I

13   have given them permission to have no opinion, then I

14   accept as a matter of course that these people have no

15   opinion.

16       Q    Doesn't the answer "I don't know" qualify as no

17   opinion?

18       A    Yes.

19       Q    All right.  What's an entity as you used it in

20   this survey?

21       A    What is an entity as I used it on this survey?

22       Q    Yeah.  Define it for me.

23       A    Any of the names, organizations, real or

24   imagined, that appear on that web page.

25       Q    People.  Is a person an entity?

1      A      That's correct.

2      Q      How many different entities appeared on your

3  stimuli that respondents responded to on this first

4  question?

5      A      Well, I'd have to look at those pages again.  I

6  know that we had -- if we just talk about the test group,

7  we had DMV.ORG, we had Google, Progressive, we had

8  Federal Express.  That's what comes to mind at the

9  moment.

10     Q      A lot of those were advertisers on that website?

11     A      Absolutely.

12     Q      So you were testing just essentially anything on

13  the website anywhere.  You weren't testing the website's

14  ownership.  You were trying to test what people thought

15  about anything they saw on any DMV.ORG web page under

16  them, correct?

17     A      Anything they saw.  What I showed them is what

18  they would have seen were they online seeking information

19  and they saw those four web pages.  Yes, anything that

20  was on those pages, it's fair game to ask about them.

21     Q      You were sensitizing them, weren't you, by

22  showing them four at once?

23     A      I did not show them four at once.

24     Q      You showed four in a row, told them to go back

25  and look at them.  You were sensitizing?

1      Q      And what question did they see?

2      A      What word is being presented.

3      Q      Okay.  That's the question at the very top on

4      the right there?

5      A      Yes.

6      Q      Did you have any that terminated, failing to see

7      Cedar?

8      A      I don't know the answer to that question.  They

9      certainly were not part of the final 834.

10     Q      Now, the next paragraph after the list of things

11     says, we're going to show you four web pages and ask you

12     some questions about them, close quote.

13            Is that your work?  Did you write that?

14     A      Yes, I did.

15     Q      So you're sensitizing the respondents as to what

16     they expect to see; is that correct?

17     A      I'm going to object to the use of the word

18     "sensitized."  Sir, I'm telling the respondents that they

19     were going to be seeing more than one page.

20     Q      Why not just present them the pages?

21     A      Because I want them to be able to view them and

22     not expect there to be a question after the initial

23     viewing.  I made a judgment call.  Here's what I'm going

24     to show you.  And then I'm going to show them.

25     Q      Is that the way, in fact, that people who

1   actually travel to the DMV.ORG website are instructed

2   when they enter the site?

3        A    No.

4        Q    Aren't you obligated as a survey expert to

5   attempt to emulate the real world environment as closely

6   as possible when conducting a survey when doing a

7   consumer perception?

8        A    Yes.  But --

9        Q    Yes.  Say yes, sir, please?

10        A    Yes, sir.

11        Q    So it is what you attempt to do?

12        A    Yes.

13        Q    This particular instruction is not consistent

14   with the real world that anyone enters the DMV.ORG

15   website in, is it?

16        A    We spoke earlier today about the fact that there

17   are many ways into the website, that I believe I was told

18   that on average four or five pages of this website are

19   viewed.  I chose to present four pages in this survey.  I

20   chose to alert the respondent that there would be more

21   than one page that they intended to look at before

22   questioning began, and I did that.

23        Q    Okay.

24        A    I replicated the marketplace with respect, as

25   best I could, to the pages they would view and the order

Kenneth Hollander - 8/21/2007

1     A     Yes.

2     Q     What's your answer?

3     A     No.

4     Q     So the only thing you tested so far in this

5     deposition as I can understand it is that person who

6     navigates through those four consecutive pages; is that

7     correct?

8     A     Actually, I navigated for them.  I presented all

9     respondents with four different pages seriatim.

10    Q     Always presented in the same order, correct?

11    A     Correct.

12    Q     So would you agree with me that what you solely

13    tested was the perception in your view of someone who

14    navigated through those exact same four pages and then

15    tested them after they had seen all four; is that

16    correct?

17    A     I certainly tested them after they had seen all

18    four.

19    Q     Okay.  And you didn't test their perception of

20    any particular point in that process, just at the end of

21    it, correct?

22    A     Correct.

23    Q     Why not?

24    A     Because I wished to give them as much or as

25    little time, as much or as little exposure to the DMV.ORG

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    reading from Exhibit 182, quote, please review each page

2    carefully.   Now, that specific instruction doesn't appear

3    anywhere on the DMV.ORG website, does it, in the actual

4    website in use?

5        A    No, it does not.

6        Q    The next statement, "Take as much or as little

7    time as you normally would."   That also doesn't appear on

8    the DMV.ORG website, does it?

9        A    No, it does not.

10       Q    Okay.   Now, this is really interesting.   You add

11   this gratuitous statement, quote, note that, No. 1, you

12   can scroll all the pages up and down, and No. 2,

13   throughout this interview you may return to any of the

14   four pages you wish to read again, close quote.

15           Did you write that?

16           MR. DAUCHER:   Argumentative.   I can make a

17   record.   Move to strike the question as improper.

18   BY MR. MAKOUS:

19       Q    Did Mr. Daucher write that for you?

20       A    Let me repeat my answer to the previous

21   question.   I wrote that.

22       Q    Now, nobody in the DMV.ORG website is told to

23   scroll anywhere; is that right?

24       A    Correct.

25       Q    Would you agree that Internet traffic often

1    moves rapidly, that people click through quickly?

2        A    I'm sure some do, some don't.  I believe some

3    scroll up and down and some do not.

4        Q    Once they get what they want, they move forward,

5    right, they don't study the entire page; is that correct?

6        A    That is correct.

7        Q    Now, you would also agree, would you not, that

8    in the actual DMV.ORG experience, no one -- no one ever

9    has four pages reviewable by them at the same time,

10   correct?

11       A    Sir, these were not reviewable at same time.

12       Q    They were saved and they could review and look

13   at them any amount of time they wanted, as many times as

14   they wished, correct?

15       A    That is correct.

16       Q    That's not consistent with the actual site

17   experience of a website traveler, is it?

18       A    I have no idea.  Sometimes when I go to sites, I

19   review the pages.

20       Q    So you don't know.  You said "no idea."

21            MR. DAUCHER:  His testimony is that --

22            MR. MAKOUS:  Be quiet.

23            MR. DAUCHER:  -- as he --

24            MR. MAKOUS:  Object.  Please don't coach.

25            THE WITNESS:  I answered your question.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    that don't have DMVs?

2         I withdraw the question.  I know I speak fast.

3         Do you know if the DMV.ORG website presented to

4    the viewer that is from a state that doesn't have a

5    Department of Motor Vehicles, a DMV, do they call it the

6    state DMV similar to the way that the California page is

7    presented?

8    A    I've listened carefully -- who calls it?  Does

9    each state call it their department?

10    Q    No.  You are testing DMV.ORG's website in your

11    view; is that correct?

12    A    Correct.

13    Q    In those states where there is no Department of

14    Motor Vehicles, DMV, such as you tested Alabama and

15    Maryland --

16    A    And Arizona and New Mexico.

17    Q    Do you know if the stimuli presented to the

18    viewer said the unofficial online guide to the Alabama

19    DMV or did it say the Alabama DOT or did it say Alabama

20    something else?

21    A    As I sit here today, I do not know.  It's got to

22    be in there.

23         MR. MAKOUS:  Counsel for the defense has just

24    presented me with -- I'll mark this as an exhibit.

25         Off the record.

Kenneth Hollander - 8/21/2007

1    can you?

2        A    I didn't test it, so I can't opine on it.

3        Q    Why did you move the viewer to what we are going

4    to mark as Exhibit 187, which is the next screen?

5            (Deposition Exhibit 187 was marked for

6            identification by the court reporter.)

7        A    It was the fourth stimulus that everybody saw.

8        Q    So at the time just prior to opening the fourth

9    stimuli, you don't know what the state of mind of the

10   consuming public was that you tested, do you?

11       A    Correct, I do not.

12       Q    Okay.  And you don't know if this particular

13   image impacted their view one way or the other, caused

14   them to change their mind or differentiate their view, do

15   you?

16       A    That feels like a lot of questions, Counselor.

17       Q    You don't know one way or the other whether this

18   fourth stimuli changed the point of view in any respect

19   in any of respondents; is that correct?

20       A    That is correct.

21       Q    Why did you put that on there?

22       A    Because it's the last place you go before

23   spending money.

24       Q    Is that a DMV.ORG page?

25       A    No.  That was where the DMV.ORG series sends you

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    final traffic school questionnaire.

2    BY MR. MAKOUS:

3        Q    That bears your correct e-mail address at the

4    top; is that correct?  Ken@khresearch.com?

5        A    Yes.

6        Q    That's the correct address.  Did you send this

7    e-mail to Mr. Daucher on the date indicated?

8        A    I'm sure I did.

9        Q    And it has -- on the second page it has the

10   traffic school screener?

11       A    Yes.

12       Q    Are these, in fact, the screening questions that

13   are used in all the surveys that you're testifying on

14   today?

15       A    I believe it is.

16       Q    Why did you select the second question, "Are you

17   male or female"?

18       A    So that I could look at those dated by gender if

19   I wished to.

20       Q    Is that just a standard survey question?

21       A    Yes.

22       Q    And why did you select the age ranges in

23   screening question No. 3, 18 to 60?

24       A    I wanted to screen out anybody who was under 18

25   and I simply made a judgment to screen out people age 60

Kenneth Hollander - 8/21/2007

1    or older.

2       Q    That's the same screening that Dr. Maronick

3    used.  Are you aware of that?

4       A    It may be.  I may be aware of that or may not

5    be.  I find no fault.

6       Q    Screening question 4, why do you select that

7    question, "Do you currently have a valid driver's

8    license"?

9       A    Because if you don't have a valid driver's

10   license, you wouldn't be going to a traffic school, you

11   probably would be going to jail.

12      Q    That's a little extreme.  Your point is, one of

13   the ways that you're trying to identify the demographic

14   is to identify those that are likely to go to traffic

15   school; is that correct?

16      A    Sure.

17      Q    You're trying to identify those that may choose

18   online traffic schools as part of their goal?

19      A    That's where I get to S7, screener 7.  It just

20   seemed reasonable and prudent for me to ask if you have a

21   valid driver's license.  You get a ticket without a valid

22   driver's license.  You get bigger problems than going to

23   driver school.

24      Q    Screen question 6 seems to be a problem for the

25   residents of Alabama and Maryland because they can't go

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1   to online traffic school, correct?

2         MR. DAUCHER:  Object, that it lacks foundation

3   at that point, assuming that that is the case.

4         THE WITNESS:  Well, what you say, sir, may be

5   true, but there were a sufficient number of people who

6   thought that was a jolly good idea and it was a gateway

7   question to be exposed to DMV.ORG.

8   BY MR. MAKOUS:

9      Q   . Okay.  So in your view, that doesn't affect the

10  reliability of the survey, the fact that the respondents

11  from those two states couldn't attend an online traffic

12  school in their state?

13        MR. DAUCHER:  Objection.  Lacks foundation.

14        THE WITNESS:  Yes, I agree that it does not

15  affect it, and please note that the question is assume.

16  BY MR. MAKOUS:

17     Q   Okay.  Screen question 7, you now have four

18  choices.  Let's read it on the record.

19        "How likely would you be to use a search engine

20  such as Google or Yahoo to find out about online traffic

21  schools in your state?"

22        "Very likely, somewhat likely, not likely not

23  sure."

24        You wrote that question, right?

25     A   I did.

Page 156

Kenneth Hollander - 8/21/2007

1     Q    Why did you select a question about a search

2  engine?  What is the relevance of that?

3     A    Because it is my understanding that that is

4  essentially how, if not -- that is my understanding of

5  how people essentially get to the DMV.ORG website.

6     Q    Okay.

7     A    If somebody told me they weren't going to go

8  through a search engine, then I don't want to talk to

9  them.

10    Q    Dr. Maronick had a similar question which you

11 have no issue with as well?

12    A    That's correct.

13    Q    You didn't really use any aspect of search

14 engines, though, in your actual survey just in the

15 screening questions; is that correct?

16    A    That is correct.

17    Q    Did you attempt to test any other perceptions of

18 the public and discard them at any time during your

19 engagement?

20        MR. DAUCHER:  Objection.  Compound.

21        THE WITNESS:  No and no.

22 BY MR. MAKOUS:

23    Q    What are the two nos?

24    A    No, I didn't attempt to test any others.  And

25 had I done so, I didn't discard them.  I didn't test

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

1    Q    The same group that responded to 1-A also
2    responded to 1-B; is that correct?
3    A    That is correct.
4    Q    Now, what if someone thought there were multiple
5    affiliations that they observed, how could they answer
6    1-A and 1-B?
7    A    Because that is -- it's asked of each answer to
8    1-A.
9    Q    Okay.  Can you elaborate for me on that?
10   A    "Which entity is affiliated with someone else,"
11   brown and black.  With whom is brown affiliated with,
12   whom is black affiliated with.
13   Q    Okay.  I'm not sure of the answer and I'm not
14   espousing that you're not trying to answer.  I don't know
15   what you said.
16   A    It's affiliated with GEICO and Progressive.
17   Q    Let me give you the hypothetical viewer who
18   looks at your four stimuli and then is asked a question
19   like No. 1.
20        First, agree with me or disagree with me, you're
21   not identifying which pages they draw the association or
22   affiliation from, are you, just that somewhere in the
23   previous four pages, they have some view on that; is that
24   correct?
25   A    That's correct.

Page 175

Kenneth Hollander - 8/21/2007

1    Q    Okay.  Secondly, you don't know at this point in

2    No. 1 how many affiliations they have drawn in their

3    minds, just that they are going to answer one or more or

4    none or not sure.

5         So the next point is, you don't know if you have

6    six affiliations in your mind or two when they answer the

7    one or more -- I'm sorry, one, when they answer one or

8    more?

9    A    I don't know what is in their mind when they

10   answer one or more.

11   Q    Okay.  So the viewer, the respondent, could have

12   six affiliations in mind.  Hypothetically, is that

13   possible?

14   A    It's hypothetically possible.

15   Q    Is it possible that they believe that one

16   entity, as you call them, is affiliated with more than

17   one organization in their mind?

18   A    Yes.  That is possible.

19   Q    Okay.  You made no effort to ascertain that in

20   your testing, though, have you?

21   A    I'm back to my hypothetical brown and black,

22   GEICO and Progressive.  Which entity is affiliated with

23   someone else?  GEICO and Progressive.  With whom is GEICO

24   affiliated?  With whom is Progressive affiliated.

25   Q    But you don't know GEICO and Progressive?

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    more are finished at the end of the series 1 questions.

2    They have skipped to the "thank you for participation."

3        Q    Why did you exclude in question 2 anyone who had

4    responded yes, one or more is affiliated?

5        A    Because they have already told me that there is

6    some connection between one or more entities on those web

7    pages.

8        Q    So you, sir, made a decision that affiliation

9    equals endorsements and sponsorship, correct?

10       A    I have made it a decision to give everybody, as

11   it were, one bite of the apple.  I'm not giving them two

12   bites.  If they think there's affiliation, that's

13   sufficient for me.  For the purposes of this survey, it's

14   sufficient that they have answered in the affirmative,

15   I've terminated them essentially afterwards.

16       Q    When you use the word "affiliated," do you have

17   a point of view as to whether or not your survey

18   respondents understand what it means?

19       A    In the same way that I'm assuming the word, the

20   term entity is understandable, I'm assuming that the word

21   affiliated is understandable.

22       Q    Affiliate has a very broad meaning though, sir;

23   would you agree?

24       A    I'm sure it can mean more than one thing.

25       Q    Okay.  What can you think of that it means?

```
 1    Give me examples or definitions.
 2        A    Having some sort of connection or relationship.
 3        Q    Okay.  If I belong to the local YMCA, am I
 4    affiliated with it?
 5        A    If you think so, you are.
 6        Q    Answer my question.  Do you think if I am a --
 7    belong, if I'm a member of the local YMCA, am I an
 8    affiliate?
 9        A    No.  You're a member of it.
10        Q    So that's not affiliation.  Membership is not
11    affiliation.
12            MR. DAUCHER:  Asked and answered.
13            THE WITNESS:  Membership is not affiliation.
14    BY MR. MAKOUS:
15        Q    Okay.  If I work at a law firm as a secretary,
16    am I affiliated with it?
17        A    You're employed there.
18        Q    So employment is not affiliation; is that
19    correct?
20        A    That is correct.
21        Q    If I am married, am I affiliated with my wife?
22        A    You are married to your wife.
23        Q    So not affiliated.
24            If I'm a licensee of an enterprise, am I
25    affiliated with it?
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

1  kinds of disputes and debates about what it means,

2  correct?

3      A     That sounds like two questions.  It's wide and

4  subject to debates.  It is what the respondent thinks it

5  is and the respondent had the opportunity to tell us that

6  DMV.ORG is affiliated with some entity or not.

7      Q     Do you know if the respondent perceived DMV.ORG

8  as an entity?

9      A     Do I know that they did?  No, I don't know that

10  they did.

11      Q     You never tested that, you never asked them

12  directly about the domain name, did you?

13          MR. DAUCHER:  Asked and answered this morning.

14          THE WITNESS:  I do feel we've been over this

15  ground before, Counselor.  I did not ask any direct

16  questions about the domain name.

17  BY MR. MAKOUS:

18      Q     Nor about the ownership, sponsorship and

19  endorsement of the website, did you?

20      A     We've been over this before.

21      Q     We didn't go over endorsement or sponsorship.

22          Would you agree that you did not test the

23  beliefs of the public as to the ownership, sponsorship or

24  endorsement of the DMV.ORG website?

25      A     That is correct.

Page 184

Kenneth Hollander - 8/21/2007

1      A    Yes, it is.

2           MR. MAKOUS:  Go ahead.  You talk.  I'm off the

3    record.

4           MR. DAUCHER:  Let's take a break.

5           (Brief recess.)

6           MR. MAKOUS:  Back on.

7           (Deposition Exhibit 194 was marked for

8           identification by the court reporter.)

9    BY MR. MAKOUS:

10     Q    Exhibit 194 is a single-sheet document called

11   "Open-end Codes."

12          Is that your code on this project,

13   Mr. Hollander?

14     A    Yes, that is my code.

15     Q    Let's try to look at this together.  I see code

16   No. 1, you've combined DMV, slash, state, slash,

17   government.  So why is it that you combined those into

18   three categories as one code instead of separate?

19     A    Because they are all speaking to an affiliation

20   with an official -- with an official governmental entity.

21     Q    Does it presume that the respondent knows what

22   DMV means?

23     A    Well, DMV was on the -- DMV.ORG was on there.

24     Q    You mean it was on the stimuli?

25     A    Right.

Page 197

Kenneth Hollander - 8/21/2007

```
 1      Q    Does it presume that the respondent understands

 2  DMV to mean Department of Motor Vehicles is a

 3  governmental agency?

 4      A    Yes, I think that presumes.

 5      Q    Is it also possible that people combine DMV, a

 6  nongovernmental agency, with two governmental agencies?

 7           MR. DAUCHER:  Vague.

 8  BY MR. MAKOUS:

 9      Q    Let me repeat the question.

10           You've combined -- you created those three

11  categories, quote, DMV, close quote, quote, government,

12  and, quote, state, together, correct?

13      A    I did.

14      Q    Then you made a judgment call, as survey experts

15  do, in coding as to whether an open-ended response meant,

16  quote, DMV, or whether an open-ended response meant,

17  quote, state, or whether an open-ended response meant,

18  quote, government in regards to the affiliation question,

19  correct?

20      A    No.  The respondent would have said one of those

21  three.

22      Q    Right.  But you made a decision when reading the

23  open-ended responses whether they meant DMV or state or

24  government in their response?

25      A    I read it.  If I saw it, I gave it a 1.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Kenneth Hollander - 8/21/2007

1    Q    In other words, if someone in their response

2   said, who do you think this is affiliated with, they put

3   DMV.  Take that as a hypothetical response.  How would

4   you have coded that?

5    A    One.

6    Q    If someone gave the hypothetical response of

7   state department, how would you have coded that?

8    A    State department might have gotten "other."  If

9   somebody said state of California or California or

10  Alabama or something, I would have given it a 1.

11   Q    Does California in the response you just gave

12  mean the state of California?

13   A    That's what I -- yes.

14   Q    How would you make that determination when the

15  respondent said California, they meant state of

16  California?

17   A    Sir, we're in a hypothetical here and I'm

18  staying within your hypothetical.

19   Q    Okay.

20   A    DMV California, state, governmental agency, all

21  got a 1.

22   Q    That would include federal government in there

23  as well?

24   A    If anybody would have responded federal

25  government, yes.  It's a disjunctive idea, Counselor, to

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1   separate them from all other responses that are not in

2   that cluster, in that constellation.

3       Q   In code No. 2, it says, "All other."  Code No. 3

4   says "Don't know, not sure, guessing."  No. 4 says

5   "None."  No. 5 has "GEICO, Progressive, insurance

6   company."  No. 6 says "DMV.ORG" and No. 7 says "CAR.ORG."

7           When someone answered No. 6, DMV.ORG, do you

8   know if they meant state agency or not?

9       A   No, sir.  If they answered DMV.ORG, they got a

10  6.

11      Q   Okay.  Now, why do you separate that out from

12  No. 1?

13      A   Because it's a separate response.  It didn't say

14  DMV.  It said DMV.ORG.

15      Q   Okay.  But that doesn't mean they don't think

16  it's a state agency, does it?

17      A   Sir, I'm not capable of climbing into somebody's

18  mind.  I can only deal with the responses in front of me.

19  If the response was DMV, period, I gave it a 1.  If it

20  was DMV.ORG, I gave it a 6.

21      Q   Okay.  If you went back to your data and took

22  all the DMV.ORGs and combined them with No. 1, would that

23  affect your opinion?

24      A   I wouldn't do that.

25      Q   Would that have affected your opinion?

1       A    I have no idea.

2       Q    It would change the results, though, that you

3  calculated and analyzed, correct?

4       A    I have no idea.

5       Q    DMV.ORG, you don't know when someone answered

6  DMV.ORG, if they believe it to be a state agency or not,

7  do you?

8       A    No.  All I know is I'm presented with the

9  answer, quote, DMV.ORG, end quote.  I gave it a separate

10 code.

11      Q    But you don't know the state of mind, whether

12 that respondent believed that that answer meant somebody

13 affiliated with a state agency or not; is that correct?

14      A    Well, sir, in a way I certainly do because then

15 we said, "With whom is it affiliated?"  And nobody said

16 the DMV.ORG is affiliated with the DMV.ORG.  Very few

17 people said DMV.ORG is affiliated with DMV, slash, state,

18 slash, government, and some people said DMV, slash,

19 state, slash, government, is affiliated with DMV.ORG.  I

20 am able to capture that and report it.

21      Q    Why did you have a category for GEICO and

22 Progressive?

23      A    Because when I started this laborious process, I

24 had included them in "all other."  Then I saw that they

25 were achieving a life of their own, so I went back and

1   a more probative manner and I get different results, and

2   I believe my survey rebuts those results purporting to

3   emanate from the plaintiff's survey.

4   BY MR. MAKOUS:

5       Q    You come up with an independent opinion as to

6   whether or not defendant's website is deceptive,

7   unrelated to the opinion of Dr. Maronick; am I correct?

8           MR. DAUCHER:  Argumentative.

9   BY MR. MAKOUS:

10      Q    Go ahead.

11      A    My opinion which I have expressed in

12  paragraph -- whatever the heck it is, 16, is independent

13  of the results expressed by the plaintiff's survey.

14      Q    It's independent of it?

15      A    Correct.

16      Q    Let's go to paragraph 14, second page of

17  paragraph 14, Mr. Hollander.  I'm going to read the

18  paragraph just for the record.

19          Quote, if you have an opinion, do you think that

20  any of the entities shown on these four pages is

21  affiliated with anyone else or that none of them are

22  affiliated with anyone else, question mark.

23          Those thinking that there was an affiliation

24  were then asked, which entity is affiliated with someone

25  else and with whom is it affiliated.  We've been through

Page 204

Kenneth Hollander - 8/21/2007

1    this.

2          Next paragraph, you say, those with no opinions

3    and those thinking none are affiliated were asked, and if

4    you have an opinion, do you think that any of the

5    entities shown on these four pages is endorsed or

6    sponsored by anyone else, or do you think that none of

7    them is endorsed or sponsored by anyone else, close

8    quote.

9          How is that you asked people with no opinion if

10   they have an opinion after they already told you they

11   don't have an opinion?

12      A    They had no opinion about the affiliation.   I

13   asked them about sponsorship and endorsement and some of

14   them did have an opinion about sponsorship or

15   endorsement.

16      Q    You meant those with no opinion on affiliation

17   were then asked, "And if you have an opinion"?

18      A    Yes.

19      Q    But you don't tell them that's why you're asking

20   them that.   You don't say do you have an opinion on

21   sponsorship or endorsement, or you don't say to them, you

22   answered you don't believe -- you have no opinion on the

23   affiliation, I'm now going to ask you about sponsorship

24   and endorsement, do you?

25      A    No.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    It's implied in that phrase.

2        A    Yes.   It is seriatim after my first declaratory

3    statement that it's okay to have an opinion, then asking

4    them in the question 1 series if they have an opinion,

5    then finally I say, again, if you have an opinion.   I

6    should think that is anything but prodding them to have

7    an opinion.

8        Q    I think you agree -- would you agree that

9    affiliation as you've used it encompasses endorsement and

10   sponsorship?   It's a broader term?

11            MR. DAUCHER:   Vague.   And I object to the

12   characterization of his testimony.

13            THE WITNESS:   I don't know.   In a legal sense, I

14   don't know.

15   BY MR. MAKOUS:

16       Q    No.   In a survey sense.

17       A    In a survey sense, I'm asking about affiliation.

18   In a survey sense, I'm saying those of you who did not --

19   I'm saying to those people who either said no, or, I have

20   no opinion about affiliation, do you believe there's a

21   sponsorship or endorsement.

22       Q    But affiliation is broad enough to include an

23   endorsement or sponsor, is it not?

24            MR. DAUCHER:   In his opinion?

25            THE WITNESS:   In my opinion, it could be.   In my

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1   opinion, sponsorship or endorsement is subsumed under

2   affiliation and/or affiliation is subsumed under

3   sponsorship or endorsement.

4   BY MR. MAKOUS:

5        Q    Okay.  Let's go to paragraph 7 of your survey,

6   expert report 172.  Your criticisms of Dr. Maronick are

7   summarized in paragraph 8; is that correct?

8        A    That is correct.

9        Q    All right.  Let's go to paragraph 9, first

10  criticism is called "Improper stimuli."  Is your opinion

11  captured in that paragraph and in your testimony today?

12       A    Are you saying --

13       Q    Is there any more on improper stimuli you would

14  like to add?

15       A    No, there is not.

16       Q    Okay.  From the documents I've seen, I noticed

17  that your stimuli is a pdf website document; is that

18  correct?

19       A    Correct.

20       Q    How do you scroll a pdf?

21       A    You use the scroll bar.

22       Q    Okay.  Where is that?

23       A    It's on the respondent's computer.

24       Q    Is it on the side, put the mouse on it, move up

25  and down?

1     A     No.

2     Q     Is it reliable within the 85 percent confidence

3     level?

4     A     Probably at the 80 percent confidence level.

5     We're talking about all others.  I'm trying to measure

6     and I'm reporting on the measurement of noise with

7     respect to DMV and DMV.ORG.  That's what I'm trying to

8     account for.  Of course, some numbers are going to be

9     different.

10     Q     Okay.  Now, if you look at the question 1-A,

11     DMV, slash, state, slash, government.  Look at the

12     results that go across in the six columns.  Would you

13     agree that the results for the non-DMV states indicate a

14     lower affiliation opinion than California?

15     A     I would.

16     Q     Yet you combined those non-DMV states with

17     California to formulate your opinion, didn't you?

18     A     I did.

19     Q     Would you agree that the numbers in the non-DMV

20     states lower the total number of people in the entire

21     test group and control group that found an affiliation?

22     A     They were lower in both the test and control

23     group, true.

24     Q     When you combine them with California, would you

25     agree that the net result was to lower the overall

1    result?

2       A    Yes.  I would agree with that.

3       Q    Now, does it concern you to have so many

4   controls that are in excess in this chart of the test

5   groups?  For example, question 1-B, your control of 14.7

6   exceeds 12.6 on the DMV, slash, state, slash, government

7   line, meaning that the control, it's a negative.  I mean,

8   we have a control group that's supposedly measuring

9   noise, you're assuming the entire test group and some.

10  What does that mean?

11      A    It means what I've been trying to tell you it

12  means, sir, that anything that appears on those pages

13  dealing with the subject of traffic schools may, in fact,

14  be thought to have some relationship, affiliations,

15  sponsorship or endorsement with an official governmental

16  agency.  I have been saying that consistently.

17      Q    I will go back to my question though.  It wasn't

18  responsive, but it was an answer.  Let's take question

19  1-B.  DMV, slash, state, slash, government.  Moving left

20  to right, your test group in the first column is 11.4

21  total.  Your control group is 10.8.  That column is a

22  combination of the two right-hand columns, one for

23  California and one for non-California, correct?

24      A    Correct.

25      Q    Focusing for a minute just on California, which

Page 229

1
2

**PROOF OF SERVICE**
Trafficschool.com, Inc. v. Edriver, Inc. - File No. 25162-14

3  STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4          At the time of service, I was over 18 years of age and not a party to the action.
5  My business address is . I am employed in the office of a member of the bar of this
   Court at whose direction the service was made.

6          On November 9, 2007, I served the following document(s):

7  PLAINTIFFS' **DESIGNATION OF SELECTED DEPOSITION**
8  **TESTIMONY** OF KENNETH HOLLANDER IN LIEU OF CROSS-
   EXAMINATION PURSUANT TO COURT ORDER ISSUED FROM BENCH
9  ON 11/8/2007

10         I served the documents on the following persons at the following addresses
   (including fax numbers and e-mail addresses, if applicable):

11  Brian M. Daucher, Esq.
    Joseph H. Tadros, Esq.
12  Amy Merlo, Esq.
    SHEPPARD MULLIN RICHTER & HAMPTON
13  650 Town Center Drive, 4th Floor
    Costa Mesa, California 92626-1925
14  Telephone: (714) 513-5100
    bdaucher@sheppardmullin.com
15  jtadros@sheppardmullin.com
    amerlo@sheppardmullin.com
16

17         The documents were served by the following means:

18  [X]    (BY E-MAIL OR ELECTRONIC TRANSMISSION) Based on a court order or
           an agreement of the parties to accept service by e-mail or electronic transmission,
19         I caused the documents to be sent to the persons at the e-mail addresses listed
           above.  I did not receive, within a reasonable time after the transmission, any
20         electronic message or other indication that the transmission was unsuccessful.

21         I declare under penalty of perjury under the laws of the State of California that the
22  above is true and correct.

23         Executed on November 9, 2007, at Los Angeles, California.

24

25

26

27                                          _____
                                                    Edwina G. Martinez
28

4831-4364-9538.1                            -7-
PLAINTIFFS' DESIGNATION OF SELECTED DEPOSITION TESTIMONY OF K. HOLLANDER IN LIU OF
CROSS-EXAMINATION PURSUANT TO COURT ORDER ISSUED FROM BENCH