EXHIBIT A

1  DAVID N. MAKOUS (State Bar # 082409)
   makous@lbbslaw.com
2  DANIEL C. DECARLO (State Bar # 160307)
   decarlo@lbbslaw.com
3  MINA I. HAMILTON (State Bar # 213917)
   hamilton@lbbslaw.com
4  LEWIS BRISBOIS BISGAARD & SMITH LLP
   221 North Figueroa Street, Suite 1200
5  Los Angeles, California 90012-2601
   Telephone: (213) 250-1800
6  Facsimile:  (213) 250-7900

7  Attorneys for Plaintiffs
   TRAFFICSCHOOL.COM, INC. and
8  DRIVERS ED DIRECT, LLC, California companies.

9

10                UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12  TRAFFICSCHOOL.COM, INC.,          ) Case No. CV 06-7561 PA (CWx)
    a California corporation; DRIVERS ED )
13  DIRECT, LLC, a California limited   ) The Honorable Percy Anderson
    liability company,                 )
14                                      ) PLAINTIFFS' POST-TRIAL
                     Plaintiffs,        ) [PROPOSED] FINDINGS OF FACTS
15                                      ) AND CONCLUSIONS OF LAW
            vs.                         ) (CITATIONS TO EVIDENCE AND
16                                      ) LEGAL AUTHORITIES)
    EDRIVER, INC., a California         )
17  corporation; ONLINE GURU, INC.,    ) [November 16, 2007]
    FIND MY SPECIALIST, INC., and      )
18  SERIOUSNET, INC., California        ) Trial:     Nov. 6-8, 2007
    corporations; RAVI K. LAHOTI, an   )
19  individual; RAJ LAHOTI, an individual, )
    and DOES 1 through 10,             )
20                                      )
                     Defendants.        )
21  _____ )

22

23

24

25

26  / / /

27  / / /

28  / / /
                              EXHIBIT A
                                  2
    4851-6320-8706.1
    ─────────────────────────────────────────────────────────
    PLAINTIFFS' POST TRIAL [PROPOSED] FINDINGS OF FACTS AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

   A.   The Parties: Plaintiffs (¶¶1-12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

   B.   The Parties: Defendants (¶¶13-21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

   C.   Competition: Both Plaintiffs and Defendants Market and Sell Traffic School and Drivers Education Courses (and Advertise Other Driving Related Services ) via the Internet Through Search Engine Marketing and Their Respective Websites (¶¶22-32) . . . . . . . . . . . . -4-

   D.   The .ORG Top-Level Domain; The DMV Moniker; Use by Defendants of DMV and Other State Agency Names in Search Engine Advertising Even for "Non-DMV" States; Defendants' Attempt to Appropriate for Exclusive Use the DMV Moniker as a Trademark; No License or Permission From DMVs (¶¶33-40) . . . . . . . . . . . . . . . . . . . . . . . . -7-

   E.   Defendants' False and Misleading Search Engine Advertising (¶¶41-61) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

   F.   Defendants' False and Misleading DMV.ORG Website (¶¶62-74) . -12-

   G.   Other Advertising for the DMV.ORG Website (¶¶75-77) . . . . . . . -14-

   H.   Evidence of Actual and Likelihood of Confusion and Intent to Deceive (¶¶78-94) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

   I.   The Materiality of the False and Misleading Advertising (¶¶95-99) . -19-

   J.   The Actual and Likely Injury to Plaintiffs (¶¶100-105) . . . . . . . . . . -20-

   K.   Steve Moretti Testified Falsely: Page View Statistics (¶¶106-110) . -20-

   L.   Steve Moretti Testified Falsely: Defendants' Conversion Data (¶¶111-115) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

   M.   Findings Related to Alleged Unclean Hands and Laches Defenses (¶¶116-121) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

   N.   Factual Findings Relating to Remedies: Injunction (¶¶122-128) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

   O.   Factual Findings Relating to Remedies: Defendants' Profits/Drivers Education and Traffic School Revenues/Advertising Costs/Laches Rebuttal (¶¶129-144) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

II.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

   A.   Elements of False Advertising Under 15 U.S.C. § 1125(a)(1)(B) . . . -27-

   B.   Legal Conclusions Regarding Various Defenses . . . . . . . . . . . . . . . -32-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C.   Legal Conclusions Regarding Unfair Competition Under
     B&P Code § 17200 et seq.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

D.   Legal Conclusions Regarding Injunctive Remedies under
     the Lanham Act   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

E.   Legal Conclusions Regarding Monetary Remedies under
     the Lanham Act   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

F.   Legal Conclusions Regarding Remedies: B&P Code § 17200
     et seq   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

EXHIBIT A
4

PLAINTIFFS' POST TRIAL [PROPOSED] FINDINGS OF FACTS AND CONCLUSIONS OF LAW

ABBREVIATIONS TO EVIDENCE USED HEREIN:

"TD"-   Trial *Declaration* without sustained objection relating to the finding.

"TE"-   Trial *Exhibit* (Post-Trial Stipulation filed on Nov. 14, 2007).

"TT"-   Trial *Testimony*, to extent any objections were not sustained.

"Depo."- Trial *Deposition Designation* without any sustained objection.

## I.    FINDINGS OF FACT

### A.    The Parties: Plaintiffs (¶¶1-12)

1.    TrafficSchool.com, Inc. ("TSC") is in the business of providing classroom, home study, and Internet-based traffic school courses. [TD Eric Creditor ¶¶2-3; 11.]

2.    TSC owns the TrafficSchool.com website and markets and sells traffic school courses to online consumers via that website. [TD Eric Creditor ¶¶3; 17(except lines 14-15); TE 300.]

3.    TSC is officially licensed by the California Department of Motor Vehicles ("CA DMV") to provide traffic school courses in the State of California to the public. [TD Eric Creditor ¶6.]

4.    Since 2005, Plaintiff Drivers Ed Direct, LLC ("Direct") has been providing drivers education courses to the public and is licensed and approved by the CA DMV to do so. [TD Eric Creditor ¶10.]

5.    Direct owns the DriversEdDirect.com website, which is accessible also through the TSC website, and markets and sells drivers education courses to online consumers via that website. [TD Eric Creditor ¶8.]

6.    From its origins in 1994, Plaintiffs' business model has expanded to include the use of Plaintiffs' websites to market traffic school and drivers education courses in California and various other states, and Plaintiffs' contractual relationships with referral providers in additional states continues to grow. [TD Eric Creditor ¶¶3; 5; 7; 11-14 (except to extent describing DMV.ORG operations per

1  sustained objections).]

2      7.      Plaintiffs also use their websites as advertising forums for non-traffic
3  school and non-drivers education third party services and to provide resources and
4  links to other sites. [TD Eric Creditor ¶16 (a-d); TE 304, 306, 308, 310, 314 .]

5      8.      Plaintiffs also provide the public with driving information through their
6  DrivingLinks.com website, which permits users to link to the TSC and Direct
7  websites. [THE DISTRICT Eric Creditor ¶30; TE 371.]

8      9.      In order to compete  for online consumers interested in traffic school
9  and drivers education courses, Plaintiffs bid on "keywords" from search engines,
10  including Google and Yahoo! [TD Eric Creditor ¶¶17 (except lines 14-15)-18; TD
11  Chris Kramer ¶¶3-4.]

12      10.      When a bid-for keyword is used by a consumer as part of their search,
13  the search results include the paid-for (or "sponsored") advertisement of the
14  advertiser that bid on the keyword. [TD Chris Kramer ¶3; TD Eric Creditor ¶17-19
15  (except lines 14-15); TE 367; 322-330.]

16      11.      In Google, for example, the sponsored listings are generally listed above
17  the "natural" or non-sponsored listings. [TD Chris Kramer ¶3; TE 367; 322-330.]

18      12.      Plaintiffs also rely on "natural" (or non-paid) listings of certain search
19  engines. [TD Chris Kramer ¶6; TE 324 (showing Direct's natural results link at
20  bottom of first page) and TE 325(showing TSC's natural results link as first non-
21  sponsored listing).]

22      **B.      The Parties: Defendants (¶¶13-21)**

23      13.      Defendant Edriver, Inc. ("Edriver") owns the domain name "dmv.org."
24  [TT 11/6, p. 21:6-8.]

25      14.      Defendant Online Guru, Inc. ("Online Guru") is responsible for
26  managing the DMV.ORG website and content located at http://www.dmv.org
27  pursuant to a management agreement with Edriver. [TT 11/6, pp.  20:19-23; 22:16-
28  22.]

15. Defendant Find My Specialist, Inc. ("Find My Specialist") and Defendant Seriousnet, Inc. ("Seriousnet") own various other domain names and websites which direct consumers to or from DMV.ORG. [Admission in Defendants' Answer to Third Amended Complaint, ¶19(a)-(c); Depo. Steve Moretti, pp.126:25 to 127:7; 134:12-23; TT 11/6, p. 21:9-20; Depo. Ravi Lahoti, p. 57:6-9; 95:19 to 96:6, Ex. 171.]

16. Defendant Find My Specialist owns the TeenDriverEducation.com website (DMV.ORG's referral website for drivers education in California) but at other times was previously owned by SeriousNet or Golden State Private School. [Depo. Steve Moretti, pp. 139:19-24 to 140:20; TE 162.]

17. Defendants Ravi Lahoti and Raj Lahoti own Biz Groups, Inc, which in turn owns each of the corporate Defendants other than Seriousnet (which is owned by Defendant Ravi Lahoti). [TE 333; Depo. Ravi Lahoti pp. 14:4-24; TT 11/6, p. 20:2-5; 21:2-5).]

18. Raj Lahoti is the CEO of Biz Groups, Inc. and all of its wholly owned subsidiaries, which includes Find My Specialist, Edriver, and Online Guru; Ravi Lahoti is the VP of Online Guru. [TE 333; TT 11/6 , pp. 19:22-20:18).]

19. Ravi Lahoti first registered the DMV.ORG domain name and both Ravi and Raj Lahoti in combination have decided to continue using the domain name DMV.ORG, [Depo. Steve Moretti, p. 17:12-15; 129:1-17.]

20. At various times, the DMV.ORG domain name was owned by SeriousNet. [TE 161.]

21. Seriousnet has developed a routine business practice of registering domains that are confusingly similar to government or private domain names.[Depo. Ravi Lahoti, pp. 62:8 to 95:18; TE 163, 165-167; 169; 171.]

/ / /

/ / /

/ / /

**C.**   **Competition: Both Plaintiffs and Defendants Market and Sell Traffic School and Drivers Education Courses (and Advertise Other Driving Related Services ) via the Internet Through Search Engine Marketing and Their Respective Websites (¶¶22-32)**

22.   Like Plaintiffs [TD Eric Creditor ¶¶3; 5; 7; 11-14], Defendants have referral relationships (often exclusive) with traffic school and drivers education providers to market and sell those services via the DMV.ORG website. [Depo. Steve Moretti, pp. 75:15 to 76:14; 78:1-25; 79:13 to 80:24; 81:3-14; 95:18 to 97:8; 104:21 to 106:24 (admission by Online Guru that they are in competition with Plaintiffs); 252:14-24 (TE 14 list of "different partners used and in what state they are currently being advertised on the DMV.ORG website."); Depo. Steve Moretti, pp. 256:7 to 258:20; 260:1 to 263:25 (TE 15 agreements with referral companies).]

23.   DMV.ORG and Defendants do not act as mere passive advertisers functioning like newspaper classifieds; they receive no revenue for the mere listings of the traffic school or drivers education advertisements on DMV.ORG site, but only receive revenue once the traffic school or drivers education course is sold through Defendants' marketing efforts; indeed, they refer to this advertising revenue as "sales commissions" or "marketing fees" from their referral partners and receive over half and as much as 80% of the total fee paid by the consumers for the courses. [TE 15 (e.g., (DEF-01957),(DEF-00239), (DEF-00244 ("sales commission"); TE 356; TT 11/7, pp. 188:2-190:21.]

24.   Like Plaintiffs [TD Eric Creditor ¶¶3; 5; 7; 11-14], Defendants own and manage websites in addition to DMV.ORG (i.e., TeenDriversEducation.com and FloridaDrivingCourse.com which are the referral websites from DMV.ORG in California and Florida) for the purpose of generating revenue from the sale of drivers education and traffic school services.  For example, Golden State Private School entered an agreement with Defendant Online Guru whereby Defendant Online Guru is to "market and promote" Golden State Private School's courses using the

1  TeenDriversEducation.com site that is "managed by" Online Guru, Inc. [TE 15

2  (DEF-00244); TE 413 (attached to Post-Trial Exhibit Stipulation); Depo. Steve

3  Moretti, p. 316:2-10.]

4    25.    Mr. Raj Lahoti's testimony that Defendants merely own the domain

5  TeenDriversEducation.com for drivers education courses is false. Find My Specialist

6  does own the domain name TeenDriversEducation.com [TT 11/6, p. 119:1-6], but

7  Mr. Raj Lahoti testified that Golden State Private School ("Golden State") manages

8  the site, not Defendants [TT 11/6, p.105:13-17]. However, as noted above and

9  specified in TE 15 (the contract between Online Guru and Golden State [TT 11/16,

10  pp. 36:6-37:11], Online Guru is responsible for managing the site, not Golden State.

11  Indeed, when a consumer visits the California drivers education page at DMV.ORG,

12  that consumer is not presented with any information about or even the identity of

13  Golden State Private School [TT 11/6, p. 119:7-20]. Moreover, when a user clicks

14  on the TeenDriversEducation.com link on the DMV.ORG website, the user goes to

15  the TeenDriversEducation.com website which is branded completely as Teen Drivers

16  Education, not Golden State Private School [TT 11/6, p. 120:17-23; TE 413

17  (communicating to consumers that the courses are being offered by

18  TeenDriversEducation.com by the use of the terms "our" and "we" in the text of the

19  website)]. These facts do not support a conclusion that DMV.ORG is merely

20  advertising for Golden State Private School. To the contrary, DMV.ORG is

21  essentially marketing and selling driving education courses and retaining all good

22  will associated with the website. [TT 11/6, pp. 122:17-124:19.]

23    26.    Defendants in some instances have referral relationships with the *same*

24  traffic school and drivers education providers as Plaintiffs. [TD Eric Creditor ¶¶12-

25  15 (except to extent it relates to DMV.ORG's operations); e.g., TE 300 (showing

26  TSC's "courses offered" for traffic school in Nevada, New Mexico, Colorado, Idaho,

27  Virgina through I DRIVE SAFELY referral provider) and TE 301(showing

28  DMV.ORG's courses offered for Nevada, New Mexico, Colorado, Idaho, Virginia

through I DRIVE SAFELY referral provider), TE 302 (showing Direct's drivers education courses being offered for Texas and Colorado through Driver Ed in a Box and Virtual Drive) and TE 303 (showing DMV.ORG's offering drivers education courses for Texas and Colorado through Driver Ed in a Box and Virtual Drive); TE 14.]

27.　　Defendants even advertise some of the same services and products on their DMV.ORG website as Plaintiffs advertise on their websites. [Depo. Steve Moretti, pp. 41:19 to 45:21; 45:22 to 46:6 (describing nature of DMV.ORG business and goods and services provided); TD Eric Creditor ¶16(a)-(e) (except to extent it relates to DMV.ORG's operations); compare TE 304 and 305 (vehicle history reports); compare TE 306 and 307 (new/used car quotes); compare TE 308 and 309 (auto insurance quotes); compare TE 310 and 311 (driver's records); compare TE 312 and 313 (DVD product "Rules of the Road."); TT 11/16, pp. 44:5-21; 45:5-15; 46:7-12.]

28.　　DMV.ORG and Plaintiff Direct have advertised their respective affiliate referral programs through the same third party website. [TE 321 (AffiliatePrograms.com ads for DMV.ORG and Direct on 2/4/2007).]

29.　　Defendants, like Plaintiffs do for their websites [THE DISTRICT Chris Kramer ¶3; TD Eric Creditor ¶17-19 (except lines 14-15)], pay for "sponsored" result listings to feature DMV.ORG on certain search engines. [Depo. Steve Moretti, p. 251:8-14; TE 13 (list of traffic school and drivers ed related keywords bid on by DMV.ORG); Depo. Steve Moretti, p. 345:1-9; TE 101 (DMV.ORG state specific traffic school and drivers related keywords).]

30.　　Defendants, like Plaintiffs [TD Chris Kramer ¶6; TE 324, 325], also rely on "natural" listings of certain search engines. [TD Chris Kramer, ¶6; TT 11/7, pp. 150:11-151:5.]

31.　　Significantly, both Plaintiffs and Defendants compete and bid on many of the same keywords in order to insure that their respective sponsored listings are

1  displayed to consumers performing online searches for traffic school and drivers

2  education courses. [TD Chris Kramer ¶¶4 (except second sentence in ¶4) and 8; TE

3  13 and 101 (Defendants' keywords) and TE 603 and 604 (Plaintiffs' keywords).]

4     32.   Defendants even bid on Plaintiff TSC's complete domain name

5  "trafficschool.com" so as to hopefully direct consumers searching online for

6  Plaintiffs' website to instead link to DMV.ORG. [TE 13 (DEF-00252)(showing

7  trafficschool.com as a bid on keyword by Defendants.]

8     **D.   The .ORG Top-Level Domain; The DMV Moniker; Use by**

9           **Defendants of DMV and Other State Agency Names in Search**

10          **Engine Advertising Even for "Non-DMV" States; Defendants'**

11          **Attempt to Appropriate for Exclusive Use the DMV Moniker as a**

12          **Trademark; No License or Permission From DMVs (¶¶33-40)**

13    33.   The .ORG is a top level domain that may be used for non-profit

14  companies, including state government DMV agencies. [TE 315 (PL01273–1274

15  (North Corolina's DMV website at NCDOT.ORG and NCDOT.ORG/DMV).]

16    34.   The "DMV" moniker is the state adopted unique identifier for the state

17  government motor vehicle regulatory agency for California as well as many other

18  states. [TE 315 (examples of selected state government agencies' use of DMV

19  acronym on official websites- including CA, AK, CT, DE, DC, ID, NE, NV, NY,

20  NC, OR, SC, UT, VT, VA, WI).]

21    35.   The California Department of Motor Vehicles ("CA DMV") uses the

22  identifier DMV. [TE 315 (PL01039-1042).]

23    36.   When consumers in California see the moniker "DMV," they recognize

24  it as standing for the "Department of Motor Vehicles". [TD Dr. Thomas Maronick,

25  TE 350 (pg. 6, Study 1).]

26    37.   Even in states where the formal name of the motor vehicle regulatory

27  agency is not abbreviated as the "DMV," evidence suggests some consumers in those

28  states still refer to the agency in that state as the "DMV." [TE 400 (consumer emails

1   to DMV.ORG where the consumer is referencing the acronym DMV and DMV.ORG

2   is sending them to the state agency URL in the non-DMV state (e.g., Massachusetts

3   (DEF-01172); (DEF-01181-from non-DMV state AZ, but consumer asks "...can I get

4   a temporary plate to go to the dmv?"); (DEF-01601-"I was told to contact the

5   DMV"- from consumer in Florida), etc., etc.]

6       38.    Defendants even bid on keywords such as "Alabama DMV", and other

7   non-DMV states so that the DMV.ORG sponsored listings appear in the search

8   results [TE 401]; they also bid on keywords incorporating the non-DMV state's

9   agency acronym and display advertising that would attract users who know the non-

10  DMV acronym (e.g.. "Alabama DPS Info...DMV.ORG/Alabama-DPS") [TE 402.]

11      39.    Defendant Edriver was attempting to appropriate the DMV.ORG name

12  exclusively nationwide by applying to the United States Patent and Trademark Office

13  for the mark "DMV.ORG," which was opposed by the CA DMV and subsequently

14  abandoned by Edriver. [TE 362.]

15      40.    Defendants have no license or permission to act as the official website

16  on behalf of any state DMV agency or to represent (impliedly or expressly) that they

17  are endorsed by, affiliated with, or licensed by the California DMV or any other state

18  DMV. [Admission in Defendants' Answer to Third Amended Complaint, ¶42; TE

19  317 (000131-last page text on DMV.ORG showing ineffective disclaimer appearing

20  at bottom of third page)]

21      **E.    Defendants' False and Misleading Search Engine Advertising**

22          **(¶¶41-61)**

23      41.    DMV.ORG is advertised in interstate commerce. [Admission in

24  Defendants' Answer to Third Amended Complaint, ¶25-26.]

25      42.    Online Guru's search engine marketing, i.e., its pay-per-click

26  advertising, often results in the display of deceptive sponsored links on search

27  engines such as Google because a consumer is likely to believe that it is a link to a

28  state DMV website or sanctioned by their state DMV agency and thus the

1 recommended traffic school or drivers education course on DMV.ORG is
2 recommended by the DMV. [TEs 322- 330, 367, 372, and 379-381, 401 and 402); TT
3 11/6, pp. 60:9-62:9 (TE 324); TD Shannon Roberston, ¶¶3-6; TD Chris Kramer, ¶7;
4 TT 11/6, pp. 60:1-61:13; 61:21-63:18; 63:19-65:4 (TE 324, 325); TE 394
5 (governmental entities such as the United States Army do use sponsored listings
6 through Google); THE DISTRICT Lisa Warren, ¶5-8.]

7       43.    One of Plaintiffs' consumer surveys was directed to testing consumer
8 confusion at the search engine stage and found that "[W]hen California residents see
9 the DMV.ORG internet address/link on a Google search for online traffic schools,
10 over half (58%) believe it is a link to the DMV or Department of Motor Vehicles".
11 [TD Dr. Thomas Maronick, TE 350 (pg. 7, Study 2); TE 389 (Rebuttal Statement of
12 Dr. Maronick)..]

13       44.    Assessing consumer perception at the search engine result stage is
14 critical because a significant number of consumers (about 80% according to
15 Defendants) locate DMV.ORG through search engine listings, 61% coming from the
16 Google search engine. [TT 11/7, p. 154:6-10; TE 339; Depo. Steve Moretti, pp.
17 223:13 to 230:25 (i.e., 224:8-21).]

18       45.    Online Guru, through search engine optimization and paid-for
19 advertising and bidding on key words, seeks to attract visitors from all states who are
20 interested in purchasing traffic school and drivers education courses, and is very
21 effective at doing so. [TT 11/6 , pp. 48:18-50:1; 50:6-16; 50:10-22; 65:24-66:13; TD
22 Chris Kramer, ¶3.]

23       46.    When a user clicks on a DMV.ORG pay-per-click advertisement for
24 traffic school or drivers education, they will travel to a dedicated page for drivers
25 education or traffic school on the DMV.ORG website and are thus highly targeted
26 consumers. [TT 11/6, pp. 68:14-70:9; TT 11/7 , p. 173:3-8 and p.175:12-18 ; TE
27 127,TE 133.]

28       47.    In 2006, 23% of those who visited DMV.ORG entered through the

1  DMV.ORG homepage.  In 2007 that figured dropped to 16.9%.  This illustrates that

2  DMV.ORG is becoming increasingly more effective and efficient in inducing

3  consumers to land on targeted pages of interest. [TT 11/7 , p. 172:4-21.]

4      48.     Online Guru's revenues are driven almost completely, upwards of 90%,

5  on a business model known as "cost per action".  This means that Online Guru only

6  makes money when a certain action is taken by a user, such as a user clicking on an

7  icon displayed on the DMV.ORG website and then purchasing a drivers education

8  course or traffic school course, for example. [TT 11/6, pp. 50:23-51:19.]

9      49.     The advertiser, i.e., Defendant Online Guru, sets forth the message that

10  consumers see in the sponsored listings, and is solely responsible for it, not the

11  search engine company. No evidence exists that Google or Yahoo! have ever

12  specifically approved DMV.ORG's advertisements. [Depo. Steve Moretti, pp. 146:18

13  to 147:4; TE 97, TT 11/6 pp. 54:20-25; 58:1-25; 60:22-25.]

14      50.     Indeed, Google search results for the keywords "red light camera ticket"

15  and "license plate covers" show sponsored links that appear to conflict with Google's

16  stated advertising policy. [TE 392; TE 95 (p. 3 of 3 relating to "Traffic Devices".]

17      51.     A November 17, 2006 search result shows DMV.ORG as the #1

18  sponsored listing for the "California DMV" and provides a link to consumers to the

19  domain name *www.ca.dmv.org* which linked directly to DMV.ORG. [TE 322.]

20      52.     The CA DMV provides information and guidance to consumers on the

21  internet at *www.dmv.ca.gov.* [TE 322 (CA DMV listing at *www.ca.dmv.org* directly

22  under the sponsored DMV.ORG listing of *www.ca.dmv.org*); TE 315 (PL01039-

23  1042).]

24      53.     A November 17, 2006 search for "dmv" shows the statement (in the text

25  of the sponsored search results): "CA Dept. Motor Vehicles Guide.  Guide to DMV,

26  License, Registration." [TE 322.]

27      54.     There is no support for the notion that the public believes that the

28  government does not publish consumer guides; indeed, as evidenced by the

1 USA.GOV website [TE 412 (attached to Post-Trial Exhibit Stipulation)], the
2 government offers dozens of guides; thus, the Defendants' testimony in this regard is
3 not credible. [TT 11/6, pp. 92:16-95:7.]

4     55.   A November 17, 2006 search for "dmv" shows the placement of
5 DMV.ORG in the second non-sponsored (or "natural") position, including the text:
6 "DMV Department of Motor Vehicles Guide-DMV.ORG with the following text:
7 "Nationwide DMV information. Drivers License, Vehicle Registration, DMV Forms,
8 Locations, Vehicle History ..." [TE 322.]

9     56.   As illustrated by a May 22, 2007 search for "dmv", Defendants changed,
10 subsequent to being sued, the sponsored advertisement link to "California DMV
11 Info" from the previous language which read "California DMV." [TE 323.]

12     57.   On November 20, 2006 and January 31, 2007 searches of the term
13 "drivers ed", DMV.ORG is the #1 sponsored listing with a link by the domain name
14 "california.dmv.org" and text: "CA Recommended drivers ed Course for obtaining a
15 Learners Permit." [TE 324.]

16     58.   In the January 31, 2007 search results for "drivers ed", the Defendants
17 changed, subsequent to being sued, the text from "California DMV Drivers Ed" to
18 "CA Drives Ed Online" and from "CA recommended drivers ed" to "Recommended
19 Drivers Ed..." [TE 324.]

20     59.   Additional sponsored listings for DMV.ORG from searches on various
21 dates for other traffic school and drivers education "keywords" show the sponsored
22 listings without any disclaimer of affiliation with an official DMV in the text. [TE
23 325-330; 367; 372; 379-381.]

24     60.   An August 17, 2007 search for "california dmv government" showed
25 Defendants' advertisement on the Google sponsored listing as: "California DMV
26 GOV Info." [TE 372.]

27     61.   Even though it is within the power of the Defendants to write text in
28 their sponsored listings to decrease confusion, Defendants failed to place the word

1  "unofficial" prominently in all of their sponsored listings related to traffic school and
2  drivers education; and at the time of trial, Defendant Raj Lahoti was uncertain if all
3  search engine advertisements incorporated the "unofficial" reference. [TT 11/6,
4  p.126:8-127:11.]

5      **F.      Defendants' False and Misleading DMV.ORG Website  (¶¶62-74)**

6      62.    The DMV.ORG home page on October 30, 2006 (prior the lawsuit)
7  displayed the license plate logo DMV.ORG and the large text (above the fine print)
8  in bold lettering, "No need to stand IN LINE. Your DMV Guide is now ONLINE!"
9  [TE 317.]

10     63.    The California 2006 DMV Driver Handbook contains the statement on
11 the second page: "Don't stand in LINE, Go on LINE! " [TE 391.]

12     64.    Defendants used names of the states directly in the DMV.ORG license
13 plate logo on the upper left corner (e.g., showing DMV.ORG used with Nevada,
14 DMV.ORG used with New Mexico, etc., etc.) [TE 301.]

15     65.    DMV.ORG's home page on October 30, 2006 contained a map of the
16 United States and text instructing consumers to "Choose Your State" by clicking on a
17 state in the map to "select your state DMV guide". [TE 317.]

18     66.    DMV.ORG's website on October 30, 2006 contained text that instructed
19 users to select a state, such as "California," and then text stating "Your Online Guide
20 to the California DMV" (using the official California state flag) and provided links
21 related to "how to complete DMV-related transactions" and other related topics. [TE
22 318.]

23     67.    The link on DMV.ORG for "Traffic Schools" under California on
24 October 30, 2006, for example, directed users to a page entitled "Traffic Schools"
25 and contained text which read, in part: "We recommend I DRIVE SAFELY as your
26 best choice for California traffic school online". [TE 319.]

27     68.    The link on DMV.ORG for "Drivers Ed" under California on November
28 27, 2006, directed users to a page entitled "Driver Education" and contained - in

1   conjunction with a picture of a California DMV issued driver's license- text, which
2   read, in part: "We recommend TeenDriversEducation.com as your best choice for
3   completing your California driver education requirement online or with a homestudy
4   course". [TE 320.]

5       69.    The Court finds that Online Guru's use of the term "recommended" on
6   its traffic school and drivers education pages, was designed to deceive the consumer
7   into the false belief that the course was being recommended by the DMV in order to
8   achieve the inherent benefit to the seller of those courses. [TD Eric Creditor, ¶¶4,
9   7,9.]

10      70.    Some changes were made to DMV.ORG's site after the lawsuit was
11  filed, but confusion among the public continues. [TE 331 (showing addition of
12  language in top left corner, but continued use of state flags-print-out from January
13  31, 2007); TE 332(showing addition of "Unofficial Online Guide" text but not on the
14  California Driver Education or Traffic Schools pages and not in the DMV.ORG
15  license plate logo at that time-print-out from May 10, 2007); TT 11/7, pp. 159:23-
16  160:24; 172:22-174:4.] . The Court finds it significant that the Defendants failed to
17  place this language on the traffic school and drivers education landing pages. [TT
18  11/7, pp. 173:25-174:4.] The Court finds that this represents an intentional omission
19  by the Defendants designed to maintain visitors traffic and increase profits.

20      71.    Defendants do not believe that adding the "unofficial" tag line to the
21  traffic school or drivers education pages of DMV.ORG will limit or reduce
22  confusion. ( TT 11/7, pp. 174:21-175:25).

23      72.    Indeed, DMV.ORG has enjoyed steady growth in the number of visitors
24  from January 1, 2006 through September, 2007. [TT 11/7. pp. 170:23-171:15.] The
25  Court agrees that the placement of this text on the traffic school and drivers
26  education pages would likely not reduce the level of confusion because there are too
27  many other elements which serve to confuse consumers.

28      73.    Plaintiffs survey, Study 3 found that "[O]ver half (56%) of California

1 | residents, when they see the DMV.ORG website, believe that it is the website of the

2 | DMV or Department of Motor Vehicles [...]" (Question 5). [TD Dr. Thomas

3 | Maronick, TE 350 (Study 3); TE 389 (Rebuttal Statement of Dr. Maronick).]

4 |     74.    The Court finds that Defendants use of the DMV.ORG domain name in

5 | the context of the DMV.ORG website as set forth above is false and misleading.

6 |     **G.**    **Other Advertising for the DMV.ORG Website  (¶¶75-77)**

7 |     75.    Defendants represented themselves to potential third party advertisers

8 | on the website AffliatePrograms.com under the guise that they are the "Department

9 | of Motor Vehicles. [TE 321]

10 |     76.    TE 17 and TE 18 represent examples of Online Guru's further attempts

11 | to mislead the public through advertising. The advertisements offer no indication

12 | that the sponsor is not The Department of Motor Vehicles and consumers would

13 | likely believe that the advertisements were for an official DMV website. [Depo.

14 | Steve Moretti, pp. 268:6-272:7.]

15 |     77.    Defendants' advertised DMV.ORG on a website called UnitedStates.org

16 | which stated: "UnitedStates.org guides you to the Web sites and services provided by

17 | the federal government"! [TE 114.] UnitedStates.org, a website owned by Defendant

18 | Find My Specialist is misleading. [TT 11/6, pp. 51:22-52:16.] The very first link on

19 | Unitedstates.org is a link to DMV.ORG which states, "A comprehensive easy-to-read

20 | guide for your Department of Motor Vehicles." [TT 11/6, p.53:12-14).   The Court

21 | finds that the use of UnitedStates.org to direct consumer traffic to DMV.ORG is

22 | deceptive because UnitedStates.org clearly communicates to consumers that it is a

23 | resource to federal government websites and in fact DMV.ORG is not a government

24 | website. A consumer accessing the DMV.ORG link through the Unitedstates.org

25 | website will likely believe that DMV.ORG is affiliated with the government. [TT

26 | 11/6, pp. 52:8-9; 53:4-16). The Court finds this conduct to be intentionally designed

27 | to deceive consumers.

28 | / / /

**H.** **Evidence of Actual and Likelihood of Confusion and Intent to Deceive (¶¶78-94)**

78. The DMV.ORG domain name in the context of the DMV.ORG website has misled and confused the public as to the website's ownership and/or affiliation with an official DMV agency. [TD Shannon Robertson, ¶¶5-6; TD Lisa Warren, ¶8; TE 4; 102; 116; 334; 335; 395; 408. .]

79. Plaintiffs' consumer survey confirms that the DMV.ORG domain name in the context of the DMV.ORG website is misleading and confusing to the public. [TD Dr. Thomas Maronick, TE 350 (pg. 8, Study 3).]

80. Public emails to DMV.ORG evidence confusion and at times anger at DMV.ORG by the public. [TE 4; 102; 116; 334; 335; 395; 408.]

81. Some examples are as follows:

a. "DV Driver" (DEF-01568) said "Suggestion: clearly state you are not the DMV.or Gov't agency." [TE 334.]

b. "Roger" (DEF-01651) said "It is disconcerting that your site shows up in Google ahead of the real State of Idaho Web site when seeking information. I am concerned this is a problem and a farce." [TE 334.]

c. "Leigh, on behalf of George" (DEF-01577) said ".I was told by Central Court for Lexington County in South Carolina that if we contacted the Arkansas DMV that ya'll would be able to tell us what court this was in and where to pay the ticket". [TE 334.]

d. "Aubrey" (DEF-01588) wrote "Thanks for the quick follow-up from Mrs. (redacted). We did receive a letter from the DMV about a two to three day insurance lapse but according to Mrs. (redacted) in your office I don't owe anything". [TE 334.]

e. "Sharon Silva" (DEF-10595) said "To the public it looked like you are the real thing". [TE 334.]

82. Examples of state government employees that sent emails to DMV.ORG evidencing confusion also exist, one in which someone from the Washington Department of Transportation is telling DMV.ORG that "Google ads by DMV.org [are] illegal" and stating: "This poses a significant public safety issue since taxpayers could be led to believe they are getting accurate information from a government source which could be especially harmful in the event of an emergency. " [TE 4 (DEF-00344); Depo. Steve Moretti, pp. 193:17 to 199:19]

83. The Court finds that because Defendants offer government related information on DMV.ORG, including information related to the DMV, there is a danger to the public in believing that the information being provided emanates from the government. [11/7 TT, p. 208:20-25.] Defendants' Director of Customer Service, Gerald Flack, expressed his concern to the Defendants about the daily confusion. [Depo. Flack, pp. 54:9-55:14). Mr. Flack recognized that there was a significant problem stemming from the state of confused customers, namely, that these customers provided sensitive financial information and the like to DMV.ORG through its email system. [Depo. Flack, pp. 58:8-60:20.] Mr. Flack suggested to Mr. Moretti that Defendants consider forcing consumers to acknowledge that they were not contacting the government so as to prevent the transmittal of sensitive information. [Id.] Defendants have not instituted any of the suggestions by Mr. Flack and the Court finds that their failure to do so is a further indication of their desire to continue to confuse people . The Court finds that there has been no credible evidence presented to suggest that there has been any reduction in confusion since Defendants made changes to its website and search engine advertising after the commencement of this lawsuit. [Depo. Flack, pp. 61:9-63:11.]

84. Public emails as late as August, 2007, *after* DMV.ORG made its change to the license plate logo evidence that confusion persists. [TE 388; 395.]

85. Numerous other third parties (including third party websites and journalists) have mistaken DMV.ORG for an official state agency website from at

1   least as early as 2006. [TD Shannon Robertson; TD Lisa Warren; Depo. Steve

2   Moretti, pp. 196:22-197; 233:3 to 236:25; TE 10, 16, 128-130, 341, 404-407.]

3       86.    As recently as the end of October, 2007, journalists have continued to

4   confuse DMV.ORG with the Department of Motor Vehicles website.[TE 410-411.]

5       87.    Defendants have no way to track how many visitors to DMV.ORG

6   believe they are dealing with a DMV office or website. [Depo. Steve Moretti, pp.

7   163:15 to 174:5 (i.e., 168:9 to 169:4; 172:7-13; 173:19 to 174:5).] No evidence was

8   presented at trial to suggest that the rate of confusion of those consumers who visit

9   the DMV.ORG website and do not send emails to DMV.ORG, is any less than those

10   that visit the website and do send emails.  In fact, the Court finds that the opposite is

11   likely true, namely, that confusion of those visiting DMV.ORG is rampant.  The

12   Court rejects the Defendants' hypothesis that only a small percentage of visitors to

13   DMV.ORG are confused. [TT 11/7, pp. 165:13-166:7; TD Shannon Robertson, ¶7

14   (was confused but did not email DMV.ORG).]

15       88.    Defendants presented no persuasive evidence at trial that any of the

16   changes Defendants made post-lawsuit either to its sponsored advertising or to

17   DMV.ORG has been in any way effective in eliminating or reducing consumer

18   confusion.  Moreover, the Court finds that the Defendants' changes were in fact

19   designed to provide the appearance that they were trying to make changes to reduce

20   or eliminate confusion but in fact, their intention was to make changes which would

21   not materially impact the flow of consumers to their website interested in purchasing

22   drivers education and traffic school courses.  The Defendants' explanations for why

23   more robust changes were not made were unpersuasive. [TT 11/7, pp. 162:10-164:9;

24   p. 165:2-6; pp. 164:13-166:7; pp. 155:2-158:25); TD Lisa Warren, ¶8 (confused in

25   July of 2007, after changes were made).]

26       89.    Defendants have admitted that confusion about DMV.ORG takes place

27   daily; that "disclaimers" simply do not work; and that even after Online Guru made

28   changes on its website in response to the allegations made in this lawsuit, Defendants

1  continued to be informed that on a daily basis consumers were confused. [TT 11/6,

2  pp. 53:14- 57:8; 88:22-89:6; p. 99:10; TT 11/7, pp. 162:6-163:8; Depo. Flack., pp.

3  61:9 to 63:11; 54:9 to 58:2 (i.e., 57-58:1); Depo. Steve Moretti, pp. 201:19 to

4  202:23.; Depo. Flack., pp. 54:9 to 58:2 (i.e., 57-58:1);61:9 to 63:11; Depo. Steve

5  Moretti, pp. 163:15 to 174:5 (i.e., 164:15 to 165:13).]

6      90.    Defendants have known about the consumer confusion at issue in this

7  case since at least 2004. Mr. Raj Lahoti received a series of correspondence from the

8  CA DMV complaining about the use of the domain name DMV.ORG and other

9  deceptive practices. [TEs 136, 342-345, 362).] As part of its response to the CA

10  DMV, Online Guru promised that it would eliminate concurrent reference to

11  California and DMV on the DMV.ORG website [TE 385 and TT 11/6 , pp. 82:8-

12  83:20.] Despite this representation, DMV.ORG subsequently utilized California in

13  close proximity with DMV on its website and in sponsored advertising. [e.g., TE

14  318.]

15      91.    The State of California Department of Motor Vehicles repeatedly

16  objected to Defendants' use of the DMV term. [Depo. Moretti, pp. 242:19 to 248:10;

17  TE 11;136; 342-345; TE 362 (CA DMV Opposition to DMV.ORG trademark,

18  2007)].

19      92.    Although Defendants knew that consumers were confused as to the

20  source and affiliation of DMV.ORG from even before this lawsuit was filed,

21  Defendants failed to take measures designed to alleviate confusion in their search

22  engine sponsored advertisements as it relates to traffic school and drivers education.

23  [TE 322, 323, 328, 329, 330, 367, 372, 379, 380; TT 11/6, p. 53:14- 57:14.]

24      93.    In his trial declaration, Raj Lahoti, at ¶16, in comparing a sponsored

25  listing with an organic listing (referencing TE 671) testified that the sponsored

26  listing, the text of which Online Guru controls, included more explicit disclosures of

27  the unofficial nature of the DMV.ORG site than did the organic listing. Upon cross-

28  examination, Mr. Lahoti admitted that in fact his declaration was not true and that

1   rather it was his opinion that the organic listing provided more explicit disclosures of

2   the unofficial nature of the DMV.ORG site than did sponsored listing. [11/7 TT, pp.

3   148:11-150:7.]

4       94.    The Court finds that the Defendants have shown a complete disregard

5   for the problem of confusion that they have caused.  While Defendants have

6   acknowledged there is confusion, Mr. Lahoti testified that he does not view the

7   confusion as a problem. [11/7 TT, p. 165:2-6.]

8       **I.**    **The Materiality of the False and Misleading Advertising (¶¶95-99)**

9       95.    There were approximately 65 million visitors to the DMV.ORG website

10   over a period of 17 months from January-May 2007. [TE 340.]

11       96.    Consumers of traffic school and drivers education courses would attach

12   great importance to the belief that a governmental DMV agency was recommending

13   or endorsing a specific traffic school or drivers education program. [TD Eric Creditor

14   ¶¶4;6;9; TE 316; TD Shannon Robertson, ¶8]

15       97.    This is so simply because consumers are often aware that their state

16   DMV must accept the traffic school or drivers education certificate to remove a

17   vehicle violation or to issue a drivers license.  [TD Eric Creditor ¶¶4;6;9; TE 316.]

18       98.    Consumers seeking traffic school and driver education services are

19   aiming to receive a certificate of completion from a licensed course that will be

20   recognized and accepted by the state agency DMV.  [TD Eric Creditor ¶¶4;9; TE

21   316.]

22       99.    In Plaintiffs' consumer survey Study 4, "[O]ver two-thirds of California

23   residents surveyed (67%) consider "recommended by the DMV" to be an important

24   factor in their decision as to which traffic school to choose." [TD Dr. Thomas

25   Maronick, TE 350 (Study 4); TE 389 (Rebuttal Statement of Dr. Maronick).]

26   ///

27   ///

28   ///

**J.    The Actual and Likely Injury to Plaintiffs (¶¶100-105)**

100.    The higher click through rate of DMV.ORG has impacted Plaintiffs' marketing efforts because Plaintiffs have to compete for the same keywords on pay per click advertising on an uneven playing field.  [TD Chris Kramer ¶¶3,4,8.]

101.    Because consumers confuse DMV.org with the government DMV agency, consumers confuse the traffic school and driver education services referred to on the DMV.ORG website as a recommendation by the state agency DMV.  [TD Shannon Robertson, ¶¶3-6, Lisa Warren,¶9.]

102.    Every time a viewer clicks through a search engine result (natural or sponsored), navigating to the DMV.ORG site, and every time a potential customer visits the DMV.ORG site looking for traffic school or drivers education services - in a place where Plaintiffs or its affiliates are fulfilling this need - is a time that Plaintiffs lose a potential customer and revenue generated from the sale.  [TD Eric Creditor ¶21; Depo. Steve Moretti, pp. 95:18-96:8]

103.    In other words, Defendants, as participants of the resulting revenue generated by their promotion and sale of traffic school and drivers education services through DMV.ORG make the sale while Plaintiffs lose that sale.  [TD Eric Creditor ¶21; Depo. Steve Moretti, pp. 95:18-96:8.]

104.    This results in a direct loss of business and marketing funds for Plaintiffs.  [TD Eric Creditor ¶¶21-24; ¶25 (except lines 26 at "Increased..." to line 28 finishing with "listings."; ¶26; TE 365.]

105.    Plaintiffs have been and are likely to continue to be injured as a result of Defendants' wrongful conduct. [TD Eric Creditor ¶¶21-24; ¶25 (except lines 26 at "Increased..." to line 28 finishing with "listings."; ¶26; TE 365.]

**K.    Steve Moretti Testified Falsely: Page View Statistics (¶¶106-110)**

106.    The Court finds that the testimony of defense witness, Steve Moretti, about Defendants' ability to track the paths of users who visit the traffic school and drivers education pages [11/7 TT, pp. 177:11-180:12] is inconsistent with Mr. Raj

1   Lahoti's testimony on the same topic [11/8 TT, pp. 18:23-20:4]. The Court accepts

2   Mr. Lahoti's testimony given at his deposition, and rejects Mr. Moretti's testimony.

3   107.   The Court finds that the page view statistics provided in paragraph 10 of

4   Steve Moretti's trial declaration are of limited value because the Court finds that the

5   website visitors analyzed in paragraph 10 of Mr. Moretti's declaration are not

6   representative of visitors who are in search of traffic school or drivers education

7   services. The evidence established that such visitors, likely link to DMV.ORG from

8   a targeted sponsored listing which directs them to a page other than the homepage.

9   [11/7 TT, pp. 176:25-179:16.]

10   108.   In May of 2007, there were 18,084 visits to the California traffic school

11   web page on DMV.ORG and of those 18,084 visits [TEs 109, 642], 6,754 landed on

12   that page. The "I Drive Safely" logo/link is prominently displayed on the California

13   traffic school page. [TE 110, DEF-02534.]

14   109.   Of the 18,084 visitors to the California traffic school page in May of

15   2007, over half that visited that page exited the DMV.ORG site from that page [TE

16   109, p. 2536; TT 11/7 , pp. 198:24-199:12.] The Court finds that this statistic

17   suggests that the California traffic school page is extraordinarily effective at

18   persuading users to click on the "I Drive Safely" logo as it is a prominent exit path

19   from that page. [11/7 TT, p. 198:13-18.]

20   110.   Of the 18,084 people who visited the California traffic school page in

21   May of 2007, 6,754, or 37%, landed on that page and of those that landed on that

22   page, 4,376 existed without looking at another page. This data suggests that visitors

23   to the California traffic school page are not viewing five to six pages of the website

24   per visit. [TE 109, p. 2537; 11/7 TT, pp. 195:14-196:20].

25   **L.   Steve Moretti Testified Falsely: Defendants' Conversion Data**

26   **(¶¶111-115)**

27   111.   The Court finds that portions of Steve Moretti's testimony at paragraphs

28   18 through 23 of his trial declaration was false. [TD Steve Moretti, ¶¶18-23; 11/7

1  TT, pp. 199:24-207:25.]

2       112.   Steve Moretti defined "conversion rate" as "the percentage of visitors to

3  a particular web page that take measurable action (i.e., click on an advertisement,

4  ultimately purchase a product sold by the advertiser)". [TD Steve Moretti, ¶18.]

5       113.   The entire rational for Mr. Moretti's presentation of the conversion rate

6  data in his trial declaration was to support Defendants' hypothesis that if DMV.ORG

7  derives an unfair advantage from a perceived affiliation with the Government, one

8  would expect to see an unusually high "conversion rate". [TD Steve Moretti, ¶22.]

9       114.   The Court finds that the "conversion rate" definition provided by Mr.

10  Moretti in paragraph 18 of his declaration was then not the definition used by Mr.

11  Moretti in his declaration when he concluded in paragraphs 20 and 21 of his

12  declaration as to what the various conversion rates are. [11-7 TT, pp. 199:25-

13  205:14.]

14       115.   The Court finds that Mr. Moretti's trial declaration testimony was false

15  with regard to the conversion rate and that such false testimony, represents a

16  concerted effort by the Defendants to manipulate its own internal data to support a

17  hypothesis which in fact is not true and which the Court finds, Defendants knew not

18  to be true.  The Court further finds that the Defendants' failure to produce conversion

19  data which would have been valuable, namely, tracking the patterns of those

20  consumers who link to DMV.ORG after clicking on drivers education or traffic

21  school courses sponsored listings when such data was within their power to produce

22  [11/8 TT, pp. 18:23-20:9], suggests strongly that the data would contradict the

23  Defendants' hypothesis.

24       **M.   Findings Related to Alleged Unclean Hands and Laches Defenses**

25            **(¶¶116-121)**

26       116.   While Defendants first had knowledge of a website that existed under

27  the DMV.ORG domain name in 2002, that website looked fundamentally different

28  than how it looked in late 2006, when this action was filed.  [TE 623-625; TD Eric

1  Creditor, ¶¶32-33.]

2      117.   The DMV.ORG website in 2002 and 2003 provided users on the

3  homepage with an immediate prompt to link to official DMV websites. [TE 623-624;

4  11/6 TT, p. 70:3-19.]

5      118.   On September 27, 2006, Defendants launched a brand new DMV.ORG

6  website. [11/6 TT, pp. 75:8-78:5.] The only disclaimer placed on the DMV.ORG

7  website prior to the filing of the lawsuit was at the very bottom of the website pages

8  which would have required a user to scroll down to view. There was no prompt on

9  the website to advise a user to scroll down. [11/6 TT, pp. 80:16-24.]

10     119.   Plaintiffs' dealings with Defendants regarding the possibility of

11  advertising on DMV.ORG, was limited to discussions had by Direct only (not TSC)

12  prior to this lawsuit and the resultant six hour test conducted in July of 2006, prior to

13  this lawsuit; in which at no time did Defendants disclose the objections they had

14  already received from state DMV agencies to Plaintiffs or the rampant consumer

15  confusion taking place. [TD Eric Creditor ¶¶33;34;36-37; 11/7 TT, pp. 166:17-

16  167:2.]

17     120.   Plaintiffs are not aware of a single instance where the public was

18  confused about the source or sponsorship of its DrivingLinks.com website and

19  Plaintiffs have never objected the merely descriptive and fair use of the term DMV.

20  [THE DISTRICT Eric Creditor ¶30.]

21     121.   There is no evidence that Plaintiffs have used any domain names

22  incorporating the term DMV in any misleading or deceptive manner. [TD Eric

23  Creditor ¶31.]

24  **N.   Factual Findings Relating to Remedies: Injunction (¶¶122-128)**

25     122.   The Court finds that an injunction is appropriate in this case.

26     123.   The Court finds that in order to prevent ongoing acts of unfair

27  competition and resulting confusion, the Court's injunction must require the

28  cessation of the use of the domain name DMV.ORG by Defendants.

124.   The Court finds that in order to prevent ongoing acts of unfair competition and resulting confusion, prior to accessing DMV.ORG, users must be prompted to acknowledge that the site they are entering is not affiliated with the government.

125.   The Court finds that in order to prevent ongoing acts of unfair competition and resulting confusion, prominent disclaimers in large type across the entirety of each page of the DMR.ORG's website must be employed.  Such disclaimers must clearly identify the site as not being affiliated with any governmental agency.

126.   The Court finds that Defendants' false advertising has resulted in significant benefits to Defendants.  Specifically, because of the nature of the Internet, DMV.ORG is now a deeply entrenched web site with about 70,000 web sites which link to DMV.ORG. [11-7 TT, p. 153:1-5; p.154:1-5.]  The Court further finds that Defendants should not retain the benefits of this deep entrenchment in the Internet when such entrenchment was created in large part from illegal conduct.

127.   The Court finds that imposition of an injunction that divests Defendants of the right to use DMV.ORG would not materially impact Defendants' business as it relates to lawfully attracting visitors to the DMV.ORG website.  Specifically, DMV.ORG attracts almost 80% of its total traffic (anticipated to be 70 million visitors in 2007) from search engines (which come from natural and sponsored listings) and Defendants would be able to continue to employ the same strategies they do today with regard to search engine optimization and search engine marketing to attract visitors.  As such, changing the domain name would not impact Defendants' ability to lawfully attract business, it would only affect Defendants' ability to benefit from confusion. [11-7 TT, p. 154:6-157:27.]

128.   Similarly, The Court finds that compelling Defendants to use an acknowledgment page, forcing consumers to represent that they understand they are entering a private site, would not materially impact Defendants' ability to operate

1  lawfully. [11-7 TT, p. 158:12-19]. The Court finds that the mere fact that such

2  changes may impact "usability", does not mitigate against the need for such

3  protection. [11-7 TT, p. 158:22 - 159:13.]

     **O.**   **Factual Findings Relating to Remedies: Defendants' Profits/Drivers**
         **Education and Traffic School Revenues/Advertising Costs/Laches**
         **Rebuttal (¶¶129-144)**

7  129.   The Court finds that a monetary award is appropriate in this case.

8  130.   Online Guru, Inc.'s ("Online Guru") profits in 2003 were $27,139.

9  (Exhibit 668).

10  131.   Online Guru's profits in 2004 were $1,722,923.  (TE 668).

11  132.   Online Guru's profits in 2005 were $4,759,589.  (TE 115).

12  133.   Online Guru's profits in 2006 were $5,582,607.  (TE 115).

13  134.  Online Guru's profits from January 2007 through  September 2007 are

14  $6,697,661. [TE 680.]

15  135.   Online Guru generates a substantial amount of its revenue from the sale

16  of traffic school and drivers education courses.  Approximately 25% to 30% of its

17  entire revenue stream in 2006 was related to the sale of traffic school and drivers

18  education courses. [Depo. Moretti, p. 73:2-7.]

19  136.   Online Guru's sales of drivers education courses is growing rapidly,

20  especially in California. [TE 681; 11/6 TT, pp. 40:17-44:4.]

21  137.   Online Guru's revenues specifically related to traffic school and drivers

22  education courses in 2006 were $4,055,846. [TE 680].  Costs of goods sold

23  amounted to approximately 52% of gross revenues in 2006.  As such, Online Guru

24  realized an approximate 48% profit margin in 2006. [TE 680].  The Court therefore

25  finds that Online Guru's profits related to drivers education and traffic school in

26  2006 was $1,946,806 (i.e., $4,055,846 x .48 = $1,946,806).

27  138.   From January 2007 through September 2007, Online Guru earned

28  revenues of $3,526,417 related solely to its traffic school and drivers education

business. [TE 680]. For this time period, Online Guru's costs of goods sold was $6,038,878 and is approximately 47.5% of its total revenues ($12,736,539). [TE 680]. Therefore, the Court finds that through September of 2007, Online Guru's profit margin for 2007 is approximately 52.5%. As such, the Court finds that Online Guru's profits derived from the sale of traffic school and drivers education courses in 2007 is $1,833,736.80 (namely, $3,526,417 x 0.52 = $1,833,736.80). [TE 680].

139. In 2004, Online Guru's search engine marketing, also known as pay-per-click advertising was $1,336,752. [TE 668.]

140. In 2005, Online Guru's search engine marketing, also known as pay-per-click advertising was $2,223,481. [TE 115].

141. In 2006, Online Guru's search engine marketing, also known as pay-per-click advertising costs were $4,995,957. [TE 115].

142. From January 2007 through September 2007, Online Guru's search engine marketing, also known as pay-per-click advertising costs were $5,448,871. [TE 680].

143. Online Guru's revenues accelerated rapidly and significantly beginning in 2004 when, under the direction of Defendant Raj Lahoti, he began to make greater use of search engine advertising for the DMV.ORG website and prompted the CA DMV and others to complain about the use of the term DMV [TE 115, TE 680].

144. Online Guru substantially increased its pay-per-click advertising from 2005 to 2006. [11/6 TT, pp. 74:12-75:7.]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.   CONCLUSIONS OF LAW

### A.   Elements of False Advertising Under 15 U.S.C. § 1125(a)(1)(B)

1.    Section 43(a)( 1 )(B) of the Lanham Act, makes actionable placing into interstate commerce "*any word, term, name, symbol*, or device, or any combination hereof, or any *false designation of origin, false or misleading description of fact*, or *false or misleading representation of fact*" concerning "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1 l25(a)(1)(B).

2.    The DMV.ORG domain name, website, and related marketing (collectively "DMV.ORG") are false statements of fact by Defendants in commercial advertising about Defendants' own services in that DMV.ORG is (a) literally false (on its face or by necessary implication in the context of the traffic school and drivers education industry) OR (b) likely to mislead and confuse consumers. Southland Sod Farms v. Stover Seed Co. ,108 F.3d 1134, *1139 (9th Cir. 1997).

3.    The advertisements in this case are sufficiently clear and unambiguous that the message being conveyed (i.e., that DMV.ORG is owned or affiliated with an official DMV) is obvious, and the Court thus not need base its decision on evidence of consumer reaction at all. Better Business Bureau Inc. v. Medical Directors Inc., 681 F.2d 397 (5th Cir. 1982)(affirming the lower court's enjoining of ads that misleadingly implied that a weight reduction program was approved by the Better Business Bureau).

4.    A website's domain name, such as DMV.ORG, signifies its source of origin and is, therefore, an important signal to Internet users who are seeking to locate web resources. See, e.g., PACCAR Inc. v. Telescan Tech. LLC, 319 F.3d 243, 250 (6th Cir.2003) [citing cases, including: People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 366 (4th Cir.2001) ("The domain name peta.org simply copies PETA's Mark,conveying the message that it is related to PETA."); Brookfield 174 F.3d at 1055, 1066 ("The domain name is more than a mere

1   address: like trademarks, second-level domain names communicate information as to

2   source.. ."); Panavision, 141 F.3d 1316, 1327("We reject [the] premise that a domain

3   name is nothing more than an address. A significant purpose of a domain name is to

4   identify the entity that owns the web site.")].

5       5.   Defendants have acted, at the least, with indifference as to the truth of

6   their advertising; thus it is presumed (without reliance on actual deception or

7   tendency to deceive) that Defendants  accomplished the intended purpose to deceive.

8   U-Haul Intern., Inc. v. Jartran, Inc. , 522 F.Supp. 1238, 1254 (D.C.Ariz., 1981), aff'd,

9   681 F.2d 1159 (9th Cir. 1982)("although [the defendant] may not have set out

10  deliberately to develop a misleading advertising campaign . . ., the strategy it adopted

11  as the basis for its campaign created a substantial risk of misleading the public, a risk

12  that was called to [the defendant's] attention on several occasions. Nonetheless, [the

13  defendant] did nothing to insure that the misleading potential of its strategy did not

14  materialize"); U-Haul International Inc. v. Jartran Inc., 793 F.2d 1034, 1041 (9th

15  1986) ("The expenditure by a competitor of substantial funds in an effort to deceive

16  consumers and influence their purchasing decisions justifies the existence of a

17  presumption that consumers are, in fact, being deceived. He who has attempted to

18  deceive should not complain when required to bear the burden of rebutting a

19  presumption that he succeeded."); Oil Heat Institute of Oregon v. Northwest Natural

20  Gas , 708 F.Supp. 1118, 1126 (D.Or.,1988)(on the plaintiff's motion for summary

21  judgment, a trier of fact could find that defendant intended to create a false

22  impression on basis of evidence that defendant knew that its statement was not true

23  with respect to all recipients, but made no attempts to clarify it).

24      6.   DMV.ORG actually deceived or has the tendency to deceive a

25  substantial segment of its audience. Southland Sod Farms v. Stover Seed Co. ,108

26  F.3d 1134, *1139 (9th Cir. 1997); U-Haul Intern., Inc. v. Jartran, Inc., 601 F.Supp.

27  1140, 1149 (D.C.Ariz. 1984), aff'd in art, rev'd in part on other grds, mod. in part on

28  other grds., 793 F.2d 1034 (9th Cir. 1986)("Consumer reliance . . . can be shown by

1  direct evidence such as testimony from individual members of buying public, or by

2  circumstantial evidence, such as surveys of buying public."); Cuisinarts, Inc. v.

3  Robot-Coupe International Corp., 509 F.Supp. 1036 (S.D.N.Y. 1981)(if tendency to

4  deceive is obvious, court may so determine without reference to recipients'

5  reactions); Better Business Bureau Inc. v. Medical Directors, Inc., 681 F.2d 397 (5th

6  Cir. 1982)(direct evidence of specific persons who were the target of Defendants'

7  misrepresentations and who were deceived may be sufficient to establish deception

8  and may even be the best means of establishing it, rather than survey evidence).

9      7.    The Court finds that Dr. Maronick's surveys addressed to consumer

10  perception are probative on the ultimate question of whether consumers were and are

11  likely to be materially deceived by the DMV.ORG website and search engine links

12  Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1142 -1143 (9th Cir. 1997);

13  McNeilab Inc. v. American Home Products Corp., 501 F.Supp. 517 (S.D.N.Y.

14  1980)(qualitative rather than quantitative determination is enough to support

15  conclusion that advertisement tends to mislead).

16      8.    The deception related to DMV.ORG is material, in that it is likely to

17  influence the purchasing decision [i.e., to purchase traffic school and drivers ed

18  services referred from DMV.ORG]. Southland Sod Farms v. Stover Seed Co. ,108

19  F.3d 1134, *1139 (9th Cir. 1997); In re Cliffdale Ass'n, Inc., 3 Trade Reg Rptr

20  (CCH) ¶22,137 (FTC Ckt 9156 1984) (it is presumed that misleading testimonials or

21  endorsements would have a tendency to mislead consumers into making buying

22  decisions that otherwise might not be made).

23      9.    In this case, it is obvious that the misrepresentations concern a quality or

24  characteristic of a service (DMV approved/affiliated) which would influence the

25  decision of a purchaser of traffic school or drivers education courses. See, e.g.,  Oil

26  Heat Institute of Oregon v. Northwest Natural Gas, 708 F.Supp. 1118, 1123

27  (D.Or.,1988)("A factfinder could reasonably conclude that information regarding the

28  amount of maintenance required for natural gas equipment is likely to influence the

1 | purchasing decisions of consumers.").

2     10.    Plaintiffs are required only to show that the misrepresentations made by
3 | Defendants are "likely" to influence purchasers; not that a purchasing decision
4 | turned solely on the Misrepresentations.  See, e.g., Williams Electronics Inc. v Bally
5 | Manufacturing Corp., 568 F.Supp 1274 (N.D. Ill. 1983) (evidence that misleading
6 | promotional material was distributed only to members of trade who were
7 | sophisticated and who did not make purchasing decisions solely on basis of
8 | promotional material would not preclude finding that such persons relied on
9 | promotional material to some extent and could be influenced by it).

10     11.    Defendants caused their false statements to enter interstate commerce.
11 | Southland Sod Farms v. Stover Seed Co. ,108 F.3d 1134, *1139 (9th Cir. 1997);
12 | Intermatic Inc. v. Toeppen, 947 F.Supp. 1227, 1239-40 (N.D. Ill. 1996)(finding
13 | internet communications to meet the "in commerce" requirement).

14     12.    Plaintiffs have been or are likely to be injured as a result of the false
15 | statements by direct diversion of sales from themselves to Defendants. Southland
16 | Sod Farms v. Stover Seed Co. ,108 F.3d 1134, *1139 (9th Cir. 1997); Oil Heat
17 | Institute of Oregon v. Northwest Natural Gas, 708 F.Supp. 1118, 1123 -1124
18 | (D.Or.,1988)(the court found sufficient that the plaintiff had produced evidence from
19 | which it could be found that the parties were competitors and that sales by the
20 | defendant would necessarily represent a loss of business to the plaintiff);Mortellito v.
21 | Nina of California Inc., 335 F.Supp 1288 (S.D.N.Y 1972) (plaintiff and defendant
22 | were indirect competitors where their products were similar).

23     13.    Plaintiffs have standing in that both Plaintiffs and Defendants are using
24 | the same type of search engine marketing to attract the same consumers (i.e., those
25 | interested in traffic school and drivers education courses) to their respective websites
26 | which allow consumers, *inter alia*, to then purchase, either directly or from a third
27 | party affiliate, a traffic school or driving school course. Plaintiffs and Defendants
28 | both realize business revenue from the sale of traffic school and drivers education

1  courses in this way, and in some instances uses the same third party affiliate to

2  provide the service. This is sufficient to confer competitor standing as both parties

3  "vie for the same dollars from the same consumer group" and Plaintiffs are thus

4  likely to be injured. 15 U.S.C. § 1125(a)(1)(providing that one who false advertises

5  "shall be liable in a civil action by any person who believes he or she is or is likely to

6  be damaged. . ."; Jack Russell Terrier Network of N. California v. Am. Kennel Club,

7  407 F.3d 1027, 1037 (9th Cir. 2005); Nat'l Servs. Group v. Painting & Decorators

8  Contractors of Am., No. SACV06-563CJC(ANX), 2006 WL 2035465, at *3-*4

9  (C.D. Cal. July 18, 2006); Kournikova v. Gen. Media Commc'ns, 278 F. Supp. 2d

10  1111, 1117-18 (C.D. Cal. 2003); Coastal Abstract Serv., Inc. v. First Am. Title Ins.

11  Co., 173 F.3d 725, 734 (9th Cir. 1999); W. States Wholesale, Inc. v. Synthetic Indus.,

12  Inc., 206 F.R.D. 271, 276 (C.D. Cal. 2002); Summit Tech., Inc. v. High-Line Med.

13  Instruments, Co., 933 F.Supp. 918, 939 (C.D. Cal. 1996).

14      14.    Each named Defendant is in some significant respect responsible for

15  DMV.ORG and connecting domains, websites, and marketing and are thus jointly

16  and severally liable under the theories of direct (as owners and officers) and joint

17  liability. See, J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR

18  COMPETITION, § 25:23 [4th Edition 2006] stating, the "use of the word 'conspiracy'"

19  is merely another way of describing a concert of action and intent which will extend

20  tort liability beyond the active wrongdoer to those who merely planned, assisted or

21  encouraged his acts, and citing to numerous cases, including Transgo, Inc. v. Ajac

22  Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1985), cert. denied, 474 U.S. 1059

23  (1986)(corporate officer or director is personally liable for all infringing acts which

24  he authorizes or directs or in which he participates; liability found); Corning Glass

25  Works v. Jeannette Glass Co., 308 F. Supp. 1321 (S.D.N.Y. 1970), aff'd, 432 F.2d

26  784 (2nd Cir. 1970); Hard Rock Café Licensing Corp. v. Concession Services, Inc.,

27  955 F.2d 1143, 1768 (7th Cir. 1992); American Philatelic Soc'y v. Claibourne, 3 Cal.

28  2d 689, 46 P.2d 135 (1935)(in cases of unfair competition, one who induces another

1  to commit fraud and furnishes the means is equally guilty); <u>Data Digests, Inc. v.</u>

2  <u>Standard & Poor's Corp.</u>, 43 F.R.D. 386 (D.N.Y. 1967). David Berg & Co. v. Gatto

3  International Trading Co., 884 F.2d 306 (7th Cir. 1989)("Because unfair competition

4  and trademark infringement are tortious, the doctrine of joint tortfeasors does apply.

5  … Every person actively partaking in, lending aid to, or ratifying and adopting such

6  acts is liable equally with the party itself performing these acts."); <u>Babbit</u>

7  <u>Electronics, Inc. v. Dynascan Corp.</u>, 38 F.3d 1161, 1184, 33 U.S.P.Q.2d 1001, 1018

8  (11th Cir. 1994) (found liable were corporate officers who directed, controlled,

9  ratified or participated in, or were the moving force behind, infringing activity. These

10  persons are personally liable "without regard to piercing of the corporate veil.").

11      **B.    Legal Conclusions Regarding Various Defenses**

12      15.   Plaintiffs' claim rightly sounds in false adverting.  See e.g.,

13  <u>Performance Indus. Inc. v. Koos, Inc.</u>, 18 U.S.P.Q.2d 1767, 1770-71 (E.D. Pa.

14  1990)(a false claim that a product has Environmental Protection Agency approval is

15  a violation of § 43(a); <u>William H. Morris Co. v. Group W. Inc.</u>, 66 F.3d 255, 257-58

16  (9th Cir. 1995)(The Lanham Act reaches not only blatant falsehoods, but also

17  innuendo, indirect intimations and ambiguous suggestions); <u>U-Haul Intern., Inc. v.</u>

18  <u>Jartran, Inc.</u>, 681 F.2d 1159, 1161-62 (9th Cir. 1982); <u>Schroeder v. Lotito</u>, 577

19  F.Supp. 708, 721 (D.C.R.I.,1983); <u>Better Business Bureau Inc. v. Medical Directors</u>

20  <u>Inc.</u>, 681 F.2d 397 (5th Cir. 1982)(false implication of agency's approval on the face

21  of advertisement); <u>CPC Intern., Inc. v. Caribe Food Distributors</u>, 731 F.Supp. 660,

22  670 (D.N.J.,1990)(manufacturer of a corn oil could prevail on its claim under § 43(a)

23  if it could prove that the sentence that appeared on the back of the bottle implying the

24  oil was approved the United States government had a tendency to deceive – the

25  manufacturer was not required to show actual deception); <u>Birthright v. Birthright</u>

26  <u>Inc.</u>, 827 F.Supp. 1114, 1138 (D. N.J. 1993)(held that the incorporation in fund-

27  raising letters sent out by organization of another's service mark supported false

28  advertising claim because donors may have chosen not to make contributions if they

1    knew that the donations were going only to the defendant).

2        16.     Simply because the domain name DMV.ORG was available for
3 registration does not make such registration legal where the use of the domain name
4 in the context of the website and search engine marketing is false and misleading or
5 otherwise actionable. Zipee Corp. v. U.S. Postal Service, 140 F.Supp.2d 1084
6 (D.Or.,2000) (owner of "postal-service.com" had violated the anti-cybersquatting
7 statute by registration of the United States Postal Service's "postal service" mark,
8 even though domain name was open for registration).

9        17.     Simply because many states utilize the DMV acronym does not mean
10 that the acronym is "generic" and cannot be used in a misleading manner.
11 Trademarks do, as a matter of trademark law, have geographic limitations that are
12 dictated by the geographic reach of the trademark's use; moreover, even generic
13 trademarks cannot be used as the vehicle for false advertising. Pennsylvania State
14 University v. University Orthopedics. Ltd., 706 A.2d 863, 868 (Pa.Super.1998)
15 (University was not required to prove exclusive use of term "university" to support
16 its cause of action for unfair competition under the Lanham Act where "consumer
17 confusion or a likelihood of consumer confusion arose from the failure of the
18 defendant to adequately identify itself as the source of the product.").

19        18.     Plaintiffs' false advertising claim in this case is not dependent on the
20 actions or inactions of others (including state DMV agencies) related to this suit.
21 Southland Sod Farms v. Stover Seed Co. ,108 F.3d 1134, *1139 (9th Cir. 1997).

22        19.     The alleged disclaimers on DMV.ORG are ineffective and thus cannot
23 support a defense to false advertising. See, e.g., Tambrands Inc. v. Warner-Lambert
24 Co., 673 F.Supp. 1190, 1194 (S.D.N.Y. 1987)("I find that the thrust of defendants'
25 advertisements is false, and that even the qualifying words added to the advertising
26 copy do not sufficiently modify the message to render the advertisements true.");
27 Thompson Medical Co. v. Ciba-Geigy Corp., 643 F.Supp. 1190, 1197 (S.D.N.Y.
28 1986)(disclaimers printed beside bar graph were not sufficient to prevent graph from

1  conveying false message).

2      20.    The Court finds that Plaintiffs claims are not barred by the equitable
3  doctrines of unclean hands or laches.

4      21.    Unclean Hands is not applicable in false advertising cases where the
5  public is being deceived as an injunction is always available. "That is, if the
6  evidence shows that plaintiff is engaging in inequitable practices, but defendant is
7  also guilty of the unfair competition charged, an injunction should be granted
8  notwithstanding the unclean hands maxim. It is better to remedy one wrong than to
9  leave two wrongs at large. If defendant thinks that plaintiff is guilty of inequitable
10 conduct, he should raise it in a counterclaim or in a separate suit against plaintiff."
11 See, J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
12 COMPETITION, § 31:53, Volume 6 (4th Ed. 2007)(hereafter "MCCARTHY"), citing
13 cases, including, the Ninth Circuit's U-Haul International. Inc. v. Jartran, Inc., 522 F.
14 Supp. 1238 (D. Ariz. 1981), aff'd, 681 F.2d 1159, 216 U.S.P.Q. 1077 (9th Cir. 1982)
15 (unclean hands is a disfavored defense in false advertising cases)." Republic
16 Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347 (9th Cir. 1 963)(Unclean
17 hands, then, does not stand as a defense that may be properly considered independent
18 of the merits of the plaintiffs claim...its assertion does not eliminate the need for the
19 court to ascertain the soundness of the plaintiff's claim . . . the relative extent of each
20 party's wrong upon the other and upon the public should be taken into account and
21 an equitable balance struck.").

22      22.    It is well-settled law that "Plaintiffs position must be judged by the facts
23 existing as they were when suit was begun, not by the facts existing in an earlier
24 time." MCCARTHY § 3 1:55, citing Coca-Cola Co. v. Koke Co. of America, 254
25 U.S. 143 (1920); Q-Tips. Inc. v. Johnson & Johnson, 108 F. Supp. 845 (D.N.J. 1952)
26 (misrepresentations of plaintiff stopped before suit filed); Finchley. Inc. v. Finchly
27 Co., 40 F.2d 736 (D. Md. 1929) (allegedly deceptive advertising discontinued several
28 years before suit filed). "Even if plaintiffs conduct existed at the time of filing suit, if

1   that conduct has been rectified by the time of judgment, unclean hands may be no

2   defense." <u>Fund of Funds. Ltd. v. First American Fund of Funds</u>, 274 F. Supp. 517

3   (S.D.N.Y. 1967).

4       23.   In order for unclean hands to be used as a defense the conduct alleged to

5   be wrongful by the defendant must be relevant to Plaintiff's claim. "For example, an

6   alleged infringer of plaintiffs protectable restaurant trade dress argued that plaintiff

7   was guilty of unclean hands in falsely advertising its hamburger meat as "ground

8   steak." The court held that even assuming that the ad was false, the misstatement

9   was not material to the subject matter of the litigation and did not constitute an

10  unclean hands defense. MCCARTHY § 31:51, citing <u>Fuddruckers. Inc. v. Doc's</u>

11  <u>B.R. Others. Inc.</u> 826 F.2d 837 (9th Cir. 1987), also citing, <u>Republic Molding Corp.</u>

12  <u>v. B. W. Photo Utilities</u>, 319 F.2d 347 (9th Cir. 1963) (false marking of article as

13  patented before plaintiff actually obtained a patent held unrelated to action for

14  simulation of that article)."

15      24.   "The defense of laches is trumped by a strong showing of likely

16  confusion of he public." MCCARTHY § 31:41; See, e.g. <u>ProFitness Physical</u>

17  <u>Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.</u>, 314 F.3d 62

18  (2d Cir. 2002)("[A] court may nonetheless grant injunctive relief if it determines that

19  the likelihood of confusion is so great that it outweighs the effect of plaintiff's

20  delay.").

21      25.   "Laches should not necessarily always be measured from defendant's

22  very first use of the contested mark, but from the date that defendant's acts first

23  significantly impacted on plaintiffs good will and business reputation."

24  MCCARTHY § 31:19-20.

25      **C.**    **Legal Conclusions Regarding Unfair Competition Under B&P Code**

26          **§ 17200 et seq.**

27      26.   Defendants' conduct constitutes a violation of California's Unfair

28  Competition Law because it squarely falls within the definition. California Business

1    and Professions Code §17200 (The "UCL"). The UCL is sweeping in nature and

2    includes "... any unlawful, unfair, or fraudulent business act or practice and unfair,

3    deceptive, untrue or misleading advertising and any act prohibited by Chapter 1

4    (commencing with Section 17500) of Part 3 of Division 7 of Business and

5    Professions Code." Section 17200 thus "borrows" violations from other laws by

6    making them independently actionable as unfair competitive practices. Cel-Tech v.

7    Los Angeles Cellular, 20 Cal.4th 163, 180 (1999). In addition, under section 17200,

8    "a practice may be deemed unfair even if not specifically proscribed by some other

9    law." Cel-Tech, at p. 180; also see Korea Supply v. Lockheed Martin, 29 Cal. 4th

10   1134, 1144 (2003).

11        27.   In addition to the above, the Defendants' conduct constitutes unfair

12   competition under California Law because it violates Cal. Civ. Code §1770(a)(2)(3)

13   which prohibits misrepresenting the "source, sponsorship, approval, or certification

14   of goods or services" or "affiliation, connection, or association with, or certification

15   by, another". Defendants conduct also constitutes unfair competition because it

16   violated Cal Vehicle Code §25 which makes it "unlawful for any person to display or

17   cause or permit to be displayed any sign, mark, or advertisement indicating an

18   official connection with either the Department of Motor Vehicles...".

19        28.   California's UCL and Section of 43a of the Lanham Act are

20   substantively substantially congruent. International Order of Job's Daughters v.

21   Lindeburg, 633 F. 2d 912, 916 (9th Cir. 1980)("federal and state laws regarding

22   trademarks and related claims of unfair competition are substantially congruent.").

23   As such, by virtue of the Court's finding that Defendants have violated Section 43a

24   of The Lanham Act, Defendants are also in violation of California's UCL.

25        29.   Plaintiffs have standing under the UCL because they have been injured

26   and lost money as a result of Defendants' false advertising. Annunziato v.

27   Emachines, 402 F. Supp. 1133, 1137 (C.D. Cal. 2005)

28   ///

**D.     Legal Conclusions Regarding Injunctive Remedies under the Lanham Act**

30.     Under the Lanham Act, a district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable ... to prevent the violation of subsection (a), (c), or (d) of section 43 [§ 1125(a), (c), or (d)]." 15 U.S.C. § 1116(a). "Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. [When] the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." F.T.C. v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982), quoting Virginian R. Co. v. System Federation, 300 U.S. 515, 552 (1937). The Court finds that the public interest is critical to this lawsuit.

31.     "Unless Congress provides otherwise, courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Northwest Environmental Defense Center v. Bonneville, 477 F.3d 668, 680 (9th Cir. 2007) (internal citations and quotations omitted). "Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and to mold each decree to the necessities of the particular case.'" F.T.C. v. H.N. Singer, 668 F.2d 1107, 1112 (9th Cir. 1982), quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944 ). "It is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." Playboy Enterprises v. Baccarat, 692 F.2d 1272, 1275 (C.D. Cal. 1982). The Ninth Circuit has held that the same rationale for awarding profits in trademark infringement suits under the Lanham Act applies to false advertising claims under the Lanham Act. U-Haul v. Jartran, Inc. 793 F. 2d. 1034, 1042 (9th Cir. 1986).

32.     In Lanham Act cases, "the courts are given flexibility in fashioning

1   injunctive relief, and "the scope of the injunction to be entered depends upon the

2   manner in which plaintiff is harmed, the possible means by which that precise harm

3   can be avoided, the viability of the defenses raised, and the relative inconvenience

4   that would be caused to defendant by each of the several means of avoidance.'"

5   Kelley Blue Book v. Car-Smarts, Inc., 802 F.Supp. 278 (C.D.Cal.1992), quoting J.

6   McCarthy, Trademarks and Unfair Competition, § 30:3 p. 466 (2d ed. 1984).

7       33.   A plaintiff does not need to prove the element of actual injury when

8   seeking injunctive relief. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134,

9   1145 (9th Cir. 1997); see also Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d

10  197, 210 (9th Cir. 1989).  Rather, to obtain injunctive relief under the Lanham Act,

11  plaintiff must show that the advertisement has misled, confused, or deceived the

12  consuming public. Southland Sod, 108 F.3d at 1140.  The relevant inquiry is

13  "whether it is likely that [defendants'] advertising has caused or will cause a loss of

14  [plaintiff's] sales, not whether [plaintiff] has come forward with specific evidence

15  that [defendants'] ads actually resulted in some definite loss of sales." Johnson and

16  Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 190 (2nd Cir. 1980) ("Sound policy

17  reasons exist for not requiring proof of actual loss as a prerequisite to 43(a)

18  injunctive relief.  Failure to prove actual damages in an injunction suit, as

19  distinguished from an action for damages, posed no likelihood of a windfall for the

20  plaintiff.  The complaining competitor gains mo more than to which it is already

21  entitled a market free of false advertising.")  "The passage of 43(a) represented a

22  departure from the common law action for trade disparagement and from the need to

23  prove actual damages as a prerequisite for injunctive relief.  This departure marked

24  the creation of a 'new statutory tort' intended to secure a market-place free from

25  deceitful marketing practices." Id. at 189, citing  L'Aignon Apparel v. Lana Lobell,

26  Inc., 214 F.2d 649, 651 (3rd Cir. 1954), and Bose Corp. v. Linear Design Labs, Inc.,

27  467 F.2d 304, 311 (2nd Cir. 1972).

28      34. The Court finds that Defendants have violated Section 43a of The Lanham

1    Act by engaging in false advertising and thus the Court finds that injunctive relief is
2    appropriate and required in this case.

3        **E.**     **Legal Conclusions Regarding Monetary Remedies under the**
4                    **Lanham Act**

5        35.    Violations of Section 43a of the Lanham Act, 15 U.S.C. §1125(a)
6    provide for a monetary remedy in the form of disgorgement of profits. The statutory
7    authority for such disgorgement of profits lies in Section 35 of the Lanham Act, 15
8    U.S.C. § 1117. Section 1117 provides in pertinent part that when a violation of
9    section 43a is established, the plaintiff "shall be entitled...subject to the principles of
10   equity, to recover (1) defendant's profits..." . "In assessing profits the plaintiff shall
11   be required to prove defendant's sales only; defendant must prove all elements of
12   cost or deduction claimed." Id.

13       36.    No proof of actual confusion or actual injury is required to recover an
14   infringer's profits. Gracie v. Gracie, 217 F.3d 1060, 1068 (9th Cir. 2000) ( "[a]
15   showing of actual confusion is not necessary to obtain a recovery of profits" ).

16       37.    The best way to deter future acts of false advertising and other forms of
17   commercial piracy is simply to make such conduct unprofitable. Maier Brewing Co.,
18   390 F.2d 117, 123 (C.D. Cal 1968). In this case the Court finds that the profits of the
19   Defendants amount to unjust enrichment, and pursuant to Section 1117, such profits
20   must be disgorged.

21       38.    An appropriate measure of disgorgement is the amount spent by
22   Defendants on the false advertising because such amount equates with the financial
23   benefit received by the wrongdoer. U-Haul Intern., Inc. v. Jartran, Inc., 793 F.2d
24   1034 (9th Cir. 1986).

25       39.    Another appropriate method of calculating the profits which must be
26   disgorged is calculating profits derived from sales attributable to the wrongful
27   conduct.
28

EXHIBIT A
41

W

<u>Lindy Pen Co. v. Bic Pen, Inc.</u>, 982 F.2d 1400, 1408 (9th Cir. 1993)

40.     The type of conduct that Lanham Act damages are designed to deter is unrelated to the type of intellectual property protected. <u>U- Haul International v. Jartran, Inc.</u>, 793 F. 2d. 1034, 1042 (9th Cir. 1986).  So whether the matter is one for trademark infringement or false advertising does not change the rationale for making such activity unprofitable for the wrongdoer for there is no significant distinction between false advertising cases and other types of cases under the Lanham Act. Id.

41.     The detailed evidence presented in this case which shows a direct relationship between the "swift revenue growth and the connection of that growth to [Defendants'] advertising" compels a finding that Defendants' profits, as measured at least by Defendants' advertising expenditures, be disgorged. <u>Id</u>. at 1042.

42.     The Ninth Circuit has held for trademark infringement cases under the Lanham Act, that in order to recover profits, a plaintiff must show that the case is "exceptional".  Exceptional cases are those where the intent or *mens rea* of the defendant has been referred to as "deliberate," or "willful," or "intentional," or "knowing."  See <u>Lindy Pen Co., Inc. v. Bic Pen Corp.</u> 982 F.2d 1400, 1406 (collecting cases and noting that deliberate infringement has been described in many different ways).  The generally accepted notion is that profits are awarded when the defendant willfully attempts to capitalize on a name or mark that was not its own. While this is not a trademark case, as noted in <u>Jartran</u>, *supra*, the type of intellectual property at issue in a Lanham Act case is unimportant to administering the remedy of profits.  The Court finds herein, for the reasons set forth in the fact findings,  that this is an exceptional case and as such, under the Lanham Act, Section 1117, disgorgement of Defendants' profits subject to the principals of equity is required.

43.     Section 1117(a) authorizes courts to award attorneys' fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). "While the term 'exceptional' is not defined in the statute, generally a [Lanham Act] case is

1 exceptional for purposes of an award of attorneys' fees when the infringement is
2 malicious, fraudulent, deliberate or willful." Invision Media Services, Inc. v. Glen J.
3 Lerner, 175 Fed.Appx. 904 (9th Cir. 2006), quoting Lindy Pen Co., 982 F.2d at 1409.
4 As the Court has found that this case is exceptional, Plaintiffs are entitled to their
5 attorneys' fees under the Lanham Act.

6      **F.**     **Legal Conclusions Regarding Remedies: B&P Code § 17200 et seq**

7     44.     Because of Defendants' violation of California's UCL, Plaintiffs are
8 entitled to attorneys' fees pursuant to California Code Of Civil Procedure, §1021.5.
9 The statute provides for attorneys' fees in any action which has resulted in the
10 enforcement of an important right affecting the public interest if: (a) a significant
11 benefit, whether pecuniary or nonpecuniary, has been conferred on the general public
12 or a large class of persons, (b) the necessity and financial burden of private
13 enforcement,...are such as to make the award appropriate, and (c) such fees should
14 not in the interests of justice be paid out of the recovery, if any". The Court finds
15 that Plaintiffs have met these elements and are thus entitled to fees because of the
16 important benefit they have conferred on the public through this litigation.

17     45.     As Defendants have violated California's UCL, The Court is
18 empowered to issue an appropriate injunction pursuant to California Business &
19 Professions Code Section 17203.

20 DATED: November 16, 2007     Respectfully submitted,

22                         LEWIS BRISBOIS BISGAARD & SMITH LLP

23                         By     _Mina Hamilton_

24                         DAVID N. MAKOUS
                             DANIEL C. DECARLO
25                         MINA I. HAMILTON

27                         Attorneys for Plaintiffs

EXHIBIT A
43
AW

**PROOF OF SERVICE**
Trafficschool.com, Inc. v. Edriver, Inc. - File No. 25162.14

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 221 N. Figueroa Street, Suite 1200, Los Angeles, California, 90012.

On November 16, 2007, I served the following document described as **PLAINTIFFS' POST-TRIAL [PROPOSED] FINDINGS OF FACTS AND CONCLUSIONS OF LAW (CITATIONS TO EVIDENCE AND LEGAL AUTHORITIES)** on all interested parties in this action by placing [X] a true copy [ ] the original thereof enclosed in sealed envelopes addressed as follows:

Brian M. Daucher, Esq.
Joseph H. Tadros, Esq.
Amy Merlo, Esq.
SHEPPARD MULLIN RICHTER & HAMPTON
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1925
Telephone: (714) 513-5100
bdaucher@sheppardmullin.com
jtadros@sheppardmullin.com
amerlo@sheppardmullin.com

[X]     BY EMAIL VIA PDF

[X]     (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 16, 2007 at Los Angeles, California.

_____
MINA HAMILTON

LEWIS BRISBOIS BISGAARD & SMITH LLP
221 NORTH FIGUEROA STREET, SUITE 1200
LOS ANGELES, CALIFORNIA 90012-2601
TELEPHONE (213) 250-1800

EXHIBIT A
44

4835-9131-4433.1