86. College students are generally interested in completing traffic school as quickly and cheaply as possible. [Designated Maronick Depo., 137:23-138:19.]

87. A California resident with a traffic ticket would first and foremost want a traffic school that would mask the points from his/her driving record. [11/6 RDT 160:19-161:18 (Creditor).]

88. Convenience is also an important factor for consumers in choosing a traffic school course. [11/6 RDT 161:19-23 (Creditor).]

89. Other traffic schools' search engine listings prominently including price (e.g., Go to Traffic School - Starting at $14.50; Traffic School - Starting at $9.95; $14.80 Online California; Traffic School - $10 Special, etc.) and selection of names for their courses (e.g., "LowestPriceTrafficSchool.com," "Cheap School") strongly suggest that price is another critical factor. [TE 67; 11/7 RDT 41:19-42:13.]

90. A visitor that clicks on the DMV.ORG advertisement of I Drive Safely must click through at least 5 additional pages once on the I Drive Safely website before making a purchase. [Lahoti Trial Decl., ¶ 9; TE 648.]

91. "Conversion rate" is a commonly used phrase within the online industry that refers to the percentage of visitors to a particular webpage that take measurable action (i.e. click on an advertisement, ultimately purchase a product sold by the advertiser). [Moretti Trial Decl., ¶ 18.]

92. Conversion rates can be calculated in at least two different ways: (a) sales derived from a particular webpage divided by the number of times that page has been viewed; or (b) sales derived from a particular webpage divided by the number of unique visits to that page. [11/7 RDT 215:7-16 (Moretti).]

93. The conversion rate for unique visitors to the TrafficSchool.com website is approximately 10 to 15 percent (% that purchase). [11/7 RDT 10:3-6 (Creditor).]

94. The TrafficSchool.com advertisements on DMV.ORG in 2003 (placed through the Overture Ad program) were not profitable, suggesting that the DMV.ORG website was not compelling any significant number of consumers to purchase traffic school services advertised thereon. [11/7 RDT 70:7-12; 73:4-13; 73:20-74:9; 75:18-76:4 (Kramer); TE 688.]

95. In a May 2006 email, Plaintiffs' principal, Chris Kramer, described the traffic from DMV.ORG as "unqualified," meaning that he believed traffic from the DMV.ORG website did not convert to a sufficient number of sales to be profitable. [11/7 RDT 83:24-84:2; 84:21-85:12 (Kramer); TE 45.]

96. The conversion rate for California traffic school advertisements on DMV.ORG is 3.25 percent when calculating sales as a percentage of page views (or approximately 7.5 percent if using unique visitors as the denominator). [Moretti Trial Decl., ¶¶ 19-21; 11/7 RDT 206:19-207:20 (Moretti).]

97. The conversion rate for California drivers education advertisements on DMV.ORG is 0.83 percent when calculating sales as a percentage

of page views (or an estimated 1.5 to 1.75 percent if using unique visitors as the denominator). [Moretti Trial Decl., ¶¶ 19-21; 11/7 RDT 219:8-220:12 (Moretti).]

98. The fact that conversion rates for DMV.ORG are lower than the conversion rates for TrafficSchool.com tends to negate Plaintiffs' allegation that DMV.ORG derives a material advantage from the alleged perceived affiliation of DMV.ORG with a state motor vehicle department.

**Causation/Injury: Explanations for Plaintiffs' Alleged Injury**

99. TrafficSchool.com was one of the first online traffic school course providers, but there are now many other competitors – some courts have approved six online providers while other courts have approved as many as 40 in California. [11/6 RDT 174:19-25, 177:22-178:7 (Creditor).]

100. The barriers to entry into the online traffic school market are relatively low for an existing classroom traffic school provider. [11/6 RDT 175:6-176:8.]

101. In a July 2007 Yahoo! search result for the search term "traffic school" there were approximately 30 results, none of which are for TrafficSchool.com and six of which are TrafficSchool.com competitors in California, demonstrating increased competition for TrafficSchool.com. [11/6 RDT 178:14-181:12 (Creditor); TE 67.]

102. Plaintiffs' search engine advertising expenditures declined from $170,000 in 2004 to less than $100,000 in 2006, while at the same time their radio

advertising expenditures increased from nothing in 2004 to $160,000 in 2006. [11/6 RDT 183:10-184:12 (Creditor).]

103.  Plaintiffs' principal, Eric Creditor, acknowledged that a possible reason for the decline in TrafficSchool.com's search engine marketing expenditures could stem from the fact that other competitors bid more for keywords. [11/6 RDT 184:17-22 (Creditor).]

104.  In 2007, Plaintiffs have reduced their marketing expenditures to pay for this litigation. [Creditor Decl., ¶ 24.]

105.  The first month in which the TrafficSchool.com website experienced a negative trend in regard to the number of visits to the website occurred in June 2005, the same month in which the DriversEdDirect.com website went live. [11/7 RDT 53:23-54:5 (Kramer); TE 28.]

106.  The drop in the number of traffic school courses TrafficSchool.com sold in Texas and Florida correlates with TrafficSchool.com's transition in each state, in different years, from receiving a referral fee from the provider of the traffic school courses in those states to actually selling the course and collecting consumer dollars and instead paying the traffic schools for fulfillment. [11/6 RDT 163:19-166:6, 166:25-168:12 (Creditor); TE 26.]

107.  DriversEdDirect's business was in fact in an upward trend at the time that it initiated contact with defendants to advertise on DMV.ORG. [Designated Leach Depo., 30:18-31:14.]

108. Plaintiffs presented no expert testimony correlating any decline in their businesses to the DMV.ORG website.

### Other Motives For Plaintiffs' Suit

109. In February 2006, DriversEdDirect initiated negotiations with Online Guru to advertise on the DMV.ORG website with the apparent intent to become a long-term partner with DMV.ORG. [11/7 RDT 78:14-21, 80:12-19 (Kramer).]

110. But even at the time that DriversEdDirect initiated contact with DMV.ORG, DriversEdDirect's owners harbored animosity toward Defendant Raj Lahoti and DMV.ORG. [11/6 RDT 196:18-199:18 (Creditor); TE 43.]

111. In April 2006, during the time DriversEdDirect was negotiating with Online Guru to advertise on DMV.ORG, Kramer emailed internally, "We shouldn't deal with people who jerk us around or lead us on" and that he would rather notify the various Dives of the DMV.ORG website, and that they ought to discuss a "strategy" for this. [11/7 RDT 81:23-82:14 (Kramer); TE 43.]

112. In a May 2006 email, Kramer again raised the strategy of contacting the state motor vehicle departments regarding DMV.ORG explaining it as "Sort of a 'if you can't join 'em, shut 'em down' approach." [11/7 RDT 83:24-84:2, 86:24-87:4, 89:7-89:9; TE 45.]

## Unclean Hands: Plaintiffs' Website Practices and Domains

113. Plaintiffs' DriversEdDirect.com website uses various state indicia without license to do so, such as images of state license plates, logos, and state seals. [11/7 RDT 57:22-60:18 (Kramer); TEs 72-74.]

114. TrafficSchool.com uses the term "Official" prominently in its sponsored advertising listings, arguably to improve its own click-through rate by suggesting a government affiliation. [11/7 RDT 61:5-62:20 (Kramer); TE 69.]

115. TrafficSchool.com owns and operates the FloridaTrafficSchool.com domain and uses the site to promote courses sold on TrafficSchool.com and DriversEdDirect.com. [11/7 RDT 17:5-12 (Creditor).]

116. The Florida TrafficSchool.com homepage has a picture of a police officer, though it is not endorsed by the Florida police department, and has a link for "Florida DHSMV resources" and to a "DHSMV Website guide," which link to Plaintiffs' DrivingLinks.com website, not the official Florida Department of Highway Safety and Motor Vehicles. [11/7 RDT 17:17-25, 20:9--21:24 (Creditor); TE 610.]

117. There are no disclaimers on the FloridaTrafficSchool.com website specifying that the website is not affiliated with any government agency. [11/7 RDT 20:4-8 (Creditor).]

118. TrafficSchool.com has a referral agreement with LowestPriceTrafficSchool.com, which refers California residents to

1  TrafficSchool.com, but TrafficSchool.com is not the lowest priced traffic school in
2  California. [11/7 RDT 63:11-16; 65:25-66:22, 68:3-6 (Kramer); TE 611.]
3
4         119.   TrafficSchool.com's LowestPriceTrafficSchool advertisements
5  would lead a reasonable consumer to presume that TrafficSchool.com offered the
6  lowest priced traffic schools in California.
7
8         120.   Plaintiffs' also created a website, DrivingLinks.com, which in
9  their own words "mirrors" the concept and content of the DMV.ORG website.
10 [Designated Kramer Depo., 250:22-251:5; Trial Exhibit 45.]
11
12         121.   Plaintiffs transferred the DrivingLinks.com domain name from
13 TrafficSchool.com to "DrivingLinks.com," a fictional entity, just prior to the launch
14 of the DrivingLinks.com website, arguably to mask the site's affiliation with
15 plaintiffs' business. [11/6 RDT 202:24-205:5 (Creditor); Designated Creditor
16 Depo., 51:4-23.]
17
18         122.   DrivingLinks.com does not expressly state on its website the fact
19 that it is controlled by TrafficSchool.com. [11/6 RDT 205:6-24 (Creditor);
20 Designated Kramer Depo., 246:15-249:4.]
21
22         123.   There are at least 19 references to the "DMV" or "Department of
23 Motor Vehicles" on a single webpage of the DrivingLinks.com website. [11/6 RDT
24 208:5-209:18 (Creditor); Designated Creditor Depo., 271:15-272:9; TE 20
25 (DEF00990-91).]
26
27         124.   DrivingLinks.com is similar to DMV.ORG with regard to its
28 content, but contains no disclaimers as to the lack of affiliation between

-25-

DrivingLinks.com and the state motor vehicle departments. [11/6 RDT 205:25-206:25 (Creditor); Designated Creditor Depo., 270:14-20, 272:16-20; TE 20 (DEF00990-91).]

125. Although the California Department of Motor Vehicles does not license online traffic schools, such as TrafficSchool.com, to provide online traffic school, Plaintiffs have registered and used certain domains containing the term "dmv," including dmvapprovedtrafficschool.com and cadmvtrafficschool.com. [11/6 RDT 151:20-152:24, 154:19-155:18, 155:24-156:18, 157:23-158:6, 158:14-159:2 (Creditor); TE 89, 90.]

126. The use of the phrase "DMV approved" affirmatively suggests that TrafficSchool.com is a DMV approved online traffic school when in fact it is not approved by the California Department of Motor Vehicles.

127. Plaintiffs have also registered, but cannot say whether they have used, the following additional domains: dmvlicenserenewal.com; dmvregistrationrenewal.com; dmvrenewals.com; internetdmv.com; dmvi.com; and trafficschool.us. [11/6 RDT 211:14-212:20 (Creditor); TE 690.]

128. Plaintiffs registered the domains Online-DMV.ORG and Internet-DMV.ORG in August 2006 during the term of their advertising agreement with DMV.ORG. At trial, Plaintiffs could not identify a business purpose for registering the domains. [11/6 RDT 212:21-214:1 (Creditor); TE 691.]

## Statute of Limitations/Laches:
## Plaintiffs' Knowledge Of DMV.ORG and Acquiescence

129. Plaintiffs learned of and visited the DMV.ORG website in March 2002 and had no objections to the use of the DMV.ORG domain at that time. [11/6 RDT 187:2-188:5; TE 32; Ravi Lahoti Trial Decl., ¶ 4; Designated Kramer Depo., p. 214:6-16.]

130. Shortly after learning of DMV.ORG in March 2002, Plaintiffs registered the domain DrivingLinks.com (March 12, 2002) and initiated contact with Ravi Lahoti to recover a domain name. Plaintiffs assertion that these events were mere coincidence is not credible. Rather, it tends to show that Plaintiffs actively investigated the DMV.ORG website at this time. [11/6 RDT 200:19-202:23 (Creditor); 11/7 RDT 68:7-70:6 (Kramer); TEs 20 (DEF00982), 32.]

131. Plaintiffs also visited the DMV.ORG website in 2003, at which time they complained to the Overture advertising network, which placed TrafficSchool.com advertisements on DMV.ORG, due to the large amount click-through charges they were incurring for traffic from their advertisements on DMV.ORG. [11/7 RDT 73:4-74:3 (Kramer); TE 33; Designated Kramer Depo., 214:20-215:13; 216:25-217:4; 226:19-21.]

132. In February 2006, DriversEdDirect initiated negotiations with Online Guru to advertise on the DMV.ORG website. [11/7 RDT 78:14-21, 80:12-19 (Kramer).]

133. DriversEdDirect sought to be "DMV.ORG's premiere California online driver's ed program and behind-the-wheel provider in Los Angeles." [11/7 RDT 80:6-16 (Kramer); TE 36.]

134. Creditor approved an email to Defendant Raj Lahoti, which states in part: "you do a fantastic job marketing DMV.ORG, and you spend a lot of money marketing your site." [11/6 RDT 192:25-194:9 (Creditor); TE 45.]

135. DriversEdDirect eventually entered a written agreement with Online Guru in June 2006, and DriversEdDirect advertisements were test marketed on DMV.ORG in July 2006. [11/6 RDT 191:17-19, 199:16-200:8 (Creditor); TE 37.]

136. Creditor had no problem with DMV.ORG recommending DriversEdDirect in the summer of 2006, and DriversEdDirect paid DMV.ORG for the referrals it received in connection with the advertisement of its driver's education courses. [11/6 RDT 200:5-12 (Creditor).]

### Statute of Limitations/Laches:
### Plaintiffs Delay and Prejudice to Defendants

137. Although Plaintiffs have been aware of DMV.ORG since 2002, and had antipathy towards DMV.ORG from the beginning, they did not file suit until over four years later in November 2006. [11/6 RDT 187:2-188:5; TE 32; Ravi Lahoti Trial Decl., ¶ 4; Designated Kramer Depo., p. 214:6-16; Plaintiffs' Complaint.]

138. Online Guru advertises DMV.ORG through pay-per-click marketing on search engines such as Yahoo! and Google. Online Guru has spent over $10,000,000 on search engine marketing to promote DMV.ORG since 2002. [Raj Lahoti Trial Decl., ¶ 5.]

139. Online Guru has spent over $500,000 on content development of the site since 2002. [Raj Lahoti Trial Decl., ¶ 6.]

140. Through Online Guru's marketing efforts, people have come to know DMV.ORG, refer to it as a good resource for DMV information, and nearly 70,000 websites link to DMV.ORG. [11/7 RDT 153:3-154:5 (Raj).]

141. Online Guru's business would suffer greatly if it was required to change the DMV.ORG domain name as it could take two to three years to build a new brand and recognition. [11/7 RDT 155:7-156:15, 157:5-25 (Raj).]

142. Requiring users to acknowledge upon arriving to DMV.ORG that the website they are visiting is not affiliated with a governmental agency (i.e., a splash page) would have a material impact on the website because splash pages are uncommon, they disrupt a visitor's flow, and actually confuse visitors. [11/7 RDT 158:12-159:13 (Raj).]

////

## CONCLUSIONS OF LAW

### Plaintiffs Do Not Have Standing

1. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. Rule 12(h)(3).

2. Plaintiffs lack standing under Article III of the Constitution because any loss they may have incurred is de minimus in light of the insignificant nature of their referral business. Berkey Photo, Inc. v. Eastman Kodak Co., 603, F.2d 263, 289 (2nd Cir. 1979) (plaintiff not entitled to judgment since it had only proved de minimus injury); Shimkus v. Hickner, 417 F.Supp.2d 884, 905 (E.D. Mich. 2006) (de minimus loss insufficient to confer standing); FRCP R. 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"); Arbaugh v. Y & H Corp., 126 S.Ct. 1235, 1240 (2006) ("The objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in litigation, even after trial and the entry of judgment.").

3. In a false advertising case under 15 U.S.C. § 1125(a)(1)(B), the plaintiff must allege "a discernibly competitive injury" in order to have standing. Waits v. Frito Lay, Inc., 978 F.2d 1093, 1109 (9th Cir. 1992).

4. "In the 'traditional sense,' 'competitors are persons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival." Summit Technology, Inc. v.

1  High-Line Medical Instruments, Co., 933 F.Supp. 918, 939 (C.D. Cal. 1996). If
2  parties who are not in direct competition are deemed to be competitors, then "'any
3  two parties with some economic nexus or whose conduct has some economic effect
4  upon the other, could be construed as 'competitors,'" contrary to Ninth Circuit law.
5  Sugai Products, Inc. v. Kona Kai Farms, Inc., 1997 WL 824022 *11 (D.Hawai'i
6  1997) (quoting Summit Technologies v. High-Line Medical Instruments, Co., 933
7  F.Supp. 918 (C.D. Cal. 1996).

9       5.   Plaintiffs lack standing under the Lanham Act because, given the
10 insignificant nature of their referral business, they do not vie with defendants for the
11 same dollars from the same consumer group in any meaningful sense. Kournikova
12 v. General Media Communications, Inc., 278 F.Supp.2d 1111, 1117 (C.D. Cal.
13 2003) ("the Court must determine whether or not the two parties vie for the same
14 dollars from the same consumer group, and whether the conduct of the defendant, if
15 true, could be said to create 'competitive injury'"); Conte Bros. Auto, Inc. v. Quaker
16 State-Slick 50, Inc., 165 F.3d 221, 223 (3rd Cir. 1998) (upholding dismissal of
17 Lanham Act false advertising claim for lack of standing where retailer of engine
18 additives held not to compete with manufacturer of similar product); FRCP R.
19 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject
20 matter, the court shall dismiss the action"); Arbaugh v. Y & H Corp., 126 S.Ct.
21 1235, 1240 (2006) ("The objection that a federal court lacks subject matter
22 jurisdiction may be raised by a party, or by a court on its own initiative, at any stage
23 in litigation, even after trial and the entry of judgment.").

### Plaintiffs' False Advertising Claim Fails

27      6.   To prevail on a false advertising claim, a plaintiff must prove:
28 (a) defendant made a false or misleading statement in a commercial advertisement

1   about the nature, characteristics, qualities, or geographic origin of their own or
2   another's product; (b) the statement actually deceived or has the tendency to deceive
3   a substantial segment of reasonably prudent consumers; (c) the deception is
4   material, in that it is likely to influence the purchasing decision; and (d) plaintiff has
5   been (or is likely to be) injured by the conduct. 15 U.S.C. § 1125(a)(1)(B);
6   Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997); Int'l
7   Ass'n of Machinists v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir.
8   1996).

[handwritten annotation: (only applicable to "falsity by" necessary "implication")]

10        7.     When evaluating an alleged false advertisement, the
11   advertisement must be considered in its full context rather than dissecting it into its
12   component parts. Southland Sod Farms, 108 F.3d at 1139; and Avis Rent A Car
13   System, Inc. v. Hertz Corp., 782 F.2d 381, 385 (2d Cir. 1986) (courts must
14   "consider the advertisement in its entirety and not … engage in disputatious
15   dissection"); and FTC v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963) (view
16   the "entire mosaic" not "each tile separately"). An analysis of DMV.ORG therefore
17   cannot be broken out into consideration of the domain and search engine search
18   results separately from the content on the website.

20        8.     Plaintiffs' false advertising claim fails as a matter of law as
21   DMV.ORG makes no express claim that it is affiliated, endorsed, or sponsored by
22   any government entity. Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425
23   F.Supp.2d 402, 417 (S.D.N.Y. 2006) ("false advertising claims based on allegations
24   of implied governmental approval have not been allowed, for 'the law does not
25   impute representations of government approval . . . in the absence of explicit
26   claims'").

9. The DMV.ORG website is not literally false, as it provides driving and motor-vehicle related information and expressly disclaims any affiliation with any government entity.

10. Defendants' DMV.ORG website was and is not misleading because the numerous conspicuous disclaimers on the website dispel any likelihood of consumer confusion. Taubman v. Webfeats, 319 F.3d 770, 777 (6th Cir. 2003) (Defendant's disclaimer on its website, www.shopsatwillowbend.com, indicating that it was not the official website for Plaintiff's mall, "The Shops at Will Bend," negated likelihood of consumer confusion; appellate court reversed preliminary injunction entered by district court).

11. Plaintiffs have failed to show that DMV.ORG was or is materially misleading in that they have produced no reliable evidence demonstrating that approval by or affiliation with an official motor vehicles department for traffic school and/or drivers education would be material to the purchasing decision. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (listing, as an element of a false advertising claim, that the deception is material in that it is likely to influence the purchasing decision).

12. Plaintiffs have failed to show that DMV.ORG was or is likely to mislead an appreciable number of reasonably prudent consumers in comparison to the significant traffic on DMV.ORG. Nutri/System, Inc. v. Con-Stan Industries, Inc., 809 F2d 601 (9th Cir. 1987) (misdirected letters and checks deemed insignificant in comparison to volume of the parties businesses); Amf, Inc. v. Sleekcraft Boats, 599 F2d 341, 353 (9th Cir. 1979) (excluding from consideration "the wholly indifferent"); Int'l Ass'n of Machinists v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996) (the law has long demanded a showing that the

allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care); A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., 57 F.Supp.2d 155 (E.D. Pa. 1999) (isolated evidence of actual confusion insufficient to establish confusion.).

13.   Plaintiffs must prove "a logical causal connection between the alleged false advertising and [their] own sales position." A "mere subjective believe that [they] will be injured" is insufficient. Century 21 Real Estate Corp. v. Re/Max South County, 882 F.Supp. 915, 924-25 (C.D. Cal. 1994). Plaintiffs have failed to provide any evidence whatsoever of a "causal connection" between the decline in their businesses and the DMV.ORG website.

### Equitable Defenses Bar Plaintiffs' Claims

14.   Plaintiffs' causes of action do not raise allegations concerning a threat to public safety and well being, and are therefore subject to equitable affirmative defenses. Jarrow Formulas, Inc. v. Nutrition now, Inc., 304 F.3d 829, 841 (9th Cir. 2002) (affirming summary judgment against plaintiff's false advertising claim based on laches, finding that "the public's interest will trump laches only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being").

15.   The limitation periods on a false advertising claim is the analogous state statute of limitations. "The analogous limitations period is California's period for fraud, which is three years." Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002).

16. The defense of laches bars an action for equitable relief where the defendant can show unreasonable delay in bringing suit plus <u>either</u> acquiescence in the act about which plaintiff complains <u>or</u> prejudice to the defendant resulting from the delay. <u>Transworld Airlines v. American Coupon Exchange</u>, 913 F.2d 676, 696 (9th Cir. 1990). Plaintiffs' causes of action are therefore barred by the doctrine of laches because:

(a) In waiting over four years after learning of the DMV.ORG website to bring this action, Plaintiffs have unreasonably delayed. <u>Grupo Gigante SA DE CV v. Dallo & Co., Inc.</u>, 391 F3d. 1088, 1101, 1105 (9th Cir. 2004) (four year delay in asserting trademark rights after learning of infringing use constituted unreasonable delay)

(b) Plaintiffs acquiesced to the conduct about which they complain in seeking to advertise and actually advertising their services on the DMV.ORG website.

(c) Given Defendants' significant investment of time and money in the DMV.ORG website, Defendants will be prejudiced if Plaintiffs are permitted to proceed with this lawsuit, as they will be worse off than they would have been had Plaintiffs brought this lawsuit in a timely fashion. <u>Transworld Airlines v. American Coupon Exchange</u>, 913 F.2d 676, 696 (9th Cir. 1990) (laches is designed to prevent a defendant from being worse off than he would have been if plaintiff had enforced his rights in a timely fashion"); <u>Grupo Gigante</u>, 391 F.3d at 1105 (defendant made the required showing of prejudice by proving that it built a

W02-WEST:3AAE1\400526095.2　　　　　　　　DEFENDANTS' POST TRIAL [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  valuable business around its trademark during the four years that
2  the plaintiff delayed the exercise of its legal rights).

4      17.    The doctrine of unclean hands precludes relief to a party that has
5  acted improperly. <u>Urecal Corp. v. Masters</u>, 413 F.Supp. 873, 875 (N.D. Ill. 1976).
6  "It is the age-old policy of courts of equity to require that he who sues seeking
7  equity must . . . come into court with 'clean hands' as respects that controversy."
8  <u>Hall v. Wright</u>, 125 F.Supp. 269, 273 (S.D. Cal. 1954). The doctrine of unclean
9  hands applies to Lanham Act cases. <u>Japan Telecom, Inc. v. Japan Telecom Am.,</u>
10 <u>Inc.</u>, 287 F.3d 866, 870 (9th Cir. 2002) (expressly recognizing the availability of the
11 unclean hands defense to false affiliation claims); <u>Emco, Inc. v. Obst</u>, 2004 U.S.
12 Dist. LEXIS 12118, *12 (C.D. Cal. May 7, 2004) (holding that the unclean hands
13 doctrine provides a defense to false advertising claims under the Lanham Act);
14 <u>Haagen Dazs v. Frusen Gladje, Ltd.</u>, 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980)
15 (Plaintiff, who engaged in conduct similar to defendant, may not secure equitable
16 relief simply because defendants' hands may be a shade or two less clean").

18     18.    In light of Plaintiffs' DrivingLinks.com website (which was
19 designed to "mirror" DMV.ORG), their FloridaTrafficSchool.com website,
20 LowestPriceTrafficSchool.com advertisements, and registration and use of domains
21 containing the "dmv" moniker, Plaintiffs are guilty of unclean hands and therefore
22 are not entitled to relief.

### **Plaintiffs Are Not Entitled To Any Monetary Recovery**

26     19.    To recover any monetary remedy, plaintiffs must demonstrate a
27 causal connection between the alleged false advertising and their purported injury.
28 <u>Century 21 Real Estate Corp. v. Re/Max South County</u>, 882 F.Supp. 915, 924-25

1  (C.D. Cal. 1994) (plaintiff's false advertising claim failed since it could not prove "a
2  logical causal connection between the alleged false advertising and its own sales
3  position"); Nikkal Industries Ltd. v. Salton, Inc., 735 F.Supp. 1227, 1238 (S.D.N.Y.
4  1990) (verdict for defendant; plaintiff failed to prove lost sales were the result of
5  defendant's advertisements rather than other factors such as its marketing strategy
6  and increased competition). Plaintiffs have failed to provide any evidence
7  demonstrating that DMV.ORG has caused them injury. And there are other
8  plausible explanations (e.g. increased competition, transitions in Plaintiffs' business,
9  shifts in Plaintiffs' marketing expenditures, etc.) for the decline in Plaintiffs' sales.
10 Accordingly, Plaintiffs are not entitled to any monetary award.

12     20.   An accounting of profits is to "constitute compensation not a
13 penalty," and is not available as a matter of right, but is subject to principles of
14 equity. 15 U.S.C. 1117; Maier Brewing Co. v. Fleischman Distilling, 390 F.2d 117,
15 120 (9th Cir. 1968). Courts evaluating whether an accounting of profits is
16 appropriate have taken into consideration the intent of the alleged wrongdoer,
17 requiring willful and deliberate wrongdoing. Maier Brewing Co., 390 F.2d at 124;
18 Alpo Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 961 (D.C. Cir. 1990);
19 Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 919 (Fed. Cir. 1984).
20 Plaintiffs are not entitled to an accounting of Defendants' profits because they have
21 offered no evidence demonstrating that Defendants' intended to mislead consumers
22 and Defendants' conduct suggests otherwise.

24     21.   An award of attorneys fees is available only in "exceptional"
25 circumstances. 15 USC 1117(a). "While the term 'exceptional' is not defined in the
26 statute, generally a trademark case is exceptional for purposes of an award of
27 attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."
28 Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1409 (9th Cir. 1993).

Plaintiffs have produced no evidence demonstrating any intent to deceive and the facts are to the contrary – Online Guru has placed numerous disclaimers on DMV.ORG and voluntarily added further disclaimers reinforcing the nature of the website since inception of this suit. Accordingly, Plaintiffs are not entitled to their attorneys fees.

Respectfully submitted,

Dated: November 16, 2007

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
BRIAN M. DAUCHER

Attorneys for Defendants