1 | *disclaimers reinforcing the nature of the website since inception of the Plaintiffs'*

2 | *lawsuit.  Raj Lahoti Trial Decl., ¶¶ 24-27; 29-34.]*

3 | **I.       The Materiality of the False and Misleading Advertising (¶¶95-99)**

4 | 95.   There were approximately 65 million visitors to the DMV.ORG website

5 | over a period of 17 months from January-May 2007. [TE 340.]

6 | 96.   Consumers of traffic school and drivers education courses would attach

7 | great importance to the belief that a governmental DMV agency was recommending

8 | or endorsing a specific traffic school or drivers education program. [TD Eric Creditor

9 | ¶¶4;6;9; TE 316; TD Shannon Robertson, ¶8.]

10 | *[Disputed on the grounds that (i) other than the declaration of Shannon Robertson,*

11 | *there is no evidence that any consumers find the endorsement of a specific traffic*

12 | *school important; (ii) no evidence suggests that consumers care more about*

13 | *government recommendation of one acceptable course over another acceptable*

14 | *course; and (iii) Ms. Robertson is the only student Plaintiffs are aware of, out of*

15 | *hundreds, that expressed any confusion as to DMV.ORG, and is therefore*

16 | *insufficient.  Designated Creditor Depo., 395:11-396:6, 396:20-397:15.  Further,*

17 | *the following evidence refutes the finding: (i) a California resident would first and*

18 | *foremost want a traffic school that would mask the points from his/her driving*

19 | *record; (ii) even Plaintiffs' expert, Maronick, construed the phrase "recommended*

20 | *by the DMV" to simply mean that a traffic school course would merely serve to*

21 | *discharge a traffic ticket; (iii) convenience and price are important factors for*

22 | *consumers; and (iv) the conversion rates for DMV.ORG (both before and after*

23 | *changes to the website), which are lower than Plaintiffs' (regardless of the method of*

24 | *calculation), undermine the theory that DMV.ORG derives an unfair commercial*

25 | *advantage based on the alleged perceived endorsement.  11/6 TT 160:19-161:23;*

26 | *11/7 TT 10:3-6, 41:19-42:13, 206:19-207:20, 219:8-220:12; Designated Maronick*

27 | *Depo., 139:21-140:15; Moretti Trial Decl., ¶¶ 19-21; TE 67.]*

28 | 97.   This is so simply because consumers are often aware that their state

1  DMV must accept the traffic school or drivers education certificate to remove a

2  vehicle violation or to issue a drivers license.  [TD Eric Creditor ¶¶4;6;9; TE 316.]

3  *[This proposed finding again conflates two distinct issues: (i) mere government*

4  *"acceptance" of a course (i.e., whether the course can mask points from one's*

5  *driving record); and (ii) endorsement by the state of one acceptable course over*

6  *another.  While sub (i) is material, sub (ii) is not material.  Designated Maronick*

7  *Depo., 139:21-140:15.]*

8      98.  Consumers seeking traffic school and driver education services are

9  aiming to receive a certificate of completion from a licensed course that will be

10  recognized and accepted by the state agency DMV.  [TD Eric Creditor ¶¶4;9; TE

11  316.]

12  *[Disputed on the grounds that consumers care first and foremost about receiving a*

13  *certificate of completion that will be accepted by the state; there is no evidence that*

14  *consumers care more about government recognition of one acceptable course over*

15  *another acceptable course.  11/6 TT 160:19-161:18.  Additionally, TSC's sales of*

16  *online traffic school prove that consumers do not care whether the course is*

17  *licensed, as the state does not license homestudy or online courses.  Kramer*

18  *Designated Depo., 273:12-20, 274:25-275:4, 276:12-277:13; 11/6 TT 152:25-*

19  *154:5.]*

20      99.  In Plaintiffs' consumer survey Study 4, "[O]ver two-thirds of California

21  residents surveyed (67%) consider "recommended by the DMV" to be an important

22  factor in their decision as to which traffic school to choose." [TD Dr. Thomas

23  Maronick, TE 350 (Study 4); TE 389 (Rebuttal Statement of Dr. Maronick).]

24  *[Disputed on the grounds that Maronick survey 4 was designed in a leading manner,*

25  *requiring respondents to rank 8 pre-selected factors set forth in the survey by*

26  *importance, rather than asking respondents an open-ended question.  Moreover,*

27  *Maronick understood the phrase "recommended by the DMV" to mean that a traffic*

28  *school course would serve merely to discharge a traffic ticket, as compared to the*

1  *state's endorsement of one acceptable school over another.  Maronick Designated*

2  *Depo., 116:25-117:10, 118:8-21, 125:8-126:17; 139:21-140:15; TE 144.]*

3  **J.    The Actual and Likely Injury to Plaintiffs (¶¶100-105)**

4  100.  The higher click through rate of DMV.ORG has impacted Plaintiffs'

5  marketing efforts because Plaintiffs have to compete for the same keywords on pay

6  per click advertising on an uneven playing field.  [TD Chris Kramer ¶¶3,4,8.]

7  *[Disputed on the grounds that (i) the finding assumes a higher click-through rate for*

8  *DMV.ORG (without any evidence in support thereof); and (ii) there is no evidence*

9  *that the alleged higher click through rate for DMV.ORG has affected Plaintiffs.  In*

10  *fact, Plaintiffs slashed their internet marketing budget in favor of other media and*

11  *acknowledged that a possible reason for the decline in TSC's search engine*

12  *marketing expenditures could stem from increased competition generally.  TE 26;*

13  *11/6 TT 183:10-184:22.]*

14  101.  Because consumers confuse DMV.org with the government DMV

15  agency, consumers confuse the traffic school and driver education services referred

16  to on the DMV.ORG website as a recommendation by the state agency DMV.  [TD

17  Shannon Robertson, ¶¶3-6, Lisa Warren,¶9.]

18  *[Disputed on the grounds that the evidence cited is insufficient to support the finding*

19  *in that (i) Ms. Robertson is the only student Plaintiffs are aware of that expressed*

20  *some confusion as to DMV.ORG; and (ii) Ms. Warren was not a consumer looking*

21  *for traffic school or drivers education services, but rather was in search of official*

22  *state logos for her traffic school website.  Designated Creditor Depo., 395:11-396:6,*

23  *396:20-397:15; Warren Trial Decl., ¶¶ 5-6.  Plaintiffs here suggest that this Court*

24  *accept the evidence of one consumer.]*

25  102.  Every time a viewer clicks through a search engine result (natural or

26  sponsored), navigating to the DMV.ORG site, and every time a potential customer

27  visits the DMV.ORG site looking for traffic school or drivers education services - in

28  a place where Plaintiffs or its affiliates are fulfilling this need - is a time that

PLAINTIFFS' POST TRIAL [PROPOSED] FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1  Plaintiffs lose a potential customer and revenue generated from the sale.  [TD Eric

2  Creditor ¶21; Depo. Steve Moretti, pp. 95:18-96:8]

3  *[Disputed on the grounds that (i) even Plaintiffs' expert explained that a consumer is*

4  *likely to hunt around on a variety of websites before making a purchasing decision;*

5  *and (ii) the testimony cited does not support the statement, as the hypothetical posed*

6  *in the cited testimony assumed that the consumer decided to purchase from a third*

7  *party advertised on DMV.ORG, not that the consumer merely navigated to*

8  *DMV.ORG as posed in this finding.  Maronick Designated Depo., 217:13-17.*

9  *Further, DMV.ORG's conversion rates are lower than Plaintiffs' (regardless of the*

10 *method of calculation), demonstrating that consumers are not materially influenced*

11 *by the DMV.ORG website.  11/7 TT 10:3-6, 206:19-207:20, 219:8-220:12; Moretti*

12 *Trial Decl., ¶¶ 19-21.]*

13      103.   In other words, Defendants, as participants of the resulting revenue

14 generated by their promotion and sale of traffic school and drivers education services

15 through DMV.ORG make the sale while Plaintiffs lose that sale.  [TD Eric Creditor

16 ¶21; Depo. Steve Moretti, pp. 95:18-96:8.]

17 *[Disputed on the grounds that, unlike Plaintiffs (whose core business entails the sale*

18 *and provision of traffic school and drivers education services), DMV.ORG does not*

19 *sell traffic school and drivers education services; rather it* <u>*advertises*</u> *the services of*

20 *third parties.  11/7 TT 103:2-22, 169:15-25.]  Further, Plaintiffs have failed to offer*

21 *any evidence of injury or any evidence to correlate some alleged injury to*

22 *DMV.ORG.  The cited testimony merely posed a hypothetical which assumed that the*

23 *consumer decided to purchase from a third party advertised on DMV.ORG.]*

24      104.   This results in a direct loss of business and marketing funds for

25 Plaintiffs.  [TD Eric Creditor ¶¶21-24; ¶25 (except lines 26 at "Increased..." to line

26 28 finishing with "listings."; ¶26; TE 365.]

27 *[Disputed on the grounds that Plaintiffs failed to produce any evidence correlating*

28 *any conduct by Defendants to any injuries they have allegedly incurred.*

PLAINTIFFS' POST TRIAL [PROPOSED] FINDINGS OF FACTS AND CONCLUSIONS OF LAW

1   *Additionally, Direct's sales were actually in an upward trend at the time it initiated*

2   *contact with Defendants to advertise on DMV.ORG, and other factors, such as*

3   *increased competition in the marketplace, Plaintiffs' marketing decisions, and*

4   *business structure with their partners, may explain any modest decline in Plaintiffs'*

5   *sales. Designated Leach Depo., 30:18-31:14; 11/6 TT 163:19-168:12, 177:22-*

6   *181:12, 183:10-184:12, 184:17-22; Creditor Decl., ¶ 24; TE 67.]*

7        105.   Plaintiffs have been and are likely to continue to be injured as a result of

8   Defendants' wrongful conduct. [TD Eric Creditor ¶¶21-24; ¶25 (except lines 26 at

9   "Increased..." to line 28 finishing with "listings."; ¶26; TE 365.]

10   *[Disputed on the grounds that Plaintiffs failed to produce any evidence correlating*

11   *any conduct by Defendants to any injuries they have allegedly incurred.*

12   *Additionally, Direct's sales were actually in an upward trend at the time it initiated*

13   *contact with Defendants to advertise on DMV.ORG, and other factors, such as*

14   *increased competition in the marketplace, Plaintiffs' marketing decisions, and*

15   *business structure with their partners, may explain any modest decline in Plaintiffs'*

16   *sales. Designated Leach Depo., 30:18-31:14; 11/6 TT 163:19-168:12, 177:22-*

17   *181:12, 183:10-184:12, 184:17-22; Creditor Decl., ¶ 24; TE 67.]*

18        **K.    Steve Moretti Testified Falsely: Page View Statistics (¶¶106-110)**

19        106.   The Court finds that the testimony of defense witness, Steve Moretti,

20   about Defendants' ability to track the paths of users who visit the traffic school and

21   drivers education pages [11/7 TT, pp. 177:11-180:12] is inconsistent with Mr. Raj

22   Lahoti's testimony on the same topic [11/8 TT, pp. 18:23-20:4]. The Court accepts

23   Mr. Lahoti's testimony given at his deposition, and rejects Mr. Moretti's testimony.

24   *[Disputed on the grounds that line of questioning for each witness is different and to*

25   *the extent that the questions are similar, the testimony is consistent. Specifically,*

26   *Mr. Lahoti only testified as to Online Guru's capability to determine, of visitors*

27   *landing on a traffic school page, what percentage viewed other pages (confirmed by*

28   *Mr. Moretti), not that Online Guru could track the actual number of pages viewed or*

1   *the percentage of visitors that exited the page by clicking specifically on the I Drive*

2   *Safely advertisement.]*

3       107.   The Court finds that the page view statistics provided in paragraph 10 of

4   Steve Moretti's trial declaration are of limited value because the Court finds that the

5   website visitors analyzed in paragraph 10 of Mr. Moretti's declaration are not

6   representative of visitors who are in search of traffic school or drivers education

7   services.  The evidence established that such visitors, likely link to DMV.ORG from

8   a targeted sponsored listing which directs them to a page other than the homepage.

9   [11/7 TT, pp. 176:25-179:16.]

10  *[Disputed on the grounds that the statement offers no evidence indicating that*

11  *consumers looking for traffic school or drivers education are unique (in that they*

12  *would view less than 5 webpages during their visit) in comparison to the average*

13  *visitor to DMV.ORG.  And rather, according to the testimony cited, a visitor that*

14  *lands on an interior page of the site is more likely to visit other pages of the website*

15  *than a visitor that lands on the DMV.ORG homepage.]*

16      108.   In May of 2007, there were 18,084 visits to the California traffic school

17  web page on DMV.ORG and of those 18,084 visits [TEs 109, 642], 6,754 landed on

18  that page. The "I Drive Safely" logo/link is prominently displayed on the California

19  traffic school page. [TE 110, DEF-02534.]

20      109.   Of the 18,084 visitors to the California traffic school page in May of

21  2007, over half that visited that page exited the DMV.ORG site from that page [TE

22  109, p. 2536; TT 11/7 , pp. 198:24-199:12.] The Court finds that this statistic

23  suggests that the California traffic school page is extraordinarily effective at

24  persuading users to click on the "I Drive Safely" logo as it is a prominent exit path

25  from that page. [11/7 TT, p. 198:13-18.]

26  *[Disputed on the grounds that the statement misleadingly suggests that the only way*

27  *to exit the California traffic school page is through the link for "I Drive Safely."  To*

28  *the contrary, as elicited by the Court's own question, visitors could exit the page by*

1    *typing a new domain, as well as at least 4 other methods (i.e., closing the web*

2    *browser, clicking on the web browser's home button, clicking on bookmarks, or*

3    *clicking on another advertisement). 11/7 TT 197:1-11; 217:24-218:21.]*

4       110.   Of the 18,084 people who visited the California traffic school page in

5    May of 2007, 6,754, or 37%, landed on that page and of those that landed on that

6    page, 4,376 existed without looking at another page. This data suggests that visitors

7    to the California traffic school page are not viewing five to six pages of the website

8    per visit. [TE 109, p. 2537; 11/7 TT, pp. 195:14-196:20].

9    *[Disputed on the grounds that of the 18,084 visitors that saw the California traffic*

10    *school page, only a quarter exited that page without viewing any other pages.*

11    *Moretti Trial Decl., ¶¶ 15-17. There is no evidence indicating that the 18,084*

12    *overall visitors viewing that page viewed fewer webpages than the average visitor*

13    *(i.e., 5 webpages), nor is there any evidence supporting Plaintiffs' suggestion that*

14    *visitors looking for traffic school or drivers education courses entered the website*

15    *through pages dedicated to those topics.]*

16       **L.    Steve Moretti Testified Falsely: Defendants' Conversion Data**

17             **(¶¶111-115)**

18       111.   The Court finds that portions of Steve Moretti's testimony at paragraphs

19    18 through 23 of his trial declaration was false. [TD Steve Moretti, ¶¶18-23; 11/7

20    TT, pp. 199:24-207:25.]

21    *[Mr. Moretti's trial declaration testimony is not false; conversion rates can be*

22    *calculated in at least two different ways, one of which was described in Mr.*

23    *Moretti's declaration. 11/7 TT 215:7-16. And, even when calculating the*

24    *conversion rates by the method most favorable to Plaintiffs, DMV.ORG's conversion*

25    *rates are still lower than Plaintiffs' conversion rates, undermining the materiality*

26    *thesis. 11/7 TT 10:3-6, 206:19-207:20, 219:8-220:12; Moretti Trial Decl., ¶¶ 19-*

27    *21.]*

28       112.   Steve Moretti defined "conversion rate" as "the percentage of visitors to

1  a particular web page that take measurable action (i.e., click on an advertisement,
2  ultimately purchase a product sold by the advertiser)". [TD Steve Moretti, ¶18.]

3         113.   The entire rational for Mr. Moretti's presentation of the conversion rate
4  data in his trial declaration was to support Defendants' hypothesis that if DMV.ORG
5  derives an unfair advantage from a perceived affiliation with the Government, one
6  would expect to see an unusually high "conversion rate". [TD Steve Moretti, ¶22.]
7  *[Disputed on the grounds that even when DMV.ORG's conversion rates are*
8  *calculated using Plaintiffs' method, they are still lower than Plaintiffs' conversion*
9  *rates, undermining Plaintiffs' thesis that perceived affiliation confers an unfair*
10 *advantage. 11/7 TT 10:3-6, 206:19-207:20, 219:8-220:12. Thus, the conclusion is*
11 *supported regardless of which method is employed for calculation of the conversion*
12 *rate and is reinforced by Plaintiffs' own statements over the years that traffic from*
13 *DMV.ORG is unqualified/poor (i.e., unlikely to produce a sale). 11/7 TT 70:7-12,*
14 *73:4-74:9, 75:18-76:4, 83:24-84:2, 84:21-85:12; TEs 45, 688.]*

15        114.   The Court finds that the "conversion rate" definition provided by Mr.
16 Moretti in paragraph 18 of his declaration was then not the definition used by Mr.
17 Moretti in his declaration when he concluded in paragraphs 20 and 21 of his
18 declaration as to what the various conversion rates are. [11-7 TT, pp. 199:25-
19 205:14.]
20 *[The definition of conversion rate is irrelevant, because even when calculated using*
21 *the method suggested by Plaintiffs at trial, DMV.ORG's conversion rates are still*
22 *lower than Plaintiffs' conversion rates. 11/7 TT 10:3-6, 206:19-207:20, 219:8-*
23 *220:12.]*

24        115.   The Court finds that Mr. Moretti's trial declaration testimony was false
25 with regard to the conversion rate and that such false testimony, represents a
26 concerted effort by the Defendants to manipulate its own internal data to support a
27 hypothesis which in fact is not true and which the Court finds, Defendants knew not
28 to be true. The Court further finds that the Defendants' failure to produce conversion

1  data which would have been valuable, namely, tracking the patterns of those

2  consumers who link to DMV.ORG after clicking on drivers education or traffic

3  school courses sponsored listings when such data was within their power to produce

4  [11/8 TT, pp. 18:23-20:9], suggests strongly that the data would contradict the

5  Defendants' hypothesis.

6  *[This finding is a gratuitous and entirely unwarranted assault on Mr. Moretti's*

7  *honesty.  As explained at trial, conversion rates can be calculated in at least two*

8  *different ways and, by either method of calculation, DMV.ORG's conversion rates*

9  *are underlined lower than Plaintiffs' own, negating any alleged materiality.  11/7 TT 10:3-6,*

10 *206:19-207:20,  215:7-16, 219:8-220:12.  Further, the suggestion the DMV.ORG*

11 *did not produce data is outrageous - Defendants produced 19 different statistical*

12 *reports (TEs 5-8, 109-111, 641-646, 672-677).]*

13      **M.      Findings Related to Alleged Unclean Hands and Laches Defenses**

14           **(¶¶116-121)**

15      116.  While Defendants first had knowledge of a website that existed under

16 the DMV.ORG domain name in 2002, that website looked fundamentally different

17 than how it looked in late 2006, when this action was filed.  [TE 623-625; TD Eric

18 Creditor, ¶¶32-33.]

19 *[Disputed on the grounds Plaintiffs had knowledge of the website in 2002 and that*

20 *the website was not fundamentally different.  For example, the website has always*

21 *used the DMV.ORG domain, has had the bottom disclaimer since 2002, and has used*

22 *the phrase "No need to stand in line, your DMV guide is no online" (or similar)*

23 *since 2004. TEs 623-625, 631.]*

24      117.  The DMV.ORG website in 2002 and 2003 provided users on the

25 homepage with an immediate prompt to link to official DMV websites. [TE 623-624;

26 11/6 TT, p. 70:3-19.]

27 *[Disputed to the extent that the statement implies that the website was any different*

28 *in 2004, 2005 and/or 2006, which it was not.]*

1    118.   On September 27, 2006, Defendants launched a brand new DMV.ORG

2    website. [11/6 TT, pp. 75:8-78:5.]  The only disclaimer placed on the DMV.ORG

3    website prior to the filing of the lawsuit was at the very bottom of the website pages

4    which would have required a user to scroll down to view.  There was no prompt on

5    the website to advise a user to scroll down. [11/6 TT, pp. 80:16-24.]

6    *[Disputed on the grounds that, though the content and structure of DMV.ORG was*

7    *revised in October 2006, the primary nature of the website remained substantially*

8    *similar to the prior content.  (Compare TE 627 to 628.)   And, prior to the lawsuit, in*

9    *addition to the bottom disclaimer on every page of the website, there was also*

10   *clarifying language in the introductory sentence on the homepage, explaining:*

11   *"Since government sites can sometimes be confusing to use, we have made this guide*

12   *for the average user to understand" (or similar).   Raj Lahoti Trial Decl., ¶ 35; TEs*

13   *627, 628.]*

14    119.   Plaintiffs' dealings with Defendants regarding the possibility of

15   advertising on DMV.ORG, was limited to discussions had by Direct only (not TSC)

16   prior to this lawsuit and the resultant six hour test conducted in July of 2006, prior to

17   this lawsuit; in which at no time did Defendants disclose the objections they had

18   already received from state DMV agencies to Plaintiffs or the rampant consumer

19   confusion taking place.  [TD Eric Creditor ¶¶33;34;36-37; 11/7 TT, pp. 166:17-

20   167:2.]

21   *[Disputed on the grounds that (i) Direct was formed to spin off the drivers education*

22   *portion of TrafficSchool.com's business and has common owners and business*

23   *space, (ii) Leach, President of Direct from approximately July 2006-January 2007,*

24   *was instructed by Kramer (co-founder of TSC and Direct) to initiate the negotiations*

25   *with DMV.ORG, and (iii) these negotiations ultimately resulted in an executed*

26   *affiliate agreement.  [Designated Leach Depo., 8:9-9:21, 28:1-31:23, 32:8-12,*

27   *32:23-33:14; TE 37; 11/7 TT 88:19-88:21.]  Disputed that "rampant consumer*

28   *confusion was taking place," or that there were any pending objections from the*

1  *state regarding DMV.ORG to disclose to Plaintiffs.   11/6 TT 82:8-83:12; see*

2  *also Defendants' Statement of Dispute in Response to Proposed Fact No. 78.]*

3      120.   Plaintiffs are not aware of a single instance where the public was

4  confused about the source or sponsorship of its DrivingLinks.com website and

5  Plaintiffs have never objected the merely descriptive and fair use of the term DMV.

6  [TD Eric Creditor ¶30.]

7  *[Disputed on the grounds that Plaintiffs do in fact object to the mere descriptive and*

8  *fair use of the term DMV in the operative complaint.  See generally Plaintiffs' TAC.]*

9      121.   There is no evidence that Plaintiffs have used any domain names

10  incorporating the term DMV in any misleading or deceptive manner.  [TD Eric

11  Creditor ¶31.]

12  *[Disputed on the grounds that, although the California Department of Motor*

13  *Vehicles does not license online traffic schools, Plaintiffs have used the domain*

14  *names dmvapprovedtrafficschool.com and cadmvtrafficschool.com to falsely claim*

15  *such approval.  11/6 TT 151:20-152:24, 154:19-155:18, 155:24-156:18, 157:23-*

16  *158:6, 158:14-159:2; TEs 89-90.  Further, Plaintiffs have also registered domains*

17  *such as internet-dmv.org and online-dmv.org (despite the fact that they could not*

18  *identify a business purpose for registering such domains).  11/6 TT 212:21-214:1;*

19  *TE 691.]*

20      **N.      Factual Findings Relating to Remedies: Injunction (¶¶122-128)**

21      122.   The Court finds that an injunction is appropriate in this case.

22  *[Disputed on the grounds that Plaintiffs failed to establish that DMV.ORG is*

23  *materially misleading to any significant portion of the millions of visitors to the*

24  *website.  Further, the current version of the website includes numerous prominent*

25  *disclaimers, well beyond what the government required of FreeCreditReport.Com or*

26  *any other cited case, negating any need for an injunction.  Compare TE 631 and*

27  *Defendants' RJN No. 3.]*

28      123.   The Court finds that in order to prevent ongoing acts of unfair

1   competition and resulting confusion, the Court's injunction must require the

2   cessation of the use of the domain name DMV.ORG by Defendants.

3   [Disputed on the grounds that such draconian relief would be unprecedented and

4   would destroy the goodwill that DMV.ORG has cultivated.  11/7 TT 153:3-154:5,

5   155:7-156:15, 157:5-25; Raj Lahoti Trial Decl., ¶¶ 5-6, 19.  Further, such a remedy

6   would conflict with principles of equitable relief.  ALPO Petfoods v. Ralston Purina

7   Co., 913 F.2d 958, 972 (D.C. Cir. 1990) ("the law requires that courts closely tailor

8   injunctions to the harm that they address"); Forschner Group v. Arrow Trading Co.,

9   124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity

10  jurisdiction has been the power to grant relief no broader than necessary to cure the

11  effects of the harm caused by the violation.").]

12       124.  The Court finds that in order to prevent ongoing acts of unfair

13  competition and resulting confusion, prior to accessing DMV.ORG, users must be

14  prompted to acknowledge that the site they are entering is not affiliated with the

15  government.

16  [Such a remedy would be draconian in that it would have a material impact on the

17  website since splash pages are uncommon, disrupt a visitor's flow, and can actually

18  confuse visitors.  11/7 TT 158:12-159:13; Dept. Health & Human Svcs.,

19  Research-Based Web Design & Usability Guidelines, § 2.1(2006) (avail. at

20  www.usability.gov) ("Users have commented that unsolicited windows or graphics

21  that 'pop up' are annoying and distracting when they are focusing on completing

22  their original activity.").  Further, such a remedy would conflict with principles of

23  equitable relief.  ALPO Petfoods v. Ralston Purina Co., 913 F.2d 958, 972 (D.C.

24  Cir. 1990) ("the law requires that courts closely tailor injunctions to the harm that

25  they address"); Forschner Group v. Arrow Trading Co., 124 F.3d 402, 406 (2d Cir.

26  1997) ("It is well-settled that the essence of equity jurisdiction has been the power to

27  grant relief no broader than necessary to cure the effects of the harm caused by the

28  violation.").]

4851-6320-8706.1
-44-

125.   The Court finds that in order to prevent ongoing acts of unfair competition and resulting confusion, prominent disclaimers in large type across the entirety of each page of the DMR.ORG's website must be employed.  Such disclaimers must clearly identify the site as not being affiliated with any governmental agency.

*[Disputed on the grounds that there is no evidence proving that DMV.ORG is materially misleading to any significant portion of the millions of visits that the website receives.  Such a remedy is unnecessary in light of the numerous and prominent disclaimers already on each page of the website, appearing at least twice at the top of the page as well as once at the bottom of the page.  TE 631.]*

126.   The Court finds that Defendants' false advertising has resulted in significant benefits to Defendants.  Specifically, because of the nature of the Internet, DMV.ORG is now a deeply entrenched web site with about 70,000 web sites which link to DMV.ORG. [11-7 TT, p. 153:1-5; p.154:1-5.]  The Court further finds that Defendants should not retain the benefits of this deep entrenchment in the Internet when such entrenchment was created in large part from illegal conduct.

*[Disputed on the grounds that DMV.ORG has not engaged in any illegal conduct to obtain the recognition it receives on the internet.  Rather, DMV.ORG's success is due to the significant resources it has invested in the website and the valuable information that it provides to consumers who cannot find the information they are looking for on less helpful government websites.  Raj Lahoti Trial Decl., ¶¶ 5-6, 19; 11/7 TT 153:3-154:5; TEs 635, 637; Dept. Health & Human Svcs., Research-Based Web Design & Usability Guidelines, § 2.1(2006) (avail. at www.usability.gov) ("Users have commented that unsolicited windows or graphics that 'pop up' are annoying and distracting when they are focusing on completing their original activity.").]*

127.   The Court finds that imposition of an injunction that divests Defendants of the right to use DMV.ORG would not materially impact Defendants' business as it

1  relates to lawfully attracting visitors to the DMV.ORG website.  Specifically,
2  DMV.ORG attracts almost 80% of its total traffic (anticipated to be 70 million
3  visitors in 2007) from search engines (which come from natural and sponsored
4  listings) and Defendants would be able to continue to employ the same strategies
5  they do today with regard to search engine optimization and search engine marketing
6  to attract visitors.  As such, changing the domain name would not impact
7  Defendants' ability to lawfully attract business, it would only affect Defendants'
8  ability to benefit from confusion. [11-7 TT, p. 154:6-157:27.]

9  *[Disputed on the grounds that such a remedy would be draconian as it would destroy*
10 *the goodwill that Online Guru has built for DMV.ORG since 2002, taking years to*
11 *build a new brand and consumer recognition.  11/7 TT 153:3-154:5, 155:7-156:15,*
12 *157:5-25; Raj Lahoti Trial Decl., ¶¶ 5-6, 19.]*

13        128.   Similarly, The Court finds that compelling Defendants to use an
14 acknowledgment page, forcing consumers to represent that they understand they are
15 entering a private site, would not materially impact Defendants' ability to operate
16 lawfully. [11-7 TT, p. 158:12-19].  The Court finds that the mere fact that such
17 changes may impact "usability", does not mitigate against the need for such
18 protection. [11-7 TT, p. 158:22 - 159:13.]

19 *[Disputed on the ground that such a remedy would be draconian in that it would*
20 *have a material impact on the website since splash pages are uncommon, disrupt a*
21 *visitor's flow, and can actually confuse visitors.  Moreover, such a remedy would be*
22 *improper, as it applies to the entire website and therefore is not narrowly tailored to*
23 *address Plaintiffs' false advertising claims, which relate to the very specific and few*
24 *advertisements (relative to the entire site) of third party traffic school and drivers*
25 *education providers.  Raj Lahoti Trial Decl., ¶ 3(a)-(m).]*

26    **O.    Factual Findings Relating to Remedies: Defendants' Profits/Drivers**
27           **Education and Traffic School Revenues/Advertising Costs/Laches**
28           **Rebuttal (¶¶129-144)**

129.   The Court finds that a monetary award is appropriate in this case.

*[Disputed on the grounds that there is no evidence proving that DMV.ORG is materially misleading to any significant portion of the millions of visits that the website receives, nor any evidence that any conduct by Defendants is the <u>cause</u> of any injury to Plaintiffs.]*

130.   Online Guru, Inc.'s ("Online Guru") profits in 2003 were $27,139. (Exhibit 668).

*[Irrelevant in light of (i) Plaintiffs' admission that DMV.ORG was not actionable until October 2006 (see Defendant's RJN Nos. 1-2) and (ii) the only damage remedy articulated by Plaintiffs - ten percent of defendants' profits on traffic school and driver's education in California, Florida, and Texas since October 2006.  (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).]*

131.   Online Guru's profits in 2004 were $1,722,923.  (TE 668).

*[Irrelevant in light of (i) Plaintiffs' admission that DMV.ORG was not actionable until October 2006 (see Defendant's RJN Nos. 1-2) and (ii) the only damage remedy articulated by Plaintiffs - ten percent of defendants' profits on traffic school and driver's education in California, Florida, and Texas since October 2006.  (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).]*

132.   Online Guru's profits in 2005 were $4,759,589.  (TE 115).

*[Irrelevant in light of (i) Plaintiffs' admission that DMV.ORG was not actionable until October 2006 (see Defendant's RJN Nos. 1-2) and (ii) the only damage remedy articulated by Plaintiffs - ten percent of defendants' profits on traffic school and driver's education in California, Florida, and Texas since October 2006.  (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).]*

133.   Online Guru's profits in 2006 were $5,582,607.  (TE 115).

*[Disputed on the grounds that the statement fails to take into account other expenses, such as rent and utilities, salaries and benefits, legal, accounting, taxes and licenses, etc., which bring Online Guru's net profits down to $4,484,389.  TE*

1  *680.  Further, in the event that the Court finds that Plaintiffs are entitled to some*

2  *monetary remedy (which Defendants do not concede is appropriate), Online Guru's*

3  *entire net profits (including other referral income not at issue) are irrelevant in light*

4  *of (i) Plaintiffs' admission that DMV.ORG was not actionable until October 2006*

5  *(see Defendant's RJN Nos. 1-2) and (ii) the only damage remedy articulated by*

6  *Plaintiffs - ten percent of defendants' profits on traffic school and driver's education*

7  *in California, Florida, and Texas since October 2006.  (Pre-Trial Conf. Hearing,*

8  *10/16/2007, 13:19-15:12).  See also Defendants' Closing Brief, § 8.1.]*

9       134.  Online Guru's profits from January 2007 through  September 2007 are

10  $6,697,661. [TE 680.]

11  *[Disputed on the grounds that the statement fails to take into account other*

12  *expenses, such as rent and utilities, salaries and benefits, legal, accounting, taxes*

13  *and licenses, etc., which bring Online Guru's net profits down to $4,213,571.  TE*

14  *680.  Further, in the event that the Court finds that Plaintiffs are entitled to some*

15  *monetary remedy (which Defendants do not concede is appropriate), Online Guru's*

16  *entire net profits (including other referral income not at issue) are irrelevant in light*

17  *of the only damage remedy articulated by Plaintiffs - ten percent of defendants'*

18  *profits on traffic school and driver's education in California, Florida, and Texas*

19  *since October 2006.  (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).  See also*

20  *Defendants' Closing Brief, § 8.1.]*

21       135.  Online Guru generates a substantial amount of its revenue from the sale

22  of traffic school and drivers education courses.  Approximately 25% to 30% of its

23  entire revenue stream in 2006 was related to the sale of traffic school and drivers

24  education courses. [Depo. Moretti, p. 73:2-7.]

25  *[Disputed on the grounds that: DMV.ORG only advertises (does not sell) third party*

26  *traffic school and drivers education courses.]*

27       136.  Online Guru's sales of drivers education courses is growing rapidly,

28  especially in California. [TE 681; 11/6 TT, pp. 40:17-44:4.]

1  *[Disputed on the grounds that Online Guru does not sell drivers education courses;*
2  *rather it advertises the services of others. Raj Lahoti Trial Decl., ¶ 8; 11/7 TT*
3  *169:15-25.]*

4      137.   Online Guru's revenues specifically related to traffic school and drivers
5  education courses in 2006 were $4,055,846. [TE 680]. Costs of goods sold
6  amounted to approximately 52% of gross revenues in 2006. As such, Online Guru
7  realized an approximate 48% profit margin in 2006. [TE 680]. The Court therefore
8  finds that Online Guru's profits related to drivers education and traffic school in
9  2006 was $1,946,806 (i.e., $4,055,846 x .48 = $1,946,806).

10  *[Disputed on the grounds that the statement fails to take into account other*
11  *expenses, such as rent and utilities, salaries and benefits, legal, accounting, taxes*
12  *and licenses, etc., which bring Online Guru's net profit margin in 2006 to 38.5%.*
13  *Moretti Trial Decl., ¶ 30; TE 680. Also, Plaintiffs now fail to conform their profit*
14  *analysis to their position that DMV.ORG was not actionable until October 2006 (see*
15  *Defendants' RJN Nos. 1-2) and the damage remedy articulated by Plaintiffs at the*
16  *pre-trial conference - i.e., ten percent of Defendants' profits on traffic school and*
17  *driver's education in California, Florida, and Texas since October 2006. (Pre-Trial*
18  *Conf. Hearing, 10/16/2007, 13:19-15:12).] However, there is no evidence that*
19  *Plaintiffs even occupy ten percent of the market in Florida or Texas; rather, the*
20  *evidence suggests that Plaintiffs' market share is substantially less. 11/7 TT 11:15-*
21  *12:2, 13:6-17:4; Defendants' Second RJN No.1.]*

22      138.   From January 2007 through September 2007, Online Guru earned
23  revenues of $3,526,417 related solely to its traffic school and drivers education
24  business. [TE 680]. For this time period, Online Guru's costs of goods sold was
25  $6,038,878 and is approximately 47.5% of its total revenues ($12,736,539). [TE
26  680]. Therefore, the Court finds that through September of 2007, Online Guru's
27  profit margin for 2007 is approximately 52.5%. As such, the Court finds that Online
28  Guru's profits derived from the sale of traffic school and drivers education courses in

1  2007 is $1,833,736.80 (namely, $3,526,417 x 0.52 = $1,833,736.80). [TE 680].

2  *[Disputed on the grounds that the statement fails to take into account other*

3  *expenses, which bring Online Guru's profit margin in 2007 to 33.1%. Moretti Trial*

4  *Decl., ¶ 31; TE 680. Also, Plaintiffs now fail to conform their profit analysis to the*

5  *damage remedy articulated by Plaintiffs at the pre-trial conference - i.e., ten percent*

6  *of Defendants' profits on traffic school and driver's education in California, Florida,*

7  *and Texas since October 2006. (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).*

8  *However, there is no evidence that Plaintiffs even occupy ten percent of the market*

9  *in Florida or Texas; rather, the evidence suggests that Plaintiffs' market share is*

10  *substantially less. 11/7 TT 11:15-12:2, 13:6-17:4; Defendants' Second RJN No.1.]*

11        139.  In 2004, Online Guru's search engine marketing, also known as pay-per-

12  click advertising was $1,336,752. [TE 668.]

13        140.  In 2005, Online Guru's search engine marketing, also known as pay-per-

14  click advertising was $2,223,481. [TE 115].

15        141.  In 2006, Online Guru's search engine marketing, also known as pay-per-

16  click advertising costs were $4,995,957. [TE 115].

17        142.  From January 2007 through September  2007, Online Guru's search

18  engine marketing, also known as pay-per-click advertising costs were $5,448,871.

19  [TE 680].

20        143.  Online Guru's revenues accelerated rapidly and significantly beginning

21  in 2004 when, under the direction of Defendant Raj Lahoti, he began to make greater

22  use of search engine advertising for the DMV.ORG website and prompted the CA

23  DMV and others to complain about the use of the term DMV [TE 115, TE 680].

24  *[Online Guru's profits prior to October 2006 are irrelevant in light of (i) Plaintiffs'*

25  *admission that DMV.ORG was not actionable until October 2006 (see Defendant's*

26  *RJN Nos. 1-2) and (ii) the only damage remedy articulated by Plaintiffs - ten percent*

27  *of defendants' profits on traffic school and driver's education in California, Florida,*

28  *and Texas since October 2006. (Pre-Trial Conf. Hearing, 10/16/2007, 13:19-15:12).*

1  *As to the communications from California, there is no evidence relating to what*

2  *prompted the State of California to send letters - no person representing the State of*

3  *California was ever called as a witness.]*

4      144.  Online Guru substantially increased its pay-per-click advertising from

5  2005 to 2006. [11/6 TT, pp. 74:12-75:7.]

6  *[As testified by Mr. Lahoti, the increase in marketing expenditures was typical of a*

7  *company that is growing.  11/6 TT 74:12-75:7.]*

8  **II. CONCLUSIONS OF LAW**

9      **A.    Elements of False Advertising Under 15 U.S.C. § 1125(a)(1)(B)**

10      1.    Section 43(a)( 1 )(B) of the Lanham Act, makes actionable placing into

11  interstate commerce "*any word, term, name, symbol*, or device, or any combination

12  hereof, or any *false designation of origin, false or misleading description of fact*, or

13  *false or misleading representation of fact*" concerning "the nature, characteristics,

14  qualities, or geographic origin of his or her or another person's goods, services, or

15  commercial activities." 15 U.S.C. § 1 l25(a)(1)(B).

16  *[Disputed.  Plaintiffs selectively quote the false advertising statute in an attempt to*

17  *import into the false advertising prong ((a)(1)(B)) a general trademark origin claim*

18  *(i.e., use of the DMV abbreviation).  The false advertising prong expressly restricts*

19  *"origin" type claims to that of false or misleading statements as to "geographic*

20  *origin."  See Waits v. Frito-Lay, Inc., 978 F.2d 1093 (9th Cir. 1992) (singer Tom*

21  *Waits has standing under false association prong ((a)(1)(A)) to sue Frito Lay for*

22  *misuse of his (or similar) voice, because he has an interest in his voice); and 3*

23  *GILSON ON TRADEMARKS § 11.06[1] (2007) (noting that though Waits had*

24  *standing, a mere competitor to Frito Lay would not have standing to object to Frito*

25  *Lay's use of Waits' voice).  This proposed finding illustrates a fundamental weakness*

26  *in Plaintiffs' standing in this case: they own no interest in the mark at issue.]*

27      2.    The DMV.ORG domain name, website, and related marketing

28  (collectively "DMV.ORG") are false statements of fact by Defendants in commercial