1  BRIAN M. DAUCHER, Cal. Bar No. 174212
2  ROBERT S. BEALL, Cal. Bar. No. 132016
   JOSEPH H. TADROS, Cal. Bar. No. 239379
3  ASHLEY E. MERLO, Cal. Bar No. 247997
4  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
5        Including Professional Corporations
6  650 Town Center Drive, 4th Floor
   Costa Mesa, California  92626-1925
7  Telephone:  (714) 513-5100
   Facsimile:  (714) 513-5130
8  bdaucher@sheppardmullin.com
   jtadros@sheppardmullin.com
9

10 Attorneys for Defendants

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14 TRAFFICSCHOOL.COM, INC., a          Case No. CV067561 PA (CWx)
   California corporation; DRIVERS ED   *The Hon. Percy Anderson*
15 DIRECT, LLC., a California limited
   liability company,                   [*PLAINTIFFS' MARKED COPY OF*]
16                                       **DEFENDANTS' POST TRIAL
                 Plaintiffs,             [PROPOSED] FINDINGS OF FACT
17                                       AND CONCLUSIONS OF LAW**
        v.
18                                       Trial Date:  November 6, 2007
   EDRIVER, INC., ONLINE GURU,           Time:        8:30 a.m.
19 INC., FIND MY SPECIALIST, INC.,       Crtrm:       15
   and SERIOUSNET, INC., California
20 corporations; RAVI K. LAHOTI, an     [Complaint Filed November 28, 2006]
   individual; DOES 1 through 10.
21                                       [*Per Court's Jan. 16, 2008 Order
                 Defendants.            requesting further support and
22                                      citations for disputed items*:
23                                      RED HIGHLIGHT= *Disputed*
24                                      BLUE HIGHLIGHT= *Undisputed*
25                                      YELLOW HIGHLIGHT= *Irrelevant*]
26
27
28

Defendants' hereby submit the following post-trial findings of fact and conclusions of law:

## FINDINGS OF FACT

### Background Facts Regarding The Defendants

1. Raj and Ravi Lahoti own, in equal shares, an entity call Biz Groups, Inc.  Biz Groups, Inc. owns Online Guru, Inc., EDriver, Inc., and Find My Specialist, Inc.  [Ravi Lahoti Trial Decl., ¶ 2.]

2. The DMV.ORG domain is owned by defendant EDriver, Inc. and licensed to Online Guru for exclusive management of the website.  The DMV.ORG website was launched in 1999 and presently contains approximately 4,000 distinct webpages with information pertaining to vehicle- and driver-related needs.  [Raj Lahoti Trial Decl., ¶¶ 2-3; 11/6 RDT 20:19-24, 21:6-8 (Raj).] [*This is false to the extent it is meant to convey that the DMV.ORG site as it exists currently – or even in previous years – was launched in 1999; rather, a rudimentary and unprofitable site existed at the DMV.ORG domain address from 1999-2003 (TE 623 -archive of 2002 version showing immediate prompt for users to connect to their official state's DMV; TE 624 -archive of 2003 version showing same; Moretti Depo. pp. 56:4-14); and Raj Lahoti stated that the 2006 revision constituted a "brand-new Website" or "brand-new almost Website" (11/6 TT Raj Lahoti, p. 76:4 -77:24). It is also false to the extent it suggests the site is purely informational; it is a profit-driven site which promotes and markets vehicle related services (Moretti Depo. pp. 41:19-46:6).*]

3. Ravi Lahoti turned over the management of DMV.ORG to Raj Lahoti in 2003 and since then Ravi Lahoti's involvement with DMV.ORG has been

1

1   relatively limited.  [Ravi Lahoti Trial Decl., ¶ 5.] *[Disputed because Ravi Lahoti has*

2   *had more than "limited" involvement at all times: he is Vice President of the*

3   *company which manages DMV.ORG, namely, Online Guru, Inc. (TE 33, TT 11/6 ,*

4   *pp. 19:22-20:18); an owner of Biz Groups, Inc., which in turn owns Defendants*

5   *Find My Specialist, Inc. and Edriver, and the sole owner of Defendant SeriousNet,*

6   *Inc. (TE 333; Depo. Ravi Lahoti pp. 14:4-24; TT 11/6, p. 20:2-5; 21:2-5).  Besides*

7   *ownership interests, he <u>directly participated</u> in the operations of DMV.ORG as he*

8   *initially registered the domain name and <u>has made the decision to continue to use</u>*

9   *<u>DMV.ORG</u> (Depo. Steve Moretti, p. 17:12-15; 129:1-17); moreover, he has been*

10  *involved with DMV.ORG since 2003 because as the principal actor of Seriousnet,*

11  *Inc., he owned various other domain names and websites which <u>at the time of this</u>*

12  *<u>lawsuit</u> directed consumers to or from DMV.ORG (Depo. Steve Moretti, pp.126:25*

13  *to 127:7; 134:12-23; TT 11/6, p. 21:9-20; Depo. Ravi Lahoti, p. 57:6-9; 95:19 to*

14  *96:6, Ex. 171.]*

15

16      4.   Ravi Lahoti solely owns SeriousNet, Inc., which is not part of the

17  BizGroup organization of companies.  [Ravi Lahoti Trial Decl., ¶ 3.]

18

19      5.   The DMV.ORG website does not implicate any serious threat to

20  public health and safety. *[This is false.  Many people have communicated highly*

21  *sensitive personal information and even information related to criminal*

22  *investigations to DMV.ORG believing it to be the official DMV; and DMV.ORG*

23  *often publishes <u>incorrect</u> information (TE 4 – e.g., DEF-00344 – "This poses a*

24  *significant public safety issue since taxpayers could be led to believe they are*

25  *getting accurate information from a government source which could be especially*

26  *harmful in the event of an emergency"; DEF-00277—"Your Description of the*

27  *Requirements for Medical Certificates is incorrect…."; DEF-00292 – "I am a*

28  *detective for Greenacres Public Safety Dep. in Palm Beach County Florida. I am*

1  *working an identify theft…"; DEF-00310—providing license and social security*
2  *numbers; DEF-00347—from Trooper Sean: "I am currently involved in a DUI*
3  *case…it is an Oregon ID in the name of [REDACTED]…The DUI arrest occurred*
4  *on…".. etc., also see TE 102, 116, 334, 408 (more emails); Depo. Moretti, pp.*
5  *193:17 - 199:19; 11/7 TT, 208:20-25).  Also, Defendants' own Director of Customer*
6  *Service expressed concern to Mr. Moretti about the level of confusion and suggested*
7  *that the public be required to first "acknowledge" that they were not contacting the*
8  *government to prevent transmittal of sensitive information; this suggestion was not*
9  *implemented and there has been no reduction in the public emails since changes*
10 *were made to the website after this litigation (Depo. Flack, pp. 54:9-55:14; 58:8-*
11 *60:20; 61:9-63:11; TE 388 and 395 –emails received to DMV.ORG after all post*
12 *lawsuit "disclaimers" were made still show confusion).]*

## Background Facts Regarding Plaintiffs' Businesses

16     6.     TrafficSchool.com owns the TrafficSchool.com website, from
17 which it sells online traffic school courses in California, Texas and Florida.
18 [11/6 Reporter's Daily Transcript ("RDT") 138:24-139:6; 163:9-165:24, 167:1-
19 168:12, 170:18-171:10 (Creditor); Designated Creditor Depo., 66:3-7, 71:4-11,
20 72:10-18.][*To the extent the statement is meant to be inclusive of all states that*
21 *Trafficschool.com sells such courses, the statement is false as courses in many other*
22 *states are sold as well (TD Eric Creditor ¶ 11).]*

24     7.     In 2005, TrafficSchool.com provided both traffic school and
25 driver's education services from the TrafficSchool.com website. In 2006, the driver's
26 education portion of the TrafficSchool.com business was transferred to a new entity,
27 DriversEdDirect. [11/6 RDT 150:11-151:7 (Creditor).]

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

8.    Plaintiff DriversEdDirect provides driver's education courses for new drivers and behind-the-wheel training.   [11/6 RDT 139:7-12 (Creditor).]

9.    TrafficSchool.com served approximately 58,000 customers in California in 2005 and 57,000 in 2006. In comparison to population statistics in California, Florida and Texas, TrafficSchool.com serves a significantly smaller portion of the traffic school market in Florida and Texas than in California. [11/7 RDT 11:15-12:2, 13:6-17:4 (Creditor); Designated Creditor Depo., 94:10-23; Defendants' Second Request for Judicial Notice, Item 1.] [*This is false as there was no evidence presented during trial as to what the market for traffic school is in Florida or Texas; all Defendants did was attempt to introduce information about population, not how population converts to traffic school markets in Florida and Texas, and the witness did not know the market share in Florida or Texas compared to California (11/7 TT, p. 16:2-3 and lns.13-22; see also, Plaintiffs' Objections to Request for Judicial Notice).*]

## Standing: Plaintiffs And Defendants Do Not Compete

10.    Plaintiffs allege competition with DMV.ORG on three bases: (a) DMV.ORG acts as a referral source in California and other states for third party traffic schools and drivers education and Plaintiffs offer traffic school and drivers education services through their websites; (b) "both Plaintiffs and Defendants act as a referral source for third party traffic schools and drivers education in various states"; and (c) "both Plaintiffs and Defendants advertise other third party services and receive financial consideration from those third parties." The latter two bases are the only viable bases upon which the parties may be deemed to compete, as the Court rejected the first basis on Defendants' motion to dismiss. [TAC, ¶ 20(a)-(c); 1-24-2007 Order.] [*This finding violates Local Rule 52-3 ("Proposed findings*

1  …shall…not make reference to allegations...”). Moreover, Defendants’ conclusion

2  is false as the Court’s 1-24-2007 order concerned allegations in the complaint, and

3  has no bearing to the trial evidence presented about the services of the parties (see,

4  Plaintiffs’ Post-Trial Findings and Post-Trial Brief for analysis as to how Plaintiffs

5  have established a competitive injury based on the trial evidence).]

6

7        11.   DMV.ORG's core business is to act as an internet publishing

8  company, with 99 percent of its revenues derived from advertising.  [11/7 RDT

9  169:15-25 (Raj).] [Mr. Lahoti’s characterization of Defendants’ business as a

10  “publishing company” is false – DMV.ORG does not act as a mere passive

11  “advertiser” functioning like a newspaper classified section or Google advertising;

12  they receive no revenue for mere listings or even click throughs of the driving or

13  traffic school courses promoted on their site, but only make money once the course

14  is sold through the site; they themselves refer to this advertising revenue as “sales

15  commissions” or “marketing fees” (TE 15 – e.g., DEF-01957, DEF-00239, DEF-

16  00244 – “sales commission”); TE 356, TT 11/7, pp. 188:2-190:21; Depo. Steve

17  Moretti, pp. 41:19- 46:6).  In this regard, defendants are more like joint venturers

18  or “partners” with their providers profiting only when a sale is made (Depo.

19  Moretti, p. 75:15-76:14; 78:1-25) —this is not the business model of a publisher

20  and Defendants’ self-serving characterization (i.e., designed to negate Plaintiffs’

21  competitive injury) does nothing to controvert the actual evidence; moreover,

22  Defendants own and manage other domains and websites for the purpose of

23  generating revenue from the sale of drivers education and traffic school courses

24  through DMV.ORG (Depo. Steve Moretti, p. 134:12-23; Plaintiffs’ Post Trial

25  Findings 24 and 25 (and cited evidence).]

26

27        12.   DMV.ORG does not earn any revenue until a visitor to its

28  website clicks on an advertisement on the site, goes to the third party advertiser's

[PLAINTIFFS MARKED COPY OF] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   website and takes some action on that third party site.  [11/7 RDT 190:3-6

2   (Moretti).] [*This statement is true with regard to DMV.ORG's partners who own*

3   *and operate separate web sites; but false when describing a transaction in*

4   *California or Florida where a visitor to DMV.ORG clicks on the advertisement and*

5   *goes to the TeenDriversEducation.com site or the FloridaDrivingCourse.com site,*

6   *as those domains are not owned by a "third party advertiser" but by Defendants*

7   *themselves (Depo. Moretti, pp. 139:19-24 to 140:20; 316;2-10). Indeed, besides*

8   *owning the domain, Defendants manage the website at TeenDriversEducation.com,*

9   *even though the fulfillment of services are provided by a third party (TE 15—DEF-*

10  *00244 (contract showing that the TeenDriversEducation.com site is "managed by"*

11  *Defendant Online Guru, Inc.); TE 413 (print-out of TeenDriversEducation.com site,*

12  *attached to Post-Trial Exhibit Stipulation).*]

13

14          13.    A visitor on DMV.ORG must click through to an advertiser's

15  website to purchase traffic school; the services are not for sale on the DMV.ORG

16  website.  [11/6 RDT 25:5-24 (Raj).] [*The first clause of the statement is false for the*

17  *same reasons set forth in number 12 above (i.e., in some cases, it is not to "an*

18  *advertiser's website" but to Defendants' websites). The second clause of the*

19  *statement is false because the site clearly <u>does offer for sale to purchasers (which is</u>*

20  *<u>the definition of "for sale")</u> traffic school courses and drivers education courses,*

21  *even if the user must then must click on the advertisement and even it the fulfillment*

22  *of courses are completed by outside companies (e.g., TE 301—showing courses*

23  *offered on DMV.ORG pages for Nevada, New Mexico, Colorado, Idaho, Virginia);*

24  *e.g., TE 303—showing courses offered on DMV.ORG site for Texas and Colorado);*

25  *TE 14 (list of partners' courses being offered on DMV.ORG site).*]

26

27          14.    Find My Specialist owns the Teen Drivers Education domain for

28  purposes of tracking sales generated by DMV.ORG advertisements, but Golden

1  State Private School, a third party drivers education provider, has created the content
2  of and manages the website. [11/6 RDT 104:25-106:9, 119:1-6, 122:17-124:11,
3  124:20-125:14, 126:14-23 (Raj).] [*The first clause of the statement is partially true,*
4  *(i.e., that the domain name is owned by Defendant Find My Specialist); however,*
5  *tracking sales is only one benefit of Defendants' ownership of the domain name—*
6  *retention of the goodwill of the name by returning customers or referrals is another*
7  *(TT 11/6, p. 122:10-16). Also, Defendant Online Guru, Inc. does in fact manage the*
8  *TeenDriversEducation.com site (Mr. Lahoti's testimony to the contrary is rebutted*
9  *by the pre-litigation operating agreement between Online Guru, Inc. and Golden*
10  *State Private School (the course fulfiller)(TE 15, DEF-00244 which states that the*
11  *site is to be "managed by" Online Guru, Inc.).*]

12

13       15. TrafficSchool.com's core business is providing online traffic
14  school services. [11/7 RDT 103:2-5 (Kramer).] [*This statement is true but should be*
15  *understood to embrace the concept of marketing and selling its own courses as well*
16  *as courses fulfilled and administered by others (like DMV.ORG does). In other*
17  *words, "providing" simply means making the courses available through the*
18  *TrafficSchool.com website – whether they are fulfilled by TrafficSchool.com or one*
19  *of its affiliate providers (TD Eric Creditor ¶¶3; 11-13 (except to extent describing*
20  *DMV.ORG operations per sustained objections); Depo. Steve Moretti, pp. 75:15 to*
21  *76:14; 78:1-25; 79:13 to 80:24; 81:3-14; 95:18 to 97:8; 104:21 to 106:24*
22  *(admission by Online Guru that they are in competition with Plaintiffs); 252:14-24*
23  *(TE 14 list of "different partners used and in what state they are currently being*
24  *advertised on the DMV.ORG website."); Depo. Steve Moretti, pp. 256:7 to 258:20;*
25  *260:1 to 263:25 (TE 15 agreements with referral companies).*]

26

27       16. DriversEdDirect's core business is providing online driver's
28  education courses and behind the wheel training. [11/7 RDT 103:4-13 (Kramer).]

1   [*Same response and evidence cited as No. 15 above, but see TD Eric Creditor ¶¶14-*
2   *15 for citation to evidence regarding Plaintiffs' driver education business rather*
3   *than its traffic school business.*]

4

5       17.    "Above 85, 90 percent" of TrafficSchool.com's revenue is
6   derived from the core business of providing online traffic school services and an
7   even higher portion of DriversEdDirect's revenue is derived from its core business
8   of providing online drivers education and behind the wheel training, [11/7 RDT
9   103:14-22 (Kramer).] [*Same response and evidence cited as Nos. 15 and 16 above.*]

10

11      18.    IDriveSafely and Golden State Private School are Plaintiffs'
12  actual "competitors" because, as Plaintiffs' principal, Eric Creditor explained, "they
13  provide the same courses that [Plaintiffs] provide to the same consumers." [11/6
14  RDT 143:15-144:10 (Creditor).] [*The statement's meaning is uncertain because of*
15  *the use of the word "actual"; the entities mentioned are indeed Plaintiffs'*
16  *competitors, but are not their only competitors; and Mr. Creditor's testimony was*
17  *not meant to suggest such.  Moreover, while Defendants are in fact competitors of*
18  *Plaintiffs (see Plaintiffs' Post-Trial Findings Nos. 22-32 and evidence therein), the*
19  *inquiry for standing is not whether the parties are "competitors" per se, but rather*
20  *whether there is competitive injury (see extensive discussion in Plaintiffs' Post-Trial*
21  *Brief).*]

22

23      19.    TrafficSchool.com provides traffic school courses in California
24  and does not earn any referral fees in California. [11/6 RDT 138:24-139:6, 162:6-
25  12 (Creditor); Designated Creditor Depo., 66:3-7.]

26

27      20.    TrafficSchool.com earned no referral fees in Texas for traffic
28  school referrals in 2005, 2006 and through June 2007, but rather sold courses to and

1  collected payment directly from consumers and paid third parties for fulfillment of

2  courses.  [Designated Creditor Depo., 71:4-11; 11/6 RDT 163:9-165:24 (Creditor).]

3  *[This statement is misleading as TrafficSchool.com did earn referral revenue (i.e.,*

4  *revenue generated from courses sold through the TrafficSchool.com website but*

5  *then fulfilled by third party providers, whether accounted for as "referral fees" paid*

6  *to TrafficSchool.com from the provider after the provider had collected the student*

7  *tuition, or accounted for as revenue obtained from students first by*

8  *TrafficSchool.com and then split with its referral providers) from the sale of traffic*

9  *school courses in Texas in 2005 through June of 2007.  In fact, TrafficSchool.com*

10 *does not fulfill courses in Texas and Florida and thus the entirety of its income in*

11 *Texas and Florida has been referral revenue (TD Eric Creditor, ¶¶11, 14; TE 365 –*

12 *i.e., PL01685); see also Plaintiffs' Objections to Defendants' Depo. Designations).*

13 *Moreover, accounting of this type of revenue as "referral fees" or otherwise has no*

14 *bearing on whether Plaintiffs have suffered a competitive injury.]*

15

16          21.    TrafficSchool.com earned no referral fees in Florida for traffic

17 school referrals in 2006 and through June 2007, but rather sold courses to and

18 collected payment directly from consumers and paid third parties for fulfillment.

19 [Designated Creditor Depo., 72:10-18; 11/6 RDT 167:1-168:12 (Creditor).] *[Same*

20 *response as No. 20 above.]*

21

22          22.    TrafficSchool.com's total referral revenue from third party

23 providers in 2006 and through June 2007 was $5,681 and $2,147, respectively,

24 comprising less than one percent of TrafficSchool.com's gross revenue.  [11/6 RDT

25 170:19-171:13 (Creditor); Trial Exhibits ("TEs") 26 (PL01685), 62, 63a; Designated

26 Creditor Depo., 322:22-25.] *[Same response as No. 20 above.  These numbers are*

27 *simply false; indeed, TE 1685 (PL01685) shows the revenue generated from its*

28 *Florida and Texas referrals (both those accounted for as "referral fees" paid for*

1   *the provider and those in which TrafficSchool.com first collected payment and then*

2   *split with its referral provider) to amount to over $500,000. Note: TE 63(a) cited by*

3   *Defendants was objected to in the Post-Trial Final Exhibit Stipulation based on*

4   *lacking foundation as it is Defendants' own summary and definition of "Referral*

5   *Income" and best evidence (FRE 1002) in that it purports to prove the contents of*

6   *Plaintiffs' own financial documents and FRE 403 in that it is grossly misleading and*

7   *inaccurate to extent it implies that the income ' derived through Plaintiff's third*

8   *party referral relationships is less than 1% of gross income, which is not true. This*

9   *fact is also irrelevant because there is no concept of "di minimus" competition for*

10  *standing purposes under the Lanham Act.]*

11

12            23.    DriversEdDirect earned no referral revenue for the advertisement

13  of driver's education courses; rather, DriversEdDirect collected the consumer dollars

14  and split the revenue with the driver's education providers.  [11/6 RDT 169:7-170:17

15  (Creditor); TE 26.] [*Again, this is misleading because outside of California, all of*

16  *DriverEdDirect's revenues are based on sales of courses where DriversEdDirect*

17  *does not actually provide those services, but they are fulfilled by third party*

18  *providers, just like DMV.ORG (TE 26 (PL01685) shows the amounts of revenues*

19  *generated based on sales for Texas and Florida drivers education; TD Eric Creditor*

20  *¶¶3; 11-13 (except to extent describing DMV.ORG operations per sustained*

21  *objections); Depo. Steve Moretti, pp. 75:15 to 76:14; 78:1-25; 79:13 to 80:24;*

22  *81:3-14; 95:18 to 97:8; 104:21 to 106:24 (admission by Online Guru that they are*

23  *in competition with Plaintiffs); 252:14-24 (TE 14 list of "different partners used and*

24  *in what state they are currently being advertised on the DMV.ORG website.");*

25  *Depo. Steve Moretti, pp. 256:7 to 258:20; 260:1 to 263:25 (TE 15 agreements with*

26  *referral companies).*]

27

28

*[PLAINTIFFS MARKED COPY OF]* DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1       24.    TrafficSchool.com has earned less than $1,000 on average over

2   the last four years for non-traffic school/drivers education related advertising

3   revenue.  [11/6 RDT 173:5-24 (Creditor); Designated Creditor Depo., 81:1-82:12;

4   TE 27 (PL01688).] *[Not supported by evidence cited; also is irrelevant as the*

5   *amount earned being "di minimus" is not a valid argument against standing, as the*

6   *Court has already stated in its previous rulings (Order on Motion to Dismiss FAC*

7   *and Order on Summary Judgment Motions).]*

8

9       25.    TrafficSchool.com does not earn any referral revenue for the sale

10   of driving records; since 2006, it has sold driving records directly to consumers in

11   California.  [11/6 RDT 173:25-174:18 (Creditor).] *[Not supported by the evidence*

12   *cited, see TE 26 (PL01685)—showing revenue from "DMV Records" from 2003 to*

13   *present; it is also irrelevant for the reason stated in No. 24 above.]*

14

15       26.    DriversEdDirect has earned no more than "a couple hundred

16   dollars a month" on non-traffic school/drivers education related advertising.

17   [Designated Creditor Depo., 108:21-109:12; 326:16-327:3.] *[Not supported by*

18   *evidence cited and ignores actual revenue reported from AdSense Program as*

19   *reported in TE 386; is irrelevant as the amount earned being "di minimus" is not a*

20   *valid argument against  standing, as the Court has already stated in its previous*

21   *rulings (Order on Motion to Dismiss FAC and Order on Summary Judgment*

22   *Motions).]*

23

24       27.    Plaintiffs' referral revenue and non-traffic school/drivers

25   education advertising revenue comprises a de minimus portion of their businesses

26   such that they cannot be deemed to compete with Defendants in any meaningful

27   sense. *[Not supported by any evidence cited and legally flawed conclusion the*

28   *amount earned being "di minimus" is not a valid argument against standing, as the*

1  *Court has already stated in its previous rulings (Order on Motion to Dismiss FAC*

2  *and Order on Summary Judgment Motions).*]

3

4  ### Use of the DMV.ORG Domain Is Not Literally False

5

6      28.    Approximately 24 states use the term "DMV" in reference to

7  their state motor vehicle department.  [Defendants' Request for Judicial Notice

8  ("RJN"), Item 10.] [*This statement is unclear.  Is it intended to mean the DMV*

9  *moniker is used in the official title of the agency, the domain name, or in*

10 *advertising?  There was no evidence submitted which established this statement. The*

11 *request for judicial notice, Item 10 (counsel prepared chart), was objected to by*

12 *Plaintiffs in a formal Objection as it lacks foundation and is incomplete, is disputed,*

13 *and is irrelevant for purposes of a determination of how consumers perceive DMV:*

14 *in fact, TE 400 shows a collection of consumer emails to the DMV.ORG website*

15 *from consumes living in "non-DMV" states (i.e., those states that do not necessarily*

16 *use DMV for their agency name) that still use the term DMV to refer to that state's*

17 *agency, and TE 401 shows DMV.ORG's ads that target consumers from non-DMV*

18 *states by using those state's agency acronyms or similar indicia in the DMV.ORG*

19 *advertisement.*]

20

21      29.    The term "DMV" is generic, as demonstrated by the State of

22 California's federal registration for the mark "STATE OF CALIFORNIA DMV

23 DEPARTMENT OF MOTOR VEHICLES" in which the State of California

24 expressly disclaims any right to exclusive use of the terms "DMV" and

25 "DEPARTMENT OF MOTOR VEHICLES."  [Defendants' RJN, Items 8-9.] [*The*

26 *statement that DMV is generic is false and demonstrates a misunderstanding of the*

27 *territorial rights doctrine of trademark law (i.e., trademark owners may have*

28 *concurrent rights with others in the exact same trademark based upon territorial*

1  *rights). It is well-settled that trademarks can have geographic boundaries ( J.*

2  *Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> , §26,*

3  *Volume 6 (4th Ed. 2007)("<u>McCarthy</u>").  For example, the state of California has the*

4  *exclusive right to use the moniker "DMV" <u>to the exclusion of all others</u> in*

5  *California (its territory) and the fact that California had to disclaim "DMV" in a*

6  *<u>federal</u> trademark registration, which by definition has national reach, merely*

7  *signifies that the State cannot lay claim to exclusive rights <u>nationally</u> to the moniker*

8  *DMV. It <u>does not</u> mean that California (or other states) do not have trademark*

9  *rights for their respective territories or that the moniker is "generic": " Each user*

10 *of the contested mark may have its own exclusive area of trademark use."*

11 *(McCarthy, §26:3).  Moreover: (1) no evidence was submitted to establish that*

12 *consumers view "DMV" as generic (rather, evidence was submitted of just the*

13 *opposite, i.e., that consumers associate "DMV" with their one and only state*

14 *agency, TE 351, Tab "D"; TE 400, TE 334); (2) even if "DMV" were generic—*

15 *which it is not—would does not mean that the moniker cannot be used to deceive*

16 *(see, e.g., <u>Pennsylvania State University v. University Orthopedics, Ltd.</u>, 706 A.2d*

17 *863, 868 (Pa.Super.1998)(University was not required to prove exclusive use of*

18 *term "university" to support its cause of action for unfair competition under the*

19 *Lanham Act where "consumer confusion or a likelihood of consumer confusion*

20 *arose from the failure of the defendant to adequately identify itself as the source of*

21 *the product.").* ]

22

23       30.   The use of the .ORG top level domain by DMV.ORG is not

24 improper, since the .org top level domain is an "open" and "unrestricted" domain

25 name (meaning anyone can register a .ORG, including commercial entities).

26 [Defendants' RJN, Item 4.] [*It is true that .org can be used by anyone and is not*

27 *restricted, but there is no evidence (or law) that its use is proper if it causes*

28

*[PLAINTIFFS MARKED COPY OF]* DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  *deception. Moreover, the Exhibit in the RJN itself states that .ORG is "primarily is*

2  *used by <u>noncommercial</u> entities around the world" (Def. Req. Ex. 4, pg. 15).*]

3

4        31.    In contrast to the .ORG top level domain, .GOV is restricted to

5  federal and state government entities.  A very substantial majority (48) of state

6  motor vehicle departments use the .gov or .us top level domain. [Defendants' RJN,

7  Items 5, 10.] [*No proper evidence was submitted to support this statement and*

8  *Plaintiffs objected to the RJN formally; moreover, whether the .GOV domain can*

9  *only be registered by government agencies does not prove that consumers know this,*

10  *or that consumers think that every state DMV website must be a .GOV domain, and*

11  *by its own statement, two states do not use a .gov or .us top level domain and there*

12  *is no requirement that they do so.*]

13

14        32.    DMV.ORG expressly disclaims any affiliation with any

15  government entity on every page of the site, in contrast to other similar websites,

16  such as DrivingLinks.com, eDMV.com, and DMVsolutions.org.  [Raj Lahoti Trial

17  Decl., ¶¶ 25-27, 29-34; TEs 623-625, 631; Designated Creditor Depo., 270:14-20,

18  272:16-20; TE 20 (DEF00990-00991); Defendants' RJN, Items 11-12.] [*This is not*

19  *true regarding the site prior to the litigation; indeed, the only disclaimer was at the*

20  *bottom of the page, not visible to a user unless the user scrolled down three pages.*

21  *(TE 317).  The alleged additional "disclaimers" employed after the litigation do not*

22  *serve to dispel confusion (Depo. Flack, pp. 61:9-63:11, TE 388; 395 (public emails*

23  *as late as August 2007 after changes were made to logo license plate, showing*

24  *confusion still exists; TE 410-411 articles as recent as Oct. 2007 showing confusion*

25  *exists; TT 11/6, pp. 53:14- 57:8; 88:22-89:6; p. 99:10; TT 11/7, pp. 162:6-163:8;*

26  *Depo. Flack., pp. 61:9 to 63:11; 54:9 to 58:2 (i.e., 57-58:1); Depo. Steve Moretti,*

27  *pp. 201:19 to 202:23.; Depo. Flack., pp. 54:9 to 58:2 (i.e., 57-58:1);61:9 to 63:11;*

28  *Depo. Steve Moretti, pp. 163:15 to 174:5 (i.e., 164:15 to 165:13); moreover, third*

1    *party sites such as eDMV.com and DMVsolutions.org are irrelevant and*

2    *DrivingLinks.com does not have a need to disclaim any affiliation as there is no*

3    *evidence that anyone would  think DrivingLinks.com is an official DMV site.]*

4

5            33.     Plaintiffs admit that DMV.ORG was "non-offensive" and not

6    actionable until at least October 2006.  [Defendants' RJN, Items 1-2.] [*This is not*

7    *true, and Plaintiffs only stated that the site was indeed an "actionable one in late*

8    *2006" (and thus why Plaintiffs filed suit then).  Plaintiffs only meant that from 2002*

9    *to before filing suit, the website progressed "from a simple and non-offensive*

10    *website" in 2002 to one alleged to be actionable when Plaintiffs filed suit in late*

11    *2006.  Moreover, the DMV.ORG site was likely actionable prior to October 2006*

12    *based on the evidence uncovered by Plaintiffs for the first time during litigation and*

13    *presented for trial (TE 342-349 – third party complaints); 11/6 TT Raj Lahoti, pp.*

14    *53:14-15; 56:23-57:4.]*

15

16            34.     Nothing on the DMV.ORG website constitutes an express

17    misrepresentation of fact.  [Compare 11/6 RDT 151:20-152:24, 157:18-158:16

18    (Creditor); 11/7 RDT 63:11-16; 65:25-66:22, 68:3-6 (Kramer); TEs 611

19    (LowestPriceTrafficSchool), 89 (dmvapprovedtrafficschool.com).] [*This is not true*

20    *if Defendants mean to suggest there was no literal falsity as a matter of law;*

21    *Defendants' pay-per-click advertising identified the site as the "California DMV"*

22    *(TE  322) and <u>then reinforced that deception</u> by presenting consumers with overt*

23    *references to DMV which are literally false by necessary implication (TE 317, 318*

24    *"CALIFORNIA DMV" with state flag, TE 319, TE 320).]*

25

26

27

28

## DMV.ORG Is Not Likely To Mislead An Appreciable Number Of Reasonably Prudent Consumers

35.    Since at least September 24, 2002, DMV.ORG has disclaimed at the bottom of each page of the website any affiliation with any government agency in text at least the same size as the other informational text on the site.  [Raj Lahoti Trial Decl., ¶ 25; TEs 623-625, 631.] [*This is misleading because prior to the commencement of litigation in 2006, the only disclaimer was at the bottom of the webpage and not visible to a user unless the user knew to, and then did, scroll down three pages (TE 317).*]

36.    The bottom disclaimer on DMV.ORG has evolved over time and, since 2003, has also stated in bold text that the site is a privately owned, for profit corporation.  [Raj Lahoti Trial Decl., ¶ 26; TEs 624-625, 631.] [*Same response as No. 35 above.*]

37.    Since at least March 17, 2004, the clarifying "welcome statement" on the homepage of DMV.ORG has explained: "Since government sites can sometimes be confusing to use, we have made this guide for the average user to understand."  [Raj Lahoti Trial Decl., ¶ 27; TE 625.] [*This is misleading because prior to the commencement of litigation in 2006, that statement was overshadowed by the bold text: No need to stand IN LINE. Your DMV Guide is now ONLINE! (TE 317).*]

38.    The content and structure of DMV.ORG was revised in October 2006, though the primary look and feel of the website remained similar to what immediately preceded it, including: (a) the use of the header "No need to Stand in Line, Your DMV Guide is Now Online" on the homepage (replaced after the suit by

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   "The Unofficial Guide to the DMV"); (b) the use of the introductory sentence,

2   "Since government DMV sites can be confusing to use, we have developed this free

3   & comprehensive guide for the average user to understand"; (c) the use of bottom

4   disclaimers on every page; and (d) the use of the DMV.ORG license plate logo in

5   the top left of every page.  In short, there is no "vast difference" as to the website

6   from February 2006 to October 2006.  [11/6 RDT 189:18-190:16 (Creditor); Raj

7   Lahoti Trial Decl., ¶ 35; TEs 627 and 628 (compare).] [*This is false. Raj Lahoti*

8   *stated that the 2006 revision constituted a "brand-new Website" or "brand-new*

9   *almost Website" (11/6 TT Raj Lahoti, p. 76:4 -77:24).*]

10

11          39.     Since inception of this litigation, Defendants have added further

12   disclaimers to DMV.ORG in the upper left corner of every webpage ("DMV.ORG is

13   not affiliated with any government agency"), in the title caption on the main

14   homepage and on each state-dedicated sub homepage ("The Unofficial Guide"), and

15   on the DMV.ORG license plate logo appearing in the upper left corner of every

16   webpage ("Unofficial Guide to the DMV").  [Raj Lahoti Trial Decl., ¶¶ 29-34; TE

17   631.] [*This is partly false because a true disclaimer is a statement that disclaims*

18   *affiliation with <u>another entity</u>.  Stating that something is "unofficial" does not*

19   *disclaim an affiliation. Moreover, there is no evidence that these additional*

20   *statements have lessened confusion and there is no explanation why more robust,*

21   *true disclaimers were not used (11/6 TT, pp. 88:15-90:13, 11/7 TT, pp. 162:10-*

22   *164:9; p. 165:2-6; pp. 164:13-166:7; pp. 155:2-158:25).*]

23

24          40.     In 2006 and through September 2007, there have been

25   approximately 46 million and 44.6 million visits, respectively, to DMV.ORG.

26   [Moretti Trial Decl., ¶ 4; TE 674.]

27

28

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

41. DMV.ORG receives on average more than 1 million visits per week, about 150,000-175,000 per day. [Moretti Trial Decl., ¶ 4; TE 674.]

42. In 2006 and through September 2007, over 50 percent of DMV.ORG visitors entered the website through either the DMV.ORG main homepage or one of the 51 state-dedicated sub homepages (including the District of Columbia). [Moretti Trial Decl., ¶ 5(b); TEs 7, 672.]

43. Approximately two-thirds of DMV.ORG's visitors view either the main homepage or one of the 51 state-dedicated sub homepages, with the conspicuous "Unofficial Guide" title, while visiting DMV.ORG. [Moretti Trial Decl., ¶¶ 7-8; TE 675.] *[The first part is not supported by the evidence and is misleading because a substantial segment of those who visit the DMV.ORG Traffic School and Driver Education sub pages do not see any such title because Defendants did not add them on those pages and those are the pages that consumers link directly to from the search engine advertisements for DMV.ORG (11/7 TT, pp. 175:12-18, TE 332—showing addition of "Unofficial Online Guide" text but not on the California Driver Education or Traffic Schools pages (i.e., 00171 and 000174); TT 11/7, pp. 159:23-160:24; 172:22-174:4, 173:25-174:4); moreover, plaintiffs dispute that "unofficial" is conspicuous (especially as it relates to the sub-homepages, see e.g., 332 (000168)) and also contend that the statement is irrelevant as there is no evidence to suggest that "unofficial" educates consumers that DMV.ORG is not affiliated with the state DMV's agencies or that it limits confusion (11/7 TT, pp. 174:21-175:25).]*

44. The average visitor to DMV.ORG views more than 5 pages per visit. [Moretti Trial Decl., ¶¶ 9-10; TEs 676-677.]

45.     In both 2006 and 2007 (through September), the DMV.ORG California traffic school webpage did not rank among the top fifty entry webpages for the site; and only one-third of one percent of DMV.ORG's visitors entered the fiftieth ranked entry webpage. [Moretti Trial Decl., ¶¶ 13-14; TEs 7, 672.]

46.     In May 2007, 0.13 percent (about 4,000) of DMV.ORG's visitors entered the website through the California traffic school webpage and only 25 percent of those visitors viewed only that webpage and exited the site from that page. [11/7 RDT 178:23-179:10 (Moretti); TEs 109. 641-642.]

47.     Apart from clicking on the IDriveSafely advertisement on the DMV.ORG California traffic school webpage, visitors to the page can exit the DMV.ORG California traffic school webpage by various mechanisms including by typing in a new domain, closing the web browser, clicking on the web browser's home button, clicking on bookmarks, or clicking on another advertisement on the webpage. [11/7 RDT 217:24-218:21 (Moretti).]

48.     Of the visitors entering DMV.ORG directly to the California traffic school webpage, approximately 75 percent visit other DMV.ORG webpages. [Moretti Trial Decl., ¶¶ 15-17; TEs 109, 642.] [*This is false and not supported by the exhibits cited.*]

49.     In May 2007, there were approximately 18,000 visits to the DMV.ORG California traffic school webpage and 33,000 page views of that same page. [Moretti Trial Decl., 15-16, 18; TEs 109 (p.1), 645 (p.2).]

50.     A consumer searching for online traffic school services will likely look at a variety of different sites before making a purchasing decision.

4833-3194-9570.1
W02-WEST:3AAE1\400526095.2

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   [Designated Maronick Depo., 217:13-17.] [*This is not supported by any admissible*

2   *evidence. Plaintiffs' objected to this evidence because Dr. Maronick specifically*

3   *said that he was speculating. Maronick Depo. p. 217:21-218:9.*]

4

5      51. Traffic school consumers take extra precaution at the time that

6   they are making a purchasing decision. [Designated Maronick Depo., 217:18-

7   218:14.] [*This is not supported by any admissible evidence. Dr. Maronick's has no*

8   *foundation to know whether or not "consumers take extra precaution at the time*

9   *that they are making a purchasing decision" and specifically stated "I'm*

10  *speculating" (217:21-23) that if they reviewed other sites, at the time of the*

11  *decision, they would be more "careful."* ]

12

13     52. A visitor to TrafficSchool.com would have to view

14  approximately 9 distinct webpages to complete a purchase of a traffic school course,

15  and would spend at least three minutes navigating through TrafficSchool.com

16  webpages to make a purchase. [11/7 RDT 49:12-51:15 (Kramer).]

17

18     53. A visitor to DriversEdDirect.com would have to view

19  approximately 7 distinct webpages to complete a purchase of a drivers education

20  course and would likely spend more than three minutes to navigate through the

21  DriversEdDirect.com webpages to make a purchase. [11/7 RDT 51:16-52:6

22  (Kramer).]

23

24     54. Plaintiffs sent letters to various states about DMV.ORG but no

25  state has joined this suit. [11/7 RDT 88:25-89:6 (Kramer).]

26

27     55. In response to a letter from Plaintiffs, the State of Georgia wrote

28  to Plaintiffs that it had "reviewed the contents of www.DMV.ORG . . . and found no

4833-3194-9570.1—
W02-WEST:3AAE1\400526095.2

20

1    misleading information."  [Designated Creditor Depo., 287:3-288:6; TE 58.]

2    [*Disputed as the context of the letter was actually the State advising that they did*

3    *not have authority to take action because Defendants were an unlicenced school.*

4    *The letter was in no fashion an endorsement of Defendants' business practices.*]

5

6         56.    The state of Pennsylvania has entered into a linking agreement

7    with Online Guru, an agreement by which Pennsylvania confirmed DMV.ORG's

8    express right to link to the Pennsylvania motor vehicle website from DMV.ORG.

9    [Moretti Trial Decl., ¶ 27; TE 659.] [*Disputed as to "confirmed" because it was the*

10   *State that initiated a complaint to DMV.ORG due to the State's concerns about*

11   *confusion due to impermissible linking and forced DMV.ORG to enter into an*

12   *agreement by which the State would not object (TE 138).*]

13

14        57.    In October 2006, Online Guru added state flags for each state on

15   the state-dedicated sub homepages.  Online Guru received no complaints regarding

16   the use of these state flags until March 2007, when the state of New York contacted

17   Online Guru and requested removal of the state flag.  Online Guru promptly agreed

18   to remove and did remove the New York flag and so advised the state of New York.

19   The state of New York then replied that it regarded the matter as "closed."  (Raj

20   Lahoti Trial Decl., ¶¶ 36-37; TE 139.] [*Plaintiffs set forth a complaint on this very*

21   *issue in November, 2006, when they filed this lawsuit.*]

22

23        58.    Online Guru has received no other complaints regarding the use

24   of state flags on the website, but decided at the time that it took down the New York

25   state flag to take down all other state flags as well.  The state flags were therefore

26   only on the website from October 2006 through March 2007.  [Raj Lahoti Trial

27   Decl., ¶ 39.] [*Same response as to No. 57.*]

28

59.     In spite of Plaintiffs' agitation, no state has joined their effort and many states voluntarily provide DMV.ORG with updated information.   [11/7 RDT 88:25-89:6 (Kramer); Moretti Trial Decl., ¶ 25; TE 635.] [*California filed an Opposition to Defendants' trademark application for DMV.ORG complaining about confusion (TE 362, 000519-520), hence the State of California has certainly expressed the same concerns; and the States of Connecticut and South Carolina filed requests for extensions of time to oppose (TE 390); moreover, other states do not merely provide "updated" information, rather, they correct incorrect information (e.g., TE 4 emails from state employees, often correcting information).*]

60.     Online Guru's sponsored advertising listings in Yahoo! and Google are subject to Yahoo!'s and Google's approval and their extensive rules regarding the content of sponsored advertisement listings.   [Raj Lahoti Trial Decl., 18; 11/7 RDT 49:5-11 (Kramer).]

61.     Online Guru has changed the sponsored listings for DMV.ORG on Google and Yahoo! to further reinforce that the website is not affiliated with the government by using terms such as "Unofficial Guide," "Driver's Ed Info," "California DMV Info," and "The unofficial guide to the CA DMV."   [11/6 RDT 99:6-18, 102:10-103:14 (Raj).] [*There is no evidence that these changes were applied to all sponsored listings (11/6 TT, p. 126:8-127:11); and the evidence has shown that any changes made do not alter the perception of consumers who are still confused daily (11/6 TT, pp. 88:15-90:13).*]

62.     DMV.ORG's search engine marketing sponsored listings across time actually resemble the organic listing that Google and Yahoo post for DMV.ORG, which includes the phrase "California DMV" in the header, suggesting that Google and Yahoo view those descriptions as reasonable.   [11/6 RDT 97:23-

4833-3194-9570.1 –
W02-WEST:3AAE1\400526095.2

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  99:2, 99:19-100:19, 102:10-103:14, 103:15-104:17; TEs 323, 324 (p.2), 670, 671.]

2  [*There is no evidence that search engines have given any thought or consideration*

3  *to Defendants' advertising practices, and the opposite evidence exists (Depo. Steve*

4  *Moretti, pp. 146:18 to 147:4; TE 97, TT 11/6 pp. 54:20-25; 58:1-25; 60:22-25).*

5  *Also, upon cross-examination, Mr. Lahoti admitted that it was his opinion that the*

6  *organic listing provided more explicit disclosures of the unofficial nature of the*

7  *DMV.ORG site than did sponsored listing (11/7 TT, pp. 148:11-150:7).*]

8

9       63.    A reasonably prudent consumer moving from search engine

10  result listings and viewing DMV.ORG in its full context, would understand that it is

11  not affiliated with any government entity, as indicated by the .ORG top level

12  domain, the multiple disclaimers on the site and other clarifying language. [*The*

13  *standard is not a "reasonably prudent consumer", but rather the intended audience.*

14  (*Southland Sod Farms*). *A substantial segment of Defendants' audience are*

15  *teenagers looking for drivers education (e.g., Shannon Robertson Decl.) and these*

16  *consumers need to be protected as well.  Also, the evidence illustrates that confusion*

17  *has and continues to be rampant (TE 388, 395, 410, 411, 11/6 TT, pp. 88:15-*

18  *90:13).*]

19

20       **No Evidence Of Intent To Deceive**

21

22       64.    DMV.ORG has always utilized disclaimers and clarifying

23  language on its site. [Raj Lahoti Decl. ¶¶ 25-27; TEs 623-625.] [*Until this lawsuit*

24  *was filed, Defendants employed one insufficient disclaimer hidden at the bottom of*

25  *the web page (TE 317).*]

26

27       65.    DMV.ORG's use of disclaimers and clarifying language

28  substantially exceeds what is done, or not done, by others including Plaintiffs.

1   [Defendants' RJN, Items 11-13 (other similar type sites, no disclaimers); 11/6 RDT

2   205:25-206:25 (no disclaimer on DrivingLinks.com); TE 20 (DrivingLinks.com);

3   11/7 RDT 20:4-8 (no disclaimers on FloridaTrafficSchool.com).] [*This is untrue*

4   *(see 64 above); and there is no evidence that Plaintiffs have created any confusion*

5   *by their practices and so comparisons to Plaintiffs' sites are of no assistance.*]

6

7       66.   Online Guru, under the direction of Raj Lahoti, has made

8   voluntary changes to DMV.ORG to reinforce the message that there is no affiliation

9   with the government.   [Raj Lahoti Decl. ¶¶ 29-34; TE 631.] [*The changes made*

10   *have not been voluntary. Changes only came after litigation (TE 332).*]

11

12       **No Appreciable Evidence Of Confusion On DMV.ORG**

13

14       67.   DMV.ORG has approximately 175,000 visitors per day but

15   receives only a couple hundred emails per day from visitors to the website.  [11/6

16   RDT 113:14-114:2 (Raj).]

17

18       68.   On a weekly basis, DMV.ORG receives approximately 20 emails

19   from visitors expressing appreciation or praise for the informational services

20   provided on the DMV.ORG website.  [Moretti Trial Decl., ¶ 25; TE 635.] [*This*

21   *statement lacks credibility as Defendants failed to produce all such e-mails or*

22   *introduce them at trial (three laudatory emails in TE 635 are hardly evidence of*

23   *"approximately 20 emails from visitors" on a weekly basis).  This information was*

24   *within their power to produce; moreover, the truth or falsity of this statement is not*

25   *helpful to the issue of confusion or any other issue in the case.*]

26

27       69.   Although a few of the couple hundred emails that DMV.ORG

28   receives each day may suggest that a particular visitor misunderstood the nature of

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  the site, these emails do not represent an appreciable number of confused consumers

2  in comparison to the traffic on the website. [*This is false. Defendants offered no*

3  *evidence that only a "few" of the "couple hundred" visitors who email daily are*

4  *confused; moreover, Defendants did not produce any consumer e-mails other than*

5  *what they were ordered to produce and completely failed to produce e-mails which*

6  *would have illustrated any decrease in confusion after the changes were made;*

7  *further still, Defendants offered no evidence to suggest that the consumer confusion*

8  *level of visitors to the site who did not send an e-mail was any less than those*

9  *consumers that did e-mail the site.*]

10

11        70.    Although a few websites appear to misdirect Internet users to

12  DMV.ORG, this misdirection is insignificant in comparison to the approximately

13  70,000 websites or internet articles that link to DMV.ORG.  [11/6 RDT 114:3-12.]

14  [*The misdirection is significant in terms of both numbers and nature.  Much of the*

15  *confusion is by journalists and state employees who are more sophisticated than*

16  *consumers (TE 4, TE 404-407; 410-411).*]

17

18        71.    Every month, DMV.ORG receives emails from employees of

19  state agencies who willingly update or clarify information about the state agency

20  information on the DMV.ORG website.  Since January 2007, employees of at least

21  20 different states have offered corrections or clarifications to information on

22  DMV.ORG.  [Moretti Trial Decl., ¶ 26; TE 640.] [*Defendants offered no tangible*

23  *evidence to substantiate this statement (although it was within their power to do so);*

24  *however, even if Mr. Moretti is to be believed, the statement establishes that*

25  *DMV.ORG is a regular purveyor of inaccurate information, which poses a public*

26  *safety issue.*]

27

28

72.     While it is the practice of Plaintiffs' driving instructors to speak to their behind-the-wheel students regarding the related driver's education program, Shannon Robertson is the only student plaintiffs are aware of that expressed some confusion as to driver's education advertisements on DMV.ORG.  [Designated Creditor Depo., 395:11-396:6, 396:20-397:15.] [*This is not true. All Mr. Creditor testified to was that driving instructors talk to their students about drivers' education; no evidence was elicited that instructors are quizzing students about the source of their drivers education; moreover, this is true only as of the time of Mr. Creditor's deposition and Defendants made no effort to elicit Mr. Creditor's knowledge of this issue at the time of trial.*]

73.     Plaintiffs' third party witness, Lisa Warren, President of The Online Traffic School, Inc., was allegedly confused by the advertisements on DMV.ORG, but viewed only a single page of the DMV.ORG website for approximately a minute and could not recall the page she viewed.  [11/7 RDT 133:25-134:3, 134:23-135:11, 135:22-136:15 (Warren).]  [*Disputed as to "allegedly" because she testified she was confused.*]

74.     Warren went on the DMV.ORG website in search of official state Texas logos (not driver's education or traffic school services), but could not find any.  [11/7 RDT 135:12-21 (Warren).]

75.     Warren agreed that the amended DMV.ORG license plate logo, which includes the phrase "Unofficial Guide to the DMV," was not confusing. [11/7 RDT 136:24-137:20 (Warren); TE 631.] [*Mrs. Warren agreed to no such thing: (1) all she was shown when asked this question was the logo and not how it appeared on the DMV.ORG site—as such, it was a meaningless question which revealed nothing of value and certainly did not negate the impact of Mrs. Warren's*

1  *confusion; (2) Mrs. Warren, after having been deposed and after having testified in*
2  *Court and after being advised about the details of the case and the claim, simply*
3  *stated she personally, at the time of trial was no longer confused by the logo alone*
4  *(how could she be, after her participation in the case and after being educated?)]*

5

6  ### Survey Evidence Shows No Confusion

7

8        76.    Defendants' survey expert, Hollander, showing respondents three
9  DMV.ORG/CAR.ORG pages plus a third party traffic school page, found that only
10  1.0 percent of California respondents (3/286) for the test group (DMV.ORG stimuli)
11  identified DMV.ORG as affiliated with the DMV/state/government (again, in either
12  direction) whereas 2.5 percent of California respondents (5/197) for the control
13  group (CAR.ORG stimuli) identified CAR.ORG as affiliated with the
14  DMV/state/government. [Hollander Trial Decl., ¶ 25(b)-(c); TE 193.] [*This*
15  *conclusion based on Mr. Hollander's survey is disputed as the design of the survey*
16  *was inherently flawed and its execution and data collection likewise flawed as*
17  *detailed in Plaintiffs' Motion in Limine to Exclude Hollander and Plaintiffs'*
18  *submitted Cross-Examination by Deposition Testimony.*]

19

20        77.    Not a single respondent residing in any of the four other tested
21  states (that do not use the "DMV" moniker) perceived DMV.ORG as affiliated with
22  the government, whereas 2.0 percent of respondents in the non-DMV states
23  identified the control, CAR.ORG, as affiliated with the DMV/state/government.
24  [Hollander Trial Decl., ¶ 25(b)-(c); TE 193.] [*Same response as to No. 76.*]

25

26        78.    By subtracting the Hollander control group findings from the test
27  group findings, it is apparent that no confusion as to source can reasonably be

28

1  attributed to the use of the DMV.ORG domain name.  [Hollander Trial Decl.,

2  ¶ 25(c).][*Same response as to No. 76.*]

3

4       79.  None of the respondents to the Hollander test survey

5  (DMV.ORG) or control survey (CAR.ORG) perceived a sponsorship between

6  DMV.ORG or CAR.ORG, respectively, and the government.  [Hollander Trial

7  Decl., ¶ 25(d).] [*Same response as to No. 76.*]

8

9       80.  Plaintiffs' expert, Maronick, surveyed respondents only in

10  relation to California traffic school, did not address states not using the "DMV"

11  moniker, and gave no opinion whatsoever as to driver's education. [Designated

12  Maronick Depo., 83:24-84:1; 96:18-19.]

13

14       81.  Maronick surveys 2 and 3 do not provide meaningful results as

15  to confusion because of their methodology flaws including:

16

17       (a) the failure to mimic a visitor's actual experience through the

18  use of improper stimuli and dissection of DMV.ORG into component parts – search

19  results, the domain and the top two-thirds of a single webpage (a page through

20  which less than 1/3 of one percent of DMV.ORG visitors enter the site) [TE 142

21  (Simonson Decl., ¶¶ 42, 49-51); Designated Maronick Depo., 13:4-14:4; Moretti

22  Trial Decl., ¶¶ 13-14; TEs 7, 672];

23

24       (b) the use of leading questions [TE 142 (Simonson Decl., ¶¶ 37-

25  39, 41-48); Designated Maronick Depo., 54:7-10];

26

27       (c) the combination of key questions on the same page creating a

28  demand effect (e.g., "Is this website endorsed by any government agency?"

4833-3194-9570.1–
W02-WEST:3AAE1\400526095.2

1   (question 6) followed on the same page by "What government agency?" (question

2   7)) [TE 144 (Surveys 2-3, questions 6-7 and 8-9); Designated Maronick Depo.,

3   39:5-11; 40:5-23; 44:2-18; 96:20-97:12; 97:17-21; 100:2-7; Simonson Decl., ¶¶ 23,

4   45-48];

5

6            (d) the failure to include a control, which Maronick himself has

7   described in literature on surveys as "indispensable" in Lanham Act cases [TEs 142,

8   143; (Simonson Decl., ¶¶ 53-55); Designated Maronick Depo., 34:5-35:5; 72:15-

9   73:13]; and

10

11           (e) the failure to instruct survey respondents not to guess.

12   [TE 142 (Simonson Decl. ¶¶ 44, 57); Designated Maronick Depo., 45:17-46:22;

13   95:25-96:1; 172:4-173:11].

14

15   [*These findings are disputed for the detailed reasons and law set forth in Plaintiffs'*

16   *Opposition to Defendants' Motion in Limine to Exclude Dr. Maronick, which is*

17   *supported by TE 389 (Dr. Maronick's Rebuttal of Research Related Issues).*]

18

19            **Materiality: No Evidence That The Alleged**

20            **Misleading Advertising Affects the Purchasing Decision**

21

22            82.   Plaintiffs allege that DMV.ORG unfairly benefits by misleading

23   consumers to believe that the site is an actual government entity (or is

24   affiliated/endorsed by the government) and thereby compelling consumers to

25   purchase the courses advertised on DMV.ORG instead of Plaintiffs' courses.

26

27            83.   There is no evidence that consumers care more about

28   government recommendation of one acceptable traffic school course over another

29

[*PLAINTIFFS MARKED COPY OF*] DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    acceptable traffic school. [*Consumers of traffic school and drivers education*

2    *courses know that both are highly regulated by the government (TD Eric Creditor,*

3    *¶¶4, 6, 9, TE 316, TD Shannon Robertson, ¶ 8). As such, that a recommendation*

4    *from the government is valuable is both self evident and was expressly established*

5    *by the Maronick survey results (TE 350, Study 4, Tab G).*]

6

7    84.    In fact, Plaintiffs expert, Maronick, understood the phrase

8    "recommended by the DMV," which he devised for survey 4, to mean that a traffic

9    school course would serve to discharge a traffic ticket. [Designated Maronick Depo.,

10   139:21-140:15.]

11

12   85.    There is no evidence that the traffic school and drivers education

13   courses advertised on DMV.ORG are not in fact approved by the government.

14

15   86.    College students are generally interested in completing traffic

16   school as quickly and cheaply as possible.  [Designated Maronick Depo., 137:23-

17   138:19.] [*Mr. Maronick specifically stated that he was only speculating (138:22-*

18   *23).*]

19

20   87.    A California resident with a traffic ticket would first and

21   foremost want a traffic school that would mask the points from his/her driving

22   record.  [11/6 RDT 160:19-161:18 (Creditor).]

23

24   88.    Convenience is also an important factor for consumers in

25   choosing a traffic school course.  [11/6 RDT 161:19-23 (Creditor).]

26

27   89.    Other traffic schools' search engine listings prominently

28   including price (e.g., Go to Traffic School - Starting at $14.50; Traffic School -

4833-3194-9570.1
W02-WEST:3AAE1\400526095.2