1   Starting at $9.95; $14.80 Online California; Traffic School - $10 Special, etc.) and

2   selection of names for their courses (e.g., "LowestPriceTrafficSchool.com," "Cheap

3   School") strongly suggest that price is another critical factor.  [TE 67; 11/7 RDT

4   41:19-42:13.] [*This statement, while irrelevant, is not supported by the evidence*

5   *cited.*]

6

7          90.   A visitor that clicks on the DMV.ORG advertisement of I Drive

8   Safely must click through at least 5 additional pages once on the I Drive Safely

9   website before making a purchase.  [Lahoti Trial Decl., ¶ 9; TE 648.]

10

11         91.   "Conversion rate" is a commonly used phrase within the online

12   industry that refers to the percentage of visitors to a particular webpage that take

13   measurable action (i.e. click on an advertisement, ultimately purchase a product sold

14   by the advertiser).  [Moretti Trial Decl., ¶ 18.]

15

16         92.   Conversion rates can be calculated in at least two different ways:

17   (a) sales derived from a particular webpage divided by the number of times that

18   page has been viewed; or (b) sales derived from a particular webpage divided by the

19   number of unique visits to that page.  [11/7 RDT 215:7-16 (Moretti).] [*There was no*

20   *evidence to suggest that the industry considers a "conversion rate" to be tied to the*

21   *number of page views in relation to a sale.  This was an alternative definition*

22   *offered by Mr. Morett only on re-direct after his cross examination in which he was*

23   *forced to acknowledge that his direct declaration testimony was false (11/7 TT pp.*

24   *199:25-205:14; compare to rial Decl., ¶18, and to re-direct testimony at 11/17 TT*

25   *215.).  Mr. Moretti's testimony in this regard is not credible in light of the fact that*

26   *it was offered only to try and rehabilitate his prior false statement.*]

27

28

93. The conversion rate for unique visitors to the TrafficSchool.com website is approximately 10 to 15 percent (% that purchase). [11/7 RDT 10:3-6 (Creditor).] [*This is true only with regard to California conversion rates, not non-California conversion rates. Mr. Creditor expressly references California only.*]

94. The TrafficSchool.com advertisements on DMV.ORG in 2003 (placed through the Overture Ad program) were not profitable, suggesting that the DMV.ORG website was not compelling any significant number of consumers to purchase traffic school services advertised thereon. [11/7 RDT 70:7-12; 73:4-13; 73:20-74:9; 75:18-76:4 (Kramer); TE 688.] [*The conclusion reached by the statement is not supported by the evidence cited. The DMV.ORG site was significantly different in 2003 (TT 624) and it is unknown why the advertisements were not successful in driving traffic. This fact is also irrelevant.*]

95. In a May 2006 email, Plaintiffs' principal, Chris Kramer, described the traffic from DMV.ORG as "unqualified," meaning that he believed traffic from the DMV.ORG website did not convert to a sufficient number of sales to be profitable. [11/7 RDT 83:24-84:2; 84:21-85:12 (Kramer); TE 45.] [*Mr. Kramer's comments in 2006 were based on his 2003 experience referenced in No. 94 above (11/7 TT, p. 86:10-14), so this is disputed to the extent it is meant to imply that the Mr. Kramer believed in 2006 that DMV.ORG was unprofitable. Also, the statement is of no value to any issue in this case.*]

96. The conversion rate for California traffic school advertisements on DMV.ORG is 3.25 percent when calculating sales as a percentage of page views (or approximately 7.5 percent if using unique visitors as the denominator). [Moretti Trial Decl., ¶¶ 19-21; 11/7 RDT 206:19-207:20 (Moretti).] [*Mr. Moretti's testimony on these points is unreliable as he was proven to have offered false testimony (see*

1  *No. 92 above). Also, there was no evidence supporting the notion that "page*
2  *views" are relevant to any issue in the case.*]

3

4      97.    The conversion rate for California drivers education
5  advertisements on DMV.ORG is 0.83 percent when calculating sales as a percentage
6  of page views (or an estimated 1.5 to 1.75 percent if using unique visitors as the
7  denominator).  [Moretti Trial Decl., ¶¶ 19-21; 11/7 RDT 219:8-220:12 (Moretti).]
8  [*See No. 96 above. Also, this is a meaningless statistic even if the math is accurate*
9  *because it measures nothing of relevance in this case.*]

10

11      98.    The fact that conversion rates for DMV.ORG are lower than the
12  conversion rates for TrafficSchool.com tends to negate Plaintiffs' allegation that
13  DMV.ORG derives a material advantage from the alleged perceived affiliation of
14  DMV.ORG with a state motor vehicle department. [*The testimony of Mr. Moretti*
15  *related to conversion rates is unreliable and false (see No. 92 above). Defendants*
16  *had the ability to test a meaningful conversion rate by examining the habits of*
17  *visitors who visited traffic school and drivers education pages on DMV.ORG who*
18  *arrived from search engine advertisements but made no effort to do so (11/8 TT, pp.*
19  *18:23-20:9); the failure to test the habits of these visitors is indicative of*
20  *Defendants' understanding that the results would have been damaging because the*
21  *data would have established a very high conversion of those consumers to a sale.*]

22

23  **Causation/Injury: Explanations for Plaintiffs' Alleged Injury**

24

25      99.    TrafficSchool.com was one of the first online traffic school
26  course providers, but there are now many other competitors – some courts have
27  approved six online providers while other courts have approved as many as 40 in
28  California. [11/6 RDT 174:19-25, 177:22-178:7 (Creditor).]

33

1    100.   The barriers to entry into the online traffic school market are

2    relatively low for an existing classroom traffic school provider. [11/6 RDT 175:6-

3    176:8.] [*Mr. Creditor testified to many barriers (11/6 TT, p. 175:15-22). Moreover,*

4    *being an existing class room provider offers little in terms of a head start to entering*

5    *the online market; certainly Defendants offered no evidence for that proposition.*]

6

7    101.   In a July 2007 Yahoo! search result for the search term "traffic

8    school" there were approximately 30 results, none of which are for

9    TrafficSchool.com and six of which are TrafficSchool.com competitors in

10   California, demonstrating increased competition for TrafficSchool.com. [11/6 RDT

11   178:14-181:12 (Creditor); TE 67.] [*Plaintiffs do not dispute the search result but*

12   *rather dispute the conclusion.  It is unclear what "increase" is referring to.*

13   *Certainly there is competition.*]

14

15   102.   Plaintiffs' search engine advertising expenditures declined from

16   $170,000 in 2004 to less than $100,000 in 2006, while at the same time their radio

17   advertising expenditures increased from nothing in 2004 to $160,000 in 2006. [11/6

18   RDT 183:10-184:12 (Creditor).] [*This is not correct because "Plaintiffs'" search*

19   *engine costs would have to include both Drivers Ed Direct and TrafficSchool.com*

20   *and Defendants have not cited to testimony which establishes both.*]

21

22   103.   Plaintiffs' principal, Eric Creditor, acknowledged that a possible

23   reason for the decline in TrafficSchool.com's search engine marketing expenditures

24   could stem from the fact that other competitors bid more for keywords. [11/6 RDT

25   184:17-22 (Creditor).] [*Mr. Creditor's testimony was related to advertisers "getting*

26   *more"; it was not related to competitors bidding more.*]

27

28

1      104.   In 2007, Plaintiffs have reduced their marketing expenditures to

2   pay for this litigation.  [Creditor Decl., ¶ 24.]

3

4      105.   The first month in which the TrafficSchool.com website

5   experienced a negative trend in regard to the number of visits to the website

6   occurred in June 2005, the same month in which the DriversEdDirect.com website

7   went live.  [11/7 RDT 53:23-54:5 (Kramer); TE 28.]

8

9      106.   The drop in the number of traffic school courses

10   TrafficSchool.com sold in Texas and Florida correlates with TrafficSchool.com's

11   transition in each state, in different years, from receiving a referral fee from the

12   provider of the traffic school courses in those states to actually selling the course

13   and collecting consumer dollars and instead paying the traffic schools for

14   fulfillment.  [11/6 RDT 163:19-166:6, 166:25-168:12 (Creditor); TE 26.] [*There is*

15   *no evidence to suggest (and Mr. Creditor- whose testimony is cited as support- did*

16   *not so testify) that the change in operations in terms of collecting money had*

17   *anything to do with a drop in sales. Defendants are speculating.*]

18

19      107.   DriversEdDirect's business was in fact in an upward trend at the

20   time that it initiated contact with defendants to advertise on DMV.ORG.

21   [Designated Leach Depo., 30:18-31:14.] [*Drivers Ed Direct had just commenced its*

22   *business at the end of 2005, so there is little value in comparing its <u>prior</u> financial*

23   *history (TD Eric Creditor, ¶¶ 8, 10).*]

24

25      108.   Plaintiffs presented no expert testimony correlating any decline

26   in their businesses to the DMV.ORG website. [*Dr. Maronick's expert surveys and*

27   *report support the proposition that confusion affected Plaintiffs' sales because*

28   *people would have been influenced to purchase a course from DMV.ORG because*

1  *they believed the course was being recommended by their official DMV government*

2  *agency (TE 350, Study 4, Tab "G"); also the other studies support a likelihood of*

3  *confusion and deception and thus a likelihood of injury to Plaintiffs' businesses (TE*

4  *350, Studies 1-3).]*

5

6  ### Other Motives For Plaintiffs' Suit

7

8  109.  In February 2006, DriversEdDirect initiated negotiations with

9  Online Guru to advertise on the DMV.ORG website with the apparent intent to

10  become a long-term partner with DMV.ORG.  [11/7 RDT 78:14-21, 80:12-19

11  (Kramer).] [*The intent was to enter into a <u>test</u> to see if a long term relationship was*

12  *feasible (TD Eric Creditor, ¶¶ 34, 36).]*

13

14  110.  But even at the time that DriversEdDirect initiated contact with

15  DMV.ORG,  DriversEdDirect's owners harbored animosity toward Defendant Raj

16  Lahoti and DMV.ORG.  [11/6 RDT 196:18-199:18 (Creditor); TE 43.] [*It is unclear*

17  *what this statement means or why it is relevant, but the evidence cited does not*

18  *support it.]*

19

20  111.  In April 2006, during the time DriversEdDirect was negotiating

21  with Online Guru to advertise on DMV.ORG, Kramer emailed internally, "We

22  shouldn't deal with people who jerk us around or lead us on" and that he would

23  rather notify the various Dives of the DMV.ORG website, and that they ought to

24  discuss a "strategy" for this.  [11/7 RDT 81:23-82:14 (Kramer); TE 43.]

25

26  112.  In a May 2006 email, Kramer again raised the strategy of

27  contacting the state motor vehicle departments regarding DMV.ORG explaining it

28

1   as "Sort of a 'if you can't join 'em, shut 'em down' approach." [11/7 RDT 83:24-

2   84:2, 86:24-87:4, 89:7-89:9; TE 45.]

3

4   **Unclean Hands: Plaintiffs' Website Practices and Domains**

5

6          113.   Plaintiffs' DriversEdDirect.com website uses various state indicia

7   without license to do so, such as images of state license plates, logos, and state seals.

8   [11/7 RDT 57:22-60:18 (Kramer); TEs 72-74.] [*Plaintiffs do not need a license to*

9   *display such symbols (however, Plaintiffs* <u>*are*</u> *licensed by the State of California in*

10  *relation to their traffic school and drivers education courses (TD Eric Creditor ¶¶6,*

11  *10). Moreover, the issue here is whether Defendants' use of state indicia* <u>*in the*</u>

12  <u>*context of other elements of the DMV.ORG site*</u> *(including the name) caused*

13  *confusion.*]

14

15         114.   TrafficSchool.com uses the term "Official" prominently in its

16  sponsored advertising listings, arguably to improve its own click-through rate by

17  suggesting a government affiliation. [11/7 RDT 61:5-62:20 (Kramer); TE 69.]

18  [*Plaintiffs utilize the word "official" to communicate to users that the site is the*

19  *"official"* <u>*TrafficSchool.com*</u> *website (11/7 TT, pp. 61:10-62:20). This is a practice*

20  *employed by untold brand holders, as in the official COCA-COLA website, etc.*]

21

22         115.   TrafficSchool.com owns and operates the

23  FloridaTrafficSchool.com domain and uses the site to promote courses sold on

24  TrafficSchool.com and DriversEdDirect.com. [11/7 RDT 17:5-12 (Creditor).]

25

26         116.   The Florida TrafficSchool.com homepage has a picture of a

27  police officer, though it is not endorsed by the Florida police department, and has a

28  link for "Florida DHSMV resources" and to a "DHSMV Website guide," which link

1  to Plaintiffs' DrivingLinks.com website, not the official Florida Department of

2  Highway Safety and Motor Vehicles. [11/7 RDT 17:17-25, 20:9--21:24 (Creditor);

3  TE 610.]

4

5       117.  There are no disclaimers on the FloridaTrafficSchool.com

6  website specifying that the website is not affiliated with any government agency.

7  [11/7 RDT 20:4-8 (Creditor).]

8

9       118.  TrafficSchool.com has a referral agreement with

10 LowestPriceTrafficSchool.com, which refers California residents to

11 TrafficSchool.com, but TrafficSchool.com is not the lowest priced traffic school in

12 California. [11/7 RDT 63:11-16; 65:25-66:22, 68:3-6 (Kramer); TE 611.] [*There is*

13 *no evidence as to whether TrafficSchool.com is or is not the lowest priced because*

14 *prices fluctuate among competitors (11/7 TT, pp. 66:8-68:8). This is also*

15 *irrelevant.*]

16

17      119.  TrafficSchool.com's LowestPriceTrafficSchool advertisements

18 would lead a reasonable consumer to presume that TrafficSchool.com offered the

19 lowest priced traffic schools in California. [*This is speculation and irrelevant; no*

20 *evidentiary support exists or is provided for this statement.*]

21

22      120.  Plaintiffs' also created a website, DrivingLinks.com, which in

23 their own words "mirrors" the concept and content of the DMV.ORG website.

24 [Designated Kramer Depo., 250:22-251:5; Trial Exhibit 45.] [*Mr. Kramer never*

25 *said it mirrored DMV.ORG's content.*]

26

27      121.  Plaintiffs transferred the DrivingLinks.com domain name from

28 TrafficSchool.com to "DrivingLinks.com," a fictional entity, just prior to the launch

1  of the DrivingLinks.com website, arguably to mask the site's affiliation with

2  plaintiffs' business.  [11/6 RDT 202:24-205:5 (Creditor); Designated Creditor

3  Depo., 51:4-23.] [*The transfer was done to have the domain name match the name*

4  *of the site (11/6 TT, p. 203:13-14); Plaintiffs identified the corporate registrant on*

5  *the WHOIS information- there was no effort to hide anything (11/7 TT, p. 28:7-17,*

6  *TE 20).  This is also irrelevant.*]

7

8  122.  DrivingLinks.com does not expressly state on its website the fact

9  that it is controlled by TrafficSchool.com.  [11/6 RDT 205:6-24 (Creditor);

10  Designated Kramer Depo., 246:15-249:4.]

11

12  123.  There are at least 19 references to the "DMV" or "Department of

13  Motor Vehicles" on a single webpage of the DrivingLinks.com website.  [11/6 RDT

14  208:5-209:18 (Creditor); Designated Creditor Depo., 271:15-272:9; TE 20

15  (DEF00990-91).]

16

17  124.  DrivingLinks.com is similar to DMV.ORG with regard to its

18  content, but contains no disclaimers as to the lack of affiliation between

19  DrivingLinks.com and the state motor vehicle departments.  [11/6 RDT 205:25-

20  206:25 (Creditor); Designated Creditor Depo., 270:14-20, 272:16-20; TE 20

21  (DEF00990-91).]

22

23  125.  Although the California Department of Motor Vehicles does not

24  license online traffic schools, such as TrafficSchool.com, to provide online traffic

25  school, Plaintiffs have registered and used certain domains containing the term

26  "dmv," including dmvapprovedtrafficschool.com and cadmvtrafficschool.com.

27  [11/6 RDT 151:20-152:24, 154:19-155:18, 155:24-156:18, 157:23-158:6, 158:14-

28  159:2 (Creditor); TE 89, 90.] [*The DMV does license traffic schools and*

1 | *TrafficSchool.com is a California DMV licensed traffic school provider (TD Eric*
2 | *Creditor, ¶16). There is no evidence that Plaintiffs' registration or use of domains*
3 | *has caused confusion or is misleading to anyone.*]

5 | 126. The use of the phrase "DMV approved" affirmatively suggests
6 | that TrafficSchool.com is a DMV approved online traffic school when in fact it is
7 | not approved by the California Department of Motor Vehicles. [*TrafficSchool.com is*
8 | *a California DMV approved traffic school provider (TD Eric Creditor, ¶4 and 5).*]

10 | 127. Plaintiffs have also registered, but cannot say whether they have
11 | used, the following additional domains: dmvlicenserenewal.com;
12 | dmvregistrationrenewal.com; dmvrenewals.com; internetdmv.com; dmvi.com; and
13 | trafficschool.us. [11/6 RDT 211:14-212:20 (Creditor); TE 690.]

15 | 128. Plaintiffs registered the domains Online-DMV.ORG and
16 | Internet-DMV.ORG in August 2006 during the term of their advertising agreement
17 | with DMV.ORG. At trial, Plaintiffs could not identify a business purpose for
18 | registering the domains. [11/6 RDT 212:21-214:1 (Creditor); TE 691.]

20 | **Statute of Limitations/Laches:**
21 | **Plaintiffs' Knowledge Of DMV.ORG and Acquiescence**

23 | 129. Plaintiffs learned of and visited the DMV.ORG website in March
24 | 2002 and had no objections to the use of the DMV.ORG domain at that time. [11/6
25 | RDT 187:2-188:5; TE 32; Ravi Lahoti Trial Decl., ¶ 4; Designated Kramer Depo.,
26 | p. 214:6-16.] [*Plaintiffs testified that they may have visited the site in 2002, but that*
27 | *it did not leave a lasting impression (11/7 TT, p. 73:16-20). The site was very*
28 | *different in 2002 than it was in 2006 when Plaintiffs filed suit (TE 623).*]

130.   Shortly after learning of DMV.ORG in March 2002, Plaintiffs registered the domain DrivingLinks.com (March 12, 2002) and initiated contact with Ravi Lahoti to recover a domain name.  Plaintiffs assertion that these events were mere coincidence is not credible.  Rather, it tends to show that Plaintiffs actively investigated the DMV.ORG website at this time.  [11/6 RDT 200:19-202:23 (Creditor); 11/7 RDT 68:7-70:6 (Kramer); TEs 20 (DEF00982), 32.] [*Plaintiffs testified credibly that the incidents were* <u>*unrelated*</u>.  *This is also an irrelevant point.*]

131.   Plaintiffs also visited the DMV.ORG website in 2003, at which time they complained to the Overture advertising network, which placed TrafficSchool.com advertisements on DMV.ORG, due to the large amount click-through charges they were incurring for traffic from their advertisements on DMV.ORG.  [11/7 RDT 73:4-74:3 (Kramer); TE 33; Designated Kramer Depo., 214:20-215:13; 216:25-217:4; 226:19-21.] [*Mr. Kramer did not testify that he visited the site in 2003 (11/7 TT, p. 73:4-20).*]

132.   In February 2006, DriversEdDirect initiated negotiations with Online Guru to advertise on the DMV.ORG website.  [11/7 RDT 78:14-21, 80:12-19 (Kramer).]

133.   DriversEdDirect sought to be "DMV.ORG's premiere California online driver's ed program and behind-the-wheel provider in Los Angeles."  [11/7 RDT 80:6-16 (Kramer); TE 36.]

134.   Creditor approved an email to Defendant Raj Lahoti, which states in part: "you do a fantastic job marketing DMV.ORG, and you spend a lot of money marketing your site."  [11/6 RDT 192:25-194:9 (Creditor); TE 45.]

135.   DriversEdDirect eventually entered a written agreement with Online Guru in June 2006, and DriversEdDirect advertisements were test marketed on DMV.ORG in July 2006.  [11/6 RDT 191:17-19, 199:16-200:8 (Creditor); TE 37.]

136.   Creditor had no problem with DMV.ORG recommending DriversEdDirect in the summer of 2006, and DriversEdDirect paid DMV.ORG for the referrals it received in connection with the advertisement of its driver's education courses.  [11/6 RDT 200:5-12 (Creditor).]

**Statute of Limitations/Laches:**
**Plaintiffs Delay and Prejudice to Defendants**

137.   Although Plaintiffs have been aware of DMV.ORG since 2002, and had antipathy towards DMV.ORG from the beginning, they did not file suit until over four years later in November 2006.  [11/6 RDT 187:2-188:5; TE 32; Ravi Lahoti Trial Decl., ¶ 4; Designated Kramer Depo., p. 214:6-16; Plaintiffs' Complaint.] [*Plaintiffs have been aware of DMV.ORG since 2002 but the site looked very different at that time and was not deemed a competitive threat then (TD Eric Creditor, ¶32, TE 623).  The failure to take action at that time was simply because there was no need to take action.*]

138.   Online Guru advertises DMV.ORG through pay-per-click marketing on search engines such as Yahoo! and Google.  Online Guru has spent over $10,000,000 on search engine marketing to promote DMV.ORG since 2002. [Raj Lahoti Trial Decl., ¶ 5.] [*This is misleading because the overwhelming majority of these costs were incurred from 2005 – 2007 (TE 115).  The suggestion that there was a powerful marketing effort in years prior is not accurate.*]

139.   Online Guru has spent over $500,000 on content development of the site since 2002.   [Raj Lahoti Trial Decl., ¶ 6.] [*This is misleading because the vast majority of this amount was spent in 2006 (11/7 TT, pp. 147:7 -148:6.)*]

140.   Through Online Guru's marketing efforts, people have come to know DMV.ORG, refer to it as a good resource for DMV information, and nearly 70,000 websites link to DMV.ORG.   [11/7 RDT 153:3-154:5 (Raj).] [*There is no evidence to suggest that this recognition is due to marketing efforts rather than a misperception about the official nature of the site (see TEs 10, 404-407, 410-41— Internet references and new articles that refer to DMV.ORG as the Department of Motor Vehicles' website).*]

141.   Online Guru's business would suffer greatly if it was required to change the DMV.ORG domain name as it could take two to three years to build a new brand and recognition.   [11/7 RDT 155:7-156:15, 157:5-25 (Raj).] [*This is not true as over 80% of DMV.ORG's traffic comes from search engines (11/7 TT, p. 154:6-10) and thus, changing the name would not have a material impact on the marketing of the site because the name is irrelevant to the search engine referrals (11/7 TT, p. 155:7-156:1). Defendants should not be allowed to continue to profit from brand recognition that is misleading (Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F. Supp. 2d 351, 57 U.S.P.Q.2d 1522, 1531 (D.N.J. 2000), aff'd 290 F.3d 578, 62 U.S.P.Q. 2d 1757 (3rd Cir. 2002) (granting preliminary injunction of use of brand name MYLANTA NIGHT TIME STRENGTH as being false by implication)).*]

142.   Requiring users to acknowledge upon arriving to DMV.ORG that the website they are visiting is not affiliated with a governmental agency (i.e., a splash page) would have a material impact on the website because splash pages are

1   uncommon, they disrupt a visitor's flow, and actually confuse visitors.  [11/7 RDT

2   158:12-159:13 (Raj).] [*No persuasive evidence was presented to establish this fact.*

3   *It is pure speculation.*]

4   / / / /

5

6                         **CONCLUSIONS OF LAW**

7

8                    **Plaintiffs Do Not Have Standing**

9

10          1.      "Whenever it appears by suggestion of the parties or otherwise

11   that the court lacks jurisdiction of the parties or otherwise that the court lacks

12   jurisdiction of the subject matter, the court shall dismiss the action."  Fed.R.Civ.P.

13   Rule 12(h)(3).

14

15          2.      Plaintiffs lack standing under Article III of the Constitution

16   because any loss they may have incurred is de minimus in light of the insignificant

17   nature of their referral business.  Berkey Photo, Inc. v. Eastman Kodak Co., 603,

18   F.2d 263, 289 (2nd Cir. 1979) (plaintiff not entitled to judgment since it had only

19   proved de minimus injury); Shimkus v. Hickner, 417 F.Supp.2d 884, 905 (E.D.

20   Mich. 2006) (de minimus loss insufficient to confer standing); FRCP R. 12(h)(3)

21   ("Whenever it appears . . . that the court lacks jurisdiction of the subject matter, the

22   court shall dismiss the action"); Arbaugh v. Y & H Corp., 126 S.Ct. 1235, 1240

23   (2006) ("The objection that a federal court lacks subject matter jurisdiction may be

24   raised by a party, or by a court on its own initiative, at any stage in litigation, even

25   after trial and the entry of judgment."). [*The cases cited are not addressing standing*

26   *in Lanham Act cases, which has have specific standards related to standing.  Under*

27   *the false advertising prong of the Lanham Act, there is no need to even prove injury,*

28   *all that is required is to prove* *likelihood* *of injury. 15 U.S.C. 1125( a),* Annunziato v.

1  *e-Machines,* 402 F. Supp. 1133, 1137 (C.D. Cal. 2005).  *Moreover, Plaintiffs*

2  *dispute that the injury suffered was (or will continue to be) de minimus.*]

3

4        3.    In a false advertising case under 15 U.S.C. § 1125(a)(1)(B), the

5  plaintiff must allege "a discernibly competitive injury" in order to have standing.

6  Waits v. Frito Lay, Inc., 978 F.2d 1093, 1109 (9th Cir. 1992).

7

8        4.    "In the 'traditional sense,' 'competitors are persons endeavoring

9  to do the same thing and each offering to perform the act, furnish the merchandise,

10 or render the service better or cheaper than his rival.'" Summit Technology, Inc. v.

11 High-Line Medical Instruments, Co., 933 F.Supp. 918, 939 (C.D. Cal. 1996). If

12 parties who are not in direct competition are deemed to be competitors, then "'any

13 two parties with some economic nexus or whose conduct has some economic effect

14 upon the other, could be construed as 'competitors,'" contrary to Ninth Circuit law.

15 Sugai Products, Inc. v. Kona Kai Farms, Inc., 1997 WL 824022 *11 (D.Hawai'i

16 1997) (quoting Summit Technologies v. High-Line Medical Instruments, Co., 933

17 F.Supp. 918 (C.D. Cal. 1996). [*The reference to "direct competitors" is not*

18 *supported by any case law.  The standing inquiry is directed to evaluating whether*

19 *the alleged injury is "harmful to the plaintiff's ability to compete with the*

20 *defendant." Jack Russell Terrier Network of Northern Ca. v. American Kennel*

21 *Club, Inc., 407 F. 3d. 1027, 1037 (9th Cir. 2005).  There is no requirement that the*

22 *parties be direct competitors.*]

23

24       5.    Plaintiffs lack standing under the Lanham Act because, given the

25 insignificant nature of their referral business, they do not vie with defendants for the

26 same dollars from the same consumer group in any meaningful sense. Kournikova

27 v. General Media Communications, Inc., 278 F.Supp.2d 1111, 1117 (C.D. Cal.

28 2003) ("the Court must determine whether or not the two parties vie for the same

4833-3194-9570.1–
W02-WEST:3AAE1\400526095.2

*[PLAINTIFFS MARKED COPY OF]* DEFENDANTS'
POST TRIAL [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1 dollars from the same consumer group, and whether the conduct of the defendant, if

2 true, could be said to create 'competitive injury'"); Conte Bros. Auto, Inc. v. Quaker

3 State-Slick 50, Inc., 165 F.3d 221, 223 (3rd Cir. 1998) (upholding dismissal of

4 Lanham Act false advertising claim for lack of standing where retailer of engine

5 additives held not to compete with manufacturer of similar product); FRCP R.

6 12(h)(3) ("Whenever it appears . . . that the court lacks jurisdiction of the subject

7 matter, the court shall dismiss the action"); Arbaugh v. Y & H Corp., 126 S.Ct.

8 1235, 1240 (2006) ("The objection that a federal court lacks subject matter

9 jurisdiction may be raised by a party, or by a court on its own initiative, at any stage

10 in litigation, even after trial and the entry of judgment."). [*This proposition is false*

11 *because the legal premise is incorrect (i.e., that there is a de minimus standard) and*

12 *it is factually unsupported because the Plaintiffs' referral business is not*

13 *insignificant (Plaintiffs' Conclusion of Law, No. 13).*]

14

### Plaintiffs' False Advertising Claim Fails

16

17        6.        To prevail on a false advertising claim, a plaintiff must prove:

18 (a) defendant made a false or misleading statement in a commercial advertisement

19 about the nature, characteristics, qualities, or geographic origin of their own or

20 another's product; (b) the statement actually deceived or has the tendency to deceive

21 a substantial segment of reasonably prudent consumers; (c) the deception is

22 material, in that it is likely to influence the purchasing decision; and (d) plaintiff has

23 been (or is likely to be) injured by the conduct. 15 U.S.C. § 1125(a)(1)(B);

24 Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997); Int'l

25 Ass'n of Machinists v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir.

26 1996). [*Defendants' improperly incorporate a selected phrase of 15 U.S.C. §1125*

27 *(a)( 1) into the case law elements of the claim and misstate element (b) of the false*

28 *advertising test even though they cite to the Ninth Circuit's seminal case of*

1  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134.  *Southland* makes no

2  reference to "reasonably prudent consumers," but rather speaks to the "audience"

3  to whom the communications are directed.  The distinction is not insignificant as a

4  substantial segment of Defendants' audience may consist of "non-prudent"

5  consumers and does in fact consist of teenagers interested in drivers education

6  courses—both of which need to be protected from false and misleading advertising.]

7

8

9

10     7.     When evaluating an alleged false advertisement, the

11  advertisement must be considered in its full context rather than dissecting it into its

12  component parts.  *Southland Sod Farms*, 108 F.3d at 1139; and *Avis Rent A Car*

13  *System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986) (courts must

14  "consider the advertisement in its entirety and not … engage in disputatious

15  dissection"); and *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) (view

16  the "entire mosaic" not "each tile separately").  An analysis of DMV.ORG therefore

17  cannot be broken out into consideration of the domain and search engine search

18  results separately from the content on the website.[A full contextual review of an

19  alleged false advertisement is only necessary for the "necessary implication" prong

20  of the literal falsity standard, not the second element of "likely to mislead" prong.

21  *Southland* at 1139.]

22

23     8.     Plaintiffs' false advertising claim fails as a matter of law as

24  DMV.ORG makes no express claim that it is affiliated, endorsed, or sponsored by

25  any government entity.  *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425

26  F.Supp.2d 402, 417 (S.D.N.Y. 2006) ("false advertising claims based on allegations

27  of implied governmental approval have not been allowed, for 'the law does not

28  impute representations of government approval . . . in the absence of explicit

1   claims'"). [*First, Defendants have expressly misrepresented an affiliation with the*
2   *government (see Response to No. 34, supra. Second, the case proposition is a red-*
3   *herring, since this is not an FDA related case:* <u>Merck</u> *cited to and relied on* <u>Mylan</u>
4   <u>Labs. v. Matkari</u>*, 7 F.3d 1130 (4th Cir.1993), where the Fourth Circuit found that*
5   *"permitting [plaintiff] to proceed on the theory that the defendants violated § 43(a)*
6   *merely by placing their drugs on the market would, in effect, permit [plaintiff] to use*
7   *the Lanham Act as a vehicle by which to enforce the Food, Drug, and Cosmetic Act*
8   *... and the regulations promulgated thereunder"; as the Court noted in its January*
9   *22, 2007 Order: "[the false advertising prong of §43(a)] prohibits a rather broad*
10  *category of misrepresentations, including those regarding the nature,*
11  *characteristics, or qualities of a defendant's goods. Ample authority establishes that*
12  *Plaintiffs' claim, alleging a misrepresentation of an endorsement or approval of a*
13  *government agency, is properly within that prohibition.*]

14

15         9.    The DMV.ORG website is not literally false, as it provides
16  driving and motor-vehicle related information and expressly disclaims any
17  affiliation with any government entity. [*First, the false advertising claim in this case*
18  *is not related solely to the DMV.ORG website alone but to the search engine and*
19  *other DMV.ORG advertisements (including TE 17 and 18). Second, as to the site, it*
20  *is literally false at least by necessary implication when the full context of the*
21  *advertising, including search engine advertising and pathways to the site from the*
22  *search engine advertising (Plaintiffs' Facts Nos. 33-40, 42,43, 51-60, 62-68, 73, 75-*
23  *77, 78, 79 and evidence cited therein).*]

24

25         10.   Defendants' DMV.ORG website was and is not misleading
26  because the numerous conspicuous disclaimers on the website dispel any likelihood
27  of consumer confusion. Taubman v. Webfeats, 319 F.3d 770, 777 (6th Cir. 2003)
28  (Defendant's disclaimer on its website, www.shopsatwillowbend.com, indicating

1  that it was not the official website for Plaintiff's mall, "The Shops at Will Bend,"

2  negated likelihood of consumer confusion; appellate court reversed preliminary

3  injunction entered by district court).[*This is an untrue factual conclusion: The*

4  *website was misleading and still causes consumer confusion (Plaintiffs' Facts Nos.*

5  *62-93).*]

6

7      11.    Plaintiffs have failed to show that DMV.ORG was or is

8  materially misleading in that they have produced no reliable evidence demonstrating

9  that approval by or affiliation with an official motor vehicles department for traffic

10  school and/or drivers education would be material to the purchasing decision.

11  Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997)

12  (listing, as an element of a false advertising claim, that the deception is material in

13  that it is likely to influence the purchasing decision). [*This is an untrue factual*

14  *conclusion as Plaintiffs' offered evidence in support of this issue (Plaintiffs' Facts,*

15  *Nos. 95-99 and evidence cited therein); moreover, in some cases like this one, it is*

16  *obvious that the misrepresentation concerned a quality or characteristic of a*

17  *product which would affect a purchaser's decision whether to buy it (e.g., Oil Heat*

18  *Institute of Oregon v. Northwest Natural Gas, 708 F.Supp. 1118, 1123*

19  *(D.Or.,1988)("A fact finder could reasonably conclude that information regarding*

20  *the amount of maintenance required for natural gas equipment is likely to influence*

21  *the purchasing decisions of consumers."))*.]

22

23      12.    Plaintiffs have failed to show that DMV.ORG was or is likely to

24  mislead an appreciable number of reasonably prudent consumers in comparison to

25  the significant traffic on DMV.ORG. Nutri/System, Inc. v. Con-Stan Industries,

26  Inc., 809 F2d 601 (9th Cir. 1987) (misdirected letters and checks deemed

27  insignificant in comparison to volume of the parties businesses); Amf, Inc. v.

28  Sleekcraft Boats, 599 F2d 341, 353 (9th Cir. 1979) (excluding from consideration

4833-3194-9570.1~
W02-WEST:3AAE1\400526095.2

49

1   "the wholly indifferent"); <u>Int'l Ass'n of Machinists v. Winship Green Nursing Ctr.</u>,

2   103 F.3d 196, 201 (1st Cir. 1996) (the law has long demanded a showing that the

3   allegedly infringing conduct carries with it a likelihood of confounding an

4   appreciable number of reasonably prudent purchasers exercising ordinary care);

5   <u>A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.</u>, 57 F.Supp.2d 155 (E.D.

6   Pa. 1999) (isolated evidence of actual confusion insufficient to establish confusion.).

7   [*This statement incorrectly identifies the standard and applies trademark rather*

8   *than false advertising law (see No. 6 supra); also, it has an erroneous factual basis*

9   *which has been fully addressed in Nos. 10 and 11, supra.*]

10

11          13.    Plaintiffs must prove "a logical causal connection between the

12   alleged false advertising and [their] own sales position." A "mere subjective believe

13   that [they] will be injured" is insufficient. <u>Century 21 Real Estate Corp. v. Re/Max</u>

14   <u>South County</u>, 882 F.Supp. 915, 924-25 (C.D. Cal. 1994). Plaintiffs have failed to

15   provide any evidence whatsoever of a "causal connection" between the decline in

16   their businesses and the DMV.ORG website. [*This is not the correct standard; all*

17   *Plaintiffs must prove is that they are <u>likely</u> to be injured (not even that they have*

18   *been injured). 15 U.S.C. §1125 (a), <u>Southland Farms</u> at 1145-1146, 15 U.S.C.*

19   *§1117, <u>Gracie v. Gracie</u>, 217 F. 3d. 1060, 1068 (9th Cir. 2000)). Moreover,*

20   *Defendants have caused injury to Plaintiffs (Plaintiffs' Facts, Nos. 100-<u>105</u> and*

21   *evidence cited therein.*]

22

23          **Equitable Defenses Bar Plaintiffs' Claims**

24

25          14.    Plaintiffs' causes of action do not raise allegations concerning a

26   threat to public safety and well being, and are therefore subject to equitable

27   affirmative defenses. <u>Jarrow Formulas, Inc. v. Nutrition now, Inc.</u>, 304 F.3d 829,

28   841 (9th Cir. 2002) (affirming summary judgment against plaintiff's false advertising

claim based on laches, finding that "the public's interest will trump laches only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being").  [*Plaintiffs cause of action <u>does</u> raise allegations concerning public safety and well being (see Response to No. 5, supra); also, the equitable defenses are <u>trumped where public confusion exists</u> (see Nos. 16 and 17, infra).*]

15.   The limitation periods on a false advertising claim is the analogous state statute of limitations.  "The analogous limitations period is California's period for fraud, which is three years."  Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002).  [*Defenses based upon delay in Lanham Act cases are governed by the equitable doctrine of laches (<u>McCarthy</u>, §31:19-20).*]

16.   The defense of laches bars an action for equitable relief where the defendant can show unreasonable delay in bringing suit plus <u>either</u> acquiescence in the act about which plaintiff complains <u>or</u> prejudice to the defendant resulting from the delay.  Transworld Airlines v. American Coupon Exchange, 913 F.2d 676, 696 (9th Cir. 1990).  Plaintiffs' causes of action are therefore barred by the doctrine of laches because:

(a)   In waiting over four years after learning of the DMV.ORG website to bring this action, Plaintiffs have unreasonably delayed.  Grupo Gigante SA DE CV v. Dallo & Co., Inc., 391 F.3d. 1088, 1101, 1105 (9th Cir. 2004) (four year delay in asserting trademark rights after learning of infringing use constituted unreasonable delay)

51

    (b)    Plaintiffs acquiesced to the conduct about which they complain in seeking to advertise and actually advertising their services on the DMV.ORG website.

    (c)    Given Defendants' significant investment of time and money in the DMV.ORG website, Defendants will be prejudiced if Plaintiffs are permitted to proceed with this lawsuit, as they will be worse off than they would have been had Plaintiffs brought this lawsuit in a timely fashion. Transworld Airlines v. American Coupon Exchange, 913 F.2d 676, 696 (9th Cir. 1990) (laches is designed to prevent a defendant from being worse off than he would have been if plaintiff had enforced his rights in a timely fashion"); Grupo Gigante, 391 F.3d at 1105 (defendant made the required showing of prejudice by proving that it built a valuable business around its trademark during the four years that the plaintiff delayed the exercise of its legal rights).

[This is factually and legally incorrect.  The defense of laches is trumped by a strong showing of likely confusion of the public ( ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62 (2d Cir. 2002)("[A] court may nonetheless grant injunctive relief if it determines that the likelihood of confusion is so great that it outweighs the effect of plaintiff's delay."); Underwriters Laboratories, Inc. v. United Laboratories, Inc., 203 U.S.P.Q. 180 (N.D. Ill. 1978) (application of laches defense "would ignore the paramount objective … which is protection of the public interest"); Conagra, Inc. v. Singleton, 743 F.2d 1508, 224 U.S.P.Q. 552 (11th Cir. 1984) (the prejudice to defendant from laches must be weighed against the public interest in avoiding confusion)). Moreover, Plaintiffs had no obligation to act until their rights were being

1   *"substantially impacted" and Plaintiffs acted promptly upon this realization*

2   *(Plaintiffs' Facts, Nos. 116-121)(Laches should be measured from the date that*

3   *defendant's acts first significantly impacted a plaintiff; "any change in the format or*

4   *method of use" by a defendant is sufficient to excuse a prior delay—McCarthy, §*

5   *31:19-20 and discussion of the legal issues of encroachment and escalation of use*

6   *by a defendant and case law).]*

7

8         17.   The doctrine of unclean hands precludes relief to a party that has

9   acted improperly.   Urecal Corp. v. Masters, 413 F.Supp. 873, 875 (N.D. Ill. 1976).

10  "It is the age-old policy of courts of equity to require that he who sues seeking

11  equity must . . . come into court with 'clean hands' as respects that controversy."

12  Hall v. Wright, 125 F.Supp. 269, 273 (S.D. Cal. 1954).  The doctrine of unclean

13  hands applies to Lanham Act cases.  Japan Telecom, Inc. v. Japan Telecom Am.,

14  Inc., 287 F.3d 866, 870 (9th Cir. 2002) (expressly recognizing the availability of the

15  unclean hands defense to false affiliation claims); Emco, Inc. v. Obst, 2004 U.S.

16  Dist. LEXIS 12118, *12 (C.D. Cal. May 7, 2004) (holding that the unclean hands

17  doctrine provides a defense to false advertising claims under the Lanham Act);

18  Haagen Dazs v. Frusen Gladje, Ltd., 493 F.Supp. 73, 75-76 (S.D.N.Y. 1980)

19  (Plaintiff, who engaged in conduct similar to defendant, may not secure equitable

20  relief simply because defendants' hands may be a shade or two less clean").

21  *[Unclean hands is not a viable defense if the public's confusion is ongoing—an*

22  *injunction is always available as a remedy regardless of the behavior of a plaintiff.*

23  *"That is, if the evidence shows that plaintiff is engaging in inequitable practices, but*

24  *defendant is also guilty of the unfair competition charged, an injunction should be*

25  *granted notwithstanding the unclean hands maxim. It is better to remedy one wrong*

26  *than to leave two wrongs at large. If defendant thinks that plaintiff is guilty of*

27  *inequitable conduct, he should raise it in a counterclaim or in a separate suit*

28  *against plaintiff." McCarthy, 31:53, citing cases, including, the Ninth Circuit's U-*

1    *Haul International, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238 (D. Ariz. 1981), aff'd,

2    *681 F.2d 1159, 216 U.S.P.Q. 1077 (9th Cir. 1982) (unclean hands is a disfavored*

3    *defense in false advertising cases); Republic Molding Corp. v. B. W. Photo Utilities,*

4    *319 F.2d 347, 350 (9th Cir. 1963).*]

5

6        18.     In light of Plaintiffs' DrivingLinks.com website (which was

7    designed to "mirror" DMV.ORG), their FloridaTrafficSchool.com website,

8    LowestPriceTrafficSchool.com advertisements, and registration and use of domains

9    containing the "dmv" moniker, Plaintiffs are guilty of unclean hands and therefore

10    are not entitled to relief. [*In order for unclean hands to provide a defense, the*

11    *alleged wrongful conduct must be related to the Defendants' conduct. See*

12    *McCarthy , § 31:44, 48, 53, (Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d*

13    *837, 847 (9th Cir. 1987)). There is no evidence that Plaintiffs engaged in any*

14    *wrongful activity which has deceived or confused the public.*]

15

16                **Plaintiffs Are Not Entitled To Any Monetary Recovery**

17

18        19.     To recover any monetary remedy, plaintiffs must demonstrate a

19    causal connection between the alleged false advertising and their purported injury.

20    Century 21 Real Estate Corp. v. Re/Max South County, 882 F.Supp. 915, 924-25

21    (C.D. Cal. 1994) (plaintiff's false advertising claim failed since it could not prove "a

22    logical causal connection between the alleged false advertising and its own sales

23    position"); Nikkal Industries Ltd. v. Salton, Inc., 735 F.Supp. 1227, 1238 (S.D.N.Y.

24    1990) (verdict for defendant; plaintiff failed to prove lost sales were the result of

25    defendant's advertisements rather than other factors such as its marketing strategy

26    and increased competition). Plaintiffs have failed to provide any evidence

27    demonstrating that DMV.ORG has caused them injury. And there are other

28    plausible explanations (e.g. increased competition, transitions in Plaintiffs' business,

1   shifts in Plaintiffs' marketing expenditures, etc.) for the decline in Plaintiffs' sales.

2   Accordingly, Plaintiffs are not entitled to any monetary award. [*The Ninth Circuit*

3   *has held that a plaintiff* <u>*need not prove injury*</u> *when seeking monetary relief under*

4   *the Lanham Act, 15 U.S.C. § 1117(a)(*<u>*Southland Sod Farms v. Stover Seed Co.*</u>*, 108*

5   *F.3d 1134, 1145-1146 (9*[th] *Cir. 1997)).  Plaintiffs are not seeking damages, but*

6   *rather, a disgorgement of Defendants' profits – as allowed—and are not required to*

7   *show any causal nexus to obtain such an award (15 U.S.C. §1117;* <u>*Gracie v. Gracie*</u>*,*

8   *217  F. 3d. 1060, 1068 (9th Cir. 2000)).  Moreover, Defendants have caused injury*

9   *to Plaintiffs (Plaintiffs' Facts, Nos. 100-*<u>*105*</u> *and evidence cited therein.*]

10

11   　　　　　20.　　An accounting of profits is to "constitute compensation not a

12   penalty," and is not available as a matter of right, but is subject to principles of

13   equity.  15 U.S.C. 1117; <u>Maier Brewing Co. v. Fleischman Distilling</u>, 390 F.2d 117,

14   120 (9th Cir. 1968).   Courts evaluating whether an accounting of profits is

15   appropriate have taken into consideration the intent of the alleged wrongdoer,

16   requiring willful and deliberate wrongdoing.  <u>Maier Brewing Co.</u>, 390 F.2d at 124;

17   <u>Alpo Petfoods, Inc. v. Ralston Purina Co.</u>, 913 F.2d 958, 961 (D.C. Cir. 1990);

18   <u>Bandag, Inc. v. Al Bolser's Tire Stores, Inc.</u>, 750 F.2d 903, 919 (Fed. Cir. 1984).

19   Plaintiffs are not entitled to an accounting of Defendants' profits because they have

20   offered no evidence demonstrating that Defendants' intended to mislead consumers

21   and Defendants' conduct suggests otherwise. [*Facts* <u>*have been*</u> *presented to*

22   *illustrate that this is an exceptional case (Plaintiffs' Findings, Nos. 78-94, and*

23   *evidence cited therein regarding deception and* <u>*intent*</u>*). Also, profits may be*

24   *awarded to* <u>*deter conduct*</u> *and take all financial incentive out of the unfair*

25   *competition (*<u>*Maier Brewing Co.*</u>*, 390 F.2d at 123).*]

26

27   　　　　　21.　　An award of attorneys fees is available only in "exceptional"

28   circumstances.  15 USC 1117(a).  "While the term 'exceptional' is not defined in the

55

1   statute, generally a trademark case is exceptional for purposes of an award of

2   attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."

3   Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1409 (9th Cir. 1993).

4   Plaintiffs have produced no evidence demonstrating any intent to deceive and the

5   facts are to the contrary – Online Guru has placed numerous disclaimers on

6   DMV.ORG and voluntarily added further disclaimers reinforcing the nature of the

7   website since inception of this suit.  Accordingly, Plaintiffs are not entitled to their

8   attorneys fees.  [*Defendants are incorrect in their assessment that facts have not*

9   *been presented to illustrate that this is an exceptional case (Plaintiffs' Findings,*

10  *Nos. 78-94, and evidence cited therein regarding deception and intent).  Moreover,*

11  *under California law (as opposed to the Lanham Act), there is no requirement of*

12  *exceptionality for attorneys' fees (Plaintiffs' Conclusions, No. 44, setting forth*

13  *standard under CCP 1021.5.*]

15  Respectfully submitted,

17  Dated:  November __, 2007

18                             SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

20              By  _____

21                             BRIAN M. DAUCHER

22                             Attorneys for Defendants