BRIAN M. DAUCHER, Cal. Bar No. 174212
ROBERT S. BEALL, Cal. Bar No. 132016
JOSEPH H. TADROS, Cal. Bar No. 239379
ASHLEY E. MERLO, Cal. Bar No. 247997
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1925
Telephone: (714) 513-5100
Facsimile: (714) 513-5130
bdaucher@sheppardmullin.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAFFICSCHOOL.COM, INC., a California corporation; DRIVERS ED DIRECT, LLC., a California limited liability company,<br><br>    Plaintiffs,<br><br>v.<br><br>EDRIVER, INC., ONLINE GURU, INC., FIND MY SPECIALIST, INC., and SERIOUSNET, INC., California corporations; RAVI K. LAHOTI, an individual; RAJ LAHOTI, an individual, and DOES 1 through 10.<br><br>    Defendants. | Case No. CV067561 PA (CWx)<br>*The Hon. Percy Anderson*<br><br>**DECLARATION OF BRUCE TOGNAZZINI**<br><br>[*Defendants' Objection To Proposed Judgment And Permanent Injunction and Proposed Revised Judgment lodged concurrently herewith*]<br><br>Complaint Filed: November 28, 2006<br>Trial Commenced: November 6, 2007 |

# DECLARATION OF BRUCE TOGNAZZINI

I, Bruce Tognazzini, hereby declare the following:

## BACKGROUND AND EXPERIENCE

1. For more than 30 years, I have specialized in the field of human-computer interaction, of which website usability is a subspecialty.

2. I am a Principal with the Nielsen Norman Group (www.nngroup.com), which is one of the foremost website usability firms in the world. Previously, I was Chief Designer at WebMD; Distinguished Engineer for Strategic Technology at Sun Microsystems; and founder and manager of Apple Computer's Human Interface Group. I worked at Apple for 14 years, hired by Steve Jobs in 1978 as employee #66. I have published two books, *Tog on Interface* and *Tog on Software Design*, both from Addison Wesley, and currently maintain a resources and advice website for web designers called *AskTog.com*. I have also co-authored and been a contributing author of numerous other books and authored dozens of papers and articles on computer design.

3. I served earlier this year as an expert witness in the patent infringement case of *Alcatel-Lucent v. Microsoft*, in the Southern District of California (Huff, Marilyn L.). I was certified as an expert and testified that Lucent's patent on form entry tools—including pop-up menus and pop-up calendars—was valid and had been infringed by Microsoft. The jury returned a verdict in favor of Lucent, and awarded $357.7 million in damages on that patent. I understand that this award is the fifth highest patent infringement award in U.S. history.

4. I also served as expert witness on human-computer interaction in CAD/CAM applications in *Ashlar Inc. v. SDRC* (N.D. Tex. 2002). In addition, I

1 | prepared an expert declaration in an action involving copyright infringement against
2 | Kazaa.com in January, 2006 (Australian Record Industry Association (ARIA) v.
3 | Sharman, et. al., Fed. Ct. of Australia), in which I opined as to whether internet
4 | users encountering a Kazaa web page informing Australian users that they were not
5 | permitted to use the site would indeed "get the message" and understand they were
6 | forbidden to use the website. Based on my evaluation, Kazaa was found by the
7 | court to have posted a clear message and, thus, not to be in violation of a prior court
8 | injunction. Earlier this year, I also submitted a declaration in Gutride Safier, LLP vs.
9 | Ticketmaster, *et. al.*, in a case involving Ticketmaster and Entertainment misleading
10 | website visitors into signing up for a program with repeating credit card charges that
11 | many "enrollees" didn't even know existed, let alone that they had been signed up
12 | for it.

14 | 5. I have consulted for dozens of large companies about website usability
15 | and interaction design. I have provided these companies advice about the effect of
16 | their interface designs on human perception, comprehension, and memory. These
17 | companies include Adobe, Ameritrade, Apple Computer, General Electric, Hewlett
18 | Packard, Kaiser Permanente, Kodak, Lotus, Symantec, and Xerox.

20 | 6. I am the author of 56 issued patents in the area of human-machine
21 | interaction, including eye-tracking and flat panel information displays.

23 | **MATERIALS REVIEWED**
24 | 7. I have reviewed the DMV.ORG website, Findings, and proposed
25 | Injunction, including the splash page.

## DEFINITIONS

8. **"Landing Page":** The first page a given user encounters upon entering a website. It could be an initial splash page, an acknowledgement splash page, a home page, or any other page on the website. The term is used in the art because that page's importance: Whatever page it may be, the user will judge the entire website by its contents. If the page is not responsive to their needs, users will usually click the Back button and select an alternate site.

9. **"Initial Splash Page":** An initial splash page, or "splash screen," precedes the domain-name page. In the case in point, an initial splash page would be invoked by linking to WWW.DMV.ORG. It, in turn, would lead to the current home page, which would actually then be a sub-page on the site.

10. **"Acknowledgement Splash Page":** An acknowledgement splash screen differs from an initial splash screen in a key way: It is presented to the user regardless of the user's entry point. Any harm or good that flows from such a page is thus visited upon all users.

## HARM OF SPLASH

11. **Initial Splash Pages:** Websites with initial splash pages typically lose 25% of their visitors at the splash page. They also frustrate those users who do eventually penetrate into the site. Those that continue to survive this high loss do so because most people do not actually enter a site via the home page. Landing on any sub-page on the site circumvents such initial splash pages.

12. **Acknowledgement Splash Pages:** A site like DMV.ORG can not only expect to lose a minimum of 25% of its users arriving at the home page, it can

-3-

expect to lose a minimum of 25% of its users arriving at every single page on the entire site since the acknowledgement splash page would be invoked for all visitors.

**Guilt by association**

13. Acknowledgement splash screens are almost exclusively the province of websites devoted to vices: pornography, alcohol, and gambling. Such sites survive what should be a high loss because of the paradoxical nature of their offerings: The more forbidden it is, the more enticing it becomes. For example, the pornographic film industry responded to the Motion Picture Association of America (MPAA) rating of X, by voluntarily trumpeting their movies as not just X, but Triple-X, website pornographers happily provide acknowledgement splash screens with the most dire of warnings. Other vices, such as drinking and gambling, also have an aura of the forbidden about them, if somewhat attenuated.

14. Requiring DMV.ORG to use a similar device will tend to paint DMV.ORG with the stained brush reserved for vice, driving away a far higher percentage of users than the 25% that might otherwise be expected.

## IMPACT OF SPLASH UPON CONSUMERS
**Visitors will be lost and page-counts will be reduced**

15. In 1993, many websites featured a splash page. This grew directly from the web's initial metaphor, literally, a "home." The splash page was the foyer to the home, inviting visitors in.

16. Splash pages initially were thought of as not only benign, but beneficial. As it turned out, nothing could have been further from the truth. By 1994, a scant year later, studies of website logs found splash screens were driving

off 25% of visitors.[1] Researchers further found that people would view a fixed number of pages on a site regardless of whether a splash page was present or not. That meant that visitors that would have viewed, for example, three active pages on a site would only view the splash page plus two active pages, directly reducing site revenues by one-third, and so forth. Visitors who would only have visited one page, the home page, took one look at the splash page and left, accounting for the direct 25% loss repeatedly reported.

17. With the publication of this research in 1994, people immediately looked at their own log files and reacted in horror: Splash pages disappeared almost overnight. They remain almost exclusively on sites designed by people with no HCI knowledge (typically, graphic designers who want to play with animation) and pornographic websites.

**Landing page will cease to be an attractant**

18. The current landing pages on the DMV.ORG site typically feature between 140 and 245 links leading further into the site or one of its sponsors/affiliates. The only path leading away from the site is the Back button. This is the way websites are typically structured.

19. The proposed replacement landing page, the acknowledgement page, features one link in to the site, the Continue button. This changes the ratio of 140+ ways in and one way out (the Back button) to an even split. The question in the

---

[1] I replicated the original research at Healtheon, now WebMD, in 1998 when Marketing insisted on adding a splash screen to our design. We lost approximately 26% of users when the splash screen went into effect. This research was, of course, not published—we eliminated the splash screen instead, and I no longer have a citation for the original research.

user's mind becomes, "do I want to go forward or not," rather than, "which one of these many options will lead me to my goal.

## IMPACT OF STATE-REDIRECT LINKS UPON CONSUMERS

### The proposed state-redirect links would slow people down

20. Web users encounter unwanted pages all the time. They soon develop the habit of clicking the Back button and selecting alternative search results provided by their search engine. Adding a drop-down with links directly to states will significantly slow down this ingrained strategy.

## THREE CLICKS BECOME MANY; NO DELAY BECOMES MUCH

21. The one and only time I used DMV.ORG as a consumer was two weeks ago, purely coincidentally, having never heard of the site or this lawsuit at the time. My stepson was buying a car from my stepdaughter and needed to know what the rules were vis-a-vis use tax, etc. Google led me to dmv.org where I took immediate note of the current notifications that the site is for profit. (I found the number of notices peculiar, but nonetheless bent rapidly to my task.) Exactly two clicks led me to the relevant document, which I then downloaded with a third click.

22. Under the proposed rules, I would have arrived at the new acknowledgement screen. Rather than peculiar, I would have found the screen alarming. I would almost certainly have turned back, requiring me to choose the next search item, the California www.dmv.ca.gov/ site, which also requires three clicks to access the same items. Total clicks from upon first entering the DMV.ORG domain: five. Total extra time: significant, not only because of the 30 to 40 seconds I would have spent trying to figure out why a non-pornography site had an acknowledgement screen, but because of the second trip to the search engine and the subsequent visit to the California www.dmv.ca.gov/ site.

23.     The California www.dmv.ca.gov/ site is not as well designed for transactions as is dmv.org. My time to find the same document, although requiring the same number of clicks, was higher when I tried it during the course of composing this declaration.

24.     Had the acknowledgement screen also offered the drop-down list of states, and had I used it, I would have spent an additional 10 to 20 seconds deciding which method—drop down or Back button—I was going to use, then faced the same difficulty using the California www.dmv.ca.gov/ site once I landed there.

## **HUMAN COMPUTER-INTERACTION (HCI) CONSENSUS RE SPLASH**

25.     The HCI community is united in its condemnation of splash screens. Few elements are so universally reviled. Web articles are rife with dire warnings. The following four links are typical:

(a)     Users expect to get to the home page as quickly as possible without unnecessary obstacle. Splash screens delay the ability to see the site structure, overall design and content and to get to an initial feeling of trust."[2]

(b)     "Sink the Splash Pages….Splash pages decrease credibility, traffic, search engine rankings, and web site performance."[3]

(c)     "Splash screens must die, as they are a barrier between the user and the content of web sites."[4]

(d)     "Splash screens — just say no"[5]

---

[2] Apogee Usability at http://www.apogeehk.com/articles/death_of_flash_splash_print.html
[3] Andy King at http://www.websiteoptimization.com/speed/tweak/splash/
[4] http://www.bindu-design.co.nz/samp.html
[5] http://training.gbdirect.co.uk/courses/web/web_site_usability_by_design.html

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this declaration on June 16, 2008 in SAN FRANCISCO, CALIFORNIA

BRUCE TOGNAZZINI

-8-

W02-WEST:NA6\400898521.1

TOGNAZZINI DECLARATION