# EXHIBIT A

Exhibit A
03

1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

11   TRAFFICSCHOOL.COM, INC., a            CV 06–7561 PA (CWx)
     California Corporation; DRIVERS ED
12   DIRECT, LLC, a California limited      FINDINGS OF FACT AND
     liability company,                     CONCLUSIONS OF LAW AND ORDER
13                                          FINDING DEFENDANTS LIABLE FOR
                Plaintiffs,                 FALSE ADVERTISING
14
15        v.

16   EDRIVER, INC., ONLINE GURU, INC.,
     FIND MY SPECIALIST, INC., and
17   SERIOUSNET, INC., California
     corporations, RAVI K. LAHOTI, an
     individual; RAJ LAHOTI, an individual;
18   DOES 1 through 10,

19              Defendants.

20

21

22        A court trial was held on November 6–8, 2007.  On November 28, 2007, Plaintiffs

23   and Defendants each filed their Post-Trial Briefs, and on January 24, 2008, Plaintiffs and

24   Defendants each filed their final responses to the opposing parties' proposed Post-Trial

     Findings of Fact and Conclusions of Law.  After considering the evidence, briefs, and
25
     arguments of counsel, the Court makes the following findings of fact and conclusions of
26
     law.[1]
27

28   ────────────────────
     [1]      The Court has elected to issue its findings in narrative form.  Any finding of fact that
     also constitutes a conclusion of law is hereby adopted as a conclusion of law, and any

## I.    FACTUAL & PROCEDURAL BACKGROUND

On November 28, 2006, Plaintiffs filed initial their complaint.  The complaint was subsequently twice amended, and on July 17, 2007, Plaintiffs filed their Third Amended Complaint ("TAC") alleging (1) Unfair Competition/False Advertising under the Lanham Act, 15 U.S.C. § 1125(a), and (2) Unfair Competition under California Business and Professions Code § 17200, et seq.  Defendants filed an answer to the TAC on August 10, 2007, in which they asserted twelve affirmative defenses, including unclean hands, laches, and that Plaintiffs lack standing.

Plaintiff TrafficSchool.com, Inc. ("TSC") is a California corporation in the business of providing classroom, home study, and Internet-based traffic school courses.  It owns the TrafficSchool.com website through which it markets and sells traffic school courses to online consumers.

Plaintiff Drivers Ed Direct, L.L.C. ("Direct") is a California limited liability company that is licensed by the California Department of Motor Vehicles to provide driver's education courses to the public.  Direct owns the DriversEdDirect.com website through which it markets and sells driver's education courses to online consumers.  DriversEdDirect.com can be accessed through the TrafficSchool.com website.  Direct was formed in 2005 to manage the driver's education component of TSC's business.  Both TSC and Direct are headed by the same Chief Operating Officer, Eric Creditor, and both were co-founded with Chris Kramer.

Plaintiffs use their websites not only to market their own traffic school and driver's education courses in California, but also to market courses offered by third parties in other states.  Additionally, Plaintiffs provide driving information through their DrivingLinks.com website, which also permits users to link to the TSC and Direct websites.

Defendants Raj Lahoti and Ravi Lahoti own, in equal shares, an entity called Biz Groups Inc., which owns Defendants Online Guru, Inc. ("Online Guru"), eDriver, Inc.

---

conclusion of law that also constitutes a finding of fact is hereby adopted as a finding of fact.

1    ("eDriver"), and Find My Specialist, Inc. ("Specialist"), which are all California

2    corporations.  Defendant eDriver owns the "http://www.dmv.org" internet domain

3    ("DMV.ORG").  The DMV.ORG website was launched in 1999.  It has evolved over time,

4    and it presently contains approximately 4,000 distinct webpages with information,

5    marketing, and promotions pertaining to vehicle and driver-related needs.

6        Online Guru is responsible for managing the DMV.ORG website and its content

7    pursuant to a management agreement with eDriver.  Defendant Ravi Lahoti solely owns

8    Defendant SeriousNet, Inc. ("SeriousNet"), a California corporation that is not a part of the

9    Biz Group, Inc. organization of companies.  Defendants Specialist and SeriousNet own other

10   domain names and websites that direct consumers to DMV.ORG.

11       Defendants have referral relationships with third-party traffic school and driver's

12   education providers to market their services via the DMV.ORG website.  Defendants receive

13   referral fees when a consumer purchases a course found through the DMV.ORG website.

14   **II.   DISCUSSION**

15       **A.   Standing**

16       Defendants argue that Plaintiffs have failed to establish standing for either their

17   Lanham Act claim or their Section 17200 claim.  "Since [the elements of standing] are not

18   mere pleading requirements but rather an indispensable part of the plaintiff's case, each

19   element must be supported in the same way as any other matter on which the plaintiff bears

20   the burden of proof, i.e., with the manner and degree of evidence required at the successive

21   stages of litigation."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130,

22   2136, 119 L. Ed. 2d 351 (1996).  "[A]t the final stage, those facts [supporting standing] (if

23   controverted) must be 'supported adequately by the evidence adduced at trial.'"  Id. (quoting

24   Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31, 99 S. Ct. 1601, 1616

25   n.31, 60 L. Ed. 2d 66 (1979)).  Competent proof to support standing must be shown by a

26   preponderance of the evidence.  Perry v. Village of Arlington Heights, 186 F.3d 826, 829

27   (7th Cir. 1999) (citation omitted); Deirmenjian v. Deutsche Bank, A.G., 2006 WL 4749756,

28   at *30 (C.D. Cal. Sept. 25, 2006).

-3-

1.   <u>Standing Under the Lanham Act</u>

In order to bring a false advertising claim under the Lanham Act, a plaintiff must show "commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant." <u>Barrus v. Sylvania</u>, 55 F.3d 468, 470 (9th Cir. 1995) (citations omitted); <u>accord</u> <u>Jack Russell Terrier Network v. Am. Kennel Club, Inc.</u>, 407 F.3d 1027, 1037 (9th Cir. 2005). For a plaintiff to have standing, the parties must be competitors in the sense that they "vie for the same dollars from the same consumer group," and the alleged misrepresentation must at least theoretically effect a diversion of business from the plaintiff to the defendant. <u>Kournikova v. Gen. Media Commc'ns, Inc.</u>, 278 F. Supp. 2d 1111, 1117–18 (C.D. Cal. 2003); <u>see also</u> <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>, 173 F.3d 725, 734 (9th Cir. 1999). Under the Lanham Act, a plaintiff need not actually be injured to have standing — likelihood of injury is enough. <u>See</u> 15 U.S.C. § 1125(a)(1) (one who advertises falsely "shall be liable in a civil action by any person who believes that he or she is <u>or is likely to be</u> damaged . . . ." (emphasis added)). Therefore "if one participant in the marketplace makes false statements that could theoretically draw consumers away from similar offerings of other participants in the same marketplace, and those false statements implicate the purposes of the Lanham Act (such as protection of trademarks or prevention of unfair competition), then those other participants have standing to bring suit under the Lanham Act for unfair competition in the form of false advertising." <u>Kournikova</u>, 278 F. Supp. 2d at 1117–18.

Here, Plaintiffs produced evidence that they compete with Defendants, and that any false statements made by Defendants are likely to injure Plaintiffs. Much of Plaintiffs' revenue is derived from sales of its own online traffic school and driver's education courses in the State of California. However, outside of California, Plaintiffs advertise traffic school and driver's education courses that are provided by third parties. (Creditor Decl. ¶¶ 11–15; Trial Ex. ("TE") 365.) Plaintiffs make money on an out-of-California course provided by a third-party provider in one of two ways: (1) advertising the third-party course on their

-4-

1 websites and then receiving a referral fee from the third-party provider after the consumer

2 purchases a course from that provider, or (2) advertising and selling the course on Plaintiffs'

3 websites that is then fulfilled by a third party with whom Plaintiffs split the purchase price.

4 (Trial Tr. 163:12–164:23, Nov. 6, 2007 ("11/6 TT").)  Combing these methods, Plaintiffs'

5 total revenue from one referral partner for ticket dismissal courses in the states of Colorado,

6 Idaho, New Mexico, Nevada, and Virginia from the beginning of 2002 through June of 2007

7 totaled approximately $33,372.  (TE 62.)  From 2002 through 2004, Plaintiffs' referral

8 revenue from the same referral partner for ticket dismissal courses in Texas totaled

9 approximately $191,173.  (TE 62; TE 365.)  From 2002 through part of 2005, Plaintiffs'

10 referral revenue from the same referral partner in Florida totaled approximately $524,104.

11 (TE 62; TE 365.)

12   In 2005 for Texas, and 2006 for Florida, Plaintiffs changed their billing arrangement.

13 Rather than having third-party course providers pay Plaintiffs for referrals, Plaintiffs

14 themselves collected money from the customers, and then paid the third-party course

15 providers a portion of the collected fees.  (11/6 TT 164:8–166:5.)  Plaintiffs' revenue in

16 Texas for ticket dismissal courses from 2005 through June of 2007 totaled approximately

17 $141,852, although it is unclear if this figure includes money ultimately paid to the course

18 providers.  (TE 365.)  Plaintiffs' revenue in Florida from 2006 through June of 2007 for

19 ticket dismissal courses totaled approximately $480,488, although again, it is unclear if this

20 figure includes money ultimately paid to the course providers.  (Id.)

21   It is undisputed that Defendants make the majority of their money through receiving

22 referral fees from third-party providers, rather than from collecting money and splitting it

23 with the third-party providers, as Plaintiffs did starting in 2005.  Defendants do not consider

24 Plaintiffs' new method of money collection to be equivalent to collecting referral fees, and

25 therefore suggest that Plaintiffs do not compete with them.  The Court finds this distinction

26 unpersuasive.  Both Plaintiffs and Defendants make money by connecting consumers with

27 third-party traffic school or driver's education providers.  A consumer who purchases a

28 third-party course after visiting Defendants' website could likewise have purchased such a

-5-

1   course after visiting Plaintiffs' website.  Indeed, one consumer testified that she purchased a

2   driver's education course by clicking on an advertisement for a course recommended on

3   Defendants' website, and that had she known this course was recommended by a private

4   entity rather than her state's Department of Motor Vehicles, she "probably would have

5   looked elsewhere for the information and would have considered other online providers,

6   including [Plaintiff] Drivers Ed Direct."  (Robertson Decl. ¶¶ 5–8.)  Furthermore, Steve

7   Moretti, Senior Vice President of business development for Online Guru, admitted in the

8   company's Rule 30(b)(6) deposition that customers using Defendants' website to find a

9   traffic school provider would probably not thereafter visit Plaintiffs' website to do the same.

10   (Moretti Dep. 95:5–96:8, June 29, 2007.)   Therefore, Plaintiffs and Defendants are

11   competitors, with at least a portion of Plaintiffs' business.

12         Defendants also assert that the portion of Plaintiffs' business that competes is "de

13   minimus."  This argument is unpersuasive because a number of courts have found that a

14   plaintiff has standing even when competition centers around a small part of a plaintiff's

15   business rather than the "focal point" of its business.  See Kournikova, 278 F. Supp. 2d at

16   1117–19 (finding that Kournikova, despite primarily being in the professional sports

17   business, also sold calendars and thus competed with publisher); Summit Tech., Inc. v.

18   High-Line Med. Instruments, Co., 933 F. Supp. 918, 939 (C.D. Cal. 1996) (refusing to

19   dismiss case on standing when plaintiff primarily sold lasers but was also involved in "all

20   aspects" of laser optics business, and defendant was an ophthalmologist who performed

21   laser vision correction).

22         Finally, Defendants attack Plaintiffs' standing under the Lanham Act by arguing that

23   Plaintiffs' claim is actually one for false affiliation or false endorsement.  The cases that

24   Defendants cite are inapposite, however.  In Mylan Labs., Inc.v. Matkari, 7 F.3d 1130, 1139

25   (4th Cir. 1993), the court rejected a false advertising claim based on the plaintiff's allegation

26   that the defendants' acts of placing their generic drugs on the market falsely implied FDA

27   approval.  In reaching this conclusion, the court held that "permitting [plaintiff] to proceed

28   on the theory that the defendants violated § 43(a) merely by placing their drugs on the

-6-

1   market would, in effect, permit [plaintiff] to use the Lanham Act as a vehicle by which to

2   enforce the Food, Drug, and Cosmetic Act ('FDCA') and the regulations promulgated

3   thereunder." Id.  In Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d

4   402, 417–18 (S.D.N.Y. 2006), the plaintiff asserted a false advertising claim based on an

5   allegation that the defendant, a generic drug manufacturer, falsely implied FDA approval

6   because it used the trademark of a comparable approved drug in comparative

7   advertisements.  The court, citing Mylan, held that the plaintiff could not sustain this claim

8   because the plaintiff did not allege that the defendant made explicit misrepresentations as to

9   FDA approval.  Id.

10         Here, Plaintiffs provide evidence that (1) Defendants portray themselves as an

11   official government motor vehicles agency, and (2) Defendants then explicitly recommend

12   particular traffic schools or driver's education course providers.  The first part of Plaintiffs'

13   claim implicates no endorsement or affiliation issues.  The second part of Plaintiffs' Lanham

14   Act claim involves an explicit endorsement, but does not implicate any other law, unlike in

15   Mylan and Merck.

16         Moreover, many courts have found that false advertising claims can be based on

17   actual or implied approval by an agency or third party.  See, e.g., Cottrell, Ltd. v. Biotrol

18   Int'l, Inc., 191 F.3d 1248, 1255–56 (10th Cir. 1999) (holding that implied false or

19   misleading statements regarding EPA approval of defendant's efficacy claim are actionable);

20   Better Business Bureau v. Med. Dirs., Inc., 681 F.2d 397, 400–03 (5th Cir. 1982) (affirming

21   grant of preliminary injunction based on advertisement falsely implying BBB's endorsement

22   of weight loss center); Performance Indus., Inc. v. Koos, Inc., 18 U.S.P.Q. 2d 1767,

23   1770–71 (E.D. Pa. 1990) (granting preliminary injunction to competitor plaintiff on false

24   advertising claim because, inter alia, defendant falsely represented that its product was

25   USDA and EPA approved).  Plaintiffs have standing under the Lanham Act.

26                2.      Standing Under California Business & Professions Code § 17200

27         Although standing under the Lanham Act requires only a showing of likelihood of

28   injury, a claim for injunctive relief under California Business & Professions Code § 17200,

-7-

1   et seq. may be brought "by any person who has suffered injury in fact and has lost money or

2   property as a result of such unfair competition."[2/] Cal. Bus. & Prof. Code § 17204. "An

3   injury in fact is '[a]n actual or imminent invasion of a legally protected interest, in contrast

4   to an invasion that is conjectural or hypothetical.'" Hall v. Time Inc., 158 Cal. App. 4th

5   847, 853, 70 Cal. Rptr. 3d 466, 470 (2008) (quoting Black's Law Dict. 801 (8th ed. 2004)).

6   A plaintiff has standing under California's Unfair Competition Law "when he or she has: (1)

7   expended money due to the defendant's acts of unfair competition []; (2) lost money or

8   property []; or (3) been denied money to which he or she has a cognizable claim []." Id.

9   (internal citations omitted).  To have standing, a plaintiff must prove that the defendant's

10   actions caused the injury. Id. at 855–57, 70 Cal. Rptr. 3d at 471–73.

11       Plaintiffs provided no admissible evidence of actual injury or to lost money caused by

12   Defendants, possibly because Plaintiffs seek damages in the form of disgorgement of profits,

13   which may not require proof of actual injury. See, e.g., Burger King Co. v. Mason, 855 F.2d

14   779, 781 (11th Cir. 1988) ("[P]laintiff need not demonstrate actual damage to obtain an

15   award reflecting an infringer's profits under § 35 of the Lanham Act . . . ." (citation

16   omitted)).  Plaintiffs showed that one driver's education customer, Shannon Robertson, was

17   confused by the DMV.ORG website, and that such confusion influenced her purchasing

18   decision. (Robertson Decl. ¶¶ 4, 6.)  However, she stated that "[h]ad I known that 'dmv.org'

19   was not the Department of Motor Vehicles website at the time that I did the online search, I

20   probably would have looked elsewhere for the information and would have considered other

21   online providers, including [Plaintiff] Drivers Ed Direct." (Robertson Decl. ¶ 8 (emphasis

22   added).)  Ms. Robertson's statement that she "probably" would have looked elsewhere, and

23   would have considered other providers such as Plaintiffs, is speculative.  While it may show

24

25   —————————————————

26   [2/]    Damages such as non-restitutionary disgorgement of profits are not available under
    Section 17200. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1140, 131

27   Cal. Rptr. 2d 29, __ (2003); G & C Auto Body, Inc. v. Geico Gen. Ins. Co., 2007 WL
    4350907, at *2 (N.D. Cal. Dec. 12, 2007).  Thus, the question of standing under this claim

28   relates solely to injunctive relief.

-8-

1   a likelihood of injury under the Lanham Act, it does not show actual injury under Section

2   17200.

3        Finally, Plaintiffs provided evidence that their business has decreased over the last

4   three or four years.  Specifically, there has been a decrease in the number of traffic school

5   courses Plaintiffs sold in California, Texas, and Florida.  (TE 365, PL–1685; Creditor Decl.

6   ¶ 22.)  Plaintiffs' sales of driver's education courses in those states has also decreased.  (TE

7   365, PL–1685, PL–1686; Creditor Decl. ¶ 23.)  This decrease in business occurred despite

8   Plaintiffs maintaining or increasing their overall marketing budget, at least prior to 2007,

9   when the marketing budget decreased in order to free money for this litigation.  (TE 365,

10   PL–1683; Creditor Decl. ¶ 24.)  However, Plaintiffs did not provide evidence that this

11   decrease in business is caused by Defendants' deceptive practices, and Plaintiffs bear the

12   burden of proving causation to have standing under Section 17200.  Hall v. Time Inc., 158

13   Cal. App. 4th at 855–57, 70 Cal. Rptr. 3d at 471–73.  Defendants, on the other hand,

14   presented evidence that other changes may have resulted in the downturn in Plaintiffs'

15   business, such as Plaintiffs' decision to shift money from internet marketing to other

16   advertisement media, or increased competition in the traffic school and driver's education

17   industries.  (TE 26; TE 365, PL–1683; 11/6 TT 182:10–184:11.)

18        Plaintiffs have failed to prove by a preponderance of the evidence that they have

19   suffered an injury in fact and lost money or property as a result of Defendants' actions.

20   Accordingly, Plaintiffs lack standing to pursue their claim under California Business &

21   Professions Code Section 17200, et seq.  The Court therefore turns to Defendants' liability

22   under the Lanham Act.

23   **B.     Liability**

24        The elements of false advertising under the Lanham Act are:

25             (1) a false statement of fact by the defendant in a commercial

26             advertisement about its own or another's product; (2) the

27             statement actually deceived or has the tendency to deceive a

28             substantial segment of its audience; (3) the deception is material,

-9-

1     in that it is likely to influence the purchasing decision; (4) the

2     defendant caused its false statement to enter interstate

3     commerce; and (5) the plaintiff has been or is likely to be injured

4     as a result of the false statement, either by direct diversion of

5     sales from itself to defendant or by a lessening of the goodwill

6     associated with its products.

7 Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (citations

8 omitted). There is no dispute that, by placing their website content on the world-wide-web,

9 Defendants placed their statement in interstate commerce, and therefore the fourth element

10 is satisfied. See, e.g., Intermatic Inc. v. Toeppen, 947 F. Supp. 1227, 1239–40 (N.D. Ill.

11 1996) (finding internet communications to meet the "in commerce" requirement). The Court

12 therefore turns to the remaining elements.

13   "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show

14 that the statement was literally false, either on its face or by necessary implication, or that

15 the statement was literally true but likely to mislead or confuse consumers." Southland, 108

16 F.3d at 1139 (citation omitted). "When evaluating whether an advertising claim is literally

17 false, the claim must always be analyzed in its full context." Id. (citations omitted). There is

18 no dispute that Defendants' website as a whole is not literally false on its face. The Court

19 assumes without deciding that DMV.ORG is not literally false by implication. Instead, the

20 Court assumes that the website is literally true and moves on to the issue of whether it is

21 likely to mislead or confuse consumers.

22    1. Confusion

23     a. Anecdotal Evidence

24   There is significant anecdotal evidence that consumers are confused by DMV.ORG.

25 In order to evaluate this anecdotal evidence of confusion in context, the Court will briefly

26 review how a consumer might arrive at, and interact with, the DMV.ORG website.  About

27 70–80% of consumers arriving at the DMV.ORG site do so through search engine listings.

28 (11/7 TT 154:6-10; TE 339; Moretti Dep. 224:8–21, June 29, 2007.) A consumer who

-10-

1   performed a Google search for "dmv" on November 17, 2006 would have found as the first

2   sponsored listing a result titled "California DMV," linking to "www.ca.dmv.org," with a

3   description of "CA Dept. Motor Vehicles Guide, Guide to DMV, License, Registration."

4   (TE 322.) It is undisputed that this sponsored listing linked directly to the DMV.ORG

5   webpage dedicated to California.  Subject to the search engine's policies, Defendants control

6   the content of their sponsored listings.  (11/6 TT 54:2–55:17; Moretti Dep. 146:18–147:4.)

7   The link for the actual state agency California Department of Motor Vehicles, found at the

8   similar domain name "www.dmv.ca.gov," was the first non-sponsored ("natural") listing

9   below Defendants' sponsored listing. (TE 322.)  DMV.ORG then appeared again as the

10  second natural listing, and included the text "DMV Motor Vehicles Guide.  Nationwide

11  DMV Information.  Drivers License, Vehicle Registration, DMV Forms, Locations, Vehicle

12  History, . . . ." (Id.)

13          A consumer performing a Google search for the term "drivers ed" on November 20,

14  2006 would have found as the first sponsored listing "California DMV Drivers Ed"

15  connected with the domain name "california.dmv.org." (TE 324.)  The description for this

16  listing was: "CA recommended drivers ed Course for obtaining a Learners Permit." (Id.)  A

17  search for "CA drivers ed" on November 27, 2006 returned the same result.  (TE 327.)

18          If a consumer clicked on one of the Google links to DMV.ORG, and arrived at the

19  DMV.ORG homepage on October 30, 2006, the consumer would have found a license plate

20  logo that displayed "DMV.ORG" in the upper left corner, and in the center top portion of the

21  page, in bold lettering of larger font than that used anywhere else on the page (except for the

22  license plate logo): "No need to stand IN LINE.  Your DMV Guide is now ONLINE!" (TE

23  317.)  The webpage also contained a map of the United States, and instructed consumers to

24  "Choose Your State" by clicking on a state in the map to "select your state DMV guide."

25  (Id.)  A consumer who chose the State of California would have been directed to a webpage

26  that, in the center top portion of the page, stated in large bold lettering: "Your Online Guide

27  to the CALIFORNIA DMV." (TE 318.)  Next to this text was a depiction of the California

28  State flag.  (Id.)  The license plate logo in the upper left corner incorporated "California"

1  above "DMV.ORG." (Id.) The page provided links "about how to complete DMV-related

2  transactions," including links titled "Drivers License," "Vehicle Registration," "Driving

3  Records," "Locations & Hours," "DMV forms," "Drivers Ed," and "Traffic Schools." (Id.)

4  By clicking on the "Traffic Schools" link, the consumer was taken to a webpage that stated

5  "We recommend [one of Defendants' referral partners] I Drive Safely as your best choice

6  for California traffic school online." (TE 319.) By clicking on the "Drivers Ed" link, the

7  consumer was directed to a page entitled "Driver Education," which contained a banner for

8  one of Defendants' referral partners, TeenDriversEducation.com, followed by the text

9  "Completion of a California Drivers Ed course is required prior to obtaining your learner's

10  permit, and ultimately receiving your Driver's License. We recommend

11  TeenDriversEducation.com as your best choice for completing your California driver

12  education requirement online or with a homestudy course." (TE 320.)

13     A disclaimer appeared on each of these website pages: "Please note that DMV.ORG

14  is not owned, operated, or affiliated with any government agency." (See TE 317; 318; 319;

15  320.) However, this disclaimer was located at the very bottom of each of these webpages, in

16  small font below the copyright notice. (Id.) When the website pages were printed on

17  standard 8.5 x 11 inch paper, the disclaimer appeared on the bottom of the second or third

18  printed page, and never appeared on the first page of the print-out. (Id.) This leads the Court

19  to conclude that the disclaimer was not visible on a typical computer screen unless the

20  consumer scrolled down.

21     There is evidence that at least one actual consumer, Shannon Robertson, was

22  confused by the DMV.ORG website. Ms. Robertson testified that in July of 2006 she used

23  the Google search engine to obtain information about a learner's permit, in anticipation of

24  becoming a licensed driver in California. (Robertson Decl. ¶¶ 5.) She used "DMV" as a

25  search term and was presented with a link to DMV.ORG as one of the results. (Id.) She

26  entered the DMV.ORG website, followed the "California" link, and believed the website to

27  be that of the official California State DMV. (Id. ¶ 5.) Ms. Robertson enrolled in a course

28  from Defendants' referral partner TeenDriversEducation.com after seeing it recommended

-12-

1    on the DMV.ORG website, but she believed that the official California State DMV had

2    actually recommended the course. (Id. ¶ 6.) The fact that Ms. Robertson believed the

3    course to be recommended by her state's DMV influenced her purchasing decision. (Id.)

4    She remained under the impression that she had taken a course recommended by the official

5    California State DMV at least through May of 2007, when she took her "behind the wheel"

6    driver's training through Plaintiff Drivers Ed Direct. (Id. ¶ 7.)

7           Lisa Janine Warren was likewise confused. She testified that in July of 2007 she

8    came upon the DMV.ORG website through a search engine while doing market research for

9    her company, The Online Traffic School, Inc. (Warren Decl. ¶ 1–5.) Mrs. Warren believed

10   the DMV.ORG website to be that of an official state DMV due to its appearance and lack of

11   disclaimers. (Id. ¶ 8.) She asked her husband, who manages the day-to-day operations of

12   Mrs. Warren's company, "why there were traffic schools advertised on a DMV site as I had

13   always believed that official DMV sites will not promote private traffic school providers."

14   (Id. ¶ 9.) He informed her that DMV.ORG was actually a private website. (Id.)

15          Ms. Robertson and Mrs. Warren were not alone in being confused. Defendants have

16   received myriad emails showing that many members of the public are confused into thinking

17   that DMV.ORG is an official state DMV website. Indeed, hundreds of emails have been

18   entered into evidence. (See TE 4; 102; 116; 334; 335; 408.) A few examples:

19   (1)    On January 4, 2007, Kimberly [last name redacted] emailed: "I sent in my renewal

20          registration for my 2005 Excursion on the 18th of December. It is now the 4th of

21          January and I was wondering where my tags are. I know with the holiday mail it is

22          probably late, however I do not want to get stopped and cited because of my expired

23          tags. My address is [redacted] . . ." (TE 4, DEF–00276.)

24   (2)    On March 19, 2007, Leigh, on behalf of George, wrote: "My boyfriend George

25          [redacted] . . . got a ticket in South Carolina in 2006. . . . Mr. [redacted] driver's

26          license number is [redacted]. His date of birth is June 3, 1971. I have his social

27          security number if needed, but I don't want to put all of his personal information on

28          this e-mail if possible. . . . I was told by Central Court for Lexington County in South

-13-

1     Carolina that if we contacted the Arkansas DMV that ya'll would be able to tell us

2     what court this is in and where to pay the ticket. . . ." (TE 334, DEF–01577.)

3 (3)    On December 1, 2006, Adam [redacted] wrote: "I was pulled over the other night and

4     the cop said that according to his computer my license was expired. My ID is not

5     expired so he told me to contact you in order to rectify the situation. I would like this

6     error to be fixed in order to prevent this from happening again." (TE 334,

7     DEF–02816.)

8 (4)    On December 4, 2006, Peter [redacted] wrote: "Hi, I need to report that I had been

9     charged with a misdomeanor [sic] DUI on 11/25/06. This is my first offence [sic] for

10     this type of charge. My license number is [redacted]. Please acknowledge that you

11     have received this notification and what action I need to take to provide you with

12     additional information. Thanks for your help!" (TE 334, DEF–02973.)

13     Law enforcement personnel have been confused as well. On February 26, 2007,

14 Trooper Sean [redacted], with an email address ending in "@wsp.wa.gov" emailed

15 DMV.ORG asking: "Dear Oregon DMV, I am currently involved in a DUI case in which a

16 driver used his friends [sic] ID but I remember it having his picture. It is an Oregon ID in

17 the name of [redacted]. I would like to see if I can get a copy of the picture/ID e-mailed to

18 me for identification purposes. The DUI arrest occurred on September 16, 2006 in

19 Snohomish County, WA. . . " (TE 335, DEF–00347.)

20     Even employees of actual official state motor vehicle departments have been

21 confused. For example, on March 2, 2007, Nadine [redacted], whose email address ends

22 with "@dot.state.nc.us" wrote:

23        Good Morning. My name is Nadine [redacted] and I am

24        employed with the DMV in North Carolina and we are presently

25        revamping our Driver License Manual that we instruct from. In

26        our Appendix section we have the information from each state

27        and we will [sic] like to make sure that this information is still

28        current and also to inquire about a few other things. I would

**Exhibit A**

1           greatly appreciate this information.  1.  What is your Headquarter

2           address?  Mailing Address?  2.  Do you have a Graduated Driver

3           License Program for applicants under 18?  3.  What are your

4           Driver Education Requirements?  (i.e. 30 hrs Classroom and

5           6hrs. Over the Road? [sic] 4.  What classes of License do you

6           issue?  5.  List of Restrictions for your state.  6.  Valid telephone

7           number in which the public can access. . . .

8  (TE 102, DEF–02506.)

9      Defendants have admitted receiving emails evidencing confusion regarding

10  DMV.ORG on a <u>daily</u> basis, even after the lawsuit was filed.  (11/6 TT 88:15–90:22; 11/7

11  TT 162:6–163:8; Flack Dep. 50:12–51:23, 54:17–19, Aug. 2, 2007; Moretti Dep.

12  164:12–165:13.)  While the number of emails from confused members of the public may be

13  small in proportion to the millions of visits that DMV.ORG receives each month (Moretti

14  Decl. ¶ 4; TE 674), Defendants have no way to track how many visitors to DMV.ORG

15  believe they are dealing with an official state DMV office or website.  (Moretti Dep.

16  168:9–23; 11/7 TT 165:13–166:7.)  The Court finds that the proportion of total visitors who

17  send an email evidencing confusion is immaterial because there is no evidence that an

18  appreciable number of confused visitors bother to send an email.  Indeed, Ms. Robertson did

19  not learn of her mistake for nearly a year, until she took her "behind the wheel" driver's

20  training through Plaintiff Drivers Ed Direct, (Robertson Decl. ¶ 7) and she did not send an

21  email to Defendants.

22      Emails are not the only evidence that confusion exists.  The City of Concord,

23  California and the City of Milpitas, California both provided links on their websites to the

24  California DMV, yet the link they each provided was to DMV.ORG.  (TE 10; 129.)  A

25  private law firm mistakenly listed DMV.ORG as the state of Texas's official DMV website.

26  (TE 128.)  A number of newspapers, even as recently as late October of 2007, have made the

27  same mistake.  (TE 341, 404, 406, 407, 410, 411.)

28

   b.   Post-Lawsuit Changes to DMV.ORG

   After this lawsuit was filed, Defendants made some changes to DMV.ORG and how they marketed it. For example, the sponsored link that appeared when a search was run for the term "dmv" on May 22, 2007 contained the description "California DMV Info" rather than the previous description of "California DMV." (TE 323.)  Likewise, as of January 31, 2007, the description in the sponsored link resulting from a search for "drivers ed" changed from "California DMV Drivers Ed" to "CA Drivers Ed Online" and "CA recommended drivers ed" changed to "Recommended Drivers Ed Course . . ." (TE 324.)  As of November of 2007, Defendants have attempted to include "unofficial" in their sponsored listings (11/6 TT 127:5–11).  However, various searches throughout 2007 show that "unofficial" is often not included in the sponsored listings, (TE 325–326; 328–330; 367; 372; 379–381), and Defendant Raj Lahoti admitted at trial that he was uncertain if all sponsored links had incorporated the "unofficial" reference. (11/6 TT 126:8–127:11.)  Defendants added a small disclaimer below their logo stating "Privately owned comprehensive guide to the DMV since 1999" (TE 331) and later "DMV.ORG is not associated with any government agency." (TE 332.)  Defendants also included "Unofficial Guide to the DMV" in small type below "DMV.ORG" in their license plate logo.  (TE 631.)  Defendants added a description in large font stating "The Unofficial Online Guide to the DMV" to some, but not all, webpages on DMV.ORG.  (TE 332; 11/7 TT 159:23–160:21; 172:22–174:4.)  However, as the many examples listed above that post-date the filing of this lawsuit show, and as Defendants admit, members of the public continue to be confused in spite of these changes.

   c.   Survey Evidence

   Both Plaintiffs and Defendants submitted expert surveys.  As discussed below, the Court finds that Plaintiffs' and Defendants' surveys are each significantly flawed, and weighs the results accordingly.  However, the Court does not find that the flaws warrant exclusion of either party's survey evidence under Rule 702 of the Federal Rules of Evidence, as both surveys generally appear to be "the product of reliable principles and methods." Fed. R. Evid. 702.

-16-

1     Plaintiffs commissioned a survey from Dr. Thomas Maronick to test consumer

2    confusion regarding DMV.ORG. In relevant part, Dr. Maronick used an internet-based

3    survey to test consumers' impressions of both internet search results and the DMV.ORG

4    website. Respondents were to suppose that they were searching for an online traffic school,

5    and were asked to choose from a list of search terms (including "other") that they would use

6    to find a traffic school. (TE 350.) Respondents were then shown a Google search page

7    resulting from a search for "online traffic schools," and then asked about the result for

8    DMV.ORG in isolation. (Id.) They were asked the open-ended question: "Whose website

9    do you think this link directs you to?" (Id.) Then they were asked if, based on the search

10   engine result, the website to which it linked was endorsed or affiliated with any entity. (Id.)

11   The survey showed that 57.6% of respondents thought the search result linked to a

12   Department of Motor Vehicles website, and that just over half thought the search result was

13   linked to a website endorsed by a government agency. (Id.) Of those responding that the

14   website was endorsed by a government agency, 96% thought it was endorsed by a

15   Department of Motor Vehicles after being asked an open-ended question. (Id.)

16     In a second survey, Dr. Maronick showed respondents screen-shots of the DMV.ORG

17   webpage. Respondents were asked the open-ended question: "Whose website do you think

18   this is?" (Id.) In response, 56% answered that it belonged to the DMV or Department of

19   Motor Vehicles. (Id.) Respondents were then asked if the DMV.ORG website was

20   endorsed or sponsored by any government agency, and 47% felt it was endorsed, and 43.8%

21   felt it was sponsored. (Id.) Of those respondents answering in the affirmative, 83% thought

22   the website was endorsed by the DMV or Department of Motor Vehicles, and 90% thought

23   it was sponsored by the same. (Id.)

24     Defendants submitted the rebuttal report and testimony of Dr. Itamar Simonson. Dr.

25   Simonson noted problems with Dr. Maronick's survey, including that it failed to use a

26   control, failed to instruct respondents not to guess, used improper and leading stimuli, and

27   combined questions onto the same page. (TE 142.) Furthermore, Dr. Simonson pointed out

28   that Dr. Maronick's survey did not provide the respondents with a view of the full

-17-

1   DMV.ORG webpage so that respondents could scroll down and see the disclaimer if they so

2   desired. (Id.) The Court agrees that the lack of a control, and the failure to present

3   Defendants' webpage as an actual consumer would see it, including the disclaimer, are

4   significant problems with Dr. Maronick's survey. The Court gives less weight to Dr.

5   Maronick's survey as a result.

6        Defendants also had a "rebuttal survey" conducted by Dr. Kenneth Hollander. This

7   survey, also internet-based, showed respondents pages from DMV.ORG, and also modified

8   versions of the same DMV.ORG pages, but with "CAR.ORG" in place of "DMV.ORG" in

9   order to serve as a control. (TE 172, 173.) The Court finds significant flaws with Dr.

10   Hollander's survey as well. First, Dr. Hollander's survey asked "If you have an opinion, do

11   you think that any of the entities shown on these four pages is affiliated with anyone else or

12   that none of them are affiliated with anyone else?" (TE 173.) When asked whether this

13   question was intelligible, Dr. Simonson, Defendants' other expert, testified: "Well, I'm not

14   sure. I'm trying to think about alternative ways of phrasing this. And I'm not sure that there

15   is an easy solution." (Simonson Dep. 207:7–19, Aug. 29, 2007.) Second, Dr. Hollander's

16   survey never asked respondents about the association or ownership of the DMV.ORG

17   website itself, as he himself admitted. (Hollander Dep. 111:5–113:12, Aug. 21, 2007.) The

18   question he asked, quoted above, was sufficiently broad to include responses about entities

19   advertised on the DMV.ORG website, rather than only about the owner or operator of the

20   DMV.ORG website itself. (Hollander Dep. 118:19–120:20.) Dr. Hollander testified:

21            Q: So you were testing just essentially anything on the website

22            anywhere. You weren't testing the website's ownership. You

23            were trying to test what people thought about anything they saw

24            on any DMV.ORG web page under them, correct?

25            A: Anything they saw. What I showed them is what they would

26            have seen were they online seeking information and they saw

27            those four web pages. Yes, anything that was on those pages,

28            it's fair game to ask them about.

-18-

1  (Hollander Dep. 120:12–20.)  Finally, Dr. Hollander's pool of respondents included persons

2  from California, which has a state agency using the "DMV" moniker.  (Hollander Dep.

3  143:22–144:3.)  However, it also included respondents from four other states that do not use

4  the "dmv" moniker, yet data from all respondents was combined.  (Id.)  Although the Court

5  finds that Plaintiffs' survey and Defendants' survey are both flawed, the Court finds that

6  Plaintiffs' survey is the more credible of the two.

7       The anecdotal and survey evidence sufficiently establishes that Defendants' website

8  has the tendency to deceive a substantial segment of its audience.  The Court therefore turns

9  to the remaining elements of materiality and likelihood of injury to Plaintiffs.

10        2.   Defendants' Deception is Material and is Likely to Injure Plaintiffs

11       There is ample evidence that consumers' confusion regarding the identity of

12  DMV.ORG is material in that it can affect purchasing decisions for traffic school or driver's

13  education products, and as a result, Plaintiffs are likely to be injured.  Shannon Robertson, a

14  driver's education course consumer, testified that had she known her course was

15  recommended by a private entity rather than her state's Department of Motor Vehicles, she

16  "probably would have looked elsewhere for the information and would have considered

17  other online providers, including [Plaintiff] Drivers Ed Direct."  (Robertson Decl. ¶¶ 5–8.)

18  Plaintiffs presented the expert testimony of Dr. Thomas Maronick, whose survey found that

19  67% of potential consumers consider "recommended by the DMV" to be an important factor

20  in their decision as to which traffic school to choose.  (TE 350 (Study 4); TE 389.)  Both

21  parties agree that a consumer of traffic school services desires a course that will mask points

22  on the consumer's traffic record.  In order for courts to consider traffic school courses for

23  this purpose, the courses must be approved by the state Department of Motor Vehicles.  (TE

24  316.)  The Court finds that consumers might be confused into thinking that the DMV.ORG

25  website is actually that of a state agency, and might falsely think that schools

26  "recommended" on the website are also approved by the agency for purposes of point

27  masking.  Therefore, the Court finds that Defendants' deception was material.

28

-19-

1    In an effort to counter a finding of materiality, Defendants introduced evidence that

2   the conversion rate[3/] for consumers visiting DMV.ORG was lower than Plaintiffs'

3   conversion rate, although there is competing evidence regarding how much lower. (Moretti

4   Decl. ¶ 18–27; 11/7 TT 199:24–207:25, 215:1–25: 219:8–220:23.) Defendants argue that

5   this suggests that confusion associated with DMV.ORG is not having an effect on

6   purchasing decisions because the conversion rate should be higher if consumers are deceived

7   into purchasing from Defendants' website. The Court finds this argument unpersuasive.

8   Defendants' conversion data did not analyze separately those consumers that came to the

9   DMV.ORG website after specifically searching for traffic school or driver's education

10   courses through an internet search engine. (11/8 TT 18:23–20:9.) Therefore, Defendants'

11   figures include confused visitors to DMV.ORG that might be looking for information from

12   what they think is their state Department of Motor Vehicles, rather than visitors specifically

13   seeking out traffic school or driver's education courses as they would on Plaintiffs'

14   websites. The Court finds that the confusion caused by Defendants' website, and the

15   marketing of it, can influence consumers' purchasing decisions, and is therefore material.

16   Accordingly, Defendants are liable for false advertising under the Lanham Act.

17           3.    Defendants' Deception Was Willful

18    In addition to producing evidence that Defendants are liable for false advertising

19   under the Lanham Act, Plaintiffs also produced evidence showing that Defendants'

20   deceptive actions were willful. The State of California expressed its concern regarding the

21   confusing nature of DMV.ORG. In a letter dated February 4, 2004, staff counsel Barbara

22   Zweig of the California DMV informed eDriver that the use of "dmv" in its email and

23   website address indicated an official connection with the state agency, and was illegal. (TE

24   342.) She demanded that DMV.ORG cease displaying "dmv.org" or any other mark with a

25   likelihood of confusion. (Id.) She further noted that DMV.ORG's disclaimer at the bottom

26   _____

27   [3/]    Although there are different methods for calculating the conversion rate, it is
     generally defined as the percentage of visitors to a particular webpage that take measurable
28   action, such as purchasing an advertised product.

-20-

1   of the webpage was insufficient to prevent confusion. (Id.) Ms. Zweig followed up with

2   two additional letters. (TE 344; 345.) The State of California also opposed Defendants'

3   trademark application for DMV.ORG. (TE 362.) Thus, DMV.ORG was informed of

4   concerns regarding confusion long before this lawsuit was filed.

5        Defendants admitted having longstanding awareness of public confusion about their

6   website. (11/6 TT 53:14–57:14, 88:15–90:22; 11/7 TT 162:6–163:8; Flack Dep.

7   50:12–51:23, 54:17–19; Moretti Dep. 164:12–165:13.) Defendants' Director of Customer

8   Service, Gerald Flack, responds to many of the emails that Defendants receive. He testified

9   that he voiced concern to others in the company regarding confusion about DMV.ORG.

10  (Flack Dep. 54:9–55:14.) He stated that one of his staff members suggested adding a one

11  page pop-up screen to inform emailing consumers that DMV.ORG is a private site and not

12  to send credit card numbers, social security numbers, and other sensitive information. (Id.

13  58:8–59:13.) Mr. Flack included this suggestion in a list he gave to Mr. Moretti, but this

14  idea was never implemented. (Id. 59:14–60:20.)

15       DMV.ORG is not the only misleading domain name that Defendants have registered

16  and exploited. Defendant SeriousNet, and by extension its owner Ravi Lahoti, have

17  displayed a pattern of registering misleading domain names such as "lasuperiorcourts.org,"

18  (Ravi Lahoti Dep. 48:7–49:19; 51:16–54:10), "USTREASURY.ORG" and

19  "USDEPARTMENTOFHOMELANDSECURITY.ORG," (Id. at 54:11–55:18) that redirect

20  visitors to Defendants' own websites, including DMV.ORG, and other affiliates.[4]

21       Despite being aware of consumer confusion, Defendants did nothing to rectify the

22  problem until the filing of this lawsuit. Indeed, Defendant Raj Lahoti testified that he does

23  not view the confusion as a problem. (11/7 TT 165:2–167:7.) The Court finds that

24  Defendants' deception was willful. The Court further finds that none of the steps that

25  Defendants have taken since the filing of this action alter this conclusion.

26  _____

27  [4]    Defendants object to this testimony as irrelevant and improper character evidence.
    However, this evidence shows intent to register misleading domain names, including

28  DMV.ORG, and is therefore admissible. See Fed. R. Evid. 404(b).

1        4.    All Defendants Are Liable

2        At the close of Plaintiffs' case, Defendants moved for judgment on partial findings

3 pursuant to Rule 52(c) of the Federal Rules of Civil Procedure on the grounds that Plaintiffs

4 failed to present evidence that could support liability as to any Defendant other than Online

5 Guru. The Court allowed briefing on this issue. Defendants argued that Plaintiffs

6 "improperly alleged a state law claim for civil conspiracy to violate the Lanham Act against

7 all defendants, including individual defendants," and that "[c]ivil conspiracy under

8 California law is not a separate and distinct cause of action." (Defs.' Rule 52(c) Mot. 3.)

9 Defendants' characterization of Plaintiffs' TAC is incorrect. Plaintiffs alleged conspiracy to

10 commit false advertising under the Lanham Act as part of the Lanham Act claim. (TAC ¶

11 48.) Plaintiffs also alleged conspiracy to unfairly compete as part of their claim under

12 California Business & Professions Code Section 17200, et seq. (TAC ¶ 52.)

13        Under the Lanham Act, "[a] civil conspiracy occurs when the parties have reached 'a

14 unity of purpose or a common design and understanding, or a meeting of the minds in an

15 unlawful arrangement.'" Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001,

16 1020 (9th Cir. 1985) (quoting Am. Tobacco Co. v. United States, 328 U.S. 781, 809–10, 66

17 S.Ct. 1125, 1138–39, 90 L.Ed. 1575 (1946)) (citations omitted)). "A conspiracy must be

18 looked at as a whole, and acts which are in themselves legal lose that character when they

19 become constituent elements of an unlawful scheme." Id. at 1020–21 (citation omitted).

20        However, "use of the word 'conspiracy' in civil tort law is a misnomer . . . . The use

21 of the word 'conspiracy' is merely another way of describing a concert of action and intent

22 which will extend tort liability beyond the active wrongdoer to those who merely planned,

23 assisted or encouraged his acts. Such 'conspirators,' are, in civil law, called 'joint

24 tortfeasors.'" 4 McCarthy on Trademarks and Unfair Competition § 25:23 (4th ed. 2007)

25 (citations omitted). "Since trademark infringement and unfair competition are torts, the

26 doctrine of joint tortfeasors is applicable." Id. (citations omitted). The Court construes

27 Plaintiffs' conspiracy allegations as allegations of joint tortfeasor liability.

28

-22-

1   "Joint tortfeasor liability is available only when the defendant has 'knowingly

2   participated in the creation, development and propagation of the . . . false advertising

3   campaign . . . .'" In re Century 21-RE/MAX, 882 F. Supp. 915, 925 (C.D. Cal. 1994)

4   (quoting Gillette Co. v. Wilkinson Sword, Inc., 795 F. Supp. 662, 664 (S.D.N.Y. 1992)).

5   Under the Lanham Act, "[a] corporate 'officer or director is, in general, personally liable for

6   all torts which he authorizes or directs or in which he participates, notwithstanding that he

7   acted as an agent of the corporation and not on his own behalf.'" Transgo, Inc., 768 F.2d at

8   1021 (quoting Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., 467 F. Supp.

9   841, 852 (N.D. Cal. 1979), aff'd sub nom., Murphy Tugboat Co. v. Crowley, 658 F.2d 1256

10   (9th Cir. 1981)).

11       Defendants themselves concede that Defendant Raj Lahoti is "active in the business

12   of Online Guru in managing the DMV.ORG domain name, including that he oversees search

13   engine marketing and search engine optimization for the company." (Defs.' Rule 52(c) Mot.

14   5.) Raj Lahoti, along with Ravi Lahoti, jointly own Biz Groups, Inc., which in turn owns

15   Online Guru and eDriver. (TE 333; 11/6 TT 20:2–21:5.) Raj Lahoti is CEO of Biz Groups,

16   Inc., and also of Online Guru and eDriver. (TE 333; 11/6 TT 20:2–21:5.) Ravi Lahoti is

17   Vice President of Online Guru. (TE 333.) Raj Lahoti and Ravi Lahoti jointly decided to

18   continue using the DMV.ORG domain name. (Moretti Dep. 129:1–17.) Raj Lahoti testified

19   that he does not consider consumer confusion regarding DMV.ORG to be a problem. (11/7

20   TT 165:2–166:7.)

21       Defendant SeriousNet, which is solely owned by Ravi Lahoti (11/7 TT 102:7–14;

22   Ravi Lahoti Dep. 14:4–24, Aug. 20, 2007), at various times managed in excess of 1,000

23   domain names that redirected to DMV.ORG. (Ravi Lahoti Dep. 57:6–9; TE 171.) As

24   discussed above, SeriousNet and Ravi Lahoti have displayed a pattern of registering

25   misleading domain names that redirect to Defendants' own websites or affiliates. (Ravi

26   Lahoti Dep. 48:7–49:19; 51:16–56:16.) At various times in the past, SeriousNet owned the

27   DMV.ORG domain name. (TE 161.)

28

-23-

Case 2:06-cv-07561-PA-CW   Document 223-2   Filed 09/12/08   Page 25 of 37   Page ID
#:1189
Case 2:06-cv-07561-PA-CW   Document 210   Filed 06/04/2008   Page 24 of 33

1    Defendant Specialist also owns thousands of domain names, hundreds of which

2    redirect to DMV.ORG.  (11/6 TT 21:9–10.)  Specialist owns the domain name

3    "UnitedStates.org," (11/6 TT 51:22–53:12), which advertises itself by stating "United

4    States.org guides you to the Web sites and services provided by the federal government."

5    (Id.; TE 114.)  The first link on UnitedStates.org is to DMV.ORG, with the description "A

6    comprehensive, easy-to-read guide for your Department of Motor Vehicles."  (TE 114.)

7    Defendant eDriver currently owns the DMV.ORG domain.  (11/6 TT 21:6–8.)

8    Defendant Online Guru operates the DMV.ORG domain pursuant to a management

9    agreement with eDriver.  (11/6 TT 22:16–22.)  Defendant eDriver also received a series of

10   correspondence from the California Department of Motor Vehicles complaining about the

11   misleading nature of DMV.ORG.  (TE 136; 342–45, 362.)

12   The Court finds that this evidence is sufficient to establish that all Defendants

13   "'knowingly participated in the creation, development and propagation of the . . . false

14   advertising campaign . . . .'"  In re Century 21-RE/MAX, 882 F. Supp. at 925 (quoting

15   Gillette Co., 795 F. Supp. at 664).  Therefore, the Court finds that all Defendants have

16   engaged in a "conspiracy" to falsely advertise, and are jointly and severally liable.

17   Defendants' Rule 52(c) motion is denied.  The Court now turns to Defendants' affirmative

18   defenses.

19   **C.    Affirmative Defenses:  Unclean Hands & Laches**

20   Defendants introduced evidence that Plaintiffs are guilty of unclean hands and laches.

21   A plaintiff has unclean hands, and can be barred from relief, if the plaintiff has engaged in

22   inequitable conduct that relates to the subject matter of the claims that the plaintiff brings

23   against the defendant.  Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th

24   Cir. 1987).  The equitable defense of unclean hands is applicable to actions under the

25   Lanham Act, including actions seeking injunctive relief.  U-Haul Int'l, Inc. v. Jartran, Inc.,

26   522 F. Supp. 1238, 1254 (D. Ariz. 1981), aff'd, 681 F.2d 1159 (9th Cir. 1982) (citing Ames

27   Publ'g Co. v. Walker-Davis Publ'ns, Inc., 372 F. Supp. 1, 13–15 (E.D. Pa. 1974); accord

28   Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3rd Cir. 2001) (unclean

-24-

1    hands applicable to false advertising claim).  Unclean hands has been applied to bar relief

2    specifically in false advertising cases.  See Emco, Inc. v. Obst, 2004 WL 1737355, at *4

3    (C.D. Cal. May 7, 2004) ("the Court holds that the unclean hands doctrine provides a

4    defense to false advertising claims under the Lanham Act.").  However, "courts are reluctant

5    to apply the unclean hands doctrine in all but the most egregious situations.  It will be

6    applied 'only where some unconscionable act of one coming for relief has immediate and

7    necessary relation to the equity that he seeks in respect of the matter in litigation.'" U-haul,

8    522 F. Supp. at 1255 (quoting Markel v. Scovill Mgf. Co., 471 F. Supp. 1244, 1255

9    (W.D.N.Y. 1979) (internal quotation omitted)).  Most commonly, courts have found that

10   unclean hands bars relief in Lanham Act cases when the plaintiff has engaged in precisely

11   the same type of conduct about which it complains.  See, e.g., Emco, 2004 WL 1717355, at

12   *4–5; Haagen-Dazs, Inc. v. Frusen Gladje Ltd., 493 F. Supp. 73, 76 (S.D.N.Y. 1980).

13          Here, Defendants presented evidence that Plaintiffs registered domain names that

14   include the "dmv" moniker, including "dmvlicenserenewal.com,"

15   "dmvregistrationrenewal.com," "dmvrenewals.com," "internetdmv.com," and "dmvi.com."

16   (11/6 TT 211:14–212:20; TE 690.)  Plaintiffs' witness and principal, Eric Creditor, did not

17   deny that some of these domain names might have been used to redirect internet traffic to

18   Plaintiffs' website.  (11/6 TT 211:6–19.)  Plaintiffs also registered the domain names

19   "Online-DMV.ORG," and "Internet-DMV.ORG."  (11/6 TT 212:21–214:1; TE 691.)  Mr.

20   Creditor testified that he did not think these domain names were used to redirect internet

21   traffic to Plaintiffs' website, but he could offer no other business purpose for registering

22   them.  (11/6 TT 212:21–214:1.)  Finally, Plaintiffs registered "cadmvtrafficschool.com."

23   (11/6 TT 156:19–21; TE 90.)

24          The Court finds that these domain names, like DMV.ORG, are confusing in that a

25   consumer, upon seeing the domain names, might think that they are associated with actual

26   state agencies that regulate motor vehicles.  Plaintiffs' actions in registering these domain

27   names are precisely the same sort of actions of which they accuse Defendants.  Plaintiffs'

28   registration of domain names that are confusing in precisely the same manner that

-25-

1  Defendants' domain name is confusing clearly relates to the subject matter of Plaintiffs' suit.

2  Moreover, Defendants presented evidence that Plaintiffs attempted to advertise their own

3  products on the DMV.ORG website.  In February 2006, Plaintiff Direct initiated

4  negotiations with Online Guru to advertise on the DMV.ORG website with the intent of

5  becoming long-term partners.  (11/6 TT 189:24–190:15; 11/7 TT 78:14–21; 80:12–19.)  In

6  April 2006, during the time that Direct was negotiating to advertise on DMV.ORG,

7  Plaintiff's principal Chris Kramer sent an internal email suggesting that Plaintiffs should

8  "spend our efforts notifying the various DMV's that DMV.org is leveraging a state agency's

9  name for profit and causing consumer confusion."  (TE 43; 11/7 TT 81:23–82:14.)  Despite

10  being aware of at least the possibility of consumer confusion with DMV.ORG, Direct still

11  entered into a written agreement with Online Guru in June 2006, and Direct's

12  advertisements were test marketed on DMV.ORG in July 2006.  (11/6 TT 190:9–191:17,

13  198:15–199:13; TE 37.)  Thus, it appears that for at least a short time, Plaintiffs were

14  complicit in Defendants' deceptive advertising.  The Court finds that Plaintiffs have unclean

15  hands.  Because the Court finds that Plaintiffs are guilty of unclean hands, the Court does

16  not reach the issue of laches.  The Court will next consider how its finding of unclean hands

17  impacts Plaintiffs' remedies.

18  **D.    Injunctive Relief**

19        In addition to damages, Plaintiffs seek injunctive relief.  Under the Lanham Act, a

20  district court has the "power to grant injunctions, according to the principles of equity and

21  upon such terms as the court may deem reasonable . . . to prevent the violation of subsection

22  (a), (c), or (d) of Section 1125 of this title."  15 U.S.C. § 1116(a).[5/]  "Power is thereby

23  resident in the District Court, in exercising this jurisdiction, 'to do equity and to mold each

24  decree to the necessities of the particular case.'"  F.T.C. v. H.N. Singer, 668 F.2d 1107,

25  1112 (9th Cir. 1982) (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S. Ct. 587, 592,

26  88 L. Ed. 754 (1944)).  When "the public interest is involved in a proceeding of this nature,

27

28  [5/]     If Plaintiffs had standing to bring their claim under Section 17200, et seq., injunctive relief would likewise be available.  Cal. Bus. & Prof. Code § 17203.

-26-

1  those equitable powers assume an even broader and more flexible character than when only

2  a private controversy is at stake." Id. However, "[t]he law requires that courts closely tailor

3  injunctions to the harm that they address." ALPO Petfoods, Inc. v. Ralston Purina Co., 913

4  F.2d 958, 972 (D.C. Cir. 1990) (citation omitted).

5       Plaintiffs need not prove actual injury in order to be entitled to injunctive relief under

6  the Lanham Act. Southland, 108 F.3d at 1145 (quoting Harper House, Inc. v. Thomas

7  Nelson, Inc., 889 F.2d 197, 210 (9th Cir. 1989)). "[R]elief is available under Lanham Act §

8  43(a) if it can be shown that the advertisement has misled, confused, or deceived the

9  consuming public." Id. at 1140 (citations omitted).

10       While Plaintiffs may come with unclean hands, this does not necessarily preclude

11  injunctive relief. Professor McCarthy remarked:

12          [W]here the law invoked by the plaintiff is really for the

13          protection of the public, unclean hands is not a defense. That is,

14          if the evidence shows that plaintiff is engaging in inequitable

15          practices, but defendant is also guilty of the unfair competition

16          charged, an injunction should be granted notwithstanding the

17          unclean hands maxim. It is better to remedy one wrong than to

18          leave two wrongs at large. If defendant thinks that plaintiff is

19          guilty of inequitable conduct, he should raise it in a counterclaim

20          or in a separate suit against plaintiff.

21  6 McCarthy on Trademarks & Unfair Competition § 31:53 (citations omitted). Several

22  courts have considered the public interest in holding that unclean hands does not bar

23  injunctive relief. For example, the Ninth Circuit noted:

24          Unclean hands, then, does not stand as a defense that may be

25          properly considered independent of the merits of the plaintiff's

26          claim . . . . In the interests of right and justice the court should

27          not automatically condone the defendant's infractions because

28          the plaintiff is also blameworthy, thereby leaving two wrongs

-27-

1   unremedied and increasing the injury to the public. Rather the

2   court must weigh the substance of the right asserted by plaintiff

3   against the transgression which, it is contended, serves to

4   foreclose that right. The relative extent of each party's wrong

5   upon the other and upon the public should be taken into account,

6   and an equitable balance struck.

7   Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 350 (9th Cir. 1963). See also

8   Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 129–30 (3rd

9   Cir. 2004) (finding "that the District Court's heavy reliance on the doctrine of unclean hands

10  to justify its denial of injunctive relief improperly weighted that evidence to the exclusion of

11  the merits of [the defendant's counter]claim and the public interest, and constituted an abuse

12  of discretion."); U-Haul, 522 F. Supp. at 1255 (finding that a defense of unclean hands did

13  not preclude injunctive relief because, inter alia, the public interest weighed against its

14  application); Tube Forgings of Am., Inc. v. Weldbend Corp., 788 F. Supp. 1150, 1153 (D.

15  Or. 1992) (rejecting unclean hands defense at summary judgment because of insufficient

16  evidence and because the public interest militated against it).[6]

17      Here, there is evidence in the record that consumers are being confused by

18  DMV.ORG. Some members of the public are emailing extremely sensitive information to

19  Defendants in the belief that Defendants are a state agency. For example, some members of

20  the public, including law enforcement personnel, have emailed information regarding DUI

21  arrests, tickets, registration information, and identification information.[7] (TE 335,

22  _____

23  [6]   Public interest concerns may also permit injunctive relief over a laches defense.

24  ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C., 314 F.3d 62, 68 (2d Cir. 2002) ("Even where laches and acquiescence would bar damages,

25  moreover, a court may nonetheless grant injunctive relief if it determines that the likelihood of confusion is so great that it outweighs the effect of plaintiff's delay in bringing suit.")

26  [7]   Defendants argue that laches, and by extension other equitable defenses such as

27  unclean hands, are not trumped by public interest concerns unless public safety and well

28  being are at issue. Defendants cite to a case involving a probiotic nutritional supplement, in which the court noted that the lack of the claimed benefits of the supplement did not cause

-28-

Exhibit A
31

1   DEF–00347; TE 334, DEF–000201; TE 334, DEF–00200.)  Because of the sensitive nature

2   of some of the information that Defendants receive because of their confusing website, the

3   Court finds that the public interest is implicated in this suit, and that unclean hands does not

4   bar injunctive relief.

5          Plaintiffs presented expert testimony that an appreciable percentage of consumers are

6   confused by Defendants' search engine marketing and non-sponsored natural listings,

7   including the DMV.ORG domain name.  This suggests that some consumers are already

8   confused before even viewing Defendants' website.  Therefore, the Court finds that

9   injunctive relief must be sufficient to remedy any confusion that consumers have already

10  developed before visiting the DMV.ORG website for the first time.  Furthermore, the Court

11  finds that injunctive relief must be sufficient to eliminate confusion from all members of the

12  public, not just those that might otherwise use Plaintiffs' services, in order to remedy the

13  public interest concerns associated with the transfer of sensitive information to Defendants.

14  Finally, the Court finds that injunctive relief must be sufficient to prevent confusion among

15  DMV.ORG's consumers, many of whom are likely to be teenagers looking to obtain a

16  learner's permit.  (See TE 320 (DMV.ORG website page discussing permits and specifically

17  mentioning "teens"), TE 324 (search result listing DMV.ORG and recommending a course

18  for obtaining learner's permit); Robertson Decl. ¶¶ 1, 3 (minor interested in learner's permit

19  using DMV.ORG).)

20         Accordingly, the Court will require Defendants to employ an acknowledgment page

21  communicating to all visitors to all entry pages of DMV.ORG that the website is privately

22  owned, and is not the website of any government agency.  This acknowledgment page shall

23

24  _____

25  harm to consumers beyond that they had been duped by false advertising.  See Jarrow
    Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 841 (9th Cir. 2002).  Thus, the court
26  held that "the public's interest will trump laches only when the suit concerns allegations that
    the product is harmful or otherwise a threat to public safety and well being."  Id.  Here, the
27  harm to consumers is not merely that they have been duped by false advertising, but also that
    they have been, and may continue to be, induced to send extremely sensitive information to
28  unintended recipients through insecure communication channels, such as email.

-29-

1   include an affirmative click-through that a consumer must choose in order to continue to the

2   DMV.ORG site. The acknowledgment page must also provide links to the websites of the

3   official state agencies that regulate motor vehicles. Such "intercept" devices have been

4   ordered by other courts in the context of telephone connections. See <u>Moore Bus. Forms, Inc.</u>

5   <u>v. Seidenburg</u>, 619 F. Supp. 1173, 1185 (D. La. 1985) (ordering intercept operator to be set

6   up at defendant's expense to answer defendant's telephone numbers and advise consumers

7   that if it was their intention to reach plaintiff they have reached the wrong party, and to

8   provide the correct number for plaintiff); <u>Florists' Transworld Delivery, Inc. v. Worldwide</u>

9   <u>Flower & Gift Emporium, Inc.</u>, 46 U.S.P.Q. 2d 1244, 1247 (D. Nev. 1998) (defendant

10  ordered to place an intercept on certain telephone numbers and the telephone intercept

11  operator shall ask each caller whether he or she is seeking an FTD florist or defendant and

12  direct the call accordingly). The Court will issue a permanent injunction consistent with this

13  Order.

14          **E.      Damages**

15          Instead of seeking compensatory damages, Plaintiffs seek equitable relief in the form

16  of disgorgement of Defendants' ill-gotten profits under the theory of unjust enrichment. The

17  Lanham Act provides that, when a plaintiff has established a violation of 15 U.S.C. §

18  1125(a), the "plaintiff shall be entitled, . . . subject to the principles of equity, to recover []

19  defendant's profits." 15 U.S.C. § 1117(a). The Court has discretion to exercise its equitable

20  powers to tailor the award and "may in its discretion enter judgment for such sum as the

21  court shall find to be just, according to the circumstances of the case." <u>Id.</u> However, "such

22  sum . . . shall constitute compensation and not a penalty." <u>Id.</u>

23          While injunctive relief may be necessary to vindicate the public interest, even when a

24  plaintiff's claim would otherwise be barred under the doctrines of unclean hands or laches,

25  the same is not necessarily the case for damages. As an equitable remedy, disgorgement of

26  profits is particularly susceptible to the affirmative defenses of unclean hands and laches.

27  Indeed, unclean hands and laches are two of several factors that courts consider in

28  determining whether to award disgorgement of profits. <u>George Basch Co., Inc. v. Blue</u>

-30-

1   <u>Coral, Inc.</u>, 968 F.2d 1532, 1540–41 (2d Cir. 1992) (courts consider "such familiar concerns

2   as: (1) the degree of certainty that the defendant benefitted from the unlawful conduct; (2)

3   availability and adequacy of other remedies; (3) the role of a particular defendant in

4   effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands.")

5   (citing <u>Restatement (Third) of Unfair Competition</u> § 37 (1995)); <u>accord</u> <u>Oyster Software,</u>

6   <u>Inc. v. Forms Processing, Inc.</u>, 2001 WL 1736382, at *7 (N.D. Cal. Dec. 6, 2001).

7        Here, the Court finds that disgorgement of profits is not necessary to serve the public

8   interest, as injunctive relief alone will provide the necessary protection.  Furthermore,

9   Plaintiffs provided no evidence showing a causal connection between Defendants' actions

10  and any harm Plaintiffs incurred, and no evidence quantifying the extent of any such harm.

11  Awarding Defendants' profits to Plaintiffs would constitute a penalty and "create a windfall

12  judgment at the defendant's expense." <u>George Basch</u>, 968 F.2d at 1540.  Accordingly, the

13  Court finds in its equitable discretion that Plaintiffs' unclean hands, and the lack of evidence

14  of injury caused by Defendants, bars Plaintiffs from obtaining a disgorgement of

15  Defendants' profits.[8/]

16        **F.    Attorneys' Fees**

17        Under the Lanham Act, "[t]he Court in exceptional cases may award reasonable

18  attorney fees to the prevailing party." 15 U.S.C. § 1117(a).  While Plaintiffs have obtained

19  injunctive relief, they have been awarded no damages.  Accordingly, and in light of

20  Plaintiffs' unclean hands, the Court does not find that this case is exceptional and declines to

21  award attorneys' fees for the Lanham Act claim.

22        Plaintiffs also assert that they are entitled to attorneys' fees under their California

23  Business & Professions Code Section 17200 claim.  Even if Plaintiffs had standing to assert

24  this claim, attorneys' fees are not available under Section 17200.  <u>See, e.g.</u>, <u>Cel-Tech</u>

25  <u>Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 179 (1999); <u>Shadoan v.</u>

26  <u>World Sav. & Loan Ass'n</u>, 219 Cal. App. 3d 97, 108 n.7 (1990).  Recognizing this, Plaintiffs

27  ─────────────────

28  [8/]    Disgorgement of profits is not available under Plaintiffs' state law claim for unfair competition under Section 17200.  <u>See</u> <u>supra</u>, Note 2.

-31-

1  seek attorneys' fees under the "private attorney general" doctrine codified in Section 1021.5

2  of the California Code of Civil Procedure.  Section 1021.5 provides:

> Upon motion, a court may award attorneys' fees to a successful
> party against one or more opposing parties in any action which
> has resulted in the enforcement of an important right affecting
> the public interest if:  (a) a significant benefit, whether pecuniary
> or nonpecuniary, has been conferred on the general public or a
> large class of persons, (b) the necessity and financial burden of
> private enforcement, or of enforcement by one public entity
> against another public entity, are such as to make the award
> appropriate, and (c) such fees should not in the interest of justice
> be paid out of the recovery, if any.

13  Cal. Code Civ. P. § 1021.5.  Courts have held that attorneys' fees under Section 1021.5 are

14  appropriate when the litigation "(1) served to vindicate an important public right; (2)

15  conferred a significant benefit on the general public or a large class of persons; and (3)

16  imposed a financial burden on plaintiffs which was out of proportion to their individual

17  stake in the matter." People ex rel. Brown v. Tehama County Bd. of Sup'rs, 149 Cal. App.

18  4th 422, 448, 56 Cal. Rptr. 3d 558, 578 (2007) (citing California Licensed Foresters Ass'n v.

19  State Bd. of Forestry, 30 Cal. App. 4th 562, 569 (1994) (quoting Baggett v. Gates, 32 Cal.3d

20  128, 142 (1982)).  A California court noted with regard to the third factor that "[s]ection

21  1021.5 is intended as a 'bounty' for pursuing public interest litigation, not a reward for

22  litigants motivated by their own interest who coincidentally serve the public." California

23  Licensed Foresters Ass'n, 30 Cal. App. 4th at 570 (citations omitted).

24      Here, Plaintiffs compete with Defendants, and therefore have a large stake in this

25  litigation.  Moreover, Plaintiffs stand to indirectly gain from a judgment entered against

26  Defendants because fewer consumers might be directed to traffic schools and driver's

27  education courses advertised on DMV.ORG, and more of those consumers might use

28  Plaintiffs' own traffic school and driver's education courses instead.  There is evidence that

-32-

1   Plaintiffs were motivated by a desire to shut down a competitor.  Mr. Kramer stated in an

2   email that "[t]his guy [Raj Lahoti] is a scam artist. . . . I'd rather take the time to send letters

3   to the legal departments of all the state's DMVs informing them that he is illegally

4   representing a state agency and causing confusion... (sic) Sort of a 'if you can't join 'um,

5   shut 'um down' approach."  (TE 45; 11/7 TT 81:19–82:14.)  The Court finds that Plaintiffs

6   were motivated to file this suit by their own interest, and that the financial burden of

7   bringing this suit was not disproportionate to their interest in the matter.  Accordingly, and

8   considering that Plaintiffs came with unclean hands, the Court finds that Plaintiffs are not

9   entitled to attorneys' fees under Section 1021.5 of the California Code of Civil Procedure.

10                                            **Conclusion**

11        For the foregoing reasons, the Court finds Defendants jointly and severally liable for

12   false advertising under the Lanham Act and the Court will issue a permanent injunction.

13   Plaintiffs are found to have had of unclean hands and failed to present evidence of injury

14   caused by Defendants.  Accordingly, the Court awards no monetary damages.  The Court

15   further declines to award attorneys' fees.

16        Attached to this Order is a proposed permanent injunction.  The parties shall have ten

17   days from the date of entry of this Order to file any objections to the form of the Court's

18   proposed permanent injunction.

19        IT IS SO ORDERED.

20   DATED:  June 4, 2008

                                                              Percy Anderson
21                                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

# EXHIBIT B

1

2

3

4

5                                                                **JS-6**

6

7

8                        UNITED STATES DISTRICT COURT

9                        CENTRAL DISTRICT OF CALIFORNIA

10

11   TRAFFICSCHOOL.COM, INC., a            CV 06–7561 PA (CWx)
     California Corporation; DRIVERS ED
12   DIRECT, LLC, a California limited      JUDGMENT AND PERMANENT
     liability company,                     INJUNCTION
13
                    Plaintiffs,
14
           v.
15
     EDRIVER, INC., ONLINE GURU, INC.,
16   FIND MY SPECIALIST, INC., and
     SERIOUSNET, INC., California
17   corporations, RAVI K. LAHOTI, an
     individual; RAJ LAHOTI, an individual;
18   DOES 1 through 10,
19                  Defendants.
20   _____

21

22   The Court, pursuant to its Findings of Fact and Conclusions of Law and Order

23   Finding Defendants Liable for False Advertising, and after having considered the parties'

24   submissions, hereby ORDERS, ADJUDICATES AND DECREES that final judgment,

25   including a permanent injunction, shall be and hereby is entered in the above entitled matter

26   as follows:

27         1.      The Defendants eDriver, Inc., Online Guru, Inc., Find My Specialist, Inc.,

28   Seriousnet, Inc., Ravi K. Lahoti, and Raj Lahoti, (collectively "Defendants"), their owners,

1    officers, directors, assignees, transferees, employees, agents and representatives, and all

2    other persons, firms or entities acting in concert or participating with them, who receive

3    notice of the injunction, are enjoined as follows:

4               (a)     Defendants shall employ an acknowledgment splash page, or "splash

5    screen," that every visitor to any entry webpage on the DMV.ORG domain shall see prior to

6    viewing any webpage content;

7               (b)     Visitors to any webpage on the DMV.ORG domain need only view the

8    acknowledgment splash page once, and need not be presented with the acknowledgment

9    splash page again when navigating to different webpages within the DMV.ORG domain;

10             (c)     The acknowledgment splash page shall state: "YOU ARE ABOUT TO

11    ENTER A **PRIVATELY OWNED** WEBSITE THAT IS **NOT** OWNED OR OPERATED

12    BY ANY STATE GOVERNMENT AGENCY.  TO CONTINUE, CLICK 'CONTINUE'

13    BELOW."  Below this disclaimer shall be a "click-through" button that the visitor must

14    affirmatively click to continue to the webpage on the DMV.ORG domain;

15             (d)     The statement in paragraph (c) shall appear in all capital letters;

16             (e)     Nothing other than the content in paragraph (c) and the DMV.ORG

17    logo shall be visible to the visitor when viewing the acknowledgment splash page;

18             (f)     The statement in paragraph (c) shall appear in fourteen (14) point font,

19    and shall be in larger font size than that used in the DMV.ORG logo and the 'continue'

20    button.

21        2.     Plaintiffs shall recover their costs of suit.

22        IT IS SO ORDERED, ADJUDICATED AND DECREED.

23

24

25    DATED: August 26, 2008             _____

26                                     Percy Anderson
                                 UNITED STATES DISTRICT JUDGE

27

28