1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE PERCY ANDERSON, JUDGE PRESIDING

4    TRAFFICSCHOOL.COM, INC., et al.,   )
                                        )
5                                       )
                                        )
6                        Plaintiffs,    )
                                        )
7                                       )
                                        )
8         Vs.                           )   No. CV 06-7561 PA
                                        )
9                                       )
                                        )
10   EDRIVER, INC., et al.,             )
                                        )
11                                      )
                                        )
12                       Defendants.    )
                                        )
13   _____   )

14

15

16         REPORTER'S DAILY TRANSCRIPT OF TRIAL PROCEEDINGS

17                     LOS ANGELES, CALIFORNIA

18                    TUESDAY, NOVEMBER 6, 2007

19

20

21               LEANDRA AMBER, CSR 12070, RPR
              OFFICIAL U.S. DISTRICT COURT REPORTER
22               312 NORTH SPRING STREET, # 442
                 LOS ANGELES, CALIFORNIA 90012
23                      (213) 613-0179

24

25

1              **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFFS,**
     **TRAFFICSCHOOL.COM, INC., et**        LEWIS BRISBOIS BISGAARD &
4    **al.:**                               SMITH LLP
                                            BY:  DANIEL C. DE CARLO, ESQ.
5                                                DAVID MAKOUS, ESQ.
                                                 MINA I. HAMILTON, ESQ.
6                                           221 NORTH FIGUEROA STREET
                                            SUITE 1200
7                                           LOS ANGELES, CALIFORNIA 90012
                                            (213) 680-5066
8                                           decarlo@lbbslaw.com

9

10

11   **IN BEHALF OF THE DEFENDANT,**        SHEPPARD MULLIN RICHTER &
     **EDRIVER, INC., et al.:**             HAMPTON LLP
12                                          BY:  BRIAN DAUCHER, ESQ.
                                                 ASHLEY E. MERLO, ESQ.
13                                               JOSEPH H. TADROS, ESQ.
                                            650 TOWN CENTER DRIVE
14                                          FOURTH FLOOR
                                            COSTA MESA, CALIFORNIA
15                                          92626-1993
                                            (714) 513-5100
16                                          bdaucher@sheppardmullin.com

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    <u>PLAINTIFFS WITNESS</u>

4                              DIRECT        CROSS

5    RAJ KUMAR LAHOTI
     BY MR. DE CARLO          19, 116
6    BY MR. DAUCHER                          95

7    ERIC JASON CREDITOR
     BY MR. MAKOUS            131
8    BY MR. DAUCHER                          148

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 6, 2007; 9:02 A.M.

-o0o-

THE CLERK:  Calling Civil Case CV 06-7561, trafficschool.com, Incorporated, et al., versus edriver, Incorporated, et al.

Counsel, please state your appearances for the record.

MR. MAKOUS:  David Makous, Daniel De Carlo, and Mina Hamilton for the plaintiffs.

MR. DAUCHER:  Brian Daucher, Ashley Merlo, and Joseph Tadros for the defendants, your Honor.

THE COURT:  Good morning.

All right.  Does either side wish to be heard on their motions in limine?

MR. MAKOUS:  Yes, your Honor.  Plaintiffs would like to be heard briefly.

THE COURT:  All right.

MR. MAKOUS:  Good morning, your Honor.

We think it useful to comment at the beginning of this trial on the two surveys.  And just to refresh the Court on this --

THE COURT:  I don't need to be refreshed.  I have read the motions.

MR. MAKOUS:  Okay.  I would like to address, then,

1    the motion to exclude Mr. Hollander and its relevance to

2    Dr. Simonson first.

3           As a fundamental position here, the defendants

4    asked for additional time, having not conducted and filed and

5    served a survey which was on the principal issues in this

6    case -- that is, the deceptive nature of the search engines

7    and the Web pages -- they essentially characterize a survey

8    which has nothing to do with what Mr. Maronick did as a

9    rebuttal survey when, in fact, it was a survey that might

10   have been presented initially.

11          Mr. Hollander is critiquing Dr. Maronick, as is

12   Mr. Simon -- Dr. Simonson.  In the interest of fairness, and

13   we believe the rules contemplate this, we are entitled to one

14   expert to do so, not two, and that the rebuttal survey be

15   excluded so as not, in fact, a rebuttal survey at all.

16          THE COURT:  If their testimony is cumulative, you

17   can object.

18          MR. MAKOUS:  Okay.

19          THE COURT:  And I'm not going to allow cumulative

20   testimony.

21          MR. MAKOUS:  So in essence, your Honor, your

22   position is that they can pick their expert?

23          THE COURT:  My position is if their testimony is

24   cumulative, then I'll exclude it.  I'm not going to entertain

25   testimony that's merely repetitive.  So two experts aren't

1    going to testify about the same -- are going to say the same

2    thing twice.

3            MR. MAKOUS:  Thank you for your clarification.

4    That disposes with that as far as I'm concerned, your Honor.

5            As far as the -- our motion to exclude

6    Mr. Hollander, it's fundamentally based upon this.  He did

7    not test any issue pertinent to this litigation.  What

8    Mr. Hollander attempted to do is ask an incomprehensible

9    question with inappropriate stimuli and seek out some wide

10   range of mental associations in the minds of the consuming

11   public, which is not pertinent to the 43A case we have before

12   us.

13           The question he asked we believe is not

14   understandable, and we believe that it is irrelevant.

15   Several reasons why:  He didn't test the same universe that

16   Dr. Maronick did.  He combined universes from multiple states

17   where there is no DMV and failed to allocate any data, and

18   changes in data accordingly.  He used multiple stimuli that

19   are -- were not tested by our expert and also not what would

20   be seen by the survey respondents.

21           That is to say that a survey respondent would see

22   a page, have it presented, and then make a decision to go

23   somewhere else.  He aggregated all of those.

24           In several states he -- none of the respondents

25   would have seen the fourth stimuli.

1          So in conclusion, none of the information sought by

2     Mr. Hollander is relevant to this litigation.

3          Let me briefly put up the question that

4     Mr. Hollander posed to the respondents.

5          THE COURT:  Did you put that question in your

6     brief?

7          MR. MAKOUS:  Yes, your Honor.

8          THE COURT:  I -- I've read your briefs.  I've seen

9     it.

10          MR. MAKOUS:  Okay.  So would the Court permit that

11     I put it up and go over it?

12          THE COURT:  Counsel, how much longer do you need --

13          MR. MAKOUS:  Well --

14          THE COURT:  -- for your argument?

15          MR. MAKOUS:  -- my argument is essentially that,

16     your Honor, as the Court would -- we can put up a

17     demonstrative.

18          THE COURT:  How much time would you like to

19     conclude your argument?

20          MR. MAKOUS:  I have concluded my argument, your

21     Honor.  It's not reliable nor relevant nor within the scope

22     of the acceptable testimony under Daubert.

23          THE COURT:  Do you want to put this up?

24          MR. MAKOUS:  Okay.  Pardon me, your Honor.  I'm

25     just searching for that question.

1          THE COURT:  Uh-huh.

2          MR. MAKOUS:  Just give me a second.

3          Let me show the Court very briefly what

4     Mr. Hollander showed to the survey respondents.

5          This is the first screen shot that was shown to the

6     respondents.  And if you'll note there are several things

7     of -- that's different than what Mr. Maronick did.  First of

8     all, it has "The Unofficial Guide to the DMV" here, which did

9     not appear when Dr. Maronick surveyed.  It has a different

10    plate number in the upper left-hand corner, *DMV.org*.

11         It also is comprised of an entire page, which is

12    the top page essentially of the Website.

13         Dr. Maronick tested the Traffic School California

14    page.  It then is followed by a second page, which one would

15    have to click through to get to on that site, called "The

16    unofficial online guide to the California DMV."

17         This is not what someone would see visiting the

18    site, unless they were progressing through it in the order

19    identified.

20         Then there is this third page here with noticeable

21    white space below it, which has the offensive references that

22    plaintiff is essentially complaining of.  It has the "I Drive

23    Safely" traffic school partnership with the plaintiff -- the

24    defendants in the middle of the page and then a lot of white

25    space below it.

1          At the very bottom of this, if someone were to

2   scroll down, they would see this disclaimer that appears at

3   the bottom.

4          In conducting this -- finally, there is -- again,

5   if one would click through, you would go to the "I Drive

6   Safely" page, which is this page.  These are four separate

7   pages, three of which would not be presented at the same time

8   to the viewer, but in sequence, if the viewer chose to go

9   through this site in this fashion.

10         This last page, of course, is not the *DMV.org* page.

11  It's a click to the "I Drive Safely" part of *DMV.org*.

12         They also accompany this with an instruction to the

13  survey respondents to scroll down if they chose to do so.

14  That was in the survey.  No such instruction exists in the

15  real-world Website of the defendants.  There's no instruction

16  to scroll down.

17         Then Mr. Hollander asks this question, which I've

18  made my notes on.  It says right here, "Mr. Hollander's

19  question:  If you have an opinion" -- this is to the survey

20  respondents after they have looked at the four pages.

21         "If you have an opinion, do you think that any of

22  the entities shown on these four pages is affiliated with

23  anyone else or that none of them are affiliated with anyone

24  else?"

25         It seems to be incomprehensible.

1          What does a "yes" answer mean to that?  What does a

2    "no" answer mean to that?

3          There's three questions in there.  If you have an

4    opinion, it is an assumption, but it's also a question:  Do

5    you have an opinion?

6          The second part of that is "Do you think any of the

7    entities shown on this page is affiliated with anyone else or

8    that none of them are affiliated with anyone else?"  I can't

9    answer that question.

10         I asked Mr. Simonson -- Dr. Simonson at his

11   deposition, "Is that a clear question?"

12         His answer was, and it's in our brief, "I'm not

13   sure."

14         This is their expert.

15         Now, you know, taking in and taking that particular

16   question for what it's worth, what is it testing?  It's not

17   testing the Website sponsorship affiliation or ownership,

18   which is the element of this case at issue.  Does the

19   consumer believe -- in this particular paradigm, does the

20   consumer believe that they are somehow somewhere, that is,

21   either at a DMV site or a site that is authorized by the DMV,

22   in essence?

23         Dr. Maronick asked the right question, the best

24   question:  Whose Website is this?  Period.  Who makes this

25   product?  Time immemorial approved question styling.

1          Mr. Hollander asked something that no one can

2   answer.  So not only is it an unreliable question; it's

3   irrelevant.  Now, let me tell you why it's irrelevant

4   further.

5          If you look at this exhibit, it has multiple

6   entities on it.  And it's -- again, I apologize.  I'm just

7   going to flash it.

8          There are four pages here.  They have all sorts of

9   information on it.  There are states all over the place.

10  There's Geico.  There's Progressive.  There's Unofficial

11  Guide.  There's *DMV.org*.  If my recollection serves me,

12  50 percent of the people that answered this question said,

13  "I don't know.  I'm not sure if any company is affiliated

14  with any or if not" -- whatever that question means.  More

15  testimony -- 50 percent is testimony that this is an

16  incomprehensible question.

17         What does "yes" mean when you answer?  What does

18  "no" mean?  It means basically anything.

19         This Court is not being asked in this case to

20  ascertain whether anybody on the top page of the *DMV.org*

21  Website, "The Unofficial Guide to the DMV," has a

22  relationship with anyone else.  It's not the issue.  The

23  public needs and its responses are unreliable, irrelevant.

24         The consequence of that, Mr. Hollander's study

25  should not be admitted into evidence.

1              Thank you, your Honor.

2              And I will respond on Dr. Maronick any criticisms

3    they have of his.

4              THE COURT:  Are you done?

5              MR. MAKOUS:  Thank you.

6              THE COURT:  Do you wish to be heard?

7              MR. DAUCHER:  Your Honor, we don't need to be heard

8    on our motion to exclude Maronick.  I believe that's

9    adequately addressed in our papers.  And I also frankly

10   believe we've adequately addressed the issues he's raised

11   today because those are exactly the arguments they presented

12   in their motions in limine.

13             One point I would make, though, with respect to the

14   question that he asserts that Maronick asked as being a

15   proper question.  The questions that Dr. Maronick asked are

16   exactly the type of leading questions that you would not

17   allow one of us to ask a witness in the courtroom.  And the

18   question that Dr. -- that Hollander asked is the type of

19   nonleading question that opens the door to further

20   investigation.  That's the fundamental dispute between those

21   two surveys.

22             You've got Hollander, who is seeking to measure

23   commercial impression, not trying to establish a commercial

24   impression by jamming a question down the throat; and you've

25   got Maronick, who is demanding a commercial impression.

1          And those are -- that ships in the night.  We did

2     a rebuttal survey to show how different the results are when

3     you use a nonleading question as opposed to a leading

4     question.  So I think it's been -- it's fully briefed in

5     terms of the legal arguments that have been presented, the

6     propriety of those surveys, and with that I would submit.

7          THE COURT:  You have two experts that are going to

8     testify or criticize their survey -- their expert's survey?

9          MR. DAUCHER:  Hollander only created a rebuttal

10    survey.  Simonson critiques the technique of Maronick.  So

11    they are different.  They are not cumulative.  In fact, we

12    have done it by declaration already, your Honor.

13         THE COURT:  Oh.

14         MR. DAUCHER:  There wasn't even an objection

15    asserted on cumulative grounds to those declarations.  So I'm

16    not sure it's really at issue anymore.  But they are

17    different topics.  Simonson comes in and points out what

18    Maronick did wrong.  Hollander comes in and shows the Court

19    what the results look like if you correct for some of those

20    errors that we attribute to Maronick's survey.

21         So they are different in that way.

22         THE COURT:  All right.  Anything else?

23         MR. DAUCHER:  Nothing further, your Honor.

24         THE COURT:  Okay.  All right.  The plaintiffs'

25    motion to preclude the testimony of the defendants' expert --

1   well, many of the criticisms that counsel points out really

2   go to the weight that the Court should afford the experts'

3   testimony.

4         And so counsel will have an ample opportunity to

5   cross-examine the defendants' experts.  So I'm going to deny

6   the motion in limine.

7         And the defendants' motion in limine to preclude

8   the plaintiffs' expert is also denied for similar reasons.

9         All right.  Are you ready to begin?

10         MR. MAKOUS:  Yes, your Honor.

11         MR. DE CARLO:  Yes, your Honor.  With one

12   exception, and we need to let our technical people, if the

13   Court permits, to set up the system so that we have access to

14   any exhibits.

15         THE COURT:  The exhibits are on the computer?

16         MR. DE CARLO:  They are, your Honor.

17         THE COURT:  Okay.  Are you going to -- are you

18   going to give an opening statement?

19         MR. DE CARLO:  No, your Honor.

20         THE COURT:  Okay.  Do you wish to give an opening

21   statement?

22         MR. DAUCHER:  We would also waive opening

23   statement.

24         THE COURT:  All right.  And who is your first

25   witness?

1          MR. DE CARLO:  We're going to start with Mr. Raj

2    Lahoti, your Honor.

3          THE COURT:  Okay.  And the computer -- your

4    exhibits are on the computer?

5          MR. DE CARLO:  Your Honor, we have -- for purposes

6    of the examination they're on the computer, and we'll be

7    asking Mr. Bruyere to call them up.  And we also have

8    binders, which our staff people left our office before we did

9    and they're not here with the hard-copy binders, which were

10   for the Court and the witness.

11         And if we could take -- at some appropriate time if

12   we could take a short break to call and find out where they

13   are.

14         THE COURT:  Well, let me see if I have this right.

15         So you have duplicates of the exhibits on the

16   computer --

17         MR. DE CARLO:  Yes, your Honor.

18         THE COURT:   -- correct?

19         Okay.  So when you display them, that's going to be

20   the same as the hard copy; correct?

21         MR. DE CARLO:  It is, your Honor.  The only value

22   to having the hard copy is that some documents are multipage

23   and so we may ask the witness to look through a multipage

24   document to familiarize themselves with it.  If we -- if --

25   it's more difficult to do that electronically because we

1    would have to go page by page by page because only one page

2    can appear on the screen at a time.

3             THE COURT:  And the -- okay.  There should be a

4    plug coming out of that machine.  I think all you need to do

5    is put the -- plug the computer into that plug, and it should

6    work.

7             MR. DAUCHER:  Your Honor, may I confer with my

8    client?

9             THE COURT:  Yes.

10            MR. DE CARLO:  Your Honor, can Ms. Hamilton be

11   excused so she can make phone calls to try --

12            THE COURT:  Yes.  That's fine.

13            Okay.  Enough of this.  Sir, you don't need to get

14   in the back of the machine.  Flip on -- there should be a

15   button on the front of this -- on the front of the console

16   that says computer.  Can you turn it around?  All the way

17   around in front where the lady is.

18            Did you punch that?

19            Once you get to that set on the computer, okay.

20   Now go over to your computer -- that's a Dell?

21            THE WITNESS:  (No audible response.)

22            THE COURT:  Okay.  Do you have something on the

23   screen on the computer now?

24            THE WITNESS:  Yes, your Honor.

25            THE COURT:  Okay.  Then you're going to need to

hit -- I think you're going to need to hold down the function key.  And your F8 key, does it say "CRT" and "LCD"?

All right.  Cycle through -- there you go.

THE WITNESS:  Thank you, your Honor.

THE COURT:  Yeah.  You're welcome.  My bill will be delivered in the morning.

Now, do you need a chair?

THE WITNESS:  Yeah.  I'll just bring it back here, your Honor.

THE COURT:  Okay.  So you're going to sit on the bench?

All right.  Now, what else do we need?

MR. DE CARLO:  Well, ideally, your Honor, I would have liked the hard copies to be able to both show the witness and for my own purposes.  But if the Court would like to get started with just the electronic, I think I can get through without hard copies.  Our messengers left before we did.  I hope they didn't get in an accident or something.

THE COURT:  I'm sure they didn't.  They -- did you -- can the person who went out to make a call -- have you heard from them yet?

MR. DE CARLO:  He's not come back in the courtroom yet, your Honor.

THE COURT:  Okay.  Well, why don't we do this. We'll give you ten minutes, and maybe you'll have some

1    information as to where they are.  Maybe they'll be here by

2    then.  So we'll take a recess for ten minutes, and then I'll

3    come back out and hopefully we'll be able to get started.

4              MR. DE CARLO:  We apologize, your Honor.

5              MR. MAKOUS:  Thank you, your Honor.

6              THE COURT:  Okay.

7              THE CLERK:  All rise.  This United States Court is

8    in recess.

9              (Whereupon, from 9:34 a.m. to 9:54 a.m., a break

10             was taken.)

11             THE CLERK:  All rise.

12             Please be seated.

13             THE COURT:  All right.  Counsel, are we ready to

14   begin?

15             MR. DE CARLO:  Yes, we are, your Honor.

16             THE COURT:  All right.  Would you call your first

17   witness.

18             MR. DE CARLO:  Yes, your Honor.

19             The plaintiff would like to call Mr. Raj Lahoti to

20   the stand.

21             THE COURT:  All right.

22             THE CLERK:  Please stand next to the Court reporter

23   and raise your right hand to be sworn.

24             Do you solemnly swear that the testimony you are

25   about to give in the matter now pending before this Court

shall be the truth, the whole truth, and nothing but the

truth so help you God?

        THE WITNESS:  I do.

        THE CLERK:  Thank you.

        Please take the witness stand.

**RAJ LAHOTI,**

 called as a witness by counsel for the plaintiff(s) being

           first duly sworn, testified as follows:

        THE CLERK:  Please state your full name and spell

your last name for the record.

        THE WITNESS:  Raj Kaumar Lahoti, L-a-h-o-t-i.

        THE COURT:  All right.  Before we begin.  Are there

any other potential witnesses in the courtroom who are not

parties?

        MR. DE CARLO:  No, your Honor.

        THE COURT:  Okay.  Go ahead.

        MR. DE CARLO:  Thank you, your Honor.

**<u>DIRECT EXAMINATION</u>**

BY MR. DE CARLO:

Q.   Good morning, Mr. Lahoti.

A.   Good morning.

Q.   I have put on the screen Exhibit 333, which I believe

you recognize; is that correct?

A.   That's correct.

Q.   Okay.  And that is an organizational chart of your

1     organization; is that correct?

2     A.    That's correct.

3     Q.    Okay.  And let's start out with what your position is

4     with each one of these entities.  Well, actually, first of

5     all, let's start out with what this chart means.  BizGroups,

6     Inc., is a -- the parent company that owns all of the

7     affiliates that are -- or all of the subsidiaries that are

8     listed below it; is that correct?

9     A.    That's correct.

10     Q.    Okay.  And when we say "parent," we mean that BizGroups

11     owns all the stock of each one of those entities; is that

12     correct?

13     A.    Yes.

14     Q.    Okay.  And your role with BizGroups, Incorporated, is

15     you are the CEO?

16     A.    Yes.

17     Q.    Okay.  And are you also the CEO of Online Guru?

18     A.    Yes.  Each of the companies.

19     Q.    Okay.  On Online Gurus primary function is to do what,

20     sir?

21     A.    It is a management and marketing company.

22     Q.    And it manages and markets Website -- a Website

23     primarily, that being *DMV.org*?

24     A.    That's one of the Websites; correct.

25     Q.    There are other Websites it manages as well?

1    A.    That's correct.

2    Q.    Okay.  And BizGroups, Inc., is a corporation that is

3    owned by two persons; is that correct?  Yourself and your

4    brother, Mr. Ravi Lahoti?

5    A.    Yes, that's correct.

6    Q.    Okay.  Edriver, Incorporated, what is its primary

7    business?

8    A.    It owns the domain name *DMV.org*.

9    Q.    And Find My Specialist, Incorporated, what is its

10   primary function?

11   A.    It owns different types of domains, domains that were --

12   that we register for various purposes.

13   Q.    Is it accurate to say that Find My Specialist owns

14   thousand of domain names?

15   A.    I believe so.

16   Q.    Okay.  And is it also accurate to say that of the domain

17   names that Find My Specialist owns, there are at least

18   hundreds of domain names that are redirected to the domain

19   name *DMV.org*?

20   A.    Yes, that's correct.

21   Q.    Are there thousands?

22   A.    I don't know if there's thousands.

23   Q.    At least hundreds?

24   A.    Yes.

25   Q.    Okay.  And ecatalyst, what does that do?

A.    That owns different types of Websites.

Q.    Okay.  Are there any particular kind of Websites that it owns?

A.    It's the structure -- you know, how we're separating them is it's -- hasn't been completely defined, but I think, you know, we have a separation.  Edriver owns the *DMV.org* Website.  Find My Specialist owns more so, you know, domain names for various for kinds of uncategorized.  And ecatalyst are some Websites that we plan on building out, you know, pretty soon.  So actually sites that we're going to build on to full Websites.

Q.    Okay.  Let's focus on *DMV.org*, which I believe you just said the domain name is actually owned by edriver, Incorporated; is that correct?

A.    That's correct.

Q.    Okay.  But it is Online Guru that makes the *DMV.org* Website; is that correct?

A.    Yes.

Q.    Okay.  And is it also accurate to say that Online Guru manages the *DMV.org* Website with permission from edriver via a license agreement?  Is that correct?

A.    Yeah.  The management agreement.

Q.    Okay.  The *DMV.org* domain name was registered in 1999?

A.    Yes.

Q.    Okay.  You did not join the company -- or strike that.

1          You did not join the organization that operates

2    *DMV.org* until 2003; is that correct?

3    A.    We -- yes.  We formed an organization in 2003.

4    Q.    Okay.  I didn't mean to confuse you, but let's be clear.

5          BizGroups, Incorporated, is a parent corporation

6    that was formed only recently; correct?  2006.

7    A.    2007.

8    Q.    2007.

9          Okay.  And when you joined the business, you

10   actually joined with entity?

11   A.    Online Guru and edriver.

12   Q.    And that was in 2003; correct?

13   A.    Around June, July.

14   Q.    And prior to that time you were a full-time college

15   student, and you recognized a -- an opportunity and so you

16   left college to run this business full time; is that

17   accurate?

18   A.    No, that's not.

19   Q.    Were you not a full-time college student before you

20   joined this business?

21   A.    No.  I was part time.  I was taking probably two

22   classes.

23   Q.    Okay.

24   A.    And I was in a business even prior to that.  So probably

25   three years before that I had my own -- or I had another

1  business with another partner.

2  Q.   Okay.  Now, let's talk about the business of

3  Online Guru.

4       MR. DE CARLO:  If you could pull up Exhibit 301,

5  Mr. Bruyere, and also be prepared with 300.

6  BY MR. DE CARLO:

7  Q.   Mr. Lahoti, *DMV.org* is principally a Website that -- I'm

8  sorry.  Strike that.

9       *DMV.org*, as part of its business model, offers for

10 sale traffic school services or traffic school courses; is

11 that correct?

12 A.   We -- that's not correct.

13      THE CLERK:  Sorry.  What's the exhibit number on

14 this?

15      THE WITNESS:  301.

16      MR. DE CARLO:  I've placed on the screen

17 Exhibit 301.

18 BY MR. DE CARLO:

19 Q.   Now Mr. Lahoti, would you take a look at Exhibit 301,

20 please.

21 A.   That's correct.  I mean yes, I'm seeing that.

22 Q.   And you recognize this page, of course; right?

23 A.   Yes.

24 Q.   Okay.  Now, this is actually a page -- I think you've

25 testified in your -- I've seen elsewhere that there's

1  approximately 4,000 total pages on the *DMV.org* Website.

2  A.    Yeah, around there.

3  Q.    I take it it fluctuates from week to week or day to day?

4  A.    Yeah.  I don't know the exact number, but yeah.

5  Q.    Okay.  And this particular page that we've placed on the

6  screen, which is Exhibit 301, this is a page which is

7  dedicated to traffic school in the state of --

8          MR. DE CARLO:  Can you blow that up a little,

9  Mr. Bruyere.

10 BY MR. DE CARLO:

11 Q.    In -- and this is a page that is dedicated to traffic

12 school in the state of Nevada; is that correct?

13 A.    Yes.

14 Q.    Okay.  And through this page, if a user -- an Internet

15 user logs onto this page, they have an opportunity at this

16 page to purchase a traffic school -- traffic school course

17 through a company by the name of I Drive Safely; is that

18 correct?

19 A.    Upon clicking on the link and visiting their site, they

20 can purchase a product from the advertiser.

21 Q.    Okay.  So the user clicks on this I Drive Safely link

22 and travels to the I Drive Safely Website where I Drive

23 Safely offers traffic school courses; is that correct?

24 A.    Yes.

25 Q.    Okay.  And this is, of course, for the state of Nevada,

1    but you offer the -- you offer traffic school services in

2    this manner in other states as well; is that correct?

3    A.   Yes.  Advertise, yes.  That's correct.

4    Q.   Okay.  And specifically with regards to I Drive

5    Safely -- by the way, I Drive Safely you would -- is an

6    affiliate of yours; is that correct?

7    A.   No, that is not.

8    Q.   They're not an affiliate?

9    A.   No.  They're not an affiliate.

10   Q.   What would you call them?

11   A.   They're an advertiser.

12   Q.   They're just an advertiser?

13   A.   Yes.

14   Q.   Okay.  Are you just a passive advertiser?  Do you know

15   what that term means?

16   A.   Passive advertiser in the sense that -- can you clarify

17   what that means?

18   Q.   Sure.

19        Well, you promote these services on your Website,

20   don't you?

21   A.   We have had the same discussion in the past.  We

22   recommend them; so if that's what -- promote and recommend is

23   the same thing, then yes.

24   Q.   Okay.  And with regards to I Drive Safely, you have a

25   relationship with I Drive Safely for purposes of providing

1    traffic school services in addition to Nevada, also New

2    Mexico?

3    A.    I think so, yes.

4    Q.    Colorado?

5    A.    Yes.

6    Q.    Idaho?

7    A.    Yes.

8    Q.    And Virginia?

9    A.    Yes.  There's -- yes.  That's correct.

10    Q.    Okay.  And are you aware that my client,

11    *trafficschool* -- are you familiar with my client

12    *trafficschool.com*?

13    A.    Yes I am.

14    Q.    Okay.  And you're familiar with the type of business

15    that *trafficschool.com* runs; is that correct?

16    A.    Of course.

17    Q.    And they offer traffic school courses as well; correct?

18    A.    Yes.

19    Q.    Okay.  And in some states *trafficschool.com* also uses

20    I Drive Safely as their traffic school fulfiller; is that

21    correct?

22            MR. DAUCHER:  Objection.  Foundation.  Speculation.

23            THE COURT:  Sustained.

24    BY MR. DE CARLO:

25    Q.    Okay.  Do you know, Mr. Lahoti, if my client,

1  *trafficschool.com,* has any type of relationship with I Drive

2  Safely?

3  A.   Yes.

4  Q.   Okay.  And that relationship is one in which my client

5  utilized -- my client, *trafficschool.com*, utilizes I Drive

6  Safely to fulfill traffic school services for users of the

7  *trafficschool.com* Website; is that correct?

8  A.   I don't know what specific states or how they -- how

9  they do it.  I think -- I think *trafficschool.com*, your

10  client, collects, you know, the payment, and then, you know,

11  I Drive Safely potentially is the course that the person

12  signs up through.  I'm not sure, though, exactly how that

13  works.

14          MR. DE CARLO:  Okay.  Can we go to Exhibit 303

15  Mr. Bruyere.

16  BY MR. DE CARLO:

17  Q.   Okay.  I put -- placed in front of you, Mr. Lahoti,

18  Exhibit 300, which is a page from the *trafficschool.com*

19  Website.

20          Do you recognize that?

21  A.   Yes.

22  Q.   Okay.

23          MR. DE CARLO:  And if we go to the next page,

24  please, Mr. Bruyere.  And the next page.

25  *///*

1  BY MR. DE CARLO:

2  Q.   As you can see from my client's Website, they also do

3  business with I Drive Safely in Nevada; is that correct?

4  A.   I can't see that from here.

5  Q.   You can't see that?

6  A.   I'm sorry.

7       You said do they do business in the same state?

8  Q.   Yes.

9  A.   I thought you said they do business with -- they do

10  business in the same state as in Nevada, yes.

11  Q.   Okay.  By using I Drive Safely.

12  A.   No.  I can see that on this.

13  Q.   Okay.

14       MR. DE CARLO:  If we go to the next page

15  Mr. Bruyere.

16  BY MR. DE CARLO:

17  Q.   And also New Mexico; correct?

18       MR. DAUCHER:  Objection.  Calls for speculation of

19  the witness as to the business of the plaintiffs, your Honor.

20       THE COURT:  Sustained.

21  BY MR. DE CARLO:

22  Q.   Do you know, Mr. Lahoti, if *trafficschool.com* provides

23  traffic school courses in the state of New Mexico through

24  I Drive Safely?

25  A.   Just one second ago they flipped to the next page and I

1    saw I Drive Safely's logo; so if that is correct, then yes.

2    But I did not know that prior to this.

3    Q.   Okay.  So independent of these documents, you don't know

4    that?

5    A.   No, I don't.

6    Q.   Okay.  Well, then, we went go over those documents

7    anymore.

8           Now, in addition to the states that I just

9    mentioned to you before -- your states, Nevada, New Mexico,

10   Colorado, Idaho, and Virginia -- *DMV.org* also offers traffic

11   school courses in other -- in other -- strike that.

12          *DMV.org* also enables its users to purchase traffic

13   school courses in other states; correct?

14   A.   We advertise other traffic school courses similar to how

15   Google would advertise every product and service in the

16   entire world.

17   Q.   Okay.  And that includes California, the state of

18   California?

19   A.   Yes.  We advertise traffic school courses in California.

20   Q.   And who do you do that through?  Which entity -- which

21   advertiser?

22   A.   At the moment I believe it is I Drive Safely.

23   Q.   Okay.  How about Florida?  Do you do business in

24   Florida?

25   A.   Yes.  We advertise traffic school in Florida.

1    Q.   Okay.  And New Jersey?

2    A.   Yes.

3    Q.   And New York as well; correct?

4    A.   Correct.

5    Q.   Okay.  Now, I think I asked you before if you promote

6    traffic school courses in those states.  And your testimony

7    is that you recommend, but you're not comfortable referring

8    to that as promotion.

9    A.   There was a time that we had recommendation language on

10   the advertisers listed on our site.  At the moment I believe

11   they -- you know, we constantly change those things, and

12   right now it's been -- I mean, not constantly, but we've

13   evolved in changing to, you know, strictly a sponsor listing

14   on our site.

15   Q.   All right.  In 2006, Mr. Lahoti, did *DMV.org* market and

16   promote the advertisers that listed traffic school services

17   on the *DMV.org* Website?

18   A.   As I set before, if promote and recommend to you mean

19   the same thing, yes.  We did recommend these traffic school

20   services.

21   Q.   Okay.  What it means to me is not important.

22        What -- what does market mean to -- to you?

23   A.   Market?

24   Q.   Yes.

25        What does that mean to you?

1    A.    We're advertising a service.

2    Q.    Okay.  So it just means "advertising"?

3    A.    I think marketing means advertising.  I'm not -- I'm not

4    sure if it means anything else.

5    Q.    Okay.  Let me ask the same question about promotion.

6              In 2006, just promote -- did you promote the

7    services of the traffic school providers that advertise

8    traffic school services on the *DMV.org* Website?

9              MR. DAUCHER:  Objection.  Asked and answered.

10             THE COURT:  Sustained.

11             MR. DE CARLO:  Okay.  Could we pull up Exhibit 115

12   please, Mr. Bruyere.

13             Oh, 15.  I'm sorry.

14             THE CLERK:  115?

15             MR. DE CARLO:  15.  15.

16   BY MR. DE CARLO:

17   Q.    Mr. Lahoti, I believe you have -- this is a multipage

18   exhibit; so if you could pull out Exhibit 15.

19             THE COURT:  Would you like to have Exhibit 15

20   placed before the witness?

21             MR. DE CARLO:  Oh, I'm sorry, your Honor.

22             Yes.  May the witness place Exhibit 15 -- may -- if

23   the Court permits, may Exhibit 15 be placed before the

24   witness?

25             THE CLERK:  Which binder is this for?  Condensed?

1          MS. HAMILTON:  Excuse me?

2          THE COURT:  All right.  Let me see counsel at

3     sidebar.

4          (Sidebar.)

5          THE COURT:  Okay.  You don't have lawyers just

6     walking up.  Okay?  So you need to tell your side if they

7     want to approach, they need to ask permission.  And try to

8     avoid after every question or every answer saying "okay."

9          Now, what are you guys doing with respect to these

10    exhibits?  Have you come to any agreement as to their

11    admissibility?

12         MR. DAUCHER:  We filed a joint exhibit list.  Most

13    are non objected; so I believe they would be admitted under

14    your order.

15         THE COURT:  Well, that's not true.

16         MR. DAUCHER:  Okay.

17         THE COURT:  So if you're going to offer -- well,

18    I don't know what you're doing right now.  So none of these

19    exhibits are in evidence.  So if you want it in, you're going

20    to have to offer it.

21         MR. DAUCHER:  Okay.

22         MR. DE CARLO:  At the time.

23         THE COURT:  If you want to come to some agreement

24    that they're already and that they're admissible, that's

25    fine.  If not, then you're going to have to offer them.

1          MR. DAUCHER:  We'll reach a stipulation.

2          MR. DE CARLO:  I believe if -- your Honor, if

3    it's -- may I just ask Mr. Daucher a question?

4          THE COURT:  Uh-huh.

5          MR. DE CARLO:  Mr. Daucher, every document that we

6    stipulated there's no objection to it -- may we have an

7    agreement or a stipulation that that be -- that exhibit be

8    automatically admitted into evidence without requiring to

9    have it admitted after each time it is raised?

10         MR. DAUCHER:  Yes.  So long as all the exhibits

11   there's no objection to are admitted I --

12         THE COURT:  That's fine.

13         At the end of the day why don't you work out a

14   stipulation.  And I'll just consider now that all the

15   documents that -- you're going to work out a stipulation as

16   to all the documents that you are displaying.

17         MR. DAUCHER:  Okay.

18         THE COURT:  Okay.  And then make sure the clerk

19   knows -- whatever the stipulation is, make sure the clerk

20   knows.  Okay?

21         MR. DAUCHER:  Okay.

22         THE COURT:  All right.

23         (Open court.)

24         MR. DE CARLO:  May I continue, your Honor?

25         THE COURT:  Yes.

1          MR. DE CARLO:  Thank you.

2     BY MR. DE CARLO:

3     Q.   Mr. Lahoti, do you have Exhibit 15 in front of you?

4     A.   Yes.

5     Q.   Okay.  These are a series of exhibits that relate to the

6     agreements between Online Guru and some of your advertisers;

7     is that correct?

8     A.   Yes.

9     Q.   Okay.  And in any of your agreements, does it indicate

10    that Online Guru is going to promote the services of the

11    advertisers?

12          MR. DAUCHER:  Objection.  Best evidence.

13          THE COURT:  Overruled.

14          You can answer if you know.

15          THE WITNESS:  Can you show me?

16          MR. DE CARLO:  May I withdraw the question, your

17    Honor?

18          THE COURT:  Yes.

19          MR. DE CARLO:  Question withdrawn.

20    BY MR. DE CARLO:

21    Q.   Mr. Lahoti, would you please turn to the page that reads

22    DEF 00244 on the bottom.

23    A.   I don't know where that is.  It goes from 242 to 249.

24          MR. DE CARLO:  It is -- to help you out, it is the

25    agreement that reads Online Guru Business Development

1    Agreement.

2            May I approach the witness, your Honor, and show

3    him --

4            THE COURT:  No.

5            Which exhibit number you are you referring to?

6            MR. DE CARLO:  Exhibit 15.

7            THE COURT:  Okay.  And the numbers that you've

8    referred him to -- is that a Bates number on the document?

9            THE WITNESS:  I see it now.

10           THE COURT:  All right.

11           THE WITNESS:  Sorry.

12           MR. DE CARLO:  Okay.

13   BY MR. DE CARLO:

14   Q.   Mr. Lahoti, do you recognize this document?

15   A.   Yes.

16   Q.   And this is a business development agreement between

17   Online Guru and who -- or whom?

18   A.   Golden State Private School.

19   Q.   Okay.  And Golden State Private School is an entity that

20   does what?

21   A.   They are a private school, and they also operate driving

22   schools.

23   Q.   Driving education courses?

24   A.   That's one of their businesses.

25   Q.   Okay.  And if you would look at Item B in the recitals.

1    A.    Item B?

2    Q.    Yes.

3    A.    Oh, sorry.

4    Q.    It says, "School desires to retain the company to market

5    and promote its business utilizing the URL

6    *teendriverseducation.com*, managed by the company."

7          Do you see that?

8    A.    Yes.

9    Q.    This is an agreement that was written by Online Guru; is

10   that correct?

11   A.    Yes.

12   Q.    *Teendriverseducation.com* is a domain name that is not

13   owned by Golden State Private School; is that correct?

14   A.    The domain name itself is not.

15   Q.    And Online Guru was going to, according to this

16   document, market and -- strike that.

17          Mr. Lahoti, what is your understanding of what

18   Online Guru was going to do -- in relation to the language in

19   this agreement that it was going to promote this business?

20   A.    What was my understanding, you said?

21   Q.    Correct.

22   A.    That we would basically display this school throughout

23   our site.  We would advertise it.  We would recommend it.  We

24   would do all those things.

25   Q.    Online Guru offers driver's education courses in --

1  through its advertisers in California; is that correct?

2  A.   We don't specifically offer driver's education.  We --

3  we advertise -- we advertise them.  There's two questions in

4  there, I think.  So we advertise these courses in California,

5  driver's education.

6  Q.   And so we're clear, the -- the student who purchases the

7  course through your advertiser, one of the states that they

8  could purchase the course in and take the driver's education

9  is California; correct?

10  A.   Yes, that is correct.

11  Q.   And another state is Florida; correct?

12  A.   For driver's education, yes.

13  Q.   And another state is New Jersey; correct?

14  A.   Don't -- I don't know about New Jersey.

15  Q.   You don't know?

16       And other -- do you know if another state is

17  New York?

18  A.   I don't think so.

19  Q.   You're not sure?

20  A.   I'm not sure.

21  Q.   Do you know if you offer driver's -- if you advertise

22  driver's education services in the state of Texas?

23  A.   Yes.

24  Q.   Okay.  And do you know if you offer driver's education

25  courses through a company in Texas by the name of Virtual

1  Drive?

2  A.   Yes.

3  Q.   And Driver's Ed In A Box is another company?

4        MR. DAUCHER:  Objection.  No question.

5        THE COURT:  Sustained.

6  BY MR. DE CARLO:

7  Q.   Do you know if Online Guru advertises the services of

8  driver's education courses in the state of Texas by the name

9  of Driver's Ed In A Box?

10 A.   I know that we do not anymore.

11 Q.   When did that relationship terminate?

12 A.   I think -- I think October 9th of this -- wait.  This is

13 November.  I think last month, 8th or 9th.  You can ask

14 Mr. Moretti for exact date.

15 Q.   You're familiar with my client, Driver's Ed Direct?

16 A.   Yes, I am.

17 Q.   And are you familiar with the states that Driver's Ed

18 Direct offers driver's education courses in?

19 A.   Not off the top of my head.

20 Q.   Okay.  So you don't know if my client, Driver's Ed

21 Direct, does business with driver's education in Texas?

22 A.   I do know that they do.

23 Q.   How about Colorado?

24 A.   At one time I did -- I did know.  I don't know how it is

25 today, but yes.

Q.   Do you know that -- do you know if Driver's Ed Direct

offers driver's education courses in the state of California?

A.   Yes.

Q.   And is driver's education -- strike that.

     Is the state of California for Online Guru an

important market for driver's education courses?

A.   I think -- I think every state is important.

Q.   Is it one of the more profitable states for -- for

Online Guru?

A.   I would say that we generate a fair amount of revenue

from the state of California.

Q.   Okay.

     MR. DE CARLO:  Could we pull you have Exhibit 61,

please, Mr. Bruyere.

BY MR. DE CARLO:

Q.   In --

     MR. DAUCHER:  What exhibit number is this?

     MR. DE CARLO:  681.

     THE CLERK:  681?

     MR. DE CARLO:  Yes.

     THE COURT:  Sir, yes.

     All right.  Does he have 681 in that bundle?

     MR. DE CARLO:  We have it.  Your Honor, I was going

to have him look at the screen.

     THE COURT:  All right.  Fine.

1    BY MR. DE CARLO:

2    Q.    Mr. Lahoti, do you recognize this document?

3    A.    I did not create this document, but let me just take a

4    look at it real quick.

5          Yes, I do.  Or I mean I know the data.

6    Q.    Okay.  And this is a --

7    A.    I can see the data.

8    Q.    And this is a summary of revenues on a month-by-month

9    basis broken down by different types of courses of Online

10   Guru; is that correct?

11   A.    Different types of courses of Online Guru?

12   Q.    Yes.

13   A.    These are the -- this is the courses that are sold of

14   our advertisers.  Or the product -- it's not even courses.

15   It's products and services that the advertisers have sold

16   because I guess -- I mean, there's one, for example,

17   Jumby Bay Studios.  They don't sell a course.  They sell a

18   DVD.  But yes.  Generally most of these are the number of

19   courses or products that each of these companies are selling

20   through the relationship with Online Guru, where they're

21   advertising with us.

22   Q.    The yellow band that's highlighted that -- specifically

23   I would like you to note online teen driving -- online and

24   online teen driving home study.  Those are the revenues that

25   are generated through the relationship with the driver's

1   education provider in California; is that correct?

2   A.    The -- those two lines, yes.  That's correct.

3   Q.    Okay.

4           MR. DE CARLO:  And if you could go to the next page

5   please Mr. Bruyere.

6   BY MR. DE CARLO:

7   Q.    Okay.  In 2006 there's a Y -- a year-to-date column

8   there.

9   A.    Okay.

10  Q.    And can you identify the fifth line down, I believe.

11          There you go.

12          MR. DE CARLO:  Thank you, Mr. Bruyere.

13          Right there.

14  BY MR. DE CARLO:

15  Q.    That relates to the revenues for driver's education for

16  2006; is that correct?

17  A.    The fifth line.

18          MR. DAUCHER:  Objection.  Vague.

19          THE COURT:  Sustained.

20          You can rephrase.

21          MR. DE CARLO:  Mr. Bruyere, are you able to put

22  these two documents next to each other, because unfortunately

23  the --

24          THE WITNESS:  That's okay.  I can see that.

25  ///

1    BY MR. DE CARLO:

2    Q.   Okay.  It looks like the fourth and the fifth item

3    relate to the California courses.  So if we go to the second

4    page.

5         MR. DE CARLO:  And if we could blow that up now

6    Mr. Bruyere; so we can see it better.

7         THE WITNESS:  It's very small, but I can see it

8    says -- I think it says -- or I think it says 1.2 million and

9    then 141,000.

10   BY MR. DE CARLO:

11   Q.   Thank you.  That's what I was trying to get at.

12   A.   Okay.  I can see that.

13   Q.   So for 2006 that represented a large percentage or a

14   substantial percentage of California driver's education

15   revenue for Online Guru; correct?

16   A.   Can you say that one more time.

17   Q.   The revenues generated from the California-based

18   driver's education courses represents a substantial segment

19   of the revenue for driver's education courses as a whole for

20   Online Guru; isn't that correct?

21   A.   That's correct.

22   Q.   And if we follow it over to the year to date in 2007,

23   that trend is continuing; is that correct?

24   A.   That's year to date 2007?  Yes, it is.

25   Q.   So would you agree that California is a growing market

1   for Online Guru with regard to driver's education with

2   California?

3   A.   Yeah.  It has grown significantly.  And I hope -- I hope

4   these things continue to grow.

5   Q.   Okay.  In addition to traffic school and driver's

6   education, Online Guru also advertises for sale a product by

7   the name of "Rules of the Road"; is that correct?  It's a

8   DVD.

9   A.   Yes.  It's another product we advertise on our driver's

10  education pages.

11  Q.   Are you aware that my client also offers for sale the

12  driver's -- the DVD entitled "Rules of the Road"?

13  A.   I wasn't until I saw it on one of the exhibits.

14  Q.   So you know now?

15  A.   Yes.

16  Q.   Online Guru provides vehicle history reports for

17  those -- strike that.

18          Online Guru makes available to Web visitors vehicle

19  history reports; is that correct?

20  A.   Yes.  That's a -- that's a product we also display or

21  advertise.

22  Q.   My client also offers vehicle history reports.

23          Do you know -- strike that.

24          Do you know if my client also offers vehicle

25  history reports?

A.   Somewhere on their site I saw that through these
exhibits.  I would have never been aware if I -- if I didn't
see it in the exhibits because it's not very clear on the
site.

Q.   Online Guru also advertises used car links; is that
correct?

A.   Used car what?

Q.   Links.

A.   Yes.

Q.   And are you aware if my client also offers used car
links on their Website?

A.   Not aware of that.

Q.   Online Guru offers links for insurance quotes; is that
correct?  Car insurance quotes.

A.   Yes.  We link to insurance companies.

Q.   That's a substantial part of Online Guru's revenues; is
that correct?

A.   Advertising those services is.

Q.   Do you know if my client advertises for insurance --
auto insurance links and quotes?

A.   I don't -- I don't think it is a substantial part of
their business, and I don't think it's very clear where to
find those on their sites.  Through litigation, I'm aware of
these things in exhibits.  But even when I'm surfing on the
site to find these, I've -- I've had trouble to find them.

1          MR. DE CARLO:  Your Honor, I would ask that the

2     answer be stricken as nonresponsive.

3          THE COURT:  You asked the question.  It will stand.

4          Overruled.

5          Next question.

6     BY MR. DE CARLO:

7     Q.   Do -- does Online Guru offer links to enable users to

8     obtain driving records?

9     A.   Are you talking about a specific state?

10    Q.   No.  For any state.

11    A.   Yes.  Through both advertisers and through linking

12    directly to the state government.

13    Q.   Do you know if my client offers those same types of

14    links?

15    A.   I don't know if they link to the state government, but

16    I do know, again through litigation, that they say that there

17    is some driving record they can order in California.

18         THE COURT:  How much longer do you have with this

19    witness?

20         MR. DE CARLO:  Probably another two hours, your

21    Honor.

22         THE COURT:  Where does it say on here that you were

23    going to have two hours with this witness?

24         MR. DE CARLO:  I believe in the original witness

25    list, your Honor, we estimated an hour to an hour and a half

1   on direct --

2            THE COURT:  Well, I'm looking at a joint trial --

3   joint witness list with a summary of the witness testimony

4   and time estimates.

5            MR. DE CARLO:  Yes, your Honor.  If my memory

6   serves, I believe we indicated an hour to an hour and a half

7   with Mr. Lahoti.  That -- that -- in preparing further for

8   Mr. Lahoti, I realized we need more time with him.

9            THE COURT:  Well, Counsel, that's why we do this.

10  So you're going to need to conform to your estimates.  And

11  one of the problems here, Counsel, why don't you ask him what

12  he knows about his own business.  I assume you'll have your

13  own witness up here who will testify as to what your clients'

14  business is.

15           Obviously -- because he isn't objecting, but

16  obviously there's no foundation for some of this.  And it's

17  just -- I don't know what the point is.  He can certainly

18  testify as to what his business is, and you can put your

19  client on to establish what their business is.  So go ahead.

20  But -- it's your witness, but the clock is running.

21           And which Mr. Lahoti is this?

22           MR. DE CARLO:  This is Mr. Raj Lahoti.

23           THE COURT:  Okay.  Go ahead.

24           MR. DE CARLO:  Thank you, your Honor.

25  BY MR. DE CARLO:

1    Q.   Mr. Lahoti, part of Online Guru's business is to provide

2    content and information regarding driving-related links; is

3    that correct?

4    A.   Yeah.  Through the *DMV.org* Website, yeah.

5    Q.   Okay.  And *DMV.org* also provides links to DMV -- to

6    official state DMVs; is that correct?

7    A.   Yeah.  That's a big part of our Website.

8    Q.   Mr. Lahoti, can -- a large part of your business is to

9    drive traffic to the *DMV.org* Website from Website users; is

10   that correct?

11   A.   Yes.

12   Q.   And the name of your company is Online Guru, and that is

13   a testament, I believe, to the fact that you have referred to

14   yourself as a -- as an expert in the -- in Website

15   management; is that correct?

16   A.   Yes.  I refer to myself as somebody who knows a lot

17   about this business.

18   Q.   You're familiar with the term "search engine

19   optimization"; correct?

20   A.   Of course.

21   Q.   And search engine optimization is the process by which

22   you attempt to have users attracted to your site through

23   getting your listings to rise to the top of natural search

24   listings on search engines; is that correct?

25   A.   That's -- that's the end -- yeah.  That's the goal of

1    search engine optimization is to optimize your Website for

2    the search engines.

3    Q.    And can you describe briefly what are the techniques

4    that you use to enhance search engine optimization.

5    A.    I mean, that's -- that's like a -- I mean, there's a lot

6    of techniques in which -- tell me what -- what -- there's --

7    there's thousands of techniques to -- to -- and I -- and we

8    implement -- you know, it's good content, good information,

9    site structure, site architecture.  Give me a little

10   direction here.

11   Q.    I will.

12         The use of meta data assists with search engine

13   optimization; is that correct?

14   A.    I don't know how much it assists anymore, to be honest

15   with you.  Meta data has been -- is something that -- you

16   know, because you can just put whatever key words you want in

17   there, a lot of search engines kind of ignore a lot of that

18   nowadays.  But we still do it because maybe there's some

19   directories that use it.  But I'm not familiar if Google or

20   Yahoo! or MSN really use that anymore.

21   Q.    Another element of assisting in search engine

22   optimization is the number of Websites that link to your

23   site; is that correct?

24   A.    It's a little bit more complex than that, but it's the

25   type of Websites that link to you, their quality; you know,

1   all of that is factored into it.

2   Q.   And that is -- search engine optimization is a different

3   concept than search engine marketing; is that correct?

4   A.   Yeah.  Search engine marketing is primarily when you pay

5   to sponsor your listing on the search engine.

6   Q.   Search engine marketing is the type of practice where

7   you purchase key words or you bid on key words in search

8   engines like Google and Yahoo!; is that correct?

9   A.   Yes.

10  Q.   And the purpose of purchasing or bidding on certain key

11  words is to attract users who are interested in those

12  particular key words; correct?

13  A.   Yeah.  The people that are searching -- that are typing

14  those key words in and searching on those key words, you want

15  to advertise your product and service on the search engine so

16  that that user might be interested in your product.

17  Q.   It's a very targeted way of -- of doing advertising?

18  A.   Definitely.  It's probably the most targeted way to do

19  it online.

20  Q.   And it's very effective in your experience?

21  A.   It depends on what your product is and -- or our product

22  and service.  Yes, it's very effective.

23  Q.   Are you familiar with the term "click per action"?

24  A.   No, I'm not.

25       You mean cost per action?

1    Q.    Cost per action.  I apologize.

2    A.    Yes.  I'm familiar with that.

3    Q.    Cost per action is the business model that Online Guru

4    primarily utilizes; correct?

5    A.    It's -- yes.  It's one of the ways that we get paid

6    through our advertiser, through the CPA model, yes.

7    Cost-per-action model.

8    Q.    And that means you get paid through your advertiser when

9    a certain action is taken by the user.  For example, a user

10   clicks on the I Drive Safely icon, travels to the I Drive

11   Safely Website, and purchases an I Drive Safely traffic

12   school course.

13           That's an action which will generate a revenue to

14   Online Guru; correct?

15   A.    Correct.  It's a -- it's a common form of

16   performance-based advertising.

17   Q.    And that represents 85 to 90 percent of Online Guru's

18   revenues?

19   A.    I believe so.

20           Sorry for interrupting.

21           Yes, I believe so.

22   Q.    Are you familiar with a --

23           MR. DE CARLO:  Can you pull up Exhibit 114, please.

24   BY MR. DE CARLO:

25   Q.    Are you familiar with the Website called

1  *UnitedStates.org*?

2  A.   Yes.

3  Q.   And this Website, if you know, is owned by who or whom?

4  A.   It's owned by us, I believe.  Find My Specialist.

5  Q.   Find My Specialist is one of those companies that is a

6  subsidiary of BizGroups; correct?

7  A.   Correct.

8  Q.   And what -- if I put the *UnitedStates.org* on your

9  screen.

10       MR. DE CARLO:  And, Mr. Bruyere, if you with blow

11  up that portion.

12  BY MR. DE CARLO:

13  Q.   It says, "*UnitedStates.org* guides you to the Websites

14  and services provided by the federal government.  We offer

15  a valuable source of information critical to citizens of the

16  United States and those who plan to become citizens."

17       The purpose of *UnitedStates.org* is to direct

18  visitors to various federal government Websites; is that

19  correct?

20       MR. DAUCHER:  I'm going to object on relevance to

21  the line of questioning.

22       THE COURT:  Why is this relevant?

23       MR. DE CARLO:  It goes to the misrepresentations of

24  the defendants.

25       And I have one more question, your Honor.

1          THE COURT:  Sustained.

2          Move on.

3    BY MR. DE CARLO:

4    Q.   There is a reference to *DMV.org*.

5          THE COURT:  Counsel, ask a question, and then

6    I'll -- if there's an objection, I'll rule on it.  So that

7    objection to that question is sustained.

8          Next question.

9          MR. DE CARLO:  Would you highlight that,

10   Mr. Bruyere.

11   BY MR. DE CARLO:

12   Q.   I've just highlighted a reference to a link to *DMV.org,*

13   where it says, "A comprehensive easy-to-read guide for your

14   Department of Motor Vehicles."

15          Is that a federal Website, Mr. Lahoti?

16   A.   No, it is not.

17   Q.   Okay.

18          MR. DE CARLO:  Would you please pull up

19   Exhibit 322, Mr. Bruyere.

20          Okay.  Could you blow up this section right here.

21   BY MR. DE CARLO:

22   Q.   This is, Mr. Lahoti, a search result from a search for

23   the term "DMV."

24          Do you see that?

25   A.   Yes, I do.

1    Q.    Online Guru bids on the term "DMV" in its search engine

2    marketing strategies with Google and Yahoo!; is that correct?

3    A.    Yes, that's correct.

4    Q.    And the reason that *DMV.org* bids on DMV as a key word is

5    because *DMV.org* is hoping to attract those who type in the

6    word DMV in searches in Google and Yahoo!; is that correct?

7    A.    Yes, that's correct.

8    Q.    Now, in terms of how this page is laid out, the top

9    listing represents a sponsored listing; is that correct?

10   A.    The top and the right side.

11   Q.    Okay.  So the top and the right -- the right is a

12   sponsored listing too?

13        MR. DE CARLO:  Go back to the full screen, please.

14   BY MR. DE CARLO:

15   Q.    So on this search result *DMV.org* is the first search?

16   A.    On this one, yes, it is.

17        MR. DE CARLO:  Can you, again, blow up the

18   reference to *DMV.org*, Mr. Hair?

19   BY MR. DE CARLO:

20   Q.    Now, with regards to search engine marketing and these

21   advertisements -- these advertisements that appear, these are

22   advertisements in which the text is written by the

23   advertiser; is that correct?

24   A.    Yes, that's correct.  Upon approval by the editorial

25   policy of Google.

1    Q.   You -- you --

2           MR. DE CARLO:  Move to strike, your Honor, as

3    nonresponsive, the latter part of the answer.

4           THE COURT:  Overruled.

5    BY MR. DE CARLO:

6    Q.   You control, Mr. Lahoti, the text that is going to go on

7    this listing; correct?  "You" meaning Online Guru.

8    A.   Same answer as before.  Yes.  Upon approval by their

9    editorial policy.

10   Q.   Google doesn't write the ad for you?

11   A.   Actually, sometimes they do.  Because we have a

12   relationship with Google, and they optimize our ads.  They

13   write them, and they display what -- we have account

14   managers, and there are times when they're telling us, "Hey,

15   these are the ads that we wrote for you, and, you know, what

16   do you think," type of thing.

17   Q.   Do you know if Google -- this is a Google page.

18          Do you know if Google contributed to the authorship

19   to the text of this sponsored ad?

20   A.   This is a year ago; so I don't remember.  But I know

21   that I, of course, approved it.

22   Q.   Okay.  Let's talk about this for a second.

23          You have identified yourself above the -- in the

24   advertisement as the -- as "California DMV."  And then

25   underneath it is your domain name, *California.DMV.org*.

1    Why, Mr. Lahoti, is there an identification on this

2    sponsored link of California DMV?

3    A.   Well, the headline allows you for 25 characters.  And

4    the purpose of the headline is basically to talk about what

5    the subject matter is of that product or service or Website

6    that you're advertising.

7         So at this time we were just basically talking

8    about what is the subject matter.  Just like if somebody

9    typed in "driver's license," we would say "California

10   driver's license."  And we -- you further clarify what that

11   is in the description lines, which are one and two.  But in

12   this case they're all across, which shows us -- it's a guide

13   to Department of Motor Vehicle information.  It's a guide to

14   DMV license and registration.

15   Q.   There's no reference on this to an unofficial guide;

16   correct?

17   A.   Well, it doesn't specifically say that it's an

18   unofficial guide.  However it says that it's a ".org" site,

19   and it's also a sponsored link, which is typically uncommon

20   for government entities to sponsor an advertisement on

21   Google --

22   Q.   Mr. Lahoti --

23   A.   -- unless -- I'm sorry.

24   Q.   Ahead --

25   A.   The military does advertise, though.  So it's not --

1  they're not banned from advertising, but it's uncommon.

2  Q.   Mr. Lahoti, at this time when this search engine -- when

3  this ad ran, you had been aware -- you had been made aware

4  that there were consumers that were confused about the

5  affiliation of *DMV.org*; is that correct?

6  A.   During this time I was aware that there are some

7  consumers that may -- that may be confused as to the nature

8  of our product and service --

9  Q.   Did you --

10 A.   -- or as to the affiliation.

11 Q.   And is there a reason why you did not put an indication

12 on this sponsored listing that you are not affiliated with

13 the California DMV?

14 A.   There's very limited text that you're able to put on

15 this ad.  So unless the entire ad says this site is not

16 affiliated with the government agency, that's pretty much all

17 you can fit in that ad.  So at that time we felt once a

18 person clicks through, they're going to see our site.

19 Q.   You're completely responsible under Google's policy for

20 the representations that are made in a sponsored

21 advertisement; is that correct?

22       MR. DAUCHER:  Objection.  Calls for a legal

23 conclusion.

24       THE COURT:  Sustained.

25 BY MR. DE CARLO:

1    Q.   According to Google's policy, Mr. Lahoti, are the -- is

2    the advertiser, Online Guru in this instance, responsible for

3    the representations that are made in a sponsored

4    advertisement according to Google's policy?

5    A.   I do not know.

6              MR. DE CARLO:  Can you please pull up --

7              THE WITNESS:  I assume we're responsible, but I

8    don't know.

9              MR. DE CARLO:  95, please.

10             THE COURT:  Counsel, you have about 45 minutes left

11   with this witness.

12   BY MR. DE CARLO:

13   Q.   Would you read Number 2, Mr. Lahoti.

14             Had you reviewed -- strike that.

15             Have you reviewed Google's policies and procedures?

16   A.   I have reviewed them in the past, yes.

17   Q.   This indicates that the consumer is solely

18   responsible --

19   A.   The customer, you mean.

20   Q.   Sorry.

21             The customer is solely responsible; is that

22   correct?

23   A.   What was that again?

24             That's correct.  They -- they put the

25   responsibility on our end.

1    Q.   Okay.  Thank you.

2              MR. DE CARLO:  Can you go to 323, please,

3    Mr. Bruyere.

4    BY MR. DE CARLO:

5    Q.   This is a listing, Mr. Lahoti, that was done on May 22,

6    2007, and it's for the same search term, DMV.

7              Do you see that?

8    A.   Yes.

9    Q.   And your sponsored listing comes up again as the first

10   sponsored listing; correct?

11   A.   Yes.

12   Q.   And there's a difference between this one and the one

13   that we pulled up from 2006.  And that's because the word

14   "info" is added to the sponsored link.  Now it says

15   "California DMV info."

16             Do you see that?

17   A.   Yes.

18   Q.   So somebody at Online Guru went and added the word

19   "info."

20             Was there a reason for that?

21   A.   First of all, we're -- these ads are changing all the

22   time.  So two months before that it probably said "guide" or

23   "info."  These ads are constantly testing and tweaking.  In

24   this case, just continual reenforcement of what information

25   they're going to find on our Website.

UNITED STATES DISTRICT COURT

1   Q.   This ad for May of 2007 comes after this lawsuit was

2   filed.

3         Was that information added in response to this

4   lawsuit?

5   A.   No, it was not.

6         MR. DE CARLO:  Would you go to Exhibit 324, please,

7   Mr. Bruyere.

8   BY MR. DE CARLO:

9   Q.   This is another search, and it's dated November 20th,

10   2006.

11         You understand that November 20th, 2006, predates

12   the lawsuit; correct?

13   A.   Yes.

14   Q.   This is a search for the term "Driver's Ed."  Driver's

15   ed is a term that *DMV.org* bids on with Google and Yahoo!;

16   correct?

17   A.   Yes.

18   Q.   And that is because Online Guru is trying to attract

19   consumers that are interested in purchasing driver's ed

20   courses to come to the *DMV.org* Website; correct?

21   A.   In this specific ad, yes.

22   Q.   The advertisement indicates in the top "California DMV

23   Driver's Ed."

24         That's text that *DMV.org* wrote; correct?

25   A.   That Online Guru did, yeah.

Q.   Online Guru.   Thank you.

And it indicates that California recommended
driver's ed course for obtaining a learner's permit.

Mr. Lahoti, in the context of this advertisement
with California DMV Driver's Ed, underneath that *DMV.org,* and
then an indication that there's a recommendation, do you
think that a reasonable consumer might be deceived into
believing that the driver's education course is being
endorsed by the California Department of Motor Vehicles?

MR. DAUCHER:  Objection.  Speculation and
irrelevant since it's not the full stimuli that the user sees
before purchasing a product.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  When I look at this ad right now with
the information that I know, I could see how a user could
be -- could perceive it as -- as a -- you know, a DMV ad
because of the use of the language in here.

BY MR. DE CARLO:

Q.   The Department of Motor Vehicles has an important
relationship with the providing of driver's education
services; is that correct?

MR. DAUCHER:  Objection.  Foundation.

THE COURT:  Sustained.

BY MR. DE CARLO:

Q.   Do you know if in order for someone to obtain a driver's license they need to first pass or take a driver's education course that is approved by the California Department of Motor Vehicles?

          MR. DAUCHER:  Same objection.

          THE COURT:  Sustained.

          MR. DE CARLO:  I asked him if he knew.

          THE COURT:  I heard you the first time.  The objection was sustained.

          MR. DE CARLO:  I apologize.

          THE COURT:  If you have another question you can ask it.

          MR. DE CARLO:  I do, your Honor.

BY MR. DE CARLO:

Q.   What is the purpose at this stage of the advertisement to be recommending a driver's education course?  Why does *DMV.org* or Online Guru at this stage recommend or indicate to the consumer that they're recommending a driver's ed course?

A.   It's an advertisement to basically get somebody to come to the site and check out the information and -- and in this specific case, a driver's ed course -- to -- you know, to purchase a driver's ed course through our advertiser.

          MR. DE CARLO:  Would you go to the next page, please, Mr. Bruyere.

BY MR. DE CARLO:

1    Q.   Now, in this -- this is another advertisement,

2    Mr. Lahoti.  And in this case the search term is "California

3    Driver's Ed."  And right below the California DMV Driver's

4    Ed, in the heading of the ad, underneath it it says

5    *California.DMV.org*.

6         Why does the word "California" come up before DMV

7    in your sponsored advertisement here?

8    A.   Because that's -- the use of sub domains is a common

9    practice.  Or the use of -- just, you know, adjusting or

10   displaying the URL based on what the subject matter is of

11   what the person is looking for.  They're looking for

12   California information; so that's going to catch their eye.

13   Q.   And in your opinion, is it -- would it be reasonable for

14   a consumer to be deceived by this advertisement into thinking

15   that it is the California Department of Motor Vehicles link?

16   A.   Not this specific domain name just because it's -- it's

17   not a government domain.  But as I said before, when we --

18   when we reevaluated the display of this -- the headline and

19   the -- the, you know, the headline specifically, we decided

20   to make some changes to it because when I look back at it,

21   I think we really -- you know, I think somebody could

22   potentially be confused by it.  So -- but I don't think in

23   the display URL it is.

24        MR. DE CARLO:  Exhibit 325, please, Mr. Bruyere.

25   BY MR. DE CARLO:

1   Q.   This is a traffic school search.  The word there is

2   "traffic school."  This is a key word that Online Guru bids

3   on to attract those interested in purchasing traffic school

4   to arrive at Online Guru's Website; correct?

5   A.   At *DMV.org*?

6   Q.   Yes.

7   A.   Yes.

8          MR. DE CARLO:  Could you go to the right side,

9   please.

10          Thank you.

11  BY MR. DE CARLO:

12  Q.   This reference is to an approved traffic school, and it

13  says what it says.

14          Mr. Lahoti, can you see how a reasonable person

15  would be deceived into thinking that this link is being

16  approved or that it's affiliated with the California

17  Department of Motor Vehicles?

18          MR. DAUCHER:  Objection.  Dysjunctive question.

19          THE COURT:  Is that a -- is that objection

20  recognized in the Evidence Code?

21          MR. DAUCHER:  It's -- it's just that it's two

22  questions.

23          THE COURT:  You mean it's compound?

24          Would you rephrase the question.

25          MR. DE CARLO:  Yes, your Honor.

BY MR. DE CARLO:

Q.  Mr. Lahoti, can you see how a reasonable consumer would
be deceived into believing that the California Department of
Motor Vehicles -- strike that.

        Do you see how a reasonable consumer would believe
that upon accessing this link they would be going to the
department -- the California Department of Motor Vehicles
Website?

A.  No, I do not.

        MR. DE CARLO:  Would you show the date on this one,
please, Mr. Bruyere.

BY MR. DE CARLO:

Q.  This is a November 27, 2006, listing.

A.  Okay.

        MR. DE CARLO:  Would you, please --

        THE COURT:  Sir, is that a question or are you
testifying?

BY MR. DE CARLO:

Q.  Is that a -- is the date on this November 27th, 2006,
Mr. Lahoti?

        MR. DAUCHER:  Objection.  Foundation.

        THE COURT:  Sustained.

BY MR. DE CARLO:

Q.  Now, with regards to -- we've shown some examples here
of California.  These similar strategies -- strike that.

1          These strategies you used -- you employ for other

2     states as well other than California; correct?

3     A.   I don't understand.

4     Q.   The key -- the bidding on key words -- you employ that

5     strategy for states other than California; correct?

6     A.   We bid on key words for every single topping on our Web

7     side.

8     Q.   And to try to attract visitors from states other than

9     California who have interest in, for example, traffic schools

10    in their own particular states; correct?

11    A.   That's one of the reasons why we attract people.

12    Q.   And the same with driver's education; correct?

13    A.   Yes.

14          MR. DE CARLO:  Okay.  If we could please go to

15    Exhibit 367.

16    BY MR. DE CARLO:

17    Q.   Mr. Lahoti, this is another Internet search.

18          Do you see that?  It's a Google search.

19    A.   Yes, I do.

20    Q.   Okay.  And the search term is -- terms are "California

21    DMV approved driver's education."

22          Can you see how a consumer interested in purchasing

23    driver's education in California might type in those search

24    terms?

25    A.   Yes.

Q. And those are search terms that are -- *DMV.org* bids on; is that correct?
A. Yes.
Q. And the date on this is --
Can you see what the date is?
A. Yes.
Q. And it's -- what is the date?
A. August 8th -- August 15th, 2007.
Q. This is after the lawsuit was filed; correct?
A. That's correct.
Q. After this lawsuit was filed, you had not yet placed any type of language on this sponsored listing that educates the consumer that you're not California Department of Motor Vehicles; is that correct?
A. That is not correct. You're talking -- this is -- well, this is after the lawsuit. But we've even made further changes even after this date, but specifically to this, the headline is actually just displaying the key word that person searches. You see it? Except the word "approved," it's just a key word assertion. So this is actually just a mistake because you'll notice that it says "DMV." The "MV" is lowercase. The other ad you saw before, capital DMV. So that's just Google's key word insertion, not to get too technical, but I just wanted to clarify.
Q. There's nothing on this sponsored listing that educates

1    a consumer that *DMV.org* is not the California Department of

2    Motor Vehicles; is that correct?

3    A.   It's not -- it's not -- first of all, it's not the

4    California Department of Motor Vehicles Website domain.  It's

5    a ".org" Website, which is typically not a Government domain

6    name.  That's -- you know, "gov" is the extension.  The TLD

7    or top-level domain extension.  And it's also a sponsored

8    link which, as I said before, it's not typical for a

9    government organization to advertise a driver's education

10   course.

11   Q.   You had it within your power to place text in this

12   advertisement that would have disclaimed an affiliation

13   specifically with the Department of Motor Vehicles; correct?

14   A.   I don't think there's enough space to really -- to say

15   that.  And I don't know what the purpose is when -- I don't

16   see the need to do that.

17          MR. DE CARLO:  Let's go to Exhibit 127, please.

18   BY MR. DE CARLO:

19   Q.   When a user, Mr. Lahoti, clicks on a sponsored

20   listing -- for example, what we have here is Exhibit 127, and

21   the search was for California Traffic School.

22          Do you see that?

23   A.   I do now, yes.

24   Q.   Okay.  And this --

25          MR. DE CARLO:  Can you go back to the full page.

1  BY MR. DE CARLO:

2  Q.   And do you see the listing the sponsored listing for

3  *DMV.org?*

4  A.   On the right side I do.

5  Q.   Now, when a user clicks on this advertisement, they're

6  going to go to a dedicated page on the *DMV.org* Website; true?

7  A.   On this ad I think they go right to the California

8  traffic school page.

9          MR. DE CARLO:  Can you go to 133, please.

10  BY MR. DE CARLO:

11  Q.   And this is a search for driver's ed.

12          And do you see your sponsored listing for driver's

13  education?

14  A.   Yes.  It's the first one on top.

15  Q.   And if a user clicks -- and if a user clicks on this

16  particular sponsored listing, they're going to be taken to

17  the California driver's education page; correct?

18  A.   That's correct.

19  Q.   Okay.  And talking first about traffic school, when a

20  user goes from the sponsored listing to the California

21  traffic school page, there's the I Drive Safe -- there's the

22  I Drive Safely icon on that page for the user to click on and

23  to be taken to the I Drive Safely Website to purchase a

24  traffic school course; correct?

25  A.   If they want to purchase it, yes.

1    Q.   Okay.  And the same with the California driver's

2    education.  When they go from a sponsored link and land on

3    the California driver's education page, that consumer is

4    provided with a link that will take them directly to a

5    Website where they could purchase a driver's education

6    course; correct?

7    A.   Assuming that their direct path is to click on that

8    link, they can do that.  But we all know that many -- many

9    people want to get acquainted with the Websites, surf around

10   before they make a purchase or even click on an

11   advertisement.

12   Q.   The link is available for them to click on and go to a

13   Website that will allow them to purchase the courses?

14   A.   That's what I said, yes.

15   Q.   Okay.  All right.

16          MR. DE CARLO:  Let's take a look at Exhibit 352,

17   please.

18   BY MR. DE CARLO:

19   Q.   Exhibit 352, Mr. Lahoti, this is what the *DMV.org*

20   Website looked like in 2002; correct?

21   A.   Does that say July 27th, 2002, at the bottom right?

22   It's very difficult to --

23   Q.   This is the date it was printed out --

24   A.   Okay.

25   Q.   -- from -- I'm asking you if -- it's a -- it's an

1    *archive.org* page.

2    A.    Okay.

3    Q.    Do you know if this is what the *DMV.org* Website looked

4    like in 2002?

5    A.    Yeah.  This is prior to my -- you know, prior to my

6    joining the company.  But yes, this is how it looked.

7    Q.    Okay.  And the -- do you know what the revenues were for

8    *DMV.org* in 2002?

9    A.    I do not.

10             MR. DE CARLO:  If you would turn, please, to

11    Exhibit 353.

12    BY MR. DE CARLO:

13    Q.    Do you know if this is what the *DMV.org* Website looked

14    like in 2003?

15    A.    Yes.

16    Q.    There are -- there is a prompt right up at the top that

17    allows the user to connect to their local DMV; is that

18    correct?

19    A.    That's correct.  Well, that's what it says.

20    Q.    So when the user -- the user clicks on here, they would

21    be given an option to go to -- to type -- they could type in

22    whatever state they want, and they would be taken to their

23    state's respective DMV?

24    A.    Well, eventually they would have -- they would be able

25    to click on -- I think -- I don't remember exactly the flow

1    of this page, but eventually they would get to their state

2    DMV Website.

3    Q.   And in 2003, do you know what the revenues were of

4    *DMV.org*?

5    A.   The revenues were -- I don't know the exact number, no.

6    Q.   If I represented to you that they were less than

7    $30,000, would that comport with your recollection?

8    A.   That would make sense, yeah.

9         MR. DE CARLO:  Let's go to 354, please,

10   Mr. Bruyere.

11   BY MR. DE CARLO:

12   Q.   Do you recognize this page as being what your Website

13   looked like in 2000 -- what the *DMV.org* Website looked like

14   in 2004?

15   A.   Yes.

16   Q.   Do you know what the revenues were in 2004?  If I told

17   you that the traffic school revenues and the driver's

18   education revenues combined were less than a quarter of a

19   million dollars in 2004, would that comport with your memory?

20        THE COURT:  Is that two questions or one?

21        MR. DE CARLO:  I'm sorry, your Honor.

22        THE COURT:  And which one do you want?

23   BY MR. DE CARLO:

24   Q.   Mr. Lahoti, if I were to represent to you that the

25   traffic school revenues for Online Guru in 2004 were less

1   than $225,000, would that comport with your memory?

2   A.   Well, not all of the revenue that we got in 2004 came

3   directly from -- the traffic schools that we had direct

4   relationships with in 2004, we only know what that revenue

5   is.  But we -- there was also traffic schools that were

6   displayed through a third-party relationship with Yahoo!, and

7   we have no idea what the segmentation of that revenue was of

8   traffic school.

9               MR. DE CARLO:  Can you pull up --

10              THE WITNESS:  So that's my full year.

11              MR. DE CARLO:  Can you pull up Exhibit 398, please.

12  BY MR. DE CARLO:

13  Q.   Mr. Lahoti, I've put on the screen Exhibit 398, which is

14  a summary of financials that were provided to us.  And if you

15  take a look at 2004 -- let's talk about 2004.  There's a line

16  item here for search engine marketing.

17              Do you see that line item?

18  A.   Yes.

19  Q.   You spent one -- approximately $1.3 million in 2004

20  search engine -- strike.

21              Search engine marketing, Mr. Lahoti, is that --

22  that is a bid for key word type of marketing; correct?

23  A.   That's right.

24  Q.   And that's the type of marketing that goes into those

25  targeted-type sponsored searches; correct?

A.   Correct.

          MR. DE CARLO:  Let's go to Exhibit 115, please.

BY MR. DE CARLO:

Q.   In 2005 --

          MR. DE CARLO:  Highlight 2005, please.

BY MR. DE CARLO:

Q.   In 2005, your search engine marketing went to
$2.2 million.

          In 2005, you were now operating -- running the
business full time; is that correct?

A.   2003 -- or the end of 2003 I started that, yeah.

Q.   And can you tell me why was there an increase of search
engine marketing from '04 to '05 of approximately a million
dollars?

A.   I mean, that's a natural growth of the Internet.  More
people are visiting Google and the search engines bids have
gone up.  You've learned more about what key words you can
target.  I mean, there's -- I can sit here for an hour
telling all the reasons it went up.

          MR. DE CARLO:  Okay.  Let's go down to 2006.

BY MR. DE CARLO:

Q.   And then in 2006 you increased your search engine
marketing up to almost $5 million.

          Would you agree that that's a substantial increase
in your search engine marketing from 2005 to 2006?

A.   I would agree that it's typical of a company that's

growing to increase it's marketing spending.

Q.   And that's also because between 2005 and 2006 you were

making -- you, Online Guru, were making a much more robust

use of search engine marketing as part of your business;

correct?

A.   Continual improvement, yes.

Q.   In late 2006, you worked on a -- on reconfiguring the

*DMV.org* Website; correct?

A.   The redesign -- excuse me.

     The redesign launched in October of 2006.  But I've

been working on it for a long time before that.

Q.   And the purpose of that redesign was to do things like

add more colors to the site?

A.   The purpose of the redesign, was it add more colors?

Q.   How about we do this.

     Let me ask you:  Why did you decide to redesign the

site in 2006?

A.   Because we wanted to improve the user experience of the

site.

Q.   You added a lot more content?

A.   More sections, more information, different site

structure, but generally it was the same -- it was the same

Website.  It just evolved.

Q.   Would you characterize the Website in 2000 -- in October

1    of 2006 after the launch as a brand-new Website?

2    A.    It's -- it's tough to say if it's a truly a brand-new

3    Website because you could get pretty much the same

4    information as you could get prior to the new Website as you

5    could with the new Website.

6           But I think the main thing is that we streamlined

7    the information.  We streamlined the user ability of it.  We

8    added some tabs to the top that people can jump from one page

9    to another a little bit easier.

10          So depending on which direction -- you know,

11   depending on what angle you look at it, yeah.  You can say

12   it's a brand-new Website.  You can say it is a redesign of

13   the Website.  You can say it's a rearchitecture of the

14   Website.

15          MR. DE CARLO:  Your Honor, with your permission, I

16   would like to just read from a section from Mr. Lahoti's

17   deposition on this topic, Page 106, Line 21 through line --

18   through Page 107, Line 14.

19          THE COURT:  Any objection?

20          MR. DAUCHER:  One moment, your Honor, please.

21          THE COURT:  Yes.

22          MR. DAUCHER:  Thank you.

23          Can you read me the line numbers again, please?

24          MR. DE CARLO:  May I approach, Counsel?

25          THE COURT:  Yes.

1          MR. DAUCHER:  No objection.

2          THE COURT:  All right.

3          MR. DE CARLO:  Starting at Line 21.

4              "ANSWER:  The design would change."

5          THE COURT:  Why don't you start with the question.

6          MR. DE CARLO:

7              "What were the differences of that

8          September 27th reconfiguration as opposed to how

9          the site looked before or how it operated before?"

10         And then there's some colloquy, and the answer

11  begins on Line 21.

12             "The design would change colors.  We put a

13         tabletop layout on top, kind of -- more of a

14         channel type of thing, similar to how *amazon.com*

15         and Wal-Mart people do that sort of stuff.  Got 'A

16         picture is worth a thousand words.'  We have

17         different layouts on every single page.  We did a

18         lot more content.  We invested a lot of resources.

19         I guess you could say invested a lot in content.

20         So we went for more of a directory-plus to more of

21         an informational guide -- more information, more

22         relevant, and more topical information, very deep

23         and also wide amount of content, more links on the

24         site.  It's an expansion of the site, as well as

25         a revamp or overhaul redesign.  It was a brand-new

almost Website.  But we took a lot of the things

that I learned from running the site for the

previous years to kind of evolve it to, or I would

like -- or I call it more like *DMV.org* 2.0 kind of

thing."

MR. DE CARLO:  Okay.  If we could go to

Exhibit 317, please.

This is from October 2006.

BY MR. DE CARLO:

Q.   This is your home page, is that correct, in October of

2006?

A.   At the end of October, yes.

Q.   Okay.  And this -- this would be a representation of

your -- of your reconfigured site; is that correct?

A.   Yeah.  This is the *DMV.org* 2.0 that I was talking about.

Q.   Now, on this --

MR. DE CARLO:  Can you go back a screen.

BY MR. DE CARLO:

Q.   On this page in October of 2006, there are no

disclaimers.  By that I mean statements disclaiming any

affiliation with the California or any Department of Motor

Vehicles; is that correct?

A.   There are no disclaimers saying that there's no

affiliation.

However, there are things that indicate that this

is not a government Website, such as the Website name:

*DMV.org*; that it's a -- you know, your DMV guide online.

It's a guide.  And the text in the first photograph, it's

very difficult to read, but it says, "This Website was

created to provide you easy to access information.  Since

government -- since government DMV sites can be confusing to

use we have developed this free and comprehensive guide for

the average person to understand."

Q.   Mr. Lahoti, there's a tag line here that says no --

that's in the middle of the page.  It says, "No need to stand

in line.  Your DMV guide is now online"?

Did you come up with that tag line -- or that

phrase?

A.   I think I did, yeah.

Q.   Did you get it -- did you copy it from anyone?

A.   No, I don't think so.

MR. DE CARLO:  Could we go to Exhibit 391, please.

BY MR. DE CARLO:

Q.   Do you recognize this document, the California Driver's

Handbook from 2006?

A.   I have not seen this.

MR. DE CARLO:  The next page, Mr. Bruyere.

THE WITNESS:  Yeah.  But it's pretty clear that it

is.

BY MR. DE CARLO:

1    Q.   And on the 2006 -- do you -- do you know -- there's a --

2    there's a tag line -- there's a line here from this page that

3    says, "Don't stand in line.  Go online."

4         You didn't copy your phrase from this handbook?

5    A.   No way.  I've been using that kind of statement

6    for quite a few -- for probably a couple of years -- a few

7    years.  I think if anything they copied us.

8    Q.   You think the California Department of Motor Vehicles

9    might have copied you?

10   A.   Why not?  That's a pretty catchy phrase, and I'm a

11   creative person.  So why not?

12         THE COURT:  You've got about 15 minutes, Counsel.

13         MR. DE CARLO:  Could we go back to the previous

14   document, which was Exhibit 317.

15   BY MR. DE CARLO:

16   Q.   There's no indication on this page to advise the

17   consumer to scroll down all the way to the bottom of the

18   page, is there?

19   A.   There's no indication what?

20   Q.   To -- there's no indication to prompt a user to scroll

21   down all the way to the bottom of the -- of this page;

22   correct?

23   A.   It's the user's responsibility to understand the entire

24   site that they're at.

25         MR. DE CARLO:  Can you go to Exhibit 318, please.

1    BY MR. DE CARLO:

2    Q.    Exhibit 318 is from October 10, 2006.

3            And this is a page that is dedicated to California;

4    is that correct?

5    A.    Yeah.  It's the California -- it's the *DMV.org* state

6    home page, basically.  It's for the -- for -- for California

7    basically.

8    Q.    And there's -- the use of the California flag next to

9    the -- "Your online guide to the California DMV," can you see

10   how a reasonable consumer might believe, upon accessing that

11   page, that they're at a California DMV Website?

12   A.    No, I don't.

13   Q.    The State of California -- the State of California

14   complained to *DMV.org* in 2004 about its domain name; is that

15   correct?

16   A.    About the *DMV.org* domain name?

17   Q.    Yes.

18   A.    Yes, they complained.

19   Q.    Okay.

20           MR. DE CARLO:  Can you go to Exhibit 342, please.

21   BY MR. DE CARLO:

22   Q.    Do you recall -- do you recall getting Exhibit 342, a

23   letter from the Department of Motor Vehicles about -- about

24   your domain name?

25   A.    Well, at the time that we received it, we actually

1   thought it was a joke because they misspelled things.  They

2   misspelled Governor Schwarzenegger's name in the letterhead,

3   and also the first line is pretty funny, actually.  "This

4   letter regards your use of 'DMV' in your email address."

5          So at first -- but we did get this, yeah.

6          MR. DE CARLO:  Okay.  Exhibit 343, please.

7   BY MR. DE CARLO:

8   Q.   You hired a lawyer to respond to it; correct?

9   A.   Yes.  That's correct.

10  Q.   And this is Mr. Trojan?

11         MR. DE CARLO:  If you go to -- this is Exhibit 385.

12  I need to look at the hard copy.  Excuse me.

13         If would you go to the next page, Mr. Bruyere.

14  BY MR. DE CARLO:

15  Q.   Mr. Lahoti --

16         MR. DE CARLO:  I'm sorry.  This is not -- this is

17  not the document.

18  BY MR. DE CARLO:

19  Q.   I'm sorry.  It wasn't Mr. Trojan.  It was Mr. Lawrence

20  Walters.

21         You know who Mr. Walters is, of course?

22  A.   Yes.

23  Q.   Okay.  Page 2 of this letter, in the last paragraph,

24  Mr. Walters in the second sentence indicates that

25  "Accordingly it has voluntarily and with full reservation of

1    rights eliminated the concurrent reference to California and

2    DMV on its Website."

3         In fact, *DMV.org* did not abide by that particular

4    representation, did it?

5    A.   Well, there was -- I believe at this time -- and it's

6    been more than three years, but I believe at this time

7    certain things were proposed to the State, and there was --

8    there was other communication back and forth.  And pretty

9    much nothing was ever -- there was no kind of, you know,

10   agreement made or anything like that.  And the matter was

11   basically then closed, and we didn't hear from the State

12   after that.

13   Q.   Did you ever stop using California concurrently with

14   *DMV.org*?

15   A.   I -- maybe for a time -- maybe for a short period of

16   time we did.  And then after the further communication --

17   it's hard, but I do remember for some time we did.  But I

18   think after that there was no issue and -- we seeked [sic]

19   counsel on it and there was no issue with it, and the matter

20   was closed with the State.

21        MR. DE CARLO:  Could we go to Exhibit 319, please.

22   BY MR. DE CARLO:

23   Q.   This is a page from --

24        MR. DE CARLO:  Is this 319?

25   ///

1   BY MR. DE CARLO:

2   Q.   This is a page from October 30th, 2006.

3        This is the page that -- this is a California

4   traffic school dedicated page on *DMV.org*; correct?

5   A.   Yes.  That's correct.

6   Q.   Okay.  And this is the page that the user will land on

7   when they come from a sponsored listing for California

8   traffic school; correct?

9   A.   Yeah.  They would land on this.

10  Q.   I'm sorry?

11  A.   They would they would probably land on this page, yes.

12       MR. DE CARLO:  Can you blow up this part right

13  here.

14  BY MR. DE CARLO:

15  Q.   And you would have -- and you represent -- I'm sorry.

16       You recommend to the user that I Drive Safely is

17  the best choice for California traffic school online at this

18  page; correct?

19  A.   That's correct.

20       MR. DE CARLO:  Let's go to Exhibit 320, please.

21  BY MR. DE CARLO:

22  Q.   This is the page that the user lands on when they do a

23  search for California driver's education on Google or Yahoo,

24  and they click on the -- on the sponsored link they will land

25  on this page; correct?

A.   Correct.

        MR. DAUCHER:  Objection.  Vague as to time.

        THE COURT:  Sustained.

BY MR. DE CARLO:

Q.   In November of 2006.

A.   Correct.

Q.   And *DMV.org* is recommending *teendriverseducation* as the
best choice for completing a California driver's education
requirement; correct?

A.   Correct.

Q.   Does *teendriverseducation.com* provide traffic school
services?

A.   No.

Q.   *Teendriverseducation* does not provide services, and
you are recommending to the consumer that
*teendriverseducation.com* is the best choice for completing
a course?

        MR. DAUCHER:  Objection.  Vague.  403.  Compound.
This is a driver's ed page.

        THE WITNESS:  You said traffic school.

        THE COURT:  Just a moment, sir.

        THE WITNESS:  Sorry.

        THE COURT:  All right.  Rephrase the question.

        THE WITNESS:  Sorry, your Honor.

BY MR. DE CARLO:

1    Q.   You are recommending to a consumer at this page a

2    driver's education course through an entity,

3    *driverseducation.com*, that does not offer driver's education

4    courses; correct?

5              MR. DAUCHER:  Objection.  Lacks foundation.

6              THE COURT:  Do you -- what's the basis?  Do you

7    know what *driverseducation.com* -- do you know what they do?

8              MR. DE CARLO:  You're asking me, your Honor?

9              THE COURT:  No.  I'm asking the witness.

10             THE WITNESS:  Sorry.

11             First of all, he said *driverseducation.com*.  It's

12   *teendriverseducation.com*.  Is that --

13             THE COURT:  Yes.

14             Do you know what *teendriverseducation.com* -- do you

15   know what services they provide?

16             THE WITNESS:  I know what the service is on that

17   Website, yes.

18             THE COURT:  Okay.  The objection is overruled.

19             You can answer the question.

20             Do you have the question in mind?

21             THE WITNESS:  Can you rephrase it or read it or

22   restate it.

23             THE COURT:  I'll ask the reporter to read it back.

24             (The record was read.)

25             THE WITNESS:  That's not correct.

1      THE COURT:  Next question.

2      MR. DE CARLO:  Let's go to Page 332 -- or

3    Exhibit 332.

4    BY MR. DE CARLO:

5    Q.   This is a page from May of 2007.

6         And Mr. Lahoti, May of 2007 is after the lawsuit

7    was filed; correct?

8    A.   That's correct.

9    Q.   Okay.  And this -- this is your home page; correct?

10   A.   Correct.

11   Q.   And you added some language on the home page after the

12   lawsuit was filed in the center indicating unofficial;

13   correct?

14   A.   That's correct.

15   Q.   You did not enter that unofficial language to either the

16   landing page -- to any traffic school dedicated landing page;

17   correct?

18   A.   That specific language, no.

19   Q.   And you did not add that language that is center -- the

20   unofficial language that is center, you did not add that

21   language to any dedicated driving education page?

22   A.   Is that a different question?

23   Q.   Yes.

24   A.   Sorry.  I didn't -- I think I misheard your first

25   question then.

1   Q.   The first question was related to traffic school and the

2   second question is related to driver's education.

3   A.   That's correct.  Same answer.

4   Q.   And you did that, and you didn't add that language

5   because you don't want the visitors, when they arrive at

6   your -- at that page, to be alerted to the fact that you're

7   not affiliated with the Department of Motor Vehicles.

8   A.   That's wrong.  That's incorrect.

9   Q.   You could have added "unofficial" or some other language

10  front and center of both the traffic school pages and the

11  dedicated driver's education pages.  You had that in your

12  power to do; correct?

13  A.   We added it into the logo.  We added it -- a disclaimer

14  underneath the logo that says, "*DMV.org* is not affiliated

15  with any government agency."

16          And at this time that we put this on the home page,

17  there was a clear spot to put it on there because prior to

18  that it said, "No need to stand in line, your DMV guide is

19  now online," but to make that additional change to put it, it

20  it's just a design, you know, decision, which at that time we

21  decided not to.

22  Q.   After the changes were made by you to the Website after

23  this lawsuit was filed, you continued to be aware of

24  instances of confusion by consumers; is that correct?

25  A.   Through the -- through the emails that we received -- we

1   received sometimes a few emails a day out of the couple of

2   hundred emails that we get that indicate maybe a consumer

3   doesn't know specifically who we are, whether we're an agent

4   or an affiliation or a government or like triple A.  So I

5   don't know exactly what that consumer is thinking, but it

6   could be perceived as though they're not positive who we are.

7   Q.   And you're also aware of instances in which people write

8   in the press about you in which they are confused about your

9   affiliation and -- or about your lack of affiliation with the

10  Department of Motor Vehicles; correct?

11          MR. DAUCHER:  Objection.  Calls for speculation as

12  to what they're thinking.

13          THE COURT:  Sustained.

14          You can rephrase it.

15          MR. DE CARLO:  Thank you, your Honor.

16  BY MR. DE CARLO:

17  Q.   Mr. Lahoti, have you seen articles or press releases,

18  things that have been published where it's clear to you --

19  and this is for the time period after you've made these

20  changes after this lawsuit was filed.

21          Have you read those types of publications where

22  it's clear to you that the author of the publication is

23  confused about your company vis-a-vis any affiliation with an

24  official government agency like the DMV?

25  A.   I'm not sure how many I've seen, but I think -- I think

1   one or more have suggested that the -- that the writer may --

2   may be confused.  But I don't know because some people who

3   link to us -- they could link to it saying find Department of

4   Motor Vehicles at *DMV.org* or find Department of Motor

5   Vehicles information at *DMV.org*.

6          Does that mean that they're confused as to who we

7   are?  Or the fact that, you know, you can find that

8   information or find a link to it from our site?  Our site is

9   easy to -- it streamlines the ability to find all of that

10  information.

11  Q.   Prior to the lawsuit, you were aware that consumers were

12  confused about your site, specifically vis-a-vis any

13  affiliation with the government, including Department of

14  Motor Vehicles; correct?

15  A.   Prior to the lawsuit, just like in most lawsuits, there

16  are sort of indications that can suggest a person -- some

17  people maybe not knowing who they're -- you know, who we are

18  or our affiliation.  I don't know the exact number, but the

19  only way we can really know is through emails that we

20  receive, and there's only a few a day.

21  Q.   I'm talking about before the lawsuit was filed you were

22  aware that there was confusion.  That's my simple question.

23          MR. DAUCHER:  Objection.  Asked and answered.

24          THE COURT:  Overruled.

25          You can answer.

1          THE WITNESS:  I was aware that there was some --

2     some number of people, just through direct communication

3     if -- that I had.

4          MR. DE CARLO:  Okay.  May I -- your Honor, do I

5     have a little more time?

6          THE COURT:  How much time do you need?

7          MR. DE CARLO:  If I could have another five to

8     10 minutes.

9          THE COURT:  You can have five more minutes.

10          MR. DE CARLO:  Would you pull up Exhibit 17,

11     please.

12     BY MR. DE CARLO:

13     Q.   Do you recognize this advertisement, Mr. Lahoti?

14     A.   Yes, I do.

15     Q.   That's an advertisement that you -- that you wrote?

16     A.   My design -- well, our company -- our company created

17     this ad.

18     Q.   How would a consumer know when looking at this

19     advertisement that you are not affiliated with the

20     California DMV?

21     A.   Well, first of all, there's a few different things.

22     This site is -- as I said before, it's *DMV.org*, which is not

23     a government site or a government domain.  It says, "Your

24     complete guide to the DMV."  It does not say, "This is the

25     DMV."

1          It's kind of -- it's an advertisement that's on

2    a -- you know, on a game Website.  So that may also indicate

3    that.  And it's complete cartoonish.

4          MR. DE CARLO:  Would you go to Exhibit 18, please.

5    BY MR. DE CARLO:

6    Q.   There is no express affiliation -- there's no express

7    indication on this advertisement, is there, that *DMV.org* is

8    not associated or affiliated with any particular Department

9    of Motor Vehicles office; is that correct?

10   A.   Just the complete guide to DMV and it's a ".org" site.

11   Q.   Mr. Lahoti, the government offers lots of guides for its

12   citizens, doesn't it?

13         MR. DAUCHER:  Objection.  Foundation.  Speculation.

14         THE COURT:  Sustained.

15   BY MR. DE CARLO:

16   Q.   Do you know if the -- if the United States government,

17   the federal government, for example, offers citizens dozens

18   of guides for a variety of different topics and interests?

19         MR. DAUCHER:  Objection.  Foundation.

20         THE COURT:  You can answer that question "yes" or

21   "no."

22         THE WITNESS:  I don't know if they're called

23   "guides."

24         MR. DE CARLO:  Your Honor, I have an impeachment

25   document that I would like to show to Mr. Lahoti.

1          May I show it to counsel and approach Mr. Lahoti?

2          THE COURT:  You can show it to counsel, yes.

3          (Sotto voce discussion between counsel was held.)

4          MR. DE CARLO:  May I approach the witness, your

5  Honor --

6          THE COURT:  You can approach the clerk.

7          MR. DE CARLO:  -- with these?

8          I'm sorry.

9          THE COURT:  All right.  Let me see the document,

10  please.

11          Is this writing on the document your writing?

12          MR. DE CARLO:  Yes, your Honor.

13          May I proceed, your Honor?

14          THE COURT:  Yes.  Go ahead and ask your question.

15          MR. DE CARLO:  Thank you.

16  BY MR. DE CARLO:

17  Q.   Mr. Lahoti, the first page of this document you

18  recognize as being the *UnitedStates.org* home page; correct?

19          THE COURT:  Do you recognize that document?

20          THE WITNESS:  I'm sorry.  I'm sorry.  Yes.  That's

21  correct.  Yes, I recognize it.

22          THE COURT:  Do you recognize it?

23          THE WITNESS:  I do recognize it.

24  BY MR. DE CARLO:

25  Q.   That's a Website that you control; correct?

UNITED STATES DISTRICT COURT

1    A.    Yes.  We manage this site.

2    Q.    On the second page of this document there is -- the

3    second page of this document, there is a link to *USA.gov*;

4    correct?

5    A.    Correct.

6    Q.    And USA dot -- do you know that -- do you know that

7    *USA.gov* is the official US gateway to all governmental

8    information?

9    A.    Yes, I do.

10   Q.    Do you recognize the next page as being the home page --

11   do you recognize the next page as being the home page to

12   United States -- to *USA.gov*?

13   A.    I'm not very familiar with this site.  I've -- I've

14   scanned it before.  But I've -- yes.  From looking at it

15   here, yes, I can see it.

16   Q.    And you can see I circled a link to consumer guides.

17          Do you see that link?

18   A.    Yes, I do.

19   Q.    And if you skipped two pages or three pages down, when

20   that link is accessed we get to a page called "Consumer

21   guides and protection."

22          Have you ever reviewed this page?

23   A.    No, I have not.

24   Q.    Do you have any knowledge as to whether the federal

25   government offers all the guides that are listed on this

1    page?

2    A.   I don't know if they offer -- I don't know if they're

3    linking to third-party cites or if they're offering it

4    themselves.

5    Q.   You don't have any reason to believe that consumers

6    believe that governments don't offer guides, do you?

7    A.   No, there's -- there's no reason to believe that.

8            MR. DE CARLO:  Thank you, your Honor.  I appreciate

9    it.

10           THE COURT:  All right.  Do you have any

11   cross-examination for the witness?

12           MR. DAUCHER:  Some redirect [sic], your Honor.

13           THE COURT:  All right.

14                       **CROSS-EXAMINATION**

15           MR. DAUCHER:  Can we take a look at Exhibit 322,

16   please.

17   BY MR. DAUCHER:

18   Q.   Okay.  Mr. Lahoti, this is Exhibit 322 you were shown on

19   earlier examination.

20           MR. DAUCHER:  This is -- for the record, it's a

21   November 17, 2006, search.

22   BY MR. DAUCHER:

23   Q.   Mr. De Carlo asked you questions about the sponsored

24   listing at the top of this exhibit.

25           Do you see that?

A.   Yes, I do.

Q.   If you will go down to the -- I take it on the search

result you can identify for us what are not sponsored

listings; is that correct?

A.   That's correct.

Q.   And where do those begin on this exhibit?

A.   Well, it's directly under the sponsored link, but

because somebody searched this with Google desktop installed

on their computer, there's that extra bit of text right

underneath the sponsored link that's usually not there.

         But underneath that, it says "California Department

of Motor Vehicles home page."

Q.   Okay.  So that result is what we can refer to as an

organic result; correct?

A.   That's correct.

Q.   And all results which follow that are organic results;

correct?

A.   That's correct.

Q.   And can you explain what -- what would be defined as an

organic result?

A.   It is a listing that Google will -- or any search engine

for that matter will -- it's the search listings that they

display based on their ranking algorithm and their free

results that they -- they link.  And usually their ranking

algorithm takes into effect many factors, you know, one of

1  which is information of the site, quality of the site,

2  et cetera, et cetera.

3  Q.   And the second organic result appears to be for *DMV.org*;

4  is that correct?

5  A.   Yes, that's correct.

6  Q.   And did *DMV.org* or your -- your entity, Online Guru,

7  draft the text of that result?

8  A.   The title tag in the description here comes from our

9  Website.

10  Q.   Do you have any control over what Google displays in its

11  organic results?

12  A.   Google usually displays the title of the Website on

13  here.  However, in the description, they can display many

14  things.  They can display a part of the Website.  They can

15  display a description of the meta -- in the meta data.  It's

16  Google's choice as to what they display there.

17  Q.   And you -- you cannot force Google to list you in

18  organic results; correct?

19  A.   No.  You cannot.

20  Q.   Okay.  Are you aware of whether state motor vehicle

21  departments pay for search engine marketing?

22  A.   No.  I'm not aware of any states that do that.

23          MR. DAUCHER:  Let's take a look at Exhibit 323,

24  please.

25  ///

1    BY MR. DAUCHER:

2    Q.   Again, this is a search result you were shown on earlier

3    examination from May of '07, a Google search result.

4          Do you recall this?

5    A.   Correct.

6    Q.   And you were asked about the sponsored listing at the

7    top.

8          And can you again identify for the Court where the

9    organic results begin.

10   A.   Right beneath sponsored links or link.

11   Q.   So -- so the first organic result on this page would be

12   California Department of Motor Vehicles; is that correct?

13   A.   Correct.

14   Q.   And then the second organic result is *DMV.org*'s Website;

15   is that correct?

16   A.   Correct.

17   Q.   And within that result, there is more underlying text

18   saying, "California DMV," dash, "CA DMV Department of Motor

19   Vehicles guide."

20         Do you see that?

21   A.   Correct.

22   Q.   Is that an organic or a sponsored result?

23   A.   It's an organic result.

24   Q.   So Google is displaying that text on its own; correct?

25   A.   That's correct.

1    Q.   You're not paying Google to do that; correct?

2    A.   That's correct.

3            MR. DAUCHER:  Would you please reference

4    Exhibit 324.

5    BY MR. DAUCHER:

6    Q.   This is a search from November of '06 that were you

7    shown on earlier examination for driver's ed on Google.

8            Do you recall this?

9    A.   Yes.

10   Q.   And are you currently running the same text for a

11   driver's ed sponsored listing at this point?

12   A.   No.  The text has changed.

13   Q.   Can you describe the changes that you've made?

14   A.   The text, I believe -- says California driver's ed info,

15   I believe in the headline.  And then the -- the description

16   lines say, "Find driver's education information or find a

17   driver's education course at 'The Unofficial Guide to the

18   DMV.'"

19           MR. DAUCHER:  And now will you now reference Page 2

20   of Exhibit 324, please.

21   BY MR. DAUCHER:

22   Q.   And this is another search result from November 27th,

23   2006, which were you asked about on examination.

24           Do you recall this?

25   A.   Yes.

1   Q.   And again, the focus was on the sponsored listing at the

2   top.  But I want you to identify for the Court where the

3   organic results begin on this page.

4   A.   So just -- just like I said before, the sponsored links,

5   usually the organic starts again.  If you ignore that, Google

6   desk top results it says, "California driver education

7   online, 39.95."  That's the first organic listing.

8   Q.   And the second organic listing appears to be for

9   *DMV.org*; is that correct?

10  A.   That's correct.

11  Q.   And again, in the underlying text within that second

12  organic listing the words "California DMV," dash, "CA DMV

13  Department of Motor Vehicles guide" appear.

14          Do you see those words?

15  A.   Correct.

16  Q.   And again, do you -- do you know who selects that text?

17  A.   Well, that was the title tag that we had on our site at

18  that time, and Google basically decides to display that

19  listing or not.

20          MR. DAUCHER:  Will you refer to Exhibit 325,

21  please.

22  BY MR. DAUCHER:

23  Q.   This is a search result from November 27th, also Google,

24  this time for traffic school.  And focus on examination was

25  on sponsored listing for *DMV.org* in the right-hand column

1    under approved traffic schools.

2            Do you see that?

3    A.    Yes.

4    Q.    Now, who is -- who does *DMV.org* advertise traffic school

5    for in California?

6    A.    We advertise I Drive Safely on *DMV.org* in the state of

7    California, on our California-related pages to traffic

8    school.

9    Q.    And do you know whether courts in California will accept

10   a certificate of completion from I Drive Safely, you know, to

11   mask traffic points?

12           MR. DE CARLO:  Objection.  Leading.

13           THE COURT:  Overruled.

14           You can answer.

15           THE WITNESS:  Yes.

16   BY MR. DAUCHER:

17   Q.    And also on this listing, can you identify for the Court

18   this Exhibit 325 where the organic results begin.

19   A.    Again, below the sponsored links and where it says

20   *trafficschool.com*.

21   Q.    Plaintiffs in this case are listed as the first organic

22   result; correct?

23   A.    That's correct.

24   Q.    And *DMV.org* appears as the fourth?

25   A.    I think the fifth actually.

1    Q.   Fifth?

2         Okay.  And again, that -- the placement of the

3    organic results is not within the control of online viewers;

4    correct?

5    A.   No, it's not.

6         MR. DE CARLO:  Objection.  Leading.

7         THE COURT:  Overruled.

8         You can answer.

9         Next question.

10        MR. DAUCHER:  I'd like to refer now to Exhibit 670.

11   BY MR. DAUCHER:

12   Q.   I believe there's a stipulation on search results.  And

13   this could be identified as an October 2007 Yahoo! search for

14   DMV.

15        MR. DE CARLO:  Yes.  That's correct.

16        MR. DAUCHER:  Thank you.

17   BY MR. DAUCHER:

18   Q.   All right.  Mr. Lahoti, does Online Guru currently bid

19   for the key word "DMV" with Yahoo!?

20   A.   Yes, we do.

21   Q.   And in this result -- in this set of results can you

22   identify for us any sponsored listings which are paid for by

23   Online Guru?

24   A.   The -- on the right column, the third listing is the

25   *DMV.org*-sponsored listing.

1    Q.   Where it says "California DMV info"?

2    A.   That is correct.

3    Q.   And it also now includes the reference, "The unofficial

4    guide to the CA DMV"?

5    A.   That is correct.

6    Q.   And on this listing, under number one it appears to be

7    *DMV.org* as well.

8         Is that an organic or a sponsored result?

9    A.   That's an organic result that Yahoo! has chosen to

10   place.

11   Q.   And the text underneath that, Directory of State

12   Department of Motor Vehicle Websites, is that text that

13   Online Guru controls?

14   A.   No, it is not.

15        MR. DAUCHER:  And will you now reference

16   Exhibit 671.

17        I believe there will also be a stipulation, your

18   Honor, that this is a Google search result from October 2007

19   for the same search term "DMV."

20        MR. DE CARLO:  That's correct.

21        What exhibit is it?  I'm sorry, Mr. Daucher.

22        MR. DAUCHER:  671.

23        MR. DE CARLO:  Thank you.

24   BY MR. DAUCHER:

25   Q.   And again, on this search result can you identify the --

1    any sponsored results that are paid for by Online Guru?

2    A.    Yes.  On the right side there are -- there's the second

3    listing.

4    Q.    And on this result for the Court can you identify where

5    the organic results begin.

6    A.    The organic results are at the top.  It's the top

7    listing on the left.

8    Q.    So the first organic result that Google posts is for the

9    California Department of Motor Vehicles?

10   A.    That's correct.

11   Q.    And *DMV.org* is listed third in the organic results;

12   correct?

13   A.    Yes.  That's correct.

14   Q.    And now Google pulls in the header text that you have on

15   your Website now, "The Unofficial Guide to the DMV"; is that

16   correct?

17   A.    Correct.

18            MR. DAUCHER:  Okay.  I'd like you to refer now to

19   Exhibit 367, please.

20   BY MR. DAUCHER:

21   Q.    This is a search result you were shown on earlier

22   examination.

23            Do you recall that?

24   A.    Yes.

25   Q.    Now, who -- does *DMV.org* advertise a California driver's

1    education provider on its Website currently?

2    A.    Yes.

3    Q.    And who is that provider?

4    A.    Golden State Private School.

5    Q.    Okay.  And is there a relationship between Golden State

6    Private School and *teendriverseducation.com* the Website?

7    A.    Golden State Private School basically manages the entire

8    Website that can you find at *teendriverseducation.com*.

9    Q.    Now, plaintiffs' counsel point pointed out that

10   *teendriverseducation.com*, the Website, is owned by one of the

11   BizGroups' entities is that correct?

12   A.    That's incorrect.

13   Q.    Who owns that Website?

14   A.    The domain name specifically is owned by one of the

15   entities.  The Website -- the information, the operation the

16   customer service, the fulfillment, the whole thing -- is run,

17   managed, operated by Golden State Private School.

18   Q.    Is there a business reason why the domain name is owned

19   by one of the BizGroup entities?

20   A.    Yes.  There's a business reason.  And the reason is

21   because in order to track sales for a cost per action, CPA,

22   business model, you need a -- a URL basically that is

23   designated for the publisher who is advertising.  And there

24   are various ways to do that.  You can have a specific file

25   name that's on the Website.  Or you can have a -- its own

1    domain name.  And that way all of the sales would -- that we

2    are referring to would be properly tracked.

3    Q.   Do you know whether Golden State sells driver's

4    education services based upon advertisement not done by

5    Online Guru?

6    A.   Of course.

7    Q.   And so the *teendriverseducation.com* domain helps

8    segregate those sales from your sales?

9    A.   That is correct.

10   Q.   Okay.  Do you know whether Golden State is an

11   approved -- a California DMV approved driver's education

12   service provider?

13   A.   I don't know if the terminology is that they are

14   approved by the California DMV.  But I do know they are

15   approved to give certificates of completion that basically

16   satisfy your driver's education requirements.  I think there

17   are some differences between private schools versus

18   brick-and-mortar driving schools; so that's kind of sort of

19   how it works.

20   Q.   All right.

21        MR. DAUCHER:  Can we refer now to Exhibit 627,

22   please.

23   BY DAUCHER:

24   Q.   Mr. Lahoti, do you recognize Exhibit 627?

25   A.   Yes.

1          MR. DAUCHER:  And, your Honor, may I ask that the

2     paper copy of this exhibit be placed before the witness?

3          THE COURT:  Yes.

4          THE WITNESS:  Okay.  I can see that.

5          MR. DAUCHER:  Thank you.

6     BY MR. DAUCHER:

7     Q.   And 627 comprises about six pages?

8          Can you identify Exhibit 627?

9     A.   You want me to tell you what it is?

10    Q.   Yes, please.

11    A.   This is the archive version of our *DMV.org* Website on,

12    I think, February 16th of 2006.

13    Q.   So this is prior to the October 2006 redesign; is that

14    correct?

15    A.   That is correct.

16    Q.   Now, as of that time, February 2006, do you know

17    approximately how many different pages the *DMV.org* Website

18    contained?

19    A.   Over a thousand.

20    Q.   Okay.  And after the redesign of the Website, how many

21    pages?

22    A.   Close to 4,000.

23    Q.   Okay.  And the pages that are referenced as Exhibit 627,

24    do those -- well, let's take a look at the first two.

25          Is that the home page from February 2006?

1    A.    That's the home page, yes.

2    Q.    And you were using the *DMV.org* license plate logo at

3    that time; correct?

4    A.    Correct.

5    Q.    And you were using your "No need to stand in line" tag

6    line at that time; correct?

7    A.    Correct.

8              MR. DE CARLO:  Objection.  Leading.

9              THE COURT:  Sustained.

10   BY MR. DAUCHER:

11   Q.    Can you identify for the Court -- well, let me just ask

12   you this.

13             On the third page of Exhibit 627, can you identify

14   what the third and fourth pages represent.

15   A.    This represents the home page of *DMV.org* pertaining to

16   the California -- the State of California.

17   Q.    Okay.  And if you will look at the fifth page of

18   Exhibit 627, can you identify for the Court what those pages

19   represent.

20   A.    Which page?

21   Q.    The fifth and sixth page.

22   A.    This page represents the California traffic school page

23   that we had at that time.

24   Q.    And so in February of 2006 you were then advertising

25   I Drive Safely; is that correct?

1    A.    That's correct.

2    Q.    Okay.  Now, will you refer to Exhibit 625, please.  I'm

3    afraid it's in a different notebook.

4          MR. DAUCHER:  I would ask that that be placed

5    before the witness as well, your Honor.

6          THE COURT:  How much longer are you going to be

7    with this witness?

8          MR. DAUCHER:  I believe only five or seven minutes,

9    your Honor.

10         THE COURT:  All right.

11   BY MR. DAUCHER:

12   Q.    Now, Mr. Lahoti, do you have Exhibit 625 before you?

13   A.    Yes, I do.

14   Q.    And can you identify it for the record.

15   A.    Well, according to the link at the bottom, it looks like

16   it's the home page of *DMV.org* in on May 17, 2004.

17   Q.    And is that consistent with what you recall the home

18   page to have looked like in approximately May of 2004?

19   A.    Yes.

20   Q.    Is -- there's some blank white space at the top of this

21   exhibit.

22         Do you know whether in 2004 that space was blank?

23   A.    No.  It was the same -- same thing as the previous

24   exhibit.  It had the -- the *DMV.org* logo and the same -- the

25   same image, I think.

1    Q.   Okay.  Mention was made in the earlier testimony about

2    the tag line "No need to stand in line."

3             And do you know -- what's your best estimate for

4    the Court as to when you began using that tag line?

5    A.   Early 2000 -- early 2004 or late 2003.

6    Q.   And in this March or May 2004 version that we're looking

7    at, Exhibit 625, was that tag line in use?

8    A.   Sorry.  Can you state that again.

9    Q.   On this version, Exhibit 625, was that tag line in use?

10   A.   Yes.  The tag line says, "No need to stand in line.

11   Your personal guide is now online."

12             MR. DAUCHER:  Can you now refer to Exhibit 318,

13   please.

14   BY MR. DAUCHER:

15   Q.   Do you recall the discussion -- I'm sorry.  We can use

16   an electronic version for this.

17             THE COURT:  That's fine.

18   BY MR. DAUCHER:

19   Q.   Do you see Exhibit 318?

20   A.   Yes, I do.

21   Q.   And in -- this indicates a date of October 2006.

22             That's after the newer version of the Website came

23   out; is that correct?

24   A.   Yes.

25   Q.   Okay.  And at that point in time, you were using state

1    flags on the state home pages; is that correct?

2    A.    Yes.  That was -- yes.

3    Q.    And when did that practice begin?

4    A.    October 2006 or when the site redesign went live.

5    Q.    So in about October 2006?

6    A.    Yes.  That's correct.

7    Q.    And are you currently using those state flags?

8    A.    No, we are not.

9    Q.    When did that practice end?

10   A.    March 2007.

11   Q.    What was the purpose of using the state flags?

12   A.    The purpose was -- you know, I guess pictures -- some

13   users respond to pictures better than text sometimes.  And so

14   we were basically trying to reenforce that they were on a

15   page dedicated to information related to California.  And it

16   was mostly a design -- you know, a design decision to put it

17   on there.

18        MR. DAUCHER:  Will you refer now to Exhibit 631,

19   please.  And specifically if you'll refer to page five of

20   that exhibit.

21        THE WITNESS:  Okay.  I'm there.

22   BY MR. DAUCHER:

23   Q.    Now, you were asked whether the current version of the

24   traffic school page for California for *DMV.org* includes the

25   unofficial guide language.

1          Do you recall that?

2     A.    Yes.

3     Q.    And does -- first of all, does Exhibit 631, Page 5,

4     reflect a copy of a current version of that page?

5     A.    No.

6     Q.    Actually -- and so -- can you identify what has been

7     revised since this -- the date of this exhibit.

8     A.    Well, this -- since the date of this specific exhibit?

9     Q.    Yes.

10    A.    There has been additional information about kind of how

11    traffic -- just at the bottom of the page below the sponsor,

12    where we talk about just like kind of rules and regulations

13    around traffic school in California, maybe the language of

14    the ad has changed a little bit.  I'm not sure specifically

15    of all the changes, but I do know that we -- we added more

16    information at the bottom.

17    Q.    On this Page 5 of Exhibit 631, under the heading

18    "traffic school" it has the "recommends" language.

19          Do you see that?

20    A.    Yes.

21    Q.    Is that how it currently shows on the Website?

22    A.    I don't think so.  I think the language was changed.

23    Q.    And does the current version of the Website for the

24    California traffic school page of *DMV.org* include the words

25    "unofficial guide"?

1    A.   Yes.  It's the current version.  Even this version has

2    it on the license plate.  It's the first thing that you see

3    when you look at what site you're on.  And then it's -- you

4    know, "This DMV is not affiliated" underneath that, but it

5    doesn't say "official" anywhere else on there.

6    Q.   You're referring to the license plate logo on the upper

7    left?

8    A.   That's correct.

9    Q.   And does that logo appear on every page of the *DMV.org*

10   Website?

11   A.   Yes.  Each and every page.

12   Q.   With the unofficial guide language?

13   A.   Correct.  The tag -- that tag line is underneath that.

14   Q.   Okay.  Mention was made of the emails that *DMV.org*

15   receives.

16          First of all, to link -- how many visitors does

17   *DMV.org* receive on a daily basis?

18   A.   On average around 175,000.

19          MR. DE CARLO:  Objection.  Exceeds the scope of the

20   direct.

21          THE COURT:  Overruled.

22          You can answer.

23          THE WITNESS:  About 175,000 on average a day.

24   BY MR. DAUCHER:

25   Q.   And how many of those visitors send emails that you

1    receive at Online Guru?

2    A.    Maybe a couple of hundred.

3    Q.    Okay.  And now mention was made of certain articles that

4    appear on the Internet that reference *DMV.org*.

5          Do you recall that testimony?

6    A.    Yes.

7    Q.    And do you know how many different articles or Websites

8    on the Internet link to *DMV.org*?

9    A.    Well, according to -- yes, I do.

10   Q.    And approximately how many?

11   A.    According to Google's Webmaster tools they give us

12   access to, it's about close to 70,000.

13         MR. DAUCHER:  Thank you.

14         No further questions, your Honor.

15         THE COURT:  All right.  We're going to take our

16   break.

17         How much do you have?  Do you have anything left

18   for this witness?

19         MR. DE CARLO:  Yes, your Honor.  I would have some

20   redirect.

21         THE COURT:  And how -- what's your estimate?

22         MR. DE CARLO:  15 minutes.

23         THE COURT:  Okay.  We'll go ahead and take our

24   break.  And we'll come back at 1:30.

25         Who is your next witness?

1           MR. DE CARLO:  The plaintiff would call

2    Eric Creditor by declaration.

3           MR. DAUCHER:  The declarations are submitted I

4    believe.  Is there an intent to read the declarations into

5    the record of the Court?

6           THE COURT:  No.  The declaration is submitted.

7           Do you have any cross-examination?

8           MR. DAUCHER:  Yes, of course, your Honor.

9           THE COURT:  Okay.  When you get back, when you call

10   Mr. Creditor, I'll tell you what the -- I think there were

11   objections to Mr. Creditor's declaration.  I'll rule on those

12   objections, and I'll give you -- depending on those rulings,

13   I may give you some brief opportunity to see if you can cure

14   any of the problems.

15          MR. DE CARLO:  Mr. Creditor is our witness, your

16   Honor.

17          THE COURT:  Yes.  And as I understand it, he had

18   some objections --

19          MR. DE CARLO:  Yes.

20          THE COURT:  -- to the declaration that you

21   submitted; correct?

22          MR. DE CARLO:  Yes, your Honor.

23          THE COURT:  Okay.  So I'm going to rule on those

24   objections, and then I'll give you a brief opportunity to see

25   if there's anything there that you can clean up based on

1    those objections.  You may elect not to do it, at which point

2    he'll start his cross-examination.

3              Okay.  We'll see everybody at 1:30.

4              THE CLERK:  All rise.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Whereupon, from 12:10 p.m. to 1:39 p.m., the.

2          afternoon recess was held.)

3          THE COURT:  All right.  Why don't we have the

4   witness resume the stand.

5          MR. MAKOUS:  Your Honor, we have some orders of

6   business.  Could we talk about them now or should we finish

7   with the witness.

8          THE COURT:  You have some what?

9          MR. MAKOUS:  Some orders to discuss on trial

10  management.

11         THE COURT:  Let's finish this.

12         MR. MAKOUS:  Thank you.

13         THE CLERK:  Sir, you are reminded that having been

14  previously sworn, you remain under oath.

15         THE WITNESS:  Thank you.

16         THE COURT:  All right.

17                    **REDIRECT EXAMINATION**

18  BY MR. DE CARLO:

19  Q.   Mr. Lahoti, regarding *teendriverseducation* and your

20  testimony earlier about that, the arrangement is between --

21  the business arrangement is between Online Guru and Golden

22  State Private School; correct?

23  A.   That is correct.

24  Q.   I'd like to show you a page that's been previously

25  marked as Exhibit 15.  And I'm just going to use the Elmo

1   because it's easier.

2            This was the business development agreement.

3            And Item B says, "The school" -- that, of course,

4   is Golden State Private School; correct?

5   A.   That is correct.

6   Q.   "Desires to retain the company" -- and the company is

7   Online Guru; correct?

8   A.   Yes.

9   Q.   And it says, "to market and promote its business

10  utilizing the URL *teendriverseducation.com* managed by the

11  company."

12           So according to this agreement, Online Guru is

13  managing the *teendriverseducation.com* Website; correct?

14           MR. DAUCHER:  Objection to the extent calls for a

15  legal interpretation of the agreement.

16           THE COURT:  Are you asking if it says what it says?

17  Is that what you're asking?

18           MR. DE CARLO:  I'm asking him if -- yes, your

19  Honor.

20           THE COURT:  I can read the document.  It says what

21  it says.

22  BY MR. DE CARLO:

23  Q.   Mr. Lahoti, is it true that Online Guru manages the

24  *teendriverseducation.com* Website?

25  A.   No, it is not.

1    Q.    *Teendriverseducation* is a domain name that is owned by,

2    I believe, Find My Specialist?

3    A.    Correct.

4    Q.    And Find My Specialist is one of those companies

5    underneath the BizGroups; correct?

6    A.    Correct.

7    Q.    When -- you indicated in your testimony with Mr. Daucher

8    that Online Guru advertises Golden State Private School;

9    correct?

10   A.    Correct.

11   Q.    Anywhere on the *DMV.org* California -- strike that.

12            In order to access *teendriverseducation.com*, the

13   user -- the Web user goes to the California driver's

14   education home page; correct?

15   A.    The California driver's ed page, yes.

16   Q.    And on it there's a link for *teendriverseducation*?

17   A.    Correct.

18   Q.    There's no reference on that page to Golden State

19   Private School; correct?

20   A.    That is correct.

21   Q.    But it's your testimony that *DMV.org* is advertising

22   Golden State Private School even though there's no reference

23   to Golden State Private School on that page?

24   A.    Well, similar to how continued ed manage -- is the

25   company that owns *IDriveSafely.com*, same thing with

1    Private -- or they manage -- it's like a fictitious business

2    name or a business name where they're operating under the

3    domain teen -- under the Website *teendriverseducation.com.*

4          It -- it doesn't -- if we -- marketing Golden State

5    Private School on our site, they are the ones that we are

6    marketing.  But they're using -- or their services are at

7    *teendriverseducation.com.*

8          The Website domain name doesn't have to be

9    necessarily the company name in which you are marketing.

10   Q.   In fact, you are not advertising Golden State Private

11   School on your Website because there is no reference to

12   Golden State Private School anywhere on your driver's

13   education page; true?

14          MR. DAUCHER:  Objection.  Argumentative.

15          THE COURT:  Sustained.

16   BY MR. DE CARLO:

17   Q.   Mr. Lahoti, when the user clicks on the

18   *teendriverseducation* link on the *DMV.org* Website, the user

19   goes to the *teendriverseducation* Website; correct?

20   A.   Correct.

21   Q.   That Website is branded completely as

22   *teendriverseducation*; is that correct?

23   A.   Yes.

24   Q.   Okay.  And, in fact, on that Website representations are

25   made to the consumer that the courses are being offered in

1  part by *teendriverseducation*; correct?

2  A.   Well, I believe that the page is about -- when you read

3  about us and the contact page all refer to Golden State

4  Private School.  So they are the ones who own that Website.

5  Q.   Don't you also represent to the consumer that is

6  *teendriverseducation* that is offering those driver's

7  education services?

8  A.   That's where you can basically find the services, at

9  teen -- through -- by visiting *teendriverseducation.com*

10  that's where the service will be hosted.

11         MR. DE CARLO:  Your Honor, may I present an

12  impeachment document to show to counsel.

13         THE COURT:  Yes.  You can show it to counsel.

14         MR. DE CARLO:  May I give one to the clerk, your

15  Honor, to give one to the Court.

16         THE COURT:  Yes.  That's fine.

17         Have you marked this?

18         MR. DE CARLO:  It has not been marked.

19         THE COURT:  Would you like to mark it?

20         MR. DE CARLO:  Yes, I would like to mark it, your

21  Honor.

22         THE COURT:  Okay.  What number is it?

23         MR. DE CARLO:  Could we mark it as 413, your Honor?

24         THE COURT:  All right.

25         Is this more than one document?

1          MR. DE CARLO:  It is multiple pages from the

2    *teendriverseducation* Website.  It's the result of clicking on

3    various links or various headings on that Website.

4          THE COURT:  Okay.

5          MR. DE CARLO:  May it be placed before the witness,

6    your Honor?

7          THE COURT:  Yes.

8          MR. DE CARLO:  Thank you.

9    BY MR. DE CARLO:

10   Q.   Mr. Lahoti, before I ask you --

11         THE COURT:  Do you have that document?

12         THE WITNESS:  No, I don't.

13         THE COURT:  Would you place that document in front

14   of the witness, please.

15         THE WITNESS:  Thank you.

16   BY MR. DE CARLO:

17   Q.   Mr. Lahoti, before I ask you a couple of questions about

18   that document, I'd like to go over a couple of points about

19   the value of -- of owning this domain name.

20         There's a significant business advantage to one of

21   your companies owning this domain name in part because the

22   goodwill that's developed is owned by Find My Specialist in

23   this instance; isn't that correct?

24         MR. DAUCHER:  Objection.  Calls for a legal

25   conclusion.

1            THE COURT:  Overruled.

2            You can answer.

3            THE WITNESS:  The main purpose of having a separate

4    domain name is so that the students can be segmented, and

5    they know how to -- they know, you know, the cost-per-action

6    fee that they're paying to us.  They can -- you know, they

7    can separate it from their own students.  That's the main

8    purpose.

9    BY MR. DE CARLO:

10   Q.   Using a domain name -- owning the domain name also helps

11   you because in the future if there's going to be referrals

12   back to the *teendriverseducation* Website, it benefits your

13   company because you're the owner of the domain name; correct?

14   A.   That would -- that would then -- if somebody, let's say,

15   goes to *driverseducation.com* and they come back to it and

16   they buy the product, we would get credit for it.

17   Q.   And this also enables you great flexibility because

18   you're not beholden to Golden State Private School.  For

19   example, if your relationship with Golden State Private

20   School severs, you can get another provider for -- I'm sorry.

21   Golden State Private School, if that relationship severs, you

22   can get another providers for driver's education, and nothing

23   about your Website has to change.  The branding can all stay

24   the same, and it remains seamless; isn't that correct?

25   A.   I'm not sure if that would be very easy to do because

1    there's -- there's existing students that are going to go to

2    that site to log in, and it would very complicated to do

3    something like that.

4    Q.   Aren't they going to go back to the *teendriverseducation*

5    Website to log in?

6    A.   That's right.  But the existing students that log in to

7    *teendriverseducation.com*, we don't run that course.  Golden

8    State Private School does.  So all of those existing students

9    you'd somehow have to link them to a course that's not

10   existing anymore.  So that doesn't give us that much

11   flexibility there.

12   Q.   For students who bookmark the *teendriverseducation.com*

13   course -- or Website, rather, that benefits Find My

14   Specialist because if those students come back and access

15   the bookmark, they're going to go back to

16   *teendriverseducation.com* as opposed to

17   *GoldenStatePrivateSchool.com* or whatever their Website is.

18   A.   Well, that's how you log into the course.  That's why

19   they would bookmark it, right?

20   Q.   Okay.  Now let's take a look at this Exhibit 413.

21          And you recognize this as being a page -- the

22   welcome page on *teendriverseducation*; correct?

23   A.   It is the home page.

24   Q.   Okay.  And again, this is branded by a -- branded as

25   *teendriverseducation*.

1          There's no branding of Golden State Private School

2    here; correct?

3    A.   Not on this page.

4    Q.   And if we go up a little bit, I highlighted some stuff.

5    It says our courses are developed by Golden State.

6          Our courses -- who are you referring to when you

7    say "our"?

8    A.   What do you mean, who am I referring to?

9          MR. DAUCHER:  Objection.  Lacks foundation that

10   they were --

11          THE COURT:  Sustained.

12   BY MR. DE CARLO:

13   Q.   Do you know who wrote this?

14   A.   Yeah.  Golden State Private School did.

15   Q.   And do you know who -- do you know who Golden State

16   Private School is referring to when they say "our"?

17   A.   Yeah.  Themselves.

18   Q.   Is not a representation made to the consumer that it is

19   *teendriverseducation* whose course it is?

20          MR. DAUCHER:  Objection.  Calls for a speculation.

21   He didn't write it.

22          THE COURT:  Sustained.

23   BY MR. DE CARLO:

24   Q.   If you turn, sir, to the page that begins, "Legal

25   information, terms of use."

1            Under "Copyright and proprietary rights:  This

2    Website is the property of driver's ed course and driver's ed

3    course is defined as "teendriverseducation.com."

4            Now, you've indicated that it is Golden State

5    Private School that wrote this text?

6    A.    That is correct.

7    Q.    Is that your understanding of the legal -- the legal

8    property rights on this Website that the Website is owned by

9    *teendriverseducation.com*?

10            MR. DAUCHER:  Objection.  702.  Calls for legal

11    opinion.

12            THE COURT:  Sustained.

13    BY MR. DE CARLO:

14    Q.    Mr. Lahoti, do you believe that Find My Specialist owns

15    the *teendriverseducation.com* Website?

16    A.    No, I do not.

17    Q.    You don't take a proprietary interest in it?

18    A.    The Website?  No.

19    Q.    Just the domain name?

20    A.    Just the domain.

21            Can I clarify something?

22            They use the domain basically under -- under

23    license.

24    Q.    They use the domain name under license for Find My

25    Specialist?

1    A.   Correct.

2    Q.   Mr. Lahoti, on your -- is it accurate to say that you

3    have not -- "you" meaning Online Guru, have not changed all

4    the sponsored listing to include "unofficial language"?

5         MR. DAUCHER:  Objection.  Vague as to "all ."

6         THE COURT:  Sustained.

7    BY MR. DE CARLO:

8    Q.   You have not -- you have not changed all of your search

9    engine advertising as it relates to *trafficschool* to include

10   the word "unofficial" within the sponsored listing; is that

11   correct?

12   A.   As of this point, I think all of it has been changed,

13   but I'm not -- I can't -- you're talking about on Google?

14   Q.   Yes.

15   A.   I'm pretty sure most, if not all, includes "unofficial"

16   as -- you know, as of now, yeah.  I'm pretty sure.

17        MR. DE CARLO:  Your Honor, I have a series of

18   impeachment documents, which I'd like to show counsel, which

19   are Web pages.

20   BY MR. DE CARLO:

21   Q.   Let me clarify my question.

22        Mr. Lahoti, on Google for driver's education, is it

23   accurate that you have not added unofficial language on all

24   of your sponsored listings for driving school?

25   A.   Did -- what was -- how is that different -- what was the

1    previous -- what was the previous question?

2    Q.    The previous question related to *trafficschool*, and now

3    I'm changing the question to driver's education.

4    A.    Okay.  So please restate that.

5    Q.    Is it accurate to say that in Google, under Googled

6    sponsored advertising for driver's education you have not

7    added the language related to unofficial in all of your

8    sponsored listings?

9    A.    We made -- we made an effort to do it on all of them.

10   So I have not seen -- I do not know of any right now that

11   don't have "unofficial" in it.

12   Q.    Okay.  By the way, on this *teendriverseducation* page it

13   indicates the course is $69.95.

14          How much of that fee does Online Guru keep as part

15   of its share?

16          MR. DAUCHER:  Objection.  Outside the scope of --

17          THE COURT:  Sustained.

18   BY MR. DE CARLO:

19   Q.    Thank you, Mr. Lahoti.

20          MR. DE CARLO:  I don't have anything else, your

21   Honor.

22          MR. DAUCHER:  No questions, your Honor.

23          THE COURT:  All right.  Sir, you may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  Who is your next witness?

1              MR. DE CARLO:  Eric Creditor, your Honor.

2              THE COURT:  Why don't we go over the objections

3     that were filed.

4              All right.  I'm looking at the defendants'

5     objections to the Creditor testimony.  Let me ask the

6     defendants.

7              Your objection -- let's take, for example, on

8     Page 7 where you object to Paragraph 11.  And are you

9     objecting to lines -- well, Page 4, Lines 4 through 5?

10             MR. DAUCHER:  Yes, your Honor.  To the extent the

11    witness is purporting to state what my client does.  But not

12    to the extent the witness is talking about his own company's

13    operations.

14             THE COURT:  Okay.

15             Okay.  The objection to Paragraphs 11, 12, 13, 14,

16    15, 16, 16-E, 19, and 28 are sustained.  There's no

17    foundation.

18             And then Paragraphs 17, 20, and 28 are sustained,

19    as is -- well, under consumer deception, 20 -- Paragraphs 29,

20    30, and Paragraph 25 on page -- pay-per-clicking marketing.

21             And under causation of injury the objection is to

22    Paragraphs 24, 25, and 26 are sustained.

23             And under 3.8, the objection to Paragraphs 38

24    through 41 are sustained.

25             We'll take up the objection to 364.

1           Now, are you still objecting to 364?

2           MR. DAUCHER:  Is that their visitor report?

3           I believe that's their visitor report, your Honor.

4    Yes.  But only to the extent that it includes a column

5    purporting to illustrate a decrease in traffic across the

6    *trafficschool.com* Website because that is, in our view,

7    misleading and so not something we would waive a business

8    record exception on because, as the Court is aware

9    *trafficschool.com* spun off driver's ed operations; so a

10   certain portion of their traffic started to funnel

11   through Driver's Ed --

12          THE COURT:  All I need to know is do you still have

13   an objection?

14          MR. DAUCHER:  Yes, your Honor.

15          THE COURT:  And then there are a number of other

16   exhibits here.  301, 303, 305, 307, 309, 311, 313, 317

17   through 320, 332, and 352 to 354.

18          MR. DAUCHER:  We would at this time withdraw those,

19   your Honor.

20          THE COURT:  Okay.  And Paragraph 16(f) and 29,

21   which I guess refers to Trial Exhibit 321.

22          MR. DAUCHER:  One moment.

23          We would retain those objections, your Honor.

24          THE COURT:  Okay.  And then Paragraphs 19, 20, 29,

25   and Paragraphs --

1          MR. DAUCHER:  Those -- I'm sorry, your Honor.

2          THE COURT:  Go ahead.

3          MR. DAUCHER:  Under section 3.3.3, we will withdraw

4    those objections.

5          THE COURT:  And what about Paragraph 29?  I think

6    it deals with 367, 372, 379, and 383 too.

7          MR. DAUCHER:  We -- we have no objection to the

8    exhibits any longer.  I think -- and I think you've taken

9    care of the test -- the opinion testimony already.

10          THE COURT:  Okay.

11          Okay.  Now, where is Mr. Creditor?

12          THE WITNESS:  Right here, your Honor.

13          THE COURT:  Okay.  Do you want to come forward and

14    be sworn.

15          THE CLERK:  Please raise your right hand.

16          Do you solemnly swear that the testimony you are

17    about to give in the matter now pending before this Court

18    shall be the truth, the whole truth, and nothing but the

19    truth so help you God.

20          THE WITNESS:  I do.

21          THE CLERK:  Please be seated.

22                    **ERIC JASON CREDITOR,**

23      called as a witness by counsel for the plaintiff(s) being

24            first duly sworn, testified as follows:

25          THE CLERK:  Please state your full name and spell

1   your last name for the record.

2          THE WITNESS:  Eric Jason Creditor, spelled

3   C-r-e-d-i-t-o-r.

4                    **DIRECT EXAMINATION**

5   BY MR. MAKOUS:

6   Q.   Good afternoon, Mr. Creditor.

7   A.   Good afternoon.

8          MR. MAKOUS:  Your Honor, let -- order of business

9   on your rulings.  I just -- there was a few things that I

10  didn't hear your ruling on.  And in order to facilitate a

11  more exam -- direct exam, which I think you are permitting us

12  to do in view of the rulings -- I'm not going to argue it.  I

13  just want to go back and find out what your ruling was, if I

14  may.

15         And the one I didn't hear was Paragraph 3.3 of

16  defendants' objections.  And I think -- yes, that would be

17  it.  3.3, which were Paragraphs 11, 14, 16, and 20 on

18  competition.

19         THE COURT:  You didn't hear it because I didn't --

20  say anything.  So those objections were overruled.  So you

21  don't need to go over that.

22         MR. MAKOUS:  Thank you, your Honor.  I apologize.

23  I didn't know your style on that.

24         Also, may I conclude that the 3.5 was also

25  overruled and 3.6?

1          THE COURT:  No.  3.5 was sustained.  3.6 was
2     sustained.
3          MR. MAKOUS:  Okay.  And then on 3.9, the trial
4     exhibit, I think you -- as I understood it, you -- that's
5     just under consideration.  There's been no ruling on that.
6     Is that what you meant?
7          THE COURT:  Yeah.  You can tell -- you can ask the
8     witness about that exhibit.
9          MR. MAKOUS:  Okay.  I will do so.
10          Thank you, your Honor.
11          And finally, the third party Web pages on Page 13,
12     which are 3.10.2, a point of order on that, the joint exhibit
13     list as filed by the parties has only a relevancy objection,
14     not an improper lay opinion.  They've withdrawn that.  And so
15     the only issue is one of relevancy, and that is on the
16     exhibit list with this Court.
17          I can inquire as to the document if you wish, but I
18     believe it's --
19          THE COURT:  Are you talking about Exhibit 321?
20          MR. MAKOUS:  I'm talking about exhibit -- Trial
21     Exhibit 321, as referenced on Page 13 of defendants'
22     objections, 3.10.2.
23          THE COURT:  Well, apparently, I guess -- what is
24     your objection to that?
25          MR. DAUCHER:  Your Honor, I think we did -- in

1    fairness to Mr. Makous, I think we did withdraw that on the

2    trial meet and confer at this point; so we will withdraw

3    that.

4             THE COURT:  All right.  Thank you.

5             MR. MAKOUS:  Thank you, Mr. Daucher.

6    BY MR. MAKOUS:

7    Q.   Mr. Creditor, did you bring your declaration to the

8    stand with you?

9    A.   I did not.  I left it.

10            MR. MAKOUS:  Your Honor, to facilitate the

11   foundational questions to this, I would like to have -- if

12   the witness could have his declaration in front of him, and

13   then I can direct him.  And then I will ask questions so that

14   we don't have to fish around for topics.  It will be much

15   more efficient if I can do it that way.

16            In other words, you ruled on Paragraph 11.  I can

17   lay -- I can put that on the Elmo and then start asking

18   questions of the witness to support the statements made in

19   those paragraphs.

20            THE COURT:  Why don't you just ask the questions.

21            MR. MAKOUS:  Can I put it on the Elmo?

22            THE COURT:  Please ask the questions.  We are --

23   that document is not in evidence.  It's merely a declaration.

24   So ask the questions.

25   BY MR. MAKOUS:

1    Q.   Okay.  Mr. Creditor, how long have you been in the

2    *trafficschool* business?

3    A.   I began this business -- into this business in 19 --

4    approximately 1990.

5    Q.   How long have you been in the online traffic school

6    business?

7    A.   We started up our online traffic school business --

8           THE COURT:  This is not a -- this is not a direct

9    examination.  If you want to ask him to establish a

10   foundation to try to cure these objections, you have got

11   about 10 minutes to do that.

12   BY MR. MAKOUS:

13   Q.   Okay.  Mr. Creditor, in your declaration do you recall

14   your testimony where you said that *trafficschool.com* competes

15   with *DMV.org* by promoting and selling *trafficschool* courses

16   in the following states, and then you named a number of

17   states?

18   A.   Yes.

19   Q.   The Court has ruled that --

20           THE COURT:  Sir, this is not a speech.  Just ask

21   questions.

22           MR. MAKOUS:  Okay.

23           THE COURT:  Establish the foundation, if you can.

24           MR. MAKOUS:  Okay.

25   BY MR. MAKOUS:

Q.   Do you have any personal knowledge of the nature of the operations of *DMV.org*, Online Guru, and the others?

A.   From my experience in the industry in --

THE COURT:  See, the question is do you have any personal knowledge of their operations.  That's the question. I'm not interested in what your experience is.

THE WITNESS:  I -- I believe that employees of our company have had discussions with their company.  I have personal knowledge from information and evidence that I have seen through this litigation as to the operations of *DMV.org* as to their --

THE COURT:  Other than what you've seen in connection with this litigation, do you have any personal knowledge of their operations?

THE WITNESS:  From what I see in search engine advertising and through the discussions that we have had prior to this litigation, yes.  I have personal knowledge I believe.

THE COURT:  Discussions with whom?

THE WITNESS:  Discussions with representatives from my company that have had -- representative -- discussions with representatives from their company.  Emails that I have reviewed between the parties.

BY MR. MAKOUS:

Q.   Referring to Driver's Ed Direct in that statement;

1   correct?

2   A.   Correct.

3   Q.   Have you ever visited the Website of *DMV.org*?

4   A.   Yes.

5   Q.   How many times?

6   A.   Hundreds of times.

7   Q.   Are you aware of how they promote and sell traffic

8   school services?

9   A.   Yes.

10  Q.   How do they do that?

11       THE COURT:   How do you -- what is the basis for

12  that knowledge?

13       THE WITNESS:   I see how they promote and sell the

14  courses at the search engine level.   I see how they promote

15  and sell it at the Website level.   I see how then their

16  partners, whom they refer over to at times, promote and sell

17  the courses as certified partners of *DMV.org*.

18  BY MR. MAKOUS:

19  Q.   Okay.   Let's take the state of California first.   How

20  does *DMV.org* promote and sell the sale of traffic school

21  services to residents of the state of California, from what

22  you've observed?

23       MR. DAUCHER:   Objection, your Honor.   Lacks

24  foundation.

25       THE COURT:   Sustained.

1    BY MR. MAKOUS:

2    Q.   You've seen the Websites, have you not?

3    A.   Correct.

4              THE COURT:  That's not enough.

5              THE WITNESS:  I've seen search engine advertising

6    that promotes --

7              THE COURT:  There's no -- excuse me, sir.  There's

8    no question pending.

9              THE WITNESS:  Sorry.

10             THE COURT:  Wait for a question.

11             THE WITNESS:  Okay.

12             THE COURT:  Go ahead.

13   BY MR. MAKOUS:

14   Q.   Have you, during the course of this litigation, been

15   privy to any evidence that supports your statements in this

16   declaration about competition between the companies?

17             THE COURT:  That question is objectionable.

18             Go ahead.  Next question.

19             MR. MAKOUS:  Okay.  The next question being

20   something prior to the litigation, your Honor?

21             THE COURT:  Sir, you are asking the questions.

22             MR. MAKOUS:  All right.

23   BY MR. MAKOUS:

24   Q.   TSC -- what is the business of *trafficschool.com*?

25   A.   *Trafficschool.com* markets and promotes, sells, fills, in

1    some cases provides certificates for the completion of ticket

2    dismissal courses in California, as well as the relationships

3    for various other states for ticket dismissal courses, in

4    addition to providing other services, such as driving record

5    fulfillments, insurance quotation forms, and some ancillary

6    services as well.

7    Q.   What is the business of *DriversEdDirect.com*?

8    A.   *DriversEdDirect* is a driving school for new drivers

9    looking for information and for courses to fulfill

10   requirements for learner's permits or licenses, depending

11   upon their state, through driver's education courses or --

12   and/or through behind-the-wheel driver's training.

13   Q.   Did *DriversEdDirect* of have any direct communication

14   with Raj Lahoti about a business partnership?

15   A.   Yes.

16   Q.   When?

17            MR. DAUCHER:  Objection.  No foundation.  The

18   witness had personal communications.

19            MR. MAKOUS:  May I inquire.  He's the president of

20   *DriversEdDirect*.

21            THE COURT:  Sustained.

22   BY MR. MAKOUS:

23   Q.   Mr. Creditor, are you aware if anyone from

24   *DriversEdDirect* had personal dealings on *DriversEdDirect's*

25   behalf with Raj Lahoti in relationship to a possible test

1   market of a sales of *DriversEdDirect* services?

2   A.   Yes.

3   Q.   When was that?

4   A.   It was --

5          MR. DAUCHER:  Objection.  Calls for hearsay, your

6   Honor.

7          THE COURT:  Not that particular question.

8   BY MR. MAKOUS:

9   Q.   When was that?

10  A.   It was -- to clarify, I'm the COO of the company, but

11  the president of our company --

12         THE COURT:  Sir, I'm going to tell you one more

13  time.  You answer his questions, only his questions.  Don't

14  volunteer information.  Okay?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Now go ahead.

17         THE WITNESS:  In February of 2006 the president of

18  our company, *DriversEdDirect*, James Leach, contacted Raj

19  Lahoti to inquire on our relationship between our companies,

20  *DriversEdDirect* and *DMV.org*.

21         MR. DAUCHER:  Move to strike everything after

22  "February 2006."

23         THE COURT:  Sustained.  The answer is stricken.

24  BY MR. MAKOUS:

25  Q.   Were you privy to emails exchanged between Mr. Leach,

1   your subordinate, and *DriversEdDirect* -- and Mr. Lahoti in

2   regards to a possible test arrangement between the companies?

3   A.   Yes.

4   Q.   And during that exchange of emails did you learn

5   anything about the business of *DMV.org*?

6   A.   From what I read in the emails that were forwarded to

7   me, yes, I did.  As well as in my discussions with my

8   subordinate, James Leach, yes.

9   Q.   What did you learn?

10          MR. DAUCHER:  I move to strike the answer to the

11  extent it relates to a Leach discussion.

12          THE COURT:  Sustained.

13  BY MR. MAKOUS:

14  Q.   From the emails that you personally reviewed,

15  Mr. Creditor, what did you learn about the business practices

16  of *DMV.org*?

17          MR. DAUCHER:  Objection.  It would lack foundation

18  as to which part of the email.  If it comes from my client it

19  could be an admission, but if it's an internal communication

20  of there's it's also hearsay.

21          THE COURT:  That question is too broad; so the

22  objection is sustained.

23          MR. MAKOUS:  Which part of it, your Honor, is

24  sustained so I might know how to rephrase?

25          THE COURT:  Let's just the question is -- the

1  objection is sustained.

2          MR. MAKOUS:  Uh-huh.  Thank you.

3  BY MR. MAKOUS:

4  Q.   Does *DMV.org* advertise any of your competitors on its

5  Website, Mr. Creditor?

6          MR. DAUCHER:  Objection.  No foundation.  Calls for

7  speculation.

8          MR. MAKOUS:  Is this -- your Honor, may I be heard

9  on this?

10          THE COURT:  Let me try to cut this short.  If

11  you're trying to put him up here to establish foundation

12  based on what somebody else told him, that's not going to

13  work.

14          MR. MAKOUS:  Even if it's the defendants, your

15  Honor?

16          THE COURT:  If you can do that, that's fine.  But

17  you haven't done that so far.  And your questions are too

18  broad.

19          MR. MAKOUS:  Okay.

20          THE COURT:  So --

21          MR. MAKOUS:  May I -- on that note, your Honor,

22  the -- his personal viewing of the *DMV.org* Website as it is

23  held out to the public is admissible evidence.  It

24  demonstrates the nature of the business.

25          THE COURT:  If you have -- your job is to answer

1    questions.  You've got five more minutes, and then I'm going

2    to turn it over to cross-examination.  This is not -- we are

3    not having a debate.

4            So go ahead.

5            MR. MAKOUS:  Okay.

6    BY MR. MAKOUS:

7    Q.   Have you been to the *DMV.org* Website?

8    A.   Yes.  Hundreds of times.

9    Q.   Does it advertise on its Website any business service in

10   competition with either of the plaintiffs?

11           MR. DAUCHER:  Objection.  No foundation.  We've

12   been down this line before.

13           MR. MAKOUS:  Let me withdraw the question.

14   BY MR. MAKOUS:

15   Q.   Is I Drive Safely a competitor of yours?

16   A.   Yes.

17   Q.   Is Golden State School a competitor of yours?

18   A.   Yes.

19   Q.   Why is that?

20           MR. DAUCHER:  Objection.  Calls -- to the extent

21   calls for a legal opinion.

22           THE COURT:  Overruled.

23           MR. MAKOUS:  Thank you, your Honor.

24           THE WITNESS:  I believe they are competitors

25   because they provide traffic school and --

1          THE COURT:  Let's take them one at a time.

2          THE WITNESS:  I Drive Safely is a competitor

3     because they provide traffic school courses.  They provide

4     the same courses that we provide to the same consumers.

5     BY MR. MAKOUS:

6     Q.   Okay.

7     A.   Golden State Private School is a competitor because they

8     provide driver's education courses, generally -- obviously to

9     the same consumers that we do, teens or new drivers looking

10    for learner's permits and/or driver's licenses.

11    Q.   Now, are there any other states that *DMV.org* has a

12    relationship with, a partner in, that you also offer either

13    driving education services or traffic school services?

14    A.   Yes.

15          MR. DAUCHER:  Objection.  No foundation.

16          THE COURT:  Sustained.

17    BY MR. MAKOUS:

18    Q.   Are you aware of any other states -- and then I will ask

19    you how you are aware.

20          Are you aware of any other states where *DMV.org* has

21    a partner in relationship with a traffic school or a driver's

22    education service?

23    A.   Yes.

24    Q.   What states?

25          MR. DAUCHER:  Objection.  Lacks foundation as to --

1       THE COURT:  Sustained.

2    BY MR. MAKOUS:

3    Q.   Have you been to the *DMV.org* Website to see the sale --

4    the advertisement of services for traffic school and driver's

5    education in states other than California?

6            MR. DAUCHER:  Objection.  Relevance.  Been down the

7    line before.  Being on the Website isn't enough to put him on

8    the stand.  No foundation.

9            THE COURT:  If he's been -- you can ask him what he

10   saw on the Website.

11           MR. MAKOUS:  Okay.  Thank you, your Honor.

12   BY MR. MAKOUS:

13   Q.   Let's -- let's take the fall of 2006 as a time frame --

14   A.   Okay.

15   Q.   -- so that we don't have a wide range of time.

16           Did you visit the *DMV.org* Website during -- anytime

17   during the fall of 2006?

18   A.   Yes.

19   Q.   Did you visit any of the particular pages within that

20   site in relationship to traffic schools or driver's

21   education?

22   A.   Yes.

23   Q.   Did you see the names of any entities offering traffic

24   school services or driver's education services on the Website

25   at that time?

1   A.   Yes.

2   Q.   What names?

3   A.   I've seen I Drive Safely.  I've seen American Safety

4   Institute -- or Florida Safety Course.  I'm sorry.  I've seen

5   *teendriverseducation*.  Driving University.  Virtual Drive.

6   Driver In The Box.  American Safety Classes, I believe.

7   Q.   Okay.  Let's start with I Drive Safely.

8        Where did you see on the *DMV.org* Website the

9   I Drive Safely name?

10  A.   I saw it on the traffic school page for the states of

11  California; Nevada, I believe; Colorado; possibly Virginia.

12  Q.   Were any of these schools recommended by *DMV.org* on

13  those Web pages?

14       MR. DAUCHER:  Objection.  No foundation.  Beyond

15  the scope of what he saw.

16       THE WITNESS:  I didn't finish what I said.  But --

17  BY MR. MAKOUS:

18  Q.   Okay.  You had additional states to ad?

19       THE COURT:  Excuse me, Counsel.  There's an

20  objection pending.

21       MR. MAKOUS:  Yes, your Honor.

22       THE COURT:  The question as phrased, the objection

23  is sustained.

24  BY MR. MAKOUS:

25  Q.   Did you see any advertisements on the California page,

1    the traffic school and *DMV.org* for the I Drive Safely?

2    A.   Yes.

3    Q.   Did you see the words "we recommend" in association with

4    it?

5         MR. DAUCHER:  Objection.  Leading questions now.

6         THE COURT:  It is leading.  Sustained.

7    BY MR. MAKOUS:

8    Q.   What do you recall seeing?

9    A.   I recall seeing an advertisement for I Drive Safely with

10   text above a paragraph recommending I Drive Safely as the

11   best choice or the recommended best choice for traffic school

12   in that state by *DMV.org*.

13   Q.   Okay.  And did -- do you recall what you saw in regards

14   to Nevada traffic school?

15        THE COURT:  Excuse me, Counsel.

16        MR. MAKOUS:  Yes.

17        THE COURT:  Are these screen shots, if you will --

18   are they exhibits in this case?

19        MR. MAKOUS:  They've all been stipulated to, and

20   they're all admissible.  They've all been admitted, I

21   believe, by stipulation.

22        THE COURT:  Okay.  So what's the point -- if

23   they're already in evidence, what's the point of having him

24   go over it?

25        MR. MAKOUS:  Your Honor --

UNITED STATES DISTRICT COURT

1          THE COURT:  They're already in evidence.  You can

2     argue them.

3          MR. MAKOUS:  Well, that's true.  We can.

4          THE COURT:  Yeah, it's true.  You can.

5          MR. MAKOUS:  I appreciate that, your Honor.

6          You've stricken his testimony about being in

7     competition, and he doesn't work for *DMV.org*.  That's

8     understandable.  But he sees what he sees in the marketplace.

9          THE COURT:  Sir, if you want to argue that they're

10     in competition, you can do that based on the documents that

11     are here.

12          MR. MAKOUS:  Okay.  Thank you, your Honor.  I'll

13     move on then.

14     BY MR. MAKOUS:

15     Q.   Have you -- you've had an opportunity, Mr. Creditor, to

16     view the search engine results that are in issue in this

17     litigation, that is, the defendants' search engine results?

18     A.   Yes.

19     Q.   Do you have an opinion about whether they are misleading

20     in any respect?

21          THE COURT:  Okay.  What's he designated, as an

22     expert?

23          MR. MAKOUS:  This is lay opinion, your Honor.

24          THE COURT:  So you -- excuse me, Counsel.

25          MR. MAKOUS:  Sure.

THE COURT:  If he wasn't designated as an expert,

he's not going to offer any expert opinions.  If you wanted

to have him offer opinions, you should have designated him as

an expert.

MR. MAKOUS:  Your Honor, I'll make an offer under

lay opinion, Federal Rule of Evidence 702, I believe --

sorry.  701.

THE COURT:  You can do that at the end of the

trial.

That objection is sustained.

MR. MAKOUS:  Okay.  May I make a record on that now

or just later on?

THE COURT:  You can do it later.

MR. MAKOUS:  Okay.

THE COURT:  And I'm just telling -- I'll tell you

right now, if any lay witness wasn't designated as an expert,

they will not be offering any expert opinions in this trial,

and they don't come in as lay opinions.

All right.  Time is up.

Do you want to cross-examine?

MR. DAUCHER:  On his declaration, yes, your Honor.

THE COURT:  Okay.

**CROSS-EXAMINATION**

BY MR. DAUCHER:

Q.   Goods afternoon, Mr. Creditor.

UNITED STATES DISTRICT COURT

1    A.    Good afternoon.

2    Q.    You are the COO, of both *trafficschool* and

3    *DriversEdDirect*; correct?

4    A.    Correct.

5    Q.    And you own half of each entity; correct?

6    A.    Correct.

7    Q.    Along with Mr. Kramer, who is here as well; correct?

8    A.    Yes.

9    Q.    And you established *trafficschool.com* in 1984; correct?

10   A.    We established it in 1984 as a partnership; correct.

11   Q.    Now, at the beginning of 2005, *trafficschool.com* was

12   also offering driving education services as part of its

13   services; correct?

14   A.    In what year, sir?

15   Q.    Beginning of 2005.

16   A.    Correct.

17   Q.    But in 2005 you established a separate company,

18   *DriversEdDirect*, to take over part of the driver's

19   education -- to take over the driver's education portion of

20   the business from *trafficschool.com*; correct?

21   A.    At the time it did not take over the driver's education

22   business from *trafficschool.com*.  That was later.  It was

23   started to create a new business model which included

24   driver's education that would eventually be spun over, as

25   well as behind the wheel driver's training throughout

UNITED STATES DISTRICT COURT

1  California.

2  Q.   Eventually, though, the driver's education functions of

3  *trafficschool.com* were transferred to *DriversEdDirect*;

4  correct?

5  A.   Correct.

6  Q.   And that happened in what year?

7  A.   2006.

8  Q.   Okay.  Well, in Paragraph 4 of your declaration, at

9  Lines 9 to 11 -- well, in Paragraph 4 you state,

10  "Specifically, points that are assigned to one's driving

11  record in communicated to DMV may be masked on the driver's

12  record by the successful completion of a traffic school

13  course which is approved or accepted by the DMV"; correct?

14  A.   Correct.

15  Q.   And you state, "Consumers are thus compelled to take

16  only DMV approved or accepted courses because only those

17  courses will successfully mask the points."

18       Your testimony; correct?

19  A.   That's my understanding, correct.

20  Q.   Isn't it true, sir, that the California DMV does not

21  license online traffic schools?

22  A.   Correct.  They accept online traffic schools.

23  Q.   They accept online traffic schools only if a state court

24  has previously accepted that online traffic school; correct?

25  A.   If a county court or one of its agencies, yes, has

1  approved its course, yes.

2  Q.   And isn't it true that the California DMV does not

3  review, to your knowledge, online traffic school curriculum?

4  A.   I do not know if the California DMV does not review or

5  not.

6  Q.   You're not aware that they do; correct?

7  A.   I have never been told that they do; correct.

8  Q.   And yet in Paragraph 6 of your declaration you say TSC

9  has beneficially licensed by the California DMV to provide

10 traffic school courses since 1994.  That's the complete

11 sentence; correct?

12 A.   Yes.

13 Q.   Wouldn't it be more accurate to say that the California

14 DMV has licensed *trafficschool.com* to provide classroom-based

15 traffic school?

16 A.   I don't know if it would be more accurate, but the

17 California DMV has licensed TSC to provide traffic school

18 courses since 1984, it is true.

19 Q.   And that's the only license that you hold from the

20 California DMV; correct?

21 A.   For *trafficschool.com*; correct?

22 Q.   So the California DMV has not licensed you to provide an

23 online traffic school; correct?

24 A.   Not at this time; correct.

25 Q.   Now, how many students so far this year has

1    *trafficschool.com* taught in the classroom in California?

2    A.    I -- I don't have that data in front of me, and I

3    haven't run any reports.

4    Q.    You're the COO of the company and you can't give an

5    estimate?

6                MR. MAKOUS:  Objection.  Argumentative.

7                THE COURT:  Okay.  I'm going to let everybody know

8    if you have an objection, you need to stand when you make it.

9                What's your objection?

10               MR. MAKOUS:  Argumentative, your Honor.

11               THE COURT:  Sustained.

12   BY MR. DAUCHER:

13   Q.    Do you have any estimate as to what -- well, are you

14   certain -- let me ask this.

15               Are you certain that *trafficschool.com* has provided

16   a classroom lecture on traffic school in 2007?

17   A.    Yes.

18   Q.    How many lectures?

19   A.    It would be speculation, but I believe it's around one

20   to two a month.

21   Q.    And isn't it true that 98 percent of *trafficschool.com*'s

22   business is through -- in California is through the online

23   traffic school?

24   A.    I don't know the percentages without looking at any data

25   in front of me, but certainly a substantial number of our

1    business comes through the online or home study market.

2    Q.   But in saying in your declaration that you carry a

3    California license, you are relying exclusively on that

4    classroom license; correct?

5    A.   Correct.

6    Q.   And the only entities in -- to your knowledge in the

7    state of California that accept online traffic school

8    certificates of completion are state courts; correct?

9    A.   I'm sorry.  Can you rephrase -- can you restate the

10   question.

11            MR. DAUCHER:  Withdrawn.

12   BY MR. DAUCHER:

13   Q.   In Paragraph 31 of your declaration you state the

14   following:  "In the past *trafficschool.com* has registered

15   domain names, which include DMV as part of the domain name,

16   but we have not used those domain names in any misleading or

17   wrongful context"; correct?

18   A.   Correct.

19            MR. DAUCHER:  Now, will you refer to Exhibit 90,

20   please.  I believe we can simply put that up on the screen.

21   BY MR. DAUCHER:

22   Q.   Isn't it true *trafficschool.com* registered the domain CA

23   DMV traffic school in --

24            MR. DAUCHER:  We can go to Page 2.

25   ///

BY MR. DAUCHER:

Q.   -- the year 2000?

A.   That's what it appears to be, yes.

Q.   But *trafficschool.com*, as far as the online portion, is not a DMV-approved traffic school; correct?

A.   It is a DMV-accepted traffic school; that is correct. It is not licensed as an online traffic school.

Q.   Now, this domain CA DMV traffic school is still registered to *trafficschool.com*; correct?

A.   Correct.  *Trafficschool.com* is a CA DMV traffic school.

Q.   In the sense that it carries a classroom license?

A.   Correct.  And hopefully at some point a license to provide online courses as the legislatures are hopefully going to pass bills that will allow that.

Q.   But not right now; right?

A.   Well, currently they did pass a bill this year, and there is a task force that hopefully next year will have regulations in place.

Q.   But not right now?

A.   Correct.

          MR. MAKOUS:  Asked and answered.

          THE COURT:  Overruled.

BY MR. DAUCHER:

Q.   Now, in fact, *trafficschool.com* not only registered this domain "CA DMV traffic school," but it also used the domain

1    in the past; correct?

2    A.    For a very short period of time that domain was

3    redirected to *trafficschool.com* -- was many years ago, a

4    couple of years -- few years ago.  And it was for a short

5    period of time; correct.

6              THE COURT:  What year was that?

7              THE WITNESS:  I -- I'm sure it sure, your Honor.

8    At least two to three years ago.

9    BY MR. DAUCHER:

10   Q.    In 2004 and 2005; correct?

11   A.    Possibly.  I'm not sure.

12   Q.    And by redirect, you mean if someone types in that

13   domain they get sent to *trafficschool.com*; correct?

14   A.    Correct.

15   Q.    So it wasn't -- it was used over a period of years;

16   correct?

17   A.    I believe it was about a little over a year period,

18   maybe.

19   Q.    Wouldn't you concede that an Internet person searching

20   the Internet could -- that's typing that name could believe

21   that the traffic school they are directed to is a DMV -- a

22   California DMV-sponsored traffic school?

23             MR. MAKOUS:  Objection.  Relevancy.  Speculation.

24   Lacks foundation.  Expert opinion.

25             THE COURT:  Overruled.

1          THE WITNESS:  I have no evidence to show that

2     anyone felt that way that came to our site through that

3     redirection, although let me further -- the site at the time

4     I believe did have some references to the fact that

5     *trafficschool.com* was a California licensed entity and may

6     have even referenced to the classroom operations.

7          MR. DAUCHER:  Move to strike that last part of the

8     answer as nonresponsive.

9          THE COURT:  Overruled.

10    BY MR. DAUCHER:

11    Q.   Why did you register the domain CA DMV traffic school?

12    A.   For several reasons.  One, we are a CA DMV-approved

13    traffic school; second, we register many domain names, some

14    for ways to potentially utilize visitor traffic at that time

15    or into the future.

16          This domain name specifically -- I -- I can't

17    speculate any further.

18    Q.   Okay.  Will you refer to Exhibit 89, please.

19          Incidentally, before we look at that.

20          You registered CA DMV *trafficschool.com* before you

21    ever had heard of *DMV.org*; correct?

22    A.   I believe so.

23    Q.   All right.  Exhibit 89 is a domain name report for the

24    domain DMV-approved *trafficschool.com*.

25          Are you familiar with that domain name?

1    A.    I am.

2              MR. DAUCHER:  Would you go to Page 2, please.

3    BY MR. DAUCHER:

4    Q.    And isn't it true that *trafficschool.com* registered that

5    domain name in June of 2000?

6    A.    That's what it appears, yes.

7    Q.    And that domain is still registered to

8    *trafficschool.com*; correct?

9              MR. MAKOUS:  Objection.  Relevance to this entire

10   line of questioning, your Honor.  Domain name registration is

11   not actionable as wrong nor relevant.

12             THE COURT:  Overruled.

13   BY MR. DAUCHER:

14   Q.    And similar to CA DMV traffic school, you used DMV

15   approved *trafficschool.com* to redirect traffic to the

16   *trafficschool.com* Website; correct?

17   A.    For that same short period of time, yes.  Back in 2004

18   and 2005, but *trafficschool.com* does offer DMV-approved

19   traffic school courses.

20   Q.    But nowhere on your Website did you ever disclose that

21   you were not DMV approved for your online courses; correct?

22             MR. MAKOUS:  Objection.  Asked and answered.

23             THE COURT:  Overruled.

24             You may answer.

25             THE WITNESS:  I'm not quite sure of what we may say

1    with regards to DMV approval or not.  But I know that we

2    definitely make reference to the Court approval status.

3    BY MR. DAUCHER:

4    Q.   But -- so you can't tell the Court that you made a

5    disclosure that you were not DMV approved for online traffic

6    school; correct?

7            MR. MAKOUS:  Objection.  Argumentative.

8            THE COURT:  Sustained.

9    BY MR. DAUCHER:

10   Q.   Isn't it fair to say that by using a name "DMV-approved

11   school" a visitor would assume that the DMV -- that

12   California DMV has approved the traffic school that visitors

13   find on typing that domain?

14           MR. MAKOUS:  Objection.  Speculation.  Lacks

15   foundation.  Expert opinion.

16           THE COURT:  Overruled.

17           You can answer.

18           THE WITNESS:  I have no idea what consumers would

19   think when they saw DMV approved.  We have received no

20   evidence of anyone that was confused as to what you're saying

21   or emails or anything on the contrary.  In fact,

22   *trafficschool.com* does offer DMV-approved courses for other

23   states that have approved the online format.

24   BY MR. DAUCHER:

25   Q.   And you were offering those courses, of course, in 2004

1    and 2005, when you were using this domain in these other

2    states; correct?

3    A.    Correct.

4    Q.    What other states, sir, offered approved -- what other

5    motor vehicle departments in other states approved online

6    traffic school during that time?

7    A.    I believe -- without looking at the information or

8    having it in front of me, I believe there were other states,

9    the states of Nevada, Virginia, Florida, possibly some

10   others.  I'm not sure when the approvals were granted.

11   Q.    But visitors to the Internet in California can type in

12   that name and find the *trafficschool.com* site; correct?

13   A.    Correct.

14   Q.    And in 2004 and 2005 California constituted at least

15   75 percent of your business; correct?  *Trafficschool.com*

16   business?

17   A.    I don't have the data in front of me, but it was a

18   substantial percentage of our business, yes.

19   Q.    When you talk about -- in your declaration about masking

20   the points," you would agree that a California resident with

21   a traffic ticket is looking for a traffic school that would

22   mask the points; correct?

23   A.    California residents, along with residents of other

24   states where similar systems are in place, yes.

25   Q.    And if *trafficschool* does not accomplish that purpose,

1   then it's not even sellable to a customer; correct?

2   A.   Not necessarily.  Some people are looking for traffic

3   school courses that the completion of them will -- just by

4   completion without having tickets reduce their insurance

5   premiums.

6   Q.   But that doesn't occur in California; correct?

7   A.   Correct.

8   Q.   So generally you would agree that the key -- the

9   first requirement for a traffic school is that it mask the

10  points in California?

11  A.   The traffic school doesn't mask the point.  It's the DMV

12  that masks the point.

13  Q.   But by -- by requirement, I mean that -- that a

14  particular course to be sellable in California must

15  accomplish that purpose, must mask the points?

16  A.   I would think as a consumer if you were purchasing a

17  course you would want to make sure that that course would be

18  able to mask that point, yes.

19  Q.   Would you also agree that it's of primary importance to

20  California residents that if a course does qualify and mask

21  the points, that that course be cheap and convenient?

22  A.   Not necessarily.  Certainly convenience.  I don't know

23  about cheap.

24  Q.   Isn't price a key -- okay.  Strike that.

25          Wouldn't you agree that students generally are not

1    looking for the toughest traffic school course they can find?

2            MR. MAKOUS:  Objection, your Honor.  Beyond the

3    scope of his declaration.

4            THE COURT:  Sustained.

5    BY MR. DAUCHER:

6    Q.   Okay.  In California there's no dispute here that

7    *trafficschool.com* sells traffic school courses that it has

8    developed; correct?

9    A.   Correct.

10   Q.   *Trafficschool.com* does not refer any California

11   residents to other California traffic schools; correct?

12   A.   Correct.

13   Q.   Okay.  But with respect to Texas, you assert that you

14   partner up with other providers; correct?

15   A.   For traffic school; correct.

16   Q.   And at some point in history *trafficschool.com* had a

17   practice of referring *trafficschool.com* visitors to traffic

18   schools in Texas; correct?

19   A.   *Trafficschool.com* still refers visitors to providers for

20   courses in Texas.

21   Q.   I'm -- I'm asking about some point in history.  We'll

22   get to that.  The second thing we'll hear about.

23           But at some point you began referring visitors to

24   traffic schools in Texas; correct?

25   A.   *Trafficschool.com* at some point in time, yes, did begin

1    and has continued to refer visitors in Texas.

2    Q.   Will you please refer to Exhibit 26, Page 3.

3            Now, Page 3 constitutes a document that -- that you

4    prepared for this litigation; correct?

5    A.   We prepared it, myself and my partner, Chris Kramer.

6    Q.   And you believe that it accurately reflects the

7    information presented; correct?

8    A.   Yes.

9    Q.   Now, it includes a row under the ticket dismissal

10   courses category for Texas defensive driving; correct?

11   A.   Correct.

12   Q.   And that is the Texas equivalent of California traffic

13   school; correct?

14   A.   In part, yes.

15   Q.   And in that row it shows by both year and the number of

16   courses -- by -- by year both the number of courses and the

17   revenues; correct?

18   A.   Correct.

19   Q.   Okay.  Now if you look in 2003, Exhibit 26 shows that

20   *trafficschool.com* earned approximately $70,000 by referring

21   approximately 6,000 Texas residents to *trafficschool*;

22   correct?

23   A.   We received $71,000 from the provider for referring

24   6,000 customers to Texas for defensive driving.

25   Q.   And you attached by your own volition an asterisk to

1    2003, and the note on Exhibit 26 says, "Dollars shows

2    estimate for referral fees paid by third party"; correct?

3    A.   Correct.

4    Q.   And so if you do the math, *trafficschool.com* earned just

5    over $10 for each referred student in Texas that year;

6    correct?

7    A.   Correct.

8         MR. MAKOUS:  Objection.  Beyond the scope of the

9    declaration, your Honor.

10        THE COURT:  The answer will stand.

11        Next question.

12   BY MR. DAUCHER:

13   Q.   But as I understand it, in 2004 *trafficschool.com*

14   changed the way it operated in Texas; correct?

15   A.   We did not change the way we operated.  We changed the

16   way the collection of fees is made by consumers and the split

17   between our company and the partner company in Texas.

18   Q.   So in 2003 a visitor that was referred by

19   *trafficschool.com* to a school in Texas would pay the Texas

20   school; correct?

21   A.   Correct.

22   Q.   But in 2004 you changed that system such that that same

23   visitor would pay you; correct?

24   A.   For a portion of 2004, correct.

25   Q.   And then in 2005 that was the exclusive way in which you

1    operated in Texas; correct?

2    A.   We collected the tuition from the student, referred the

3    student to the Texas provider, and then split the revenues,

4    yes.

5    Q.   And that's -- for 2004 for Texas we see a footnote that

6    divides out the dollars you received by referral from the

7    dollars that you collected directly; correct?

8    A.   Correct.  I see that.

9    Q.   But in -- by 2005 you had done away with the system by

10   which you paid to third parties referral or by which --

11   strike that?

12          By which third parties in Texas paid referral fees

13   to you; correct?

14   A.   Correct.

15   Q.   And that did not occur in '06 or '07; correct?

16   A.   Correct.  And those years we paid them for the provision

17   of the courses in the certificates the same as they had been

18   doing in previous years, but we were now collecting the

19   revenues and paying them.

20   Q.   And you instead were able to negotiate a fee that you

21   would pay to the Texas school for fulfilling the course;

22   correct?

23   A.   We modified the arrangement of how the money was

24   collected and distributed, yes.

25   Q.   Now, if you look at 2005 for Texas, which is the first

1    year you exclusively collected fees for Texas, you sold only

2    2100 courses; correct?

3    A.    Correct.

4    Q.    As opposed to 6,000 in 2003; correct?

5    A.    I -- I don't see that here.

6          Correct.

7    Q.    Okay.  But even though the number of courses went down

8    substantially, *trafficschool.com* actually managed to earn

9    more money under the new system; correct?  In Texas?

10   A.    No.  This does not -- the 2005 references referencing to

11   the gross dollars collected does not take into account the

12   split that was paid.

13   Q.    But I take it you negotiated a more favorable rate per

14   student by collecting the dollars yourself?

15   A.    A little more favorable, yes.

16   Q.    And that's why you chose the transition to that system

17   where you sold the course; correct?

18   A.    One of the reasons, yes.

19   Q.    But one fact that accompanied that process was that the

20   number of courses you directly sold dropped; correct?

21   A.    I don't see that being a correlating fact in any way.

22   Q.    Whether it's -- but -- that is a fact.  It just dropped

23   from '03 to '05; correct?

24   A.    Certainly.

25   Q.    All right.  Let's look at Florida.

1          In Florida you went through a similar transition;

2     correct?

3     A.    Correct.

4     Q.    Except that that transition occurred one year later in

5     time than the Texas transition; correct?

6     A.    Yes.

7     Q.    And so if we look at Florida in 2004, *trafficschool.com*

8     earned approximately $200,000 in revenue by referring

9     11,500 students; correct?

10    A.    Correct.

11    Q.    So that I've done the math, that's about 1750 per

12    student in revenue from referrals in 2004; correct?

13          MR. MAKOUS:  Objection, your Honor.  He's asking

14    the witness to agree with his mental state calculation.  And

15    speculative.

16          MR. DAUCHER:  Perhaps we can just have a

17    stipulation that that's the math.

18          MR. MAKOUS:  Objection.  Relevance as well to this

19    entire line of questioning.

20          THE COURT:  The objection is overruled.

21          You can answer the question if you can.

22          THE WITNESS:  I don't recall what the specific

23    dollar amount that we received per student, but the 200,000

24    was the fees that were paid to us by the third party for the

25    11,000-plus courses that were sold through the Website.

BY MR. DAUCHER:

Q.   2005 was the transition year; correct?

A.   Correct.

Q.   But unlike Texas in 2005, your numbers did not decline; correct?

A.   They pretty much were stagnant as it appears, yes.

Q.   But in the first full year 2006, when you were exclusively selling the courses, the number of courses sold declined in Florida; correct?

A.   Correct.

Q.   By about 20 percent; correct?

A.   By about 1800 courses.

Q.   But isn't it fair to say, Mr. Creditor, that *trafficschool.com* understood that as it transitioned from referring -- from accepting referral fees from third parties to collecting those fees that it would pay a certain price in terms of the number of gross courses sold?

          MR. MAKOUS:  Objection.  Vague.

          THE COURT:  Do you understand the question?

          THE WITNESS:  I don't understand the question --

          THE COURT:  All right.

          THE WITNESS:  -- at all.

          THE COURT:  All right.  The objection is sustained.

BY MR. DAUCHER:

Q.   Isn't it true that you understood that in making this

1    transition you would actually sell fewer courses but make

2    more money?  Yes?

3    A.    No.  Our intention by doing the migration that we did

4    accounting wise was -- is -- has always been to sell more

5    courses.  We never intended to have our course sales

6    decrease.

7    Q.    Okay.  This same Exhibit 26 also includes your report of

8    income for driver's education-type services; correct?

9    A.    I'm sorry.  Can you restate?  There's driver's ed

10   courses on here right.

11   Q.    Right.

12          And that -- those number reflect dollars earned by

13   *trafficschool.com* on driver's education; correct?

14   A.    Correct.

15   Q.    And none of those dollars are asterisked as referral

16   dollars; correct?

17   A.    Those are all dollars that were collected by

18   *trafficschool.com*.  There's certainly revenue split that was

19   made from those dollars to the providers in those other

20   states that were providing the courses.

21   Q.    And if you go to the fourth page of Exhibit 26, the

22   fourth page shows the driver's ed revenue for *DriversEdDirect*

23   upon its inception and through May 2007 or June 2007;

24   correct?

25   A.    Yes.

1    Q.   None of those revenues are reported as referral

2    revenues; correct?

3    A.   I'm not quite sure what you're referring to as referral

4    revenues.  I mean, these are revenues that we collected.  And

5    there's a good portion of these revenues that we paid to the

6    courses in Texas and in Florida for referring the customers

7    to them.

8    Q.   Right.

9         But these do not reflect amounts paid to

10   *DriversEdDirect* by a Florida or Texas school; correct?

11   A.   Correct.

12        By a student of those states generally, not by a

13   school.

14   Q.   Schools did not -- those schools did not pay

15   *DriversEdDirect* money; correct?

16   A.   Correct.  As I stated, we paid them for the fulfillment

17   of the courses that we referred over to them.

18   Q.   Okay.  But -- would you refer to Exhibit 62, please.

19        Exhibit 62 constitutes another report that you

20   created for this litigation; correct?

21   A.   My partner, Chris Kramer, did, yes.  And I reviewed it.

22   Q.   And you believe it's accurate; correct?

23   A.   A lot of these information -- a lot of this information

24   is numbers provided us to by I Drive Safely, but I do believe

25   it to be fairly accurate, yes.

1    Q.   And for the states Colorado, Idaho, New Mexico, Nevada,

2    Virginia, this report shows referral dollars received by

3    *trafficschool.com* from third-party providers in those states;

4    correct?

5    A.   Which portion of this are you referring to?

6    Q.   Those five states, the top five states.

7    A.   Correct.

8         That is the revenue that was received by

9    *trafficschool.com* from I Drive Safely for referring visitors

10   to -- for those states, yes.

11   Q.   And in -- in no year did you earn more than $10,000

12   total from all of those states combined; correct?

13   A.   Does not appear to be more than 10,000, no.

14   Q.   In Paragraph 16 of your declaration, you identify

15   certain nontraffic school nondriver's ed entities for whom

16   you post advertisements on the *trafficschool.com* site.

17        Are you familiar with that testimony?

18   A.   I'm familiar with the promotion of nontraffic school and

19   nondriver's education-related products and services on the

20   *trafficschool.com* Website.

21   Q.   And those include Rules of the Road; correct?

22   A.   No.  I would call that a driver's education-related

23   product.

24   Q.   Okay.  So those numbers would be under driver's

25   education.  They would include vehicle history reports?

1    A.   Vehicle history reports; correct.

2    Q.   And insurance?

3    A.   Insurance quotations.

4    Q.   Used car sales?

5    A.   Used car, new car, quotes, sales, yes.

6    Q.   And driving records?

7    A.   And driving records.

8    Q.   Okay.  Will you look at Exhibit 27, please.

9         THE COURT:  About how much longer do you have with

10   this witness?

11        MR. DAUCHER:  Probably about, again, as much as

12   I've done, your Honor.

13        THE COURT:  I'm sorry?

14        MR. DAUCHER:  About another hour, I would guess.

15        THE COURT:  Okay.  We'll take our break.

16        MR. DAUCHER:  Okay.

17        THE COURT:  Now, and we'll come back out in about

18   ten minutes.

19        We'll resume.

20        THE CLERK:  All rise.

21        (Whereupon, from 3:02 p.m. to 3:12 p.m., a break

22        was taken.)

23        THE COURT:  All right.  If we could have the

24   witness resume the stand, please.

25        THE CLERK:  Sir, you are remained that having been

1    previously sworn, you are still under oath.

2            THE WITNESS:  Yes, I understand.

3            Thank you.

4    BY MR. DAUCHER:

5    Q.   When we broke we were just about to refer to Trial

6    Exhibit 27.

7            Do you have it before you?

8    A.   I have a profit-and-loss statement in front of me.

9    Q.   And you prepared that document; correct?

10   A.   Correct.

11   Q.   And you believe that accurately reflects the third party

12   the nontraffic school nondriver's said revenue for

13   *trafficschool.com*; correct?

14   A.   Besides the driving records revenue that is reported on

15   another profit-and-loss statement or another report, I do

16   find it to be accurate.

17   Q.   And across the four and approximately one and a half

18   years reported the total advertising revenue to

19   *trafficschool.com* for nontraffic school nondriver's ed

20   related as -- is about $3,500; correct?

21   A.   Are you referring to what's on this report or total,

22   including driving record revenues which is not on here?

23   Q.   This report first.

24   A.   This report shows $4,000 of total income.

25   Q.   And driving records is not on here; is that correct?

1    A.   Correct.  It was on one of the previous exhibits you

2    showed me.

3    Q.   And your position is that *trafficschool.com* markets

4    third-party driving records services?

5    A.   We sell driving records.

6    Q.   So you directly sell those records to consumers in

7    California?

8    A.   We sell driving records to consumers, yes.

9    Q.   So you don't earn referral fees from third parties for

10   driving records; correct?

11   A.   For a period of time there was a revenue split with a

12   partner, and at this time we now provide the driving records

13   ourselves and retain our revenues.

14   Q.   And when did that transition occur?

15   A.   I believe it was in 2006.

16   Q.   And those driving records are for the State of

17   California; is that correct?

18   A.   Correct.

19   Q.   In Paragraph 3 of your declaration, sir, you indicate

20   that *trafficschool.com* is one of the first providers of

21   online traffic school; is that correct?

22   A.   Yes.  We're one of the first.

23   Q.   And you began offering online courses in about 2000;

24   correct?

25   A.   Correct.

1    Q.   And prior to that time, *trafficschool.com* had a Website,

2    but on that Website it advertised only its course work or

3    course book; correct?

4    A.   We advertised a home study workbook.  We also advertised

5    classroom traffic school programs.

6    Q.   To establish the online traffic school, one of the first

7    steps that you took was to convert your workbook materials

8    onto an online format; correct?

9    A.   Correct.

10   Q.   And you hired a Web design firm to help you with that

11   process; correct?

12   A.   Yes.

13   Q.   And you spent about $20,000 in that process; correct?

14   A.   I believe it was also -- the money was spent to convert

15   the course work into a course platform, as well as redesign

16   of the Website.

17   Q.   But the $20,000 covered that initial work; correct?

18   A.   I believe so.

19   Q.   And then you would tender that course that you built to

20   certain courts, seeking approval; correct?

21   A.   Yes.

22   Q.   And you did that just by generally sending letters to

23   state courts; correct?

24   A.   Sending letters.  We participated in various trade

25   organization trade shows, some seminar presentations as well.

1  Q.   And that process that we just discussed took about six

2  months; right?

3  A.   It's an ongoing process.

4  Q.   But in terms of the time from the time you first decided

5  to offer an online school to the time when you had one

6  available for some California residents was about six months;

7  correct?

8  A.   A few months, yeah.  Approximately.

9  Q.   Wouldn't it be fair to say that it's not very difficult

10 for a company with a traffic school course book to convert

11 its program then to an online traffic school?

12 A.   I don't know what you are referring to by "difficult"

13 specifically.  If you could clarify that.

14 Q.   Well, is there anything else you had to do besides that

15 which we've discussed?

16 A.   There's quite a bit of requirements.  You must go

17 through bonding requirements.  Some courts have insurance

18 requirements.  Some courts have you go through third-party

19 agencies that do the reviewing and the monitoring for you.

20 Some courts have requirements that don't really pertain to

21 the course, that pertain to customer service or office

22 requirements, server requirements.  I mean, there's some

23 courts that have 30 pages of requirements.

24 Q.   But isn't it fair to say that any California traffic

25 school that already has its course work has a certain

1    familiarity with court requirements already?  Correct?

2            MR. DE CARLO:  Objection.  Relevance to this entire

3    line of questioning, your Honor.  Beyond the scope of the

4    declaration.

5            THE COURT:  Are you planning on calling him in your

6    own case?

7            MR. DAUCHER:  I was hoping not to, actually.  I'm

8    close to being able to not call him in my own case, and this

9    rebuts the alleged injury that he sets forth -- or the injury

10   facts he sets forth in the decreased sales.

11           THE COURT:  Okay.  The objection is overruled.

12           Go ahead.

13           THE WITNESS:  Can you repeat the question, please.

14           MR. DAUCHER:  Can you have it read back, your

15   Honor.

16           THE COURT:  Yes.

17           The reporter, please read back the last question.

18           (The record was read.)

19           THE WITNESS:  No.  I would say that that's

20   incorrect.

21   BY MR. DAUCHER:

22   Q.   Let me get at it this way.

23           Isn't it fair to say that today there are many

24   California traffic schools that offer online courses?

25   A.   I -- I don't know what you mean by "many," sir.  There

1    are competitors, yes, that offer online traffic courses in

2    California.

3    Q.    Approximately how many that you're aware of?

4    A.    It varies.  Some courts it's six.  Some courts it's 40,

5    possibly a little more.  Some courts it's none.  You can't

6    have a course in some courts in California.  Some courts have

7    sole providership agreements with one individual school.

8    Q.    Okay.  Will you refer to Exhibit 67, please.

9            MR. DAUCHER:  Again, I believe -- this is a search

10   report, your Honor.  Again, I believe there will be a

11   stipulation that this is a Yahoo! search report from

12   July 2007 for the words "traffic school."

13           MS. HAMILTON:  That's correct.

14   BY MR. DAUCHER:

15   Q.    Now, on this particular search in the summer, by typing

16   in the word "traffic school" Yahoo! returns 30 results on

17   this page and the next page.  And I believe that's 10 organic

18   listings and 20 sponsored listings.

19           MR. DAUCHER:  Can you flip to the next page.

20   BY MR. DAUCHER:

21   Q.    Do you see those listings?

22   A.    I see the listings, yes.

23   Q.    And *trafficschool.com* is not among them?

24           MR. MAKOUS:  Objection, your Honor.  The search

25   references 300,000 results, just so it's not confusing.  So

1    he's misrepresenting what the evidence is.

2              THE COURT:  The question is not evidence.

3              Go ahead.

4    BY MR. DAUCHER:

5    Q.   *Trafficschool.com* is not among the 30 entities listed on

6    these Page 1 results for Yahoo! traffic school; correct?

7    A.   On these particular pages as the search was done on that

8    day at that time from wherever it was, what computer, I don't

9    see the *trafficschool.com* site listed on the two pages that

10   you're showing me.

11   Q.   And of these 30, can you just identify for the Court

12   which of them you are aware of that provide traffic school

13   services to California residents?

14   A.   Can you define for me "provide services"?

15   Q.   Meaning they maintain online course.  They offer -- they

16   sell books.

17             MR. MAKOUS:  Objection, your Honor.  This is

18   remote, speculative, and lacks foundation.  We'll stipulate

19   this is a search result.

20             THE COURT:  Overruled.

21             Do you have the question in mind?

22             THE WITNESS:  I'm -- I'm having a hard time reading

23   some of the specific URLs.  So I'm not exactly sure.

24             THE COURT:  Okay.  Well, maybe they can make it

25   larger for you.

1     BY MR. DAUCHER:

2     Q.   Let's work on the first five organic results first and

3     box those.

4          Of those, can you identify ones that under our

5     agreed definition provide California traffic schools

6     services?

7     A.   I Drive Safely.   Traffic Interactive, I believe does.

8     I don't know what the others -- I can't see what the last one

9     is, but it looks to be referencing to Florida.   So I would

10     think it would not be, but I've not -- I'm not familiar with

11     Point Busters.

12     Q.   How about Number 3, Improv Comedy Traffic School?

13     A.   There are some references on some court lists to online

14     traffic schools provided under names similar to this.   I

15     don't know if this specific site, as it's listed here, is one

16     of those providers.

17     Q.   How about -- let's look at the sponsored results on the

18     top on Exhibit 67.   Let's go to traffic school.

19          Which of those, to your knowledge, provide traffic

20     school services in California?

21     A.   Go To Traffic School provides courses in California.

22     Got A Ticket provides courses.   I believe NDDS, as well as

23     *DMV.org*, through their relationships with other providers,

24     promote and sell courses that are for traffic schools in

25     California.

1    Q.    What about the sponsored results on the column on

2    Page 1?

3    A.    I believe AM/PM Traffic School is a California course

4    that provides, as well as Traffic 101.  Anytime Traffic

5    School.  Not sure of the Always Open or the initial one, the

6    Safety USA.  I can't see the last one.  I'm sorry.  It's

7    getting cut off.  I don't know if Traffic School Affiliate is

8    a provider of courses or if they sell courses through their

9    Website.

10   Q.    How about *ticketnomore.com*?

11   A.    I'm not sure.  They could be.  There's a few courses

12   approved in Los Angeles.  So it's possible.

13   Q.    Now in 2000, when *trafficschool.com* began selling online

14   courses, *trafficschool.com* posted the price of its course

15   right on the front page of the Website; correct?

16   A.    For a period of time, yes.  We have had a price on the

17   home page of our *trafficschool* site.

18   Q.    And in 2000 that price was 19.95; correct?

19   A.    I don't recollect exactly what the price is.  The prices

20   have fluctuated a little bit over time.  It could have been

21   1995.

22   Q.    But in 2003 *trafficschool.com* stopped putting the price

23   of its traffic school on its home page; correct?

24   A.    As we began to offer courses for states other than

25   California -- we took the price down off the home page since

1    courses in other states wore obviously different pricing.

2    Q.   And you understand from looking at Exhibit 67, which is

3    still up, that many traffic schools put the price of their

4    course directly into their search engine marketing results;

5    correct?

6              MR. MAKOUS:  Objection.  Best evidence.

7              THE COURT:  Overruled.

8              THE WITNESS:  I see that many of them quote a

9    price.  I wouldn't constitute it as the price of their

10   course.  But I do see pricing in their advertisements.

11   BY MR. DAUCHER:

12   Q.   And *trafficschool.com* does not do that; correct?

13   A.   Currently we do not; correct.

14   Q.   And you understand that there are certain schools in

15   California that offer online traffic school for less money

16   than *trafficschool.com*; correct?

17   A.   At various times there certainly can be other schools

18   that offer pricing that may be less than *trafficschool.com.*

19   I don't know what everybody is charging at every particular

20   moment in time.

21   Q.   What are you -- what does *trafficschool.com* charge right

22   now in California for its online course?

23   A.   We have a standard price of 24.95, with considerable

24   discounted pricing available through coupon advertising that

25   we do through online marketing, affiliate marketing, and

1   various other forms of traditional and nontraditional

2   advertising.

3   Q.   And it's true that you're aware right now that there is

4   more than one traffic school online traffic school available

5   in California for less money; correct?

6   A.   No.  I'm not aware of that.  I see that there are some

7   schools that are advertising their price as that.  I don't

8   know if it's specifically related to a California course here

9   or what.  I -- I would not say that I know that for sure.

10  Q.   Will you please refer back to Exhibit 26 now.

11          The first page of Exhibit 26 is also a report

12  prepared by you; correct?

13  A.   Correct.

14  Q.   And that shows for *trafficschool.com* marketing expenses

15  for the years '03 to '07; correct?

16  A.   Correct.

17  Q.   And if you look in 2004, *trafficschool.com* spent

18  $170,000 on pay-per-click, also known as search engine

19  marketing; correct?

20  A.   Correct.

21  Q.   And in 2005 that number dropped slightly to $161,000 for

22  *trafficschool.com*; correct?

23  A.   Correct.

24  Q.   And 2006 that number dropped to below $100,000; correct?

25  A.   The money that was spent on pay-per-click advertising

1    did drop, yes.

2    Q.   And in 2004, we now look at the radio advertising

3    column, *trafficschool.com* spent no money on radio; correct?

4    A.   In what year, sir?

5    Q.   2004.

6    A.   Correct.

7    Q.   But in 2005 *trafficschool.com* spent over $100,000 on

8    radio; correct?

9    A.   That is correct.

10   Q.   And in 2006 *trafficschool.com* spent approximately

11   $160,000 on radio; correct?

12   A.   Correct.

13   Q.   Now, in your declaration you assert that your

14   pay-per-click marketing expenditures have declined.

15           Are you familiar with that testimony?

16   A.   Yes.

17   Q.   Now, isn't it true that that decline could be attributed

18   to the fact that other advertisers are getting more than you

19   are for key words for traffic school?

20   A.   Possibly.  I don't think that that is directly the

21   reason.  I mean, we have been very competitive in search

22   engine marketing in that year.

23   Q.   Isn't it true that the decline in search engine

24   marketing could also be attributed to your decision to

25   reallocate resources from pay-per-click to radio that we've

1    just seen?

2    A.   The allocation of marketing dollars for pay-per-click

3    versus radio are completely irrelevant to each other.  The

4    online pay-per-click dollars are a correlation of how many

5    people click on our ads.  Radio is an entirely different

6    spend.  It was not directly related to the amount of people

7    that were coming to us.  So these determinations to spend

8    more in radio, which was an active decision on our part, was

9    in no way impacted -- or in no way impacted the fact of less

10   money being incurred by our company for pay-per-click

11   advertising, as that is a direct correlation of people

12   clicking on the ads.

13   Q.   Now -- all right.  In 2007, your marketing expenditures

14   are down across the board; correct?

15   A.   Correct.

16   Q.   And I note that in 2007, if you look at it on a ratio

17   basis, the radio and the pay per click are running at about

18   an even pace; is that correct?

19   A.   It appears to be, yes.

20   Q.   So in 2007 you had the ability to reduce your spend on

21   search engine marketing; correct?

22   A.   We always have the opportunity to reduce our spend by

23   just not bidding on terms, which is not what we did.

24   Q.   You can also increase?

25   A.   That's -- I'm sorry.  We reduced our spend on radio,

1  yes.  We had a -- made that deliberate choice to do that.

2  But pay-per-click advertising, we kept our same theory of the

3  more clicks the better.  And we were as aggressive as we

4  could be in trying to get clicks.

5  Q.   Isn't it true that in your declaration you say that in

6  2007 you reduced your entire marketing budget to pay for this

7  litigation?

8  A.   Yes.  I don't know if I said entire marketing budget,

9  but I am certainly referring to the areas of the marketing

10  budget that we have reduced here, like radio, TV commercials,

11  other forms of advertising, postcard campaigns.  We did not

12  reduce our pay-per-click advertising on our own.

13  Q.   Meaning by that you did not change the bid amounts or

14  the words on which you bid?

15  A.   Well, our bid amounts and our words do change to be

16  competitive, certainly.  We would have made changes to be

17  more competitive.  We wouldn't have reduced our bids or

18  changed our language to be less competitive.

19  Q.   You're saying that you just -- the search engine just

20  won't take your money?

21  A.   That's not what I'm saying.  I don't believe I said

22  that.  If people don't click on our advertisements because

23  they're clicking on advertisements that I guess it could be

24  construed as misleading, but regardless they're not clicking

25  on our ads, we're not going to incur those pay-per-click

1    costs.

2    Q.   All right.  Will you look at Exhibit 32, please.

3            You're familiar with the fact that in March 2002

4    *DMV.org* initiated contact with *trafficschool.com*; correct?

5    A.   I am aware that Ravi Lahoti emailed *trafficschool.com*.

6    Q.   And Mr. Kramer advised you of that fact in -- upon

7    receipt of that email; correct?

8    A.   At some point I was certainly advised of it, yes.

9    Q.   And one of the things you did at that time was to go and

10   visit the *DMV.org* Website; correct?

11   A.   I don't know if I personally visited the *DMV.org* site at

12   that time.  But I'm -- I might have.  I -- I really don't --

13   I mean, this is over five years ago.  I don't recall for

14   sure.

15           MR. DAUCHER:  I'd like to read from the witness's

16   deposition at Page 145, Lines 12 to 17.

17           THE COURT:  Any objection?

18           MR. MAKOUS:  No objection, your Honor.

19           THE COURT:  All right.  Go ahead.

20           MR. DAUCHER:  I believe there will be a stipulation

21   that this question is in reference to the 2002 time period,

22   given the context of the deposition.

23           MR. MAKOUS:  That's acceptable.

24           MR. DAUCHER:  Okay.

25               "QUESTION:  Okay.  Now, one thing I'm still

1                    not clear on is so you told your counsel to get

2                    that domain name back from *DMV.org*, but did you

3                    actually go to the *DMV.org* Website and look at it,

4                    see what they were doing?

5                         "ANSWER:  Yes."

6               Will you please put up Exhibit 352.

7    BY MR. DAUCHER:

8    Q.   Mr. Creditor, did -- do you recall the *DMV.org* Website

9    looking something like this, as pictured on Exhibit 352?

10   A.   I don't recall what I saw.  As I said, I might have

11   visited it back in 2002.  If this is what's being represented

12   as what the site looked like in 2002, then this is what I

13   might have seen.

14   Q.   Let me ask you this:  Do you have any reason to believe

15   that in 2002 the *DMV.org* Website did not include in prominent

16   letters the domain name *DMV.org* at the top?

17               MR. MAKOUS:  Objection.  Speculation.  The witness

18   has no recollection of seeing it.  He's asking -- he's

19   arguing with the witness as to what a document shows.

20               THE COURT:  Okay.  Look, just state the nature --

21   just state the objection.

22               MR. MAKOUS:  Yes, your Honor.

23               THE COURT:  If I want some argument, I'll ask for

24   it.

25               MR. MAKOUS:  Yes, your Honor.

1           THE COURT:  Okay.  So what's your objection?

2           MR. MAKOUS:  My objection is he's arguing with the

3     witness about what a document shows on recollection.  He has

4     no recollection of.  So it's speculative, irrelevant, and

5     best --

6           THE COURT:  I didn't ask for a speech, Counsel.

7     It's either irrelevant, foundation.  Okay?

8           MR. MAKOUS:  Irrelevant.

9           THE COURT:  So I don't want a speech.

10          MR. MAKOUS:  Irrelevant.  Foundation.  Speculation.

11          THE COURT:  Objection is overruled.

12          You can answer the question.

13          Do you have the question in mind?

14          THE WITNESS:  I don't recollect how long the

15    *DMV.org* Website has contained -- you referenced to the large

16    lettering of the term *DMV.org*.  I have no idea.

17    BY MR. DAUCHER:

18    Q.   All right.  Turning to -- well, in Paragraph 32 of your

19    declaration you say that there is, quote, "a vast difference"

20    unquote, between what the Website -- what the *DMV.org* Website

21    looked like when -- prior to October 2006 essentially.

22          Is that what you're intending say in that

23    paragraph?

24    A.   Well, certainly the page that you just showed me is a

25    vast difference from the site as it was when we filed the

1    suit.

2    Q.   But is it a vast difference from -- from what the site

3    looked like in February of 2006?

4    A.   It was definitely different.

5    Q.   I'm just asking is that language that you used in your

6    declaration, "vast difference," applicable to the distinction

7    between the Website *DMV.org* in February 2006 and October

8    2006?

9              MR. MAKOUS:  Objection.  Argumentative.

10             THE COURT:  Overruled.

11             You can answer.

12             THE WITNESS:  Over the course of this litigation

13   I have reviewed a lot of pages or a lot of versions of the

14   *DMV.org* home page.  And I have seen vast differences from

15   revision to revision to revision to the present.  I don't

16   know how else best to answer that.

17             MR. DAUCHER:  Can you look at -- can you look at

18   Exhibit 627, please.  This was previously identified.

19   BY MR. DAUCHER:

20   Q.   Do you recognize this as the February 2006 version of

21   the *DMV.org* Website?

22   A.   It could be.  I -- I'm looking at the archive.org

23   reference in the URL in the bottom.  And it looks sometime in

24   2006.  Yes, it was probably very similar to this.

25   Q.   And in February 2006 you and Mr. Kramer instructed

1  Mr. Leach, who was then serving as president of

2  *DriversEdDirect*, to initiate business discussions with

3  *DMV.org*; correct?

4  A.   We instructed him to look into entering into a

5  relationship of some sort or to begin discussions for our

6  *DriversEdDirect* company.

7  Q.   And when you did that, you were familiar with the form

8  of the *DMV.org* Website as it existed at that time; correct?

9  A.   Correct.

10 Q.   And based upon what you saw, you were willing to go

11 forward to seek a business relationship with *DMV.org*;

12 correct?

13 A.   We were willing to enter into a test agreement to

14 determine if sales could be made and if some of the sales

15 promotions that were being told to us were true, to assess

16 the business model that they were doing.

17 Q.   You did enter an agreement with -- between for

18 *DriversEdDirect* with *DMV.org* in June of 2006; correct?

19 A.   We entered into a test agreement, yes.

20      MR. DAUCHER:  Well, let's look at Exhibit 37,

21 please.  And perhaps we can have Exhibit 37 put before the

22 witness.

23      THE CLERK:  37, Counsel?

24      MR. DAUCHER:  Yes, please.

25      THE WITNESS:  Okay.

1    BY MR. DAUCHER:

2    Q.   First of all, can you confirm that 37 is the agreement

3    that was entered between *DriversEdDirect* and *DMV.org* in

4    June 2006?

5    A.   Yes.

6    Q.   Well --

7    A.   Between Online Guru --

8    Q.   Correct.

9    A.   -- and *DriversEdDirect*, yes.

10   Q.   And can you identify anything in that agreement which

11   identifies that as a test agreement?

12           MR. MAKOUS:  Objection.  Best evidence and calls

13   for a legal conclusion.

14           THE COURT:  Overruled.

15           THE WITNESS:  Within the agreement I don't see

16   that.  I do know that there was emails that I was copied on

17   that references to a test period between our company and the

18   *DMV.org* Website from Raj Lahoti and James Leach.

19   BY MR. DAUCHER:

20   Q.   Let's step back and look at Exhibit 45.  And perhaps you

21   have that in front of you --

22   A.   I do.

23   Q.   -- is that correct?

24           Great.

25           Exhibit 45 is a series of emails during the time

1   period of February to May 2006 related to negotiations

2   between *DriversEdDirect* and Online Guru; correct?

3   A.   There appears to be some emails between the internal

4   parties at my company about the relationship.  There doesn't

5   appear to be any emails between us and the defendants.

6   Q.   Okay.  Fair enough.

7          If you'll look at Page 2 of this exhibit, that

8   appears to me to be a draft that is circulating within

9   *DriversEdDirect* of a communication to Online Guru regarding

10  the proposed business relationship; is that correct?

11  A.   Regarding the proposed 30-day test, yes.

12  Q.   And it looks like Mr. Leach, *DriversEdDirect's*

13  president, forwarded this to you and Mr. Kramer for review;

14  correct?

15  A.   We were two of the people that it was sent to, yes.

16  Q.   And you did review it; correct?

17  A.   Yes.

18  Q.   And you -- in fact, within the body of this draft email

19  you interposed certain text constituting your comments;

20  correct?

21  A.   Yes.  I made some comments that are included here.

22  Q.   Now, in the third sentence of Mr. Leach's draft,

23  Mr. Leach said or proposed to say, "I know you do a fantastic

24  job marketing *DMV.org*, and you spend a lot of money marketing

25  your site."

1          Do you see that text?

2    A.    I do.

3    Q.    And you reviewed that text in or around late February;

4    correct?

5    A.    Correct.

6    Q.    And you did not comment negatively about use of that

7    text; correct?

8    A.    I did not comment negatively in this email; that is

9    correct.

10   Q.    Did you suggest in some other way to Mr. Leach that he

11   should not say that?

12   A.    I don't know if I suggested to Mr. Leach or to my

13   partner, Chris; but I know that I certainly questioned the

14   issue as to why that was used.  And my understanding is that

15   that was communicated to James or Jimmy by Raj, and it was

16   Jimmy's intention to stroke his ego a little bit by including

17   Raj' contentions and that he does a fantastic job of

18   marketing.

19         MR. DAUCHER:  Move to strike as hearsay as to what

20   Mr. Leach conveyed to Mr. Creditor.

21         THE COURT:  Sustained.

22   BY MR. DAUCHER:

23   Q.    In the last photograph of that -- in the last sentence

24   of that paragraph it says, "There is something said with the

25   quality of education students should receive when it comes to

1   driver's education.  And we would like to eventually become

2   the quality partner that you refer all of your driver's ed

3   traffic."

4           You saw that text in February of 2006; correct?

5   A.   Yes.

6   Q.   And it looks to me like Mr. Leach wrote in his comments,

7   paren, (I don't know about this line), closed paren.

8           Is that your understanding?

9   A.   That's my understanding.

10  Q.   And it looks do me like you wrote in your comments after

11  that, which included your name and then said, "This is fine

12  to leave, I think"; correct?

13  A.   Correct.

14  Q.   So you were okay with that text; correct?

15  A.   Yes.

16  Q.   And so at that time you intended to become a partner

17  with *DMV.org* not just on the test basis; correct?

18  A.   This whole email in relationship discussion was all

19  based on a 30-day test.  What would have happened after that,

20  I have no idea.  But this email and all the discussions we

21  had was based on a 30-day test.

22  Q.   Okay.  Negotiations proceeded slowly; correct?

23  A.   It -- it definitely didn't go as fast as other

24  negotiations we've been in.

25  Q.   And one of the things that slowed down negotiations was

1    that *DMV.org* wanted a hefty referral fee; correct?

2    A.    I don't know if that's what slowed down the negotiation.

3    Q.    Well, there was a lot of haggling about the fees that

4    would be paid; correct?

5    A.    There was some emails back and forth, but there were

6    long periods of time where there were breaks in time.  I

7    don't know if that's because of haggle and negotiation or if

8    it was because of travel schedules of your client or what.

9    But -- I don't know what it was regarding to.

10   Q.    Can you refer to exhibit -- well, let me ask this.

11          Is it fair it say that the initial pricing that

12   Mr. Raj Lahoti proposed was too high for *DriversEdDirect*?

13   A.    From my recollection I believe that it was too high.

14   However, I don't see it right in front of me; so I don't know

15   exactly what you're referring to.  Some of it might have been

16   okay.  Some of it might not have been.  I don't recall

17   exactly.

18   Q.    Let's -- let's look at Exhibit 43.

19          Again, Mr. Creditor, do you have the paper copy of

20   that one?

21   A.    I do.

22   Q.    All right.  And now can you -- that one I think I could

23   correctly describe as communications both between Online Guru

24   and *DriversEdDirect,* as well as internal to *DriversEdDirect*;

25   correct?

1    A.   Yes.  It looks like there's some correspondence between

2    us and Raj, and then later emails between just us internally.

3    Q.   Now, if you look at Pages 2 and 3 together, there's an

4    email that overlaps from 2 to 3, where Mr. Lahoti basically

5    tells Mr. Leach that *DMV.org* can't go forward because they

6    were working on new developments for the site.

7         Do you see that?

8    A.   I see that.

9    Q.   And Mr. Leach forwarded that to you; correct?

10   A.   Yes.

11   Q.   And on Page 2 now, you reviewed that email; correct?

12   A.   I did.

13   Q.   And you wrote the response that's found at the top half

14   of Page 2, quote, "Screw this guy.  I always had a bad

15   feeling about dealing with them.  Let Raj take advantage of

16   someone else," unquote; correct?

17   A.   Correct.

18   Q.   When you said you always had a bad feeling about them,

19   what did you mean?

20   A.   I believe that from the beginning of the negotiations

21   one of the things that Jimmy had said to me was that he felt

22   that Raj was very aggressive in his negotiations.  And I had

23   expressed from the day one that we're not going to let

24   anybody take advantage of us.  And there were some other

25   comments that had been made by Raj to Jimmy that were just

UNITED STATES DISTRICT COURT

1   little concerning for myself, and I had just expressed that

2   maybe we should just pass on this relationship.

3           And from the beginning I had a bad feeling about

4   dealing with them.

5   Q.   So by the word "always," what you're saying is that you

6   meant only back to February of 2006 and not prior?

7   A.   I don't know if I was aware of anyone named Raj prior to

8   February.

9   Q.   But this sentence says dealing with them, meaning

10  *DMV.org*; correct?

11  A.   And then I reference to Raj specifically.

12  Q.   Okay.  So your testimony is the "always" only relates

13  back to February 2006; correct?

14  A.   I -- I don't remember what --

15  Q.   Okay.

16  A.   -- I said in mind specifically at that time.

17  Q.   If you go to Page 1 of this email there's further

18  colloquy internal to *DriversEdDirect,* and you write again

19  another response.

20  A.   I'm sorry.  What page?

21  Q.   Page 1 -- middle of Page 1 at 4:01 p.m., 10 minutes

22  after the one we just looked at.

23          Quote, "Whatever.  I didn't like these guys before

24  now," period.  "I really can't stand them," period.

25          You wrote that; correct?

1   A.   I did.

2   Q.   And when you wrote you really didn't like these guys

3   before now, does that again only refer back as far as

4   February 2006?

5   A.   Possibly.  It could also be referring to an earlier

6   situation that we had had with them where we had to have

7   legal action get involved to have a domain name transferred

8   to us.

9   Q.   So it's fair to say that that statement accurately

10  captured your viewpoint on *DMV.org* at that time, April 2006;

11  correct?

12  A.   No.  That accurately captured my feelings towards the

13  Defendants Raj and Ravi Lahoti specifically and how they

14  operated their businesses and how they were dealing with us

15  at that time.

16  Q.   But nonetheless, thereafter you signed -- or

17  *DriversEdDirect* signed a contract with *DMV.org*; correct?

18  A.   Correct.

19  Q.   Now, after the contract was signed, *DMV.org* did run

20  *DriversEdDirect* advertisements in July 2006; correct?

21  A.   I believe that's about the time frame.

22  Q.   And *DriversEdDirect* realized sales from those

23  advertisements; correct?

24  A.   I don't know.  You're saying advertisements like it's

25  plural.  I don't know how many advertisements there were.

1    But we did realize sales from the promotion of

2    *DriversEdDirect,* and the recommendation of our course is the

3    best choice for driver's ed in California on the *DMV.org* site

4    for a period of time.

5    Q.   And you had no problem with *DMV.org* recommending

6    *DriversEdDirect* on that *DMV.org* Website in the summer of

7    2006; correct?

8    A.   No.  We -- I believe we are the best choice.

9    Q.   And *DriversEdDirect* paid *DMV.org* the required referral

10   fees in connection with those advertisements; correct?

11   A.   We paid whatever fees were due according to the

12   agreement we had at the time.

13   Q.   Those were referral fees; correct?

14   A.   I guess that's the way it would be constituted, sure.

15   Q.   Okay.  Now, turning to Paragraph 30 of your declaration,

16   you state that in 2006 *trafficschool.com* formed a Website at

17   the Internet domain address *drivinglinks.com*; correct?

18   A.   Correct.

19   Q.   Now, if you'll -- if we can refer to Exhibit 20.  I

20   think that may be in your notebook as well.

21   A.   Okay.  Number 20 is "Who is records?"

22   Q.   Yes.

23   A.   Okay.

24   Q.   And the first "who is report" there constitutes a who is

25   record for *drivinglinks.com*; correct?

A.   No.  This is a who is report for the domain name
*trafficschool.com* that I'm looking at in Exhibit 20 -- 20-A?

Q.   20-A.

A.   That's what I see.  *Trafficschool.com* is the domain
name.

Q.   Let's look then at what we have on the screen.
Defendants' 982 is the Bates stamp there.

          And that's the --

A.   Okay.  I see what you're saying.

Q.   Okay.  Now, this *drivinglinks* domain name is registered
to an entity identified as *drivinglinks.com*; correct?

A.   Correct.

Q.   And if you look at Page 2 of this registration, it was
registered on March 13, 2002; correct?

A.   I don't know the accuracy of the record created versus
when the Website domain, I mean, was registered on.  But
according to this, the record of this domain was created on
March 13, 2002.

Q.   Is that inconsistent with any recollection you have?

          MR. MAKOUS:  Objection.  Vague.  Speculative.

          THE COURT:  Do you understand the question?

          THE WITNESS:  I do.

          I have registered -- we've registered lots of
domain names.  I don't recall the dates of them.  But
we've -- we've registered domains since very early 2000 to

1   the present.

2   BY MR. DAUCHER:

3   Q.   So you don't have any information today that suggests

4   that that record is incorrect as to when *drivinglinks.com* was

5   registered as a domain?

6   A.   Correct.

7   Q.   Okay.  And that happens to be exactly one week after

8   Ravi Lahoti initiated contact from *DMV.org* to

9   *trafficschool.com*; correct?

10  A.   I didn't -- I didn't look at the date that Ravi Lahoti

11  emailed us, but I remember it was in 2002.  So --

12  Q.   Isn't it true that this is one of the steps that you

13  took in response to the email from Mr. Ravi Lahoti in

14  March 2002?

15  A.   No.  That's not true.  The only steps we took were to

16  contact our attorneys to have Ravi Lahoti transfer a

17  misspelling of the *trafficschool.com* domain name to us, which

18  he did at that time.

19  Q.   And you remember that clearly that this --

20  A.   I do.  I do.  I remember that very clearly, yeah.

21  Q.   But you don't remember when the *drivinglinks.com* domain

22  was registered?

23  A.   No.  Because it's one of many domains we registered.

24  Q.   Okay.  The *drivinglinks.com* domain was originally

25  registered to *trafficschool.com*; correct?

1    A.   I believe so.

2    Q.   And that -- well, let me see -- *trafficschool.com* holds

3    quite a number of domain names; correct?

4    A.   It's the registered owner, yes.

5    Q.   Of about, say, 500 domains?

6    A.   Approximately.

7    Q.   There's nothing inherently wrong in owning a lot of

8    domain names; correct?

9    A.   I don't believe so.

10   Q.   And as I understand it, this is the only -- well, this

11   registration record was updated on September 28, 2006, to

12   change the registration from *trafficschool.com* to

13   *drivinglinks.com*.

14          Is that consistent with your recollection?

15   A.   Prior to the activation of the Website at that domain we

16   modified the registrant name to *drivinglinks.com*.

17   Q.   And *drivinglinks.com* does not exist as a formal entity

18   under any state; correct?

19   A.   It's a domain name.

20   Q.   It's not a California corporation; correct?

21   A.   No.

22   Q.   It's not a partnership limited partnership; correct?

23   A.   Correct.

24   Q.   This is the only domain name that *trafficschool.com*

25   registered that for which the registrant was changed to a

1   fictitious name; correct?

2          MR. MAKOUS:  Objection.  Relevance, your Honor.

3          THE COURT:  Overruled.

4          You can answer.

5          THE WITNESS:  *Trafficschool.com* has not changed the

6   registrant name to other names besides *DriversEdDirect,* or in

7   this case *drivinglinks.com*.

8   BY MR. DAUCHER:

9   Q.   Have other domain names been changed to

10  *drivinglinks.com*?

11  A.   I don't believe so.

12  Q.   So this is the only one that you're aware of that has

13  been changed; correct?

14  A.   Correct.  The name is consistent with the name on the

15  Website.

16  Q.   Isn't it true that -- and you testified that this was

17  done just ahead of the point in time when the *drivinglinks*

18  Website was taken live onto the Internet; correct?

19  A.   Sometime before the site was taken live; correct.

20  Q.   And isn't it true that the purpose of changing the

21  domain registration from *trafficschool.com* to *drivinglinks*

22  was to mask the affiliation between *drivinglinks* and

23  *trafficschool.com*?

24  A.   No.  As I just said, it was strictly to have the name on

25  the registrant who is be consistent with the domain name that

1    is listed on the Website.

2    Q.   Was there a business reason why you did that?

3    A.   We -- no.  Maybe to at some point diverse identify into

4    a business on its own.  But at this time no.  It was just to

5    have it be consistent.

6    Q.   Okay.  The *drivinglinks* Website, the content on that

7    Website is controlled by *trafficschool.com*; correct?

8    A.   Correct.

9         And in no way masks that *trafficschool.com* has a

10   relationship with it.  I mean, there's advertisements for it

11   all over the place.

12   Q.   There's advertisements for *trafficschool.com*; that's

13   correct.  But there's no disclaimer on that Website that the

14   site is operated by *trafficschool.com* correct?

15   A.   Well, there's a reference to a resources or a partners

16   page where we do reference that *trafficschool.com* and

17   *DriversEdDirect* are resources or partners of the

18   *DriversEdDirect* Website.

19   Q.   But again, even those resource pages do not state that

20   the Website *drivinglinks.com* is controlled by

21   *trafficschool.com;* correct?

22   A.   I -- I didn't know that it needed to be.

23   Q.   So there is no such statement; correct?

24   A.   I don't believe that there is such a statement.

25   Q.   Now, the *drivinglinks.com* Website is, content wise,

1    similar to the *DMV.org* Website; correct?

2    A.    Similar in what nature?

3    Q.    Similar in that it provides motor vehicle-related

4    information to citizens browsing the Internet.

5    A.    We provide on *drivinglinks* information for people from

6    various states to seek automotive-related information and

7    link to their official DMVs in a very non misleading and

8    confusing way.  We also have links to traffic school and

9    driving school services, as well as insurance quotation

10    forms, some other related automotive products, driving

11    related games, and so forth.

12    Q.    There's no disclaimer on the *drivinglinks.com* Website of

13    any kind disclaiming an affiliation with the Government;

14    correct?

15    A.    I -- I don't see why you would need a disclaimer on the

16    *drivinglinks* site disclaiming -- there's no reason why anyone

17    would think that the *drivinglinks.com* site has anything to do

18    or sponsored by or is a government --

19            THE COURT:  That's a very cute answer, but it

20    doesn't answer the question.  So just "yes" or "no."

21            THE WITNESS:  Can you repeat the question.

22            THE COURT:  There is no disclaimer on the

23    *drivinglinks* Website of any kind of disclaiming an

24    affiliation with the Government; correct?

25            THE WITNESS:  Correct.

1    BY MR. DAUCHER:

2    Q.   So the *drivinglinks.com* Website has fewer than 100 pages

3    of content; correct?

4    A.   I don't know the exact number of pages of content on the

5    *drivinglinks* Website.

6    Q.   What is your best estimate?

7    A.   Less than 500.

8    Q.   Okay.  And *trafficschool.com* does not spend any money

9    marketing *drivinglinks.com* on search engines; correct?

10   A.   Not on search engines; correct.

11   Q.   And *drivinglinks.com* only receives approximately 1- to

12   200 visitors a day; correct?

13   A.   A few hundred visitors per day; correct.

14   Q.   And there's a way that visitors to *drivinglinks.com* can

15   contact the *drivinglinks* Website by email; correct?

16   A.   Correct.

17   Q.   And you testified that you don't receive -- you haven't

18   received any emails which you record as demonstrating that

19   visitors to the *drivinglinks.com* Website are confused as to

20   an affiliation with the Government; correct?

21   A.   We haven't received any emails, period.

22   Q.   Now, if in the course of two years *drivinglinks.com* did

23   receive two emails from consumers that suggested that they

24   might be confused as to an affiliation with the Government,

25   would that cause you to shut down your Website?

1          MR. MAKOUS:  Objection.  Improper hypothetical

2    question.  Calls for speculation.  Irrelevant.  Lacks

3    foundation.

4          THE COURT:  Sustained.

5          MR. DAUCHER:  Can we refer to Defendants' 990 in

6    Exhibit 20.

7    BY MR. DAUCHER:

8    Q.   Now, Mr. Creditor, you can confirm that 990 is a page

9    available on the *drivinglinks.com* Website; correct?

10   A.   It appears to be a page printed on June 19 from the

11   *drivinglinks* Website.

12   Q.   Do you believe that page is still available on the

13   *drivinglinks.com* Website?

14   A.   It -- it is.  It could have had changes made to it, but

15   I'm sure this page is still available in some fashion.

16   Q.   And the page is entitled "Department of Motor Vehicle

17   resources"; correct?

18   A.   I don't see the title.  I see the header above the top

19   paragraph that says Department of Motor Vehicle resources.

20   Q.   Okay.  That's what I was referring to.

21   A.   I think the title is "Your state DMV at

22   *drivinglinks.com*."

23   Q.   I take it that you don't believe it's misleading to put

24   up a Web page entitled "Department of Motor Vehicle

25   resources"; correct?

A.   I -- I don't find it misleading for us on this site;
correct.

Q.   Now, this page, including on the text that spills over
to Defendants' 991, contains 19 distinct references to the
term "DMV or Department of Motor Vehicles."

          Do you recall we went through that at your
deposition?

A.   I do.

Q.   Isn't it true that part of the purpose of those repeated
references is to attempt to improve the natural search result
position of *drivinglinks.com* on search engines?

A.   In part.  It's also to be able to direct people to their
official state's motor vehicle agency, Department of Motor
Vehicles, or division of motor vehicles.

Q.   And I take it that you don't think it's misleading to
use the phrase "Department of Motor Vehicles" repeatedly on
this page; correct?

A.   On this Page I do not see it as a problem at all.

Q.   You now, are you the person at *trafficschool.com* that's
primarily responsible for domain name management?

A.   Primarily.

Q.   *Trafficschool.com* has registered various other domain
names with the term "DMV" in the domain name; correct?

A.   We've registered some with DMV and related terms.

Q.   I'd like to show Demonstrative 5, which we delivered to

1    the other side.

2              May I show them the demonstrative --

3              THE COURT:  That's fine.

4              MR. MAKOUS:  We object only to relevance but

5    then -- the accuracy of information appears to be correct.

6    We have no objection to the accuracy of the exhibit, just its

7    relevance.

8              THE COURT:  Okay.  Well, I guess I'll need to take

9    a look at it.

10             Okay.  The objection is overruled.

11             Has this been marked?

12             MR. MAKOUS:  Your Honor, just for the record, I

13   think it's only one sheet so far is all he's offering.  Just

14   Page 5, not that entire document.

15             MR. DAUCHER:  We can mark it as 690, your Honor, if

16   you wish.  Or it's just a demonstrative in any case if you

17   would like to mark it.

18             THE COURT:  We're going to need to mark it.

19             MR. DAUCHER:  Okay.  690, mark it, please.

20             THE COURT:  Okay.  And are you marking Page 5?  Is

21   that all you're --

22             MR. DAUCHER:  And I will be marking the next page

23   as well.  We may as well -- online -- is that online --

24   Page 6.

25             THE COURT:  Yes.

1          MR. DAUCHER:  Page 6, *DMV.org*.  I believe the

2     plaintiffs have reviewed that as well.

3          MR. MAKOUS:  Yes.  Same objection as before,

4     relevancy.  But no objection to the accuracy.

5          THE COURT:  Okay.  What number do you want to give

6     it?

7          MR. DAUCHER:  691, your Honor.

8          THE COURT:  All right.  It will be marked for

9     identification.

10         (Exhibit Number 691 marked for identification.)

11         MR. DAUCHER:  Okay.  Let's go ahead and refer then

12    to 690.

13    BY MR. DAUCHER:

14    Q.   Mr. Creditor, we've put together on 690 a table of

15    DMV-related domain names that traffic -- that we believe

16    *trafficschool.com* has registered.

17         Can you confirm that DMV -- that *trafficschool.com*

18    has registered each of the listed domain names on 690?

19    A.   Yes.  The first five are -- have DMV within them.

20    Obviously, the last one does not.

21    Q.   The last one being *trafficschool.us*; correct?

22    A.   Correct.

23    Q.   And -- but *trafficschool* did register *trafficschool.us*;

24    correct?

25    A.   I believe so.

1   Q.   And can you also confirm that the dates of registration

2   are accurate?

3   A.   They seem accurate.

4   Q.   And can you also confirm that each of those domains

5   remains registered by *trafficschool.com*?

6   A.   I believe so.

7   Q.   And can you tell me whether *trafficschool.com* has ever

8   used any of these domain names?

9   A.   I don't recall whether *trafficschool.com* has ever used

10  them to redirect to *trafficschool.com*.  They might have been

11  used in a sense through a registration process by the

12  registration company that we use.  But I don't know if it was

13  of something that we actively used ourselves.

14  Q.   So you cannot tell this Court one way or the other

15  whether or not, in fact, you used any of these domain names

16  to redirect to *trafficschool.com*; correct?

17  A.   I don't believe any of these names, other than possibly

18  *trafficschool.us*, but I -- I could be wrong -- were

19  redirected to *trafficschool.com*.  I don't know if any of them

20  were used at all ever.

21  Q.   Will you also look at now Exhibit 691.  And 691 is

22  another table identifying two additional domain names

23  *online-DMV.org*, *Internet-DMV.org*.

24       Do you see those?

25  A.   I do.

1    Q.   And can you confirm that those were registered by

2    *trafficschool.com* in August of 2006?

3    A.   They were.

4    Q.   And that was during the time in which you actually had a

5    written agreement with *DMV.org*; correct?

6    A.   We had a written agreement with Online Guru.

7    Q.   That's correct.

8              During that time?

9    A.   Yes.  I believe we had not yet terminated the agreement;

10   correct.

11   Q.   And you retained these registrations; correct?

12   A.   At this time I believe so.

13   Q.   What was the purpose of registering these domains?

14             MR. MAKOUS:  Objection.  Relevance.

15             THE COURT:  Overruled.

16             THE WITNESS:  I don't know.  It was -- I don't

17   know.

18   BY MR. DAUCHER:

19   Q.   Isn't it true that at that point in time you were

20   frustrated with *DMV.org*?

21   A.   Were we frustrated with *DMV.org*?  We were certainly

22   frustrated with Raj Lahoti.

23   Q.   Have you ever used either of these domain names --

24   A.   No.

25   Q.   -- in any way?

1    A.    I don't believe so.

2    Q.    Can you tell this Court unequivocally whether you've

3    used either of these domain names?

4    A.    When you say "used," can you reference to or define

5    "used," please.

6    Q.    Well, as I understand, you can put up a Website.  That

7    would be one form of use.

8          You haven't done that, I take it?

9    A.    We personally have not put up a Website; correct.

10   Q.    Are you aware of whether someone else has put up a

11   Website using these domains?

12   A.    No.

13   Q.    Another thing you can do, as I understand it, is that

14   you could redirect the Website to *trafficschool.com* or

15   another domain.

16         Have you redirected it?

17   A.    I don't believe so.

18   Q.    But can you tell the Court unequivocally you have not?

19   A.    I don't believe we have redirected these domain names to

20   *trafficschool.com*.  And I don't believe that we have created

21   a Website that we have placed at either one of these domain

22   names unequivocally.  And if the Court was to take away these

23   domain names from us because they found that it was

24   misleading, then that would be fine.

25   Q.    Do you believe these domain names are misleading?

1          MR. MAKOUS:  Objection.  Relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  Do I believe they were misleading?  I

4    believe that the name *DMV.org* is misleading.

5    BY MR. DAUCHER:

6    Q.   But what about these domains?

7    A.   I personally don't know what would be construed legally

8    as misleading or not with regards to these specific domain

9    names.

10         THE COURT:  All right.  We're going to stop for the

11   day.

12         How much longer do you have with this witness?

13         MR. DAUCHER:  No more than 10, 15 minutes, your

14   Honor.

15         THE COURT:  All right.  Well, we'll resume

16   tomorrow.

17         All right.  Sir, you may step down.

18         THE WITNESS:  Thank you.

19         MR. MAKOUS:  Your Honor, we have a new matter we

20   would like to bring to the Court's attention before the Court

21   adjourns.  It will be very brief.

22         MR. DAUCHER:  Time saving.

23         MR. MAKOUS:  Time saving, and it will help the

24   Court expedite the trial, I believe.

25         THE COURT:  What's that?

1          MR. MAKOUS:  At my suggestion, Mr. Daucher is

2     willing to stipulate that the two experts, Mr. --

3     Dr. Maronick and, I suppose, Ken Hollander will be offered

4     only in paper form with the right of both sides to submit

5     selected deposition testimony, in essence, as our cross in

6     lieu of bringing them here both from out of state and far

7     away.

8          Court permitting, of course.

9          THE COURT:  Okay.  So you're not going to call your

10    experts live.  Is that --

11         MR. MAKOUS:  We weren't going to do it either.  We

12    were just going to cross-examine each other's experts, but

13    we've agreed to forgo that.

14         THE COURT:  So you're not going to cross-examine

15    the experts, and you're going to give me some deposition

16    testimony to look at.

17         MR. MAKOUS:  As our cross.

18         THE COURT:  As the cross?

19         MR. MAKOUS:  Yes, your Honor.

20         THE COURT:  Okay.  All right.

21         MR. DAUCHER:  Yes.

22         MR. MAKOUS:  And --

23         MR. DAUCHER:  Secondly, your Honor, with respect to

24    the --

25         THE COURT:  I'm sorry.  One other question.

1          And what's going to be their direct?

2          MR. MAKOUS:  The declarations that have been

3    submitted by both experts.

4          MR. DAUCHER:  Actually, Simonson falls into that

5    group as well.  All three have lodged declarations -- direct

6    declarations, as we construe the Court to require further

7    direct testimony.

8          THE COURT:  I don't know about yours, but I thought

9    that you didn't submit a declaration on behalf of your

10   expert.  I thought what you made some reference to either his

11   report --

12         MR. MAKOUS:  We did a trial declaration, which

13   incorporated his prior declaration, your Honor.  It is --

14         THE COURT:  Okay.  Are you --

15         MR. MAKOUS:  It is before the Court.

16         THE COURT:  All right.  You're talking about the

17   declaration that was used for the summary judgment?

18         MR. MAKOUS:  That is correct.

19         THE COURT:  Okay.  So that --

20         MR. MAKOUS:  And I believe the rebuttal

21   declaration, including the survey.  This is declaration with

22   the survey --

23         THE COURT:  Okay.

24         MR. MAKOUS:  -- as our evidence on that point.

25         THE COURT:  All right.  So that's what you're going

1   to use for your direct testimony.

2            MR. MAKOUS:  That's correct.

3            THE COURT:  Okay.  And is that acceptable?

4            MR. DAUCHER:  It is, your Honor.  We believe that

5   the objections we made to it were heard on in limine, and the

6   rest goes to weight.  So we'll argue it.

7            THE COURT:  All right.

8            MR. MAKOUS:  Thank you, your Honor.

9            The second point is just to remind the Court they

10  have two rebuttal experts allegedly.  We move to strike both

11  without the ability to know which they're offering for what

12  purpose.  I would just like to make that of record since

13  they're not going to be, either one, be live now.  We object

14  to their testimony as to Mr. Hollander and Dr. Simonson.

15  They're both survey guys.

16           THE COURT:  Okay.  Well, I think counsel has --

17  I think counsel addressed that point.  And I'll look at

18  the -- I'll look at the declarations, and to the extent

19  they're cumulative, I'm not going to consider it.  I'm not

20  going to consider both of them.

21           MR. DAUCHER:  That's fine.  We don't -- that's

22  fine, your Honor.

23           MR. MAKOUS:  Finally, one final -- your Honor, we

24  have witnesses coming from Texas and California that we would

25  bring tomorrow.  And they are three operators of traffic

1   schools and driver's ed courses that have done business with

2   the defendant or have issues relevant to this litigation.

3   And I know the Court has made comments about this.  They each

4   have different clusters of testimony to offer.  It's not

5   redundant.  We would make them -- we would offer their

6   declarations, which have been made of record.

7        Mr. Daucher has objected as of record, and, of

8   course, they will submit to cross-examination.  We -- we ask

9   the Court to allow us to do that and make its rulings on

10  admissibility later so we can bring the witnesses and get

11  them done because it's difficult to engineer all these people

12  with the time schedules.

13       THE COURT:  You can call -- it isn't up to me to

14  allow -- you can call whoever you want to call in your case.

15  I've looked at their declarations, and some of their

16  testimony is problematic.  Unless these people were

17  designated as experts, I think -- I'm not sure how much

18  they're going to have to say, but you can certainly call

19  them.  You have given me their declarations.  He's made his

20  objections.  And, you know, I'll rule on it.  And some

21  other -- some of their testimony --

22       Well, let me just ask you this.

23       As far as I know, none of those people were

24  designated as an expert witness; correct?

25       MR. MAKOUS:  That's correct, under the --

1           THE COURT:  Okay.

2           MR. MAKOUS:  -- Federal Rules of Civil Procedure,

3      that is accurate.

4           THE COURT:  Okay.  And so they're going to be here

5      tomorrow.  That's fine.  And I'll rule on the objections, and

6      to the extent you can repair or, I guess, rehabilitate them,

7      whatever, I'll give you an opportunity to do that, but must

8      say that some of their testimony I doubt seriously is coming

9      in.

10          But --

11          MR. MAKOUS:  Okay.  Thank you, your Honor.

12          What's the Court's schedule for tomorrow?

13          THE COURT:  I thought what we would do is start at

14     8:30, but what -- but one of the things I really want counsel

15     to do -- if -- if you're comfortable at this point that all

16     of the documents -- all of the exhibits that were referred to

17     in your -- well, if all the exhibits on the joint exhibit

18     list are now -- you've stipulated they're going to be

19     admitted.  Is that the state -- is that the case?

20          MR. DAUCHER:  I believe we would stipulate that any

21     without objection would be -- would be admitted.  And then

22     there may be a further -- I've suggested a further

23     stipulation.  There are many relevancy objections.  I don't

24     envision the Court entertaining those in a long discussion.

25     Both sides have them.  The Court is able to weigh the

1  evidence.  We proposed waiving those as well to alleviate the

2  problem.

3          THE COURT:  Well, what I'd like the problems to do

4  for any exhibits that you haven't agreed to that are coming

5  in, I'd like you to meet and confer about those and see if I

6  can resolve whatever your differences are as to those

7  exhibits so that we can make sure that all the exhibits that

8  are being put in front of witnesses are either in evidence or

9  they're going to be offered.  So we can make sure that we've

10  got an accurate record.

11          Okay?

12          MR. DAUCHER:  Very well.

13          THE COURT:  Now, anything else?

14          MR. DE CARLO:  Will we have another full day

15  tomorrow, your Honor?

16          THE COURT:  Who are the witnesses that you're

17  planning on calling tomorrow?

18          MR. DE CARLO:  We would call Mr. Kramer, who is one

19  of the parties; then we have -- the other remaining witnesses

20  are the declarations.  I can identify those.

21          THE COURT:  Okay.  So you're going to call --

22  you're going it call Mr. Kramer?

23          MR. DE CARLO:  Correct, your Honor.

24          THE COURT:  Okay.  And who else?  Is that

25  Wright's -- is that one of the persons you're calling?

1          MR. DE CARLO:  We would call Shannon Robertson by

2     declaration.

3          THE COURT:  Okay.

4          MR. DE CARLO:  We would call Chuck -- Chuck

5     Dunbar --

6          THE COURT:  Uh-huh.

7          MR. DE CARLO:  -- by declaration --

8          THE COURT:  Okay.

9          MR. DE CARLO:  -- and we would call Gary Tsfrin by

10    declaration.

11         THE COURT:  Well, how can these people talk about

12    remedies, for example?

13         MR. DE CARLO:  Your Honor, the -- because part of

14    the remedial analysis in this case is the benefit to the

15    public and the competitors are part of the public, and so we

16    believe that it is pertinent -- highly relevant in this case

17    for the competitors to testify how these practices are

18    impacting their businesses.

19         THE COURT:  I'm not -- well, that wasn't my

20    question.

21         How are they going to testify about what a

22    remedy -- what proper remedy is available here?  I don't

23    think that's -- I really don't think that that's testimony

24    that they ought to be addressing.  The Court will determine

25    what the appropriate remedy is.  And these people are not

1    experts, or at least they haven't been designated as experts.

2    And I doubt even had they been designated as experts, had

3    they'd be able to adequately testify about the remedy that

4    the Court should enter in this case.

5            So -- but, you know, we can take that up tomorrow.

6            MR. DE CARLO:  It's -- may -- would you like a

7    comment on that?  Shall I comment on that, your Honor.

8            It's never been our intention to offer these

9    witnesses as experts.  They are percipient witnesses who are

10   laying a foundation about their experience in the industry,

11   and then are commenting on both their observations.

12           THE COURT:  You should have designated them.  They

13   can talk about facts.  If they're percipient witnesses, they

14   can talk about facts.  But they -- they're not going to be

15   allowed to offer opinions if they weren't designated.

16   It's -- and if there was any doubt in your mind, you should

17   have designated them as an expert.  And if you didn't, a lot

18   of these declarations that I've looked at -- it seems to me

19   you know they're testifying as experts.

20           And they may well be in the industry, but that

21   doesn't relieve you of the obligation of designating them as

22   experts, at least as I read this testimony in any event.

23           So if you want to make a -- if you want to make a

24   proffer -- well, I guess I have your proffer.  If you want to

25   be heard on that, that's fine.  But I think counsel's

1    objection, given the way these declarations are structured,

2    are well taken.

3            MR. DE CARLO:  Well, the declarations, your Honor,

4    also extend beyond opinion testimony to also the witnesses

5    testifying about what people told them, what they have

6    observed.

7            THE COURT:  What people told them?

8            MR. DE CARLO:  Yes, your Honor.  Specifically

9    related to the instances --

10           THE COURT:  How do you get that in?  How does that

11   come in?

12           MR. DE CARLO:  Evidence of comments that these

13   persons heard by confused -- by confused consumers are not

14   hearsay.  They are not being offered for the truth of the

15   matter asserted.  They are being asserted to establish that

16   these people were confused.

17           THE COURT:  Well, but -- but, sir, I think probably

18   the way that you could -- you have these -- you have these

19   experts.  They're going to talk about confusion; right?  And

20   he's done a survey.

21           Am I correct.

22           MR. DE CARLO:  That's correct, your Honor.

23           THE COURT:  And furthermore, if you're -- if you

24   wanted to share this with your expert and let your expert --

25   your expert can rely on anything basically in formulating his

1    opinion.  And if it's not being offered for the truth, what

2    is it being offered for?

3              MR. DE CARLO:  To show the confused state of mind.

4              THE COURT:  Whose state of mind?

5              MR. DE CARLO:  In -- it depends on the situation.

6              THE COURT:  Whose state of mind?

7              MR. DE CARLO:  The declarant's.

8              THE COURT:  Who's the declarant?

9              MR. DE CARLO:  The situation of Mr. Dunbar, for

10   example, or Mr. Wright is a better example, it is people who

11   are -- who are confused by the *DMV.org* Website in believing

12   that the course they took was approved by the Department of

13   Motor Vehicles.

14             So they related to Mr. Wright we -- we took the DMV

15   driver's education course.

16             THE COURT:  Uh-huh.

17             MR. DE CARLO:  Mr. Dunbar will come in and testify

18   that those comments were made to him.  We're not offering

19   that evidence to establish that these people took the DMV

20   course.

21             THE COURT:  No.  You're offering it to show that

22   they were confused.

23             MR. DE CARLO:  Yes, your Honor.

24             And Mr. Dunbar has that kind of testimony and

25   Mr. Wright has that kind of testimony and Mr. Tsfrin has that

1    testimony.

2              THE COURT:  Okay.  Do you want to be heard?

3              MR. DAUCHER:  Your Honor, I don't believe that's an

4    exception.  When he said declarant, the declarants are the

5    competitors, not the people they heard from.  And moreover,

6    the testimony that -- that they offer about things they

7    heard, oftentimes they offer vague assertions.  They don't

8    tell who, when.  There's no indicia of reliability to what is

9    stated in those declarations that, in my view, should push

10   the Court towards allowing them in under a hearsay exception.

11             THE COURT:  Don't you have --

12             Don't you have -- isn't your expert going to offer

13   testimony on the issue of confusion in that there were

14   confused consumers?  And didn't you elicit from the

15   defendants themselves that they've, from time to time,

16   encountered people who were confused?

17             MR. DE CARLO:  Yes, we have, your Honor.  And we

18   also have hundreds, if not thousands, of pages of emails to

19   that effect as well.

20             However, what we also have is information from

21   those outside of the parties who have specific information

22   about confused consumers.

23             THE COURT:  Okay.  All right.  Anything else?

24             MR. DAUCHER:  Nothing further, your Honor.

25             MR. MAKOUS:  Yes, your Honor.

1           Would it be a full day tomorrow?  I guess that's

2    what we were looking at.  Until 4:30?

3           THE COURT:  Yeah.  We'll go as long as I can

4    withstand it.  Okay.

5           MR. MAKOUS:  One final thing, your Honor.

6           Mr. Daucher has advised me that he's going to

7    finish with Mr. Creditor for all purposes tomorrow; so we

8    will not be re-calling him.

9           THE COURT:  I think that's what he said.

10          MR. MAKOUS:  Okay.  I wasn't clear once again.

11          Thank you.

12          THE COURT:  Okay.  Anything -- anything else?

13          Okay.  We'll see everybody tomorrow morning at

14   8:00 o'clock.

15          THE CLERK:  All rise.

16          This Court stands adjourned.

17          (Whereupon, at 4:38 p.m., the proceeding.

18          concluded.)

19

20

21

22

23

24

25

| PLAINTIFFS' EXHIBITS | IDENTIFIED |
|---|---|
| 15 | 32 |
| 17 | 91 |
| 18 | 92 |
| 20 | 199 |
| 26 | 162 |
| 27 | 171 |
| 32 | 186 |
| 37 | 190 |
| 43 | 195 |
| 45 | 191 |
| 61 | 40 |
| 62 | 169 |
| 67 | 177 |
| 89 | 156 |
| 90 | 153 |
| 114 | 51 |
| 115 | 32 |
| 127 | 68 |
| 300 | 28 |
| 301 | 24 |
| 303 | 28 |
| 317 | 78 |
| 318 | 80 |
| 319 | 83 |
| 320 | 84 |
| 321 | 129 |
| 322 | 53 |
| 323 | 97 |
| 324 | 60 |
| 325 | 63 |
| 332 | 86 |
| 333 | 19 |
| 342 | 81 |
| 343 | 82 |
| 352 | 70 |
| 353 | 71 |
| 367 | 66 |
| 385 | 82 |
| 391 | 79 |
| 398 | 73 |
| 413 | 123 |

229

| | DEFENSE'S EXHIBITS | IDENTIFIED |
|---|---|---|
| 2 | 655 | 108 |
| | 627 | 106 |
| 3 | 631 | 111 |
| | 670 | 102 |
| 4 | 671 | 103 |
| | 681 | 40 |
| 5 | 691 | 201 |
| | 990 | 207 |

UNITED STATES DISTRICT COURT