1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3              HONORABLE PERCY ANDERSON, JUDGE PRESIDING

4    TRAFFICSCHOOL.COM, INC., et al.,    )
                                         )
5                                        )
                                         )
6                        Plaintiffs,     )
                                         )
7                                        )
                                         )
8         Vs.                            )   No. CV 06-7561 PA
                                         )
9                                        )
                                         )
10   EDRIVER, INC., et al.,              )
                                         )
11                                       )
                                         )
12                       Defendants.     )
                                         )
13   _____     )

14

15

16         REPORTER'S DAILY TRANSCRIPT OF TRIAL PROCEEDINGS

17                    LOS ANGELES, CALIFORNIA

18                 WEDNESDAY, NOVEMBER 7, 2007

19

20

21

22              LEANDRA AMBER, CSR 12070, RPR
             OFFICIAL U.S. DISTRICT COURT REPORTER
23              312 NORTH SPRING STREET, # 442
                LOS ANGELES, CALIFORNIA 90012
24                    (213) 613-0179

25

Dockets.Justia.com

1                  **A P P E A R A N C E S**

2

3   **IN BEHALF OF THE PLAINTIFFS,**
     **TRAFFICSCHOOL.COM, INC., et**   LEWIS BRISBOIS BISGAARD &
4   **al.:**                   SMITH LLP
                               BY:  DANIEL C. DE CARLO, ESQ.
5                                  DAVID MAKOUS, ESQ.
                                  MINA I. HAMILTON, ESQ.
6                        221 NORTH FIGUEROA STREET
                        SUITE 1200
7                        LOS ANGELES, CALIFORNIA 90012
                        (213) 680-5066
8                        decarlo@lbbslaw.com

9

10

11  **IN BEHALF OF THE DEFENDANT,**   SHEPPARD MULLIN RICHTER &
     **EDRIVER, INC., et al.:**       HAMPTON LLP
12                        BY:  BRIAN DAUCHER, ESQ.
                                    ASHLEY E. MERLO, ESQ.
13                                  JOSEPH H. TADROS, ESQ.
                        650 TOWN CENTER DRIVE
14                        FOURTH FLOOR
                        COSTA MESA, CALIFORNIA
15                        92626-1993
                        (714) 513-5100
16                        bdaucher@sheppardmullin.com

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                    CROSS    REDIRECT    RECROSS    VOIR DIRE

4      PLAINTIFFS' WITNESS

5      **ERIK JASON CREDITOR**
       BY MR. MAKOUS                22
6      BY MR. DAUCHER    5 (RESUMED)            33, 39
       BY THE COURT                                          35
7

8      **CHRISTOPHER PETER KRAMER**
       BY MR. MAKOUS
9      BY MR. DAUCHER    41

10     **JOHN PAUL WRIGHT**        DIRECT
       BY MR. DE CARLO            113
11
       **LISA WARREN**
12     BY MS. MERLO    133

13                                                        PAGE

14     PLAINTIFFS REST                                    143

15     DEFENSE'S 52C MOTION                               143

16

17                    CROSS    REDIRECT    RECROSS

18     DEFENSE'S WITNESS

19     **RAJ LAHOTI**
       BY MR. DE CARLO  146
20
       **STEVE MORETTI**
21     BY MR. DAUCHER                214
       BY MR. DE CARLO  170                    219
22

23

24

25

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, NOVEMBER 7, 2007;

2                              8:33 A.M.

3                               -o0o-

4          THE CLERK:  This is CV 06-7561, *trafficschool.com*

5     versus *edriver*.

6               Counsel, please state your appearances.

7               MR. MAKOUS:  Good morning, your Honor.

8               David Makous, Daniel De Carlo, and Mina Hamilton

9     for plaintiffs.

10              THE COURT:  Good morning.

11              MR. DAUCHER:  Good morning, your Honor.

12              Brian Daucher, Joseph Tadros, and Ashley Merlo for

13    defendants.

14              THE COURT:  Good morning.

15              All right.  I believe we had a witness on the

16    stand.  So if the witness could please come forward and

17    resume the stand.

18              THE CLERK:  Sir, you are reminded that having been

19    previously sworn you remain under oath.

20              THE WITNESS:  I understand.

21              THE COURT:  All right, sir.

22              THE WITNESS:  Good morning.

23              MR. DAUCHER:  Good morning, Mr. Creditor.

24    ///

25    ///

1                    **CROSS-EXAMINATION** (RESUMED)

2      BY MR. DAUCHER:

3      Q.   In California certain counties, as we discussed

4      yesterday, do not all accept online traffic school

5      certificates; correct?

6      A.   Correct.

7      Q.   In fact, different courts within a specific county might

8      have different policies; correct?

9      A.   Generally that's not the case.

10     Q.   But it is the case in some cases in California; correct?

11     A.   I don't believe it is the case any longer.  Most courts,

12     if not all, within a county have the same rules, to my

13     understanding, as it relates to online traffic school for

14     that county.

15     Q.   What steps, if any, does *trafficschool.com* take to

16     ensure that potential customers in those counties that do not

17     accept online certificates -- that they do not purchase your

18     services?

19               MR. MAKOUS:  Objection.  Vague.  Unclear question.

20               THE COURT:  Overruled.

21               You can answer.

22               THE WITNESS:  We have a page that says that we are

23     not approved in that locality.

24     BY MR. DAUCHER:

25     Q.   And, in fact, as a visitor makes his or her way through

1   the *trafficschool.com* Website, a visitor needs to input their

2   residence county; correct?

3   A.    The county where they received the ticket.

4   Q.    Okay.  And that acts as an additional screening

5   mechanism for *trafficschool*; correct?

6   A.    Correct.

7   Q.    To ensure that you're not inadvertently selling courses

8   to students who received a ticket in a county that will not

9   accept your certificate?

10  A.    Correct.

11  Q.    And it's -- how long have you had that system in place?

12  A.    Since we began our Website in 2000, when we started

13  offer online traffic school.

14  Q.    So that was one of the things that you built into the

15  Website right from the beginning; is that correct?

16  A.    Was a selection process where students would enter their

17  county and court where they received their tickets; correct.

18  Q.    And if the student entered a county or -- where the

19  ticket -- where the Court would not accept the certificate,

20  then that Website would so advise that student; correct?

21  A.    So advise them as to what?

22  Q.    That -- that *trafficschool.com* could not offer them a

23  course for that particular ticket.

24  A.    The information that's been presented on the

25  not-approved pages have evolved over the years, but there's

1   always been a not-approved notice saying that at the time --

2   at that time we are presently not approved by that court to

3   provide courses to them.

4   Q.   Yesterday we looked at the advertising budget for

5   *trafficschool.com*.  One of the things that *trafficschool.com*

6   does to promote its Website is to run radio spots; correct?

7   A.   Correct.

8   Q.   And how long typically are those radio spots?

9   A.   30-second advertisements.

10  Q.   And in those spots does *trafficschool* make it clear to

11  all potential California residents in range of the radio

12  station whether the *trafficschool.com* online course will mask

13  points for their specific ticket?

14       MR. MAKOUS:  Objection.  Speculative and lacks

15  personal knowledge.

16       THE COURT:  Overruled.

17       You can answer.

18       THE WITNESS:  I'm not 100 percent sure of what the

19  range is of every radio station that we advertise on, but I

20  don't believe the advertisements make mention that we may not

21  be able to mask certain county's tickets.

22  BY MR. DAUCHER:

23  Q.   And have you ever considered putting in such a

24  disclaimer in the 30-second spot?

25  A.   No.

1    Q.   Because there's not enough time in that spot to justify

2    putting in such a disclaimer; correct?

3               MR. MAKOUS:  Objection.  Argumentative and

4    relevance.

5               THE COURT:  Overruled.

6               You request answer.

7               THE WITNESS:  I'm sure that there are ways to be

8    creative about saying anything in a 30-second spot.  I've

9    never had any reason to believe that it was necessary to put

10   any sort of disclaimer in our 30-second advertisement spots.

11   BY MR. DAUCHER:

12   Q.   Are you familiar with the concept of conversion rates?

13   A.   Yes.

14   Q.   And would it be fair to define that as -- for instance,

15   with respect to *trafficschool.com*, the number of visitors to

16   *trafficschool.com* as opposed to the number of visitors that

17   actually purchase the *trafficschool.com* course?

18   A.   Is there a question there?  I'm sorry.  I don't

19   understand.

20   Q.   Yes.

21               Is that -- do you understand that definition that

22   I've proposed?

23   A.   When our company determines conversions, we generally

24   look at unique visitors to our Website.

25   Q.   And that is the denominator, I take it, and on top you

place the number of actual purchases during that same period

of time; correct?

        MR. MAKOUS:  Objection.  Vague and unclear.

        THE COURT:  Overruled.

        THE WITNESS:  I'm not sure of the numerical

sequence of setting up the numbers, but we do utilize the

unique visitors to our Website and look at the number of

courses that are sold to determine the conversion percentage.

BY MR. DAUCHER:

Q.   And that -- that percentage turns out to be less than

100 percent; correct?

A.   Yes.

Q.   Okay.  And you would agree that for *trafficschool.com*,

*trafficschool.com*'s conversion rate is between 10 to

15 percent; correct?

A.   It depends on what course you are considering the

conversion rate for.

Q.   You testified at deposition that you would agree with

Mr. Kramer's testimony that in general the conversion rate

for *trafficschool.com* for online traffic school courses in

California was 10 to 15 percent.

A.   I was deposed before Mr. Kramer; so I definitely didn't

agree to anything Mr. Kramer said.  You might have made

reference to a conversion to 10 to 15 percent.  I might have

agreed to it for our California course, but I certainly

1   didn't represent that it was for anything other than that or

2   agreed to anything Mr. Kramer specifically said.

3   Q.   Okay.  But you would agree that 10 to 15 percent is a

4   reasonable estimate for California; correct?

5   A.   For the conversion of unique visitors that purchase

6   a California traffic school course on *trafficschool.com*, yes.

7   Q.   Now, do you have an estimate as to the size of the

8   California online traffic school market on an annual basis?

9   A.   It really is pure speculation.  There is no specific

10  reports that are provided to schools.  I've estimated that

11  it's about a half a million people, but it really is just

12  pure speculation because there's no reports provided on the

13  number of online traffic school students in California.

14  Q.   But -- but you've been in the industry for more than

15  10 years; correct?

16  A.   Correct.

17  Q.   And you are aware generally of the other businesses in

18  California that offer online traffic schools; correct?

19  A.   Certainly.

20  Q.   And as part of running your business, you monitor their

21  growth; correct?

22  A.   As best as possible.  I don't know how I would monitor

23  their specific growth, but I view their Websites.

24  Q.   And you would agree that your belief is that

25  *trafficschool.com* has about 10 percent of the California

1  market; correct?

2  A.  If the online traffic school market is approximately

3  500,000 students, then we would have approximately 10 percent

4  of the online traffic school market in California.

5  Q.  And I think yesterday we established that California

6  constitutes about three-quarters of your gross revenue on an

7  annual basis -- correct? -- for *trafficschool.com*?

8  A.  I don't know if I ever specifically stated that it was

9  three-quarters, but it is -- it's a large percentage, for

10  sure.

11  Q.  Three-quarters is about right; isn't it?

12  A.  It's a large percentage.  I'd have to look at the

13  documents in front of me to be able to answer specifically,

14  but it's a large percentage.

15  MR. DAUCHER:  Your Honor, at this time we would

16  offer a demonstrative, which we previously disclosed to

17  counsel, reflecting census data for California, Texas, and

18  Florida for the year 2000, just the populations.

19  THE COURT:  You want to put this in front of the

20  witness?

21  MR. DAUCHER:  Yes, we would like to do that.

22  THE COURT:  Okay.  Any objection?

23  MR. MAKOUS:  Your Honor, may I show you the

24  exhibit?  There is an objection.

25  THE COURT:  Now, has this exhibit been marked?

1          MR. DAUCHER:  We would mark it 692.

2          THE COURT:  All right.  Sir --

3          MR. MAKOUS:  Yes.

4          THE COURT:  -- don't display it, please.

5          MR. MAKOUS:  I was not going to, your Honor.

6          THE COURT:  Then --

7          MR. MAKOUS:  I was just asking if it was on so if I

8    wanted to, it would be.  That's all I wanted to know.

9          THE COURT:  Would you please take your seat.

10          (Exhibit Number 692 identified.)

11          THE COURT:  Okay.  And what's your objection?

12          MR. MAKOUS:  First of all, we don't know the

13    relevance of this.

14          Second of all, this is nine-year-old data.  The

15    states have grown at different rates, and if they had the

16    current data, they certainly could have offered that.

17          There is nothing in this lawsuit relevant to the

18    year 2000.

19          THE COURT:  So to make a long-winded story, your

20    objection is relevancy?

21          MR. MAKOUS:  That's correct, your Honor.

22          THE COURT:  Okay.  Well, from now on if I ask you

23    for an objection, state your objection based on the Evidence

24    Code.  If I want argument, I'll ask for it.

25          Okay.  Do you wish to be heard?

1        MR. DAUCHER:  Your Honor, I think this is the last

2   official census taken in the United States.  I think it's

3   reasonably reliable for purposes here, and my intention is to

4   demonstrate that they do not have a proportional share of the

5   Texas or Florida markets.

6        THE COURT:  Okay.  We'll mark it as 692.  It can be

7   placed in front of the witness.

8        The objection is overruled.

9        MR. DAUCHER:  Your Honor, I take it that -- this is

10  something which we've asked the Court to take judicial notice

11  of in terms of the facts here.  And in accepting the exhibit,

12  is the Court taking judicial notice.

13        THE COURT:  All I'm doing -- what you've told me at

14  this point is that this is a demonstrative exhibit that you

15  wish to use in questioning this witness.

16        MR. DAUCHER:  Okay.

17        THE COURT:  It has nothing to do with your request

18  that I take judicial notice at this point.

19        MR. DAUCHER:  Okay.

20  BY MR. DAUCHER:

21  Q.   Mr. Creditor, do you see the Exhibit 692 before you?

22  A.   I do.

23  Q.   And do you see that according to the data from the year

24  2000, at least, Texas has approximately 60 percent as much --

25  as many residents as the state of California?

1    A.   That's what it says.

2         MR. MAKOUS:  Objection.  Compound.  Assumes facts

3    not in evidence.

4         THE COURT:  Overruled.

5         Go ahead.

6    BY MR. DAUCHER:

7    Q.   And in California in 2006 *trafficschool.com* sold 57,000

8    courses; correct?

9    A.   I believe that's correct.

10   Q.   But *trafficschool.com* in 2006 sold only 2,000 courses in

11   Florida; correct?

12   A.   I don't have the numbers in front of me, but I -- I --

13   I don't know the specific numbers without seeing the report.

14        MR. DAUCHER:  All right.  Can we look at

15   Exhibit 26, please.  Page 3, please.

16   BY MR. DAUCHER:

17   Q.   And again, Mr. Creditor, Exhibit 26, Page 3 is the

18   report you prepared; correct?

19   A.   Correct.  As I see it, the state of Florida has, in

20   2006, 9,390 courses sold for *trafficschool*.

21   Q.   I'm sorry.  I misspoke.

22        I first asked you about Texas population, and I

23   meant to refer you to the sales of *trafficschool* in Texas; so

24   my question would be in Texas your *trafficschool* sales were

25   2,000 courses; correct?

A.    In 2006 course sales are 1800, yes, for *trafficschool*.

Q.    Isn't it fair to say, Mr. Creditor, that

*trafficschool.com* controls significantly less of the market

for traffic school in Texas than it does in California?

A.    It certainly has decreased and has less market share

year over year, according to this report.  In 2003 and '4 we

certainly had much more market share than we do in 2005, '6,

and to the present.

Q.    But my question was isn't it true that regardless of

increase or decrease, if you look at 2006, *trafficschool.com*

has a significantly lower percentage of the market in Texas

than it does in California?

A.    Have you provided me with any evidence of what the

market is in Texas?

          THE COURT:  Sir, he asks questions.  You answer

them.

          THE WITNESS:  Okay.

          THE COURT:  You don't ask him questions.  So --

          And, yeah, what do you have to say?

          MR. MAKOUS:  Objection.  Speculation.

          THE COURT:  Okay.

          MR. MAKOUS:  Lacks personal knowledge.

          THE COURT:  Your objection is overruled.

          Okay.  Do you have the last question in mind?

          THE WITNESS:  I do.

1          THE COURT:  Okay.  Let's have your answer.

2          THE WITNESS:  I have no knowledge of what the Texas

3    market is for traffic school.

4    BY MR. DAUCHER:

5    Q.   Let me go through the similar analysis with Florida.

6          According to the -- Exhibit 692, Florida has

7    approximately one-half the population of California.

8          Do you see that?

9    A.   I see that.

10   Q.   And in Florida in 2006 *trafficschool.com* sold

11   approximately 9,400 courses; correct?

12   A.   Correct.

13   Q.   And based upon that, isn't it -- information, isn't it

14   fair to say that *trafficschool.com* has significantly less

15   than 10 percent of the Florida traffic school market for

16   online courses?

17         MR. MAKOUS:  Objection.  Incomplete hypothetical.

18   Speculative.  Lacks personal knowledge of the witness.

19         THE COURT:  Overruled.

20         THE WITNESS:  I do not know what the Florida market

21   is for online traffic school to be able to give you the

22   percentage of the market that that 9,400 represents.

23   BY MR. DAUCHER:

24   Q.   So you would not have any additional information that

25   could shed more light on this question than what has been put

1    before you this morning; correct?

2    A.    Personally I do not; correct.

3    Q.    Both with respect to Texas and Florida; correct?

4    A.    Correct.

5    Q.    Okay. *Trafficschool.com* owns the domain name Florida

6    Traffic School; correct?

7    A.    Yes.

8    Q.    And *trafficschool.com* uses that domain name to sell

9    online traffic school courses in Florida; correct?

10    A.    We use it as a promotional site for courses to sell on

11    *trafficschool.com* and *DriversEdDirect* for traffic school or

12    for driver's education.

13    Q.    And the content of that site is created by

14    *trafficschool.com*; correct?

15    A.    Collectively by both companies and the employees of the

16    companies.

17    Q.    Now, if you would refer to Exhibit 610, please.

18          (Exhibit Number 610 identified.)

19    BY MR. DAUCHER:

20    Q.    This is the first page that's been put before you

21    electronically.

22          Can you identify that as the home page of

23    *Floridatrafficschool.com*?

24    A.    That appears to be the home page of the

25    *Floridatrafficschool.com* site.

1  Q.   And I take it that you don't believe that the use of

2  "Florida" ahead of "trafficschool" could confuse visitors to

3  this site as to an affiliation with the state of Florida;

4  correct?

5          MR. MAKOUS:  Objection.  Relevance.  Lacks

6  foundation.

7          THE COURT:  Overruled.

8          THE WITNESS:  Well, the courses that are offered

9  through this site are approved by the Florida authorities.

10  So there is an affiliation between the courses that are

11  offered on the site and the state of Florida.

12  BY MR. DAUCHER:

13  Q.   There's a difference, isn't there, between a -- having

14  the approval of the Government and being affiliated with the

15  Government; correct?

16          MR. MAKOUS:  Objection.  Calls for a legal

17  conclusion.  Beyond the scope of the -- of any issue in this

18  case.  Irrelevant.

19          THE COURT:  Overruled.

20          Go ahead.

21          THE WITNESS:  I don't -- I don't understand the

22  legal definitions of "approval" versus "affiliation."

23          THE COURT:  Counsel, all I want is your objection

24  based on the Evidence Code because I'd hate to think that

25  there's any kind of coaching going on here.  So if you don't

1  state your objection based on the Evidence Code, it's going

2  to be overruled.

3            All right?  That's the last time --

4            MR. MAKOUS:  Would you like the --

5            THE COURT:  That's the last time --

6            Excuse me, sir.

7            MR. MAKOUS:  Yes, your Honor.

8            THE COURT:  That is the last time I'm going to warn

9  you.  Just the Evidence Code.  That's it.

10            MR. MAKOUS:  Let me make it very clear.  There's no

11  coaching going on in the courtroom.

12            THE COURT:  Sir?

13            MR. MAKOUS:  And if you want me to site the

14  Evidence Code --

15            THE COURT:  Excuse me.  I've told you three times.

16  I've told you today, I've told you yesterday to site the

17  Evidence Code.  That's all I want.  And if I think there's

18  coaching going on here, we will have another trial after this

19  one is over.

20            MR. MAKOUS:  Your Honor?

21            THE COURT:  Now sit down.

22            MR. MAKOUS:  May I --

23            THE COURT:  You may sit down.

24            MR. MAKOUS:  May I state Federal Rules of Evidence?

25            THE COURT:  You may sit down, sir.  I'm not here to

1    educate trial lawyers.  I assume they know their business.

2              Now let's go.  Next question.

3    BY MR. DAUCHER:

4    Q.    Now, the *Floridatrafficschool.com* Website does not

5    contain any express disclaimer to indicate that the school is

6    not affiliated with the state of Florida; correct?

7    A.    I don't believe there's any disclaimers on the

8    *Floridatrafficschool.com* site.

9    Q.    In the upper left-hand corner of the home page there's a

10   picture of a police officer.

11             Do you see that?

12   A.    I do.

13   Q.    Is that a real Florida police officer?

14   A.    I don't know.  He could be.

15   Q.    You don't know?

16   A.    I don't know.  It's a stock photograph from our

17   designers.

18   Q.    I take it you would agree that the

19   *Floridatrafficschool.com* Website does not carry the

20   endorsement of the Florida Police Department; correct?

21   A.    I -- I don't know if the Florida Police Department

22   endorses any -- I don't know it.  No, of course not.

23   Q.    Okay.  Can we look then at the bottom right-hand corner

24   with the box that begins FLA DHSMV resources.

25             First of all, you understand that the State of

1    Florida does not use the abbreviation "DMV" for its motor

2    vehicle department; correct?

3    A.    Correct.

4    Q.    And that's also true in Texas; correct?

5    A.    I believe you're correct.

6    Q.    Now, by using the heading "FLA DHSMV Resources," are you

7    attempting to suggest that there's an affiliation between

8    *Floridatrafficschool.com* and this FLA DHSMV?

9    A.    We are simply saying that if you click that button, you

10   will find Florida DHSMV resources.  I don't understand what

11   you mean by "affiliation."

12   Q.    On the next line of this box there's a line that says

13   "DHSMV Website guide."

14            Do you see that?

15   A.    Yes.

16   Q.    And I take it that is a link; is that correct?

17   A.    I think the only link on there, although I could be

18   wrong -- I believe it is the button that says "Find DHSMV."

19   Q.    If you click on that button, "Find DHSMV," that takes

20   the visitor to the *drivinglinks.com* Website; correct?

21   A.    I believe that's correct.

22   Q.    Not to the Florida DHSMV; correct?

23   A.    It takes you to the Florida page on the *drivinglinks.com*

24   site.

25   Q.    Is there anything in this box that, in your opinion,

1  advises the visitor that the Website is not affiliated with

2  the FLA DHSMV?

3  A.   No.

4         MR. DAUCHER:  No further questions, your Honor.

5         THE COURT:  All right.  Do you have any questions?

6         MR. MAKOUS:  Yes, your Honor.  Just a few.

7                    **REDIRECT EXAMINATION**

8  BY MR. MAKOUS:

9  Q.   Yesterday, Mr. Creditor, the -- Mr. Daucher asked you

10 some questions about the contacts that you had with the

11 defendants in this litigation in the early part of 2006.

12        Do you recall that general line of questioning?

13 A.   Yes.

14 Q.   Okay.  Can you explain to the Court why it is that

15 *DriversEdDirect* first contacted *DMV.org* in the early part of

16 2006?

17 A.   Sure.

18        We had started a new business in 2005 and were in

19 the latter part of 2005 exploring ways to build our business,

20 increase sales, increase visitor traffic.  And one of the

21 directors or the president, Jimmy Leach, was to look for many

22 ways of increasing sales and traffic.  And in those

23 discussions in latter 2005 and early 2006 we were assessing

24 many traditional and nontraditional forms of ways to do that.

25 And one of the ways that we felt to do that would be to

1   contact *DMV.org* as they were --

2   Q.    Let me just interrupt a minute so it doesn't get too

3   narrative.

4   A.    Sure.

5   Q.    Why did you pick *DMV.org*?

6   A.    We picked them because in searching various search

7   engines -- Google, Yahoo!, MSN, et cetera -- for virtually

8   all terms related to the driver's education business, they

9   were coming up very high and always near the top.  And we

10  felt that since they were obviously, in our opinion, getting

11  a significant amount of traffic because of that, that they

12  would be a good source of, you know, potential traffic and

13  sales for us to look into a relationship.

14  Q.    What do you mean when you say "very high up"?  What are

15  you referring to?

16  A.    When you would search the terms "driver's education,"

17  "California online driver's ed," they would be at the top of

18  the sponsored links, generally listed at the top of the page

19  or the top right.  They also had very high natural and

20  organic listings for many of the search terms that were

21  relevant for our business.

22  Q.    And how is it that they achieved a high positioning on

23  the sponsored link positioning as a search engine result?

24          MR. DAUCHER:  Objection.  Foundation.  Speculation.

25          THE COURT:  Sustained.

1  BY MR. MAKOUS:

2  Q.    Based on your experience, sir, do you know how a company

3  like yourself would find itself placed at the top of a

4  sponsored link in a search engine for the word "traffic

5  school"?

6  A.    There are certainly various ways that you can do that.

7  Google has its own systems for allowing you to be -- bid

8  higher than others.  You bid on your terms.  There's

9  algorithms that allow for them to determine click-through

10 ratios and so forth.  I think there might be other search

11 engines where it's based solely just on bid amount, but

12 generally it's bid amount and the algorithms that Google has

13 created.

14 Q.    In early 2006 did you know how much traffic, in fact,

15 *DMV.org* was driving to its Website?

16       MR. DAUCHER:  Objection.  Calls for a speculation.

17 Foundation.

18       THE COURT:  You can answer that "yes" or "no."

19       THE WITNESS:  Once we began --

20       THE COURT:  "Yes" or "no"?

21       THE WITNESS:  Yes.

22 BY MR. MAKOUS:

23 Q.    And how did you come upon that information?

24 A.    The president of our company began negotiations with

25 Raj Lahoti, and Raj Lahoti offered that information to us.

Q.   Okay.  In point of fact, wasn't Mr. Lahoti giving you

representations about how much traffic was coming to his

site.

A.   He was certainly making representations as to the amount

of sales that they were making.

Q.   Okay.  And during these -- this conver- -- this

interaction between *DriversEdDirect* and Online Guru, did they

ever disclose to you any of the objections to the business

practices made by the State of California?

A.   Never.

Q.   Did they ever make or disclose any objections made by

any other state to their business practices?

A.   Never.

Q.   Did they ever disclose to you the emails that they were

receiving demonstrating that members of the public and state

agencies believed that they were the DMV?

A.   No, they did not.

Q.   Would you have continued any discussions with them if

they had?

A.   Absolutely not.

Q.   When did you run this test that took place in the

relationship between your company, *DriversEdDirect*, and

Online Guru?

A.   There was about a six-hour period in July where our

advertisement was being displayed.

1    Q.   So one day -- not even a day; is that correct?

2    A.   It was one evening.

3    Q.   And how did that stop?

4    A.   I believe Mr. Lahoti took the advertisement down,

5    according to the emails that I have seen.

6    Q.   Did he ever explain to you why?

7    A.   He made some representations that there were site design

8    issues, I believe.

9    Q.   Were you aware that he was undergoing a redesign of his

10    Website at that time?  At that time were you aware of that?

11    A.   Yes.

12    Q.   Okay.  And were you ever made aware that a new Website

13    did get launched under the *DMV.org* domain?

14    A.   I was aware of that in October.

15    Q.   When did you first seek legal counsel about the business

16    practices of the defendants on this --

17    A.   In --

18    Q.   -- on this issue in this case?

19    A.   In August of 2006.

20    Q.   And did the legal relationship between your company,

21    *DriversEdDirect*, and Online Guru terminate at any time?

22    A.   Yes.  We terminated the arrangement in September of --

23    Q.   Of what year?

24    A.   September of 2006.

25    Q.   How did you do that?

1    A.   By written letter.

2    Q.   Okay.  After you sent the notice of termination to

3    Mr. Lahoti, did he contact your company at any time after

4    that?

5    A.   He contacted Jimmy Leach, the president of

6    *DriversEdDirect* at the time, and asked if we were interested

7    in restarting the test.

8    Q.   Okay.  Were you interested?

9    A.   No.

10   Q.   When did you learn about the contacts by the various

11   state agencies against the defendants in this case?

12   A.   Through the course of discovery we have seen letters.

13   Q.   In this litigation?

14   A.   In this litigation, yes.

15   Q.   When did you first learn about the emails that you've

16   seen in this litigation?

17   A.   Through the course of discovery in this litigation we

18   have reviewed many emails.

19            MR. MAKOUS:  I'd like to put up Exhibit 20, please.

20            (Exhibit Number 20 identified.)

21   BY MR. MAKOUS:

22   Q.   Okay.  Do you recall yesterday, Mr. Creditor, that

23   Mr. Daucher asked you a series of questions about

24   *drivinglinks.com*?

25   A.   I do.

1    Q.   All right.  I'd like to draw your attention to the

2    center -- lower center of the exhibit.

3            MR. MAKOUS:  And if I could ask Ron to magnify that

4    where it has --

5            Right here.  Yeah.  That's good.

6    BY MR. MAKOUS:

7    Q.   Does the registration with the registrar disclose the

8    address and phone number of your *drivinglinks.com*?

9    A.   It is the address for our company.  It's phone numbers

10   of -- you could reach *trafficschool* or *DriversEdDirect*

11   representatives at those.

12   Q.   So if someone telephoned that telephone -- used that

13   telephone and called in 2006, it would have been

14   functional -- or sent a letter to that address or even

15   visited that address they would have encountered your

16   businesses; correct?

17   A.   Correct.

18           MR. MAKOUS:  Okay.  I would like to go to Page 990

19   of that exhibit.  I'm sorry it's -- I apologize.  It's

20   exhibit.

21   BY MR. MAKOUS:

22   Q.   I can't seem to find the exhibit.  Counsel yesterday

23   showed you the top page of the *drivinglinks.com* Website.

24           Do you recall that?

25   A.   Yes.

1    Q.   And on that top page were the direct listings to the

2    50 state -- the state DMV offices displayed?

3    A.   Let me clarify.  I don't know if it's the top page but

4    I -- it's actually open in this book.

5    Q.   What exhibit is that?

6    A.   Exhibit 20, I think.

7    Q.   Yeah.  I'm in Exhibit 20.

8         MR. MAKOUS:  Apparently -- here we go maybe -- now

9    it's on the screen, your Honor.

10   BY MR. MAKOUS:

11   Q.   If I could, I'll ask Mr. Creditor, is this the

12   *drivinglinks.com* Website?

13   A.   This is a page on the *drivinglinks.com* Website, yes.

14   Q.   Is there any indication of any of the state DMV contact

15   information there?

16   A.   Yes.  At the bottom of the page there are the links and

17   the names to the 50 motor vehicle agencies.

18   Q.   Is that displayed on the screen right now?

19   A.   No.  It's below that.  That's where it begins.

20   Q.   Okay.  And if the user was to click on those links,

21   would there be any redirect to those particular sites?  What

22   would happen?

23   A.   I believe it does take you to the official site for that

24   state's motor vehicle agency, but I -- I haven't visited the

25   *drivinglinks* page in question for a while.  So I'm not for

1   certain.

2   Q.   On the conversion rates -- let's talk about that for a

3   minute and draw your attention to what Mr. Daucher asked you

4   earlier today.

5        Does the defendant -- are you aware of the

6   defendants' conversion rates in this case at all?

7        MR. DAUCHER:  Objection.  Foundation.  Other than

8   yes, no.

9        THE COURT:  You can answer that "yes" or "no."

10       Do you have the question in mind?

11       THE WITNESS:  I --

12       THE COURT:  Is it "yes" or "no"?

13       THE WITNESS:  Yes.

14  BY MR. MAKOUS:

15  Q.   Okay.  What have you learned about the conversion?

16       THE COURT:  What is the basis for your knowledge?

17  BY MR. MAKOUS:

18  Q.   What's the basis for your knowledge?

19  A.   I have read declarations from the defendants or from

20  principals of the defendants where they have represented what

21  their conversion percentages are.

22       THE COURT:  Declarations that you've reviewed in

23  connection with this litigation?

24       THE WITNESS:  Correct, sir, your Honor.

25  BY MR. MAKOUS:

1  Q.   Is there any correlation --

2         THE COURT:  Excuse me.

3         MR. MAKOUS:  Yes, your Honor.

4         THE COURT:  Do you have any other basis for your

5  knowledge of their conversion rates, other than what you've

6  read in connection with this litigation?

7         THE WITNESS:  Not of conversion rate, no, your

8  Honor.

9  BY MR. MAKOUS:

10 Q.   In order to -- so the Court is advised of this,

11 Mr. Creditor, in order to convert a visitor, they have to

12 visit a site to be converted -- is that correct? -- so to

13 speak?

14 A.   Yes.

15 Q.   Okay.  So for someone to be converted to a sale, they

16 have to go to your Website for you to make that sale; is that

17 correct?

18 A.   Theoretically, yes.

19 Q.   And for someone to be converted to *DMV.org* partners,

20 they would have to go to the *DMV.org* Website; is that

21 correct?

22        MR. DAUCHER:  Objection.  Lacks foundation.

23 Speculation.

24        MR. MAKOUS:  I'll withdraw the question, your

25 Honor.

1          THE COURT:  All right.

2     BY MR. MAKOUS:

3     Q.   Is there a correlation between someone going to a

4     Website, being drawn to the Website, and making a purchase at

5     that Website?

6          MR. DAUCHER:  Objection.  Calls for opinion except

7     as to his company perhaps.

8          MR. MAKOUS:  I'll make it limited to his company,

9     your Honor.

10         THE COURT:  All right.

11         THE WITNESS:  Can you restate the question.

12    BY MR. MAKOUS:

13    Q.   Yes.

14         In your experience, can you make a sale if the

15    person doesn't go to your Website?

16    A.   Not for our online traffic school courses.

17    Q.   So the only way that you can make a sale in your online

18    business is for someone to be attracted to your Website; is

19    that correct?

20    A.   Correct.

21    Q.   And how are your customers attracted to your Website?

22    A.   Customers come from search engines.  Customers are

23    referred by friends and family.  There are some lists that

24    are provided by various courts.  We do other forms of

25    advertising and marketing which drive traffic to our Website,

1   as well such as the radio advertising.

2            MR. MAKOUS:  I have no further questions.

3            MR. DAUCHER:  Your Honor, just briefly can we look

4   at Exhibit 20 again and specifically Page 990 of that

5   exhibit.

6                        **RECROSS-EXAMINATION**

7   BY MR. DAUCHER:

8   Q.   Mr. Makous was asking you about whether this page

9   contained links to the official state motor vehicle Websites.

10           Do you recall that?

11  A.   Yes.

12  Q.   Now, looking at the top portion of this page, which is

13  shown on Defendants' 990, there are a set of links on that

14  top portion to the -- to 50 states; correct?

15  A.   Those are links to the 50 state pages within the

16  *drivinglinks* site.

17  Q.   Right.

18           So in other words, a visitor who clicks on those

19  links does not go to the official Website of any state;

20  correct?

21  A.   Once they click that link, the resulting page is the

22  link to the official state site.

23  Q.   But by clicking these links that the visitor sees on the

24  top of this page, the visitor is taken to another portion of

25  the *drivinglinks.com* Website; correct?

1    A.    The top box, yes.  Correct.

2    Q.    And if we -- there is more to this page, though;

3    correct?

4    A.    Correct.

5    Q.    And if a visitor scrolls down to the next page.

6          MR. DAUCHER:  Can we see the next page.

7    BY MR. DAUCHER:

8    Q.    Then your testimony is that -- well, first of all, on

9    the next page -- which is actually part of the same Web page;

10   correct?

11   A.    Correct.  It's one -- one page.

12   Q.    There are a list of links there; correct?

13   A.    Yes.

14   Q.    And your belief is that those links take visitors

15   directly to the official state motor vehicle Websites?

16   A.    I think so.  I -- like I said, I'm not certain, but I

17   believe so.

18   Q.    And to see those links, a visitor would have to scroll

19   down; correct?

20   A.    Well, it depends on what their state was.

21   Q.    Do you not know that when Defendants' 990 -- when the

22   top of that page is shown on a computer screen, that it, in

23   fact, will not show any of the links we're looking at at

24   Defendants' 991 [sic]?

25   A.    I don't know that.

1    Q.   But you would agree at least that for the State of

2    Wyoming for instance a visitor would have to scroll down to

3    find that link; correct?

4    A.   Depending upon a person's computer screen, they may have

5    to scroll down; correct.

6    Q.   And visitors to Websites do scroll down on occasion,

7    don't they?

8    A.   I don't know.  I sometimes do scroll down.

9             MR. DAUCHER:  Okay.  No further questions.

10            MR. MAKOUS:  No questions, your Honor.

11            THE COURT:  I have a couple of questions for you.

12            THE WITNESS:  Yes, sir, your Honor.

13                       VOIR DIRE EXAMINATION

14   BY THE COURT:

15   Q.   California refers to their Department of Motor Vehicles

16   as the DMV; correct?

17   A.   Correct, your Honor.

18   Q.   Does Florida?

19   A.   No.

20   Q.   Okay.  And what is -- how do they refer to their --

21   their comparable state DMV?

22   A.   It's the Department of Highway and Safety Motor

23   Vehicles, the DHSMV.

24   Q.   Okay.  And what about Texas?

25   A.   Texas is varying agencies.  There's the Department of

1    Public Safety, DPS.

2    Q.    Uh-huh.

3    A.    There's also the Texas Education Agency, the TEA.

4    Q.    Okay.  But they don't have a, quote, unquote, "DMV"

5    either; correct?

6    A.    They don't have an agency that's called the DMV;

7    correct.

8    Q.    Okay.  Okay.  You do business in Florida; correct?

9    A.    Yes.

10   Q.    And Texas?

11   A.    Yes.

12   Q.    Okay.  What other states do you do business in?

13   A.    We do business in Nevada.

14   Q.    Okay.  Let's stop there.

15         Does Nevada have a DMV?

16   A.    Yes.

17   Q.    Okay.  What other states do you do business in?

18   A.    Colorado.

19   Q.    And do they have a DMV or is their -- yes.

20         Do they have a DMV?

21   A.    I believe they have a DMV that's under the -- another

22   agency name.

23   Q.    Okay.  That's what I'm really -- that's what I'm really

24   focusing on.  I assume all of these states regulate drivers.

25   A.    No.  I'm sorry, your Honor, to interrupt, but they --

1    they have a DMV.  They call it the DMV for the motor vehicle.

2    Q.    Okay.  So they call it the DMV.

3    A.    Under the Department of Revenues umbrella.  But they

4    call it the DMV.

5    Q.    Okay.  What other states do you do business in?

6    A.    New Mexico.

7    Q.    Okay.  And do they have a DMV?

8    A.    I believe so.

9    Q.    Okay.  And what other states do you do business in?

10   A.    New York.

11   Q.    Okay.  And do they have a DMV?

12   A.    Yes.

13   Q.    Okay.  And what other states do you do business in?

14   A.    New Jersey.

15   Q.    And do they have a DMV?

16   A.    I'm not certain.

17   Q.    Okay.  How many states do you do business in?

18   A.    Besides the ones I mentioned, approximately five to

19   eight others, maybe.

20   Q.    Okay.  And of those five or eight others, how many of

21   those have a, quote, unquote, "DMV"?

22   A.    Approximately half.

23   Q.    So somewhere between two and four.

24   A.    I believe so; correct.

25   Q.    All right.  And if I've looked at Exhibit 20, that would

1   be one way to tell for sure which of those states used a DMV?

2   A.   Correct.  We put the monikers on the links on the page;

3   correct.

4                MR. DAUCHER:  Your Honor, may I be heard briefly?

5                THE COURT:  In a minute.

6                MR. DAUCHER:  We haven't -- okay.

7   BY THE COURT:

8   Q.   Or I guess another way I can do that would be to go to

9   the official Website for each of those states?

10  A.   Correct.  Although sometimes the state's Website doesn't

11  represent specifically the monicker on the Website.  It may

12  just be part of the Website's Web address.

13               THE COURT:  All right.  All right.  Does anybody

14  have any additional questions for the witness based on what

15  the Court asked?

16               MR. MAKOUS:  No, your Honor.

17               MR. DAUCHER:  I would, your Honor, briefly.

18               First, I would point out that at the inception of

19  the trial we filed a request for judicial notice, which

20  included a chart for each state by name and including the Web

21  addresses.

22               THE COURT:  We'll get there.

23               MR. DAUCHER:  Okay.  So if the Court is looking for

24  a place --

25               THE COURT:  I'm sorry?

1          MR. DAUCHER:  -- that's -- I'm just pointing that

2    information out to the Court in terms of where it is.

3          THE COURT:  That's fine.  We'll get there.

4                **FURTHER RECROSS-EXAMINATION**

5    BY MR. DAUCHER:

6    Q.   All right.  Mr. Creditor, I believe you testified that

7    you believe New Jersey has a DMV; is that correct?

8    A.   No.  I said I was uncertain of New Jersey.

9    Q.   New Jersey's entity is, in fact, the Motor Vehicle

10   Commission; correct?

11   A.   I see that now; correct.

12         MR. DAUCHER:  Okay.  No further questions, your

13   Honor.

14         THE COURT:  Okay.  Do you have anything?

15         MR. MAKOUS:  No, your Honor.

16         THE COURT:  Okay.  Sir, thank you.

17         You may step down.

18         THE WITNESS:  Thank you, sir.

19         THE COURT:  I'm going to ask that the witness --

20   well, is the witness going to be available throughout this

21   trial?

22         MR. MAKOUS:  Mr. Creditor?

23         THE COURT:  Yes.

24         MR. MAKOUS:  Yes.

25         THE WITNESS:  Yes, sir.

1       MR. MAKOUS:  He'll be here every day.

2       THE COURT:  I may have some questions for him at

3  the conclusion of the trial.  I don't know.  Maybe.

4       Okay.  Thank you.

5       MR. MAKOUS:  We would like to now call Chris

6  Kramer.

7       THE CLERK:  Please raise your right hand.

8       Do you solemnly swear that the testimony you are

9  about to give in the matter now pending before this Court

10 shall be the truth, the whole truth, and nothing but the

11 truth so help you God?

12      THE WITNESS:  I do.

13      THE CLERK:  Please be seated.

14                  **CHRISTOPHER PETER KRAMER,**

15   called as a witness by counsel for the plaintiff(s) being

16         first duly sworn, testified as follows:

17      THE CLERK:  Please state your full name and spell

18 your last name for the record.

19      THE WITNESS:  Christopher Peter Kramer,

20 K-r-a-m-e-r.

21      THE COURT:  All right.  Let's go through the

22 objections that were tendered to Mr. Kramer's declaration.

23      Okay.  Under 2.1 the objection to Paragraph 4,

24 Page 1, Lines 22 through 24 are sustained.

25      Paragraph 9 is sustained.

1          2.3, Paragraph 5 is sustained.

2          Paragraph 5, Line 7 and 8 -- that's sustained.

3          2.4, Paragraph 5 is sustained.

4          Paragraph 6 -- that objection is overruled.

5          Paragraph 5 is sustained.

6          Under 2.5 Paragraph 7 is sustained.

7          Under 2.6 Paragraph 9 is sustained.

8          Under 3.1 -- oops -- I think that's all.

9          MR. MAKOUS:  Your Honor, I didn't get your ruling

10    on 2.2 on Page 4, paragraph 4.

11          THE COURT:  That objection is overruled.

12          MR. MAKOUS:  I have no questions for this witness,

13    your Honor.

14          THE COURT:  All right.

15                    **CROSS-EXAMINATION**

16    BY MR. DAUCHER:

17    Q.   Good morning, Mr. Kramer.

18    A.   Good morning.

19    Q.   You've been in the traffic school business since 1991;

20    correct?

21    A.   Correct.

22    Q.   But *trafficschool.com* was not formed until 1994;

23    correct?

24    A.   In 1994 it was a partnership between myself and

25    Mr. Creditor.

1    Q.   So between those years you worked for a company called

2    Traffic Safety Consultants here in California; correct?

3    A.   Yes, I did.

4    Q.   And they had a division which operated traffic schools;

5    is that correct?

6    A.   Their business was operating classroom traffic schools.

7    Q.   And as I understand it, you actually ran two such

8    traffic schools for Traffic Safety Consultants; correct?

9    A.   I did.

10   Q.   One was called The Comedy School; correct?

11   A.   That's correct.

12   Q.   And one was called The Cheap School; correct?

13   A.   That is correct.

14   Q.   Do you know why those names were chosen?

15   A.   I wasn't part of the decision to choose those names.

16   Those names were chosen prior to my coming on board.

17   Q.   At your deposition, Mr. Kramer, we discussed the

18   sourcing of visitors to both *trafficschool.com* and

19   *DriversEdDirect*.

20        Do you recall generally that discussion?

21   A.   Generally, I do.

22   Q.   And I'm going to -- and I'm going to try to keep this

23   short, try to see if we can reach agreement on what those

24   numbers are.  I've prepared and delivered to counsel a

25   proposed demonstrative and citing the underlying evidence for

1    that.

2              MR. DAUCHER:  And we'd mark this 693, if it's

3    acceptable to plaintiffs.

4              THE COURT:  Okay.  Any objection?

5              MR. MAKOUS:  I have no objection to its marking,

6    your Honor.  We don't know what it's going to be used for.

7    I honestly don't know the source of the data; so I would like

8    to reserve on that.

9              THE COURT:  All right.  Let's -- let me take a look

10   at it.

11             Okay.  So you're just -- at this point just using

12   it as a demonstrative exhibit.  It's not coming into

13   evidence; correct?

14             MR. DAUCHER:  That's correct, your Honor.

15             THE COURT:  Okay.  It will be marked and placed

16   before the witness.

17             (Exhibit Number 693 identified.)

18   BY MR. DAUCHER:

19   Q.   Mr. Kramer, you do have familiarity with the sources of

20   *trafficschool.com*'s business; correct?

21   A.   I do.

22   Q.   And would it be fair to say that your view is that at

23   least 50 percent of visitors to *trafficschool.com* arrive

24   there by typing the *trafficschool.com* domain name?

25   A.   That would be accurate, but there's different ways in

1  which they would find the domain name to type it in.

2  Q.  And would it also be fair to say that *trafficschool.com*

3  receives some visitors from search engines?

4  A.  We do.

5  Q.  And visitors from search engines can come in two ways;

6  correct?

7  A.  That's correct.

8  Q.  Organic and through paid marketing; correct?

9  A.  Yes.

10  Q.  And on this demonstrative, 693, I've listed figures of

11  10 percent for each method.

12         Would that be consistent with your understanding?

13  A.  Approximately.

14  Q.  And another source of *trafficschool.com* visitors is

15  court Websites; correct?

16  A.  Yes.

17  Q.  And would it be consistent with your understanding to

18  say that you believe that about 10 percent of

19  *trafficschool.com*'s visitors arrive in that way?

20  A.  I believe it's less than 10 percent.

21  Q.  What's the best estimate you can get for that figure?

22  A.  I would estimate for around five percent.

23  Q.  *Trafficschool.com* has certain affiliates that send

24  traffic or visitors to *trafficschool.com*; correct?

25  A.  We do.

1    Q.   And would it be fair to say that your view is that about

2    five percent of *trafficschool.com*'s traffic arrives in that

3    way?

4    A.   Approximately.

5    Q.   Now let me ask you this:  Is there any significant

6    category that is not represented on Exhibit 693?

7    A.   There's not.  But again, if I could just clarify, with

8    typing in the domain name there's many reasons why customers

9    would type in the domain name, such as hearing a radio

10   advertisement, seeing our name on a paper court list, having

11   been referred the name from a friend or previous customer.

12   Q.   And some might type it simply because they're looking

13   for a traffic school and they add ".com"; correct?

14   A.   Sure.

15        MR. DAUCHER:  I'd like to do the same thing with a

16   document I'll mark as 694, again previously shown to counsel.

17   This is for *DriversEdDirect*.

18        MR. MAKOUS:  Same position, your Honor.

19        THE COURT:  All right.

20        (Exhibit Number 694 identified.)

21        THE COURT:  All right.  You may display it.

22   BY MR. DAUCHER:

23   Q.   Mr. Kramer, you are familiar with the ways in which

24   *DriversEdDirect* gets traffic to its Website; correct?

25   A.   Yes.

Q.   And again, I've created this demonstrative, 694, to try
to summarize that a certain amount of traffic comes to
*DriversEdDirect* through typing as well; correct?
A.   Correct.  Through, again, seeing various advertisements.
Q.   And you would estimate that at 15 percent; correct?
A.   It may be a little bit higher.
Q.   What's your -- what's your best estimate there?
A.   Maybe closer to 20 or 25 percent.
          THE WITNESS:  Can I ask a question?
          THE COURT:  No, sir.
          THE WITNESS:  Okay.
          THE COURT:  He asks questions; you answer.  If your
lawyer will ask you questions -- he'll have an opportunity to
ask you questions.
          Okay.  Next question.
BY MR. DAUCHER:
Q.   So it's fair to say that *trafficschool.com* receives more
of its traffic through typing than *DriversEdDirect.com* does;
correct?
A.   Correct.
Q.   Now, *DriversEdDirect* also receives traffic through
search engines; correct?
A.   Yes.
Q.   Both organic and paid marketing; correct?
A.   Yes.

Q.   And would you -- would it be a fair estimate to say the organic search produces -- search results produce 20 percent of *DriversEdDirect.com's* business?

A.   That seems a little high.

Q.   What's your best estimate for that number?

A.   I would estimate closer to 10 percent.

Q.   What about paid search engine marketing?  Is 10 percent a good estimate for that?

A.   Ten percent seems like a good estimate.

Q.   Okay.  A significant amount of traffic to *DriversEdDirect* comes from gaming Websites; correct?

A.   Correct.

Q.   Can you just briefly explain to the Court what that means.

A.   Yes.

     On the *DriversEdDirect* Website, we have a game. It's a flash-based game.  It's called the *DriversEdDirect* parking game.  And it's used for promotional purposes.  Also for educational purposes, for our teenage customers to practice parking and add a little more interactivity to the Website.

Q.   And I take it the category third-party gaming Websites means other gaming Websites that send visitors to *DriversEdDirect.com*?

A.   Correct.

1    Q.    And is it fair to say that you believe that about

2    30 percent of your traffic arrives that way?

3    A.    Approximately.

4    Q.    Certain traffic to *DriversEdDirect.com* arrives through a

5    link from *trafficschool.com*; correct?

6    A.    Yes.

7    Q.    And would you agree that the 7.5 percent estimate is a

8    good estimate for that traffic?

9    A.    I would say it would be higher.

10   Q.    Higher?  How much higher?

11   A.    It depends on the time frame.  When we first launched

12   the company it was much higher than 7.5 percent.  As time has

13   gone on and *DriversEdDirect* was promoting more of its

14   services itself and not relying so much on the transition of

15   customers from *trafficschool* to *DriversEdDirect* it has

16   started to decrease, but it's still a significant part of

17   *DriversEdDirect's* business.

18   Q.    What is your estimate for your percentage at the outset

19   of the *DriversEdDirect* Website from *trafficschool.com* link?

20   A.    I would say most of the customers.

21   Q.    "Most" meaning more than half?

22   A.    I would estimate that, yes.  More than half.

23   Q.    All right.  You're involved with the process of

24   preparing sponsored listings for both *trafficschool* and

25   *DriversEdDirect* for search engines; correct?

1    A.    Yes.

2    Q.    And you are aware that both Google and Yahoo! have

3    content rules for sponsored listings; correct?

4    A.    Yes.

5    Q.    And you are aware that both Google and Yahoo! reserve

6    the right to reject proposed sponsored listings; correct?

7    A.    There's different ways in which they each separately can

8    reject, but yes.

9    Q.    And, in fact, Yahoo! has rejected proposed sponsored

10   listings from *trafficschool.com*; correct?

11   A.    A couple of them passed.

12   Q.    Okay.  Now, with respect to the *trafficschool.com*

13   Website, you would agree that a visitor would have to view at

14   least nine distinct pages before completing the purchase of a

15   course from *trafficschool.com*; correct?

16   A.    It depends on where they land and for what course

17   they're purchasing.

18   Q.    So you would not agree with that -- they would have to

19   view at least nine pages?

20   A.    I would agree with that if a customer landed on the home

21   page and wanted to take a California-based course, they would

22   have to view approximately nine pages.  That seems accurate.

23   Q.    Is that the -- would that be the bulk of your customers?

24   A.    A substantial amount of customers are taking the

25   California traffic school course, yes.

1  Q.   And arriving on your home page to do it; correct?

2  A.   I don't know the exact percentages that arrive on the

3  home page.

4  Q.   All right.  I'm going to ask that we read from the

5  witness's deposition at Page 168, Lines 23 through 169,

6  Line 5.

7       MR. MAKOUS:  May I ask him for his copy because we

8  have a condensed.

9       THE COURT:  Why don't you look on with him.

10      MR. MAKOUS:  Thank you.

11      No objection.

12      THE COURT:  All right.

13      MR. DAUCHER:

14           "QUESTION:  Let me ask this:  What is the

15           minimum number of pages on your Website

16           *trafficschool.com* that a visitor would have to

17           click through to purchase a California ticket

18           dismissal course?

19           "ANSWER:  Give me one second to think about

20           it.

21           "QUESTION:  Sure.

22           "ANSWER:  Approximately nine pages."

23  BY MR. DAUCHER:

24  Q.   Mr. Kramer, would you also agree that the average

25  visitor seeking to purchase a California ticket dismissal

1    course would have to spend at least three minutes migrating

2    through those pages?

3    A.    We don't run time statistics to determine that.  I know

4    we went through this in my deposition and I gave a couple of

5    estimates, but it depends on the type of customer.  If it's a

6    customer who sees a site, lands on the home page, is ready to

7    purchase, just goes through the pages in a quick manner,

8    approximately -- if it's someone who takes more time, maybe

9    they don't have their court paperwork in front of them, they

10   need that information to enter into the registration page

11   before they can make a credit card purchase, it could take

12   more time.  We just don't have those numbers.

13   Q.    But you would agree that three would be a good minimum

14   number; correct?  Three minutes?

15   A.    Approximately.

16   Q.    Okay.  Now, turning to the *DriversEdDirect.com* Website,

17   you would agree that a visitor would have to view at least

18   seven pages before purchasing an online California driver's

19   education course; correct?

20   A.    Approximately.

21   Q.    And would you agree that at a minimum it would take a

22   similar amount of time, namely, about three minutes for a

23   visitor to migrate through those pages?

24   A.    For a driver's education visitor, which is typically a

25   teenager, it may take significantly more time because many

1    times the teenager views the pages along with their parent or

2    guardian before purchasing the course.  Again, we don't run

3    statistics to determine that data.

4    Q.   So, if anything, it would be more than three minutes for

5    the *DriversEdDirect.com* Website?

6    A.   I would speculate and say yes.

7    Q.   Okay.  Will you refer to Exhibit 28, please.

8              Do you recognize this document, Mr. Kramer?

9    A.   I do.

10   Q.   And who created this?

11   A.   Mr. Creditor.

12   Q.   Did you participate in that process?

13   A.   I helped him.

14             (Exhibit Number 28 identified.)

15   BY MR. DAUCHER:

16   Q.   Now, the first two columns on the first page of this

17   document show the month and then the number of visitors in

18   that month; correct?  For *trafficschool.com*.

19   A.   Yes.  The month and the number of unique visitors.

20   Q.   To *trafficschool.com*; correct?

21   A.   Correct.  And that data comes straight from a Web

22   statistics reporting software package that you have access

23   to; correct?

24   A.   Correct.  Testimony comes from two actually.  We

25   currently use one, which was replaced by a previous package.

1    Q.   And there's a third column on Exhibit 38 showing a

2    percentage change.  And I take it that data is data that was

3    produced for this litigation; correct?

4    A.   Yes.

5    Q.   And not by one of the Web statistics programs; correct?

6    A.   No.

7         MR. DAUCHER:  And can we refer to Page 2 briefly.

8    BY MR. DAUCHER:

9    Q.   Page 2 shows similar information for

10   *DriversEdDirect.com*; correct?

11   A.   Yes.

12   Q.   Including the months, the visitors, and percentage

13   change; correct?

14   A.   Yes.

15   Q.   Same answers would apply with respect to the source of

16   those numbers; correct?

17   A.   Yes.

18   Q.   Except that on Page 2 the *DriversEdDirect.com* visitors

19   report runs only from February '06 to May '07; correct?

20   A.   Correct.  We weren't, from my recollection, running the

21   software on the *DriversEdDirect* Website until February of

22   '06.

23   Q.   But it's correct that the *DriversEdDirect.com* Website

24   went live in about June of 2005; correct?

25   A.   That's correct.

1    Q.   So if you refer back to Page 20, the first page of

2    Exhibit 28, can you identify for the Court the first month in

3    which you report a negative trend for the *trafficschool.com*

4    visits?

5    A.   It appears to be June 2005.

6    Q.   Now, prior to June 2005, *trafficschool.com* sold the

7    driver's education services on its Website; correct?

8    A.   Correct.  I believe it was transitioned over to

9    *DriversEdDirect* in January of '06.

10   Q.   Let's look at the month of February '06.  In

11   February '06 this report shows *trafficschool.com* visitors of

12   48,600 approximately; correct?

13   A.   Yes.

14   Q.   And on Page 2 the *DriversEdDirect.com* report shows

15   visitors of 25,800 approximately; correct?

16   A.   I'm sorry.  Could you please repeat the question.

17        MR. MAKOUS:  Your Honor, I would just like to make

18   a note that the wrong information was before the witness, and

19   I ask that Mr. Daucher reask the questions, please.

20   BY MR. DAUCHER:

21   Q.   In February '06 the *DriversEdDirect* --

22        THE COURT:  Excuse me.  Counsel, you'll have an

23   opportunity -- if there's something wrong with this or you

24   think it's wrong, you'll have an opportunity to take him on

25   redirect and straighten it out.

1          So it's overruled.

2          Go ahead.

3     BY MR. DAUCHER:

4     Q.    Would you agree, Mr. Kramer, that in February '06,

5     Page 2 of Exhibit 28 reports that the *DriversEdDirect.com*

6     Website received approximately 25,800 visits?

7     A.    Correct.

8     Q.    And now if we go back to Page 1, in February of '06 you

9     report in the third column a drop in traffic of 19 percent;

10    correct?

11    A.    That's correct.

12    Q.    And I take it that's measured year over year; is that

13    correct?

14    A.    Correct.

15    Q.    In other words, the comparison number is February '05;

16    correct?

17    A.    I believe so.

18    Q.    And in February of '05 *trafficschool.com* reported 50 --

19    approximately 58,000 visitors; correct?

20    A.    Correct.

21    Q.    So when you report a 19 percent decline, what you're

22    saying is you had 10,000 fewer visitors year over year;

23    correct?

24    A.    Approximately, yes.

25    Q.    But at the same time and in fairness, shouldn't it be

1    noted that *DriversEdDirect.com* had 25,800 additional

2    visitors?

3    A.   That's correct.

4          But as I previously stated, a large amount of

5    traffic being sent to *DriversEdDirect* was coming from

6    *trafficschool.com*.

7    Q.   And you estimated that as more than half as your best

8    estimate; correct?

9    A.   That's what I estimated.

10   Q.   Okay.  Now, one other thing that could explain in part

11   the reduction in traffic to *trafficschool.com* is the fact

12   that *trafficschool.com* in 2006 reduced its search engine

13   marketing budget; correct?

14   A.   I apologize.  Could you please repeat the question.

15         MR. DAUCHER:  May I have it read back, your Honor.

16         THE COURT:  Yes.

17         (The record was read.)

18         THE WITNESS:  I wouldn't say that we purposely

19   decreased our search engine marketing budget.  We did

20   transfer some of the dollars we were spending in 2006 to

21   *DriversEdDirect* to bid on more *DriversEdDirect* or driving

22   industry related key words.

23         Although we still continued to this day on

24   *trafficschool.com* to bid on key words that may be synonymous

25   with both driver's education and traffic school.

BY MR. DAUCHER:

Q.   But I -- would you agree that in part the reduction in

traffic to *trafficschool.com* could be attributed to the

reduction in dollars spent by *trafficschool.com* on search

engine marketing?

A.   I don't know that for a fact.

          MR. DAUCHER:  All right.  Your Honor, I would like

to read from the witness's deposition then at Page 81, 7

to --

          MR. MAKOUS:  No objection.

          THE COURT:  All right.

          MR. DAUCHER:

              "QUESTION:  Isn't it fair to say that the

          reduction in visitors from year over year -- from

          '06 to '07 could be attributed at least in part to

          the reduction in" --

          You know, I'll withdraw it, your Honor.  I don't

think it's applicable.

          THE COURT:  All right.

          MR. DAUCHER:  Can we refer to Exhibit 72.

BY MR. DAUCHER:

Q.   Mr. Kramer, do you recognize Exhibit 72 as a page from

the *DriversEdDirect* Website?

A.   I do.  If possible, could you please darken the exhibit

a little bit.

1  Q.   This is -- I think this is the best we can do.  It is in

2  color but --

3  A.   Okay.  It's just a little hard to read the top portion

4  but --

5  Q.   Do you see that on the bottom right-hand corner there is

6  a rendering of a Colorado license plate?

7  A.   Yes.

8  Q.   Do you have the permission of the State of Colorado to

9  use its license plates on your Website?

10 A.   Never received any correspondence from the State of

11 Colorado that there's a problem with using this license

12 plate.

13 Q.   But just to be clear, you don't have express permission

14 to use that; correct?

15 A.   We did not ask for permission.

16 Q.   And you do not have it today; correct?

17 A.   No.

18       MR. DAUCHER:  Will you refer to Exhibit 73, please.

19       (Exhibit Number 73 identified.)

20 BY MR. DAUCHER:

21 Q.   Do you recognize this page from the *DriversEdDirect*

22 Website?

23 A.   I do.

24 Q.   Is this page still in use today?

25 A.   I believe it is.

1  Q.   And incidentally, is the Colorado page -- Colorado

2  license plate page still in use today as well?

3  A.   I believe it is.

4  Q.   Okay.  Now, on this page, Exhibit 73, in the lower

5  left-hand corner -- I apologize for the image quality -- but

6  is that not the California DMV logo?

7  A.   I'm familiar with what we have there.  It's not

8  recognizable in this exhibit.  But yes, it does say "DMV" in

9  that area.

10 Q.   Actually, is it not the California DMV logo?

11 A.   I don't know if it's the official logo that they use

12 today.

13 Q.   Do you know where you obtained that artwork?

14 A.   I did not obtain this artwork.

15 Q.   Somebody -- who did this for *DriversEdDirect.com*?

16 A.   It was created by one of our designers.

17 Q.   Did you review the content of the Website before it went

18 live?

19 A.   I did.

20 Q.   You were asked about this exhibit at your deposition,

21 correct, in this case?

22 A.   I don't remember specifically.  I may have been.

23        MR. DAUCHER:  Okay.  Can we refer to Exhibit 74,

24 please.

25        (Exhibit Number 74 identified.)

1  BY MR. DAUCHER:

2  Q.   Do you recognize this as a page from the

3  *DriversEdDirect.com* Website?

4  A.   I do.

5  Q.   And is that a current page on the Website?

6  A.   I believe it is.

7  Q.   Now, near the top on the left-hand side there is artwork

8  which appears to be the state seal for Nevada; is that

9  correct?

10  A.   Correct.

11  Q.   Do you have permission to use the Nevada state seal?

12  A.   We had not sought permission, nor were we told it was an

13  issue by the State of Nevada.

14  Q.   So you do not have written authority to use that;

15  correct?

16  A.   No.

17  Q.   And the seal is still in use today?

18  A.   I believe so.

19        MR. DAUCHER:  Will you refer to Exhibit 69, please.

20        (Exhibit Number 69 identified.)

21        MR. DAUCHER:  I believe there will be a stipulation

22  that this is a search result from July '07 from Yahoo! on

23  *drivingschool*.

24        MR. MAKOUS:  Pardon me.  Is this previously marked

25  as an exhibit?

1          MR. DAUCHER:  Yes.  Depo exhibit --

2          MR. MAKOUS:  Then it's so stipulated.

3          THE COURT:  All right.  Thank you.

4    BY MR. DAUCHER:

5    Q.   Now, can you identify for the Court where the sponsored

6    listings appear on this Exhibit 69.

7    A.   They appear in the top portion of the page.  I believe

8    the first four listings with the bullet points next to them

9    were the sponsored results.

10   Q.   And so I take it that the fourth result, which bears the

11   heading "*trafficschool.com*," dash, "official site" is for

12   your business; correct?

13   A.   That is correct.

14   Q.   And that is the way that *trafficschool.com* -- well, let

15   me withdraw that.

16          *Trafficschool.com* specifies the content of the

17   sponsored listings; correct?

18   A.   Correct.

19   Q.   And *trafficschool.com* chose to use the words "official

20   site" in the top line of its sponsored listing; correct?

21   A.   I did, yes.

22   Q.   And it is still that way today; correct?

23   A.   Is that way today to inform users searching for traffic

24   schools that *trafficschool.com* is the official site of our

25   company.

1   Q.   Isn't it true, Mr. Kramer, that a consumer reading the

2   word "official site" might presume that *trafficschool.com* has

3   some affiliation with the Government?

4   A.   I don't believe so.

5            MR. MAKOUS:  Objection.  Relevance.

6            THE COURT:  Overruled.

7   BY MR. DAUCHER:

8   Q.   Isn't the purpose of using the words "official site" in

9   your sponsored listings to improve your click-through rate to

10  your Website?

11  A.   Well, I think the purpose of any type of advertising in

12  the pay-per-click realm is to improve the click-through rate.

13  The purpose of this is -- there's many reasons for it.  As I

14  mentioned before, we want to educate consumers that unlike

15  many of the other schools advertising on pay-per-click who

16  may claim to be *trafficschool.com* in a variety of ways are

17  not the official site of our business *trafficschool.com*.  In

18  no way are we saying we're the official site of the

19  Government or of the court.  We do not state that here.  And

20  this is a common practice in many different industries.

21  Q.   Now, in your deposition you testified that if *DMV.org*

22  were to use the words "official site" in connection with its

23  sponsored listings, you would object to that; correct?

24  A.   I think it would greatly add to the confusion that's

25  already existing with their aggressive pay-per-click

1   campaign, yes.

2          MR. DAUCHER:  Objection.  Move to strike the

3   opinion portion.

4          THE COURT:  Sustained.

5   BY MR. DAUCHER:

6   Q.   Mr. Kramer, are you familiar with the Website by the

7   name of *lowestpricetrafficschool.com*?

8   A.   Yes.

9   Q.   They run a Florida-based online traffic school; correct?

10  A.   I believe that's their primary business, yes.

11  Q.   And *trafficschool.com*, your business, has a referral

12  agreement with *lowestpricetrafficschool.com*; correct?

13  A.   We do.

14  Q.   And under that agreement, *lowestpricetrafficschool.com*

15  refers California residents to *trafficschool.com*; correct?

16  A.   Correct.

17         MR. DAUCHER:  Can you refer to Exhibit 611, please.

18         (Exhibit Number 611 identified.)

19  BY MR. DAUCHER:

20  Q.   Do you recognize Exhibit 611?

21  A.   I recognize it.

22  Q.   And in the upper left-hand corner -- well, whose Website

23  is this?  Is this a Website that is controlled by

24  *lowestpricetrafficschool.com* or by yourselves?

25  A.   You know, I believe this resides on their Website.  I'm

1    not 100 percent sure.  I wasn't directly involved with this

2    relationship.

3    Q.   I think that's accurate.  But do you see the upper

4    left-hand corner where the *lowestpricetrafficschool.com*

5    powered by *trafficschool.com* text appears?

6    A.   I do.

7    Q.   And a visitor who goes to *lowestpricetrafficschool.com*

8    and selects California will eventually be transitioned over

9    to the *trafficschool.com* Website; correct?

10   A.   Correct.

11   Q.   And that same text that we just discussed also appears

12   at the top of related pages on the *trafficschool.com* Website;

13   correct?

14   A.   Again, I was not directly involved with this

15   relationship or the creation of the pages, but I believe it

16   does.

17   Q.   Do you -- isn't it reasonable to -- well, strike that.

18           Isn't it true that a visitor to the

19   *lowestpricetrafficschool.com* Website might expect that they

20   are going to receive the lowest price traffic school?

21           MR. MAKOUS:  Objection.  Relevance.  Speculation.

22   Lacks foundation.

23           THE COURT:  Did you finish the question?

24           MR. DAUCHER:  Yes, your Honor.

25           THE COURT:  Overruled.

1          You may answer.

2          THE WITNESS:  I don't know what

3    *lowestpricetrafficschool.com* customers expect.  I do know

4    that *lowestpricetrafficschool.com* is the name of their

5    company, not just their Website.  And they also offer other

6    services besides traffic schools.  So when a customer is

7    looking for a driver's education course from the

8    *lowestpricetrafficschool.com* Website, I'm assuming that they

9    realize they're not going to get the lowest-priced traffic

10   school when they're taking a driver's education course.

11   BY MR. DAUCHER:

12   Q.   What about with respect to taking a traffic school

13   course in California?

14   A.   Well, in California it does say "powered by

15   *trafficschool.com*."

16   Q.   Below *lowestpricetrafficschool.com* in bigger letters;

17   correct?

18   A.   Again, that's the name of their company.

19   Q.   But that branding appears on your Website too; correct?

20   A.   Correct.

21   Q.   And you have a written agreement with

22   *lowestpricetrafficschool* related to this relationship;

23   correct?

24   A.   We do.  I have not reviewed it.

25   Q.   So you don't know whether it requires you to guarantee

1   to students the lowest price in California?

2          MR. MAKOUS:  Objection.  That calls for legal

3   conclusion.  Relevance.

4          THE COURT:  Overruled.

5          THE WITNESS:  No.  But I can tell you to this day

6   we've received no complaints from customers.

7   BY MR. DAUCHER:

8   Q.   In fact, in California *trafficschool.com* is not the

9   lowest price, correct, traffic school?

10  A.   Prices fluctuate.  Prices vary from county to county.

11  As it states here, the price is lower than our normal price.

12  Q.   In fact, what is the price as charged to visitors that

13  arrive to this portion of the *trafficschool.com* Website from

14  *lowestpricetrafficschool.com*?

15  A.   I believe, as displayed on this page, it states only

16  21.95.

17  Q.   Are you aware of -- isn't it true that you are aware

18  that other California online traffic schools charge less than

19  21.95 per class?

20  A.   In some counties.  I'm not aware of the pricing for

21  every school in every county throughout the state of

22  California.

23  Q.   But I take it that you, as the operator of

24  *trafficschool.com,* feel no obligation to guarantee to

25  visitors that arrive from *lowestpricetrafficschool.com* that

1   they will actually receive the lowest price for traffic

2   school in California; correct?

3              MR. MAKOUS:  Objection.  Relevance.

4              THE COURT:  You know, in a court trial a relevance

5   objection is really out of order.  But putting that aside,

6   the objection is overruled.

7              Go ahead.  I think I can probably figure out in the

8   Court how much weight this questioning deserves.

9              So go ahead.  You can answer.

10             THE WITNESS:  Could you please repeat the question.

11  I apologize.

12             THE COURT:  That's fine.

13             I think the question was but I take it you, as the

14  operator of *trafficschool.com*, feel no obligation to

15  guarantee to visitors that arrive from the

16  *lowestpricetrafficschool.com* that they will actually receive

17  the lowest price for traffic school in California; correct?

18             THE WITNESS:  They may receive -- it may be the

19  lowest price in certain counties.  As I stated before, if I

20  received probably even one complaint from our customers, then

21  I would address the situation.

22             We're not trying to deceive anyone with this

23  relationship.

24  BY MR. DAUCHER:

25  Q.   So it may not be misleading in some counties?

1   A.   Again, I do not know what other schools charge in every

2   county.

3   Q.   But you are aware that *trafficschool.com* is not the

4   lowest-price traffic school in every county in which it

5   competes; correct?

6   A.   I don't believe we are.

7           MR. DAUCHER:  Will you refer to Exhibit 32, please.

8           (Exhibit Number 32 identified.)

9   BY MR. DAUCHER:

10  Q.   Do you recall -- this is a one-page document.

11         Do you recall receiving this email from Ravi Lahoti

12  in -- on March 6, 2002?

13  A.   I do.

14  Q.   One of the things that you did in response to receipt of

15  this email was to visit the *DMV.org* Website; correct?

16  A.   I believe that I may have.  I don't recall specifically

17  what the site looked like.  Most likely because it was very

18  rudimentary at the time and didn't leave a lasting

19  impression.

20  Q.   And shortly after receiving this inquiry, you discovered

21  that Serious Net, Ravi Lahoti's company, had registered a

22  domain containing a misspelling of *trafficschool.com*;

23  correct?

24  A.   Yes.  They were typo squatting our domain name; correct.

25  Q.   That's your opinion that they were typo squatting;

1  correct?

2  A.   Well, when they registered a domain name with the

3  addition of one letter or the subtraction of one letter --

4  actually, it was two domain names.  I feel that that's typo

5  squatting.

6  Q.   There are many other traffic schools in the United

7  States that incorporate the words "traffic school" into their

8  domain; correct?

9  A.   Yes.  But that doesn't have anything to do with my

10 definition of typo squatting as I understand it.

11 Q.   And you learned about this alleged typo squatting by

12 running a reverse IP address trace against the server that

13 hosted the *DMV.org* Website; correct?

14 A.   That's incorrect.  As I mentioned in my deposition, I do

15 not recall the circumstances in which I was made aware of the

16 ownership of these domain names by Mr. Ravi Lahoti, and I

17 still believe that it was happenstance.  It may have been an

18 issue brought up to me by a customer through one of our

19 customer service staff.  That does happen on occasions when

20 people can't find our Website.  It -- I'm not sure exactly

21 how.

22 Q.   Your best recollection is that it's a coincidence that

23 in March of 2002 you discovered the alleged typo squatting?

24 A.   I don't remember running a reverse IP report.

25 Q.   But your best testimony is it's a coincidence?

1    A.    I believe so.

2    Q.    Is it also a coincidence that one week after receiving

3    Ravi Lahoti's email *trafficschool.com* registered the

4    *drivinglinks.com* domain name?

5    A.    Yeah.  That had nothing to do in regards to receiving

6    this email from Ravi Lahoti.

7    Q.    All right.  In 2003, moving along a year, one of the

8    ways that you marketed *trafficschool.com* was through

9    Overture's Add program; correct?

10   A.    Yes.  But if I could clarify, Overture had a couple --

11   they had two different types of abilities for advertisers to

12   participate in their programs.

13   Q.    Can you just briefly briefly describe those programs?

14   A.    Sure.

15         One is the typical pay-per-click program, bidding

16   on key words and being listed in various sponsored results,

17   not only on Overture but other Websites that are part of

18   their network.

19         The other program that they had is -- it's called a

20   Content Match program whereas advertisers can place their ads

21   on what Overture determines, I believe, as content-related

22   Websites that weren't part of the actual pay-per-click

23   network.

24   Q.    So Overture -- and -- let me ask this:

25         *Trafficschool.com* at one point in 2003 did

1    participate in the Content Match program; correct?

2    A.    Correct.

3    Q.    And under that program, Overture had discretion to place

4    *trafficschool.com* ads on third-party Websites that it deemed

5    to be content related; correct?

6    A.    I believe so.  I believe back then Overture was

7    basically in control of placing the ads.

8    Q.    And when a user would click on an ad that had been

9    placed through Content Match by Overture, Overture would

10   charge *trafficschool.com* a fee; correct?

11   A.    Correct.

12   Q.    And this is a little different than the cost-per-action

13   model; correct?

14   A.    I believe it was different than the pay-per-click model

15   because the amounts that were charged to participate in their

16   Content Match system were lower.

17   Q.    What I'm getting at is that once a user clicks on that

18   ad, *trafficschool.com* is charged regardless whether there's

19   an actual purchase of a service?

20   A.    Oh, I'm sorry.  Yes, we would be charged.

21   Q.    And *trafficschool.com* kept a credit card on file to

22   secure that -- those payments; correct?

23   A.    Correct.  That was how we ensured that there were

24   adequate funds to participate in the program.

25   Q.    And Overture would report to you on, I think, a biweekly

1    basis the charges for that advertising service; correct?

2    A.   The way that we had it set up is Overture would notify

3    us when a certain threshold was reached with the amount of

4    money that was in our account, and they would automatically

5    charge our credit card to refill our balance in Overture.

6              MR. DAUCHER:  Your Honor, point of clarification.

7    I believe there are witnesses in the room now that are

8    nonparties --

9              THE COURT:  All right.

10             MR. DAUCHER:  -- possibly.

11             No?  Okay.  I take that back.

12   BY MR. DAUCHER:

13   Q.   One problem with the cost-per-click advertising model is

14   that paying for clicks you're not guaranteed to get

15   high-quality traffic; correct?

16   A.   It depends on the number of factors.  It depends on the

17   specific key word that's being bid on.  If it's not targeted

18   to the type of business that a company is running that then

19   the likelihood of receiving sales is lower.  I also believe

20   it depends on the positioning of the sponsored advertisement.

21   It may not be as beneficial to be in the number one position

22   and bid the most amount of money.  It may not be beneficial

23   to be in the 20th position.

24   Q.   But I'm referring to the Overture program.

25             Is your answer the same for that?

A.   Participating in the program we were seeking to receive

visitors who looked on ads, that came to our site, and

converted into sales.

Q.   Okay.  And in December of '03 you received some charges

from Overture that were significantly greater than what you

had seen historically; correct?

A.   That's correct.

Q.   And you investigated these charges; correct?

A.   I did.

Q.   And you discovered that a large number of

*trafficschool.com*'s advertisements were being placed through

Overture on *DMV.org*; correct?

A.   Correct.

Q.   By that time you were familiar with the *DMV.org* Website;

correct?

A.   Well, as I stated previously, in 2002 I may have visited

the site.  Again, it didn't leave a lasting impression on me,

but at that time I was aware of them.  And I probably visited

their site to see where our ads were being displayed.

Q.   And on receiving these reports you actually send written

objection to Overture, citing the fact that although there

were a high number of click throughs, only a small percentage

of those clicks were converting into sales; correct?

A.   That's correct.  I was worried about the amount of

traffic not converting.  Again, I didn't know exactly how

1    those ads were displayed on the *DMV.org* Website and if it

2    would be beneficial to continue to receive these clicks that

3    we're converting.

4              MR. DAUCHER:  Can we refer to Exhibit 688, please.

5              (Exhibit Number 688 identified.)

6    BY MR. DAUCHER:

7    Q.   Mr. Kramer, can you identify this exhibit as emails

8    between *trafficschool.com* and Overture related to this issue?

9    A.   Yes.

10   Q.   All right.  If you will refer to Page 2.

11             And again, these emails also relate to that issue;

12   correct?

13   A.   Correct.

14   Q.   On the bottom half of that page there's an email that

15   you sent to Overture; correct?

16   A.   Correct.

17   Q.   And you wrote in the second paragraph, although I think

18   a very large amount of traffic has been generated by this

19   site, an extremely low amount of the leads have converted

20   into sales"; correct?

21   A.   Correct.

22             I was worried that the ads being displayed on the

23   site were potentially fraudulent, in other words, for some

24   reason someone was just clicking on the ads at a high rate.

25   Q.   When you said "this site," you were referring to

1    *DMV.org*; correct?

2    A.   Correct.

3    Q.   Now, if you'll go back to Page 1, you had to send a

4    follow-up to Overture after they responded to you; correct?

5    A.   Correct.

6    Q.   And in the second paragraph of your response, at the top

7    there it says, "As you can imagine, we are extremely

8    disappointed with the additional Content Match but more

9    specifically with *DMV.org,*" comma, "we had to incur thousands

10   of dollars of advertising budget towards unqualified clicks."

11           You wrote that; correct?

12   A.   That's what I wrote.

13   Q.   And by the use of "we," who are you referring to?

14   A.   My company, *trafficschool.com*.

15   Q.   And this is something that you had discussed with

16   Mr. Creditor; correct?

17   A.   We probably had a discussion in regards to it.

18   Q.   So you were telling Overture that you were extremely

19   disappointed with them but even more disappointed with

20   *DMV.org*; is that right?

21   A.   I was disappointed that we were charged a large amount

22   of money in the short period of time and the amount of

23   visitors that converted was low.  I mean, did we receive

24   revenue from these clicks?  Yes.

25   Q.   But not a high conversion rate; correct?

1    A.    I don't remember the specific conversion rate.

2    Q.    But not a conversion rate that would be sufficient to

3    justify the charges coming through from Overture; correct?

4    A.    Correct.  It wasn't profitable.

5    Q.    Mr. Kramer, isn't it true that almost immediately upon

6    hearing from *DMV.org* in 2002 you took a dislike to *DMV.org*?

7    A.    Well, I wouldn't say I was particularly fond of *DMV.org*

8    for purchasing misspellings of our domain name, but people do

9    things in business that they do.

10   Q.    You've purchased domain names of -- that include the

11   actual name of your competitors; correct?

12   A.    I don't know if we purchased -- if it's possible to

13   purchase a domain name with the actual name of the

14   competitor.  Are you saying tied into *trafficschool.com*?

15   Q.    This domain name in particular, "I Drive Safely," dash,

16   *"trafficschool.com*."

17          *Trafficschool.com* purchased that domain name;

18   correct?

19   A.    Correct.

20          And *trafficschool.com* does offer through a

21   relationship with I Drive Safely I Drive Safely courses.

22   Q.    So you had the advance consent to do that; correct?

23   A.    They -- I've heard no issues from them in regards to it.

24   Q.    But --

25   A.    But we do offer I Drive Safely courses on

1    *trafficschool.com,* similar to how we offered DMV-approved

2    courses on *trafficschool.com.*

3    Q.    In any case, you took no action against *DMV.org* in 2004;

4    correct?

5    A.    This was 2003.

6    Q.    That's correct.

7          I'm now asking about 2004.

8    A.    The action that we took is we decided not to participate

9    in the Content Match option with Overture.

10   Q.    You didn't take any direct action against *DMV.org* in

11   2004; correct?

12   A.    No.  I didn't feel that, you know, we had a right to

13   since we were participating in the Overture program.  They

14   were just displaying our ads.

15   Q.    You didn't take any action against *DMV.org* in 2005;

16   correct?

17   A.    Could you be more specific with "action."

18   Q.    Any direct action against *DMV.org* didn't -- didn't --

19   let me try --

20         You didn't write them a letter saying, "We think

21   your site is misleading"; correct?  In 2005.

22   A.    I did not write them a letter.

23   Q.    Your counsel didn't do that either; correct?

24   A.    I don't believe they did.

25   Q.    Didn't send them an email to that effect in 2005;

1    correct?

2    A.    I don't believe so.

3    Q.    No form of communication whatsoever to *DMV.org* in 2005

4    advising them of an objection you had to their business

5    practices; correct?

6    A.    Well, in the beginning part of 2005 they really weren't

7    as much on our radar.  We didn't feel at that time that it

8    was an issue that we had to deal with.  I mean, we're running

9    a business, many issues that come up, many things that we

10   deal with on a daily basis.

11   Q.    And so no communication in 2005?

12   A.    I -- I can't recall if we had communication with *DMV.org*

13   in 2005.

14   Q.    But in February of 2006 you instructed *DriversEdDirect*

15   president Jimmy Leach to contact *DMV.org* to negotiate

16   advertising for *DriversEdDirect* on *DMV.org*?

17   A.    Yes.  That's when we saw that *DMV.org* was becoming

18   extremely aggressive in the pay-per-click realm, and also

19   with their site being optimized and becoming very high in the

20   natural listings we thought it was something we should

21   explore.

22   Q.    When you say "extremely aggressive," did you think at

23   that time that *DMV.org* was doing something wrong?

24   A.    By being aggressive in pay-per-click search engine

25   advertising?

1    Q.   By being extremely aggressive.

2    A.   I -- I don't know if I necessarily definitively knew

3    that -- what they were doing was wrong.  Did I potentially,

4    you know, have an issue with it?  Did I think there was a

5    possibility that the use of their name and the use of their

6    advertisements and the look and feel of their Website in

7    combination with that domain name was an issue?  I didn't

8    know for sure.

9              MR. DAUCHER:  Will you refer to Exhibit 36, please.

10             (Exhibit Number 36 identified.)

11             THE COURT:  How much longer do you have with this

12   witness?

13             MR. DAUCHER:  About 20 minutes, your Honor.

14             THE COURT:  All right.  We're going to take our

15   break now.  We'll come back at a quarter to the hour.

16             Who is your next witness?

17             MR. DE CARLO:  John Wright, your Honor.  He's one

18   of the declarants, and he is here.

19             THE COURT:  Okay.  All right.  We'll come back in

20   about 15 minutes.

21             THE CLERK:  All rise.

22             (Whereupon, from 10:30 a.m. to 10:55 a.m., a break

23             was taken.)

24             THE CLERK:  All rise.

25             THE COURT:  All right.  Let's have the witness back

1  on the stand, please.

2  THE CLERK:  Sir, you are reminded that having been

3  previously sworn you remain under oath.

4  THE WITNESS:  Yes.

5  BY MR. DAUCHER:

6  Q.  Mr. Kramer, before the break I'd referred to Exhibit 36.

7  Do you see that before you?

8  A.  Yes, I do.

9  Q.  And this is an email you sent in February 2006 to

10  Mr. Leach; correct?

11  A.  Yes.

12  Q.  And in the second-to-the-last sentence of the first

13  paragraph you wrote, "We want to be *DMV.org*'s premiere

14  California online Driver's Ed program and behind-the-wheel

15  provider in Los Angeles"; correct?

16  A.  Yes.  That's what I wrote.

17  Q.  And at that time did you have a good faith intent to

18  actually become a long-term partner with *DMV.org*?

19  A.  Yes.

20  Q.  So at that time I take it you had no objection to the

21  manner in which the operators of *DMV.org* Website presented

22  the Website to the public; correct?

23  A.  I thought there may have been some issues.  I hadn't

24  explored those issues.  This was also written in the context

25  to Jimmy Leach, who was a subordinate, and I was trying to

1   motivate him to reach an agreement, the best one that I could

2   get.

3   Q.   Mr. Leach was not able to immediately reach an agreement

4   with *DMV.org*; correct?

5   A.   It took a -- many months.

6   Q.   And during that process you became frustrated with

7   *DMV.org*; correct?

8   A.   I'd say I was a little skeptical as far as what was

9   going on and what was being told to us.  I was a little

10  frustrated with Mr. Leach not being able to secure an

11  agreement in a more expedited fashion.  Typically these types

12  of agreements that we make don't drag on for four to

13  five months.

14  Q.   And you -- are you telling me that you blame that on

15  Mr. Leach?

16  A.   I wouldn't necessarily say that it was all of his fault.

17  I mean, there were obviously issues that were going on with

18  dealing with Mr. Raj Lahoti.

19  Q.   Okay.  Let's refer to Exhibit 43.

20          (Exhibit Number 43 identified.)

21  BY MR. DAUCHER:

22  Q.   Do you recognize the first page of Exhibit 43, which is

23  before you as an email that you sent on April 24, 2006, to

24  Mr. Creditor and Mr. Leach?

25  A.   I do.

1    Q.   And you wrote, "We shouldn't deal with people who jerk

2    us around or lead us on"; correct?

3    A.   That's what I wrote in this email; correct.

4    Q.   And by "people" you were referring to Online Guru;

5    correct?

6    A.   Raj Lahoti.

7    Q.   Not to Mr. Leach; right?

8    A.   No.  In the second sentence you wrote I would rather

9    spend our efforts notifying the various DMVs that *DMV.org* is

10   leveraging a state agency's name for profit and causing

11   consumer confusion.

12           You wrote that; correct?

13   A.   I did, and I followed up with we should discuss this

14   strategy.

15   Q.   So by this time, April of 2006, you had reached a

16   conclusion that -- in your own mind that *DMV.org* was causing

17   consumer confusion?

18   A.   In the context of this statement, I was exploring the

19   option of inquiring of state agencies to simply explore what

20   their opinions were of the defendants and their use of the

21   DMV moniker on their Website.  I thought that there was a

22   possibility.  I had not come to a definitive conclusion at

23   this time.

24   Q.   That sentence says, "Is leveraging a state's name for

25   profit and causing consumer confusion."

1          There's no reference to the mere possibility that

2    that's occurring; correct?

3    A.   This is an internal email between myself and

4    Mr. Creditor and Mr. Leach.  It was discussing strategy.  You

5    know, by this time sales were going down; visitors were going

6    down; we wanted to explore a relationship to do a test to see

7    if that test would be fruitful.

8          In my mind I thought it was a possibility.

9    Q.   So you suggested strategy discussions about that option;

10   correct?

11   A.   Correct.  That's what I state.

12   Q.   But no such discussions occurred; correct?

13   A.   No discussions occurred.  Jimmy notified us that

14   Mr. Lahoti had not informed him of any issues that he had

15   previously had with any state agencies, nor had Mr. Lahoti

16   notified Mr. Leach of the numerous consumer emails that he

17   had received or where customers were consumed.

18          MR. DAUCHER:  Move to strike as hearsay as to what

19   Mr. Leach was told or not told.

20          THE COURT:  Sustained.

21          MR. DAUCHER:  Will you refer to Exhibit 45.

22          (Exhibit Number 45 identified.)

23   BY MR. DAUCHER:

24   Q.   Do you recognize this first page of Exhibit 45 as

25   comprising an email that you sent on May 3, 2006, to

1    Mr. Creditor, Mr. Leach, and Mr. Mycoskie?

2    A.    I recognize it.

3    Q.    Mr. Mycoskie was at one time a part owner of

4    *DriversEd.com*; correct?

5    A.    Yes.

6    Q.    But as of the time of the filing of this suit he is no

7    longer an owner; correct?

8    A.    He is no longer a member.

9    Q.    Okay.  If we could look at the top email.  You wrote --

10   the first sentence after "my opinion," "This guy is a scam

11   artist.

12          You are referring to Raj Lahoti?

13   A.    That's correct.

14   Q.    And when did you come to the opinion that Mr. Lahoti was

15   a scam artist?

16   A.    During the time I wrote this email.

17   Q.    So just in May of 2006.

18   A.    It -- was I skeptical before?  Sure.  Had I used the

19   terminology or the phrase "scam artist" before?  I don't

20   believe I did.

21   Q.    In the third sentence of that paragraph you wrote,

22   "We've seen his traffic," dot, dot, dot.

23          By that what were you referring to?

24   A.    I was referring to the -- excuse me.

25          Through our participation with Overture, through

1  the Content Match program that we participated in where we

2  received the -- a large amount of visitors to our Website

3  that didn't convert at a rate that I deemed to be beneficial

4  or profitable.

5  Q.   And you went on to describe the traffic as, quote,

6  "unqualified," unquote; correct?

7  A.   I use that terminology as a -- just to explain -- as I

8  mentioned before, it -- the traffic didn't convert to what we

9  felt was sufficient.  But again, this is traffic going to the

10  *trafficschool.com* Website.  We had not seen this traffic

11  going to the *DriversEdDirect* Website, which is promoting

12  Driver's Ed services.

13  Q.   But when you use the word "unqualified" you meant to

14  express to the other owners and operators of *DriversEdDirect*

15  that you expected there would be a lot of click throughs but

16  not many purchases from dealing with *DMV.org*; correct?

17  A.   Possibly.  But I go on to state, "Who knows?"

18       Through discussions I've had or I had previously

19  with Mr. Creditor and Mr. Leach, this relationship related to

20  Driver's Ed is a little bit different of a situation just

21  because we discussed how powerful the DMV name would be in

22  relation to providing courses for teen drivers looking to

23  obtain a license.  I believe it's more powerful, at least in

24  their opinions and possibly in mine, that more people would

25  convert into sales through receiving their traffic.

1    Q.    Isn't there an inconsistency in your testimony between

2    you describing *DMV.org*'s traffic as unqualified in this email

3    in May 2006 and your testimony just now that you regard the

4    *DMV.org* domain name as a very powerful marketing tool?

5    A.    I don't think I said the *DMV.org* domain name.  I said

6    traffic coming from a site using DMV and promoting DMV

7    services, I believe, is a little bit more powerful for

8    traffic, at least for qualified leads, than it would be for

9    traffic school, although for traffic school it plays a part

10   as well.  And the unqualified traffic I was referring to was

11   not a direct relationship that we had with *DMV.org*.  It was

12   our participation through a third-party program, Overture;

13   whereas, you know, we did not have control or say as to how

14   they promoted our ads on their Website.

15   Q.    But this email was written strictly in the context of a

16   business negotiation between *DriversEdDirect* and *DMV.org*;

17   correct?

18   A.    Correct.  It was an email discussing possibilities.

19   Q.    And you didn't here draw any distinction between what

20   you expected the traffic to look like in the *DriversEdDirect*

21   content as opposed to what you had seen in the traffic school

22   context; correct?

23   A.    Well, that's why I put, "But who knows?"

24   Q.    In the next paragraph you wrote, "I would rather take

25   the time to send letters to the legal departments of all the

1  states' DMV's informing them that he is illegally

2  representing a state agency and causing consumer confusion."

3          You wrote that; correct?

4  A.   That is what I wrote.

5  Q.   That's not -- that's a stronger statement than what you

6  had written on April 24th because you use the word

7  "illegally" now; correct?

8  A.   I'm sorry.  Could you bring out what I put on the 24th

9  just so I can see.

10         MR. DAUCHER:  I'm going to put up Exhibit 43, the

11  top email.

12         Exhibit 45, this is what we have been discussing.

13  43 is what we were looking at previously; so 43 is the

14  prior --

15         THE WITNESS:  Okay.  I see it.

16         I did not use the term "illegally" in this

17  sentence.

18  BY MR. DAUCHER:

19  Q.   So you were using even stronger language in this May 3rd

20  email than you had used on April 24th; correct?

21  A.   Well, if you necessarily characterize it as a stronger

22  language.  I mean, I was putting forth to my partner and to

23  Jimmy Leach the prospect as a strategy to inquire to various

24  DMVs to get their opinions on what they felt about the

25  defendants' use of *DMV.org* and how it was promoted and how

1  their Website is displayed.

2            I mean, I'm not an attorney.  I -- at that time I

3  did not know that what they were doing was illegal.  Had I

4  known at that time that what they were doing was falsely

5  advertising that they were the DMV, negotiations would have

6  been terminated immediately.

7  Q.   But you use the word "illegally" in your email; correct?

8  A.   I did put the term "illegally."

9  Q.   Now, was that really your opinion at the time or was

10  that just frustration that was ebbing up from the slow

11  process of getting a contract with *DMV.org*?

12  A.   I would probably say a combination of both.  I was a

13  little bit frustrated.  You know, did I think that this deal

14  was going to come to fruition after five months of

15  negotiation?  You know, did I have in the back of my mind

16  that what they were doing was really illegal?  I wasn't sure.

17  Q.   When you say --

18  A.   Go ahead.

19  Q.   -- you instructed Mr. Leach to initiate contact on

20  February -- in the middle of February '06; correct?

21  A.   Correct.

22  Q.   This email of May 3rd comes only two and one half months

23  later; correct?

24  A.   Four months.  February to May.

25  Q.   What you suggest in this sentence about sending letters

1  to the states, you eventually did that; correct?

2  A.   I did not do that.

3  Q.   Your counsel did that; correct?

4  A.   I believe they did.

5  Q.   And no state joined this lawsuit; correct?

6  A.   No.

7  Q.   At the end of that paragraph you wrote sort of a quote,

8  "If you can't join 'em, shut 'em down approach"; correct?

9  A.   That's what I wrote.

10  Q.   What did you mean by that?

11  A.   Well, I categorized that as a sort of a flip statement.

12  Again, this is an internal communication.  You know, business

13  was going on, sales were going down.  If what they're doing

14  is, you know, okay and, you know, it's not illegal, then

15  obviously we would have pursued a relationship and, you know,

16  we probably wouldn't be here today.  But you know, "shut 'em

17  down" is more exploring the possibility of finding out,

18  gathering more information, internally my suggestion of

19  inquiring of various legal departments of state agencies.

20  Q.   Isn't it true, Mr. Kramer, that you meant exactly what

21  you said; that if *DMV.org* didn't do business with

22  *DriversEdDirect* that you would seek to shut down *DMV.org*?

23  A.   Absolutely not.

24  Q.   Well, that's what you're here asking this Court to do

25  right now; correct?

1    A.   Not because they didn't do business with us.

2              MR. DAUCHER:  No further questions, your Honor.

3              THE COURT:  All right.

4              MR. MAKOUS:  Just a few minutes, your Honor.

5              If I could have Exhibit 69 put up, please.

6                      **REDIRECT EXAMINATION**

7    BY MR. MAKOUS:

8    Q.   Do you recall, Mr. Kramer, Mr. Daucher asking you

9    questions about this Yahoo! search?

10   A.   I do.

11   Q.   All right.  You'll note that it says *trafficschool.com*,

12   official site.

13              Are you aware of any state agency anywhere in the

14   country called Traffic School?

15   A.   I am not.

16   Q.   How many DMVs are there in the United States to your

17   knowledge?

18              MR. DAUCHER:  Objection.  Lacks foundation.

19              THE COURT:  Sustained.

20   BY MR. MAKOUS:

21   Q.   Are you aware of how many there are?  Yes or no, sir.

22   Are you aware --

23   A.   Approximately, yes.

24   Q.   How many?

25              THE COURT:  What's the source of your knowledge,

1   sir?

2           THE WITNESS:  Through research.

3           THE COURT:  Through what?

4           THE WITNESS:  Through research related to this case

5   and research in previous business dealings in the past

6   seeking out, potentially, approvals for our courses in other

7   states.

8           THE COURT:  This research that did you in

9   connection with this case, did you do that at the request of

10  somebody or did you do it on your own?

11          THE WITNESS:  I've done it on my own.

12  BY MR. MAKOUS:

13  Q.   As part of your regular course of business, you deal

14  with the state agencies called the Department of Motor

15  Vehicles in various states; is that correct?

16  A.   That's correct.

17  Q.   In your estimation, how many state agencies use the

18  acronym DMV?

19  A.   I believe there's approximately 24, 25.

20  Q.   Thank you.

21          There was some testimony earlier about the

22  *lowestdrivetrafficschool.com* [sic].

23          Your company advertises a price for its traffic

24  school courses, does it not?

25  A.   It does.

1   Q.   Are there any add-ons that the consumer purchases when

2   they purchase your course?

3   A.   There are.

4   Q.   Do you charge for them?

5   A.   Some we do.  We do charge for expedited delivery

6   services for certificates.

7   Q.   In the basic course charge that you charge, does it

8   include things like delivery of certificates and identity

9   verification and things of that nature?

10  A.   Yes.  We do not charge for the basic delivery of a

11  certificate to a court, whether it be via mail, fax, or

12  electronically.  And we do not charge for the identity

13  verification services that are required by a handful of

14  courts throughout the state of California.

15  Q.   Do other traffic schools in the state of California add

16  on for those charges in addition to their basic service

17  charge?

18          MR. DAUCHER:  Objection.  Lacks foundation.

19          THE COURT:  Sustained.

20          MR. MAKOUS:  I'll withdraw the question.

21          Thank you, your Honor.

22  BY MR. MAKOUS:

23  Q.   Are you aware of whether or not other competitors in the

24  state of California traffic school space charge for those

25  add-ons?

1   A.   I am aware that other schools do.

2          MR. DAUCHER:  Objection.  Move to strike after "I'm

3   aware."

4          THE COURT:  Sustained.

5   BY MR. MAKOUS:

6   Q.   Did you ever encounter any other domain names this

7   Serious Net had registered and were causing concern that

8   you've not testified to yet?

9          MR. DAUCHER:  Objection.  Lacks foundation.  It may

10  call for character evidence.

11         MR. MAKOUS:  I'll withdraw the question and make it

12  simpler.

13  BY MR. MAKOUS:

14  Q.   You've been asked by Mr. Daucher questions about this

15  typo squatting on *trafficschool's* name.

16         Do you recall that?

17  A.   I do.

18  Q.   Okay.  And that was done by Serious Net, and you

19  objected to it; is that correct ?

20  A.   That's correct.

21  Q.   Are you aware of any other domain names in the

22  *trafficschool* space that Serious Net registered that you

23  objected to?

24         MR. DAUCHER:  Objection.  Irrelevant, your Honor.

25  Possible character evidence.

1           THE COURT:  Overruled.

2           THE WITNESS:  Yes, I am.

3    BY MR. MAKOUS:

4    Q.   What --

5           MR. DAUCHER:  Objection -- objection.  Lacks

6    foundation.

7    BY MR. MAKOUS:

8    Q.   What name?

9           THE COURT:  Excuse me.  What's the basis for your

10   knowledge?

11   BY MR. MAKOUS:

12   Q.   Mr. Kramer, the Court has asked you a question.

13   A.   Through notification by email of -- from competitors

14   notifying us, as well as other competitors that particular

15   domain names were problematic and --

16          THE COURT:  Okay.  So you got -- so you received

17   this information from somebody else; right?

18          THE WITNESS:  I was notified of it by other

19   competitors; correct.

20          THE COURT:  That's from somebody else?

21          THE WITNESS:  Okay.

22          THE COURT:  Okay.

23   BY MR. MAKOUS:

24   Q.   Did you independently go to any of those sites that were

25   identified in those emails?

1    A.    I did.

2    Q.    What sites?

3    A.    I went to a site called *LAsuperiorcourts.org*.

4    Q.    Did it have an SDN courts?

5    A.    Yes.

6    Q.    And what did you observe there?

7    A.    I observed that that site was being redirected to I

8    Drive Safely, which a partner of *DMV.org*, and the official

9    Website for the LA Superior Court is *LAsuperiorcourt* without

10   the S *.org*.

11   Q.    Did you investigate to determine who registered the

12   domain name *LAsuperiorcourts.org*?

13   A.    Yes.

14   Q.    What did you learn?

15   A.    I believe it was --

16              MR. DAUCHER:  Objection.  Lacks foundation.

17              THE COURT:  Did you conduct this investigation

18   yourself?

19              THE WITNESS:  I did.

20              THE COURT:  Okay.  Overruled.

21              THE WITNESS:  I believe it was Serious Net.

22   BY MR. MAKOUS:

23   Q.    A defendant in this lawsuit?

24   A.    Correct.

25   Q.    Is that the same Serious Net that's part of the BizGroup

1    that Mr. De Carlo inquired from Mr. Lahoti yesterday?

2    A.    I believe it is.

3    Q.    There were some questions from Mr. Daucher about the

4    time that was spent on the site, and I'm going to go through

5    it briefly, Mr. Kramer.

6           When a consumer comes to the *DriversEdDirect* site

7    are there different kinds of services that they may be

8    seeking?

9    A.    Yes, there are.

10    Q.    What are they?

11    A.    For the *DriversEdDirect* site there are -- depending on

12    the area in which the customer lives, we offer an online

13    driver's education course.  *DriversEdDirect* is also a DMV

14    licensed driving school, and we provide behind-the-wheel

15    training for teenagers, which is part of the criteria to

16    fulfill to obtain a license in the state of California.

17    Q.    Okay.  So please describe for the Court briefly what

18    behind the wheel means.

19    A.    In the state of California the minimum requirements to

20    obtain a license as a teenager between the ages of 16 and 17

21    and a half years old is -- there's two main components.  One

22    is the person must take a driver's education course, which

23    can be done online or in person, and that must be the

24    equivalent of the requirements of the DMV; and the second

25    requirement is they must complete a minimum of six hours of

1    behind-the-wheel training with the licensed driving school.

2    And we provide both services.

3    Q.    In your experience, do they spend a longer time on your

4    Website when requiring behind-the-wheel services and

5    requiring online traffic -- online training?

6    A.    From my experience, the purchasing decision for a

7    behind-the-wheel training course takes much longer simply

8    because of the variety of courses we offer.  We offer not

9    only the basic six-hour, but we also offer 10-hour and

10   20-hour packages.  And these -- these behind-the-wheel

11   training programs cost substantially more money than the

12   online driver's education course.  So there's much more

13   thought going into the purchasing process by the consumer and

14   much more consultation with the parent or guardian of the

15   teenager.

16   Q.    Does *DMV.org* directly offer for sale behind-the-wheel

17   courses?

18            MR. DAUCHER:  Objection.  Lacks foundation.

19            THE COURT:  Sustained.

20   BY MR. MAKOUS:

21   Q.    You had negotiations with *DMV.org* for an arrangement --

22   a potential arrangement in the spring of '06 that has been

23   testified to.

24            Do you recall that testimony?

25   A.    I do.

1    Q.   Was that for a test relationship or a permanent

2    relationship at that time?

3    A.   Test relationship.

4    Q.   Okay.  Were there discussions with Mr. Lahoti on behalf

5    of *DriversEdDirect* of sharing revenue in the behind-the-wheel

6    space?

7    A.   There were.

8    Q.   What did Mr. Lahoti ask for in the way of a percentage

9    of that?

10           MR. DAUCHER:  Objection.  Lacks foundation as to

11   witness's knowledge.

12           THE COURT:  Did you personally sit in on these

13   negotiations that you're being asked about?

14           THE WITNESS:  I was part of the discussions between

15   myself and Mr. Creditor and Mr. Leach.  I did not have direct

16   discussions with Mr. Lahoti, but I did view his emails.

17   BY MR. MAKOUS:

18   Q.   And what did those emails disclose in the way of his

19   participation request?

20   A.   I was --

21           MR. DAUCHER:  Objection.  Hearsay, your Honor.

22           THE COURT:  Excuse me.

23           You saw an email that was directed to him?  Who was

24   the email directed to?

25           THE WITNESS:  Raj's emails were all directed to

Mr. Leach.

THE COURT:  Okay.  And then you saw Mr. Lahoti's
email that had been directed to Mr. Leach; correct?

THE WITNESS:  Correct.

THE COURT:  Okay.  And then I guess the question
that counsel has asked you is what did those emails disclose
in the way of his participation request?

Why don't you rephrase the question because I'm not
sure what you're -- I think I know, but I'm not sure based on
the wording of the question.  So why don't you repeat the
question.

BY MR. MAKOUS:

Q.   What did you understand to be the percentage of revenue
that Mr. Lahoti wished to share in in the sale behind the
wheel in the proposed relationship?

THE COURT:  Okay.  Now, was there anything in that
email that disclosed that information that he's asking you
about?

THE WITNESS:  Yes, your Honor.

THE COURT:  Okay.

BY MR. MAKOUS:

Q.   What was it?

A.   During the beginning portion of the negotiations, Raj
would send the email requesting --

THE COURT:  Sir, just -- just tell us what was in

1    the email that you reviewed and respond to his question.

2            THE WITNESS:  I reviewed the payment structure that

3    Erik and I ultimately decided on to pay Mr. Lahoti for

4    referrals for behind-the-wheel programs.

5    BY MR. MAKOUS:

6    Q.   What was that?

7    A.   In the beginning he wanted a very large percentage of

8    our --

9            THE COURT:  Okay.  That answer is stricken.

10           Do you have the email?

11           MR. MAKOUS:  Yes, your Honor.  We can -- we can --

12           THE COURT:  What's the exhibit number?

13           MR. MAKOUS:  I'll have it pull it up, your Honor.

14   Your Honor, we could do it with their witnesses, so.

15           THE COURT:  We can do it with what.

16           MR. MAKOUS:  With the defendants' witnesses.

17   It's --

18           THE COURT:  Okay.

19           MR. MAKOUS:  I'm not going to waste the Court's

20   time on this.

21           Thank you.

22           THE COURT:  All right.  That's fine.

23           MR. MAKOUS:  I appreciate the Court's efforts.

24   BY MR. MAKOUS:

25   Q.   You were recently asked by Mr. Daucher about various

1    communications, emails that you internally sent between you

2    and Erik and Blake and Jimmy about your feelings about

3    Mr. Lahoti and his company.

4           Did you know at the time that you were expressing

5    those views if any Department of Motor Vehicles agency had

6    investigated or taken action of any kind against the

7    defendants?

8    A.    Absolutely not.

9           MR. MAKOUS:  No further questions.

10                   **RECROSS-EXAMINATION**

11   BY MR. DAUCHER:

12   Q.    Mr. Kramer, Mr. Makous asked whether you advertise the

13   price of *trafficschool.com*.

14          Do you recall that question?

15   A.    I recall him asking me a question in that regard, yes.

16   Q.    Well, currently *trafficschool.com* does not advertise the

17   price of its traffic school services; correct?

18   A.    We do advertise the price of our services in some forms

19   of advertising.

20   Q.    But it doesn't appear in your sponsored listings; right?

21   A.    Actually, Mr. Creditor may have been mistaken.  It may

22   appear in our listings for Florida-related driver's education

23   courses.

24   Q.    I'm talking about traffic school.

25   A.    Not that I can remember.

1    Q.   And it doesn't appear on the home page of

2    *trafficschool.com* Website currently; correct?

3    A.   Correct.

4    Q.   Now, Mr. Makous asked you about the ownership of

5    Serious Net.  Do you -- do you have any personal knowledge as

6    to who owns Serious Net?

7    A.   I -- I believe it is Mr. Ravi Lahoti.  I guess

8    Serious Net and Find My Specialist and all the other names

9    mixed up sometimes.  I apologize.

10            MR. MAKOUS:  Your Honor, we will stipulate that is

11   not owned by BizGroup; it is owned by Ravi Lahoti.

12            MR. DAUCHER:  That it's outside of the BizGroup

13   entities and owned only by Ravi Lahoti.

14            MR. DE CARLO:  We will stipulate to that.

15            THE COURT:  All right.

16            MR. DAUCHER:  No more questions.

17            THE COURT:  All right.  Do you have anything else?

18            MR. MAKOUS:  Yes, your Honor.

19            I would like to introduce that email now, if I

20   could, in lieu of having to bring Mr. Raj Lahoti on the

21   stand.

22            THE COURT:  No.

23            MR. MAKOUS:  Thank you, your Honor.

24            THE COURT:  I was going -- I asked you what the

25   number was -- well, we'll -- we'll figure out about the email

1   later.

2           Let me ask you a question.

3           What is your company's core business?

4           THE WITNESS:  Core business for *trafficschool.com*

5   is providing online traffic school services.

6           THE COURT:  Okay.  And what's the core business of

7   the -- of the other plaintiff in the case?

8           THE WITNESS:  Core business of *DriversEdDirect* is

9   providing two main products, one being the online driver's

10  education courses and the other providing the

11  behind-the-wheel training program; whereas, *DriversEdDirect*

12  has a fleet of vehicles that provides instruction to

13  teenagers using our instructors.

14          THE COURT:  And what -- do you know what portion of

15  your revenue can be attributed to your core business, what

16  percentage of your total revenues?

17          THE WITNESS:  For *trafficschool.com* I'd say above

18  85, 90 percent.

19          THE COURT:  Okay.  And what about the other?

20          THE WITNESS:  I'd say the same.  Probably a little

21  bit higher for *DriversEdDirect* as we don't offer as many

22  ancillary services.

23          THE COURT:  All right.  Okay?

24          Anybody have anything else?

25          MR. MAKOUS:  No, your Honor.  Thank you.

1          MR. DAUCHER:  No, your Honor.

2          THE COURT:  Thank you very much.

3          You may step down.

4          THE WITNESS:  Thank you, your Honor.

5          THE COURT:  Call your next witness.

6          MR. DE CARLO:  Your Honor, the plaintiff would like

7    to call Mr. John Wright.

8          THE COURT:  All right.

9          MR. DE CARLO:  Mr. Wright is here, your Honor.

10         Does the Court want to go through the objections

11   before we call him in the courtroom?

12         THE COURT:  That's fine.

13         Okay.  Are you ready?

14         MR. DE CARLO:  Yes, your Honor.

15         THE COURT:  Okay.  Under 6.1, Paragraph 3 is

16   sustained.

17         The objection to Paragraph 7 is sustained.

18         The objection to Paragraph 8 is sustained, as,

19   I guess -- and then there's another objection to lines --

20   that same paragraph, Lines 24 through 28, and that is

21   sustained.

22         Under 6.2, the objection to Paragraph 3 is

23   sustained.

24         Paragraph 7 is sustained.

25         Paragraph 12 is sustained.

1          Under 6.3, that's sustained.

2          Paragraph 4, Lines 5 through 8, that's sustained.

3          And the same with Paragraph 12 under 6.3.

4          Under 6.4 -- I don't know why this is set up this

5     way, but anyway -- Paragraph 9, sustained.

6          Paragraph 10 is sustained.

7          Paragraph 14 is sustained.

8          Under 6.5, Paragraph 15 is sustained.

9          And I think that's it.

10          MR. DE CARLO:  May I be heard, your Honor?

11          THE COURT:  Sure.

12          MR. DE CARLO:  Thank you, your Honor.

13          I understand the Court's rulings on the opinion

14     testimony.  I am not going to argue that point.

15          If the Court would entertain argument on

16     Paragraph 4 and Paragraph 12, which is -- particularly the

17     sections which deal with Mr. Wright's experience of

18     confusion.

19          THE COURT:  Okay.  Well, let's take up Paragraph 4

20     first.

21          MR. DE CARLO:  Okay.  I believe that Mr. Wright's

22     testimony -- we believe, your Honor, that Mr. Wright's

23     testimony as it relates to his personal perception of

24     consumers who have been confused is both relevant.  It is not

25     hearsay.  And it is specifically related to the materiality

1  element in this case.

2          Specifically on the hearsay front of the hearsay

3  issue, it is not hearsay because Mr. Wright is testifying

4  about the confused state of teenagers and their parents.

5          As to the materiality, it goes to the fact that

6  these students and their parents understand that what they

7  were purchasing was a course that was affiliated with the

8  DMV.

9          It also establishes on the materiality issue that

10  even after --

11          THE COURT:  Let me ask you this.

12          Here's the problem I have with this.  It's so

13  broad, how can anybody be cross-examined about this?  If he

14  had -- if he kept documents and said I was contacted by

15  Mrs. Smith from Decatur, Georgia, and she told me X," then

16  the other side would have had an opportunity to go confront

17  her and say, "Is this true?"

18          But, you know, "I talked to a bunch of people and

19  they told me this"?

20          MR. DE CARLO:  Your Honor, I talked to Mr. Wright

21  in the hallway --

22          THE COURT:  Uh-huh.

23          MR. DE CARLO:  -- and he's prepared to lay a

24  foundation for how these instances occur.  They typically

25  occur in in-person meetings.  And I asked him how many times

1  it happens, and he's told me it happens a thousand --

2  thousands of times repeatedly.

3         So to answer the Court's question --

4         THE COURT:  Uh-huh.

5         MR. DE CARLO:  -- business people don't write down

6  the names of people who are coming in to them and sharing

7  with them the same story over and over again.

8         And the hearsay rule -- again, this isn't hearsay.

9  If it is hearsay, your Honor, I would submit that it squarely

10  fits in the state-of-mind exception.  And the issue of

11  whether -- the ultimate issue of hearsay is whether the

12  information is reliable.  And when you have a witness who

13  is --

14         THE COURT:  And that -- and that's the point.

15         MR. DE CARLO:  And when you have a witness who is

16  testifying that this very similar scenario has happened on

17  numerous occasions under the same circumstances -- and he

18  will also testify that the way he educates people as they're

19  sitting in his office is he says, "Well, here, let me show

20  you," and he pulls up the *DMV.org* Website.  And then he says

21  people are like, "Oh, my gosh, I didn't know."

22         So it goes to confusion, and we think it's

23  important for materiality.

24         THE COURT:  Sir, let me -- let me -- this case is

25  not going to turn on whether -- it's not going to turn on

1   confusion.  I can tell you that much.

2       MR. DE CARLO:  Thank you for that insight, your

3   Honor.

4       THE COURT:  So I really don't know -- I don't think

5   that's the real -- I don't think that's the real issue in

6   this case.  And so I -- well, I'm just -- I'm going to leave

7   it at that.  I don't think that's the real issue in this

8   case.

9       MR. DE CARLO:  Your Honor, if the Court's ruling

10  stands, I don't think there's anything for Mr. Wright to take

11  the stand to be cross-examined about because I believe the

12  entirety of his deposition has been excluded.  So I would

13  just tell him to go home.  But if the Court's inclined to

14  hear more testimony and foundation, what have you, about

15  these experiences, if the Court thinks it would be helpful,

16  that would be the only value that Mr. Wright would have at

17  this point.  If that's -- if that's -- the Court's not --

18      THE COURT:  And what about Paragraph 12?

19      MR. DE CARLO:  Mr. Wright is authenticating the

20  communications he had with the State of California.  It

21  illustrates -- it's part of the chain of facts that relate to

22  competitors complaining to the state, the state complaining

23  to Mr. Lahoti; Mr. Lahoti not revealing any of that to our

24  clients during the negotiations in 2006.

25      THE COURT:  What are suing him for?

1          MR. DE CARLO:  I'm sorry?

2          THE COURT:  What are you suing him for?

3          MR. DE CARLO:  False advertising, Lanham Act,

4    unfair competition, and Business and Professions Code, unfair

5    competition.

6          THE COURT:  Okay.  And the fact that he didn't

7    disclose any of that to your clients during the negotiations

8    is -- ties into those issues --

9          MR. DE CARLO:  Well, your Honor, that's a good

10   question.  I -- I don't understand why any of that's relevant

11   to this case.  The Court has entertained it.  It goes to --

12         THE COURT:  Look, it's a court trial.  Okay?  And

13   I would assume that if you win you want the -- as few issues

14   on appeal as possible.  And despite what you -- despite what

15   you may think, I think I have a pretty good sense of what's

16   real.  I had the issues in this case and what's relevant.

17         So --

18         MR. DE CARLO:  I understand what the Court is

19   saying, your Honor.  It would appear based on the Court's

20   comments and the Court's ruling that there's no particular

21   value of Mr. Wright testifying, but --

22         THE COURT:  And now if you want to -- if -- if you

23   want to try to establish some -- if you want to try to

24   rehabilitate him with respect to Paragraph 4, fine, but --

25         MR. DE CARLO:  I don't want to run afoul with the

1  Court's ruling.

2          THE COURT:  You're not running afoul of my ruling.

3  You have a perfect right based on the objection and based on

4  the Court's rulings if you want it put him up there and see

5  if you can get this in some form to overcome the objections,

6  fine.

7          MR. DE CARLO:  I'll give it a shot, your Honor.

8  Thank you.  And I'll be brief.

9          THE COURT:  All right.  Let me just hear from the

10  other side briefly.

11          MR. DAUCHER:  With respect to Paragraph 4, your

12  Honor?

13          THE COURT:  Yes.  I think that's all we're talking

14  about.

15          MR. DAUCHER:  We believe that the evidence offered

16  there is vague and unreliable.  And one Court said that

17  plaintiffs -- and this is Eighth Circuit.  Plaintiff's claim

18  of actual confusion, misdirected mail and phone calls fails

19  to raise a genuine factual dispute.

20          So -- for two reasons:  First, the vague evidence

21  of misdirected phone calls and mail is hearsay of a

22  particularly unreliable nature, given the lack of opportunity

23  for cross-examination of the caller or sender regarding the

24  reason for the confusion.  And Mr. De Carlo suggested to the

25  Court that somehow we would be able to explore the reason for

1    the confusion.

2           But that witness is not here.  So I do believe that

3    a distinction can be drawn between a specific incident and a

4    general statement.

5           THE COURT:  Well, I kind of agree with you.

6           But if you want to make the effort, that's fine.

7           MR. DE CARLO:  Thank you, your Honor.

8           THE COURT:  Was this witness's deposition taken?

9           MR. DE CARLO:  It was not.

10          THE COURT:  Excuse me one minute, sir.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  If you could just step out.  I'm sorry.

13   If you could just step out for two minutes.

14          THE WITNESS:  Sure.  Not a problem.

15          THE COURT:  And tell me, if you would, assuming he,

16   as a competitor, has suffered some kind of harm, why is that

17   relevant in your case?

18          MR. DE CARLO:  Well, we are certainly not

19   submitting evidence of his injury as part of a case that he

20   has.  We're not doing that at all, your Honor.

21          To the extent that Mr. Wright believes that he is

22   injured -- and we talked about this briefly yesterday.  It

23   goes to the remedy.  And I understand the Court doesn't want

24   competitors telling the Court what to do.  It's simply

25   evidence of how the public, and competitors are an element to

1    the public, how they're being harmed.

2              THE COURT:  Okay.  That's what I -- that's what you

3    said yesterday.

4              Okay.  Fine.  Have him come on in.

5              How much time are you going to need?

6              MR. DE CARLO:  I'm going to try to lay a

7    foundation, your Honor.  About three minutes, and if it

8    doesn't work, we'll be done.

9              THE CLERK:  Please raise your right hand.

10             Do you solemnly swear that the testimony you are

11   about to give in the matter now pending before this Court

12   shall be the truth, the whole truth, and nothing but the

13   truth so help you God?

14             THE WITNESS:  I do.

15             THE CLERK:  Please be seated.

16                         **JOHN PAUL WRIGHT,**

17    called as a witness by counsel for the plaintiff(s) being

18              first duly sworn, testified as follows:

19             THE WITNESS:  Thank you.

20             THE CLERK:  Please state your full name and spell

21   your last name for the record.

22             THE WITNESS:  John Paul Wright.

23             You said just spell the last name?

24             THE CLERK:  Spell the last name.

25             THE WITNESS:  W-r-i-g-h-t.

1      MR. DE CARLO:  May I go on, your Honor.

2      THE COURT:  Yes.

3                  **DIRECT EXAMINATION**

4   BY MR. DE CARLO:

5   Q.   Good morning, Mr. Wright.

6        How are you today?

7   A.   Thank you.

8   Q.   Thank you for coming.

9        You're here voluntarily; is that correct?

10  A.   That's correct.

11  Q.   Mr. Wright, the business you operate is called what?

12  A.   Allstars Driving School.

13  Q.   And is that a typical behind the wheel type of driving

14  school?

15  A.   Yes, sir.

16  Q.   Can you very briefly tell the Court what kind of

17  services you offer.

18  A.   Well, we offer Driver's Ed and driver's training.

19  Q.   And who are typically your customers?

20  A.   Typically they are teens under the age of 18.

21  Q.   And you have cause to have numerous in-person

22  communications and conversations with your customers?

23  A.   Yes, I do.

24  Q.   Where do those conversations typically take place?

25  A.   Generally at my office.

1   Q.   And where is your office, sir?

2   A.   We're in San Jose, at 1043 Alameda.

3   Q.   And typically are your customers accompanied when they

4   come and talk to you, a parent or a guardian?

5   A.   Yes, sir.

6   Q.   Why do you have -- what is the nature -- don't tell me

7   about the conversations, but please just tell me a general

8   reply, what are the types of conversations that you have

9   typically with students at your office?

10  A.   With the students or the parents?

11  Q.   Both.

12  A.   Generally, the parents like to get to know the driving

13  school that they're going to be turning their teen over to to

14  have the opportunity to meet the instructors.  We'll ask them

15  what phase they're at.  For example, I may ask them, "Are you

16  needing the classroom education and the driving?  Or are you

17  needing just the driving?"  They'll then answer whether they

18  have the -- they've already done the classroom or not.

19  Q.   And typically by the time they've come to see you,

20  oftentimes these students have already taken one portion of

21  the driver's education requirements?

22  A.   Yeah.  Some of them have.

23  Q.   And oftentimes have they taken it through an online

24  course?

25  A.   That's correct.

1    Q.   Is that becoming an increasingly more popular event in

2    California?

3    A.   Yes, sir.

4    Q.   Online driver's education for that first phase of the

5    training?

6    A.   Yes, sir.

7    Q.   But then the student, in addition to online, also has to

8    go and take an actual behind-the-wheel course?

9    A.   By state requirements that's true.

10   Q.   And that's why they come to you?

11   A.   That's correct.

12   Q.   In the context of your dealings with your students and

13   their guardians, have you come to learn about instances where

14   the students have taken online courses?

15   A.   Yes, I have.

16   Q.   And have you come to learn that they've taken online

17   courses through the *DMV.org* Website?

18   A.   Yes, I have.

19   Q.   Can you describe how you've come to learn that?

20   A.   Well, because I'm also in the industry and offer, you

21   know, education myself, I like to ask them where they --

22   where they did their Driver's Ed.  And the way that -- for

23   example, the -- I'll ask them, where did you do it?  A lot of

24   them are saying at the DMV.  They were not saying *DMV.org*.

25   And I would say, well --

1          THE COURT:  That's fine.

2          Next question.

3     BY MR. DE CARLO:

4     Q.   And Mr. Wright, approximately how long has this type of

5     conversation -- that specific conversation --

6     A.   Yes.

7     Q.   -- you just described, how long have you been

8     experiencing that?

9     A.   Since 2003.

10    Q.   Has the frequency increased? decreased? stayed about the

11    same?

12    A.   Absolutely increased.

13    Q.   And can you give me an estimate or give the Court an

14    estimate of how many times this has happened?

15    A.   I would say over a thousand.  You know, I can't -- don't

16    know a specific number.

17    Q.   Does it happen every week?

18    A.   At least -- I would say that it happens once a day.

19    Q.   Do you educate these people that they're mistaken?

20    A.   Absolutely.

21         MR. DAUCHER:  Objection, your Honor.  Lacks

22    foundation.

23         THE COURT:  Yeah.  You're sort of --

24         Have you completed your foundational questions?

25         MR. DE CARLO:  I've completed my foundational

1  questions, your Honor.

2          I'm sorry.  Can I ask a couple more?

3          THE COURT:  Sure.

4  BY MR. DE CARLO:

5  Q.   Mr. Wright, do you keep a log of these types of

6  instances?

7  A.   We have not, no.

8  Q.   And is there a reason why you haven't kept a log?

9  A.   A lot of times as the owner I'm not at the facility

10 every single day.  So it was reported to me by my staff.  At

11 that time we just eased the proper chains by calling the --

12         THE COURT:  Okay.  Sir, so some of these instances

13 have been reported to you by other --

14         THE WITNESS:  That's correct.

15         THE COURT:  -- members of your staff?

16         THE WITNESS:  Yes, sir.  And myself.

17         THE COURT:  Okay.

18 BY MR. DE CARLO:

19 Q.   You've experienced this yourself as well, sir?

20 A.   Yes.

21 Q.   So we're clear, you testified thousands of times.

22         Are you including those instances in which your

23 staff relayed the information to you?

24 A.   That's correct.

25 Q.   Let's just talk about your personal experience.

1   Don't -- don't --

2           THE COURT:  It doesn't --

3           MR. DE CARLO:  It doesn't matter.

4           THE COURT:  -- really matter.

5           MR. DE CARLO:  Your Honor, that's the foundation I

6   have to lay for this.

7           THE COURT:  All right.  Sir, thank you.

8           THE WITNESS:  Thank you, sir.

9           MR. DAUCHER:  I didn't hear anything else, your

10  Honor, in terms of a foundation or anything that improves the

11  vagueness of his testimony or improves my ability to

12  cross-examine him about those experiences.  In fact, what I

13  heard was some concession that suggests that at least in some

14  cases he's not even the one hearing it.

15          THE COURT:  Okay.  I'm going to --

16          Go ahead.

17          MR. DE CARLO:  I don't have anything further.

18          THE COURT:  Okay.  I'm going to -- the ruling is

19  going to stand.

20          If -- I may revisit that ruling if, in fact, the

21  likelihood of confusion or confusion becomes a greater issue

22  in this case than I think it is.  But I really don't think

23  that's the real -- I don't think the plaintiffs' case will

24  rise or fall from a failure to show confusion.

25          And if it does, if I'm mistaken about that or it

becomes a greater issue, then I may revisit that ruling.  And

we'll -- and we'll figure out some way to accommodate

counsel, an opportunity to cross-examine the witness if I do.

And that witness is from San Jose?

MR. DE CARLO:  Yes, your Honor.

THE COURT:  Okay.

MR. DAUCHER:  Your Honor, there's some ambiguity

whether the declaration is entirely then withdrawn or not.

If not entirely withdrawn, I'm not sure what it's offered for

now that those objections have been sustained.  And I -- if

it is going to remain, then I need to consider cross on

whatever is left.  I don't think -- I think that would -- his

opinion, the confusion, everything is out.  Everything

that -- besides foundation is out.

MR. DE CARLO:  Well, we're not withdrawing it.  We

understand the Court's ruling, but we're not withdrawing it.

MR. DAUCHER:  So -- so I would move that the rest

be stricken because there's no relevant evidence that follows

the foundation, at least for now.

THE COURT:  Well, I'm not inclined to strike the

declaration in its entirety.  I don't think that -- what's

left I'm not sure moves the ball, but I'm not inclined just

to strike it in its entirety at this point.  It --

MR. DAUCHER:  May I have a few minutes to --

THE COURT:  Sure.

1          MR. DAUCHER:  -- see what's left?

2          THE COURT:  Uh-huh.

3          MR. DAUCHER:  Your Honor, we would not have any

4    questions at this time.  If you reconsider, we may.

5          THE COURT:  All right.  We're going to take our --

6    we're going to take our lunch break now, and we'll resume at

7    1:30.

8          Now who is your next witness?

9          MR. DE CARLO:  Our next witness, your Honor, is

10   Chuck Dunbarr.  Similar issues with Mr. Dunbarr.

11         THE COURT:  Okay.  And who do you have after that?

12         MR. DE CARLO:  Then we would -- I believe Ms. Lisa

13   Warren will be here in the afternoon.  And she's by

14   declaration, but I don't believe there was any objection to

15   it.  So it's on the cross.

16         THE COURT:  Okay.  So Lisa "Horn"?

17         MR. DE CARLO:  "Warren."

18         THE COURT:  Lisa Warren.  Okay.

19         MR. DE CARLO:  And then Elizabeth Sanchez, I

20   believe, is coming this afternoon.

21         MR. DAUCHER:  Well, we've asked -- I sent an email

22   to her counsel asking her to appear, but it's really their

23   witness.  I don't know if she's going to show up or not.

24         MR. DE CARLO:  I thought, Mr. Daucher, you were

25   arranging for her appearance.  And I thought I was supposed

1    to arrange it.  I certainly would have.

2         MR. DAUCHER:  And I've taken steps to try to

3    arrange it too and --

4         THE COURT:  All right.

5         MR. DAUCHER:  -- send her back.

6         THE COURT:  All right.  So the witnesses that you

7    know are going to be here this afternoon are?

8         MR. DE CARLO:  Mr. Dunbarr.

9         THE COURT:  Okay.

10        MR. DE CARLO:  And Ms. Warren.

11        THE COURT:  Okay.  And who do you have after that?

12        MR. DE CARLO:  And then it is Shannon Robertson.

13        THE COURT:  Okay.  And is she going to be here

14   today?

15        MR. DE CARLO:  We've been instructed by Mr. Daucher

16   that she have no intentions to cross-examine her.

17        MR. DAUCHER:  We waive cross on that.

18        THE COURT:  Okay.  My question was is she going to

19   be here today?

20        MR. DE CARLO:  She is not.  It's just her

21   declaration, your Honor.

22        THE COURT:  Okay.  So it's just the declaration.

23        Okay.  And who else?

24        MR. DE CARLO:  We've submitted on Mr. Maronick and

25   potentially Mr. Tsfrin, although in light of the Court's

1    comments we're going to revisit that and he's not going to be

2    here today anyway.  He will at least be here tomorrow.

3              THE COURT:  Okay.

4              MR. DE CARLO:  And then the remainder of our live

5    witnesses would be just cross-examination of Mr. Moretti and

6    briefly of Mr. Lahoti.

7              THE COURT:  I'm sorry.  Mr. Who?

8              MR. DE CARLO:  Moretti, the principal of the

9    defendants.

10             THE COURT:  Okay.  Let me just make sure I

11   understand.

12             Are you -- are you calling Mr. Moretti in your

13   case?

14             MR. DE CARLO:  We are not calling him in our case.

15             THE COURT:  Okay.  All I'm interested in now are

16   the people that you're calling in your case.

17             MR. DE CARLO:  Those are the only people, plus the

18   submission of the declaration transcripts.

19             THE COURT:  Okay.  And then you'll be resting?

20             MR. DE CARLO:  That's correct, your Honor.

21             THE COURT:  Okay.  All right.  And who are you

22   calling?

23             MR. DAUCHER:  We will call the declarations that we

24   have and ask the Court to entertain our requests for judicial

25   notice in our case and that will be it.  There will be no

1    live witnesses that we will call in our case.

2              THE COURT:  Okay.  All right.  So it sounds like we

3    may be finished today with the live witnesses.

4              MR. DE CARLO:  I would suspect so.

5              THE COURT:  Okay.  All right.  I'll see everybody

6    at 1:30.

7              THE CLERK:  All rise.

8              (Whereupon, from 12:04 p.m. to time, a break was

9              taken.)

10             THE CLERK:  All rise.

11             This United States District Court is once again in

12   session.

13             Please be seated.

14             THE COURT:  Okay.  Who is your next witness?

15             MR. DE CARLO:  Your Honor, the plaintiff would call

16   Mr. Chuck Dunbarr.

17             THE COURT:  Okay.  I'll go over his -- objections

18   to his declaration.

19             Okay.  Doesn't Mr. Dunbarr fall into the same

20   category as the affidavit witness?

21             MR. DE CARLO:  Your Honor, he has similar testimony

22   as the last witness.  He also has some additional topics as

23   well.

24             THE COURT:  Okay.  Well, let's go through these.

25             Okay.  Under 4.14-A, that's sustained.

1          4.2 -- 4-B is sustained.

2          Paragraph 8 is sustained.

3          Paragraph 9, that's sustained.

4          Paragraph 11 is sustained.

5          Under 4.3, Paragraphs 4-A, 5, and 6 are sustained.

6          Under 4.4, Paragraph 9 -- Paragraph 9 is -- they're

7     sustained.

8          Okay.  The -- under 4.4, the first reference under

9     Paragraph 9 is sustained, and I'm going to come back to

10    the -- I guess it's Lines 14 through 17.  I think that's --

11    I think that's it.

12         Okay.  Let me ask the defendants.

13         Under 4.4, what is it that you're objecting to?

14         MR. DAUCHER:  For Lines 14 through 17, your Honor.

15         THE COURT:  Okay.  And that is before "advertising

16    on *DMV.org* you would get an average of one to two refund

17    requests a month.  After our product began being marketed by

18    *DMV.org* the number dramatically increased to 12 -- 10 to 12 a

19    month."

20         Is that the --

21         MR. DAUCHER:  I think the basis of the objection of

22    404 is that he's asserting he is injured by that conduct, and

23    I don't see -- if that's not the purpose of it, I don't see

24    what the purpose of that is besides possibly to demonstrate

25    the alleged confusion impliedly through what -- the actions

1    that they take?  I don't know.

2              THE COURT:  Okay.  Do you wish to be heard on that?

3              MR. DE CARLO:  That also goes to the issue of

4    materiality, and we can lay a further foundation on that with

5    Mr. Dunbarr.

6              THE COURT:  Well, what's the foundation for that?

7              MR. DE CARLO:  He will testify that after they

8    began to use *DMV.org* for the states where the Driver's Ed In

9    A Box product, which is what Mr. Dunbarr sells in states

10   where that is not approved, meaning that the student can't

11   take that course to the DMV and get their license, that the

12   refund requests went up dramatically because people thought

13   they were getting a course that they purchased through the

14   *DMV.org* Website, which, in fact, they weren't.  So it

15   illustrates that -- both, they were confused and they were

16   confused --

17             THE COURT:  Well, there's another explanation for

18   that, isn't there?

19             MR. DAUCHER:  Your Honor, there is another

20   explanation.  That is that -- that -- or Driver's Ed In A Box

21   takes no steps to not sell its course in a place where it's

22   not approved, unlike the plaintiffs in this case.  I don't

23   see the relevance of that alleged injury.  It's tangential.

24             THE COURT:  The only possible -- well, I wouldn't

25   say the only possible -- but the relevance, I would think,

1    would be as to confusion, but it seems to me if he's selling

2    the product in another state there's an explanation for that,

3    and you can't get -- and as the declaration is drafted, it

4    suffers from the same infirmity that the previous declarant

5    had.

6           But go ahead.  I'll -- I'll hear you, but do you

7    have any further argument you wish to make?

8           MR. DE CARLO:  Well, the issue of it being not

9    approved in a particular state doesn't mean that they don't

10   sell products in states where it's not approved.

11          It means that the DMV won't accept it as --

12          THE COURT:  Okay.  That's fine.

13          MR. DE CARLO:  And what Mr. Dunbarr will also

14   testify to is that because they're -- of Driver's Ed In A

15   Box's relationship with *DMV.org*, they implemented a proactive

16   measure where they actually contact everybody who purchases

17   the product in a non approved state to make sure that those

18   people understood what they were getting.  And he will also

19   testify that --

20          THE COURT:  What does that mean; that they would

21   make sure they knew what they were getting?

22          MR. DE CARLO:  That they would not get a course

23   that would be approved by the DMV.  So they understood that

24   what they were getting -- for those courses that were

25   purchased through the DMV Website -- *DMV.org* Website.

1          THE COURT:  Let me see if I understand this.

2          So he's going to testify that he would follow up.

3     When somebody enrolled in this course that he would contact

4     the person signing up and explain to them you understand that

5     what?  What would he say?

6          MR. DE CARLO:  It would not necessarily be him.  It

7     would be his customer service people.  But yes, they would

8     call that student and say, "We understand you purchased this

9     course through *DMV.org*.  Do you understand that this is not

10    affiliated or approved by your DMV course?"

11         And if people said, "Oh, I didn't know that," then

12    they would refund them their money.  And if the people said,

13    "That's fine.  I'll buy it anyway," then they would go ahead

14    and continue on with the transaction.

15         THE COURT:  Okay.  And then -- and this is all

16    relevant to what?

17         MR. DE CARLO:  It goes to the steps that this

18    competitor took to try to alleviate the reality of the

19    numbers of people that were confused.  This Driver's Ed In A

20    Box --

21         THE COURT:  But the only way you get to confusion

22    and the only way this becomes relevant, it seems to me, is

23    you have to rely -- you have to get to the point where he's

24    able to testify, "I've been contacted by numerous consumers

25    who are confused."

1            MR. DE CARLO:  That's correct.

2            THE COURT:  Okay.

3            MR. DE CARLO:  I would agree with that.

4            THE COURT:  Okay.  And I think that's the problem,

5     at least that I have with it.  I don't see how this is any

6     different from the previous declarant that you brought in.

7     So I'm going to sustain the objection to that paragraph as

8     well or that -- those lines.

9            MR. DAUCHER:  Your Honor, Section 4.5 was

10    Mr. Dunbarr on what should be done as a remedy in this case.

11           THE COURT:  Hold on.

12           Yes.

13           MR. DAUCHER:  I didn't hear whether you were

14    sustaining that or not.

15           THE COURT:  I did.

16           MR. DAUCHER:  Okay.  Thank you.

17           THE COURT:  That's when the playing field can only

18    be level.

19           MR. DAUCHER:  Yes, your Honor.

20           THE COURT:  Okay.

21           MR. DE CARLO:  Your Honor, in light of the Court's

22    rulings on Mr. Dunbarr's declaration, there is some more

23    testimony that I could cover with him that's not in his

24    declaration.  And he is here.  I would like to make a

25    proffer --

1          THE COURT:  Okay.

2          MR. DE CARLO:  -- because I don't want to waste the

3     Court's time if the Court is not interested in hearing this,

4     but Mr. -- I heard the Court ask Mr. Creditor today about

5     the -- the -- what the official agency's name is in Texas.

6     Mr. Dunbarr is someone who has a significant amount of

7     experience in the driver's education business in Texas.  And

8     I believe I would be able to elicit from him his observations

9     about how the consumers in Texas perceive the acronym DMV.

10    I think I can lay an adequate foundation that it would be

11    based upon his experience.

12         He goes to -- I think he's going to tell us five

13    trade shows a year.  And he's got a lot of interaction with

14    people on that topic.  And then the other things that I could

15    elicit from him is that before hiring -- before entering

16    into -- his company, Driver's Ed In A Box, entered into a

17    relationship with the defendants in '05.

18         Prior to '05, Mr. Dunbarr's company had a referral

19    relationship with three other Internet referral-based

20    companies after Mr. Lahoti -- after he did business --

21    entered into the business relationship with Mr. Lahoti, the

22    referral business from his other sources dropped off

23    dramatically to the tune of about 90 percent.

24         THE COURT:  And that's relevant to what?

25         MR. DE CARLO:  Materiality.  When -- when

1    Mr. Lahoti became the referral source --

2                THE COURT:  Uh-huh.

3                MR. DE CARLO:  -- the other referral sources, one

4    of which was our client, dropped off dramatically.  That

5    business was replaced by Mr. Lahoti's company.  It

6    illustrates the strength of Mr. Lahoti's advertising in this

7    market.

8                THE COURT:  And that goes to what?

9                MR. DE CARLO:  I think, your Honor, that goes to

10   materiality.  And I think it also goes to evidence that the

11   Court might find useful in terms of crafting an injunction --

12   an appropriate injunction.  It might go to the remedy issue.

13               THE COURT:  The fact that he's --

14               MR. DE CARLO:  In compet- -- I'm sorry.  In the

15   issue of competition.

16               THE COURT:  It might go to the issue of

17   competition?

18               MR. DE CARLO:  It does go to the issue of

19   competition.

20               THE COURT:  I thought you were talking about the

21   injunctive relief.

22               MR. DE CARLO:  I was adding another topic.

23               THE COURT:  I see.

24               Sounds like it was a prompted topic, but okay.

25               MR. DE CARLO:  It was.

1          THE COURT:  So -- I've been there.

2          Okay.  Well, as to the additional topics that

3    you -- you know, that weren't listed in this declaration, the

4    problem I've -- the problem I have with that is that the

5    reason that we do this, that we make the party file the

6    declarations is so that the other side has an opportunity to,

7    you know, adequately prepare for the cross-examination.  And

8    so that's I guess the problem I have with that --

9          MR. DE CARLO:  This was a witness, your Honor,

10   that -- that wasn't deposed anyway.

11         THE COURT:  Well, I know he wasn't deposed.  But

12   you filed your declaration.  You listed everything.  You gave

13   that to counsel.  Counsel had an opportunity to review the

14   declaration and file the -- any objections he had to the

15   testimony.  And now we're kind of changing the rules.

16         What's -- what's your view?

17         MR. DAUCHER:  We would object.  It -- I would call

18   it a Trojan Horse, except I don't think the offer warrants

19   the reference.  I think it's -- the offer to have him come in

20   and testify about the consumer's perception in Texas's

21   opinion testimony of the sort that the Court has already

22   addressed.

23         As far as the pre '05 injury goes, we -- this is

24   the first we've heard of it, of course.

25         And secondly, you know, in their summary judgment

1    papers the plaintiffs have stated twice that they thought the

2    site pre '06 was non actionable. And now they want to bring

3    in a third party to talk about how that third party was

4    injured in '05. And I think it's -- they should have put in

5    the declaration if they wanted to do it, and I don't think

6    there's a sufficient offer of proof to warrant more time.

7           THE COURT: Okay. Anything else?

8           MR. DE CARLO: Our position is not that the

9    advertising by the defendants was not actionable

10    pre-October 2006.

11           THE COURT: Okay. The objections will stand. If

12    you want to attempt to cure any of those, I'll give you an

13    opportunity to do that, although I'm not sure you can. But

14    I'll certainly give you that opportunity.

15           MR. DE CARLO: Well, your Honor, in all candor and

16    fairness to the Court's time, the test- -- the foundation has

17    been laid in the declarations. And if that's the Court's

18    ruling, I don't want to waste the Court's time and just

19    repeat what's already in declarations.

20           THE COURT: All right. The objections will stand.

21    Who is your next witness?

22           MR. DE CARLO: Ms. Warren, W-a-r-r-e-n.

23           THE COURT: Okay.

24           MR. DAUCHER: Your Honor, there are no written

25    objections to Ms. Warren's declaration, and Ashley Merlo will

1   handle the cross-examination.

2              THE COURT:  All right.

3              THE CLERK:  Ms. Warren, please step forward next to

4   the court reporter.

5              Here, please.

6              Please raise your right hand.

7              Do you solemnly swear that the testimony you are

8   about to give in the matter now pending before this Court

9   shall be the truth, the whole truth, and nothing but the

10  truth so help you God?

11             THE WITNESS:  I do.

12             THE CLERK:  Thank you.

13             You may be seated.

14                        **LISA WARREN,**

15   called as a witness by counsel for the plaintiff(s) being

16              first duly sworn, testified as follows:

17             THE CLERK:  Please state your first and last name

18  and spell your name for the record.

19             THE WITNESS:  Lisa Warren, L-i-s-a; last name

20  W-a-r-r-e-n.

21             THE CLERK:  Thank you.

22             THE COURT:  All right.  Counsel.

23                     **CROSS-EXAMINATION**

24  BY MS. MERLO:

25  Q.   Good afternoon, Ms. Warren.

1          You are currently the president of the online
2    *trafficschool*, Incorporated; correct?
3    A.   Correct.
4    Q.   Okay.  And as president, what are your current
5    responsibilities?
6    A.   Currently I mostly manage the money flow, oversee the
7    staff, any issues that arise.
8    Q.   And are you also involved in the graphic design?  Is
9    that correct?
10   A.   Somewhat.  We have a Web team now.
11   Q.   And is it correct that you've been working part time for
12   the past seven or eight years or so for the online traffic
13   school?
14   A.   Correct.
15   Q.   So is it accurate to say that you're not involved in the
16   day-to-day business?
17   A.   A little bit of the day-to-day business, but not every
18   day, no.
19   Q.   And is it correct that the first time you heard of
20   *DMV.org* was when you were doing some search engine searches
21   this past summer?
22   A.   Yes.
23   Q.   And in your declaration I believe you stated that you
24   came across *DMV.org* in about July; is that correct?
25   A.   Correct.

1    Q.    And about how long were you on the *DMV.org* Website?

2    A.    I probably looked over it for a minute or less.

3    Q.    A minute or less.

4          And about how many Web pages did you view while

5    were you on the *DMV.org* Website?

6    A.    I believe I only viewed one page.

7    Q.    Okay.  In your declaration at Paragraph 7 it says

8    that -- you state that you were on the page for a couple of

9    minutes; is that about right?

10   A.    I believe the paper was up for a couple of minutes, but

11   I only viewed it for probably under a minute.

12   Q.    Okay.  And so when you were searching on -- or when you

13   were on the *DMV.org* Website, you were actually in search of

14   official Texas state logos; is that correct?

15   A.    Yes.  I was asked to look at -- get some ideas for

16   advertisement in Texas.  I was looking for logos or colors.

17   Q.    Okay.  And did you find any official state Texas logos

18   on the *DMV.org* Website?

19   A.    No.  I do not recall, no.

20   Q.    And so then you left the *DMV.org* Website after that?

21   A.    Correct.

22   Q.    Okay.  And in your declaration, in Paragraph 8, you said

23   that the *DMV.org* license plate logo confused you; is that

24   correct?

25   A.    That did not confuse me.

1   Q.    It did not?

2   A.    What was on the page with that plate did confuse me.

3   Q.    Okay.  Did the logo contribute to your confusion?  Is

4   that -- is that an accurate statement?

5   A.    Yes.

6   Q.    Okay.  What else on the page was it that confused you?

7   A.    The listing of traffic school names confused me.

8   Q.    Are you -- when you say "listing," are you referencing

9   advertisements?

10  A.    Not advertisements.  A listing of names -- yes.  I guess

11  advertising different private traffic schools.

12  Q.    Okay.  And so were you -- do you recall the Web page of

13  the -- of *DMV.org* that you were on when were you on the

14  Website?

15  A.    I do not recall.

16  Q.    But it was probably a page that related to traffic

17  school?

18  A.    It was a page related -- relating to different traffic

19  schools.

20  Q.    Okay.  And you were con- -- you stated that you were

21  confused, and part of that confusion was contributed -- you

22  contribute to the *DMV.org* license plate logo?

23  A.    Correct.

24          MS. MERLO:  Could we pull up Exhibit 631, please.

25  BY MS. MERLO:

1    Q.   In the upper left corner of this Web page is the *DMV.org*

2    license plate logo.

3         MS. MERLO:  Can you -- we zoom in on that.

4    BY MS. MERLO:

5    Q.   Is that the license plate logo that you recall seeing?

6    A.   It was similar to that.  I don't recall if that was the

7    exact one.

8    Q.   Okay.  Do you remember if it said "The Unofficial Guide

9    to the DMV"?

10   A.   I do not recall seeing that.

11   Q.   Seeing that logo right now, is that logo confusing to

12   you?

13        MR. DE CARLO:  Objection.  Foundation.

14        MS. MERLO:  Is --

15        THE COURT:  Overruled.

16        You can answer.

17        THE WITNESS:  To me, personally?

18   BY MS. MERLO:

19   Q.   Yes.

20   A.   It's not that confusing, no.

21        MS. MERLO:  Okay.  Thank you.

22        No further questions.

23        THE COURT:  Okay.  Do you have anything else for

24   this witness?

25        MR. DE CARLO:  I do not, your Honor.

1                THE COURT:  Okay.  You may step down.  Thank you.

2           Do you have another witness?

3                MR. DE CARLO:  We do, your Honor.  At this time we

4      would call Shannon Robertson, but there's not going to be any

5      cross, I think.

6                THE COURT:  Okay.

7                MR. DAUCHER:  No cross and no objection.

8                THE COURT:  Okay.

9                MR. DE CARLO:  And then we have the deposition

10     testimony of Mr. Flack only.  We're not going to call him

11     live.  He's with the defendants, one of their employees.

12               THE COURT:  Okay.  And I'm sorry, who is that?

13               MR. DE CARLO:  His name is Gerald Flack, F-l-a-c-k.

14               THE COURT:  Okay.

15               MR. DE CARLO:  We also have the deposition

16     testimony of the defendants' CFO Michael Jacobson through

17     deposition.  We won't call him -- we won't call him live.

18               THE COURT:  Okay.  Let me just -- just so that I'm

19     clear on this.  For example, Jacobson is here locally?

20               MR. DAUCHER:  I believe he resides in San Diego,

21     your Honor.

22               THE COURT:  Okay.  Do you have any objection to

23     either of these witnesses' deposition -- well, do you have

24     any objection to these witnesses' testimony being received

25     via deposition?

1          MR. DAUCHER:  No, your Honor.  We had a mutual

2     agreement that we could do that.

3          THE COURT:  Okay.  That's fine.

4          MR. DAUCHER:  We did submit certain objections.

5          THE COURT:  Right.  That's fine.

6          MR. DE CARLO:  Your Honor, we've already reached a

7     stipulation about the experts, and we would offer

8     Dr. Maronick, his declaration and his survey.

9          THE COURT:  Okay.  And that is the declaration and

10    survey that were filed in connection with the summary

11    judgment motion?

12         MR. DE CARLO:  Can I ask Ms. Hamilton to address

13    that?

14         THE COURT:  Sure.

15         MS. HAMILTON:  Your Honor, the declaration was

16    filed as a trial declaration, and it -- and it didn't attach,

17    but it references trial exhibits, which are -- his expert

18    report and his rebuttal report.  And those have been filed

19    previously on summary judgment motions.  But they are now

20    trial declarations -- I mean trial exhibits.  Excuse me.

21         THE COURT:  Okay.

22         MS. HAMILTON:  And I could give you those numbers.

23         THE COURT:  No.  That's all right.  Just a moment.

24         Okay.  A declaration that was filed by Dr. Maronick

25    is -- consists of two paragraphs; correct?  Is that what

1    you're referring to?

2             MS. HAMILTON:  Yes.

3             THE COURT:  Okay.  And then you want -- and then

4    you filed his report, which was Exhibit 350 and Exhibit 389;

5    correct?

6             MS. HAMILTON:  Yes.  Those are exhibits that are in

7    the trial binders.

8             THE COURT:  Okay.

9             MS. HAMILTON:  I'll ask Mr. Daucher if he has an

10   objection to that.  And if he did, if he would submit it in

11   a different format last night, and I didn't hear a response.

12            THE COURT:  Okay.

13            MR. DAUCHER:  Your Honor, I think we discussed

14   this.  We asserted an objection to Maronick on the liability

15   grounds in the motion in limine.

16            THE COURT:  Right.

17            MR. DAUCHER:  Having gotten past that, we are

18   moving to lodge depo testimony mutually in terms of

19   impeachment of the other side's experts.

20            THE COURT:  Right.

21            Okay.  But you have no objection to these exhibits

22   that are referenced in his declaration?

23            MR. DAUCHER:  That's correct.

24            THE COURT:  All right.

25            MR. DE CARLO:  And then finally, your Honor, we

1   have a gentleman by the name of Gary Tsfrin.  Mr. Tsfrin's

2   testimony was submitted by declaration.  But it is, again,

3   substantially congruent with the other competitors, and I

4   suspect the Court's view then would be the same.  So I guess

5   I would request that the Court accelerate that and strike

6   his -- strike his declaration.

7           If -- if we could address that issue now --

8           THE COURT:  Sure.

9           MR. DE CARLO:  -- so that we don't have to make

10  arrangements for him to be here.

11          THE COURT:  Okay.  All right.  The objections to

12  that declaration -- let me -- okay.

13          Paragraph 3, the objection is sustained.

14          Paragraph 4, that objection is sustained.

15          I'm on 5.1.

16          The objection to Paragraph 4, Lines 5 through 17,

17  they're sustained.

18          The objection to Paragraph 5, lines -- that's

19  sustained.

20          Paragraph 6, that's sustained.

21          And 5.2, sustained.

22          Paragraph 6, sustained.

23          And Paragraph 7 is sustained.

24          And 5.3, Paragraph 5 is sustained.

25          Paragraph 6 is sustained.

1           The references to Paragraph 8 are sustained.

2           Paragraph under 5.4, Paragraph 7 is sustained.

3           And Paragraph 9 is sustained.

4           MR. DE CARLO:  And then, your Honor, the only

5   declaration left is -- or witness left is Elizabeth Sanchez.

6   Ms. Sanchez is the very brief declaration that attaches an

7   email where she is describing --

8           THE COURT:  You have to keep your voice up just a

9   little.

10          MR. DE CARLO:  Sorry, your Honor.

11          Ms. Sanchez's declaration is a short declaration

12  where she is authenticating an email that she had sent to her

13  boss that relates to issues of actual confusion.

14          THE COURT:  Okay.  Did you file any objection to --

15          MR. DAUCHER:  Yes, your Honor.  On hearsay grounds

16  also.  Same ground.

17          THE COURT:  Okay.  I'm going to sustain that

18  objection for the reasons previously stated.

19          And let me clear up something that I said -- I

20  think that I may have said before.  When I -- I think I said

21  earlier that I didn't think the plaintiffs' case would fail

22  because of the lack of confusion.  What I meant to say was I

23  don't think the plaintiffs' case will fail or rise and fall

24  based on the testimony that you were sought -- that you were

25  seeking to get in through the declaration that these people

1    had talked to people who had told them that they were

2    confused.  Okay?

3              If that helps.

4              MR. DE CARLO:  And then subject only, your Honor,

5    to the exhibits, which last night we were successful with

6    stipulating to the vast majority of them being entered into

7    evidence, and then having argument on whatever is left over

8    in terms of documents, we rest our case.

9              THE COURT:  Okay.

10             MR. DAUCHER:  On the exhibits there will be a

11   written stipulation filed and lodged with the clerk as well

12   to specify the exhibits.

13             THE COURT:  Okay.  And when are you going to do

14   that?

15             MR. DAUCHER:  Tomorrow morning.

16             THE COURT:  All right.

17             MR. DAUCHER:  Number two, your Honor, now that they

18   rested, under 52C we would move for a partial judgment on

19   alternative grounds:  One, as against the -- all the

20   individual defendants other than Online Guru, the one that

21   manages the Website.  I don't believe that the plaintiffs

22   made any case that the individual defendants or the other

23   companies have engaged in anything resembling false

24   advertising.

25             There's a second part.  We want to take that up

1  first.

2  THE COURT:  I think what I'm going -- no.  Why

3  don't you go to this.

4  What's the second part of that?

5  MR. DAUCHER:  Your Honor, that actually will be our

6  only ground right now.

7  THE COURT:  Okay.  I'm going to -- I'm going to

8  defer ruling on that motion until such time as I've had a

9  chance to make sure that I've reviewed all the deposition

10  testimony and the -- and after looking at the exhibits.  And

11  I may ask the parties to brief that issue as well.

12  MR. DE CARLO:  Your Honor, may I have a

13  clarification?  I'm not sure I heard what the motion was or

14  understood what the motion was.  Could I ask Mr. Daucher to

15  restate that or --

16  MR. DAUCHER:  It's a 52C motion for judgment at the

17  end of the plaintiffs' case based on failure of the

18  plaintiffs to carry their burden of proof on a bench trial as

19  to the liability of all defendants other than Online Guru,

20  the manager of the domain name, whose liability, of course,

21  we do not concede, but there's some scintilla in that case.

22  THE COURT:  You --

23  MR. DE CARLO:  Now I understand.  I -- I want to

24  make sure that I noted that we also submitted the deposition

25  testimony of Mr. Ravi Lahoti.  I think I missed it.

1          THE COURT:  All right.  That's fine.

2          Okay.

3          MR. DAUCHER:  Your Honor -- so for our case first,

4     your Honor, we would offer the declaration of Raj Lahoti as

5     previously lodged.

6          THE COURT:  I don't believe there were any

7     objections filed in connection with that declaration.

8          MR. DE CARLO:  I believe we did, your Honor.

9          THE COURT:  Okay.  Let's see.

10          I take that back.  You did have some.

11          THE COURT:  Okay.  I do have your objections to

12     that declaration.  I believe you objected to Paragraphs 46

13     through 51.

14          MR. DE CARLO:  That's correct, your Honor.  And

15     it's on topics that I believe the Court has already commented

16     on in terms of the relevancy objection.

17          THE COURT:  Right.

18          Okay.  So that objection is overruled.

19          MR. DAUCHER:  Your Honor, I understand that

20     plaintiffs may wish cross on the declaration.

21          MR. DE CARLO:  No.  We have cross-examination.

22          MR. DAUCHER:  What?

23          MR. DE CARLO:  I thought you said "waive."

24          MR. DAUCHER:  No.  "May wish."

25          THE COURT:  Okay.  So you want to cross-examine

1    him?

2            MR. DE CARLO:  We do, your Honor.

3            THE COURT:  Okay.  That's fine.

4            Okay.  And just so that I can do some planning,

5    your cross-examination is going to take roughly how long?

6            MR. DE CARLO:  For Mr. Raj Lahoti, I would estimate

7    a half hour to 45 minutes.  And for the other remaining live

8    witness, which is Mr. Moretti, I would estimate about an

9    hour.

10           THE COURT:  Okay.  Then why don't we have Mr. --

11   why don't we have the witness come forward.

12           THE CLERK:  Please raise your right hand.

13           Do you solemnly swear that the testimony you are

14   about to give in the matter now pending before this Court

15   shall be the truth, the whole truth, and nothing but the

16   truth so help you God?

17           THE WITNESS:  I do.

18           THE CLERK:  Thank you.  You may be seated.

19                           **RAJ LAHOTI,**

20    called as a witness by counsel for the defense being first

21                    duly sworn, testified as follows:

22           THE CLERK:  Please state your first and last name

23   and spell your name for the record.

24           THE WITNESS:  Raj Lahoti, R-a-j, last name is

25   L-a-h-o-t-i.

THE CLERK:  Thank you.

MR. DE CARLO:  Thank you, your Honor.

**CROSS-EXAMINATION**

BY MR. DE CARLO:

Q.   Good afternoon, Mr. Lahoti.

A.   Good afternoon.

Q.   I'm going to be asking you some questions this
afternoon, mostly about your declaration that you filed.
I've placed on the screen, Mr. Lahoti, your declaration, and
I'd like you to focus on the statement you made in
Paragraph 6 about $500,000 being spent on content
development.

          Is it accurate to say that a substantial portion of
$500,000 that was spent on content development was spent in
the year 2006 in relation to the brand-new Website that you
created?

A.   I would say probably half to two-thirds.

          I'm sorry.  I -- let me clarify.  Specific to 2006,
probably around half.

Q.   And then how much in 2007?

A.   Well, in 2007 we still have a lot of freelance writers
and two full-time employees.  So maybe around 150 to --
$150,000, maybe $160,000.

Q.   So is it accurate to say of the $500,000 that you
testified here has been spent on content development,

1    approximately 350- to $360,000 that's been spent in the

2    last -- since the beginning of 2006?

3    A.    Probably about $400,000 since 2000 -- since the

4    beginning of 2006 because I did have that other employee and

5    some other writers since 2002.  There was a lot less going on

6    for the -- you know, the previous three or three years.

7              MR. DE CARLO:  Thank you.

8              Mr. Bruyere, can we have 671 put on.

9              (Exhibit Number 671 identified.)

10   BY MR. DE CARLO:

11   Q.    Okay.  This is Exhibit 671.

12             Do you recall this exhibit?

13   A.    Yes.

14   Q.    And on this exhibit we see a sponsored listing for

15   *DMV.org*; is that correct?

16   A.    That's correct.  On the right side.

17   Q.    And there's also an organic listing; is that correct?

18   A.    That's correct.

19   Q.    And in Paragraph 16 -- in Paragraph 16 of your

20   declaration you state that a comparison of the -- well, this

21   is Paragraph 16, Line 19.

22             You say, "A comparison of the language of the

23   organic listing" -- okay?  So I see the organic listing --

24   "with the sponsored listing" -- and you have the sponsored

25   listing -- "shows that Online Guru includes more explicit

1    disclosures of the unofficial nature of the site than Google

2    itself does in its organic search results."

3         MR. DE CARLO:  Can you make it -- this part --

4    include that please -- include that.

5    BY MR. DE CARLO:

6    Q.    Okay.  So let me ask you a few questions about that

7    Mr. Lahoti.

8         It's your contention when you compare the sponsored

9    listing with the organic listing that the sponsored listing

10   makes more prominent use of the unofficial nature of your

11   Website than does the organic listing.

12        Is that your testimony?

13   A.    Can -- can you -- can you quote -- can you tell me

14   exactly what I said in the declaration.

15        Well, if you want to know what I think right now,

16   I think given the amount of space that you have in the

17   sponsored listing from the headline and description versus

18   the organic, I think they're -- they're relatively similar.

19   I think the sponsored listing does not have it in the

20   headline, whereas the organic one does.  So I think certainly

21   that it's -- it's -- you know, it's the first thing you see

22   in the organic for sure.

23        So I'm not sure if I think the sponsored is more or

24   less.

25        But because -- because of the fact that it is a

1   sponsored listing, I think that adds a little bit more to

2   the nature of that it's a -- you know, it's a private

3   organization or a commercial organization.

4   Q.   The sponsored listing does not include more explicit

5   disclosures of the unofficial designation of your Website

6   than does the organic; isn't that true?

7   A.   That's right.

8        I think it's the nature of the fact that the

9   limited space and the fact that it is a sponsored listing.

10  But as far as expressed disclaimer, I would agree with that.

11  Q.   Okay.  Paragraph 17 of your declaration, Mr. Lahoti, you

12  indicate that Online Guru receives substantial traffic to its

13  *DMV.org* Website from both organic and sponsored listings.

14       Is it accurate to say that while you get

15  substantial traffic from both, it's the sponsored listing

16  that's more important to driving traffic to your site than is

17  the organic listing?  Is that true?

18  A.   I could not say that it's more important because I think

19  they are -- they are both very important.  And if you're

20  asking me if one gets more traffic than the other --

21  Q.   Okay.  Let's ask that question.

22  A.   -- I can answer that.

23       But I don't believe that one is more important than

24  the other because had -- if we did not have sponsored

25  listings in there, they would -- they could -- you know, they

1  could see the organic listings there.  And so having both,

2  it's just -- it reinforces our Website and listings.

3          But as far as the first -- I mean, the other

4  question, our sponsored listings do get as -- more traffic

5  than the organic listings.

6  Q.   Can you put an estimate on a percentage basis -- if

7  100 percent equals traffic from organic and sponsored

8  listings, what percentage comes from sponsored listings?

9  A.   Out of all of the traffic that comes from search

10  engines, maybe -- maybe two-thirds are paid.

11  Q.   How about if we narrow that question down to the traffic

12  that flows from search engines directly to either a page

13  dedicated to traffic school or a page dedicated to driver's

14  education.

15          So remember those pages we talked about where,

16  for example, on the California traffic school page you land

17  on the California traffic school page and there's the I Drive

18  Safely logo, and then for the driver's education you land on

19  the driver's education page, and there's

20  *teendriverseducation.com*.

21          So I'm just talking about those types of targeted

22  pages.  What percentage of traffic that lands on those

23  targeted pages comes from sponsored listings as opposed to

24  organic listings?

25  A.   Specifically from search engines?

1   Q.   Yes.

2        Because it's only from search engines that you have

3   sponsored listings; right?

4   A.   I guess my clarifying question is there are ways to get

5   to the driver's education and traffic school pages other than

6   the search engine.

7   Q.   I'm specifically talking about the traffic that travels

8   from the search engine via either a sponsored link or an

9   organic link and lands on those directed targeted pages.

10  A.   Unless I had some data in front of me, I would not be

11  able to answer that without guessing wildly.

12  Q.   During the course of this lawsuit had you ever queried

13  your Web analytic software to try to determine that

14  statistic?

15  A.   Personally, I have not.

16  Q.   Do you know if anybody in your organization has?

17  A.   Yes.  Oh, actually, I believe so.  I believe Mr. Moretti

18  has.  But you'd have to ask him for sure because I don't know

19  for sure.

20  Q.   I understand.

21       Let me go back to your declaration.  I'm going to

22  have you focus on exhibit -- I'm sorry.  Paragraph 19 of your

23  declaration.

24       You say a lot here about the nature of your

25  Website.  I'd like to try to break it down a little.  You

1    indicate that "Online Guru is a deeply intrenched domain name

2    on the Internet with significant associated goodwill."

3            What do you mean when you say, first of all, that

4    there's significant associated goodwill with the *DMV.org*

5    Website or domain name?

6    A.   I believe that there -- there has been a lot of effort

7    and energy focused on marketing *DMV.org*, that Website and

8    domain name.  And as far as the significant associated

9    goodwill, that means many people know about the Website.

10   There are experiences -- they have positive experiences with

11   it, I assume; and, therefore, many Websites, you know, talk

12   about *DMV.org*.  They refer to it.  They -- they refer to it

13   as a good resource for DMV information.

14           So that's -- that's what I mean now.

15           Deeply entrenched domain name just means many years

16   of that, you know, has gone by where it's grown in nature --

17   in nature as a brand.  It's brand has grown, I guess.  So

18   that's what I mean.

19   Q.   In the Internet world, when you say you are deeply

20   entrenched, that has meaning in the context of you have a lot

21   of computers and people linking to your site; is that

22   correct?

23   A.   I don't know about people, but computers.

24           Are you talking about Websites?

25   Q.   Yes.

1    A.    Okay.  There's a lot of Websites certainly that are

2    linking to *DMV.org*.  And in this declaration, just to clarify

3    the search on Google does show 1,040, but I did refer to it

4    yesterday that in the back-end tools that you use at Google

5    it's closer to 70,000.

6    Q.    I believe I saw a statistic recently in your production

7    that approximately 80 percent of online -- I'm sorry.  Of

8    *DMV.org*'s visitors come from search engines.

9          Is that accurate?

10   A.    That would sound -- that would sound correct.

11   Q.    And the search engine -- I think we went over this the

12   other day.

13         The search engine traffic is, in great respect,

14   related to your expertise in both search engine optimization,

15   as well as search engine marketing, your personal expertise.

16   A.    Restate that real quick.  Sorry.

17   Q.    I can ask it again.

18   A.    Yeah.  Sure.

19   Q.    That 80 percent traffic that comes from the Websites is,

20   in great respect, due to your personal expertise as being a

21   very skilled search engine optimizer; correct?

22   A.    That's what our company does.

23   Q.    And you personally are very good at it.

24   A.    Well, that's my role at the company is I am the search

25   engine marketing and search engine optimization manager -- or

1    I'm -- I'm a marketing person there as well.

2    Q.   Mr. Daucher asked Mr. Kramer -- you were obviously in

3    the courtroom, if Mr. Kramer's intention or desire was to

4    close down your business.

5          Do you recall that question and the testimony?

6    A.   Yes, I do.

7    Q.   Now, if you were required to change your domain name,

8    for example, *unofficialDMVguide.org* instead of *DMV.org* -- if

9    you were compelled to change your domain name, that wouldn't

10   put you out of business, would it?

11   A.   I have no idea what the effect of that would be.

12   Q.   You would still be able to engage in search engine

13   optimization, just using a different domain name; correct?

14         In other words, what I'm getting at is you would

15   still be able to employ the same strategies -- the meta data,

16   the creating of content to try to get the search engines to

17   pick you up, and other strategies to employ.

18         You could still do that even with a different

19   domain name; correct.

20         MR. DAUCHER:  Objection.  Outside the scope and

21   argumentative.

22         THE COURT:  Overruled.

23         You can answer.

24         THE WITNESS:  You can -- you can list any site or

25   any domain name in the search engine.  You can optimize any

1    Website.  The ability to change our domain name now at this

2    point -- you know, it would -- it would take years I would --

3    I would probably have to -- you know, it would take years --

4    the -- the -- I don't say think the business would be -- you

5    know, I don't think the business would be necessarily, you

6    know, shut down.

7          I don't know what the number of revenue that

8    would -- you know, if it would -- if we would lose 99 percent

9    of our revenue, if I would have to let go of every employee.

10    I don't know what the effect would be of changing the domain

11    name.

12          So I really can't answer that question as -- you

13    know, it -- it depends on a variety of things, and it depends

14    on -- but -- but I believe certainly the business would

15    suffer greatly.

16    Q.  I believe I saw a statistic that there's either been

17    70 million visitors to the *DMV.org* site this year or that's

18    what was -- that's what there's going to be in 2007.

19          Is that accurate?

20    A.  The run rate is about 60 to 70 million visitors a year.

21    That's the run rate currently.

22    Q.  And you said that about 80 percent of your traffic comes

23    from search engines; right?

24    A.  That's right.  So that would be, you know, around

25    27 percent maybe from organic and, you know, 54 or 53 and a

1    half from paid -- if you -- if you break down the original

2    assumption that one-third is paid and two-thirds is organic.

3           I'm sorry.  That one-third is organic and

4    two-thirds is paid.

5    Q.   So even if you had to do search engine marketing and

6    search engine optimization with a new domain name, that still

7    is tens of millions of visitors that you could attract to

8    your site just with a new domain name.

9           MR. DAUCHER:  Objection.  Incomplete hypothetical.

10   Lacks foundation.

11          THE COURT:  Do you understand the question?

12          THE WITNESS:  I certainly do understand the

13   question.

14          THE COURT:  All right.  You may answer.

15          THE WITNESS:  I do not believe that it would be --

16   it would be so easy for us now at this point of investing

17   this much time and energy and resources into our brand

18   *DMV.org*.  I don't think we would be able to -- be able to

19   attract the same number of visitors so quickly.  I think it

20   would take -- I think it would take three years -- or two,

21   three years -- again, these are hypothetical guesses -- to

22   build that brand and -- and build that recognition so that

23   people, you know, when they do see our ads, they would click

24   on it.  I don't see it as something that with a flip of a

25   switch you could just get those visitors back.

1    BY MR. DE CARLO:

2    Q.   But the 80 percent from search engines are new visitors.

3    They're visitors that are finding you on a search engine.  So

4    with a new name, you still could make use of your great

5    expertise and search engine optimization and search engine

6    marketing to get those visitors to view your site.  You are

7    just using a different domain name.

8              THE COURT:  So what's your question here, Counsel?

9              MR. DE CARLO:  I'll withdraw it, your Honor.

10             THE COURT:  Okay.

11   BY MR. DE CARLO:

12   Q.   Now, Mr. -- Mr. Lahoti, similarly if *DMV.org* were

13   required to have consumers acknowledge -- for example, before

14   they land on a traffic school page or driver's education

15   page, to have consumers acknowledge when they arrive at that

16   page that the page they're visiting is not affiliated with a

17   governmental agency, that wouldn't put you out of business,

18   would it?

19   A.   I certainly don't think acknowledging that we're not --

20   I certainly don't -- no, I don't think it would put us out of

21   business.

22   Q.   Would that even have a material impact on your business

23   if consumers were just required before they got on to your

24   traffic school or driver's education page to simply

25   acknowledge this site is not affiliated with any governmental

1    agency or any DMV.

2    A.    Your question is would that have a material impact?

3    Q.    That's my question, sir.

4    A.    I don't have any idea what impact that would have.  My

5    guess is it would.

6    Q.    Why is that your guess?

7    A.    Just from usability studies that show that, you know,

8    entry pages, splash pages, you know, those are uncommon

9    practices, and they disrupt a user's, you know, flow.

10            And they actually -- they actually confuse

11   visitors, visitors that are aware of the nature of the site.

12   So I do believe just from those studies, but I've never done

13   it.  So I have no idea what would happen.

14            MR. DE CARLO:  Can I have 631 put on the screen

15   please, Mr. Bruyere.

16   BY MR. DE CARLO:

17   Q.    Mr. Lahoti, you recognize this as Exhibit 31, which is

18   your -- that's your home page; correct?

19   A.    Exhibit 631, you said?

20   Q.    Yes.

21   A.    That's our -- it looks like -- that's almost like --

22   that's the home page, yeah, currently -- even currently used.

23   Q.    And I think we went over this the other day, but just as

24   a -- to refresh -- the language that reads "The Unofficial

25   Guide to the DMV," when was that added?

1        MR. DAUCHER:  Objection.  Vague as to which

2   reference to unofficial guide he's talking about.

3        MR. DE CARLO:  Oh, my pointing is not seen on the

4   screen.  Oh, there you go.

5             Thank you, Mr. Bruyere.

6        THE WITNESS:  That language I believe was added

7   around May of this year.

8   BY MR. DE CARLO:

9   Q.   And with regards to the traffic school targeted pages

10  and the driver's education targeted pages, you did not add

11  language like this in the center of those pages?

12  A.   Well, just to clarify, that language was replaced.

13  There was previous branding tag-line language that was used

14  on this page, and that was changed almost as a rebrand in

15  May.  There was never any spot on those traffic school and

16  driver's education pages to put that language.

17            However, we did put that on every page in the

18  license plate.

19  Q.   I understand you put it in the license plate.

20            My question is you did not put any kind of bold

21  unofficial language in the middle of your traffic school or

22  driver's education landing pages.

23  A.   We did not adjust the design of the page to include a

24  tag line of that nature.

25  Q.   And those pages are designed to capture the consumers

1  who were coming from a targeted pay-per-click advertisement;

2  is that correct?

3  A.   That is incorrect.  Those pages are the same template we

4  use on every informational page on our site, and there's

5  nearly 3,000 of those types of pages.

6  Q.   You do know that a lot of consumers who are specifically

7  looking for traffic school or driver's education that come

8  from sponsored links land on those pages?

9  A.   Sure.  There are consumers that land on those pages.

10  Q.   Did you give any thought to putting a prominent

11  disclaimer disclaiming any association or affiliation with

12  the Government or any DMV agency across the top, from end to

13  end of a page?

14  A.   Not from end to end, but we did put it in the license

15  plate and below the license plate on every page, and it's the

16  first -- pretty much the first text that's on the page.

17  Q.   You didn't put a prominent disclaimer from end to end;

18  is that right?

19  A.   That's right.  I -- that's what I said.

20  Q.   Why wouldn't you do that?

21  A.   I'm not sure what the reason would be to do that.

22  Q.   Okay.  Let me lay a little foundation on that.

23        I believe you testified yesterday that you're aware

24  of ongoing confusion by consumers at your Website; correct?

25        MR. DAUCHER:  Objection.  Misstates his testimony.

1          MR. DE CARLO:  I'll withdraw it.

2          THE COURT:  Why don't you just ask whatever

3    question you want to ask him.  We will see if it draws

4    foundation.

5    BY MR. DE CARLO:

6    Q.   Mr. Lahoti, are you aware that there's daily ongoing

7    confusion by consumers who visit *DMV.org*?

8          MR. DAUCHER:  Now it's outside the scope of his

9    declaration.

10         MR. DE CARLO:  May I address that, your Honor?

11         THE COURT:  Yes.

12         MR. DE CARLO:  Paragraph 29, Line 14 of

13   Mr. Lahoti's declaration -- actually, beginning with Line 13,

14   Online Guru does not believe the success of our Website is

15   due to confusion of its visitors.  Online Guru believes to

16   the contrary that given the possible dissatisfaction of the

17   public with motor vehicles --

18         That's enough.

19         THE COURT:  Okay.  The objection is overruled.

20         You can answer.  Do you have the question in mind?

21         THE WITNESS:  It would be nice to restate it.

22         THE COURT:  All right.  I'm going to ask the

23   reporter to read it back.

24         (The record was read.)

25         THE WITNESS:  I mention that there are emails that

1  we get every day that suggest or that could be perceived that

2  the user is not aware of -- to the nature of our site.  And

3  it could be the person -- you know, things that things that

4  were the Government that could be affiliated somehow.  It

5  could be we're an agent of the Government.  I don't know what

6  that user is thinking, but certainly a reasonable person

7  could suggest that that's what -- you know, there are a few

8  maybe a day that think that.

9  BY MR. DE CARLO:

10  Q.  So in light of your knowledge on that topic, why not

11  take a proactive approach and place some kind of prominent

12  disclaimer across the -- strike that.

13      Would you agree that the fact that this continues

14  to occur, this confusion continues to occur, that the changes

15  that you've made either to your search engine advertising or

16  to the site itself is not working?

17  A.  I would disagree with that.

18  Q.  Can you tell me how you disagree with that if, by your

19  own admission, the confusion continues daily.

20  A.  Well, I don't know what the state of the mind is of the

21  consumers.  But what I can say is that if a consumer is

22  coming to our Website and they read the site, they see the

23  logo, they see right beneath the logo.  You know, they read

24  the information on our site.  They go through the help

25  center.  The help center says we're not affiliated with the

1    Government.  They do all those steps, and the consumer still,

2    you know, potentially is confused as to the nature of our

3    site, I have no idea what, you know -- what that consumer's

4    state of mind is and why they would think that we're the

5    Government.

6            You know, without knocking that specific person,

7    you know, maybe they're just not reading.  I don't know.

8            But I'm sorry if I didn't answer your question.

9    Maybe you --

10   Q.   Sure.

11           My question was would you agree, in light of what

12   you know, that in -- in conjunction with these changes that

13   you've made, that the confusion continues unabated every day.

14   So hold --

15           Let me finish my question.

16           MR. DAUCHER:  Objection.  Argumentative.

17           Is there a question?  There's a lot of speeches.

18           THE COURT:  I don't know.  I guess he hasn't

19   finished.

20   BY MR. DE CARLO:

21   Q.   The changes you're making, would you agree, are not

22   working to help alleviate confusion?

23           MR. DAUCHER:  Objection.  Assumes facts and

24   argumentative.  Asked and answered also at this point.

25           THE COURT:  Sustained.

1    BY MR. DE CARLO:

2    Q.   Do you have any information, Mr. Lahoti, that any of the

3    changes that you've made have helped lessen the rate of

4    confusion?

5    A.   I don't believe there was ever a problem prior to even

6    putting this reinforcing language with confusion.

7    Q.   Mr. Lahoti, didn't you testify that you're aware that

8    there is confusion?  Isn't that a problem?

9         MR. DAUCHER:  Objection.  Argumentative.  Asked and

10   answered.

11        THE COURT:  Sustained.

12   BY MR. DE CARLO:

13   Q.   Mr. Lahoti, do you believe that there has ever been a

14   problem vis-a-vis confusion with the *DMV.org* Website?

15        MR. DAUCHER:  Objection.  403.  It's overbroad.

16        THE COURT:  Overruled.

17        You can answer.

18        THE WITNESS:  Do I ever believe there was a problem

19   with confusion?

20   BY MR. DE CARLO:

21   Q.   Yes.

22   A.   I don't think -- given the information that we know from

23   our users, I do not believe out of the 60 million visitors

24   that come to our Website if a -- if less than a half a

25   percent or less than a quarter percent of them, if we have

1    that information even -- if they -- if we -- you know, if one

2    can perceive that they are confused, I don't know if that's

3    even possible to eliminate with any company -- you know, with

4    whatever Website.  I think there are always going to be users

5    that could potentially be confused, and I don't know what the

6    state of their mind is.  But I never thought it was a problem

7    with what we knew about our users.

8    Q.   So what the State of California told you in their

9    correspondence was not a concern to you?

10   A.   Which specific correspondence?

11   Q.   The correspondence that dealt with the issue of the

12   State of California advising you about confusion, about

13   misrepresentations.

14             MR. DAUCHER:  Objection.  Vague.

15             THE COURT:  Sustained.

16   BY MR. DE CARLO:

17   Q.   Mr. Lahoti, during the negotiations with my clients in

18   '06 related to the test, at any time did you advise Mr. Leach

19   in your negotiations about the confusion that you were aware

20   of vis-a-vis consumers and your Website?

21   A.   I did not inform him -- I did not inform them of any

22   confusion.

23   Q.   And did you ever advise Mr. Leach at any time about any

24   correspondence that you received from any state agency about

25   any topic?

1   A.   No, I did not.  Nor did I think that there was a need

2   to.

3            MR. DE CARLO:  Thank you, your Honor.

4            I don't have anything further.

5            MR. DAUCHER:  No questions, your Honor.

6            THE COURT:  All right.  You may step down.

7            Thank you.

8            THE WITNESS:  Thank you, your Honor.

9            MR. DAUCHER:  Your Honor, we would now offer the

10  declaration of Steve Moretti, who is in the courtroom.

11           THE COURT:  All right.  Why don't we go over those

12  objections.

13           All right.  Paragraphs 13 and 14, there's a

14  relevancy objection.  That's overruled.

15           Paragraph 17 is another relevancy objection.

16  That's overruled.

17           Paragraphs 18 through 23 -- another relevancy

18  objection.  That's overruled.

19           Paragraphs 29 through 33 -- this is not an

20  evidentiary objection.  This should have either been a motion

21  that was brought before the magistrate or motion in limine;

22  so I'm going to overrule it at this stage.

23           And does somebody have Exhibit 682?  Maybe if they

24  could be put up on the screen if it's on the computer.

25           You need to make it a little larger.

1          THE COURT:  What's your objection to 682?

2          MR. DE CARLO:  It purports to summarize courses

3     from Florida and Texas.  And as we reference the exhibit,

4     there's no reference to Florida or Texas traffic school.

5          THE COURT:  So what did you mean when you

6     referenced the exhibit?

7          MR. DE CARLO:  It's not on the exhibit that

8     Mr. Moretti is using as the foundation for his summary.

9     Page 27, lines --

10          THE COURT:  Yes.  I see it.

11          Well, are you saying that in that paragraph he

12     refers to Texas and Florida?  And in the exhibit itself there

13     is no exhibit doesn't mention those two states.

14          Is that what you're saying?

15          MR. DE CARLO:  Yes, your Honor.

16          THE COURT:  Okay.

17          MR. DAUCHER:  That's incorrect, your Honor.

18          First, the Paragraph 32 found at Page 27 of

19     Mr. Moretti's declaration says, "Trial Exhibit 682

20     constitutes a distinct report showing referral revenues.  I

21     state for Colorado, Idaho, Nevada, New Mexico, Virginia,

22     Texas, and Florida, it does not say exclusively traffic

23     schools."

24          If you turn to Exhibit 682, that constitutes a

25     report for both *trafficschool* and *DriversEd*, and under the

1    *DriversEd* column there are Florida and Texas revenues

2    reported.

3              THE COURT:  That seems to be the case.

4              All right.  That objection is overruled.

5              THE COURT:  All right.  Do you wish to

6    cross-examine Mr. Moretti?

7              MR. DE CARLO:  I do, your Honor.

8              THE COURT:  All right.

9              Oh, I'm sorry.  I have one question to -- for the

10   previous witness.

11             Sir, if you could just have a seat right there.  It

12   will only take a minute.

13             Yeah.  Why don't you come back up.

14             I think I know the answer to this.

15             But what is your -- what is your company's core

16   business?

17             THE WITNESS:  Our company's core business is an

18   Internet publishing company.

19             THE COURT:  And you make -- and the revenues from

20   your -- your revenues are derived from what source?

21             THE WITNESS:  Advertising revenues.

22             THE COURT:  Okay.  And that's the core business of

23   your company?

24             THE WITNESS:  That is how we make 99 percent of our

25   revenue or around --

1          THE COURT:  All right.  Thank you.

2          THE CLERK:  Please raise your right hand.

3          Do you solemnly swear that the testimony you are

4    about to give in the matter now pending before this Court

5    shall be the truth, the whole truth, and nothing but the

6    truth so help you God?

7          THE WITNESS:  I do.

8          THE CLERK:  Thank you.  You may be seated.

9                    **STEVE MORETTI,**

10   called as a witness by counsel for the defense, being first

11              duly sworn, testified as follows:

12         THE CLERK:  Please state your first and last maim

13   and spell your name for the record.

14         THE WITNESS:  Steve Moretti, S-t-e-v-e, last name

15   M-o-r-e-t-t-i.

16         THE CLERK:  Thank you.

17         THE COURT:  All right, Counsel.

18                  **<u>CROSS-EXAMINATION</u>**

19   BY MR. DE CARLO:

20   Q.   Mr. Moretti, I want to go over --

21         Good afternoon.

22   A.   Good afternoon.

23   Q.   I'd like to go over some things in your declaration.

24   And I've placed it on the -- Page 16 on the screen.  You

25   provide on Page 16 a variety of statistics.  And I -- I'm not

1    going to go through all of them, but I do want to just note

2    that if we could focus on January 1, 2006, through

3    September 2007 -- so essentially currently today -- you've

4    indicated that the Internet users have risen from 755,000 to

5    1.2 million visits per week.  Correct?

6    A.    Incorrect.

7    Q.    I'm sorry.  How did I get that wrong?

8    A.    The range of visitors per week has varied from 755,000

9    to approximately 1.2 million per week over the time period of

10   January 1st to September 29th, 2007.

11   Q.    When you say generally, on an increasing line there

12   is -- you mean there's been steady growth in terms of

13   visitors to the Website; correct?

14   A.    The overall trend of the visits per week has

15   increased -- is on an increasing slope; correct.

16   Q.    And during this time period -- January 1, 2006, to

17   September 29, 2007 -- as we've heard throughout this trial,

18   there has been some changes made to the Website; is that

19   true?

20   A.    Correct.

21   Q.    And so it would not appear that the changes that were

22   made to the Website have impacted negatively the Website in

23   terms of visitors.

24   A.    Correct.

25             MR. DE CARLO:  Placing up on the screen Page 17 of

1    your declaration which relates, and then specifically

2    Paragraph 5, and I'd like to focus on Paragraphs A and B.

3    BY MR. DE CARLO:

4    Q.   In 2006, 23 percent entered a Website -- entered the

5    Website through the home page, and then in 2007 that's gone

6    down to 16.9 percent; correct?

7    A.   Correct.

8    Q.   That is an indication -- that generally is a positive

9    trend, is it not, because it shows that more visitors are

10   landing on more targeted pages of interest for those

11   visitors; true?

12   A.   Potentially.  The -- I would attribute most of the

13   difference to -- as the site has grown from a content

14   standpoint, the more pages that exist on the Website, the

15   more likely it is that users will enter the Website through

16   other pages.

17   Q.   That's generally a sign that you're doing a better job

18   as focusing people into their specific areas of interest on

19   the site; true?

20   A.   They're certainly finding it easier to deep link into

21   the site.

22   Q.   And then for B you've indicated that 50 percent entered

23   the Website through either the *DMV.org* home page or one of

24   its 51 states' dedicated home pages.

25               There is a dedicated home page for every state and

1    the District of Columbia on the *DMV.org* Website?

2    A.   Correct.

3    Q.   And for each state there is a further dedicated page for

4    specifically *trafficschool*; correct?

5    A.   I believe for *trafficschool*; correct.

6    Q.   And there is a further dedicated page for driver's

7    education; correct?

8    A.   I believe that's correct as well.

9    Q.   And you indicate that all the state home pages include

10   the disclaimer unofficial and conspicuous text.  The

11   conspicuous text that you're referring to is what?

12   A.   There's a --

13   Q.   I'm sorry.  Let me ask a better question.  Let me

14   withdraw that?

15         The conspicuous text is where on those pages?

16   A.   It would be in two prominent places on the Website.

17   Both on the DMV license plate logo itself and also in the --

18   specifically on the state dedicated home pages.  The content

19   that starts below the masthead says, "The unofficial guide to

20   the state motor vehicle agency."

21   Q.   And did you define that as being a prominent placement

22   in your view?

23   A.   I believe it's -- it's conspicuous.  I believe it's from

24   a -- a -- certainly from a reenforcement standpoint, yes.

25   Q.   Those -- that unofficial language, at least in the

1  conspicuous area of the center right below the mast, that

2  language was not placed on any of the dedicated *trafficschool*

3  pages or driver's education pages; correct?

4  A.   Correct.

5  Q.   Was there any discussion amongst the people at *DMV.org*

6  since this lawsuit has started to place that kind of text on

7  the driver's education pages and the *trafficschool* pages?

8  A.   No.  The -- when you look at the state dedicated home

9  pages there's always been language there that references the

10 guide to motor vehicle agencies.  What we've done is we've --

11 internally from a brand strategy standpoint we have

12 identified "The Unofficial Guide to the DMV" as our primary

13 tag line and replaced it similar to how we replace it on the

14 home page in other areas of the site.

15 Q.   So specifically related to the driver's education pages

16 and the *trafficschool* pages, no consideration was given to

17 putting that unofficial text in the center of the page below

18 the -- or the top center below the mast?

19 A.   Correct.  Since it already is in place on the logo

20 itself.

21 Q.   Do you believe that if you placed that type of

22 unofficial language below the mast in the center of the

23 *trafficschool* pages and the driver's education pages, that it

24 would help lessen the amounts of confusion?

25 A.   I don't necessarily think so.  I think part of what you

1    need to think about as it relates to messaging and copy on a

2    Website is that when you have 4,000 pages, based upon the

3    nature of that page, you know, what content makes since to

4    have on that specific page.

5              So to have -- to say things numerous times I think

6    is already kind of a stretch from a repetitive standpoint.

7    So to put it onto the *trafficschool* pages, which we don't

8    consider to be a primary entry page into the Website, unlike

9    the state home pages and the prime -- and the main home page,

10   no.  We haven't -- haven't considered adding it to interior

11   pages of the site as well.

12   Q.   The *trafficschool* and driver's education pages are

13   primary entry points for those consumers that are

14   specifically interested in driver's education and traffic

15   school when they come from sponsored listings.  Isn't that

16   true?

17   A.   Some consumers come from -- directly from a sponsored

18   listing onto that page.

19   Q.   So knowing that there are a class of consumers that land

20   on those pages, the traffic school and the driver's education

21   pages from the sponsored listings -- do you think that

22   placing that unofficial language below the mast and in the

23   middle -- do you think that that would help lessen the level

24   of confusion?

25   A.   I don't -- I don't think so.

1    Q.   On Paragraph 10 of your declaration, you go through some

2    statistics about page views.

3              And again, you get all this from your -- your

4    software called Omniture; is that correct?

5    A.   That's correct.

6    Q.   The -- you've provided a chart here which speaks to the

7    number of visitors per month and the total number of page

8    views; correct?

9    A.   Correct.

10   Q.   I want to make sure I'm -- that we're defining our

11   terms.

12             A visit relates to a visitor arriving on your Web

13   page; correct?

14   A.   Correct.

15   Q.   So one human being visiting your Website is a visitor

16   and that equals a visit?

17   A.   That equals a visit, yes.

18   Q.   And then the numbers of page views is throughout that

19   same period of time you can query the Omniture software to

20   find out how many total pages were viewed?

21   A.   Correct.

22   Q.   And some people look at one page other -- some other

23   people look at more pages?

24   A.   Correct.

25   Q.   The visitors who enter the home page are not necessarily

1    indicative of visitors that enter targeted pages of interest,

2    like the *trafficschool* page or the driver's education page in

3    terms of assessing their proclivity to look at multiple

4    pages; is that correct?

5    A.    I would say the -- if a visitor comes to the site,

6    depending upon what page they initially land on, I don't have

7    any data that represents any differences between how many

8    pages a consumer coming through the home page would

9    necessarily see versus coming through another page on the

10    site.

11    Q.    Do you have an assessment, just having been involved in

12    this business and being involved in this Website, that

13    persons who land on targeted pages, like the *trafficschool* or

14    the driver's education page, that they're less likely to view

15    multiple pages than someone who lands on the home page?

16    A.    I -- actually, I would think on the contrary.  I think

17    if somebody lands on an interior page of the site -- when a

18    consumer lands on a Website, and especially with the

19    navigation that we have and the prominence of the navigation

20    that we have, it makes it very easy for the consumer to link

21    back to the home page, stay at home pages, or any other tabs

22    or sections of our site.  So I would I contend that most

23    consumers who land on an interior page are probably more

24    likely to visit other pages than someone who lands directly

25    on the home page since they've landed directly on the home

1    page.

2    Q.   How about someone who does a search for traffic school

3    services on Google -- types in something specific to their

4    wanting to take a traffic school course in California, they

5    find your sponsored link, and they click to your

6    *Californiatrafficschool* page.  That person may have found

7    what they wanted and is less likely to click around through

8    the site.  Isn't that true?

9    A.   They may have.

10   Q.   So --

11   A.   I don't know.

12   Q.   -- as a class of users, those types of users may very

13   well be less likely than those that land on the home page to

14   look at multiple pages; true?

15   A.   I -- I don't know.

16   Q.   You didn't pull any of that data?

17   A.   Which data?

18   Q.   The data that would indicate the paths that people take

19   when they land specifically on a *trafficschool* page or a

20   driver's education page?

21   A.   We pulled some specific data as relates to consumers who

22   land directly on the *Californiatrafficschool* page.

23   Q.   And coming -- and after looking at that data did you

24   come to any conclusions as to what the -- how many pages

25   those consumers view on average, the ones that land on the

1  *Californiatrafficschool* page?

2  A.   I couldn't segment how many of those -- what the average

3  is, but what we could identify is that of consumers who come

4  to our Website, who land on -- who come to our Website,

5  directly onto the *Californiatrafficschool* page, which

6  represented, I believe in May of 2007, .13 percent of our

7  Website traffic -- approximately 25 percent of those

8  consumers, of that .13 percent only saw one page.  The rest

9  of those consumers saw multiple pages, but I don't know what

10  the average number of pages were that they saw.

11  Q.   So if a full quarter of the people that landed on that

12  page only looked at one page, isn't it fair to assume that

13  the average -- that the average page views of people who

14  landed on that page would not be five to six?  We have a full

15  quarter of those people that only looked at that one page?

16  A.   It might be slightly less than five to six.

17  Q.   And -- and when you say they only looked at that one

18  page you know that they got to that page and exited that page

19  after only looking at that page; right?

20  A.   Correct.

21  Q.   And one of the exit paths or primary exit paths is that

22  big I Drive Safely logo that's right in the middle of the

23  page.  You click on I Drive Safely, and it takes you out of

24  the *DMV.org* Website and right into the I Drive Safely

25  Website; right?

1    A.   That would be one of the ways to exit our site; correct.

2    Q.   Did you track the -- did you pull the data that

3    would illustrate of the people that landed on the

4    *Californiatrafficschool* page, what percentage of them went to

5    I Drive Safely as their exit path?

6    A.   We do not track that data.

7    Q.   The Omniture software that you have can track that data,

8    can't it?

9    A.   I believe if you code every single external link on the

10   entire site, it's possible to track that data through --

11   through the Omniture software, but we don't currently do that

12   today.

13        MR. DE CARLO:  Your Honor, I'd like to read from

14   Mr. Lahoti's deposition.

15        THE COURT:  Okay.  Page and line number.

16        MR. DE CARLO:  191, Line 7 through 16, and then

17   picking up online 192 -- I'm sorry.  Page 192 through -- Line

18   5 through Page 193, Line 12.

19        MR. DAUCHER:  Okay.  No objection.

20        THE COURT:  Okay.  Go ahead.

21        MR. DE CARLO:  This is Page 191 of Mr. Lahoti's

22   declaration -- deposition.

23             "QUESTION:"

24        THE COURT:  Excuse me.  Wait a minute.  You're

25   reading from Mr. Lahoti's deposition?

1          MR. DE CARLO:  Yes, your Honor.

2          THE COURT:  No, no.  If you want -- if you want

3   me -- the purpose of reading a deposition in this fashion is

4   to -- if you're reading his deposition, you can do that.  If

5   there's something in this deposition -- I assume this

6   deposition is part of what you've already -- have you

7   designated this deposition?

8          MR. DE CARLO:  I don't believe we did, your Honor.

9          THE COURT:  Okay.

10          MR. DE CARLO:  And that is --

11   May I explain?

12          THE COURT:  Sure.  Go ahead.

13          MR. DE CARLO:  I certainly wouldn't anticipate that

14   Mr. Moretti would not give testimony consistent with what

15   Mr. Lahoti testified to about the ability to track reports,

16   to track users, and to --

17          THE COURT:  Uh-huh.

18          MR. DE CARLO:  -- and regarding pathing reports.

19          THE COURT:  I think where this may come in is --

20   you don't read it with this witness.  It may come in in

21   rebuttal, but I don't think you use it while this witness is

22   on the stand.

23          MR. DE CARLO:  Would it be appropriate, your Honor,

24   for me to read it and ask the witness if he agrees with the

25   testimony --

1          THE COURT:  No, no.

2          MR. DE CARLO:  -- of Mr. Lahoti.

3          THE COURT:  No, no.  Witnesses -- it isn't up to a

4    witness to agree with another witness's testimony.  That's

5    for the Court to determine whether -- or the trier of fact to

6    determine whether the -- there's some inconsistency in the

7    witness's testimony.  And so you can certainly -- you may be

8    able to offer this in rebuttal, and then in your argument you

9    can say, "Look, I asked him this, and another witness said --

10   you know, I asked him X and another witness testified as to

11   Y."

12         But I don't think you can impeach this witness with

13   somebody else's deposition testimony.

14         MR. DE CARLO:  Thank you, your Honor.

15   BY MR. DE CARLO:

16   Q.   Mr. Moretti, are you familiar with what a pathing report

17   is?

18   A.   I am.

19   Q.   And a pathing report is something through Omniture that

20   you can track the paths that your users travel through your

21   Website; correct?

22   A.   Through our Website; correct, to a degree.

23   Q.   And do you have any way of tracking -- of the people

24   that come into the *Californiatrafficschool* page, do you have

25   a way of tracking those people who land on that

1     *Californiatrafficschool* page and who go to the I Drive Safely

2     page as their exit portal?

3     A.    Not through Omniture pathing reports, no.

4     Q.    Do you have some other means of doing that?

5     A.    The only -- the only ways of doing that would be to --

6     as I said, through Omniture there is the capability if you go

7     through and tag or code every single external link on the

8     site and you can access that data through Omniture.

9           The only other information we have that would

10    relate to click data would be we use an ad-serving system

11    that basically serves the advertisements on our site. But we

12    do that on an advertiser basis. We don't do it -- we have

13    approximately, I believe, 40 to 45 advertisers on the site

14    right now. So we don't break it down by advertiser, by

15    placement, by page.

16    Q.    Do you think it would have been helpful in the context

17    of the issues in this litigation to ascertain the tendencies

18    of people who come from search engine advertising and land on

19    dedicated traffic school or driver's education pages?

20    A.    Can you repeat the question?

21    Q.    Yes.

22           Do you think it would have been helpful in the

23    context of this litigation to track the tendencies of

24    visitors who came from a sponsored link and landed on a

25    dedicated traffic school or driver's education page?

1    A.    So if you would be looking for the number of consumers

2    who clicked on search engine advertising key words and landed

3    on specific pages, that data also wouldn't be readily

4    available through the Omniture system.

5          The only way to try to collect that data would be

6    to go to each one of the unique search engines, pull their

7    associated data, and then try to consolidate that, which, to

8    a degree, would be somewhat different as search engines

9    measure their metrics slightly different.

10         But we don't track every single -- we don't track

11   the number of impressions and clicks to our Website for every

12   single key word that we bid on.

13   Q.    Let me ask it a different way.

14         Do you think it would have been helpful to track

15   those users who landed on the *Californiatrafficschool* page

16   how many of them exited to I Drive Safely?  Do you think that

17   would have been helpful in the context of this litigation?

18   A.    I suppose from our standpoint, as we look at -- when we

19   look at the performance of -- of our site as -- as relates to

20   our relationship with the advertiser, we don't look at it so

21   much as the number of visitors that see an advertisement and

22   go to our advertiser.  We view it more on an impression-base

23   level, thus page use.

24   Q.    My question was do you think it would be -- it would

25   have been helpful in the context of this litigation to track

1  the people who landed on the *Californiatrafficschool* page and

2  exited to I Drive Safely?

3       Did you think that that would have been helpful in

4  the context of this litigation?

5  A.   Helpful to?

6  Q.   The issues that are being explored.

7  A.   I suppose any data is helpful, but that data is not

8  easily available.

9  Q.   Wouldn't that data help illustrate how effective the

10 I Drive Safely page is because if people are landing on it

11 and then exiting through the I Drive Safely page, and if you

12 could get a sense of what percentage of the people are

13 exiting through the I Drive Safely link as opposed to exiting

14 your site through some other link, that would give you have

15 some indication of how effective that page is.  Isn't that

16 true?

17       MR. DAUCHER:  Objection.  Argumentative.

18       THE COURT:  Sustained.

19       Okay.  We're going to take our break.

20       How much longer do you have with this witness?

21       MR. DE CARLO:  About a half an hour, your Honor.

22       THE COURT:  Okay.  We'll come back at a quarter to

23 the hour.

24       THE CLERK:  All rise.

25       This Court is now in recess.

1          (Whereupon, from 3:31 p.m. to 3:48 p.m., a break

2          was taken.)

3          THE COURT:  All right.  If we could have the

4    witness resume the stand, please.

5          All right.

6          MR. DE CARLO:  Thank you, your Honor.

7    BY MR. DE CARLO:

8    Q.   Mr. Moretti, let's talk about driver's education for a

9    second.

10          MR. DE CARLO:  Can you place Exhibit 672 on the

11    screen.

12          672.  And if you would go to this page here.

13    BY MR. DE CARLO:

14    Q.   Do you recognize this report?

15    A.   I do.

16    Q.   This is an Omniture report that indicates the entry

17    pages to *DMV.org*; correct?

18    A.   It does for -- I'm not too sure of the period of time,

19    but it is an entry pages report.

20          MR. DE CARLO:  Could you go back to the previous

21    page so we can get the date range.

22    BY MR. DE CARLO:

23    Q.   The date range is January 1, 2007, to September 10th,

24    roughly nine months.  True.

25    A.   Agreed.

1    Q.   And Number 44 indicates -- that's an indication that the

2    *Californiadrivereducation* page was the 44th most popular

3    page in terms of places where Internet users landed on the

4    *DMV.org* site through that nine-month period; correct?

5    A.   I believe so, yes.

6    Q.   And that indicates 159,000 -- roughly 160,000 people,

7    we'll call it, landed on that page; correct?

8    A.   I believe so.

9    Q.   And those users are users who are likely particularly

10   interested in *Californiadrivereducation* because they landed

11   on that -- on that targeted page; correct?

12   A.   Correct.

13   Q.   And so that -- in that nine-month period that

14   represented 160,000 opportunities for *DMV.org* to sell a

15   *Californiadrivereducation* course; correct?

16   A.   I would say it was 160,000 times when a consumer --

17   potentially the same consumer, I don't know, visited that

18   page -- entered our Website through that page.

19   Q.   Doesn't that mean that it's 160,000 roughly

20   opportunities for *DMV.org* to sell a driver's education course

21   in California?

22   A.   I would say that was 160,000 opportunities for the

23   consumer to view our -- the advertising of our partner.

24   Q.   Okay.  Well, let's look at what the Website that your --

25   the Website that the consumer goes to when they click on the

1  link.

2        This has been marked as Exhibit 413.

3        This is what the consumer sees when the consumer

4  clicks on the *teendrivereducation* link, which is the

5  driver -- which is the *Californiadriverseducation* page;

6  right?

7        MR. DAUCHER:  Objection.  Vague.  I don't

8  understand --

9        THE COURT:  Do you understand the question?

10        THE WITNESS:  I believe so, your Honor.

11        THE COURT:  All right.  Go ahead.  You can answer.

12        THE WITNESS:  This is the page that the consumer --

13  this is not the page the consumer sees based upon the entry

14  pages report you just saw -- just showed me.  This is the

15  page the consumer would see after they go to our Website and

16  after they click on the advertisement to the advertisement.

17  BY MR. DE CARLO:

18  Q.   The advertisement is the *Californiadriverseducation* page

19  that has a link for *teendrivereducation*; correct?

20  A.   One of the links on the pages to *teendrivereducation;*

21  correct.

22  Q.   And who is that on that page -- that driver's education

23  page?  Who is that an advertisement for?

24  A.   *Teendrivereducation.com*, which is powered by

25  Golden State.

1  Q.   So it's an advertisement for *teendrivereducation.com*?

2  A.   It's an advertisement for -- to -- to -- for that

3  Website; correct.

4  Q.   Does the consumer, when they land on your Website, even

5  know who -- are they even told who Golden State is?

6            Strike that.  Bad question.

7            Does the consumer have any exposure to your

8  advertiser when they land on your California traffic --

9  *Californiadrivereducation* page?

10 A.   They don't have -- I don't believe there's a reference

11 to Golden State on the *Californiadrivereducation* page.

12 Q.   So it's your contention that you're posting an

13 advertisement for Golden State, yet the consumer has no

14 knowledge of Golden State when they land on that page.

15           MR. DAUCHER:  Objection.  Argumentative.  Asked and

16 answered.

17           THE COURT:  I think it is.  Sustained.

18           MR. DE CARLO:  Argumentative or asked and answered,

19 your Honor.

20           THE COURT:  Either one.  You've made your point.

21           MR. DE CARLO:  Thank you, your Honor.

22 BY MR. DE CARLO:

23 Q.   In terms of how you generate revenue from driver's

24 education, *DMV.org* does not make money by posting the

25 *teendrivereducation* emblem or link on the -- on your

1    Website; correct?

2    A.    Not directly, no.

3    Q.    You don't make money until somebody clicks on that link,

4    goes to the driver's education -- *teendriverseducation*

5    Website, and makes a purchase?

6    A.    Correct.

7    Q.    So then you share in the revenues with Golden State, the

8    provider.

9    A.    We're paid a fee by -- by Golden State.

10   Q.    It says here that the course is 69.95.

11          Do you see that?

12   A.    I do.

13   Q.    Well, what fee does Golden State pay you from the 69.95

14   that's paid by the student?

15   A.    I don't know off the top of my head.

16   Q.    Is it more than 50 percent?

17   A.    I think so.

18   Q.    Is it closer to 80 percent?

19   A.    I don't think so.  I think it's somewhere in that range.

20   Q.    Which range?

21   A.    50 to 80 percent range.

22   Q.    In terms of the growth pattern of driver's education,

23   I believe I saw a statistic -- I can find it if you need to.

24          But is it accurate to say that *DMV.org* has sold

25   more courses drive -- *Californiadriverseducation* courses in

1   2007 than in the entire time period of 2006?

2   A.   I don't know off the top of my head.

3            MR. DE CARLO:  Can we go to Exhibit 681.

4   BY MR. DE CARLO:

5   Q.   Do you believe the driver's education market in

6   California is growing?

7   A.   I am definitely not an expert on the driver's education

8   market in California.

9   Q.   Do you know if *DMV.org*'s sales of driver's education

10  California is growing?

11  A.   I believe if you look at the course count relative to

12  this exhibit, from 2006.

13            If we could go to the next.

14            MR. DE CARLO:  Let's go to the next page.

15            THE WITNESS:  Yeah, I can take a look.

16            MR. DE CARLO:  And it's -- I count the -- it's the

17  fourth and fifth lines down, Mr. Moretti, because we don't

18  have the columns.

19            THE WITNESS:  So based upon the 2006 data, it looks

20  like -- oh, you want the courses or the revenue?

21  BY MR. DE CARLO:

22  Q.   The revenue is fine.

23  A.   Okay.  So I believe then we're looking at the --

24  approximately 1.44 million in 2006 and approximately

25  1.4 million in 2007.

1   Q.   So -- so it's accurate to say that you've sold more

2   courses in the first nine months of '07 than you did in the

3   entire year of '06?

4   A.   Actually, I think it's a little bit less at this point

5   in time.  But I would imagine by the end of the year it will

6   be slightly more.

7   Q.   Thank you.

8        Can I go to Exhibit 319, please.

9        You testified earlier, Mr. Moretti about a

10  statistic that 25 percent of the people that landed on the

11  *Californiatrafficschool* page exited after only visiting one

12  page.

13       This is a *Californiatrafficschool* page; correct?

14  A.   That was a previous version of the page; correct.

15  Q.   And the exit -- one of the exit points might very well

16  be clicking on I Drive Safely; correct?

17  A.   That's one of the exit points on the page.

18  Q.   Does this statistic not suggest that -- that 25 percent

19  of the people who land on that page access -- immediately go

20  to I Drive Safely?

21  A.   I don't believe so.

22  Q.   Doesn't it suggest that a very high percentage of the

23  people who land directly on the I Drive Safely page go

24  directly to I Drive Safely as their exit point?

25  A.   I don't necessarily know that that's the case.

1    Q.   Do you believe that to be the case?

2    A.   I would think -- of all of the exit links on the page I

3    would think that because that advertisement is the most

4    prominent, then probably so in relation to the other

5    advertisements that are listed in the right-hand side in the

6    sponsored listings.  But I don't know exactly, and I don't

7    know how many people land on the page and then immediately

8    exit without going to any of the advertisers.

9            MR. DE CARLO:  Let's take a look at Exhibit 109,

10   please, Mr. Bruyere.

11   BY MR. DE CARLO:

12   Q.   In your declaration, Mr. Moretti, you did some statistic

13   gathering relative to May of 2007 with regards to

14   *trafficschool*.

15           Do you recall doing that?

16   A.   I do.

17   Q.   All right.  Let's go through some of those statistics.

18           In May of 2007, there was 18,084 people.  And

19   that's up on the screen -- that landed on the

20   *Californiatrafficschool* page; correct?  Just in May of 2007.

21   A.   I believe so.

22   Q.   All right.  That represents 18,000 potential customers

23   of traffic school in California in just May of 2007 alone;

24   correct?

25   A.   Potentially.  This might be -- it might be a little bit

1    less based upon if you -- if you took out unique, you know,

2    visitors.  But it's probably approximately 18,000.

3              MR. DE CARLO:  Exhibit 110, please.

4    BY MR. DE CARLO:

5    Q.   And then of those 18,084 visitors to the

6    *Californiatrafficschool* page, 6700 of them landed on that

7    page; is that correct?  And this is Exhibit 110.

8              MR. DE CARLO:  If you can go to the next page,

9    please.

10             And go to Page 2534.

11   BY MR. DE CARLO:

12   Q.   This is a report that indicates in May of 2007

13   *Californiatrafficschool* entry pages, 6754; correct?

14   A.   Correct.

15   Q.   I think I misspoke.

16             The 18,000 people represents the number of visitors

17   that actually at some point during their visit saw the

18   *Californiatrafficschool* page; correct?

19   A.   Correct.

20   Q.   And then this next statistic that we just went over

21   indicates the number of people that entered the site at that

22   page?

23   A.   Yes.  The 6,754 would be a subset of the 18,000.

24   Q.   So roughly a third -- it's actually 37 percent -- I did

25   the math -- of the people who have seen the page, the

1    *Californiatrafficschool* page in May of 2007 landed there.

2            Fair?

3    A.   Fair.

4    Q.   Another statistic that you've pointed out.

5            Of the 6 -- oh.

6            MR. DE CARLO:  Let's go to Exhibit 109, Page 2537.

7            Of the -- and then on Page 2537.  One more.

8    BY MR. DE CARLO:

9    Q.   Of the people -- you recognize this report?

10   A.   Yes.

11   Q.   This is an indication that it tracks the people who land

12   and then exit it?

13   A.   Correct.

14   Q.   Of the 6754 people that landed at the page, 4376 of them

15   exited without looking at another page?

16   A.   Fair.

17   Q.   Two-thirds of the people that landed directly on that

18   targeted page exited without looking at another page.

19            Doesn't that suggest that this page is very

20   effective at getting people to click on I Drive Safely?

21   Because that's one of the exit points.

22   A.   That's one of the exit points.  It could be very

23   ineffective as well.

24   Q.   Two-thirds of the people, and that could indicate it's

25   ineffective --

1    A.    Definitely.

2    Q.    -- for people.

3          Can you explain that?

4    A.    Yes.  As an Internet publisher our goal is to have

5    people view multiple pages of our Website, find information

6    and content.  So consumers who land on our site and

7    immediately exit our site, that is not necessarily a good

8    thing for us.

9    Q.    But it's a good thing if those people are landing on

10   that page and clicking on I Drive Safely and buying a

11   *trafficschool* course.

12         That's a very good thing; right?

13   A.    Potentially.

14   Q.    So isn't that -- isn't that statistic an indication that

15   that page is very powerful at getting people who land on it

16   to act and click on I Drive Safely?

17   A.    I'd say it's -- I'd say people act.  I don't know

18   necessarily that they click on I Drive Safely or one of the

19   other advertisers on the page or actually just leave the site

20   completely.

21   Q.    Well, we know they leave the site completely because

22   that's what the statistic is.

23         THE COURT:  Well, let me ask you -- let me ask you

24   a question.

25         THE WITNESS:  Yes, sir.

1           THE COURT:  When -- when he refers to that they

2     exit the site, is the only way they could exit that site

3     would be to click on I Drive Safely?

4           THE WITNESS:  No, sir.

5           THE COURT:  Okay.  So in other words, if I was on

6     the site, I could type in www.ms.com, and that would be

7     considered an exit?

8           THE WITNESS:  Correct.

9           THE COURT:  And that would be reflected in the

10    statistics?

11          THE WITNESS:  Correct, sir.

12          THE COURT:  Go ahead.

13    BY MR. DE CARLO:

14    Q.   So, Mr. Moretti, as the Court has indicated or asked

15    you, one of the exits is the I Drive Safely -- I Drive Safely

16    points?

17    A.   One of the methods; correct.

18    Q.   And do you believe that two -- that this statistic,

19    two-thirds of the people land on the page and then

20    immediately exit -- is that suggestive of that page being

21    effective in getting users to click on I Drive Safely as

22    their exit point?

23          MR. DAUCHER:  Asked and answered.

24          THE COURT:  Sustained.

25          MR. DE CARLO:  I'll move on.

1  BY MR. DE CARLO:

2  Q.   Doesn't that statistic also suggest that of the persons

3  who land on the *trafficschool* dedicated page, at least in May

4  of 2007, that on average they're not looking at five to six

5  pages?

6  A.   So of the -- let's break it down by the numbers.

7       So of the population that enters the site on the

8  *Californiatrafficschool* page --

9  Q.   6700 people.

10  A.   Okay.  So about 30 percent of them --

11  Q.   Two-thirds of them.

12  A.   Two-thirds of them exit, but 30 percent, give or take,

13  view more pages than that.  I don't know how many pages those

14  consumers view.

15  Q.   Do you have any data to suggest that people who land on

16  the home page exit the home page at a rate of 67 --

17  two-thirds?

18  A.   I have not that data.

19  Q.   Do you have any knowledge as to whether the exit rate of

20  that page is that high?

21  A.   I do not.  I do not know.

22  Q.   You don't have a belief one way or the other?

23  A.   Correct.

24       MR. DE CARLO:  Let's go to Exhibit 109 at 2536,

25  Mr. Bruyere.

1    (Exhibit Number 109 identified.)

2    BY MR. DE CARLO:

3    Q.   Now, regardless of -- of the -- back up to the first

4    statistic, which was the 18,000 that at some point during

5    their visit in May of 2007 saw the page -- taking a look at

6    Exhibit 109, do you recognize this report?

7         Do you understand what this report is?

8    A.   I do.

9    Q.   And this indicates that of those that saw the page in

10   May of 2007, the 18,000, plus 9900 of them exited from that

11   page, over half?

12   A.   Correct.

13   Q.   Does that suggest that half of the people in May of 2007

14   that saw the *Californiatrafficschool* page that have exited

15   from that page -- does that suggest to you that the I Drive

16   Safely -- that the design of that page is effective in

17   getting people to click on I Drive Safely?

18   A.   I do not know.

19   Q.   Do you know if the exit point from your home page is

20   over 50 percent of your -- of the viewers who see that page?

21   A.   I do not know.

22   Q.   Do you have any estimate?

23   A.   I do not.

24   Q.   Okay.  Let's talk about some of the statistics for your

25   conversion data.

1          You have identified conversion -- you've provided a

2     definition of conversion rate in Paragraph 18 of your

3     declaration.  And you say that it is the percentage of

4     visitors to a particular Web page that take measurable

5     action.

6          True?

7     A.   Correct.

8     Q.   Visitors, again, are human beings who visit the site?

9     A.   Correct.

10    Q.   So based on that definition -- let me give you an

11    example to make sure we understand.

12          One visitor in May of 2007 visits the

13    *Californiatrafficschool* page, clicks on the I Drive Safely

14    icon, and purchases an I Drive Safely course.

15          So we have one visitor, *Californiatrafficschool*

16    page, taking the measurable action of clicking and buying.

17          That's a 100 percent conversion rate; correct?

18    A.   For -- for that -- for that funnel, yes.

19    Q.   Same person -- same -- same visitor visits the Web page.

20    While he's on your site, he looks at nine other pages, for a

21    total of 10 pages.  He takes a measurable action, and he buys

22    a product.  One person buys a product, been on your Website

23    once.

24          100 percent conversion rate?

25          MR. DAUCHER:  Objection.  Vague as to the product.

1          THE WITNESS:  Can you restate the question, please.

2    BY MR. DE CARLO:

3    Q.   It doesn't matter what the product is.

4          They take an action -- we'll keep it consistent

5    with my original example.

6          User logs on to the site; visits the

7    *Californiatrafficschool* page; and, in addition, visits nine

8    other pages.  So that user visits a total of ten pages --

9    A.   Okay.

10   Q.   -- travels to I Drive Safely Website, purchases an I

11   Drive Safely course -- conversion rate equals 100 percent?

12   A.   From a visitor to sales standpoint.

13         The conversion rate would equal 10 percent from a

14   page view to sale standpoint.

15   Q.   But I just want to focus on your definition of visitor

16   to a particular Web page that takes a measurable action.  The

17   Web page, in my second hypothetical, that the user -- that

18   the user took the action on was the *Californiatrafficschool*

19   page.  While he was there he looked at other pages.  Okay?

20         But on your definition, in my example -- my second

21   example, that's a 100 percent conversion rate; right?

22   A.   If he just looked at -- of the 10 pages that the visitor

23   looked at that, if were all distinct pages, then it would be

24   a 100 percent conversion from the *Californiatrafficschool*

25   page to a sale.

Q.   And that's a valuable piece of information for you to
know so that you can determine of the people that travel on
your site, how many of them on a percentage basis are you
converting to a sale.

     That's why that information is valuable to you;
correct?
A.   Oh, I certainly don't discount the value of having that
information; correct.
Q.   The conversion rate is not, in the second example that I
gave, one human being logs onto your site, clicks on I Drive
Safely, and has also looked at nine other pages -- but clicks
on I Drive Safely and buys the product.

     The conversion rate isn't 10 percent, is it?
A.   It depends on what your -- correct.  You're correct.
I believe I misspoke there.  It basically depends on what
you're trying to measure.  If you're trying to measure the
performance of an advertisement, the question becomes how
many times is that advertisement shown and then how many
sales resulted from that advertisement.

     And within that exposure of the advertisement, the
entire experience is driven by a visitor.  It doesn't happen
without a visitor.
Q.   I'm limiting my question to your definition of
conversion rate.
A.   Okay.

1    Q.   So under your definition of conversion rate, if one

2    visitor visits the site and takes an action, regardless of

3    how many pages they look at, that's a 100 percent conversion

4    rate.

5    A.   If you're looking at visitor-to-sale conversion.  You

6    can look at it different -- different ways.

7    Q.   I just want to use your definition.

8    A.   As it relates to the exercise for the declaration,

9    I believe we looked at page views to sale.

10   Q.   Mr. Moretti, based upon the definition that you used in

11   Exhibit 18 -- I'm sorry.  Paragraph 18, in my second --

12   second hypothetical about the one visitor, regardless of how

13   many -- how many pages the visitor looks at, the conversion

14   rate is going to be 100 percent.

15        Isn't that true, based on your definition of the

16   conversion rate?

17   A.   I believe that's the definition within that -- within

18   that statement; correct.

19   Q.   Now, let's take a look at your data from Exhibit 20 --

20   I'm sorry.  Paragraph 20.

21        Do you realize -- you recall from Paragraph 20

22   you're calculating so-called conversion rates; right?

23   A.   Calculating a conversion rate; correct.

24   Q.   Well, you're certainly -- when you say a conversion

25   rate, you are incorporating in this calculation in

1    Paragraph 20 your definition in Paragraph 18 that we just

2    went over; right?

3    A.   I believe -- as I stated, I believe -- what I know is

4    that the calculations in Paragraph 20 were based on

5    page-views-to-sale conversion.

6    Q.   But that's not your definition of conversion rate in

7    Paragraph 18?

8    A.   Then I would say --

9              THE COURT:  You're arguing with the witness now.

10   So just ask questions.

11             MR. DE CARLO:  Sorry.

12   BY MR. DE CARLO:

13   Q.   Why did you -- well, let's go through the data.

14             You indicated that in January of '06 through July

15   of '07 -- I'm looking at Paragraph 20-A -- there were 607,000

16   page views of pages promoting *trafficschool*.  And during that

17   period you said there were 19,000 courses purchased.  And

18   then you divided 19,000 by 607,000 and came up with a

19   conversion rate of 3.25 percent.

20   A.   Okay.

21   Q.   Now, Mr. Moretti, based on your definition of a

22   conversion rate, that's not accurate, is it?

23             And let me -- let me follow up on that.

24             Isn't it threw that in order to arrive at the

25   conversion rate, you would have had to have known how many

1    visitors are represented by the 607,000 page views.  So then

2    if you took the number of visitors and divided that by the

3    number of courses, you would have come up with the conversion

4    rate that you defined in Paragraph 18; true?

5    A.    I believe the definition that is used in Paragraph 18

6    and the actual calculation in Paragraph 20 are different.

7    Q.    Do you see anywhere in your declaration where you

8    advised the Court of that fact?

9    A.    Not until you're advising me of it right now.

10   Q.    So therefore, the data that we see on Page 23 of your

11   declaration -- that data is not a reflection of a conversion

12   rate as you've defined it.

13   A.    Within Paragraph 18, I don't believe so.  This would be

14   a representation of page-views-to-sales conversion.

15   Q.    And the reason you went through this exercise -- I

16   believe you state so in your declaration -- is at

17   Paragraph 22.

18           "Plaintiffs' theory in this case is that *DMV.org*

19   derives an unfair advantage from the perceived affiliation

20   with the Government.  If the hypothesis is correct, one would

21   expect to see *DMV.org* realize an unusual high conversion

22   rate, at least a higher conversion rate than due to

23   plaintiffs.  However, the conversion rate for *DMV.org* is less

24   than one percent for driver's education and only 3.25 percent

25   for traffic school."

1           Let's stop right there.

2           The statistic of one percent and 3.25 percent is

3     not accurate as you have defined conversion rate; true?

4     A.   As I've stated previously, the definition in

5     Paragraph 18 is different than -- I believe is different than

6     the actual calculations that we're looking at, which are

7     page-views-to-sales conversion.

8     Q.   And then you go on to say these rates are significantly

9     lower than plaintiffs' conversion rates, and you ask the

10    Court to compare the Kramer deposition.

11          Do you have some reason to believe that Mr. Kramer

12    in his deposition -- or my clients at any time have defined a

13    conversion rate as equalling actions per number of pages

14    viewed?

15    A.   I would have to see their data again.

16    Q.   That's not what Mr. Kramer said in his deposition, is

17    it?

18    A.   I don't know off the top of my head.

19    Q.   In fact -- could we go to exhibit -- we already -- you

20    recall from Exhibit 109 that the total visitors to the

21    *Californiatrafficschool* page in May of 2007 was roughly

22    18,000?

23          Do you recall that?

24    A.   I do.

25          MR. DE CARLO:  Let's go to Exhibit 647, please.

1   Page 9793.

2           In fact in -- one more over, please.

3   BY MR. DE CARLO:

4   Q.   Do you recognize this document?

5   A.   I do.

6   Q.   In May of 2007 *DMV.org* sold 1356 *trafficschool* courses;

7   correct?

8   A.   Total?  Oh, yes.  Yes, I believe so.

9   Q.   So the real conversion rate for May of '07 is 1356,

10  based on -- strike that.

11          The real conversion rate, based on your definition

12  in Paragraph 18, of courses sold -- or actions taken is 1356,

13  the number of courses sold, divided by 18,084; right?

14  A.   Relative to visits to sales, I think that would be

15  correct.  I think.

16  Q.   I did the math.  It's roughly seven and a half percent.

17  A.   Okay.

18  Q.   Does that sound about right?

19  A.   If we were trying to identify visits to sales, I believe

20  so.

21  Q.   That's what you thought you were doing in your

22  declaration; right?

23  A.   Well, no.  What I thought I was doing in my declaration

24  was using information that we have readily available, which

25  is page views to sales on an aggregate basis.

1    Q.   Okay.  Let me show you Paragraphs 24 through 26.  I'm

2    not going to put it up.  I'm just going to ask the question.

3              Paragraph 24 through 26, you talk about generally

4    laudatory emails that *DMV.org* receives from consumers.

5              Do you recall that testimony?

6    A.   We certainly receive emails from consumers.

7    Q.   And you also receive emails from actual state agencies

8    where they advise you periodically of inaccuracies that you

9    have on your site?

10   A.   We have received some emails from state agencies;

11   correct.

12   Q.   And is it true that you do not guarantee to your

13   consumers that the information that you place on your site

14   about various DMV regulations and rules is accurate?  You

15   don't guarantee it?

16   A.   We don't guarantee it, no.

17   Q.   And you don't take responsibility for any incorrect

18   information.

19   A.   Correct.

20   Q.   So it would be important that people understand when

21   they're visiting the site that the information they're

22   getting is not information coming from a DMV.

23              Is that a fair statement?

24   A.   The information is not coming directly from -- it's not

25   a state Website; so it's not the State's information, no.

Q.   And you want to make sure that when people visit your
site that they're not thinking that this information is
actually coming from the State.

        That's an important consideration for you; correct?
A.   I don't know if I would say it's an important
consideration for us it make sure that people know the
information is not coming directly from the State as it
relates to the intent of our site, which is to try to
aggregate and centralize information across the US.  We
certainly do our best to basically report in a sense what we
know as the latest facts for certain aspects of DMV
transactions.
Q.   You're familiar with the email system at *DMV.org* where
in -- every response to every consumer email contains
standard language that educates the consumer that you are not
the DMV; correct?
A.   There is some standard language used in the signature
portion of the emails.
Q.   What was the purpose of putting that standard language
in all of your email responses to consumers?
A.   I think specifically for the consumers who contact us
that potentially are confused or mistaken continue to
reinforce that we are not a government entity or affiliated
with the government.
        MR. DE CARLO:  Okay.  Can we go over to

1    Exhibit 115, please.

2              I'm almost done, your Honor.

3              THE COURT:  Okay.

4              MR. DE CARLO:  I know I'm past my estimate.

5    BY MR. DE CARLO:

6    Q.   Okay.  Mr. Moretti, if which take a look at this.  This

7    is -- can you see this document, Mr. Moretti?

8    A.   Yeah, I can see it for the most part.

9    Q.   This is 2005 and 2006 financial summaries; correct?

10   A.   Correct.

11   Q.   This is -- this is a document that was provided to us,

12   if you recall, at your deposition; correct?

13   A.   I believe so.

14   Q.   All right.  Can we -- and I'll note that there is no

15   information on this sheet that was provided to us at your

16   deposition about anything other than costs related to the

17   costs of goods sold; correct?

18   A.   Correct.

19              This is a breakdown of gross profit margin.

20              MR. DE CARLO:  And then if we would go, please, to

21   Exhibit 398.

22   BY MR. DE CARLO:

23   Q.   This references 2003 and 2004, and this was also

24   provided during your deposition; correct?

25   A.   I can't recall if this was provided during deposition or

1    afterwards.

2              (Exhibit Number 398 identified.)

3    BY MR. DE CARLO:

4    Q.   And there's no information on this document either

5    related to any costs other than the costs of goods sold;

6    correct?

7    A.   Correct.  From a call standpoint; correct.  This also

8    shows gross profit margin.

9              MR. DE CARLO:  Now, let's go to Exhibit 680,

10   please, Mr. Bruyere.

11             (Exhibit Number 680 identified.)

12   BY MR. DE CARLO:

13   Q.   This is -- do you see this document?  Can you see it?

14   A.   I can.

15   Q.   It's an updated financial summary of 2006, 2007.

16   A.   It is an updated summary that also includes not only

17   gross profit margin -- but I can't see it right now.  It also

18   includes net income.

19   Q.   And this was provided to us shortly before this trial

20   started; correct?

21   A.   I believe so.

22   Q.   Do you have any idea of the expenses that are listed

23   underneath gross profits, namely the salaries and benefits,

24   legal and accounting -- do you have any idea of how those

25   relate to driver's education or traffic -- driver's education

1  or *trafficschool* business?

2  A.   Those expenses would be -- our -- you know, the fixed

3  costs of the entire business.

4  Q.   Okay.

5       MR. DE CARLO:  Your Honor, again at this point I

6  would ask to move to strike that section of Exhibit 6 -- I

7  know the Court ruled on this already.  I've elicited

8  additional testimony.  And so with the additional testimony

9  I would renew our request that the information under the

10 expense line be stricken because it was not provided to us

11 during discovery.  And because it was under Rule 26, it is

12 the defendants' obligation to provide financial data on

13 damages.

14      And under the Lanham Act, it is the plaintiffs'

15 responsibility to provide information related as to gross

16 sales, and it is the defendants' obligation to prove the

17 offset.  So during the discovery period, all we were provided

18 was gross revenues and cost of goods sold.

19      THE COURT:  Are you finished with this witness?

20      MR. DE CARLO:  I have two or three more questions.

21      THE COURT:  Well, why don't you ask those, and then

22 we'll take up this issue because you've got five minutes.

23      MR. DE CARLO:  Thank you.

24 BY MR. DE CARLO:

25 Q.   On 680, Mr. Moretti, there's no reference to revenues

1  from driving records that are sold; is that correct?

2  A.   It's not specifically broken down as a separate line

3  item, no.

4  Q.   Do you have an estimate of what *DMV.org*'s revenues were

5  in 2000 -- 2005 and 2006 for the driving records that were

6  sold?

7  A.   I do not.

8  Q.   Do you know why that information was left off of this

9  summary?

10  A.   I believe the -- the "all other referral income" line

11  item was representative of all other income associated with

12  non driver's education and *trafficschool* products.

13  Q.   So you have no way to estimate of that recall other

14  referral income, what portion of it is driving records?

15  A.   Not off the top of my head, no.

16  Q.   With regard to -- you're familiar with the search engine

17  marketing costs in -- for your Website?

18  A.   The aggregate costs, yes.

19  Q.   Do you have an estimate or do you know if the search

20  engine marketing costs are greater as it relates to your

21  *trafficschool* and your driver's education business as opposed

22  to your category of business, specifically the insurance

23  quotes?

24  A.   Are our costs greater in search engine marketing

25  *trafficschool* and Driver's Ed key words relative to

1  insurance?

2  Q.   Let me ask it a different way.

3  A.   Okay.

4  Q.   In terms of the dollars that you spend on a monthly

5  basis for search engine marketing --

6  A.   Okay.

7  Q.   -- does *trafficschool* and driver's education represent

8  the larger share of search engine marketing dollars?

9  A.   I don't believe so.

10 Q.   Do you know what category does?

11 A.   We don't necessarily -- we don't -- we don't categorize

12 it at a very granular level.  But I believe -- and Mr. Lahoti

13 would know better than I, but I believe the vast majority of

14 our bidding is done on more general key words.

15         MR. DE CARLO:  I don't have anything further, your

16 Honor.

17         Thank you.

18         THE COURT:  Okay.  Do you have any questions for

19 this witness?

20         MR. DAUCHER:  Briefly.

21         THE COURT:  How much?

22         MR. DAUCHER:  Five minutes.

23         THE COURT:  Okay.

24                    **REDIRECT EXAMINATION**

25 BY MR. DAUCHER:

1    Q.   Okay.  Mr. Moretti, can we look at the conversion chart

2    that was -- that is found on Page 23 of your declaration,

3    please.

4            Mr. Moretti do you recognize this as the conversion

5    chart from your declaration?

6    A.   Yes.

7    Q.   And Mr. De Carlo is correct that that -- those

8    conversion calculations are based on page views against

9    courses sold?

10   A.   Correct.

11   Q.   Or rather I should say classes sold against page views?

12   A.   Yes.

13   Q.   And Mr. De Carlo was also correct that another way to

14   calculate that would be courses sold to visitors; correct?

15   A.   That is another conversion rate calculation you could

16   run, yes.

17   Q.   I believe Mr. De Carlo is correct that if you run it in

18   that way for May of 2007 instead of -- for *trafficschool*

19   instead of 4.15 percent, you would reach a number of seven

20   percent; correct?

21   A.   Seemingly so, yes.

22   Q.   So if you do use a visitor's approach as opposed to a

23   page view's approach, it will increase the conversion rate;

24   correct?

25   A.   Correct.

1    Q.   But only in the example from four to seven percent;

2    correct?

3    A.   Correct.

4    Q.   Okay.  Will you refer to Exhibit 680, please.

5              And I believe Mr. De Carlo was asking you about the

6    fact that for American Safety Council, the figures there --

7    first of all, what state or states does American Safety

8    Council provide services in that are advertised on *DMV.org*?

9    A.   Florida, Indiana, maybe a couple of others.

10   Q.   Okay.  And that -- the revenue from that entity is

11   broken out separately on this Exhibit 680; correct?

12   A.   As relative to that advertiser, it is one line item;

13   correct.

14   Q.   And that line item includes revenue from that advertiser

15   from traffic schools; correct?

16   A.   Correct.

17   Q.   And driver's education; correct?

18   A.   Correct.

19   Q.   And driving records; correct?

20   A.   Correct.

21   Q.   And I believe Mr. De Carlo asked you whether you have an

22   estimate as to the breakdown of those -- of the driving

23   records component.

24   A.   For that specific line item I would refer to the

25   notation at the bottom.  My interpretation of his question

1  was that he was looking for a breakdown of all driving

2  records revenue, which I don't have.

3  Q.   And the notation at the bottom -- well, first of all,

4  did you prepare this document?

5  A.   I did.

6  Q.   And what -- did you have an estimate when you prepared

7  this document as to what the driving records portion of that

8  line item should comprise?

9  A.   Not prior to developing this document.  We had to go

10 back into the previous reporting and break it down.

11 Q.   But you reviewed the reports and came up with an

12 assessment?

13 A.   Correct.

14 Q.   And what was that assessment?

15 A.   That 15 percent of the revenue was associated to

16 driver's education products, 25 percent was associated to --

17 associated to driving records, and 60 percent was associated

18 with *trafficschool*.

19 Q.   And to the extent that *DMV.org* receives other driving

20 records, revenue, is that reported in any of the three line

21 items at the top?

22 A.   No.  The rest of that revenue would all follow in the

23 "all other referral income" line item.

24 Q.   Okay.  Now, Mr. De Carlo was asking you about visitors

25 that exit it the *Californiatrafficschool* page.

1          Do you recall that testimony?

2     A.    I do.

3     Q.    Can -- and the Court asked you whether it would be

4     possible for a visitor to type in a new domain and exit in

5     that fashion.

6          Do you recall that?

7     A.    I do.

8     Q.    Can you describe the other ways in which a visitor could

9     exit that page of the *DMV.org* Website, apart from clicking on

10    the I Drive Safely advertisement?

11    A.    Sure.

12         The user -- if they have their -- the trafficking

13    is based on the consumer's Web browser; so if they were to

14    close the Web browser that would constitute exiting the site.

15    If they were to type in another domain name and go to that

16    page, that would redirect the site.  Many browsers have a

17    home button; so they would hit that.  The consumer would be

18    taken back to the master home page of their browser.  If they

19    had any bookmarks, they could click on any of those and go to

20    a different site.  Or they could click on one of the numerous

21    advertisers that are promoted on that page.

22         MR. DAUCHER:  All right.  Thank you.

23         No further questions, your Honor.

24         THE COURT:  All right.  Anything else?

25         MR. DE CARLO:  Very, very briefly.

1          THE COURT:  It's going to be brief.

2          MR. DE CARLO:  One question, your Honor.

3          **RECROSS-EXAMINATION**

4  BY MR. DE CARLO:

5  Q.  Mr. Moretti --

6          THE COURT:  I've heard that before.

7  BY MR. DE CARLO:

8  Q.  -- the .83 percent converse rate, driver's education,

9  based on your definition of conversion rate, what's the real

10  conversion rate for driver's education in May of 2007?

11          MR. DAUCHER:  Objection.  Argumentative about real.

12          THE COURT:  It's all right.  You can answer the

13  question.

14          THE WITNESS:  Based upon the different points of

15  data that we just looked at, I would assume that, you know,

16  it would be approximately 75 to 100 percent higher than

17  .83 percent.  So it -- potentially 1.5 to 1.75 percent from

18  a visitor-to-sale conversion-rate standpoint.

19          MR. DE CARLO:  I'm sorry, your Honor.

20          THE COURT:  You see, as lawyers they always say

21  it's one more question, and I have not had anybody stick to

22  that promise.

23          But go ahead.

24  BY MR. DE CARLO:

25  Q.  Mr. Moretti, in order to do the calculation, you would

1  have to know how many visitors you had to the

2  *Californiadriverseducation* page in 2006.

3  A.  Correct.  Yeah.  To do a full analysis you would have to

4  pull up the number of visits for all of those time periods.

5  Q.  So you're guessing when you say that you're assuming it

6  would be 75 to 100 percent higher?

7  A.  Based upon the fact that the *trafficschool* visitor to

8  sale conversion rate that we identified was approximately 75

9  to 100 percent higher than the page-view-to-sale conversion

10  rate.  If you use that same metric, which I would believe to

11  be a fair metric to use, then it would probably be -- the

12  .83 percent would be approximately 75 to 100 percent higher.

13  Q.  Mr. Moretti, for -- the numbers for driver's education

14  are very different from *trafficschool*.  You have got

15  5500 page views for driver's education, and you have

16  607,000 page views for *trafficschool*.  I'm sorry.  I

17  apologize.

18      You have 5.5 million page views for driver's

19  education and you have 607,000 page views for *trafficschool*.

20  A.  Correct.  But because the page view count is different,

21  I would not assume that there would be a dynamic difference

22  in the type of interaction that those visitors have with our

23  Website.

24      MR. DE CARLO:  Nothing further, your Honor.

25      Thank you.

1          THE COURT:  All right.  Sir, you may step down.

2          All right.  As to your request, you knew -- you

3    knew the burden that the defendants faced if you were going

4    to seek -- I take it your argument is the burden is on them

5    to show any offset as to their profits.

6          MR. DE CARLO:  Yes, your Honor.  Under the

7    Lanham Act that's correct.

8          THE COURT:  And you knew that when discovery

9    closed.

10          MR. DE CARLO:  Right.

11          And as a matter of fact, during the deposition of

12    Mr. Moretti I indicated to Mr. Daucher, are these the only

13    expenses we're going to see.

14          THE COURT:  That's fine.

15          Okay.  Well, let me ask you this:  Are you -- is

16    your request to strike the expenses -- does it relate only to

17    the -- the legal -- I believe that's what your -- your

18    question that you --

19          Well, let me go back here for a minute.

20          Does that go to the salary, benefits, legal, and

21    accounting?

22          MR. DE CARLO:  Yes.  Just that section.  I believe

23    it's a million dollars roughly in expenses.

24          THE COURT:  Okay.  Well, you -- and what you're

25    basically saying is they violated -- they violated the rule.

1    You could have filed a motion in limine to preclude them from

2    offering any other expenses other than those that were --

3    they made available during discovery.  You could have filed

4    that prior to the start of the trial, couldn't you?

5         MR. DE CARLO:  But what we did do is we filed an

6    objection to the exhibit based on the -- based on that exact

7    same --

8         THE COURT:  I know.  I know you filed an objection.

9    Okay?

10        But my question was you could have filed a motion

11   in limine to preclude them from offering any expenses other

12   than that which you had been provided with during discovery.

13   Isn't that true?

14        MR. DE CARLO:  We could have filed a motion in

15   limine, your Honor.

16        THE COURT:  Okay.  And when we talk about

17   objections to declarations, normally you're talking about

18   objections that are set forth in the Evidence Code, aren't

19   you, that you would assert at trial?

20        And the purpose of a motion in limine is to

21   preclude evidence -- is to preclude evidence about which you

22   don't think -- well, that you could bring with regard to a

23   violation of Rule 26 or any other rule.

24        MR. DE CARLO:  Your Honor, I believe that this is a

25   request that is properly under the umbrella of Rule 26 and

1   Rule 37.  It is akin to --

2           THE COURT:  Uh-huh.

3           MR. DE CARLO:  -- a party trying to bring in

4   evidence at trial which should have been disclosed during

5   discovery which -- which was not.

6           To answer the Court's question about the motion in

7   limine, I candidly don't know if there's authority that

8   states that --

9           THE COURT:  I get them all the time.

10          MR. DE CARLO:  I didn't know -- or I don't know

11  that objections to exhibits that are based on Rule 26 or

12  Rule 37 have to be brought as motions in limine.

13          THE COURT:  There -- quite frankly, you could have

14  brought a motion -- you could have brought a motion prior to

15  the close of discovery, couldn't you?

16          MR. DE CARLO:  Well, I didn't --

17          THE COURT:  I mean, that's what Rule 37 is defined

18  to do.

19          MR. DE CARLO:  Well, your Honor, not really because

20  it's not our burden to say you -- it's not our burden to ask

21  for it.  It's their burden to -- to give it to us.

22          THE COURT:  That's fine.  That's fine.

23          MR. DE CARLO:  So when I --

24          THE COURT:  And when that burden wasn't satisfied,

25  you could have brought a motion under Rule 37 to preclude

1  them from offering any evidence on that score, couldn't you?

2         MR. DE CARLO:  Yes.  Most definitely.

3         THE COURT:  And sometimes people -- lawyers will

4  come in and say it was too late for us to bring that motion.

5  We found out about it too late or we just found out during --

6  when we met with the defendants about exhibits that they're

7  going to offer this.  And you could have brought a motion in

8  limine at that time or you could have brought a motion in

9  limine.

10         MR. DE CARLO:  This exhibit was presented to us

11  just prior to trial.

12         THE COURT:  You --

13         MR. DE CARLO:  I cannot say, your Honor, whether it

14  was given to us in a time period -- within the statutory time

15  period for us to bring a motion in limine.  I'm sorry.  I

16  can't recall when we exactly got it.  But when a document is

17  handed to you or an exhibit is handed to you as part of your

18  pretrial exchange --

19         THE COURT:  Uh-huh.

20         MR. DE CARLO:  -- and it is a supplement,

21  completely new information from discovery, we had no

22  opportunity to depose anybody on it.

23         From a substantive standpoint, your Honor --

24         THE COURT:  Excuse me.

25         When it was given to you -- you don't recall now,

1    though, when it was given to you?

2              MR. DE CARLO:  It was during the -- it was during

3    the pretrial exchange of exhibits.  It appeared as a new

4    exhibit when we were doing the exhibit exchange for getting

5    ready for trial.

6              THE COURT:  Okay.

7              MR. DE CARLO:  It was after the close of discovery.

8              THE COURT:  That's right.  That's right.

9              And at that point you could have brought that to

10   the Court's attention by way of a motion in limine; correct?

11             MR. DE CARLO:  I believe we could, your Honor.

12   That's a fair point.

13             THE COURT:  Okay.

14             MR. DE CARLO:  May I address the prejudice to us?

15             THE COURT:  What I'm going to do is I'm going to

16   allow each side to -- you can file a five page -- you can

17   file a five -- no more than five pages as to why this

18   evidence should be stricken or in support of your motion to

19   strike it.

20             And one thing you ought to include is why it didn't

21   either bring a motion or a motion in limine -- well, you can

22   do whatever you want, but I probably would be interested in

23   hearing that.

24             And then I'll give the defendants five pages to

25   respond.

1          MR. DE CARLO:  Thank you, your Honor.

2          THE COURT:  Okay.  And let's -- okay.  Why don't

3    you give that to me by a week from today, on the 14th, and

4    the defendants will have until the 21st to respond.

5          So -- and you can tell me why you were prejudiced

6    in the papers.  Okay?

7          Now, I have got to take care of something.  I'm not

8    sure how long that's going to take.  It's probably going to

9    take -- it may take 15 or 20 minutes.  So I'll tell you what.

10   Why don't -- well, let me request this.

11         Do you have any other additional witnesses?

12         MR. DAUCHER:  Your Honor, we have additional

13   declarations and then our -- our request for judicial notice.

14         THE COURT:  Okay.  So you have the request for

15   judicial notice.  You've got additional declarations.

16         Are any of those people going to be testifying

17   live?

18         MR. DAUCHER:  I believe the live testimony is

19   concluded with that unless they wish to cross.  I don't

20   believe they do.

21         MR. DE CARLO:  There's nobody we wish to cross

22   other than the -- there's nobody left.

23         THE COURT:  Okay.  All right.  Why don't we -- why

24   don't you show up at 10:00 o'clock tomorrow, and we'll --

25   yeah.  Why don't we make it 10:00 o'clock, and then we'll

1    briefly discuss further post-trial briefing that the Court

2    will want and a briefing schedule.

3                MR. DE CARLO:  Can we presume, your Honor, that the

4    Court does not want closing arguments tomorrow?

5                THE COURT:  If you want to -- if you want to have

6    closing arguments tomorrow, that's fine.  If you want to --

7    what I had thought you would -- well, what I had thought I

8    would do is get closing briefs from you, in addition to a

9    supplemental exchange of findings based on now what you know

10   of the evidence.

11               And then once I get the briefing, then I would

12   decide whether I wanted any particular points argued.

13               MR. DE CARLO:  That's acceptable to us.

14               MR. DAUCHER:  To us as well.  We could close

15   tomorrow as well, so.

16               THE COURT:  It's up to you.

17               MR. DE CARLO:  I -- I do not want to offer a

18   closing argument tomorrow, your Honor.  We would prefer --

19               MR. DAUCHER:  We're fine with your preferred

20   schedule if you prefer briefs and then closing let's do that.

21               THE COURT:  Okay.  Well, as long as it's acceptable

22   to everybody.  Then that's -- that's what we'll do.

23               All right.  So why don't I see everybody tomorrow

24   at 10:00 o'clock, and we'll set these briefing schedules.

25   And the defendants can formally move in the additional

1      declarations that they want, and they can make their requests

2      for judicial notice.

3                  Okay.  Anything else?

4                  MR. DE CARLO:  Nothing else, your Honor.

5                  MR. DAUCHER:  Nothing further.

6                  THE COURT:  Okay.  We'll see everybody tomorrow

7      morning at 10:00 o'clock.

8                  THE CLERK:  All rise.

9                  THE COURT:  All right.  10:00 o'clock tomorrow, and

10     there may be other matters in here tomorrow.  If you're going

11     to need any of your materials, they probably ought to be

12     stacked here on the table.

13                  All right.  Thank you.

14         (Whereupon, at 4:41 p.m., the proceeding concluded.)

15

16

17

18

19

20

21

22

23

24

25

```
PLAINTIFFS' EXHIBITS              IDENTIFIED

  20                                  27
  28                                  52
 398                                 211


DEFENSE'S EXHIBITS                IDENTIFIED

  32                                  68
  36                                  79
  43                                  81
  45                                  83
  69                                  60
  73                                  58
  74                                  59
 109                                 190
 610                                  17
 611                                  63
 671                                 148
 680                                 211
 688                                  74
 692                                  12
 693                                  43
 694                                  45
```