BRIAN M. DAUCHER, Cal. Bar No. 174212
ASHLEY E. MERLO, Cal. Bar No. 247997
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626-1993
Telephone: (714) 513-5100
Facsimile:  (714) 513-5130
bdaucher@sheppardmullin.com
amerlo@sheppardmullin.com

PAMELA L. JOHNSTON, Cal Bar No. 132558
JAIME GUERRERO, Cal Bar No. 192211
FOLEY & LARDNER LLP
555 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (213) 972-4500
Facsimile: (213) 486-0065
pjohnston@foley.com
jguerrero@foley.com

ANDREW SERWIN, Cal Bar No. 179493
FOLEY & LARDNER LLP
402 West Broadway, Suite 2100
San Diego, CA 92101
Telephone: (619) 234-6655
Facsimile: (619) 234-3510
aserwin@foley.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAFFICSCHOOL.COM, INC., a California corporation; DRIVERS ED DIRECT, LLC., a California limited liability company,<br><br>        Plaintiffs,<br><br>        v.<br><br>EDRIVER, INC., ONLINE GURU, INC., FIND MY SPECIALIST, INC., and SERIOUSNET, INC., California corporations; RAVI K. LAHOTI, an individual; RAJ LAHOTI, an individual; DOES 1 through 10,<br><br>        Defendants. | Case No. CV 06-7561 PA (CWx)<br><br>**DEFENDANTS' OPPOSITION TO MOTION FOR CONTEMPT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with Defendants' Compendium of Declarations and Exhibits]<br><br>**Hearing:**<br>Date:     February 2, 2009<br>Time:     1:30 p.m.<br>Place:    Courtroom of the Hon. Percy Anderson |

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND......................................2
   **A.** Procedural History ......................................................................2
   **B.** Factual Background .....................................................................3
      **1.** Pre-Injunction Preparation For Splash Page.......................3
      **2.** The Incomplete Meet And Confer Process ........................5
      **3.** Statistics Re JavaScript And Cookies................................6
      **4.** DMV.ORG Additional Disclaimers/Safeguards ................6
      **5.** Plaintiffs' Own TrafficSchool.Com Website......................8
      **6.** Other Websites Also Rely On JavaScript/Cookies ............8

III. ARGUMENT ........................................................................................8
   **A.** Defendants Have Not Violated The Injunction ..............................9
      **1.** Nearly All Users See The Splash Page..............................9
      **2.** Plaintiffs' Other Complaints...........................................12
      **3.** Font Size – 14 Pixels And Sizing Of The Logo ..............13
      **4.** Title Tags .....................................................................15
   **B.** First Amendment Concerns .......................................................16
   **C.** Sanctions are Not Warranted ....................................................19
      **1.** Coercive Sanctions are Not Appropriate ........................20
      **2.** Compensatory Sanctions are Not Warranted ...................21
         a. Plaintiffs Have Not Established Any "Actual Losses" ....................................................................22
         b. No Attorneys' Fees Should Be Awarded ........................24

IV. CONCLUSION .................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996) ........................................................................... 17

*ALPO Petfoods v. Ralston Purina Co.*,
    913 F.2d 958 (D.C. Cir. 1990) ........................................................... 11

*Bingman v. Ward*,
    100 F.3d 653 (9th Cir. 1996) .............................................................. 20

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm.*,
    447 U.S. 557 (1980) ........................................................................17-19

*Forschner Group v. Arrow Trading Co.*,
    124 F.3d 402 (2d Cir. 1997) ............................................................... 11

*General Signal Corp. v. Donallco, Inc.*,
    787 F.2d 1376 (9th Cir. 1986) ....................................................19-20, 22

*In re Bennett*,
    298 F.3d 1059 (9th Cir. 2002) ........................................................ 9, 13

*In re Dual-Deck Video Cassette Antitrust Lit.*,
    10 F.3d 693 (9th Cir. 1993) ......................................................9, 13, 22

*Int'l Union v. Bagwell*,
    512 U.S. 821 (1994) ........................................................................... 20

*Jerry's Famous Deli, Inc. v. Papanicolaou*,
    383 F.3d 998 (9th Cir. 1994) .............................................................. 23

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2nd Cir. 1995) ............................................................. 23

*Lasar v. Ford Motor Co.*,
    399 F.3d 1101 (9th Cir. 2005) ............................................................ 20

*New York State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2nd Cir. 1989) ........................................................... 22

*Organization for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ...................................................................16-17

*Perry v. O'Donnell*,
    759 F.2d 702 (9th Cir. 1985) .............................................................22

*Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) .........................................................................16

*Portland Feminist Women's Health Center v. Advocates for Life*,
    877 F.2d 787 (9th Cir. 1989) ...................................................19, 21-22

*Stone v. City of San Fran.*,
    968 F.2d 850 ....................................................................................9

*United States v. United Mine Workers of America*,
    330 U.S. 258 (1947) ..................................................................19, 22

*Vertex Distributing v. Falcon Foam Plastics*,
    689 F.2d 885 (9th Cir. 1982) .............................................................13

*Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .........................................................................17

*Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*,
    383 F.2d 1484 (11th Cir. 1987) .........................................................23

*Western Lighting Corp. v. Smoot-Holman Co.*,
    352 F.2d 1019 (9th Cir. 1965) ...........................................................23

*Whittaker Corp. v. Execuair Corp.*,
    953 F.2d 510 (9th Cir. 1992) .........................................................20-21

*Wolfard Glass Blowing Co. v. Vanbragt*,
    118 F.3d 1320 (9th Cir. 1997) .............................................................9

**RULES**

Local Rule 7-3 ....................................................................................6, 24

# MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Defendants have complied with the clear and definite portions of this Court's August 26, 2008 permanent injunction ("Injunction") that required Defendants to display a splash page to every visitor before each visitor enters defendant Online Guru, Inc.'s DMV.ORG website ("Website").  The splash page's required disclaimer informs visitors that the Website is privately run and not owned or operated by any government agency.  Plaintiffs' speculation that millions of visitors cannot see the disclaimer on DMV.ORG's splash page is not supported by the evidence here.  In fact, as shown in the declarations submitted by Defendants herewith, over 97% of all actual visitors to the Website, in fact, can view this splash page as they enter the Website; this is true because more than 97% of the actual visitors to the Website have both "cookies" and JavaScript enabled.  Furthermore, the Website contains voluntary disclaimers on each and every webpage that state that the Website is privately owned and is not operated by any government agency. These voluntary disclaimers located on every page ensure that the less then 3 percent of visitors who do not have JavaScript and cookies enabled receive nevertheless the same information and understand that the Website is not owned or affiliated with any government agency.

Plaintiffs have brought a motion for contempt claiming Defendants have not complied with the Injunction.  A finding of contempt is inappropriate here. Plaintiffs' motion appears to be yet another attempt to shutter DMV.ORG.

Defendants have worked hard to comply with the Injunction expending more than 400 hours in the task and have adopted an approach that ensures that nearly all of visitors to the Website can view the required splash page.  Defendants have also gone above and beyond the requirements of the Injunction by including numerous

disclaimers on the Website to ensure that it is not misleading and informs visitors that this is a private Website. No sanctions should issue against any defendant.[1] If the Court is concerned about how the splash page has been implemented, Defendants should be provided with an opportunity to correct any fixable issue if a reasonable method that conforms with the First Amendment can be fashioned. Finally, Defendants ask this Court to consider lifting or narrowing the Injunction's requirement that Defendants employ a splash page on DMV.ORG because this aspect of the Injunction strongly implicates serious First Amendment concerns.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural History

DMV.ORG is a one-stop shop that provides the public with an easy and centralized place to locate information about DMV-related information, car insurance, relocation guides, and other motor vehicle services for each of the 50 states. The Plaintiffs brought this lawsuit seeking damages and an injunction. On August 26, 2008, this Court entered the Injunction, mandating defendants eDriver, Inc., Online Guru, Inc., Find My Specialist, Inc., Seriousnet, Inc., Ravi K. Lahoti, and Raj Lahoti (collectively "Defendants") to take certain steps and to implement a significant barrier (the splash page) before the public can view the content of the Website.

The Injunction ordered Defendants, with regard to DMV.ORG, to do the following: (a) and (b) employ a "splash page" that "every visitor" to any entry webpage on the DMV.ORG domain shall see once prior to viewing any webpage

---

[1] Plaintiffs have lumped together all the defendants and asked for sanctions against all of them. The company that is the host of the DMV.ORG website is defendant Online Guru, Inc. Plaintiffs have not established that the conduct or lack of action by anyone or any entity other than defendant Online Guru, Inc. is at issue here. At a minimum, the Court should certainly decline to find the individuals and other entities in contempt.

content – visitors need not see the splash page again while navigating around the Website; (c) and (d) include in all capital letters "YOU ARE ABOUT TO ENTER A PRIVATELY OWNED WEBSITE THAT IS NOT OWNED OR OPERATED BY ANY STATE GOVERNMENT AGENCY. TO CONTINUE, CLICK 'CONTINUE BELOW" with a click through button below this disclaimer on the splash page; (e) no other content shall appear on the splash page other than the DMV.ORG's organization's logo and the declaimer; and (f) the disclaimer shall "appear in fourteen (14) point font, and shall be larger font size than that used in the DMV.ORG logo and the 'continue' button." When the Injunction issued, the logo for the Website included the name of the domain "DMV.ORG" plus a line of text below that stated "Unofficial Guide to the DMV."

### B. Factual Background

#### 1. Pre-Injunction Preparation For Splash Page

This Court issued a proposed injunction on June 5, 2008 and its permanent injunction on August 26, 2008 (with electronic service on August 29, 2008). (CR 215). Between June 5 and August 29, Defendants actively prepared to implement the splash page. (Gray Decl., ¶ 7.) As a result of these efforts, upon transmittal of the Injunction, DMV.ORG was able to deploy the splash page on the DMV.ORG website on August 29, 2008. (*Id.*, ¶ 7.)

Defendant Online Guru, Inc.'s team spent more than 400 hours to develop and implement a splash page that would comply with the Injunction while seeking to preserve the public's ability to access the content they are searching for on the DMV.ORG website. (Lahoti Decl., ¶ 4.) Visitors rely primarily upon search engines to find the content contained on the DMV.ORG website that users are searching for. Search engines index websites and publish search results based upon relevant website content. For these reasons, it was critical that the content of the DMV.ORG website not be masked from search engines. (Gray Decl., ¶ 9, 23). Using a different technology, a search engine would only read the splash page and

LACA_2099097.6

not the content underneath it, thereby failing to identify for potential visitors the actual content of the Website. (*Id.*, ¶ 9, 23). In other words, use of a different technology would make the Website effectively invisible to search engines such as Google or Yahoo! that the public relies upon to locate the content located on websites users are searching for. Certainly that could not have been the Court's intent to impose such a severe First Amendment restriction on this Website.

One aspect of the challenge posed by the splash page relates to the fact that the DMV.ORG website has a massive number of accessible pages – approximately 120,000 accessible pages. Each such page, depending upon a particular user's search terms, is a potential "entry" or arrival page. At the same time, each such page may also be viewed in varying sequences after arrival (no splash required). As a result, DMV.ORG had to set up a splash page that would recognize whether each specific page was the entry page or a later page in the sequence of a particular visit. (Gray Decl., ¶ 8.)

In implementing the splash page, the team from Online Guru, Inc. considered and rejected several options including IP tracking, URL query string (as suggested by Plaintiffs), hidden form fields, and Adobe Flash local stored objects. (Gray Decl., ¶ 23). But Online Guru, Inc. ultimately determined that JavaScript and cookies was the best combination in terms of coverage for the splash page for entering visitors while maintaining visibility to search engines so that the public can find the Website. (*Id.*, ¶ 22). JavaScript and cookies are a widely accepted standard and provide coverage and visibility to search engines. The cookies are "session" cookies, meaning that they are not permanent files embedded to track broad use, but rather are used only to track a single specific session to ensure that if that that same user later revisits the site, the splash again appears upon entry during the next visit. (*Id.*, ¶ 17.) For its part, JavaScript, a widely used tool, allows display of the splash page to potential visitors but ensures that the underlying content of the DMV.ORG website is not masked from search engines. (*Id.*, ¶¶ 9, 15.)

1 | DMV.ORG relies upon JavaScript capabilities not just for operation of the
2 | splash page, but also for other aspects of the Website. (Gray Decl., ¶ 22.) For
3 | instance, if a user has JavaScript disabled then he cannot use the site's state drop
4 | menu, the website's search function, or purchase anything from most of the
5 | advertisers on the Website. (*Id.*, ¶ 22).

6 | Once DMV.ORG implemented the splash page, it conducted regression
7 | testing and used web analytics to attempt to ensure that the splash page was
8 | functional without error across the site. (Gray Decl., ¶ 37.)

## 2. The Incomplete Meet And Confer Process

10 | The meet and confer process is set forth in greater detail in the declaration of
11 | Brian Daucher and exhibits attached thereo. In summary, the parties in early
12 | September 2008 met and conferred about the size of the logo. (Daucher Decl., Ex.
13 | 6.) Defendants noted the basic conflict between: (a) the Court's instruction that the
14 | disclaimer text be 14 point font; and (b) the Court's permission to use the
15 | DMV.ORG logo so long as font therein be no larger than the disclaimer.
16 | Defendants pointed out that if the "DMV.ORG" portion of the logo, as opposed to
17 | the "Unofficial Guide" textual portion of the logo, were required to be less than 14
18 | size, then the "Unofficial Guide …" portion of the logo would be illegible because it
19 | would be too small to read. (Daucher Decl., Ex. 7.) Defendants offered to submit
20 | this matter to the Court for clarification on a suitable briefing schedule. (*Id.*)
21 | Plaintiffs declined to seek joint clarification, asserting that "there is nothing to be
22 | clarified." (*Id.*)

23 | In September 2008, Plaintiffs raised specific minor flaws they identified in
24 | the splash page, which Defendants promptly addressed and resolved. (*See e.g.*
25 | Hamilton Decl., Ex. E, pp. 20-21 (drop down problem raised 9/22/08) and Ex. G
26 | (drop down problem solved 9/24/08)). In September 2008, Plaintiffs also raised the
27 | question of whether visitors using certain portable devices (some cell phones and
28 | some PDAs) could see the splash page. Defendants noted that nearly all users were,

LACA_2099097.6

in fact, able to see the splash page; Defendants also pointed out the redundant and enhanced disclaimers on each page of the site operated as a backstop, which was not required by the injunction. (Hamilton, Ex. G (9/24 Daucher email)). Plaintiffs never raised or discussed any issue related to the font/pixel size of the splash disclaimer. (Daucher Decl., ¶ 6). After September 2008, Plaintiffs never communicated with trial counsel on compliance questions; instead, three months later, Plaintiffs filed this broad motion for contempt. (*Id.*, ¶ 5.) There is no recitation in Plaintiffs' notice of motion, motion or declaration of counsel that any final meet and confer session was held pursuant to Local Rule 7-3.

### 3. Statistics Re JavaScript And Cookies

DMV.ORG employs a robust web analytics system, Omniture, that allows DMV.ORG to track a variety of visitor statistics, including the specific JavaScript/cookies settings of each visitor's browser. (Annett Decl., ¶ 4.) For purposes of this opposition, DMV.ORG generated a report for December 2008 that breaks down, according to JavaScript/cookies capability, the number of visitors and pages viewed on the DMV.ORG website. (Annett Decl., ¶ ¶ 6-8 and Exs. 1-2). These statistics (Ex. 1) and the summary of them (Ex. 2) establish the following for the month of December 2008: (a) 97.3% of all visitors had both cookies and JavaScript enabled; and (b) 98.1% of all pages viewed were viewed by visitors that had both cookies and JavaScript enabled. (*Id.*) In short, JavaScript and cookies are enabled for, and hence the splash screen is visible to, nearly all visitors to the site.

### 4. DMV.ORG Additional Disclaimers/Safeguards

DMV.ORG also deployed and displays a series of additional disclaimers and safeguards on the Website to echo the substance of the Court's disclaimer. These additional disclaimers ensure that visitors are aware of DMV.ORG's private status and are informed that no government agency owns or operates the Website. These embedded disclaimers were not required by the Court's injunction, but provide the following:

1 • This Court's disclaimer in a large exclusive highlighted section at the
2   top of each and every webpage (not just entry pages):



8   (Lahoti Decl., Ex. 21.)
9 • A disclaimer at the bottom of each and every webpage that states:
10   "DMV.ORG is a **privately owned website** that is **not** owned or
11   operated by any government agency."  ("Alcock decl.,  ¶ 19).
12 • The use of  "Unofficial Guide to the DMV" in the logo at the top of
13   every page; and, use of "Unofficial Guide to the DMV" on the home
14   page and each state home page.  (Lahoti Decl., 5b).
15 • A requirement that visitors to DMV.ORG sending a communication to
16   DMV.ORG must click through an affirmative acknowledgement
17   checkbox confirming that the visitor understands that the website is
18   privately-owned.  (Lahoti Decl., Ex 23).
19   The banner at the top of webpages, the disclaimer at the bottom of webpages,
20   and the DMV license plate logo that contains the term "Unofficial Guide to the
21   DMV" are part of the website's code.  (Alcock Decl., ¶ 19).  Accordingly, they are
22   displayed on every page and are visible to every visitor who enters the Website even
23   if they do not have JavaScript or cookies enabled.  (*Id.*).  In other words, certain
24   visitors who enter from a cell phone who cannot view the splash page may
25   (depending on the phone's capabilities) see the additional voluntary disclaimers as
26   they navigate around the Website.

LACA_2099097.6

### 5. Plaintiffs' Own TrafficSchool.Com Website

Plaintiffs' TrafficSchool.com website shows that they themselves use and require JavaScript/cookies capabilities. (Gray Decl., ¶ 20.) Specifically, *with JavaScript disabled*, a user of the TrafficSchool.com website cannot sign up for traffic school, defensive driving, or driver's education, and, cannot start or re-enter a course. (Gray Decl., ¶ 20.) In fact, the homepage of TrafficSchool.com will not fully display without JavaScript enabled. (*Compare* Gray Decl., Exs. 11 (JavaScript enabled) and Ex. 12 (JavaScript disabled)). A user that attempts to use the TrafficSchool.com website without cookies enabled will receive the following error message: "Must Have Cookies" and explains: "The TrafficSchool.com website requires that cookies be enabled in order to proceed." (*Id.*, Ex. 13.)

### 6. Other Websites Also Rely On JavaScript/Cookies

Amazon.com, contrary to assertions by Plaintiffs, does in fact rely upon cookies to track users progress through the site and shopping cart. Upon entry to the Amazon.com site, the site deposits two "session" cookies on a user's computer. (Gray Decl., ¶ 33, Ex. 16.) Amazon.com also advises users that they will "not be able to complete a purchase" or store items in the Shopping Cart if cookies are disabled. (*Id.*, Ex. 34.)

WebMD, a private health reference site, requires users to enable JavaScript. If a user attempts to access the site with JavaScript disabled, parts of the site simply will not function. (Gray Decl., ¶ 21, Ex. 14.) Other websites that rely upon cookies include Apple.com and Yahoo.com. (*Id.*, ¶ 19.)

## III. ARGUMENT

Defendants are not in contempt of the Court's Injunction and no finding of contempt should issue. Furthermore, the Injunction as applied to the Website, particularly if Plaintiffs' objection about the use of JavaScript and cookies must be incorporated, raises significant First Amendment issues. The Court should take this opportunity to narrow the Injunction in order to remove this barrier to entry to the

LACA_2099097.6

1   Website because this barrier is operating as a prior restraint of speech. Finally, this
2   Court should decline to sanction or punish Defendants.

### A.    Defendants Have Not Violated The Injunction

4      To succeed on a contempt motion, the moving party must "show by clear and
5   convincing evidence that [the alleged contemnor] violated the [the injunction]
6   beyond substantial compliance, and that the violation was not based on a good faith
7   and reasonable interpretation of the judgment." *Wolfard Glass Blowing Co. v.*
8   *Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997). "The moving party has the burden
9   of showing by clear and convincing evidence that the contemnors violated a ***specific***
10  ***and definite order*** of the court." *In re Bennett*, 298 F.3d 1059, 1069 (9th Cir. 2002)
11  (emphasis added). Contempt is not proper where there is substantial compliance,
12  where actions appear based upon "a good faith interpretation and reasonable
13  interpretation of the [order]," or where there are "technical or inadvertent
14  violations." *Compare In re Dual-Deck Video Cassette Antitrust Lit.*, 10 F.3d 693,
15  695 (9th Cir. 1993) (vacating contempt finding, noting substantial compliance);
16  *contrast Stone v. City of San Fran.*, 968 F.2d 850, 857-58 (contempt found only
17  after history of non-compliance; contempt proper where "little conscientious effort
18  … to comply").

19     Plaintiffs have failed to meet such a substantial burden of proof. Defendants
20  have made substantial efforts to comply with the terms as they understood them and
21  are in compliance with the clear and definite terms of the Injunction (not all terms
22  were, however, clear and definite as applied to the Website). For these reasons,
23  Plaintiffs' motion should be denied.

### 1.    Nearly All Users See The Splash Page

25     Plaintiffs assert that DMV.ORG's reliance upon JavaScript and cookies as
26  implementing tools for the splash page is unreasonable and should be determined to
27  be contempt. The Injunction does not forbid the use of JavaScript and cookies. In
28  urging their position, Plaintiffs speculate that a significant percentage of users do

LACA_2099097.6

1  not see the splash page because of some combination of disabling or rejecting
2  JavaScript or cookies, through affirmative choice or use of a browser which does not
3  allow for such tools (certain mobile devices).  (Mot. at 15.)  Plaintiffs' speculation is
4  not proof.

5      This speculation is contrary to the actual statistics.  As shown by the actual
6  statistics about visitors who enter DMV.ORG's Website, 97-98% of users of
7  DMV.ORG have enabled JavaScript and cookies; as such they have the means to
8  see the splash page.  (Annett Decl., Exs. 1 and 2).

9      This protection is more than reasonable.  There is no method or means by
10  which DMV.ORG could design a splash page that would guarantee that 100% of all
11  visitors would see the splash page no matter what computer, cell phone, or device
12  the visitor was using and what programs they had enabled or disabled.  (Alcock
13  Decl., ¶ 16).  The Internet is global and complex.  Browser technology advances so
14  rapidly that the number of variables involved in designing a splash page ensure that
15  no solution could guarantee 100% coverage before entering the Website.  (*Id.*)
16  Despite this difficulty, DMV.ORG's splash page comes remarkably close and the
17  approximately 2% of users who cannot see all aspects of the splash page is not
18  statistically significant.  (*Id.*, ¶ 17).  This reasonable level of protection is further
19  enhanced by Defendants' use of voluntary redundant features that make it nearly
20  impossible for a visitor not to realize that the Website is privately owned and not
21  affiliated with any government agency.  (*Id.*, ¶ 20).

22      Plaintiffs' solution cannot guarantee 100% coverage and would not make a
23  statistically significant improvement over the splash page's current catchment.
24  (Alcock Decl., ¶ 18).  Moreover, implementation of Plaintiffs' solution could risk
25  making the Website invisible to search engines and decrease its functionality.  (*Id.*).
26  In particular, Plaintiffs gloss over or ignore the practical competing interests with
27  respect to search engines.  Plaintiffs suggest that a URL string could be used to track
28  visitors.  (Mot. at 17.)  But such a proposal does not address how the splash page

would be displayed (i.e., through JavaScript or some other means), nor does it consider the impact of an alternative form of display of splash page upon indexing of the site by search engines (the availability of the site's content to the public).  (*See* Alcock Decl., ¶ 9, Ex. 18-21) (explaining how improperly implemented splash pages mask web pages from search engines).  In fact, Defendants considered and rejected this particular solution because it could significantly diminish the usability of the Website and mask it from search engines.  (*Id.*, ¶ 23).

This Court should consider these concerns and narrow the Injunction to the least restrictive means to accomplish the goal of informing the public of the non-governmental ownership of the Website.  *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 972 (D.C. Cir. 1990) (courts closely tailor injunctions to the harm that they address); *Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation.").

Defendants did not await entry of the Injunction to assess implementation; rather, upon receipt of the proposed injunction, and in good faith, DMV.ORG staff spent hundred of hours considering various alternatives, including the URL string. (Gray Decl., ¶ 23).  For specific and good cause, DMV.ORG chose to use JavaScript and cookies to enable the splash page.  (*Id.*, ¶¶  7, 22-23.)  The result is not absolutely perfect, but given the wide variety of user capabilities and the various problems posed by any type of splash page, this solution is consistent with the Court's Injunction.  (*See* Alcock Decl.¶ 21).

Plaintiffs' assertion that the use of JavaScript and cookies are not reasonable implementation tools is also belied by both Plaintiffs' own conduct and the operation of prominent third party sites.  As noted above, Plaintiffs' site TrafficSchool.com requires users to allow cookies and will not run properly without JavaScript.  (Gray Decl., 20).  Contrary to Plaintiffs' claims, third party sites like Amazon.com and

LACA_2099097.6

WebMD rely upon and require cookies and/or JavaScript as well. (*Id.*, ¶¶ 21, 34). Moreover, other portions of the DMV.ORG website, apart from the splash page, also rely upon JavaScript – demonstrating that DMV.ORG believes it reasonable to assume JavaScript capability for purposes apart from compliance with the Injunction. (*Id.*, ¶ 22). These facts bolster the reasonableness and good faith of the choice by Defendants to incorporate JavaScript and cookie capability.

Plaintiffs also fail to address or consider Defendants' substantial and numerous additional disclaimers and safeguards. Defendants have voluntarily added substantial additional disclaimers and safeguards to mitigate the potential harm from any gap in coverage. (Lahoti Decl., ¶ 5 (including same disclaimer at top of all pages on the website, highlighted and set apart)) (Alcock Decl., ¶ 19 (identifying safeguards).) Several of these safeguards are embedded in the Website and are displayed on every page and are visible to every visitor to the Website even if they do not have JavaScript or cookies enabled. (*Id.*, ¶ 19). These additional steps demonstrate the extent of Defendants' efforts to comply with both the letter and spirit of the Injunction. Given these voluntary actions, a contempt finding is unsupported by the evidence and contrary to the law.

### 2.    Plaintiffs' Other Complaints

In addition to complaints about the imperfect coverage of the splash page, Plaintiffs raise further technical complaints about the form of the splash page and the display surrounding and outside of the page itself. Specifically, Plaintiffs contend that the DMV.ORG logo on the page is too big and that the use of title tags outside of the display window violate the injunction. These complaints are technical concerns that can be addressed if necessary, not acts in furtherance of an intentional and knowing violation of this Court's injunction. *In re Dual-Deck Video Cassette Antitrust Lit.*, 10 F.3d 693, 695 (9th Cir. 1993) (vacating contempt judgment finding alleged contemnors conduct "harmless technical violations" and in substantial compliance with the court's order); *Vertex Distributing v. Falcon Foam Plastics*,

LACA_2099097.6

689 F.2d 885 (9th Cir. 1982) (affirming district's court's refusal to hold defendants in contempt despite evidence of technical violation of consent judgment).

### 3. Font Size – 14 Pixels And Sizing Of The Logo

With respect to the size of the Logo, Plaintiffs first raised this issue on September 2, 2008 and Defendants promptly responded with a detailed explanation on September 4. (Daucher Decl., Ex. 7). The interpretation of the Injunction on this point requires some reasonableness in that the Injunction states that the disclaimer be in font size 14 point, but then requires that the font in the Logo not be larger than the disclaimer. The Injunction does not specify if it is the "DMV.ORG" portion of the logo that must be smaller than 14 point font or the line of text ("Unofficial Guide to the DMV") that appears in the logo just below "DMV.ORG" that must be smaller than 14 point font. On this point, the Injunction is not "definite and clear." Also, the Injunction uses the term "14 point font" but computer websites are designed using a web-based equivalent system of sizing known as pixels (here, the disclaimer is in 14 pixels). Thus, the Injunction is not definite and clear with regard to the meaning of the size of the words to be employed on the Website. No one should be held in contempt unless Plaintiffs have established by clear and convincing evidence that the directives of the Injunction are specific and definite on the point at issue. *In re Bennett*, 298 F.3d at 1069 ("moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court").

Defendants sought to comply in a way that was logical and consistent with the spirit of the injunction when applied to the medium at issue. First, in compliance with the Court's injunction, the splash page *displays* the disclaimer language in the standard measurement for text on websites - namely, 14 pixels which is the web's equivalent to 14 point font. (*See* Baldwin Decl. ¶¶ 5, 6). Pixels are the *de facto* text display specifically for computer monitors. Moreover, Web designers are not only encouraged but taught not to set text size for computer displays (*i.e.*, websites) in

LACA_2099097.6

point. (*See id.* ¶ 6). This is because computer displays and their display resolutions are specified in pixels. (*See id.* ¶ 8). Given that monitors and their display resolutions vary, a text size specification in font may lead to sizing inconsistencies for different users (*e.g.*, text in 14 point may look bigger to one user and smaller to another). Thus, spacing of text size according to pixels ensures display consistency for website visitors. DMV.ORG, like other sites such www.cnn.com and www.espn.go.com, uses pixels in accordance with accepted web design conventions and to assure the text displays properly to as many users as possible. (*See id.* ¶ 7). Therefore, DMV.ORG's display of "YOU ARE ABOUT TO ENTER A **PRIVATELY OWNED** WEBSITE THAT IS **NOT** OWNED OR OPERATED BY ANY STATE GOVERNMENT AGENCY. TO CONTINUE, CLICK 'CONTINUE' BELOW" in 14 pixels complies with Court's Injunction, and does not give rise to a finding of contempt.

Second, with respect to the sizing of the logo, Defendants interpreted the Injunction to allow the Logo to be a reasonable size, at least such that it would be legible so that when visitors found the splash page, they would know what website they had located. The language of the Injunction was not definite and clear on this point because of the combination on the Website's logo of "DMV.ORG" and the smaller text below it of "Unofficial Guide To the DMV." Defendants did not want the language "Unofficial Guide to the DMV" to become unreadable by being set too small, in light of the thrust and import of the Injunction. Thus, the size chosen by Defendants for the size of the logo utilizes a font size for the "Unofficial Guide" language that is smaller than the disclaimer, but, concededly, a size for the "DMV.ORG" portion that is larger than the disclaimer. The overall size for the Logo chosen by Defendants is in fact smaller than the Logo size used on each page of the DMV.ORG website. (*Compare* Hamilton Decl., Ex. I (splash page Logo) *with* Lahoti, Ex. 21 (example of regular page sizing).)

LACA_2099097.6

Notably, Defendants offered to put this matter to the Court for clarification, but Plaintiffs twice ignored this offer and then refused – preferring instead to turn it into a motion for contempt. (Daucher Decl., Ex. 7 (offers)). Defendants still believe the choice they made to ensure that the textual portion of the logo is readable is the right answer and consistent with the import of the injunction.

### 4. Title Tags

Plaintiffs assert that it is contempt to allow any description of the specific page sought by the user at the very top of the screen, even outside of the page window. (Hamilton Decl., Ex. I.)

The Injunction specifies that a user must see the splash page "prior to viewing any webpage content" and also specifies that "Nothing other than the content in paragraph (c) [disclaimer and continue button] and the DMV.ORG logo shall be visible to the visitor when viewing the acknowledgment splash page." The language requires that the splash page contain nothing but the disclaimer, the Logo, and the continue button. The splash page complies with that mandate.

Plaintiffs contort the Injunction to attempt to mandate that no title be displayed at the very top of the viewing screen, even if outside if the webpage itself. Without direction from Plaintiffs, the title tags are not even immediately obvious. The Injunction does not touch upon how Defendants were to handle the title tags.

Search engines rely upon title tags when ranking and analyzing a website in response to a person's search request. They are very important in helping a potential visitor locate the Website. Even though the injunction is silent as to the wording of title tags, Plaintiffs argue that Defendants should nevertheless remove all title tags from each of their webpages. (Mot., at 13). There is no way to remove a title tag when a page serves as an entry page but restore it when the page is viewed after the entry page. Moreover, title tags are not part of the Website; instead, they are part of the user's browser. As a result, if all title tags must be removed, then this will affect not just a single "entry" or arrival page, but all page views on the

DMV.ORG website, regardless of sequence. Such a result would drastically remove further content from the public. Plaintiffs may be pushing this point upon the Court in hopes that the Court will further restrict how the Website operates. This would further implicate the First Amendment, undermine the usability of the site, and would help accomplish Plaintiffs' goal of shutting down the Website.

Plaintiffs' argument that the title tag serves a pure marketing function also fails. To the contrary, the title tag complies with the spirit of the injunction because it contains the words "Unofficial Guide to the DMV" alerting visitors that the site is not affiliated with any government agency. (Alcock, ¶ 19).

### B. First Amendment Concerns

This Injunction poses a different problem: it operates as an unconstitutional prior restraint because it mandates that Defendants build and maintain a barrier, *i.e.* the splash page, that infringes upon the public's access to the content of the Website. This operates as a prior restraint on speech. Defendants respectfully request that the Court withdraw or narrow the Injunction in order to address the public's and Defendants' First Amendment rights with regard to the Website. If the Court is disinclined to dissolve or narrow the injunction at this juncture, then Defendants request that any clarification of the Injunction take First Amendment considerations into account going forward.

An order that bars speech before it even occurs is a "prior restraint," which is highly disfavored. *See* William Blackstone, Commentaries on the Laws of England, bk. IV, ch. XI, 151-52, (London, 1765-69) (18th ed., New York, 1836, vol. 2, 112-13). The Supreme Court has repeatedly emphasized that prior restraints are presumptively unconstitutional. *See, e.g., Pittsburgh Press v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). A plaintiff or court, correspondingly, bears "a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin*, 402 U.S. at 419.

LACA_2099097.6

Some of the speech the Court's Injunction purports to bar is admittedly commercial speech. Commercial speech is, however, entitled to First Amendment protection in both prior-restraint and subsequent-punishment cases alike provided it is truthful and not misleading. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm.*, 447 U.S. 557, 563-66 (1980); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). The Court must closely examine the actual speech that is to be targeted by the government action. *Central Hudson*, 447 U.S. at 565-66.

Here, the Injunction currently requires that Defendants employ an acknowledgement "splash page" "that *every visitor* to any entry webpage on the DMV.ORG domain shall see prior to viewing any webpage content[.]" (CR 262, at 2) (emphasis added). The Injunction prohibits users and potential users of Defendants' Website from entering without first entering through the "splash page." It operates as a significant barrier to entry for potential visitors. Yet there is nothing false or illegal about the speech on Defendants' Website, particularly where, as here, Defendants have clearly informed all visitors that it is not owned or operated by any state government agency. (Alcock Decl. ¶ 19).

Moreover, just as Defendants have a First Amendment right to engage in commercial speech, Internet users have a right to receive the information contained therein, which right is also infringed upon by the Injunction. *Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976). When government action targets truthful and non-misleading commercial speech regarding lawful activity, it will be found unconstitutional unless (1) it seeks to advance a substantial government interest; (2) it directly advances that interest; and (3) it does not burden any more speech than is necessary to accomplish its goal. *See Central Hudson*, 447 U.S. at 563-66. Here, Plaintiffs, as the party seeking to censor speech, bear the burden of proving each of these elements. *Id.* If any element is not met, the restraint is invalid. In this case, none are met.

LACA_2099097.6

The Injunction does not meet the first prong of the *Central Hudson* test, which requires a "substantial interest to be achieved by restrictions on commercial speech . . . ." *Central Hudson*, 447 U.S. at 564. While the Court certainly has a legitimate interest in enforcing its orders, Plaintiffs cannot establish that they have a general interest in preventing users and potential users from entering Defendants' Website without first passing through the offending "splash page." Further, while the Court has an interest in preventing users and potential users from being misled by false advertising, the Injunction goes too far. This is so because Defendants have taken affirmative steps to inform the visitors to its Website that it is not owned or operated by any state government agency. Without a substantial interest to justify the prior restraint on speech, Plaintiffs cannot satisfy the *Central Hudson* test and the Injunction does not survive constitutional scrutiny.

A restriction on truthful commercial speech "must directly advance the state interest involved; the [speech restriction] may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 564. A prior restraint on even commercial speech "may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest . . . ." *Id.*

The interest that this Court has in preventing Defendants from disseminating purportedly false advertising is not advanced by the Injunction beyond the voluntary disclaimers that appear on the actual pages of the Website. The "splash page" provides redundant information that only works as a barrier to the Website's content. Plaintiffs have not shown that any false information remains on the Website. Because this element of the *Central Hudson* test is not met, the Injunction violates the First Amendment.

The Injunction is not narrowly tailored to serve the Plaintiffs or the Court's narrow interest. Government action that censors speech cannot "completely

LACA_2099097.6

suppress information when narrower restrictions . . . would serve its interest as well." *Central Hudson*, 447 U.S. at 564.

Here, another, less-restrictive means would suffice to serve the Plaintiffs and the Court's interests, namely, allowing Defendants to place the same information that is currently on the "splash page" as a banner on the webpages of Defendants' Website. A less restrictive means would advance the Court's concerns without blocking as much speech and access to speech. This would more narrowly address the Court's concern that Defendants not disseminate false advertisements. These First Amendment concerns should be incorporated into the Court's ruling here. Defendants ask that the Injunction be lifted or, at a minimum, narrowed.

## C. Sanctions are Not Warranted

Plaintiffs argue that Defendants' alleged violations of the Injunction warrant coercive sanctions by the district court. Specifically, plaintiffs argue that this Court should impose both a large coercive sanction to be paid to the Court *as well as* compensatory sanctions to be paid to Plaintiffs. (Mot. at 18). Coercive sanctions are not warranted because Defendant did not violate the terms of the Injunction. Moreover, even if Plaintiffs could establish technical violations of the Injunction, which they have not, the arguments for coercive sanctions are without basis.

If a violation has been shown, the court may impose civil contempt sanctions. *United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947). Civil contempt sanctions are remedial, and thus cannot be imposed to punish *past* behavior. *Portland Feminist Women's Health Center v. Advocates for Life*, 877 F.2d 787, 790 (9th Cir. 1989). Such remedial sanctions may take two forms: first, sanctions designed to coerce *future* compliance with the underlying order; or second, sanctions designed to compensate for *actual* losses caused by noncompliance with the underlying order. *Id.*; *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379-80 (9th Cir. 1986). This Court should decline to enter remedial sanctions.

The Supreme Court has stated that "a flat, unconditional [non-compensatory] fine even as little $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." *Int'l Union v. Bagwell*, 512 U.S. 821, 829 (1994) (citations omitted). "Generally, the minimum sanction necessary to obtain compliance is to be imposed." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (citations omitted). This is so because, unlike "the punitive nature of criminal sanctions, civil sanctions are wholly remedial." *Id.*

The Ninth Circuit "recognize[s] that the Supreme Court has tended to classify fines paid to the court as punitive fines, while fines payable to another party are remedial." *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1111 (9th Cir. 2005). However, the identity of the payee is not determinative. The Ninth Circuit has also held that a fine payable to an opposing party was punitive when it was not designed "to compensate [the opposing party] for any actual or estimated harm." *Bingman v. Ward*, 100 F.3d 653, 656 (9th Cir. 1996).

### 1. Coercive Sanctions are Not Appropriate

Plaintiffs argue that this Court should order "a large monetary coercive sanction, namely a $10,000 per day fine." (Mot. at 21). Plaintiffs argue "the harm threatened by Defendants continued non-compliance is severe and great." (*Id.*).

Plaintiffs argue that because of Defendants' alleged violations, "possibly millions of visitors to DMV.ORG are not being presented with the splash screen before viewing the DMV.ORG website content[.]" (*Id.*). While Plaintiffs' claim is grossly exaggerated and not supported by any evidence, as set forth more fully above, a fundamental problem with Plaintiffs' argument is that the alleged "character and magnitude of the harm threatened," *General Signal Corp.*, 782 F.2d at 1380, does not warrant the suggested $10,000 per day fine. (Mot. at 21). As the Ninth Circuit noted in *Whittaker Corp.*, the district court should generally impose "the minimum sanction necessary to obtain compliance[.]" 953 F.2d at 517.

1    If this Court decides that a coercive sanction is warranted, it should first

2    permit Defendants the opportunity "purge the contempt" in order to avoid paying

3    the coercive sanction by providing Defendants sufficient time to come into

4    compliance with the clear and definite aspects of the Court's Injunction (which

5    would require further clarification from the Court on some of the technical points

6    discussed above about size of type and how to size the logo). *Portland Feminist*,

7    877 F.2d at 790. This should be done, however, in a manner that is consistent with

8    the First Amendment. Defendants have attempted to comply in good faith with the

9    Court's Injunction and reached out to Plaintiffs to seek a joint request to the Court

10   for clarification of the Court's Injunction. Plaintiffs, however, have repeatedly

11   rejected Defendants efforts to seek clarification of the terms of the Court's

12   Injunction. Moreover, Defendants also voluntarily provided disclaimers on its

13   Website not required by the injunction.

14   Based on the foregoing, this Court should reject Plaintiffs' request for a

15   coercive sanction. If, however, the Court considers granting Plaintiffs' request for a

16   coercive sanction, the Court should order a $500 per day fine beginning thirty (30)

17   days after a finding that Defendants' violated the Court's Injunction. This will

18   permit Defendants sufficient time to "purge the contempt" and implement whatever

19   steps are necessary to come into compliance with a newly clarified Injunction.

## 2.    Compensatory Sanctions are Not Warranted

21   Plaintiffs argue that this Court should order compensatory sanctions for

22   Defendants alleged technical violations of the Court's Injunction. (Mot. at 19-20).

23   Specifically, Plaintiffs seek an award of attorneys' fees for their "policing" of the

24   Website and for bringing the motion; plaintiffs also seek an award of Defendants'

25   profits for the period of non-compliance. (*Id.*). Plaintiffs' arguments for

26   compensatory sanctions, however, are fundamentally flawed, overreaching and

27   intended to harm Defendants.

28

When compensation rather than coercion is intended, the district court may impose a "fine" payable to the complainant, which must be "based upon evidence of complainant's *actual loss*." *United Mine Workers*, 330 U.S. at 304 (emphasis added). As noted by the Ninth Circuit, a court may award fines as a compensatory sanction, but such "awards are limited to '*actual losses sustained* as a result of the contumacy.'" *Gen. Signal Cor. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (citation omitted) (emphasis added); *see also New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1353-54 (2nd Cir. 1989) ("[S]ome proof of loss must be presented to justify [a fine's] compensatory aspects.").

Actual losses may include "reasonable attorney's fees" incurred "to prosecute the contempt proceeding." *Portland Feminist*, 877 F.2d at 790. In fashioning civil contempt sanctions, the district court has discretion to award reasonable fees and costs as a remedial measure[.]" *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) ("Attorneys' fees frequently must be expended to bring a violation of an order to the court's attention."). However, the district court has the "discretion to analyze each contempt case individually and decide whether an award of fees and expenses is appropriate as a remedial measure." *Id.*

### a. Plaintiffs Have Not Established Any "Actual Losses"

Plaintiffs have not proven that they suffered any actual losses as a result of the alleged contempt. Plaintiff concede that "it is difficult to prove actual losses from [Defendants'] continued violations of the Injunction[.]" (Mot. at 19). Instead, Plaintiffs request that the Court order Defendants "to pay to Plaintiffs the profits derived from the DMV.ORG website during the period of non-compliance (i.e., from the date that the Court ordered the Injunction to the present)." (*Id.*). Plaintiffs' request for defendants' profits is fundamentally flawed and would operate as a punishment.

A monetary award to a party moving for contempt "must be limited to their 'actual loss' for 'injuries which result from the noncompliance.'" *In re Dual-Deck*,

10 F.3d 693, 696 (9th Cir. 1993) (citations omitted).  The rule that sanctions can be paid directly to plaintiffs who present some form of loss "implies that the sanction should correspond at least to some degree with the amount of damages." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1062 (2nd Cir. 1995).  An award of Defendant's profits to Plaintiffs would violate this rule and would be inconsistent with the Court's prior ruling in this case when the Court found that "Plaintiffs provided no evidence showing a causal connection between Defendants' actions and any harm Plaintiffs incurred …. Awarding Defendants' profits to Plaintiffs would constitute a penalty and 'create a windfall judgment at the defendant's expense.'" (6-4-08 Findings Of Fact And Conclusions of Law, p. 31).

Here, Plaintiffs have provided nothing to indicate that they have sustained any actual losses as a result of Defendants alleged violations of the Court's Injunction. Instead, Plaintiffs cite to a patent case, *Western Lighting Corp. v. Smoot-Holman Co.*, 352 F.2d 1019 (9th Cir. 1965), and two Lanham Act cases, *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004 (9th Cir. 1994),  and *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 383 F.2d 1484 (11th Cir. 1987), for the proposition that the Court can award Defendants' profits if Plaintiffs cannot establish actual losses.

Plaintiffs reliance on *Western Lighting Corp.* is misplaced because, as the Ninth Circuit noted that, unlike the instant case, the "patent statute contains a very liberal provision as to damages."  352 F.2d at 1022.  Plaintiffs' reliance on *Jerry's Famous Deli, Inc.* and *Wesco Mfg.*, Inc. is equally misplaced, as both of those cases arose from a defendant's infringement of a plaintiff's trademark rights.  Neither situation is present here.  Plaintiffs have not established actual losses associated with the Defendants' alleged willful false advertising.  Depriving Defendants of their profits would be impermissibly punitive.

LACA_2099097.6

## b. No Attorneys' Fees Should Be Awarded

While this Court is empowered to order Defendants to pay an award of attorneys' fees to Plaintiffs upon a finding that Defendants were in violation of the Court's Injunction, attorneys fees are not warranted in this case. This is so because any attorneys' fees incurred by Plaintiffs in bringing the instant motion for contempt could have been avoided. Several issues were resolved through the meet and confer process. It is reasonable for the Court to require Plaintiffs' counsel to have conducted a final conference regarding "substance of the contemplated motion and any particular resolution[,]" L.R. 7-3, prior to filing the instant Motion. Plaintiffs' counsel failed to include in the notice of motion a statement that "the conference pursuant to L.R. 7-3" took place on a specific date because it did not occur.

When Plaintiffs brought a technical violation to Defendants' attention, Defendants would take corrective action. In addition, Defendants repeatedly sought agreement from Plaintiffs to submit a joint request to the Court for clarification of the Court's Injunction. Plaintiffs, however, repeatedly refused to submit joint questions for clarification to the Court. By filing the instant Motion without jointly seeking clarification or giving the Defendants an opportunity to correct the alleged technical violations regarding the pixels issue or agreeing to submit joint questions for clarification, Plaintiffs expended attorneys' fees that could, and should, have been avoided.

LACA_2099097.6

## IV.   CONCLUSION

Defendants acted in good faith and have substantially complied with the Injunction.  Plaintiffs' motion should be denied.


Dated:  January 20, 2009          FOLEY & LARDNER LLP


By      /S/ Pamela L. Johnston
ANDREW SERWIN
PAMELA L. JOHNSTON
JAIME GUERRERO

Attorneys for Defendants
EDRIVER, INC., ONLINE GURU, INC.,
FIND MY SPECIALIST, INC.,
SERIOUSNET, INC., RAVI K. LAHOTI and
RAJ LAHOTI

LACA_2099097.6