BRIAN M. DAUCHER, CAL. BAR NO. 174212
ASHLEY E. MERLO, CAL. BAR NO. 247997
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
  A Limited Liability Partnership
  Including Professional Corporations
650 TOWN CENTER DRIVE, 4th FLOOR
COSTA MESA, CA 92626-1993
TELEPHONE:    714.513.5100
FACSIMILE:     714.513.5130
bdaucher@sheppardmullin.com
amerlo@sheppardmullin.com

PAMELA L. JOHNSTON, CAL. BAR NO. 132558
JAIME B. GUERRERO, CAL. BAR NO. 192211
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET
LOS ANGELES, CA  90071-2300
TELEPHONE:    213.972.4500
FACSIMILE:     213.486.0065
pjohnston@foley.com
jguerrero@foley.com

ANDREW B. SERWIN, CAL. BAR NO. 179493
**FOLEY & LARDNER LLP**
402 W. BROADWAY, SUITE 2100
SAN DIEGO, CA  92101-3542
TELEPHONE:   619.234.6655
FACSIMILE:    619.234.3510
aserwin@foley.com

ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAFFICSCHOOL.COM, INC., A CALIFORNIA CORPORATION; DRIVERS ED DIRECT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, <br><br> PLAINTIFFS, <br><br> VS. <br><br> EDRIVER, INC.; ONLINE GURU, INC.; FIND MY SPECIALIST, INC., AND SERIOUSNET, INC., CALIFORNIA CORPORATIONS; RAVI K. LAHOTI, AN INDIVIDUAL; RAJ LAHOTI, AN INDIVIDUAL; AND DOES 1 THROUGH 10, <br><br> DEFENDANTS. | CASE NO:  CV 06-7561 PA (CWx) <br><br> **DECLARATION OF DAVID GRAY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT** <br><br> DATE:       FEBRUARY 2, 2009 <br> TIME:       1:30 P.M. <br> PLACE:      COURTROOM OF HON. PERCY ANDERSON |

I, David Gray, hereby declare the following:

1.      I am the Director of Technology at Online Guru, Inc. ("Online Guru").  I have personal knowledge of the facts hereinafter stated and hereby testify competently thereto as a witness in the above-captioned matter.

1

Dockets.Justia.com

2. Online Guru is responsible for managing the business operations and content of the website located at www.dmv.org (the "DMV.ORG").

## BACKGROUND

3. I hold a Bachelors of Science degree in electrical engineering from Purdue University with concentrations in micro-controller programming and Digital Signal Processing applications. I am also certified as a Microsoft Certified Solutions Developer (MCSD).

4. During the course of my professional career, I have worked on the development of client server applications, e-commerce, content management applications, consumer portals, and network analysis tools.

5. As Online Guru's Director of Technology, I am responsible for and oversee the company's information technology department, which in turn, is responsible for, among other things, development and technological planning (including that of DMV.ORG), and support of network systems and applications.

6. In my capacity as Director of Technology, I was personally involved in the deployment, implementation and support of the splash page as ordered by this Court's August 26, 2008 Judgment and Permanent Injunction ("Injunction"). Specifically, I participated in the discussions, analysis and decision-making regarding the implementation plan for the splash page and oversaw the team responsible for implementation of the page.

## IMPLEMENTATION OF THE SPLASH PAGE

7. Even prior to the issuance of the Injunction at the end of August 2008, Online Guru began researching and analyzing the implementation of a splash page on DMV.ORG. This was done in light of the Court's Proposed Injunction in June 2008. As a result of this work over the summer, when the injunction was served upon defendants on August 28, 2008, we were able to take the splash page live the next day, August 29, 2008. The implementation of a splash page for a website such as DMV.ORG is a very difficult task for several reasons.

8.     First, the DMV.ORG website has nearly 120,000 pages, and the deployment of the splash page across those pages presented a significant challenge because each of those pages is a potential "entry" or arrival page. As a result, any splash page deployment would have to both function on each of those pages when those pages serve as entry pages, but not function on those pages when they are viewed in a sequence after the entry page by a specific visitor.

9.     Second, users access DMV.ORG's content and information primarily through the use of search engines. A splash page, if not implemented properly, will prevent users from finding DMV.ORG's content through the use of search engines such as Google and Yahoo!. This is because search engines index websites based on their content, and the content of the splash page can replace or mask the website's true content. As a result, with the wrong type of splash page, the accessibility of a website's true content will drop, and every page will appear to have the same content (*i.e.*, merely the language in the splash page). This problem is well recognized in the web page design industry and has led many designers to recommend against the use of splash pages altogether:

> a.     Larissa Thomason, *Promotion Tip: Splash Pages May Drown Your Website* at http://www.ewebarchitecture.com/tip.php?id=83 ("Most search engine algorithms rank pages based on a combination of HTML Code Elements, page content, and link popularity. Splash pages, deficient in all three areas, often turn away spiders [programs that index web pages for search engines] as efficiently as they turn away visitors. Furthermore, . . . . [a] splash page hides some of your content from search engines by adding another level without adding much value to the site.");

> b.     Aaron Wall, *Why Splash Pages are Bad for Rankings* at http://www.search-marketing.info/traps/splash.htm ("Many search engines cannot effectively navigate through and index flash [splash pages]. This means that you have little to no content to optimize and more than likely will not be able to

1   achieve top rankings.")

2           c.      Jennifer Kyrnin, *About.com: Web Design/HTML Splash Pages: Pros*

3   *and Cons* at http://webdesign.about.com/od/navigation/a/aa020303a.htm ("Splash

4   pages break search engines.  Since many splash pages only include a flash

5   animation there isn't a lot for search engines to optimize on.  And if you add

6   content to the page in comments you can be penalized for spamdexing.");

7           d.      Helen Faber, *Why Avoid a Splash Page* at

8   http://www.webfuel.ca/Why-avoid-a-splash-page ("Often splash pages turn away

9   spiders just like their site visitors.  Without direct access to the URL structure

10  search engines find it difficult to crawl and index a site.  Lack of a proper link

11  structure to internal web pages (usually only one link that goes to one page)

12  hinders these pages from getting indexed.  This will *of course* hurt your potential

13  search engine ranking.") (emphasis in original).

14  Attached hereto as Exhibits 18 - 21 respectively are true and correct copies of these

15  articles.  A splash page that masks DMV.ORG's content from search engines would be

16  catastrophic and would prevent users from finding its content through search engines.

17  Simply put, DMV.ORG would cease to generate meaningful results for users of search

18  engines such as Google and Yahoo!.

19                          **JAVASCRIPT AND COOKIES**

20          10.     In developing and deploying the splash page for DMV.ORG, Online Guru

21  had to consider several technical requirements and the continued viability of the website.

22          11.     As mentioned above, Online Guru had to deploy the splash page in a

23  manner that would still allow users to search for and find DMV.ORG's information

24  through search engines.

25          12.     Furthermore, a splash page would require DMV.ORG servers to maintain

26  "state" with a user's visit (to track that specific visitor's prior page visits).  This is

27  necessary to ensure the splash page is displayed upon a user's first entry to the website,

28  and that it is not again displayed on other pages for the user's length of the visit to the

1  website.

2  13.   To cope with these issues, Online Guru employed widely used and accepted

3  technologies including JavaScript and Cookies.

4  14.   JavaScript was chosen as a solution because it assures that the splash page

5  is not displayed to search engines. JavaScript is able to accomplish this because it is a

6  client side technology. In other words, JavaScript is interpreted and run by a user's

7  browser. Thus, a programmer using JavaScript is able to assure that a browser performs

8  certain functions, such as the display of an image or text, only if certain parameters are

9  met. To assure, the continued existence of DMV.ORG it was imperative for us to be able

10  to do the following: display the splash page to users, while not displaying the splash

11  page to search engines. A specific trait that search engines share is that they do not

12  accept cookies when crawling and indexing web pages. Consequently, JavaScript was

13  the ideal technology. In our case, JavaScript was used to specify that the browser display

14  the splash page (the "function") based on the presence of a cookie (the "parameter").

15  15.   Client side technologies are distinct from server side technologies which

16  are executed on the server.  In the case of client side technology, a cookie is sent from

17  the server to the browser which is accessible from JavaScript. Search engines do not

18  accept cookies, so if the JavaScript program does not find the cookie locally, it is highly

19  likely that the request is from a search engine and the splash page will not be displayed.

20  On the other hand, if the JavaScript program has access to the cookie, the request is

21  highly likely to be coming from a user and the splash page will be displayed.

22  16.   As Director of Technology for Online Guru, I routinely monitor and review

23  other websites for usage statistics concerning users to those sites. Two websites which I

24  have visited and reviewed for their user statistics are www.w3schools.com and

25  www.thecounter.com.

26  a.   www.w3schools.com ("w3schools") is an internet site providing

27  free information and resources targeted at web developers. *See*

28  http://www.w3schools.com/about/about_pagehits.asp. In January 2008, the site

had 11,571,428 unique visitors and 81,768,558 page views. *Id.* w3schools tracks several user statistics and compiles statistics by using its own log-files and monitoring other resources around the Internet. Among these statistics are yearly figures for w3schools visitors using web browsers with JavaScript turned on from January 2000 through January 2008. *See* http://www.w3schools.com/browsers/browsers_stats.asp. According to such figures, the percentage of user with JavaScript turned on has gone up every single year from 2000, reaching 95% in 2008. Attached hereto as Exhibit 22 is a true and correct copy of a screenshot of w3schools displaying such figures.

        b.     www.thecounter.com ("TheCounter") is a third-party website providing web analytic tools. Like w3schools, TheCounter tracks and compiles a number of user statistics for visitors to its site. Among these statistics is a figure tracking the percentage of site visitors using JavaScript enabled web browsers from February 1, 2008 through December 31, 2008. *See* http://www.thecounter.com/stats/2008/December/javas.php. According to such figure, over 93% of the site's 50,185,204 visitors for that time period had JavaScript enabled browsers. *Id.* Attached hereto as Exhibit 23 is a true and correct copy of a screenshot of TheCounter displaying such figure.

        c.     While different web sites attract different types of users and target different audiences, the above figures are compatible and supported by Online Guru's own statistics pertaining to its own visitors and users as set forth in the Declaration of Scott Annett In Support of Defendants' Opposition to Plaintiffs' Motion for Contempt.

    17.    Cookies are mere text files placed on the user's system as a method to maintain a user's "state" – *i.e.*, remember whether or not the user was shown a splash page upon entry to DMV.ORG. The cookies that DMV.ORG uses are not permanent files deposited to track broader use, but rather are mere "session" cookies, used to track only that specific session on the site. As a result, if a visitor initiates a new "session" or

new visit to DMV.ORG, the visitor will again see the splash page first and a new "session" cookie will be established.

18.     As discussed in the paragraph 14, cookie technology is also used as a method to determine if an access request was coming from a search engine or a user. This is because search engines do not accept cookies. As a result, if a cookie is enabled, this mechanism will assume that the access request is coming from a user's web browser, and then run JavaScript to display the splash page. In this way, search engines, whose purpose is to seek true content, are allowed to see the site, while users when they click through first see the splash page.

19.     In preparing this declaration, I conducted a review of numerous well-known websites to determine whether or not they relied on the use of cookies. Examples of websites that use cookie technology include, without limitation:

            a.      http://www.amazon.com

            b.      http://www.webmd.com

            c.      http://www.apple.com

            d.      http://www.yahoo.com

20.     I also reviewed Plaintiffs' website at http://www.trafficschool.com ("Trafficschool") to determine whether or not it relies on the use of JavaScript and Cookies. To do so, I first visited Trafficschool with **both** JavaScript and cookies **enabled** on my browser. Attached hereto as Exhibit 11 is a true and correct copy of a screenshot I took of that website with JavaScript enabled on my web browser. I then visited Trafficschool with **JavaScript disabled** on my web browser. Upon doing so, it became apparent that Trafficschool is a website largely driven by JavaScript. Specifically, I was not able to view most of the content I viewed when JavaScript was enabled and also unable to use it properly. For example, with JavaScript **disabled**, I was unable to: (1) sign up for traffic school; (2) sign up for defensive driving; (3) sign up for drivers education; (4) start a course; and (5) re-enter a course. Attached hereto as Exhibit 12 is a true and correct copy of a screenshot I took of that website with **JavaScript disabled** on

my web browser. Finally, I again visited Trafficschool with cookies **disabled** on my web browser. Upon doing so, I received an error message stating the following: "The Trafficschool.com website requires that cookies be enabled in order to proceed." Attached hereto as Exhibit 13 is a true and correct copy of a screenshot I took of that website with **cookies disabled** on my web browser.

21. Another example of a website that will not function properly when JavaScript is disabled is http://www.webmd.com ("WebMD"). I attempted to access WebMD with JavaScript disabled on my web browser. When doing so, a large click box on the webpage stopped functioning – *i.e.*, any attempt to click on it and complete it did not succeed. When I accessed the same website with JavaScript enabled, the very same "click-box" was functional and responsive to my inputs. Attached hereto as Exhibit 14 is a true and correct copy of a screenshot I took of that website displaying the "click-box" in the middle of the page.

22. Based on our internal discussions and planning as set forth above, it is my belief that the implementation of a splash page through the use of JavaScript and cookies was the best solution available that would allow DMV.ORG to still be accessible to search engines. Furthermore, this was determined to be the best solution to reach the largest spectrum of users given the widespread use and acceptance of these technologies as set forth above. This solution was also favored because DMV.ORG assumes JavaScript capabilities for numerous other aspects of its website. For instance, if a user has JavaScript disabled the following portions of DMV.ORG will not function:

    a. The State Drop Down Menu – The state drop down menu is one of the primary means for getting to content for a specific state. Without JavaScript this menu does not even appear. This effects approximately 120,000 pages.

    b. The Websites Search Function – Visitors without JavaScript are unable to search our site using our search box. Nearly 1/3 of visitors use our site search function. This effects approximately 120,000 pages.

    c. Answers.dmv.org – Visitors without JavaScript cannot ask questions

at our question and answer product at http://answers.dmv.org.

       d.     Rate this Page – Users without JavaScript are unable to provide feedback in our suggestion tool.

       e.     Purchase Insurance – Visitors without JavaScript are unable to purchase insurance at our advertisers' Esurance, Progressive Insurance, and Liberty Mutual's sites. This is one of our revenue streams.

       f.     Purchase Defensive Driving Courses – Visitors without JavaScript are unable to purchase Defensive Driving courses at our advertiser's site iDriveSafely.com. This is one of our revenue streams.

       g.     Purchase Practice Tests – Visitors without JavaScript are unable to purchase practice tests at our advertiser's site iDriveSafely.com. This is one of our revenue streams.

       h.     Purchase Driving Records – Visitors without JavaScript are unable to purchase driving records at our advertiser's site DrivingRecords.com. This is one of our revenue streams.

23.     Between June 2008 (when the proposed injunction was issued) and August 2008 (when the Injunction was issued), we spent hundreds of hours analyzing our options, seeking an option which would both meet the mandate of this Court but not also destroy the accessibility of the content of the site. In this process, we spent significant time and resources researching, brainstorming, analyzing, testing, and troubleshooting different mechanisms for the display of a splash page in compliance with the Injunction. For example, we considered several other methods including, without limitation, IP Tracking, URL Query String (as suggested by plaintiffs), Hidden Form Fields, and Adobe Flash. However, each method has its own imperfections, drawbacks, and would present problems in terms of user adoption and penetration.

       a.     IP Tracking involves storing IP information from the request on the server. IP Tracking would have allowed us to know if a request from an individual IP was the first request and whether a splash page should be displayed.

The difficulty with this solution is that IP addresses are not unique per user. Thousands of users can share the same IP address through an Internet Service Provider. Thus, this method would be completely unreliable and would not allow us to determine if a splash page had been shown or not.

b.     URL Query Strings embed visitor information in the URL for each request. This solution would have required us to amend each request with a Token consisting of 16-32 characters. Each Token would represent a unique visitor and would be stored on a database that tracks the visitor. The Token would also be used to determine whether or not to display a splash page. The problem with this solution is that Tokens are indexed by search engines. This means that when our website shows up in a search engine result the Token would be displayed, harming our users' ability to discern the relevance of our information. We currently have very clean URLS. For example, the link on our website to driving records information in the state of Alabama is: http://www.dmv.org/al-alabama/driving-records.php. The addition of a Token would make the URL look similar to this: http://www.dmv.org/al-alabama/driving_records.php? refid =175W065ACQPTS W S873SD. This would decrease the readability of the URL and harm the website's visibility to search engines because search engines credit websites with a clean URL structure.

c.     Hidden Form Fields embed "state" information into the HTML of a page. There are several problems with this solution. First, anytime a user hits the "back" button, the "state" information would be lost and the splash page would display again. Second, this would impact the internal linking on the website by changing every link to a form. Search engines do not follow these forms in the same way that links are followed, and would not be able to navigate our site as well.

d.     Adobe Flash is extremely similar to JavaScript in that it is a client-side technology. If we had used Flash, it would have operated in the same way as

10

our JavaScript and would test if the request came from a search engine and if the request did not would display a splash page. We felt that any issues with Flash would be the same as with JavaScript, and ultimately chose to use JavaScript because it is a technology that is more widely deployed than Flash, and because Online Guru had superior expertise with JavaScript given that it was already used on DMV.ORG Therefore, it was determined that JavaScript would allow for a faster and more efficient implementation of the splash page.

## MOBILE DEVICES

24.     I understand that Plaintiffs contend that the splash page is not visible to users of mobile devices such as RIM BlackBerries and Palm Treos.

25.     The device per se (*i.e.*, RIM BlackBerry, Palm Treo, Apple iPhone) is not as relevant as the combination of the device's operating system and web browser type.

26.     In choosing a solution, we tested over 130 combinations of operating systems and web browsers with the goal of obtaining as much coverage as possible without destroying accessibility of the site content to the search engines.

27.     Omniture, Inc. is a third party company that sells web analytics software. Omniture software is an industry standard tool used for tracking website internet traffic and related statistics. Online Guru has a license to use Omniture's web analytics software. Online Guru is therefore able to access a variety of forms of traffic data for the DMV.ORG website through Omniture. I personally review reports from Omniture on a regular basis to analyze the performance of the DMV.ORG website.

28.     I have reviewed an Omniture report identifying the types of web browsers used to access DMV.ORG for December of 2008. Attached hereto as Exhibit 15 is a true and correct copy of this report.

29.     According to these figures, individuals used a total of 159 different types of web browsers to access DMV.ORG. Of these, our records show that 139 of those browsers supported display of the splash page. Furthermore, of the remaining 20 web browsers which did not support display of the splash page, this represented only 0.02%

DECLARATION OF DAVID GRAY
CASE NO: CV 06-7561 PA (CWX)

1  of visitors.

2      30.    Online Guru aimed to have 100% penetration across web browsers. Cross-

3  browser compatibility (*i.e.*, compatibility among the 100s of browsers) is an industry

4  wide problem. There are differences in every browser that impact the way websites are

5  displayed and function. All of this means that there simply is no industry standard for

6  splash pages, and no method, that will assure 100% user penetration without at the same

7  time precluding search engines from identifying content on the site itself.

8                    **PLAINTIFFS' PROPOSED IMPLEMENTATION**

9      31.    I have reviewed the Declaration of Thomas Benton Greenhaw V In Support

10  of Plaintiffs' Motion for Contempt Against Defendants for Violation of the Court's

11  Injunction and for Sanctions ("Greenhaw Decl.").

12      32.    In his declaration, Mr. Greenhaw points to the mechanism that

13  Amazon.com employs for the display of splash pages. Specifically, in paragraph 15, he

14  states in pertinent part:

15          Amazon.com as well as many other active multi-visitor
           websites, do not rely upon cookies or Java Script, but rather
16          attach a specific tracking number as part of the website URL
           when a visitor is linked to or visits their site. When using this
17          procedure, the website server can identify each unique
           computer user as they gain access to the website and navigate
18          within it. This highly utilized approach of assigning a
           specific tracking number to each visitor upon linking to a
19          given site shifts the functionality of identifying a computer
           user away from the computer user's Java Script enabled web
20          browser (as the Site now performs this function) and directly
           to the web server such as the Site. In employing this type of
21          methodology – namely attaching a tracking number to each
22          visitor – a standard html web page could be used as a splash
           screen and such a screen would then effectively be visible to
23
24
           ALL COMPUTER USERS AND VISITORS TO THE SITE
25          ....
26
27  (Greenhaw Decl. ¶ 15.)

28      33.    Mr. Greenhaw's statement above is inaccurate. First, he is incorrect in

                                    12

1  stating that Amazon.com and other active multi-visitor websites do not rely on cookies.

2  To test Mr. Greenhaw's assertion, I pointed my web browser to www.amazon.com.

3  Contrary to Mr. Greenhaw's position, Amazon.com instantly installed two cookies on my

4  browser ("session-id" and session-id-time"). Upon visiting a certain product page

5  another cookies was installed on my browser ("ubid-main"). Moreover, when I added

6  something to my shopping another cookie was installed on my browsers ("session-

7  token"). Attached hereto as Exhibit 16 are true and correct copies of screenshots I took

8  during the test showing Amazon.com's installation of cookies on my browser when I

9  visited the website, visited a certain product page, and added an item to my shopping cart.

10  These are "session" cookies substantially similar to those used by DMV.ORG to

11  implement the splash page.

12      34.    It appears that Amazon.com uses a combination of client side and server

13  side solutions. This is because even a server side solution must still maintain and track a

14  user's "state." While it is true that Amazon.com assigns each user an ID when they visit

15  the site, as stated by Mr. Greenhaw, they track the user's "state" through cookies. When

16  a user travels around Amazon.com, cookies are passed from page to page, letting the

17  application know who is requesting the page. Without the cookie, the server would not

18  be able to track users from one page to the other, and would lose information about the

19  user (*e.g.*, what is in his or her shopping cart). In fact, Amazon.com itself notes that

20  cookies are "safe," and that without cookies, a user will not be able to use certain features

21  of the website, explaining that "[c]ookies allow us to recognize you automatically

22  whenever you visit our site so that we can personalize your experience and provide you

23  with better service . . . [i]f your web browser is set to refuse cookies from our website,

24  you will not be able to complete a purchase or take advantage of certain features of our

25  website, such as storing items in your Shopping Cart or receiving personalized

26  recommendations." Attached hereto as Exhibit 17 is a true and correct copy of a

27  screenshot I took of an Amazon.com page explaining Amazon's use of cookies.

28      35.    Furthermore, Mr. Greenhaw's position that using a standard html web page

13

1 for the splash page would be feasible for DMV.ORG does not appear to be accurate. As I
2 discussed above, a splash page implemented in such a manner would prevent users from
3 finding DMV.ORG's information through search engines. Greenhaw makes no mention
4 of the impact of a splash page upon the search engine. In such a case, search engines
5 would index the splash page, replace DMV.ORG's content with verbiage on the splash
6 page itself, and every page on the website will appear to have the same exact content (i.e.,
7 only a disclaimer). If this were to happen, DMV.ORG would cease to appear as a result
8 to user search engine queries.
9
10 **PREVIOUS ISSUES RAISED BY PLAINTIFFS,**
11 **AND ADDRESSED BY ONLINE GURU**
12    36.    After the splash page went live, Plaintiffs began raising issues with the
13 splash page to Online Guru via its attorneys.
14    37.    Given the substantial task and complexity involved in deploying a splash
15 page for nearly 120,000 pages on DMV.ORG, we engaged in ongoing testing and
16 troubleshooting efforts. Specifically, we conducted regression testing for the splash page
17 launch and attempted to cover as many permutations as possible using multiple resources.
18 We tracked analytics to verify impressions and clicks on the splash page on a daily basis.
19 We also carefully monitored user feedback daily for suggestions and comments regarding
20 the splash page. For any identified problem areas, immediate steps were taken to address
21 the issues.
22    38.    For example, as set forth in the Declaration of Mina I. Hamilton In Support
23 of Plaintiffs' Motion for Contempt Against Defendants for Violation of the Court's
24 Injunction and for Sanctions ("Hamilton Decl."), Plaintiffs brought to our attention the
25 display of images and drop-down menus on the splash page. (*See* Hamilton Decl. ¶¶ 3-
26 6.) Those were technical bugs stemming from differences in implementation between the
27 hundreds of different browsers and browser versions for approximately 120,000 different
28 pages. Each version is built on proprietary implementations and interpretations of

specifications published by consortiums and professional associations such as W3C and IEEE for example. Once the above issues were brought to our attention, the code was immediately updated and the bug fixed. The errors on the display were not intentional and provided for a bad user experience.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I executed this declaration on January 2, 2009 in San Diego, California.

David Gray