UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 23 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| TRAFFICSCHOOL.COM.INC, a California corporation and DRIVERS ED DIRECT LLC, a California limited liability company,<br><br>        Plaintiffs - Appellees,<br><br>  v.<br><br>EDRIVER INC., a California corporation; et al.,<br><br>        Defendants - Appellants. | No. 08-56518<br><br>D.C. No. 2:06-cv-07561-PA-CW<br>U.S. District Court for Central California, Los Angeles<br><br>**MANDATE**<br><br>RECEIVED<br>CLERK, U.S. DISTRICT COURT<br><br>AUG 23 2011<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY           DEPUTY |
| TRAFFICSCHOOL.COM.INC, a California corporation and DRIVERS ED DIRECT LLC, a California limited liability company,<br><br>        Plaintiffs - Appellants,<br><br>  v.<br><br>EDRIVER INC., a California corporation; et al.,<br><br>        Defendants - Appellees. | No. 08-56588<br><br>D.C. No. 2:06-cv-07561-PA-CW<br>U.S. District Court for Central California, Los Angeles |
| TRAFFICSCHOOL.COM.INC, a | No. 09-55333 |

California corporation and DRIVERS ED
DIRECT LLC, a California limited
liability company,

          Plaintiffs - Appellants,

   v.

EDRIVER INC., a California
corporation; et al.,

          Defendants - Appellees.

D.C. No. 2:06-cv-07561-PA-CW
U.S. District Court for Central
California, Los Angeles

The judgment of this Court, entered July 28, 2011, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure. No costs.

FOR THE COURT:
Molly C. Dwyer
Clerk of Court

Rhonda Roberts
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

TRAFFICSCHOOL.COM, INC., a
California corporation; DRIVERS ED
DIRECT, LLC, a California limited
liability company,
    *Plaintiffs-Appellees,*

     v.

EDRIVER INC., a California
corporation; ONLINE GURU, INC., a
California corporation; FIND MY
SPECIALIST, INC., a California
corporation; SERIOUSNET, INC., a
California corporation; RAVI K.
LAHOTI, an individual; RAJ LAHOTI,
an individual,
    *Defendants-Appellants.*

No. 08-56518

D.C. No.
2:06-cv-07561-PA-
CW

9733

TRAFFICSCHOOL.COM, INC., a
California corporation; DRIVERS ED
DIRECT, LLC, a California limited
liability company,
                *Plaintiffs-Appellants,*

                v.

EDRIVER INC., a California
corporation; ONLINE GURU, INC., a
California corporation; FIND MY
SPECIALIST, INC., a California
corporation; SERIOUSNET, INC., a
California corporation; RAVI K.
LAHOTI, an individual; RAJ LAHOTI,
an individual,
                *Defendants-Appellees.*

No. 08-56588

D.C. No.
2:06-cv-07561-PA-
CW

TRAFFICSCHOOL.COM, INC., a
California corporation; DRIVERS ED
DIRECT, LLC, a California limited
liability company,
                *Plaintiffs-Appellants,*

                v.

EDRIVER INC., a California
corporation; ONLINE GURU, INC., a
California corporation; FIND MY
SPECIALIST, INC., a California
corporation; SERIOUSNET, INC., a
California corporation; RAVI K.
LAHOTI, an individual; RAJ LAHOTI,
an individual,
                *Defendants-Appellees.*

No. 09-55333

D.C. No.
2:06-cv-07561-PA-
CW

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
March 3, 2010—Pasadena, California

Filed July 28, 2011

Before: Alex Kozinski, Chief Judge, William A. Fletcher,
Circuit Judge, and Robert W. Gettleman,, District Judge.*

Opinion by Chief Judge Kozinski

---

*The Honorable Robert W. Gettleman, Senior United States District
Judge for the Northern District of Illinois, sitting by designation.

## COUNSEL

Eileen R. Ridley (argued), Andrew B. Serwin and Chad R. Fuller, Foley & Lardner LLP, San Diego, California, for the defendant-appellants-cross-appellees.

David N. Makous (argued), Daniel C. DeCarlo and Mina I. Hamilton, Lewis Brisbois Bisgaard & Smith LLP, Los Angeles, California, for the plaintiffs-appellees-cross-appellants.

## OPINION

KOZINSKI, Chief Judge:

Defendants own and manage DMV.org, a for-profit website with a mission to save you "time, money and even a trip to the DMV!" DMV.org, Home Page, http://www.dmv.org (last visited Feb. 28, 2011). Consumers visit DMV.org for help renewing driver's licenses, buying car insurance, viewing driving records, beating traffic tickets, registering vehicles, even finding DUI/DWI attorneys. The more eyeballs DMV.org attracts, the more money defendants earn from selling sponsored links and collecting fees for referring site visitors to vendors of traffic school courses, driver's ed lessons and other driver-related services. This seems like a legitimate

and useful business, except that some visitors mistakenly believe the site is run by their state's department of motor vehicles (DMV).

Plaintiffs TrafficSchool.com, Inc. and Drivers Ed Direct, LLC market and sell traffic school and driver's ed courses directly to consumers. They also compete with DMV.org for referral revenue. Plaintiffs claim that defendants violated federal and state unfair competition and false advertising laws by actively fostering the belief that DMV.org is an official state DMV website, or is affiliated or endorsed by a state DMV.

After a trial, the district court held that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), but rejected plaintiffs' claim under California's unfair competition statute, Cal. Bus. & Prof. Code § 17200. The court issued an injunction ordering DMV.org to present every site visitor with a splash screen bearing a disclaimer. Unhappily for plaintiffs, the court denied monetary relief and declined to award attorney's fees. Both sides appeal.

## Standing

The district court found that plaintiffs "failed to prove . . . that they have suffered an injury in fact and lost money or property as a result of Defendants' actions," and that they "provided no evidence showing a causal connection between Defendants' actions and any harm Plaintiffs incurred." Defendants argue that this finding divested the district court of jurisdiction, and also that plaintiffs lacked standing under the Lanham Act. The latter contention is wrong because a false advertising plaintiff need only believe that he is *likely* to be injured in order to bring a Lanham Act claim. 15 U.S.C. § 1125(a). Moreover, the district court made its findings of no injury when it analyzed plaintiffs' state-law unfair competition claim. These findings conclusively establish that plaintiffs didn't have standing to bring their state-law claim; but, because California's unfair competition law defines "injury in

fact" more narrowly than does Article III, the findings don't necessarily preclude Article III standing. *See* Cal. Bus. & Prof. Code § 17204.[1]

The district court, however, failed to analyze Article III standing, which "is required to establish a justiciable case or controversy within the jurisdiction of the federal courts." *Gerlinger* v. *Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008). We have held that the absence of standing under the antitrust laws "affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court," as the absence of Article III standing would. *Id.* This is equally true for false advertising claims, so the district court should have undertaken an independent analysis of Article III standing before determining standing under the Lanham Act. *See Ford* v. *NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 n.1 (5th Cir. 2002).

**A.** Constitutional standing calls for the familiar trio of injury in fact, causation and redressability. *See Allen* v. *Wright*, 468 U.S. 737, 751 (1984); *Levine* v. *Vilsack*, 587 F.3d 986, 991-92 (9th Cir. 2009). Defendants contend that plaintiffs lack all three, but their arguments regarding causation and redressability are derivative of the district court's no-injury finding. We therefore construe defendants' challenge to be limited to the injury-in-fact requirement.

**[1]** In a false advertising suit, a plaintiff establishes Article III injury if "some consumers who bought the defendant['s] product under [a] mistaken belief" fostered by the defendant "would have otherwise bought the plaintiff['s] product." *Joint Stock Soc'y* v. *UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir. 2001). The plaintiff can prove his injury using "actual market

---

[1]Plaintiffs filing an unfair competition suit must prove a pecuniary injury, *Hall* v. *Time Inc.*, 70 Cal. Rptr. 3d 466, 470-71 (Cal. Ct. App. 2008), and "immediate" causation, *In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009). Neither is required for Article III standing.

experience and *probable* market behavior." *Adams* v. *Watson*,
10 F.3d 915, 923 (1st Cir. 1993). This makes sense, because
proving a counterfactual is never easy, and is especially diffi-
cult when the injury consists of lost sales that are "predicated
on the independent decisions of third parties; *i.e.*, customers."
*Am. Soc'y of Travel Agents, Inc.* v. *Blumenthal*, 566 F.2d 145,
157 (D.C. Cir. 1977) (Bazelon, C.J., dissenting). A plaintiff
who can't produce lost sales data may therefore establish an
injury by creating a chain of inferences showing how defen-
dant's false advertising could harm plaintiff's business.

[2] Plaintiffs introduced ample evidence that they compete
with defendants for referral revenue—sometimes partnering
with the same third-party traffic school or driver's ed course
providers. Sales gained by one are thus likely to come at the
other's expense. Evidence of direct competition is strong
proof that plaintiffs have a stake in the outcome of the suit,
so their injury isn't "conjectural" or "hypothetical." *Lujan* v.
*Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs
also presented testimonial and survey evidence that a "recom-
mended by DMV" endorsement is an important factor in con-
sumers' choice of traffic schools and driver's ed classes. It
stands to reason that defendants will capture a larger share of
the referral market—to plaintiffs' detriment—if they mislead
consumers into believing that DMV.org's referrals are recom-
mended by their state's DMV. Plaintiffs have therefore estab-
lished sufficient injury for Article III standing.

[3] **B.** We set out the test for Lanham Act standing in *Jack
Russell Terrier Network of Northern California* v. *American
Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005),
where we held that "a plaintiff must show: (1) a commercial
injury based upon a misrepresentation about a product; and
(2) that the injury is 'competitive,' or harmful to the plain-
tiff's ability to compete with the defendant."[2] Defendants first

---

[2]A plaintiff may meet both prongs of *Jack Russell* and still lack standing
if the purpose of his false advertising suit is to enforce someone else's

argue that plaintiffs fail the competitive prong of *Jack Russell* because DMV.org is "the Internet incarnation of the basic publishing [business] that has existed for decades if not centuries," while plaintiffs' websites are self-promotional tools. But plaintiffs introduced evidence that they compete with DMV.org in the traffic school and driver's ed referral markets in a number of states. Based on this evidence, the district court found that "Plaintiffs and Defendants are competitors, with at least a portion of Plaintiffs' business." This finding isn't clearly erroneous. *See Polykoff* v. *Collins*, 816 F.2d 1326, 1331 (9th Cir. 1987).

[4] Defendants also argue that plaintiffs fail the *Jack Russell* test because the only injury the district court identified was to the public. We agree that plaintiffs have not proven an identifiable injury to themselves, but proof of such injury isn't the same as proof of "commercial injury," which is what *Jack Russell* requires. 407 F.3d at 1037 & n.19. Defendants' confusion is understandable, however, because *Jack Russell* never explained how a plaintiff should go about proving commercial injury, *id.*, nor did *Barrus* v. *Sylvania*, 55 F.3d 468, 470 (9th Cir. 1995), the case *Jack Russell* cited in support of the commercial injury test.

[5] The Lanham Act permits "any person" to sue if he "believes that he . . . is *likely* to be damaged." 15 U.S.C. § 1125(a) (emphasis added). Because a likely injury is far less certain than an actual injury, plaintiffs need not prove the latter to establish the commercial injury necessary for Lanham Act standing. *See Johnson & Johnson* v. *Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980); *see also Harper House, Inc.* v. *Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)

---

statutory rights. *See Sybersound Records, Inc.* v. *UAV Corp.*, 517 F.3d 1137, 1143-44 (9th Cir. 2008) (Copyright Act). For example, plaintiffs couldn't sue to vindicate the California DMV's trademark rights. But *Sybersound* isn't implicated here because plaintiffs sued to enforce their own right to be free of unfair competition.

(holding that "a competitor need not prove [past] injury when suing to enjoin conduct that violates section 43(a)," in part because the "competitor may suffer future injury").

[6] We have generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers. In *Waits* v. *Frito-Lay, Inc.*, 978 F.2d 1093 (9th Cir. 1992), we held that a plaintiff bringing a false advertising suit had to show a "discernibly competitive injury," and gave the following example:

> If a film's distributor wrongfully indicates that a film is "PG"-rated when in reality it should be "R"-rated, a competitor with a PG-rated film would have standing: the misrated film theoretically draws young audiences away from the competitor's film because of the misrepresentation concerning the suitability of its content.

*Id.* at 1109. Thus, when plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing.

There are good reasons to presume that a competitor bringing a false advertising claim has suffered a commercial injury. Competitors "vie for the same dollars from the same consumer group," and a misleading ad can upset their relative competitive positions. *Kournikova* v. *Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1117 (C.D. Cal. 2003). Moreover, the Lanham Act is at heart a consumer protection statute. U-Haul Int'l, Inc. v. *Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982) ("*U-Haul I*"); *see* 5 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 27:25 (4th ed. 2010) [hereinafter *McCarthy*]; *see also* Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960, 964 (1993) ("The great evil the Lanham Act seeks to prevent is that of consumers being duped into buying a watch they later discover was made

by someone other than Rolex." (footnote omitted)). Requiring proof that defendant's ads caused plaintiff to lose sales as a prerequisite to bringing suit would frustrate its ability to act as the fabled vicarious avenger of the consuming public. 5 *McCarthy* § 27:31; *see Johnson & Johnson*, 631 F.2d at 191. *But see B. Sanfield, Inc.* v. *Finlay Fine Jewelry Corp.*, 258 F.3d 578, 580-81 (7th Cir. 2001) (competitor "is not a public prosecutor" and must therefore "prove past or potential injury").

[7] We need not decide today whether our presumption of commercial injury is conclusive or rebuttable because defendants didn't point to any evidence—such as an increase in plaintiffs' sales—that might tend to rebut the presumption. *See B. Sanfield, Inc.*, 258 F.3d at 581 (finding no past or future injury in part because plaintiff's "sales rose during the months covered by its claims"). We therefore presume that plaintiffs suffered a commercial injury.

**C.** Plaintiffs' Lanham Act standing thus turns on the second half of *Jack Russell*'s commercial injury prong: whether DMV.org's ads are misleading. *See Jack Russell*, 407 F.3d at 1037. After extensively reviewing the evidence, the district court found that DMV.org's entire site had a "tendency to deceive a substantial segment of its audience." *See Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

[8] The court discussed several facets of the website that were likely to mislead consumers into thinking DMV.org was affiliated with a government agency. At the time plaintiffs filed their suit, anyone in California who googled "dmv" or "drivers ed" would see sponsored listings for "ca.dmv.org" or "california.dmv.org," respectively; clicking those listings would take the googler to DMV.org. While there's nothing inherently misleading about sponsored search results, they *can* mislead if they are named so as to give a false impression as to the likely sponsorship of the website to which they refer.

*See Toyota Motor Sales, U.S.A., Inc.* v. *Tabari*, 610 F.3d 1171, 1177-78 (9th Cir. 2010). Defendants' use of the "ca." and "california." prefixes obviously was designed to suggest an affiliation with the State of California. DMV.org's site design also mimicked an actual DMV site by copying slogans and state symbols, and by linking to web pages elsewhere on the site that helped consumers complete DMV-related transactions like applying for a license, registering a car and signing up for traffic school. DMV.org did disclaim connection with state DMVs, but this disclaimer was easy to miss because it was displayed in small font at the bottom of each page, where many consumers would never scroll.

[9] Plaintiffs also introduced evidence of actual consumer confusion. They provided two declarations from individuals who confused DMV.org with an official DMV site and hundreds of emails sent by consumers who contacted DMV.org thinking it was their state's DMV. Some of these emails contained sensitive personal information that the typical consumer wouldn't share with a commercial website. Here's an example, with redactions:

> My boyfriend George [redacted] . . . got a ticket in South Carolina in 2006. . . . Mr. [redacted] driver's license number is [redacted]. His date of birth is [redacted]. I have his social security number if needed, but I don't want to put all of his personal information on this e-mail if possible. . . . I was told by Central Court for Lexington County in South Carolina that if we contacted the Arkansas DMV that y'all would be able to tell us what court this is in and where to pay the ticket.

Other emails were sent by law enforcement officials and state DMV employees who were similarly confused by DMV.org. For example, a Washington state trooper emailed DMV.org asking:

Dear Oregon DMV, I am currently involved in a DUI case in which a driver used his friends [sic] ID but I remember it having his picture. It is an Oregon ID in the name of [redacted]. I would like to see if I can get a copy of the picture/ID e-mailed to me for identification purposes. The DUI arrest occurred on September 16, 2006 in Snohomish County, WA.

Plaintiffs also produced evidence that two California cities, a private law firm in Texas and a number of newspapers mistakenly linked their websites to DMV.org instead of a state DMV website.

[10] In addition to this anecdotal evidence, the district court examined Internet surveys submitted by the parties. Plaintiffs' survey showed that a majority of California residents searching online for traffic schools believed that (1) DMV.org's website was actually the California DMV's and (2) a search engine listing for DMV.org was endorsed or sponsored by the California DMV. The court pointed out significant flaws in the survey—including plaintiffs' failure to use a control—but found it more credible than defendants' survey and gave it some weight. We share the district court's concerns with plaintiffs' survey, but can't find that the court erred by considering it along with the other evidence.

[11] Plaintiffs introduced volumes of evidence showing that they compete with defendants and that DMV.org probably misleads consumers. Because we presume commercial injury in this case, plaintiffs have met both prongs of *Jack Russell*'s test for Lanham Act standing.

**False Advertising**

[12] **A.** To succeed on an Internet false advertising claim, a plaintiff must show that a statement made in a commercial advertisement or promotion is false or misleading, that it actually deceives or has the tendency to deceive a substantial seg-

ment of its audience, that it's likely to influence purchasing decisions and that the plaintiff has been or is likely to be injured by the false advertisement. *See Southland Sod Farms*, 108 F.3d at 1139.[3] As we explained, *see* pp. 9745-47 *supra*, the district court made extensive findings in support of its conclusion that the DMV.org URL, defendants' search engine marketing strategy and the design of DMV.org were likely to, and did, confuse consumers. None of these findings was clearly erroneous, and they establish that the DMV.org site deceives a substantial segment of its audience. Plaintiffs' evidence also shows that a "recommended by DMV" endorsement will affect purchase decisions, and that plaintiffs are likely to suffer injury when consumers visit DMV.org instead of their competing sites. The district court committed no error in holding that defendants violated the Lanham Act.

**B.** By way of a remedy, the district court ordered DMV.org to present every site visitor with a splash screen stating, "YOU ARE ABOUT TO ENTER A *PRIVATELY OWNED* WEBSITE THAT IS *NOT* OWNED OR OPERATED BY ANY STATE GOVERNMENT AGENCY." Visitors can't access DMV.org's content without clicking a "CONTINUE" button on the splash screen.[4] Defendants argue that the district court abused its discretion by fashioning a "blanket injunction" that's overbroad—i.e., restrains conduct not at issue in plaintiffs' complaint—and violates the First Amendment.

**[13]** *Overbreadth.* The district court reasoned that the splash screen was necessary to: (1) "remedy any confusion that consumers have already developed before visiting DMV.ORG for the first time," (2) "remedy the public interest concerns associated with [confused visitors'] transfer of sensi-

---

[3]A plaintiff bringing a false advertising claim must also show that defendant caused its false or misleading statement to enter interstate commerce, *see Southland Sod Farms*, 108 F.3d at 1139, but this is virtually automatic for websites.

[4]We have reproduced the splash screen at Appendix A.

tive information to Defendants," and (3) "prevent confusion among DMV.ORG's consumers." Defendants argue that the splash screen doesn't effectuate these stated goals. But their only evidence is a declaration from DMV.org's CEO stating that defendants tested several alternative disclaimers and found them to be more effective than the splash screen in preventing consumers from emailing DMV.org with sensitive personal information. To the extent we credit a self-serving declaration, *see SEC* v. *Phan*, 500 F.3d 895, 909-10 (9th Cir. 2007), defendants' evidence doesn't prove that the splash screen is ineffective in this respect, and says nothing about whether the alternative disclaimers serve the other two interests identified by the district court. Defendants haven't carried their "heavy burden" of showing that their alternative disclaimers reduce DMV.org's likelihood of confusing consumers. *Austl. Gold, Inc.* v. *Hatfield*, 436 F.3d 1228, 1243 (10th Cir. 2006) (citing *Home Box Office, Inc.* v. *Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987)). The scope of an injunction is within the broad discretion of the district court, *Interstellar Starship Servs., Ltd.* v. *Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002), and the district court here didn't abuse that discretion when it concluded that the splash screen was the optimal means of correcting defendants' false advertising.

[14] *First Amendment.* Courts routinely grant permanent injunctions prohibiting deceptive advertising. *See* 1 Charles E. McKenney & George F. Long III, *Federal Unfair Competition: Lanham Act § 43(a)* § 10:5 (17th ed. 2010). Because false or misleading commercial statements aren't constitutionally protected, *see Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980); *Dr. Seuss Enters., L.P.* v. *Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 n.11 (9th Cir. 1997), such injunctions rarely raise First Amendment concerns.

[15] The permanent injunction here does raise such concerns because it erects a barrier to *all* content on the DMV.org

website, not merely that which is deceptive. Some of the website's content is informational and thus fully protected, such as guides to applying for a driver's license, buying insurance and beating traffic tickets. *See Mattel, Inc.* v. *MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002). The informational content is commingled with truthful commercial speech, which is entitled to significant First Amendment protection. *See Cent. Hudson,* 447 U.S. at 564. The district court was required to tailor the injunction so as to burden no more protected speech than necessary. *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Nissan Motor Co.* v. *Nissan Computer Corp.*, 378 F.3d 1002, 1016-17 (9th Cir. 2004).

[16] The district court does not appear to have considered that its injunction would permanently and unnecessarily burden access to DMV.org's First Amendment-protected content. The splash screen forces potential visitors to take an additional navigational step, deterring some consumers from entering the website altogether.[5] It also precludes defendants from tailoring DMV.org's landing page to make it welcoming to visitors, and interferes with the operation of search engines, making it more difficult for consumers to find the website and its protected content.[6] All of these burdens on protected speech are, under the current injunction, permanent.

The district court premised its injunction on its findings that defendants' "search engine marketing" and "non-sponsored natural listings, including the DMV.ORG domain

---

[5] Defendants' website usability expert submitted a declaration stating that splash screens typically drive away up to a quarter of potential site visitors. Plaintiffs cite nothing to rebut this evidence.

[6] Defendants introduced unrebutted evidence that splash screens commonly interfere with the automated "spiders" that search engines deploy to "crawl" the Internet and compile the indexes of web pages they use to determine every page's search ranking. And splash screens themselves don't have high search rankings: Search engines commonly base these rankings on the web page's content and the number of other pages linking to it, and splash screens lack both content and links.

name," caused consumers to be confused even before they
viewed DMV.org's content. The court also identified specific
misleading statements on the website. The splash screen is
justified to remedy the harm caused by such practices so long
as they continue. But website content and advertising prac-
tices can and do change over time. Indeed, the court found
that defendants had already "made some changes to
DMV.ORG and how they marketed it."

The splash screen is also justified so long as it helps to rem-
edy lingering confusion caused by defendants' past deception.
But the splash screen will continue to burden DMV.org's pro-
tected content, even if all remaining harm has dissipated. At
that point, the injunction will burden protected speech without
justification, thus burdening more speech than necessary. *See
Madsen*, 512 U.S. at 765; *Nissan Motor Co.*, 378 F.3d at
1016-17; *see also E. & J. Gallo Winery* v. *Gallo Cattle Co.*,
967 F.2d 1280, 1298 (9th Cir. 1992) (permanent injunction
can't burden future non-misleading business practices); *U-
Haul Int'l, Inc.* v. *Jartran, Inc.*, 793 F.2d 1034, 1042-43 (9th
Cir. 1986) ("*U-Haul II*") (permanent injunction can't burden
future truthful advertising).

[17] On remand, the district court shall reconsider the
duration of the splash screen in light of any intervening
changes in the website's content and marketing practices, as
well as the dissipation of the deception resulting from past
practices. If the district court continues to require the splash
screen, it shall explain the continuing justification for burden-
ing the website's protected content and what conditions
defendants must satisfy in order to remove the splash screen
in the future. In the alternative, or in addition, the court may
permanently enjoin defendants from engaging in deceptive
marketing or placing misleading statements on DMV.org. *See
U-Haul II*, 793 F.2d at 1043 (modifying injunction to prohibit
only false or misleading advertising).

C. The district court denied plaintiffs' request for an award
of profits because they provided "no evidence [of causation or

evidence] quantifying the extent of any . . . harm" they suf-
fered as a result of DMV.org's actions. Nothing in the Lan-
ham Act conditions an award of profits on plaintiff's proof
of harm, and we've held that profits may be awarded in the
absence of such proof. *See Southland Sod Farms*, 108 F.3d at
1146; *U-Haul II*, 793 F.2d at 1040-42. But an award of profits
with no proof of harm is an uncommon remedy in a false
advertising suit. It's appropriate in false *comparative* advertis-
ing cases, where it's reasonable to presume that every dollar
defendant makes has come directly out of plaintiff's pocket.
*See, e.g., U-Haul II*, 793 F.3d at 1041; *U-Haul I*, 681 F.2d at
1159 (newspaper ad falsely stated that defendant's rental
trucks were bigger, newer and more fuel-efficient than trucks
in plaintiff's fleet). It's also appropriate where ordinary dam-
ages won't deter unlawful conduct: for example, when defen-
dant associates its product with plaintiff's noncompetitive
product to appropriate good will or brand value. *See, e.g.,
Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d
117, 120, 123-24 (9th Cir. 1968) (brewer of Black & White
beer forced to pay profits to distiller of Black & White
scotch). The reason there is that plaintiff is unlikely to have
lost any sales or sale contracts to defendant, and the damages
must be measured by defendant's gains from the illicit use.

[18]  But neither the comparative advertising nor good will
cases are relevant here, where plaintiffs claim that "defen-
dant[s] advertised a different (and allegedly better) product
than they delivered." *Harper House, Inc.*, 889 F.2d at 209 n.8.
The Lanham Act allows an award of profits only to the extent
the award "shall constitute compensation and not a penalty."
15 U.S.C. § 1117(a). But "when advertising does not directly
compare defendant's and plaintiff's products," the injury to
plaintiff "may be a small fraction of the defendant's sales,
profits, or advertising expenses." *Harper House, Inc.*, 889
F.2d at 209 n.8. Plaintiffs didn't produce *any* proof of past
injury or causation, so the district court had no way to deter-
mine with any degree of certainty what award would be com-
pensatory. *See ALPO Petfoods, Inc. v. Ralston Purina Co.*,

913 F.2d 958, 969 (D.C. Cir. 1990) ("[T]he court must ensure that the record adequately supports all items of damages . . . lest the award become speculative or violate [the Lanham Act's] prohibition against punishment."); *see also* 5 McCarthy § 27:42 (explaining that "some quantum of lost sales must be proven"). The district court didn't err in denying damages.

### Attorney's Fees

Section 35 of the Lanham Act permits an award of attorney's fees to a "prevailing party" in "exceptional cases." 15 U.S.C. § 1117(a). The district court denied plaintiffs attorney's fees and gave the following justification:

> While Plaintiffs have obtained injunctive relief, they have been awarded no damages. Accordingly, and in light of Plaintiffs' unclean hands, the Court does not find that this case is exceptional and declines to award attorney's fees for the Lanham Act claim.

We review the denial of attorney's fees for abuse of discretion, *see Polo Fashions, Inc.* v. *Dick Bruhn, Inc.*, 793 F.2d 1132, 1133 (9th Cir. 1986), and must affirm unless the district court applied the wrong legal standard or its findings were illogical, implausible or without support in the record, *see United States* v. *Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).[7]

[19] **A.** Lanham Act cases generally consider whether *defendants'* conduct was "fraudulent, deliberate, or willful." *Horphag Research Ltd.* v. *Garcia*, 475 F.3d 1029, 1039 (9th

---

[7]In *Gracie* v. *Gracie*, 217 F.3d 1060 (9th Cir. 2000), we stated that a "party alleging that the district court erred by failing to award attorneys' fees under [section] 1117 faces an uphill battle." *Id.* at 1071; *see* 5 McCarthy § 30:105. Of course, *every* party alleging an abuse of discretion faces an "uphill battle," because *Hinkson* requires us to give significant deference to a district court's findings.

Cir. 2007); *see Earthquake Sound Corp.* v. *Bumper Indus.*, 352 F.3d 1210, 1216-17 (9th Cir. 2003) (summarizing case law on exceptionality); *see also Lindy Pen Co.* v. *Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993) ("[G]enerally a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful."). By examining only the relief awarded to *plaintiffs*, and failing to consider defendants' conduct, the district court applied the wrong legal standard. *See Lahoti* v. *Vericheck, Inc.*, 636 F.3d 501, 511 (9th Cir. 2011).

[20] No doubt, the court may take plaintiffs' failure to recover damages into account when exercising its discretion to award fees, but it must also consider that plaintiffs obtained a judgment and an injunction that ameliorate a serious public harm. In addition, the court must weigh the unlawfulness of defendants' conduct. It would be inequitable to force plaintiffs to bear the entire cost of enjoining defendants' willful deception when the injunction confers substantial benefits on the public. *See Comm. for Idaho's High Desert, Inc.* v. *Yost*, 92 F.3d 814, 818-19, 825 (9th Cir. 1996) (plaintiff was entitled to attorney's fees when district court awarded injunction but not damages); *Audi AG* v. *D'Amato*, 469 F.3d 534, 550-51 (6th Cir. 2006) (same). Plaintiffs put an end to the confusion created by DMV.org and stopped consumers from mistakenly transferring sensitive personal information to a commercial website. This conferred significant benefits on third parties and also vindicated plaintiffs' right *to a "market free of false advertising." Johnson & Johnson*, 631 F.2d at 192. The district court abused its discretion by failing to consider these substantial benefits or defendants' bad acts in determining whether to award attorney's fees.

**B.** Defendants challenge the district court's finding that their deception was willful—and thus "exceptional" under *Horphag* and *Lindy Pen*. But the district court's willfulness finding is supported by evidence that defendants planned to mislead site visitors and knew that their conduct confused

consumers. *See Playboy Enters., Inc.* v. *Baccarat Clothing Co.*, 692 F.2d 1272, 1276 (9th Cir. 1982) (agreeing with claim that defendants who hired a manufacturer to produce counterfeit goods were "flagrant and willful" infringers); *Earthquake Sound Corp.*, 352 F.3d at 1218 (holding that "ample evidence of actual confusion" was the most important support for district court's finding of willfulness). Defendants associated their website with URLs and search terms that falsely implied DMV.org was a government site. They had in their possession hundreds of emails sent by consumers who contacted DMV.org thinking it was a state agency. And DMV.org's director of customer service testified that he voiced concerns about these emails to senior management.

Defendants claim that they reacted by "explain[ing] away any confusion" and adding disclaimers to the bottom of each web page.[8] But defendants knew that the disclaimers were ineffective, because adding them didn't end the stream of emails sent by consumers who thought they'd contacted their state DMV. There was overwhelming proof that defendants knew their statements confused consumers and did little or nothing to remedy it. The district court could reasonably infer that they willfully deceived the public. *See Audi AG*, 469 F.3d at 551.

Nor can defendants prevail by claiming that their deception wasn't "egregious." We rejected a similar theory in *Earthquake Sound*, where we held that exceptionality doesn't require egregious conduct. 352 F.3d at 1217. The two cases defendants cite, *Johnson & Johnson-Merck Consumer Pharm. Co.* v. *Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992), and *Johnson & Johnson-Merck Consumer Pharm. Co.* v. *Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125,

---

[8]Defendants argue that the district court shouldn't have considered one defendant's "pattern of registering misleading domain names," but this evidence is in fact relevant to defendants' intent to deceive consumers. *See Polo Fashions, Inc.*, 793 F.2d at 1134.

131-32 (3d Cir. 1994), suggested only that egregious conduct could be probative of willfulness, not that it's a prerequisite.

**C.** Defendants point to the district court's finding that plaintiffs had unclean hands as an independent basis for denying attorney's fees. But that finding is clearly erroneous.[9] The district court gave two reasons why it thought plaintiffs had unclean hands: (1) they registered domain names the court deemed similar to DMV.org, such as Online-DMV.org, Internet-DMV.org and cadmvtrafficschool.com; and (2) they attempted to advertise their products on DMV.org despite being aware that the site deceived the public. Neither amounts to "clear, convincing evidence," *Citizens Fin. Grp., Inc.* v. *Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004), that "plaintiff[s'] conduct [wa]s inequitable" and "relate[d] to the subject matter of" their false advertising claims, *Japan Telecom, Inc.* v. *Japan Telecom Am. Inc.*, 287 F.3d 866, 870 (9th Cir. 2002).

Merely registering a domain name isn't proof of unclean hands. *See* 5 McCarthy § 25:76; *see also Brookfield Commc'ns, Inc.* v. *West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999). Until a domain name is associated with a server that hosts a website, it's not visible to consumers and thus can't possibly confuse them. And plaintiffs' ads on

---

[9]It's not clear that the award of attorney's fees is subject to equitable doctrines such as unclean hands. The provision of the Lanham Act authorizing attorney's fees doesn't use the word "equity." *Compare* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."), with *id.* ("[T]he plaintiff shall be entitled, subject to . . . the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."), *and* 15 U.S.C. § 1116(a) ("[C]ourts . . . shall have power to grant injunctions according to the principles of equity . . . ."). Arguably, Congress displaced courts' "general equity power" when it "meticulously detailed the remedies available" under the Lanham Act. *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U.S. 714, 719-20 (1967). Nevertheless, we need not reach this issue because we reverse the unclean hands finding.

DMV.org ran for just six *hours*, a de minimis period of time. Our review of the record reveals no evidence of actual deception caused by plaintiffs' advertising. *See Japan Telecom, Inc.*, 287 F.3d at 870.

Defendants argue that the district court's unclean hands finding can be sustained based on plaintiffs' bad intentions, pointing to an email from plaintiffs' co-founder that recommended taking an "[i]f you can't join 'em, shut 'em down approach" to DMV.org. But the doctrine is unclean hands, not impure thoughts. It's doubtful that bad intentions that are never put into effect could support a finding of unclean hands. *See Perfumebay.com, Inc.* v. *eBay, Inc.*, 506 F.3d 1165, 1178 (9th Cir. 2007) (holding that the record must "affirmatively demonstrate" consumer deception). And the email here actually undermines the rationale for finding unclean hands. Plaintiffs acquired information showing that defendants confused the public; using *litigation* to shut down a competitor who uses unfair trade practices is precisely what the Lanham Act seeks to encourage. *See* 5 *McCarthy* § 27:25.

[21] Because the district court erred in finding that defendants' conduct wasn't exceptional and that plaintiffs had unclean hands, its denial of attorney's fees was an abuse of discretion. We remand for the district court to consider the award of attorney's fees anew in light of the considerations discussed above.

## Joint Liability

[22] After plaintiffs presented their case at trial, defendants filed a Rule 52(c) motion arguing that the evidence was insufficient to hold liable any defendant other than Online Guru. The district court delayed ruling on the motion until the close of trial, when it held that all defendants were jointly and severally liable. In its ruling, the district court explained in great detail each defendant's role in creating, developing or disseminating DMV.org's misleading advertising. These find-

ings aren't clearly erroneous, and we agree with the district court that they're sufficient to hold defendants liable as joint tortfeasors. *See* 4 *McCarthy* § 25:23.

## Contempt

**[23]** Plaintiffs also appeal the district court's refusal to hold DMV.org in contempt for several technical violations of the injunction. We review this ruling for abuse of discretion. *See Hallett* v. *Morgan*, 296 F.3d 732, 749 (9th Cir. 2002). The district court found that defendants "substantially complied" with the injunction and any deviations appeared to be based on "a good faith and reasonable interpretation of the [court's order]." (Alteration in original.) Plaintiffs argue that the district court erred when it credited defendants' explanation for the technical violations. But the district court applied the correct legal standard, *see In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993), so we cannot overturn its ruling unless its factual findings are illogical, implausible or without support in the record. *See Hinkson*, 585 F.3d at 1262. We cannot say that the district court's decision to accept defendants' explanations for what turned out to be technical breaches of the injunction come anywhere near satisfying the *Hinkson* standard for abuse.

**AFFIRMED in part and REVERSED in part. REMANDED with instructions. No costs.**

## Appendix A

