# EXHIBIT AA



# DISCLOSURES

## Information about Online Advertising



# OVERVIEW

Although the number of companies advertising online—and the number of consumers shopping online—are soaring, fraud and deception may dampen consumer confidence in the e-marketplace. But cyberspace is not without boundaries, and fraud and deception are unlawful no matter what the medium. The FTC has enforced and will continue enforcing its consumer protection laws online to ensure that products and services are described truthfully in online ads and that consumers get what they pay for. These activities benefit consumers as well as sellers, who expect and deserve a fair marketplace.

Many of the general principles of advertising law apply to Internet ads, but new issues arise almost as fast as technology develops. This booklet describes the information businesses should consider as they develop online ads to ensure that they comply with the law. Briefly,

1. The same consumer protection laws that apply to commercial activities in other media apply online. The FTC Act's prohibition on "unfair or deceptive acts or practices" encompasses Internet advertising, marketing and sales. In addition, many Commission rules and guides are not limited to any particular medium used to disseminate claims or advertising, and therefore, apply to online activities.

2. Disclosures that are required to prevent an ad from being misleading, to ensure that consumers receive material information about the terms of a transaction or to further public policy goals, must be clear and conspicuous. In evaluating whether disclosures are likely to be clear and conspicuous in online ads, advertisers should consider the *placement* of the disclosure in an ad and its *proximity* to the relevant claim. Additional considerations include: the *prominence* of the disclosure; whether items in other parts of the ad *distract attention* from the disclosure; whether the ad is so lengthy that the disclosure needs to be *repeated;* whether disclosures in audio messages are presented in an adequate *volume and cadence* and visual disclosures appear for a sufficient *duration*; and, whether the language of the disclosure is *understandable* to the intended audience.

3. To make a disclosure clear and conspicuous, advertisers should:

   - Place disclosures near, and when possible, on the same screen as the triggering claim.

   - Use text or visual cues to encourage consumers to scroll down a Web page when it is necessary to view a disclosure.

   - When using hyperlinks to lead to disclosures,
     - make the link obvious;
     - label the hyperlink appropriately to convey the importance, nature and relevance of the information it leads to;
     - use hyperlink styles consistently so that consumers know when a link is available;

1

- place the hyperlink near relevant information and make it noticeable;
- take consumers directly to the disclosure on the click-through page;
- assess the effectiveness of the hyperlink by monitoring click-through rates and make changes accordingly.

○ Recognize and respond to any technological limitations or unique characteristics of high tech methods of making disclosures, such as frames or pop-ups.

○ Display disclosures prior to purchase, but recognize that placement limited only to the order page may not always work.

○ Creatively incorporate disclosures in banner ads or disclose them clearly and conspicuously on the page the banner ad links to.

○ Prominently display disclosures so they are noticeable to consumers, and evaluate the size, color and graphic treatment of the disclosure in relation to other parts of the Web page.

○ Review the entire ad to ensure that other elements—text, graphics, hyperlinks or sound—do not distract consumers' attention from the disclosure.

○ Repeat disclosures, as needed, on lengthy Web sites and in connection with repeated claims.

○ Use audio disclosures when making audio claims, and present them in a volume and cadence so that consumers can hear and understand them.

○ Display visual disclosures for a duration sufficient for consumers to notice, read and understand them.

○ Use clear language and syntax so that consumers understand the disclosures.

④ Commission rules and guides that use specific terms—"written," "writing," "printed" or "direct mail"—are adaptable to new technologies.

○ Rules and guides that apply to written ads or printed materials also apply to visual text displayed on the Internet.

○ If a seller uses email to comply with Commission rule or guide notice requirements, the seller should ensure that consumers understand that they will receive such information by email and provide it in a form that consumers can retain.

○ "Direct mail" solicitations include email. If an email invites consumers to call the sender to purchase goods or services, that telephone call and subsequent sale must comply with the Telemarketing Sales Rule requirements.

2

# I. INTRODUCTION

Day in and day out, businesses are going online to advertise and sell their products and services. The Internet combines aspects of print, television, and radio advertising in an interactive environment, and while it presents a new and fast-paced experience for consumers, it also raises interesting—and occasionally complex—questions about the applicability of laws that were developed long before "dot com" became a household phrase.

The Federal Trade Commission has examined how its own consumer protection rules and guides apply to advertising and sales made via the Internet. This staff working paper discusses FTC requirements that disclosures be presented clearly and conspicuously, in the context of Internet advertisements. It also discusses how certain rules and guides apply to online activities, when the rule or guide refers to "written" ads or "direct mail" solicitations or requires notices to be sent to consumers.

The publication of this staff working paper follows a public comment period and a public workshop which was held to discuss the applicability of FTC rules and guides to online activities. [1] In evaluating how disclosures can be displayed clearly and conspicuously in online ads, the comments and workshop discussion focused specifically on disclosures required by the rules and guides. [2] The same analysis that applies to rule and guide disclosures also applies to disclosures that are necessary to prevent deception under Section 5 of the FTC Act. They, too, must be clear and conspicuous. Therefore, this paper addresses both types of disclosures. [3]

# II. THE APPLICABILITY OF FTC LAW TO INTERNET ADVERTISING

The FTC Act's prohibition on "unfair or deceptive acts or practices" broadly covers advertising claims, marketing and promotional activities, and sales practices in general. [4] The Act is not limited to any particular medium. Accordingly, the Commission's role in protecting consumers from unfair or deceptive acts or practices encompasses advertising, marketing, and sales online, as well as the same activities in print, television, telephone and radio. Indeed, since 1994, the Commission has brought over 100 law enforcement actions to stop fraud and deception online and is working to educate businesses about their legal obligations and consumers about their rights.



For certain industries or subject areas, the Commission issues rules and guides. Rules prohibit specific acts or practices that the Commission has found to be unfair or deceptive. [5] Guides help businesses in their efforts to comply with the law by providing examples or direction on how to avoid unfair or deceptive acts or practices. [6] Many rules and guides address claims about products or services or

advertising in general and are not limited to any particular medium used to disseminate those claims or advertising. [7] Therefore, the plain language of many rules and guides applies to claims made on the Internet. [8] For example, the Mail or Telephone Order Merchandise Rule, which addresses the sale of merchandise that is ordered by mail, telephone, facsimile or computer, applies to those sales regardless of "the method used to solicit the order." [9] Solicitations made in print, on the telephone, radio, TV or online naturally fall within the Rule's scope. In addition, the Guides Concerning the Use of Endorsements and Testimonials in Advertising apply to endorsements, which are defined as "any advertising message . . . [that] consumers are likely to believe reflects the opinions, beliefs, findings, or experience of a party other than the sponsoring advertiser." [10] The Guides refer to advertising without limiting the media in which it is disseminated, and therefore, encompass online ads.

> THE PLAIN LANGUAGE OF MANY RULES AND GUIDES APPLIES TO CLAIMS MADE ON THE INTERNET.

# III. CLEAR AND CONSPICUOUS DISCLOSURES IN ONLINE ADVERTISEMENTS

When it comes to online ads, the basic principles of advertising law apply:

1. Advertising must be truthful and not misleading; [11]
2. Advertisers must have evidence to back up their claims ("substantiation"); [12] and
3. Advertisements cannot be unfair. [13]

Unique features in Internet ads also may affect how an ad and any required disclosures are evaluated.

## A. Background on Disclosures

Advertisers must identify all express and implied claims that the ad conveys to consumers. When identifying claims, advertisers should not focus only on individual phrases or statements, but should consider the ad as a whole, including the text, product name and depictions. [14] If an ad makes express or implied claims that are likely to be misleading without certain qualifying information, the information must be disclosed. Advertisers must determine which claims might need qualification and what information should be provided in a disclosure. If qualifying information is necessary to prevent an ad from being misleading, advertisers must present the information clearly and conspicuously.

A disclosure only qualifies or limits a claim, to avoid a misleading impression. It cannot cure a false claim. If a disclosure provides information that contradicts a claim, the disclosure will not be sufficient to prevent the ad from being deceptive. In that situation, the claim itself must be modified.

Many Commission rules and guides spell out the information that must be disclosed in connection with certain claims. In many cases, these disclosures prevent a claim from being misleading or deceptive. [15] Other rules and guides require disclosures to ensure that consumers receive material information about the terms of a transaction, [16] or to further public policy goals. [17] These disclosures also must be clear and conspicuous.

# B.  The Clear and Conspicuous Requirement

Disclosures that are required to prevent deception—or to provide consumers material information about a transaction—must be presented "clearly and conspicuously." [18] Whether a disclosure meets this standard is measured by its performance—that is, how consumers actually perceive and understand the disclosure within the context of the entire ad. The key is the *overall net impression* of the ad—that is, whether the claims consumers take from the ad are truthful and substantiated. [19]

In reviewing their online ads, advertisers should adopt the perspective of a reasonable consumer. [20] They also should assume that consumers don't read an entire Web site, just as they don't read every word on a printed page. [21] In addition, it is important for advertisers to draw attention to the disclosure. Making the disclosure available somewhere in the ad so that consumers who are looking for the information *might* find it doesn't meet the clear and conspicuous standard.

Even though consumers have control over what and how much information they view on Web sites, they may not be looking for—or expecting to find—disclosures. Advertisers are responsible for ensuring that their messages are truthful and not deceptive. Accordingly, disclosures must be communicated effectively so that consumers are likely to notice and understand them.

# C.  What are Clear and Conspicuous Disclosures?

There is no set formula for a clear and conspicuous disclosure. In all media, the best way to disclose information depends on what information must be provided and the nature of the advertisement. Some disclosures are quite short, while others are more detailed. Some ads use only text, while others use graphics, video and audio. Advertisers have the flexibility to be creative in designing their ads, so long as necessary disclosures are communicated effectively and the overall message conveyed to consumers is not misleading.

To evaluate whether a particular disclosure is clear and conspicuous, consider:

- the **placement** of the disclosure in an advertisement and its **proximity** to the claim it is qualifying,

- the **prominence** of the disclosure,

- whether items in other parts of the advertisement **distract attention** from the disclosure,

- whether the advertisement is so lengthy that the disclosure needs to be **repeated**,

- whether disclosures in audio messages are presented in an adequate **volume and cadence** and visual disclosures appear for a sufficient **duration**, and

- whether the language of the disclosure is **understandable** to the intended audience.

The following discussion uses these traditional factors to evaluate whether disclosures are likely to be clear and conspicuous in the context of online ads. In the online version of this booklet, the underlined hyperlinks link to mock ads. In the printed booklet, the circles in the margin correspond to mock ads in the appendix. Each mock ad presents a scenario to illustrate one or more particular factors. Advertisers must consider all of the factors, however, and evaluate an actual disclosure in the context of the ad as a whole.



Refer to Example # in the Appendix.

# 1. Proximity and Placement

A disclosure is more effective if it is placed near the claim it qualifies or other relevant information. Proximity increases the likelihood that consumers will see the disclosure and relate it to the relevant claim or product. For print ads, an advertiser might measure proximity in terms of whether the disclosure is placed adjacent to the claim, or whether it is separated from the claim by text or graphics. The same approach can be used for Internet ads. Web sites, however, are interactive and have a certain depth—with multiple pages linked together and pop-up screens, for example—that may affect how proximity is evaluated.

## a. Evaluating Proximity in the Context of a Web Page

Some disclosures must be made when an ad contains a certain claim (often referred to as a "triggering claim"). On a Web page, the disclosure is more likely to be effective if consumers view the claim and disclosure together on the same screen. Even if a disclosure is not tied to a particular word or phrase, it is more likely that consumers will notice it if it is placed next to the information, product, or service to which it relates.



In some circumstances, it may be difficult to ensure that a disclosure appears on the "same screen" as a claim or product information. Some disclosures are long and difficult to place next to the claims they qualify. In addition, computers and other information "appliances" have varying screen sizes that display Web sites differently. [22] In these situations, consumers may need to scroll to view a disclosure. If scrolling is necessary, advertisers should ask whether consumers are likely to do it. If consumers don't scroll, they may miss important qualifying information and be misled.

In these circumstances, advertisers are advised to:

**Use text or visual cues to encourage consumers to scroll.**
Text prompts can indicate that more information is available. An explicit instruction like "see below for important information on diamond weights" will alert consumers to scroll and look for the information. The text prompt should be tied to the disclosure that it refers to. General or vague statements, such as "see below for details," provide no indication about the subject matter or importance of the information that consumers will find and are not adequate cues.



The visual design of the page also could help alert consumers to the availability of more information. For example, text that clearly continues below the screen, whether spread over an entire page or in a column, would indicate that the reader needs to scroll for additional information. Advertisers should consider how the Web page is displayed by the default Web browser setting for which the ad is designed, as well as for different display options.

A scroll bar on the side of a computer screen is not a sufficiently effective visual cue. Although the scroll bar may indicate to some consumers that they have not reached the end of a page, many consumers may not look at the scroll bar. In fact, some consumers access the Internet with devices that don't display a scroll bar.

**Avoid Web page formats that discourage scrolling.**
The design of some pages might indicate that there is no more information on the page and no need to continue scrolling. If the text ends before the bottom of the screen or readers see several inches of blank space, chances are they will stop scrolling and miss the disclosure. In addition, if there is a lot of unrelated information—either words or graphics—separating a claim and a disclosure, even a consumer who is prompted to scroll might miss the disclosure or not relate it to a distant claim they've already read.

## b.  Hyperlinking to a Disclosure

With hyperlinks, additional information, including disclosures, might be placed on a Web page entirely separate from the relevant claim. Disclosures that are an integral part of a claim or inseparable from it, however, should be placed on the same page and immediately next to the claim. In these situations, the claim and the disclosure should be read at the same time, without referring the consumer somewhere else to obtain the disclosure. This is particularly true for cost information or certain health and safety disclosures. For example, if the total cost of a product is advertised on one page, but there are significant additional fees that the consumer would not expect to be charged, the existence of those additional fees should be disclosed on the same page and immediately adjacent to the total cost claim.[23] In other situations, it may not even be necessary to use a hyperlink to convey disclosures. Often, disclosures consist of a word or phrase that may be




**Ex. 5**

easily incorporated into the text, along with the claim. This placement increases the likelihood that consumers will see the disclosure and relate it to the relevant claim.

Under some conditions, however, a disclosure accessible by a hyperlink may be sufficiently proximate to the relevant claim. Hyperlinked disclosures may be particularly useful if the disclosure is lengthy or if it needs to be repeated (because of multiple triggers, for example). The key considerations for effective hyperlinks are:

- the labeling or description of the hyperlink,

- the consistency in the use of hyperlink styles,

- its placement and prominence on the Web page, and

- the handling of the disclosure on the click-through page.

**Choosing the right label for the hyperlink.** A hyperlink that leads to a disclosure should be labeled clearly and conspicuously. The hyperlink's label—the text or graphic assigned to it—affects whether consumers actually click on it and see and read the disclosure.

- **Make it obvious.** Consumers should be able to tell that they can click on a hyperlink to get more information.

- **Label the link to convey the importance, nature and relevance of the information it leads to.** The hyperlink should give consumers a *reason* to click on it. That is, the label should make clear that the link is related to a particular advertising claim or product and indicate the nature of the information to be found by clicking on it. The hyperlink label should use clear, understandable text. Although the label itself does not need to contain the complete disclosure, it may be useful to incorporate part of the disclosure to indicate the type and importance of the information the link leads to.


**Ex. 6**

- **Don't be coy.** Some text links may provide no indication about why a claim is qualified or the nature of the disclosure. In most cases, simply hyperlinking a single word or phrase in the text of an ad may not be effective. Although some consumers may understand that there is additional information available, they may have different ideas about the nature of the information and its significance. The same


**Ex. 7**

MAKE IT OBVIOUS.

LABEL THE LINK.

DON'T BE SUBTLE.

DON'T BE COY.

8



may be true of hyperlinks that simply say "disclaimer," "more information," "details," or "terms and conditions."



- **Don't be subtle.** Asterisks or other symbols by themselves may not be effective. Typically, they provide no clues about why the claim is qualified or the nature of the disclosure. [24] In fact, consumers may view an asterisk or another symbol as just another graphic on the page. Even if a Web site explains that a particular symbol is a hyperlink to important information, consumers might miss the explanation, depending on where they enter the site and how they navigate through it.

**Using hyperlink styles consistently allows consumers to know when a link is available.** Although the text or graphics used to signal a hyperlink may differ among Web sites, treating hyperlinks inconsistently within a single site can increase the chances that consumers will *not* notice—or click on—a disclosure hyperlink. For example, if hyperlinks usually are underlined in a site, chances are consumers wouldn't recognize italicized text as being a link, and could miss the disclosure.

**Placing the link near relevant information and making it noticeable.** The hyperlink should be proximate to the claim that triggers the disclosure so that consumers can notice it easily and relate it to the claim. Typically, this means that the hyperlink is adjacent to the triggering term or other relevant information. Consumers may miss disclosure hyperlinks that are separated from the relevant claim by text, graphics, blank space, or intervening hyperlinks. Format, color or other graphics treatment also can help to ensure that consumers notice the link. (See below for more information on prominence.)



**Getting to the disclosure on the click-through page should be easy.** The click-through page—that is, the page the hyperlink leads to—must contain the complete disclosure. The disclosure must be displayed prominently. Distracting visual factors, extraneous information, and many "click-away" opportunities to link elsewhere before viewing the disclosure can obscure an otherwise adequate disclaimer.



- **Get consumers to the message quickly.** The hyperlink should take consumers directly to the disclosure. They shouldn't have to search a click-through page or go to other pages for the information. In addition, the disclosure should be easy to understand.



- **Assessing the effectiveness of a hyperlink disclosure is important.** Tools are available to allow advertisers to evaluate the effectiveness of disclosures through hyperlinks. For example, advertisers can monitor click-through rates—how often consumers click on a hyperlink and view the click-through page—for accurate data on the efficacy of the hyperlink. Advertisers also can evaluate the amount of time visitors spend on a certain page, which may indicate whether consumers are reading the disclosure.



9

- **Don't ignore your data.** If hyperlinks are not followed, another method of conveying the required information would be necessary.

## c.  Using High Tech Methods For Proximity and Placement

Disclosures may be displayed on Web sites in many ways. For example, a disclosure may be placed in a frame that remains constant even as the consumer scrolls down the page or navigates through another part of the site. A disclosure also might be displayed in a window that pops-up or on interstitial pages that appear while another Web page is loading. New techniques for displaying information are being unveiled all the time. But there are special considerations for evaluating whether a technique is appropriate for providing required disclosures.



- **Don't ignore technological limitations.** A scrolling marquee—information that scrolls through a box on a Web site—may display differently depending on the type of browser a consumer uses. Similarly, some browsers or information appliances may not support or display frames properly, so a disclosure placed in one portion of the frame may not be viewable. Certain Internet tools may overcome this limitation by determining if a consumer's Web browser can view frames and if not, serving a page that is formatted differently. Without such tools, advertisers should be concerned about whether a required disclosure will appear; if it won't, they should choose different ways to communicate the disclosure.

- **Recognize and respond to characteristics of each technique.** Some consumers may miss information presented in a pop-up window or on an interstitial page if the window or page disappears and they are unable or unaware of how to access it. Others may inadvertently minimize a pop-up screen by clicking on the main page and may not know how to make the pop-up screen reappear. There may be ways to get around these drawbacks, such as requiring the consumer to take some affirmative action to proceed past the pop-up or interstitial (for example, by clicking on a "continue" button).

- **Research can help.** Research may be useful to help advertisers determine whether a particular technique is an effective method of communicating information to consumers. For example, research may show that consumers don't actually read information in pop-up windows because they immediately close the pop-up on the page they want to view. It also may indicate whether consumers relate information in a pop-up window or on an interstitial page to a claim or product they haven't encountered yet. Advertisers should consider this information in determining effective methods of presenting required disclosures.

### d.    Displaying Disclosures Prior to Purchase

Disclosures must be effectively communicated to consumers *before* they make a purchase or incur a financial obligation. Disclosures are more likely to be effective if they are provided in the context of the ad, when the consumer is considering the purchase. Where advertising and selling are combined on a Web site, disclosures should be provided before the consumer makes the decision to buy, say, before clicking on an "order now" button or a link that says "add to shopping cart."

> D<span>ISCLOSURES MUST BE EFFECTIVELY</span> COMMUNICATED TO CONSUMERS *BEFORE* THEY MAKE A PURCHASE OR INCUR A FINANCIAL OBLIGATION.



- **Don't focus only on the order page.** Some disclosures must be made in connection with a particular claim or product. Consumers may not relate a disclosure on the order page to information they viewed many pages earlier. It also is possible that after surfing a company's Web site, some consumers may decide to purchase the product from the company's "bricks and mortar" store. Those consumers would miss any disclosures placed only on the ordering page.

### e.    Evaluating Proximity With Banner Ads

Most banner ads displayed today are teasers. Because of their small size, they generally do not provide complete information about a product or service. Instead, consumers must click through to the Web site to get more information and learn the terms of an offer. In some instances, a banner may contain a claim that requires qualification.

- **Disclose required information in the banner itself or clearly and conspicuously on the Web site it links to.** In some cases, a required disclosure can be incorporated into a banner ad easily. Because of the space constraints of banner ads, other disclosures may be too detailed to be disclosed effectively in the banner. In some instances, these disclosures may be communicated effectively to consumers if they are made clearly and conspicuously on the Web site the banner links to and while consumers are deciding whether to buy a product or service. In determining whether the disclosure should be placed in the banner itself or on the Web site the banner links to, advertisers should consider how important the information is to prevent deception, how much information needs to be disclosed, the burden of disclosing it in the banner ad, how much information the consumer may absorb from the ad, and how effective the disclosure would be if it was made on the Web site. [25]



**Ex. 21**

- **Use creativity to incorporate or flag required information.** Scrolling text or rotating panels in a banner can present an abbreviated version of a required disclosure that indicates that there is additional important information and a more complete disclosure available on the click-through page. With lengthier disclosures, the banner can direct consumers to the Web site for more information. The full disclosure then must be clearly and conspicuously displayed on the Web site.

> USE CREATIVITY TO INCORPORATE OR FLAG REQUIRED INFORMATION.

- **Provide any required disclosures in interactive banners.** Some banner ads allow consumers to interact within the banner, so that they may conduct a transaction without clicking through to a Web site. If consumers can get complete information about a product or make a purchase within an interactive banner, all required disclosures should be included in the banner.

## 2. Prominence

It's the advertiser's responsibility to draw attention to the required disclosures.

- **Display disclosures prominently so they are noticeable to consumers.** The size, color, and graphics of the disclosure affect its prominence.

    - **Size Matters.** Disclosures that are at least as large as the advertising copy are more likely to be effective.

    - **Color Counts.** A disclosure in a color that contrasts with the background emphasizes the text of the disclosure and makes it more noticeable. Information in a color that blends in with the background of the ad is likely to be missed.

    - **Graphics Help.** Although using graphics to display a disclosure is not required, they may make the disclosure more prominent.

- **Evaluate the size, color, and graphics of the disclosure in relation to other parts of the Web site.** [26] The size of a disclosure should be compared to the type size of the claim and other text on the page. If a claim uses a particular color or graphic treatment, the disclosure can be formatted the same way to help ensure that consumers who view the claim are able to view the disclosure as well. In addition, the graphic treatment of the disclosure may be evaluated in relation to how graphics are used to convey other items in the ad.

**Ex. 22-23**

- **Don't bury it.** The prominence of the disclosure also may be affected by other factors. A disclosure that is buried in a long paragraph of unrelated text would not be effective. The unrelated text detracts from the message and makes it unlikely that a consumer would notice the disclosure or recognize its importance. Even though the unrelated information may be useful, advertisers must ensure that the disclosure is communicated effectively.

## 3. Distracting Factors in Ads

The clear and conspicuous analysis does not focus only on the disclosure itself. It also is important to consider the entire ad. Elements like graphics, sound, text or even hyperlinks that lead to other pages or sites, may result in consumers not noticing, reading or listening to the disclosure.



- **Don't let other parts of an ad get in the way.** On television, moving visuals behind a text message make the text hard to read and may distract consumers' attention from the message. Using graphics online raises similar concerns: flashing images or animated graphics may reduce the prominence of a disclosure. Graphics on a Web page *alone* may not undermine the effectiveness of a disclosure. It is important, however, to consider all the elements in the ad, not just the text of the disclosure.

## 4. Repetition

It may be necessary to disclose important information more than once in an advertisement to convey a non-deceptive message. Repeating a disclosure makes it more likely that a consumer will notice and understand it. Still, the disclosure need not be repeated so often that consumers would ignore it and that it would clutter the ad.

- **Repeat disclosures on lengthy Web sites, as needed.** Consumers can access and navigate Web sites differently. Many consumers may access a site through its homepage, but others might enter in the middle, perhaps by linking to that page from a search engine or another Web site. Consumers also might not click-on every page of the site and may not choose to scroll to the bottom of each page. And many may not read every word on every page of a Web site. As a result, advertisers should question whether consumers who see only a portion of their ad are likely to miss a necessary disclosure and be misled. [27]

- **Repeat disclosures with repeated claims, as needed.** If claims requiring some qualification are repeated throughout an ad, it may be necessary to repeat the disclosure too. In some situations, a disclosure is tied so closely to a claim that it must always accompany the claim to prevent deception. Depending on the disclosure, a clearly-labeled hyperlink could be repeated on various pages so that the full disclosure would be placed on only one page of the site.

# 5. Multimedia Messages

Internet ads may contain audio messages, video clips and other animated segments with claims that require qualification. As with radio and television ads, the disclosure should accompany the claim. In evaluating whether disclosures in these multimedia portions of online ads are clear and conspicuous, advertisers should evaluate all of the factors discussed in this paper and these special considerations:

- **For audio claims, use audio disclosures.** The disclosure should be in a volume and cadence sufficient for a reasonable consumer to hear and understand it. The volume of the disclosure can be evaluated in relation to the rest of the message, and in particular, the claim. Of course, consumers who do not have speakers, appropriate software, or appliances with audio capabilities will not hear the claim or the disclosure. Because some consumers may miss the audio portion of an ad, disclosures triggered by a claim or other information in an ad's text should not be placed solely in an audio clip.

- **Display visual disclosures for a sufficient duration.** Visual disclosures presented in video clips or other dynamic portions of online ads should appear for a duration sufficient for consumers to notice, read and understand them. As with brief video superscripts in television ads, fleeting disclosures on Web sites are not likely to be effective.

# 6. Understandable Language

To ensure that disclosures are effective, consumers must be able to understand them. Advertisers should use clear language and syntax and avoid legalese or technical jargon. Disclosures should be as simple and straightforward as possible. Incorporating extraneous material into the disclosure also may diminish the message that must be conveyed to consumers.

# IV.  SPECIFIC ISSUES IN APPLYING CERTAIN RULES AND GUIDES TO INTERNET ACTIVITIES

## A.  It's Not Just Paper Anymore

Some Commission rules and guides use certain terms—such as "written," "writing" and "printed"—that connote words or information on paper. With the increasing use of computers and other electronic devices, that meaning is changing. In addition, thanks to email, businesses are no longer limited to using traditional communications vehicles like mail or the telephone to comply with rule or guide requirements to notify consumers.

### 1.  Rules and Guides that Use the Terms "Written," "Writing" or "Printed"

Many rules and guides use the terms "written," "writing" and "printed," but in different ways. Some apply to written ads or transactions, using the term written to connote visual text. Others require information to be disclosed in writing, signaling the importance of text and the ability to retain and refer to the information more than once. Because each term must be analyzed within the context of the rule and guide itself, the Commission will continue to examine the exact nature of how these rules and guides apply to the paperless world of e-commerce and online advertising on a case-by-case basis and through periodic rule and guide reviews. [28]

For the most part, however, Commission rules and guides that use the words "written," "writing" and "printed" will apply online. In many cases, an Internet ad that uses visual text is the equivalent of a "written" ad. Consumers expect to receive the same information and protections whether they're looking at a paper catalog or an online one. For example:

- Claims "in writing . . . or in any broadcast advertisement" about an appliance's energy use or efficiency must be tested in accordance with the Appliance Labeling Rule. [29] Common sense dictates that this includes online claims. An energy use claim presented in visual text on a Web site should be treated the same as a claim in a print ad.

- If certain information about energy efficiency must be provided in "printed" catalogs featuring appliances, [30] the information also should be provided online. There are no more constraints to providing this information on a Web site than there would be on paper.

15

## 2.  Using New Technologies to Comply with Rules & Guides

As more activities and transactions take place online, businesses are using email to communicate with their customers. In some cases, email may be used to comply with a rule or guide requirement to provide or send required notices or documents to consumers. A key consideration for choosing this method of delivery is whether consumers understand or expect that they will receive important information by email. In addition, information should be provided in a form that consumers can retain, either by saving or printing. Here are examples of how these considerations apply to particular rules:

- If a seller cannot ship goods ordered by mail, telephone, or computer within the time promised (or otherwise 30 days), the seller must inform consumers of the delay and give them the option to agree to the delay or cancel the order and get a refund.[31] Sellers are not required to use a particular method to send delay notices and online merchants may use email to send these notices. Consumers often provide their email address as part of an online order form. It may make good business sense for a seller to tell consumers that they plan to send any delay notices to that email address. This information may be added to an online order form without substantial cost or difficulty and may alert consumers that future communications about the order will occur online.

- Online sellers of negative option plans—such as book-of-the-month clubs—also may use email to communicate with consumers. With these plans, sellers send announcements that identify the merchandise that will be shipped and billed for that month unless the consumer declines by a certain date.[32] These monthly notices are an important part of the plan. If consumers don't understand that notices are sent by email, they may not respond and may incur charges for merchandise they don't want. Because sellers are required to clearly and conspicuously disclose the material terms of the plan in their promotional materials, they should clearly inform consumers about how the notices will be sent before consumers enroll in the plan.

- Sellers that offer written warranties on consumer products must include certain information in their warranties and make them available for review at the point of purchase.[33] Warranties communicated through visual text on Web sites are no different than paper versions and the same rules apply. The requirement to make warranties available at the point of purchase can be accomplished easily on the Internet. For example, Internet merchants may use a clearly-labeled hyperlink such as "click here for warranty information" to lead to the full text of the warranty. Because consumers may need to refer to the warranty while comparison shopping or after the purchase, the warranty should be presented in a way that is capable of being preserved, either by downloading or printing. This is especially important if a paper warranty is not included with the product.

## B.  Direct Mail Solicitations Online

"Direct mail" solicitations generally refer to promotional materials that consumers receive through traditional mail. With technological advances, these kinds of solicitations have moved online.

Although the Telemarketing Sales Rule applies largely to telemarketing calls from business-to-consumer, it also applies to telephone calls the consumer places in response to a "direct mail" advertisement.[34] As with direct mail sent by traditional means, email can convey the false impression that the recipient has been "specially selected" for an offer not available to the general public. That impression may be exploited in a telemarketing call, particularly if the direct mail piece omits important information about the products or services offered. Therefore, if an email invites consumers to telephone the sender to purchase goods or services, the phone call is subject to the Telemarketing Sales Rule[35]—as is the subsequent sale.

Not all online advertisements are considered "direct mail" solicitations. Consumers who view most Web sites, newsgroups, or electronic bulletin board postings are likely to understand that the goods or services are being offered on the same terms and conditions to all consumers—and that they haven't been "specially selected" for the offer. Like television and newspaper advertisements, Web sites generally, newsgroups, and electronic bulletin board postings are different forms of advertising than "direct mail."[36] Telephone calls placed in response to these types of ads would generally be exempt from the Telemarketing Sales Rule.[37]

# V.  Conclusion

Although the number of companies advertising online—and the number of consumers shopping online—are soaring, fraud and deception may dampen consumer confidence in the e-marketplace. To ensure that products and services are described truthfully in online ads and that consumers get what they pay for, the FTC has, and will continue to, enforce its consumer protection laws. Many of the general principles of advertising law apply to online ads, but new issues arise almost as fast as technology develops. The FTC will continue to evaluate online advertising, using traditional criteria, while recognizing the uniqueness of the new medium. Businesses as well should consider these criteria when developing online ads and ensuring they comply with the law.

# ENDNOTES

<sup>1</sup>   The Commission initially requested written comment on a proposal that discussed how it would apply its rules and guides to online activities. 63 Fed. Reg. 24998 (May 6, 1998). After reviewing the comments, the Commission held a public workshop on May 14, 1999, to explore the issues further. *See* 64 Fed. Reg. 14156 (Mar. 24, 1999) (announcing the workshop). Twenty-five groups, including businesses, trade associations and consumer organizations, participated in the workshop discussion. The focus of the workshop was an evaluation of how disclosures required by FTC rules and guides can be displayed clearly and conspicuously in Internet advertisements. A shorter session examined how terms such as "written," "writing" and "printed" are used in FTC rules and guides and should be interpreted in light of the use of electronic media. Additional written comments were submitted after the workshop. The public comments and the workshop transcript are available at **http:// www.ftc.gov/bcp/rulemaking/elecmedia/index.htm** or from the FTC's Consumer Response Center, 600 Pennsylvania Avenue, NW, Room 130, Washington, DC 20580.

<sup>2</sup>   With the rules and guides, the content of the disclosure generally is prescribed. Thus, it was unnecessary to examine broader issues that might arise in examining advertising in general—for example, whether a disclosure is even necessary or what it should say.

<sup>3</sup>   This working paper, however, does not address disclosures required by regulations issued by the Federal Reserve Board: Regulation B, 12 C.F.R. Part 202; Regulation E, 12 C.F.R. Part 205; Regulation M, 12 C.F.R. Part 213; Regulation Z, 12 C.F.R. Part 226. This paper also does not address which country's laws govern a particular transaction or sale. The FTC and other countries and organizations have been evaluating these issues and will continue to work cooperatively in this area. *See* **http://www.ftc.gov/bcp/icpw/index.htm** for more information about international issues.

<sup>4</sup>   The Commission's authority covers virtually every sector of the economy, except for certain excluded industries, such as the business of insurance and banks.

<sup>5</sup>   The Commission issues rules pursuant to Section 5 of the FTC Act when it has reason to believe that certain unfair or deceptive acts or practices are prevalent in an industry. 15 U.S.C. § 57a(a)(1)(B). The Commission may seek civil penalties from any person or company that violates a rule "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). The Commission also may seek redress for consumers. 15 U.S.C. § 57b(a)(1). In addition, the Commission promulgates rules pursuant to specific statutes, which are designed to further particular policy goals. The remedies available to enforce these rules vary.

<sup>6</sup> Guides are "administrative interpretations of the laws administered by the Commission." 16 C.F.R. § 1.5. Although the guides do not have the force and effect of law, the Commission may bring an enforcement action if a person or company fails to comply with a guide and engages in an unfair or deceptive practice in violation of the FTC Act.

<sup>7</sup> The following rules and guides are included in this category: Guides for the Nursery Industry (16 C.F.R. Part 18); Guides for the Rebuilt, Reconditioned and Other Used Automobile Parts Industry (16 C.F.R. Part 20); Guides for the Jewelry, Precious Metals, and Pewter Industries (16 C.F.R. Part 23); Guides for Select Leather and Imitation Leather Products (16 C.F.R. Part 24); Tire Advertising and Labeling Guides (16 C.F.R. Part 228); Guides Against Deceptive Pricing (16 C.F.R. Part 233); Guides Against Bait Advertising (16 C.F.R. Part 238); Guides for the Advertising of Warranties and Guarantees (16 C.F.R. Part 239); Guides for the Household Furniture Industry (16 C.F.R. Part 250); Guide Concerning Use of the Word "Free" and Similar Representations (16 C.F.R. Part 251); Guides for Private Vocational and Distance Education Schools (16 C.F.R. Part 254); Guides Concerning Use of Endorsements and Testimonials in Advertising (16 C.F.R. Part 255); Guides Concerning Fuel Economy Advertising for New Automobiles (16 C.F.R. Part 259); Guides for the Use of Environmental Marketing Claims (16 C.F.R. Part 260); Rules and Regulations Under the Wool Products Labeling Act of 1939 (16 C.F.R. Part 300); Rules and Regulations Under Fur Products Labeling Act (16 C.F.R. Part 301); Rules and Regulations Under the Textile Fiber Products Identification Act (16 C.F.R. Part 303); Rule Concerning Disclosures Regarding Energy Consumption and Water Use of Certain Home Appliances and Other Products Required Under the Energy Policy and Conservation Act ("Appliance Labeling Rule") (16 C.F.R. Part 305); Rule Concerning Automotive Fuel Ratings, Certification and Posting (16 C.F.R. Part 306); Labeling Requirements for Alternative Fuels and Alternative Fueled Vehicles (16 C.F.R. Part 309); Telemarketing Sales Rule (16 C.F.R. Part 310); Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets (16 C.F.R. Part 410); Retail Food Store Advertising and Marketing Practices (16 C.F.R. Part 424); Use of Prenotification Negative Option Plans (16 C.F.R. Part 425); Power Output Claims for Amplifiers Utilized in Home Entertainment Products (16 C.F.R. Part 432); Preservation of Consumers' Claims and Defenses (16 C.F.R. Part 433); Mail or Telephone Order Merchandise Rule (16 C.F.R. Part 435); Credit Practices Rule (16 C.F.R. Part 444); Used Motor Vehicle Trade Regulation Rule (16 C.F.R. Part 455); Labeling and Advertising of Home Insulation (16 C.F.R. Part 460); Interpretations of Magnuson-Moss Warranty Act (16 C.F.R. Part 700); Disclosure of Written Consumer Product Warranty Terms and Conditions (16 C.F.R. Part 701); Pre-Sale Availability of Written Warranty Terms (16 C.F.R. Part 702); Informal Dispute Settlement Procedures (16 C.F.R. Part 703).

<sup>8</sup> A rule or guide applies to online activities if its scope is not limited by how claims are communicated to consumers, how advertising is disseminated, or where commercial activities occur. As needed, the Commission will amend or clarify the scope of any particular rule or guide in more detail during its regularly scheduled

review. The Commission has a program in place to periodically review its rules and guides to evaluate their continued need and to make any necessary changes.

[9] 16 C.F.R. § 435.2(a).

[10] 16 C.F.R. § 255(b).

[11] As explained in the FTC's Deception Policy Statement [hyperlink], an ad is deceptive if it contains a statement—or omits information—that is likely to mislead consumers acting reasonably under the circumstances and is "material" or important to a consumer's decision to buy or use the product. *See FTC Policy Statement on Deception, appended to Cliffdale Associates, Inc.*, 103 F.T.C. at 174 ("Deception Policy Statement"). A statement also may be deceptive if the advertiser does not have a reasonable basis to support the claim. Advertising Substantiation Statement [hyperlink]. *See FTC Policy Statement on Advertising Substantiation, appended to Thompson Medical Co.*, 104 F.T.C. 648, 839 (1984), aff'd, 791 F.2d 189 (D.C. Cir. 1986), cert. denied, 479 U.S. 1086 (1987).

[12] Before disseminating an ad, advertisers must have reasonable support for all express and implied objective claims that the ad conveys to consumers. When an ad lends itself to more than one reasonable interpretation, there must be substantiation for each interpretation. The type of evidence needed to substantiate a claim may depend on the product, the claims, and what experts believe is necessary. If an ad specifies a certain level of support for a claim—"tests show x"—the advertiser must have at least that level of support.

[13] According to the FTC Act, 15 U.S.C. § 45(n) and the FTC's Unfairness Policy Statement [hyperlink], an advertisement or business practice is unfair if it causes or is likely to cause substantial consumer injury that consumers could not reasonably avoid and that is not outweighed by the benefit to consumers or competition. *See FTC Policy Statement on Unfairness, appended to International Harvester Co.*, 104 F.T.C. 949, 1070 (1984).

[14] Copy tests or other evidence of how consumers actually interpret an ad can be valuable. In many cases, however, the implications of the ad are clear enough to determine the existence of the claim by examining the ad alone, without extrinsic evidence.

[15] For example, if an endorsement is not representative of the performance that consumers can generally expect to achieve with a product, advertisers must disclose this fact so that consumers are not misled. Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.2.

[16] For example, any solicitation for the purchase of consumer products with a warranty must disclose the text of the warranty offer or how consumers can obtain it for free. Pre-Sale Availability of Written Warranty Terms, 16 C.F.R. § 702.3.

[17] For example, the required energy efficiency disclosures in the Appliance Labeling Rule, 16 C.F.R. § 305.4, further the public policy goal of promoting energy conservation.

[18] Some rules and guides, as well as some FTC cases, use the phrase "clearly and prominently" instead of "clearly and conspicuously." These two phrases are synonymous.

[19] Deception Policy Statement at 175-76.

[20] Deception Policy Statement at 178.

[21] Deception Policy Statement at 180-81.

[22] Web pages can vary in length, and one Web page may be the equivalent of many printed pages.

[23] In some cases, the details about the additional fees might be too complex to describe adjacent to the price claim and may be provided by using a hyperlink. But, a clear statement about the existence and nature of the extra fees should appear adjacent to the price. Of course, all cost information should be presented to consumers at the time of purchase. Consumers should understand the exact amount they will be charged and should not have to learn this information by clicking on hyperlinks.

[24] Asterisks and other symbols also are used in different ways on Web pages, which may confuse consumers as to where the related disclosure may be found. Some online asterisks and symbols are hyperlinks that click-through to a separate page and others are static, referring to a disclosure at the bottom of the page.

[25] This approach is consistent with Commission policy for disclosures in other media. For example, the Commission has required fuller disclosures in print ads and a shorter disclosure in a short television ad with a referral to another location for more complete information. *See, e.g., Nutri/System, Inc.*, 116 F.T.C. 1408 (1993) (consent order requiring a shorter disclosure for 15 second television ads).

[26] Web sites may display differently depending on the browser, computer screen, or other information appliance used. Advertisers may be working with a default view, but also evaluating different display options so that the site will be attractive and accessible to most consumers. Considering different display options also may be necessary to ensure that qualifying information is displayed clearly and conspicuously. Evaluating the prominence of the disclosure in relation to the rest of the ad helps ensure that consumers are able to view the disclosure.

[27] *See, e.g., Kent & Spiegel Direct, Inc.*, 124 F.T.C. 300 (1997); *Synchronal Corp.*, 116 F.T.C. 1189 (1993) (consent orders requiring disclosures to be repeated during television infomercials).

[28] For example, the Commission specifically amended the Textile Rules' requirement to disclose textile origin in "print" catalogs to clarify that these disclosures must be made in online catalogs as well. *See* 63 Fed. Reg. 7507 (Feb. 13, 1998) or **http://www.ftc.gov/os/1998/9802/textile.htm** for a discussion of the amendments to the Rules and Regulations Under the Textile Fiber Products Identification Act, 16 C.F.R. Part 303.

[29] 16 C.F.R. § 305.1(d).

[30] 16 C.F.R. §§ 305.2(m), 305.14.

[31] Mail or Telephone Order Merchandise Rule, 16 C.F.R. § 435.1(b).

[32] Rule Concerning Use of Prenotification Negative Option Plans, 16 C.F.R. § 425(a)(2).

[33] Disclosure of Written Consumer Product Warranty Terms and Conditions, 16 C.F.R. § 701.3, and Pre-Sale Availability of Written Warranty Terms, 16 C.F.R. § 702.3. According to the Rule Regarding Pre-Sale Availability of Written Warranty Terms, an alternative to making the warranty terms available prior to purchase is for sellers to provide information about how consumers may obtain the written warranty for free by mail. 16 C.F.R. § 702.3(c)(2).

[34] 16 C.F.R. § 310.6. The Telemarketing Sales Rule prohibits deceptive and abusive telemarketing practices. Among other things, it requires that certain information be disclosed in telemarketing calls. The scope of the Rule does not extend to transactions that take place *entirely* online. The sales transaction must involve a traditional voice telephone call. *See* 60 Fed. Reg. 30,406, 30,411 (June 8, 1995). In addition, in most situations, the Rule does not apply if a consumer calls a business in response to an advertisement. However, if a consumer calls a business in response to a "direct mail" advertisement, that call *is* subject to the Rule.

[35] The telephone call may be exempt from the Rule's coverage if the direct mail piece contains certain disclosures, such as the total cost to purchase the goods or services.

[36] Whether certain types of online ads, such as targeted banner ads or personalized solicitations on Web sites, constitute direct mail should be evaluated on a case-by-case basis.

[37] A small number of telemarketing transactions relating to specific types of goods or services are covered by the Telemarketing Sales Rule, regardless of the advertising method or manner in which the telemarketing calls were initiated. For example, credit repair services and advance fee loan services sold through telemarketing are covered by the Telemarketing Sales Rule, regardless of whether the consumer called in response to a direct mail piece, television advertisement, or Web site. 16 C.F.R. § 310.6(e) and (f).

22

# APPENDIX: MOCK ADS

The disclosure "imitation" needs to accompany the triggering term "pearl" so that consumers are not misled about the type of pearls being sold. The disclosure would not be as effective if it was separated from the word pearl or placed on a different page. The FTC's Guides for the Jewelry, Precious Metals, and Pewter Industries, 16 C.F.R. § 23.19, recognize this and advise that the disclosure "imitation" immediately precede the word pearl. In this situation, there is no reason to evaluate proximity differently in Internet ads than with other types of ads.



# FTC FASHION JEWELRY



## Imitation Pearl Hoop Earrings



| | | |
|---|---|---|
| Retail Price | - | $45.99 |
| ✴ Our Low Price | - | $29.99 |

Item#: GRTDEAL
Shipping Weight:                    0.1 Lbs.

add to cart

Lustrous imitation pearl hoop earrings. The highest quality imitation pearls fall delicately from these classically styled 14K gold hoops.  The perfect fashion accessory for any occasion.

This ad contains visual cues that may indicate that more information is available. The vertical blue bar continues "below the fold" -- the end of the screen on the monitor -- and the text on the left column is continuous. A consumer who is already scrolling to read DJ Blackhand's endorsement, is also likely to see the disclosure that follows it.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|-------------|--------------------|---------|----------------|

| Hi-speed Internet can now reach *YOUR* door. | Quick DDRIP *D*ownload *D*ecode *R*ecord *I*nstant *P*lay | Make the Internet FUN again. |
|---|---|---|
|  |  ORDER NOW |  |

**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*"QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

-- D.J. Blackhand

(QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.)

# Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load -- Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

# Enjoy The Best Entertainment - All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!** No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!**  Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home!  *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

| **Home** | **How QD Works** | **What Customers Say** | **Experts** | **Privacy Policy** |
|---|---|---|---|---|

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation

This ad must disclose that the diamond weights are not exact and that a 3/4 carat diamond may weigh between .70 and .84 carats. Because of the blank space between the textual description of the product and the disclosure, even consumers who scroll down the page will probably think that there is no more information to view and are likely to miss the disclosure.



# FTC FASHION JEWELRY



## 3/4 Ct. Diamond Earrings



Retail Price - $1365.00

Our Low Price - $ 975.00

Item#: GRTDEAL
Shipping Weight:   0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines.  Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Diamond weights may not be exact.  A 3/4 ct. diamond may weigh between .70 - .84 carat.

Although QuickDDRIP's advertised price is $129.95, there are additional conditions and fees associated with purchasing the product, including obtaining a rebate and contracting for 2 years of QD Internet Service. The Internet Service contract itself has significant costs and conditions. Although the details about these additional fees and conditions are described on the click through page, their existence is properly disclosed on the same page as and adjacent to the price claim.



# Quick DDRIP
## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

**Hi-speed Internet can now reach *YOUR* door.**

**Quick DDRIP**
*D*ownload
*D*ecode
*R*ecord
*I*nstant *P*lay

**Make the Internet FUN again.**



**ORDER NOW**





# Priced At Only $129.95*
*After $200 Rebate.  Requires 2 year (24 month) QD
Internet Service contract at $19.99/month.

Early cancellation of Internet Service will result in substantial penalties.
You may have to pay significant telephone charges to use the Internet Service.
Click here for more information.

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation.

Click-through page



| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

## REBATE AND INTERNET SERVICE INFORMATION

The $200 Mail-In Rebate requires that you agree to a 2 year (24 month) contract for QD Internet service at $19.99 per month.

If you cancel your contract for QD Internet service before your 2 year membership expires, you will be required to repay the rebate according to the following time schedule:

- If you cancel in months 1-6, you must repay the entire $200 rebate.

- If you cancel in months 7-12, you must repay $150.

- If you cancel in months 13-24, you must repay $100.

You may incur significant telephone charges to access QD Internet service depending on your location and your calling plan. You may visit our web site or call 1-800-QNUMBER to learn the telephone access numbers available in your area. You must contact your local telephone company to find out any applicable charges for these numbers.

To obtain the $200 rebate, you must send the completed required mail-in rebate form and a copy of your dated sales receipt to the address provided on the rebate form. The rebate form will be included with your Quick DDRIP. Allow 4-6 weeks to receive your rebate.  To be eligible for the rebate, you must agree to the QD Internet service membership agreement and you must have a major credit card. The $19.99 per month service charge will be billed to your credit card.

This offer is valid only in the United States. All customers must be 18 years or older.

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation

The disclosure "imitation" needs to accompany the triggering term "pearl" so that consumers are not misled about the type of pearls being sold. It is not difficult to incorporate this one word disclosure in the text of this ad.



# FTC FASHION JEWELRY



## Imitation Pearl Hoop Earrings



Retail Price     -      $45.99
Our Low Price  -      $29.99

Item#: GRTDEAL
Shipping Weight:          0.1 Lbs.

add to cart

Lustrous imitation pearl hoop earrings. The highest quality imitation pearls fall delicately from these classically styled 14K gold hoops.  The perfect fashion accessory for any occasion.

The hyperlink incorporates part of the required disclosure -- that diamond weights are not exact -- and indicates the information (about weight ranges) that the link leads to. The label notifies consumers about the type and importance of the information accessible by this link.



# FTC FASHION JEWELRY



Diamond Weights are Not Exact
Click here for Weight Ranges.

## 3/4 Ct. Diamond Earrings



Retail Price    -  $1365.00
Our Low Price -  $  975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines. Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Click-through page

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

Diamonds

Diamond weights are stated in "carats."  A carat is equal to 200 milligrams (or 1/5 gram).  A carat is divided into 100 points.   Therefore, a .25 carat diamond may be referred to as a  25-point diamond.

Diamond weights may not be exact.  For us to offer you these low FTC prices, we sell our diamonds in size ranges.  The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

This ad must disclose that the diamond weights are not exact and that a 3/4 carat diamond may weigh between .70 and .84 carats. Underlining the "3/4 carat" may indicate that it is a hyperlink, but it does not identify the relevance of the information it leads to. Consumers may expect to find additional information about "carats" or diamond weights generally, but not necessarily qualifying information.



# FTC FASHION JEWELRY

## 3/4 Ct. Diamond Earrings



Retail Price     - $1365.00

 Our Low Price -  $ 975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines.  Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Click-through page

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

Diamonds

Diamond weights are stated in "carats."  A carat is equal to 200 milligrams (or 1/5 gram).  A carat is divided into 100 points.   Therefore, a .25 carat diamond may be referred to as a  25-point diamond.

Diamond weights may not be exact.  For us to offer you these low FTC prices, we sell our diamonds in size ranges.  The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

This ad must disclose that DJ Blackhand was paid for his endorsement. The name "DJ Blackhand" is underlined to indicate that it is a hyperlink. Consumers may have different understandings about what this link leads to -- for example, biographical information about DJ or his picture -- and may see no reason to click on the link.



# Quick DDRIP
## Stop the Waiting - Get in the Game



| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

### Hi-speed Internet can now reach *YOUR* door.



### Quick DDRIP
*D*ownload
*D*ecode
*R*ecord
*I*nstant *P*lay



**ORDER NOW**

### Make the Internet FUN again.



**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*"QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

-- [D.J. Blackhand](#)

# Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load -- Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

# Enjoy The Best Entertainment - All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!** No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!** Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home! *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation



**Important Information About D.J. Blackhand's
Endorsement of Quick DDRIP**

QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

Because many of the experiences described in the testimonials may not be typical of what consumers generally will experience with the product, a disclosure regarding this fact is needed. The hyperlink, "Disclaimer" does not indicate that the testimonial claims are qualified and does not indicate what consumers can expect to learn by clicking on it.



# Quick DDRIP

## Stop the Waiting - Get in the Game



| **Home** | **How QD Works** | **What Customers Say** | **Experts** | **Privacy Policy** |

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP

"This product is AWESOME!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"



– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."



-- Evelyn M., concerned daughter in Detroit, MI

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie anytime I want and the quality is great. When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening. And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."



-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle from daddy, . . . ."



-- Sam and Nancy, new parents in Tallahassee, FL

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET NOW Conference. I bought one as soon as they came out and it more than lives up to the hype. No more problems with stop and start video feeds and I've never been "disconnected" from the Internet during a live event because of slow transmission speeds. Heck, I've never been disconnected during a download of a movie for that matter - which may be because movies download 8 times faster with **Quick DDRIP** than they did before."



-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software and hardware in my day and the **Quick DDRIP** really delivers. I frequently listen to Blues radio stations on the Internet and have always had problems with fidelity and distortion. Not any more -- with QD's higher speeds, I get hi-fidelity, Dolby-quality sound at analog prices. And it's so fast and reliable!"



-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on the Internet is incredible.   No more of those irritating jerky delays when I'm watching my favorite games (you know, where the missing frame is the part showing the completion of the pass) - and the picture is sharp enough to tell if the running back's foot was out of bounds when he caught that long pass (no instant replay needed!!) And the best part is I'm no longer limited to watching East Coast games broadcast on TV - but can keep up with the Big 12. (GO WILDCATS!!)"



-- Jerry W., transplanted K-State fan, Baltimore, MD

"**Quick DDRIP** outperforms the other equipment on the market. I listen to a lot of high fidelity symphonic recordings and I must say that Quick DDRIP really lives up to its reputation. I can download performances of the Berlin Symphony Orchestra off the Internet in just a few minutes and the sound quality is unbeatable. Without Quick DDRIP, I just didn't have the patience to wait for the entire symphony to download. Now there's a whole new world of music for me to explore!"



– Curt D., music lover in Mobile, AL



| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

## Important Information About Quick DDRIP's Performance

**Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions.  You should not expect to achieve results as good as those described in the testimonials.**

Although this hyperlink indicates that more information is available, it does not indicate the importance of this information or the fact that it is related to the diamond weight. Consumers may believe, for example, that this link takes them to shipping and ordering information, rather than information about the diamond's weight.



# FTC FASHION JEWELRY



Click here for more details
on the jewelry item you are purchasing.

## 3/4 Ct. Diamond Earrings



Retail Price    - $1365.00
Our Low Price -  $ 975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines. Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

| Click-through page |
| --- |

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

Diamonds

Diamond weights are stated in "carats."  A carat is equal to 200 milligrams (or 1/5 gram).  A carat is divided into 100 points.   Therefore, a .25 carat diamond may be referred to as a  25-point diamond.

Diamond weights may not be exact.  For us to offer you these low FTC prices, we sell our diamonds in size ranges.  The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

This ad must disclose that DJ Blackhand was paid for his endorsement. The asterisk next to DJ's name does not suggest the importance and relevance of information that the link leads to.  Because many consumers may easily miss the asterisk hyperlink, it is not clear and conspicuous.



Ex. 11

# Quick DDRIP

## Stop the Waiting - Get in the Game



| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

**Hi-speed Internet can now reach *YOUR* door.**

**Quick DDRIP**

*D*ownload
*D*ecode
*R*ecord
*I*nstant *P*lay

**ORDER NOW**

**Make the Internet FUN again.**

**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*"QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

-- D.J. Blackhand*

# Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load -- Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

# Enjoy The Best Entertainment - All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!** No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!**  Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home!  *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|--------------|--------------------|---------|----------------|

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation

| Click-through page |
|---|

## Quick DDRIP

### Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|---|---|---|---|---|

**Important Information About D.J. Blackhand's
Endorsement of Quick DDRIP**

QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

This ad must disclose that DJ Blackhand was paid for his endorsement. It is not clear that the red star next to DJ's name is a hyperlink. It is also confusing because the same type of star is used on another part of the page solely as a graphic.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|--------------|--------------------|---------|----------------|



**Hi-speed Internet can now reach *YOUR* door.**

**Quick DDRIP**
*D*ownload
*D*ecode
*R*ecord
*I*nstant *P*lay

**ORDER NOW**

**Make the Internet FUN again.**

**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*"QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

-- D.J. Blackhand

# Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load -- Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

# Enjoy The Best Entertainment - All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!** No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!**  Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home!  *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|--------------|--------------------|---------|----------------|

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation



**Click-through page**

# Quick DDRIP

### Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

**Important Information About D.J. Blackhand's
Endorsement of Quick DDRIP**

QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

The descriptive hyperlink in this ad is placed adjacent to the 3/4 carat diamond weight claim.  This helps to ensure that consumers notice the link and relate it to the testimonial.



# FTC FASHION JEWELRY



Diamond Weights are Not Exact
Click here for Weight Ranges.

## 3/4 Ct. Diamond Earrings



Retail Price    - $1365.00
Our Low Price -  $  975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines. Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Click-through page

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

Diamonds

Diamond weights are stated in "carats."  A carat is equal to 200 milligrams (or 1/5 gram).  A carat is divided into 100 points.   Therefore, a .25 carat diamond may be referred to as a  25-point diamond.

Diamond weights may not be exact.  For us to offer you these low FTC prices, we sell our diamonds in size ranges.  The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

This hyperlink may be easily missed by consumers because it is separated from the 3/4 carat claim and because it appears below blank space that suggests that there is no further information to view.



# FTC FASHION JEWELRY



## 3/4 Ct. Diamond Earrings



Retail Price    -  $1365.00

Our Low Price -  $ 975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines.  Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Diamond Weights Are Not Exact. Click Here for Weight Ranges.

| Click-through page |
| --- |

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

Diamonds

Diamond weights are stated in "carats."  A carat is equal to 200 milligrams (or 1/5 gram).  A carat is divided into 100 points.   Therefore, a .25 carat diamond may be referred to as a  25-point diamond.

Diamond weights may not be exact.  For us to offer you these low FTC prices, we sell our diamonds in size ranges.  The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

The disclosure on the click-through page -- concerning DJ Blackhand's endorsement -- is included in the middle of unrelated text and large amounts of graphics. It is not obvious to a consumer who clicked to this page where the disclosure is and its relevance.



# Quick DDRIP

## Stop the Waiting - Get in the Game



| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

**Hi-speed Internet can now reach *YOUR* door.**



**Quick DDRIP**

*D*ownload
*D*ecode
*R*ecord
*I*nstant *P*lay



**ORDER NOW**

**Make the Internet FUN again.**



**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*"QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

--D.J. Blackhand

Paid Endorsement

# Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load --

Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

## Enjoy The Best Entertainment All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!**
No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!**  Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home!  *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

| **Home** | **How QD Works** | **What Customers Say** | **Experts** | **Privacy Policy** |
|---|---|---|---|---|

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation

Click-through page

# Quick DDRIP

## Stop the Waiting - Get in the Game

**Home**　　**How QD Works**　　**What Customers Say**　　**Experts**　　**Privacy Policy**



**Priced at just**

**$129.95**

+ Shipping and Handling
($9.95, 2 days shipping, $.4.95 for 5 days shipping)



# HOT  HOT  HOT!!!

Over 40,000 satisfied customers - and the numbers keep growing!

* D.J. Blackhand has been involved in the gaming world since he was 12 years old.  After purchasing Quick DDRIP, he rapidly ascended the Wrath of Thor tournament levels to become the intergalactic champion several years running. D.J. loves all kinds of games and plays several hours daily. His interests also include playing with his Briard dog, Thunder, and running on the beach. QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

Reviewers  in **Web Surfer Pro**, **Families Online**, and **Moviemag.com** are unanimous in their praise of QD:

"Easy setup, good performance, reasonable price -   what more could you want?" **Moviemag.com**  Click here to read review

"Quick DDRIP is truly revolutionary.  It will turn the PC into the Family Entertainment Center" **Families Online** (February 21, 1999)  Click here to read review

"A great alternative to waiting for hi-speed phone or cable Internet services to reach your neighborhood."
**Web Surfer Pro** (March 1999)  Click here to read review

The hyperlink on this page takes consumers to the top of the click-through page. The disclosure about diamond weights is provided in the middle of the page and consumers must scroll down to find this information. The hyperlink should bring consumers directly to the disclosure.



# FTC FASHION JEWELRY



Diamond Weights are Not Exact
Click here for Weight Ranges.

## 3/4 Ct. Diamond Earrings



Retail Price    - $1365.00
Our Low Price - $ 975.00

Item#: GRTDEAL
Shipping Weight:    0.1 Lbs.

add to cart

Classic diamond solitaire earrings. Our sparkling round-cut diamonds are colorless and have only slight inclusions. Straight from the FTC's Washington DC diamond mines. Set in a stylish six-prong setting of 14 karat gold.  The perfect fashion accessory for that special occasion.

Click-through page

# FTC FASHION JEWELRY



## JEWELRY INFORMATION

**Colored Gemstones**          **Pearls**          **Diamonds**

**Colored Gemstones**

Colored gemstones may be treated to enhance their color or durability. These treatments may not be permanent and the effects of some treatments may lessen or change over time

You need to take special care of treated gemstones. Do not use ultrasonic cleaners or harsh solvents to clean your gemstone. Also, do not expose your gemstone to sudden, extreme changes in temperature.

Our gemstone rings are available in the standard sizes, 5 through 8. For an additional charge of $2, you may order rings in other sizes. Please contact a customer service representative to place this special order.

**Pearls**

Natural or real pearls are made by oysters and other mollusks. Cultured pearls also are grown by mollusks, but with human intervention; that is, an irritant introduced into the shells causes a pearl to grow. Imitation pearls are man-made with glass, plastic, or organic materials. Because natural pearls are very rare, most pearls used in jewelry are either cultured or imitation pearls.

To clean your pearls, simply wipe them with a soft, dry cloth. You should not use any commercial cleaners for your pearls.

**Diamonds**

Diamond weights are stated in "carats." A carat is equal to 200 milligrams (or 1/5 gram). A carat is divided into 100 points. Therefore, a .25 carat diamond may be referred to as a

25-point diamond.

Diamond weights may not be exact. For us to offer you these low FTC prices, we sell our diamonds in size ranges. The following chart shows the range of weight for each size diamond.

1/10 ct. can range from .09 to .11 carat
1/8 ct. can be .11 to .13 carat
1/7 ct. can be .13 to .15 carat
1/6 ct. can be .15 to .17 carat
1/5 ct. can be .18 to .22 carat
1/4 ct. can be .21 to .29 carat
1/3 ct. can be .30 to .36 carat
½ ct. can be .45 to .59 carat
5/8 ct. can be .59 to .67 carat
3/4 ct. can be .70 to .84 carat
7/8 ct. can be .85 to .95 carat
1 ct. can be .95 to 1.10 carat
1 1/4 ct. can be 1.20 to 1.29 carat
1 ½ ct. can be 1.45 to 1.55 carat
1 3/4 ct. can be 1.70 to 1.82 carat
2 ct can be 1.95 to 2.05 carat

This disclosure appears as scrolling text when viewed with one browser, Microsoft Explorer, but it may not appear when viewed with another browser, Netscape.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|--------------|--------------------|---------|-----------------|

| Hi-speed Internet can now reach *YOUR* door. | Quick DDRIP *D*ownload *D*ecode *R*ecord *I*nstant *P*lay | Make the Internet FUN again. |
|---|---|---|
|  |  **ORDER NOW** |  |

**Quick DDRIP** is the REVOLUTIONARY device that easily hooks up to your home computer and phone line.



**Quick DDRIP** uses a special processing chip, and proprietary compression, decoding and caching techniques, to manipulate and speed up data transmissions.

*QD's superior real-time performance enhances the gaming experience for all levels of players. After I installed QD, it didn't take long for me to win my first Wrath of Thor national championship - and I'm still #1 this year. Whether you've got a 486 or a Pentium, QD can improve your "see-and-react" abilities. Soon you'll be winning all your matches."*

--D.J. Blackhand

QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

## Quick DDRIP Gives You Unparalleled Internet Performance

• NO DELAY waiting for images to load -- Graphics-intensive Web pages load FAST!

• SPEEDY file downloads -- even huge files download in a fraction of the time it takes you now! Try it with your next online video purchase!

• ENHANCED streaming audio and video quality for live Web events!

• UNBELIEVABLY FAST "action" in online games!

• FAST DELIVERY of graphics for FANTASTIC virtual reality experiences!

## Enjoy The Best Entertainment - All From Home

**WATCH A FULL-LENGTH MOVIE ONLINE!** No more waiting in line for a ticket or for the rental. Find your favorite pay-per-view movies on the Web - and let QD do the rest. With QD, streaming pay-per-view movies start playing instantaneously -- **Quick DDRIP's** built in decoder sees to that!



**Pay-Per-View Movie Releases**

**CONCERT IN A CAN!** Buy a VIRTUAL TICKET and go on a LIVE WEB CONCERT TOUR with the best musicians without ever leaving your home! *And you won't believe the difference in audio and video quality over existing technology!* Whether you are a movie buff or an audiophile, **Quick DDRIP** is technology made for you.



**Live Concert Webcasters**

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

Some images are from "Corel Gallery Magic 200,000" by Corel Corporation



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP

"This product is AWESOME!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"

– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."

-- Evelyn M., concerned daughter in Detroit, MI

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie anytime I want and the quality is great. When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening. And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."

-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle from daddy, . . . ."

-- Sam and Nancy, new parents in Tallahassee, FL

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET NOW Conference. I bought one as soon as they came out and it more than lives up to the hype. No more problems with stop and start video feeds and I've never been "disconnected" from the Internet during a live event because of slow transmission speeds. Heck, I've never been disconnected during a download of a movie for that matter - which may be because movies download 8 times faster with **Quick**

**DDRIP** than they did before."

-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software
and hardware in my day and the **Quick DDRIP** really delivers. I
frequently listen to Blues radio stations on the Internet and have always
had problems with fidelity and distortion. Not any more -- with QD's
higher speeds, I get hi-fidelity, Dolby-quality sound at analog prices.
And it's so fast and reliable!"

-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on
the Internet is incredible.   No more of those irritating jerky delays when
I'm watching my favorite games (you know, where the missing frame is
the part showing the completion of the pass) - and the picture is sharp
enough to tell if the running back's foot was out of bounds when he
caught that long pass (no instant replay needed!!) And the best part is
I'm no longer limited to watching East Coast games broadcast on TV -
but can keep up with the Big 12. (GO WILDCATS!!)"

-- Jerry W., transplanted K-State fan, Baltimore, MD

"**Quick DDRIP** outperforms the other equipment on the market. I listen
to a lot of high fidelity symphonic recordings and I must say that Quick
DDRIP really lives up to its reputation. I can download performances of
the Berlin Symphony Orchestra off the Internet in just a few minutes
and the sound quality is unbeatable. Without Quick DDRIP, I just didn't
have the patience to wait for the entire symphony to download. Now
there's a whole new world of music for me to explore!"

– Curt D., music lover in Mobile, AL



**Important Information About Quick DDRIP's Performance**

**Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions. You should not expect to achieve results as good as those described.**

The pop-up screen that contains the disclosure appears when you first access this page. If you click on another portion of the page, the pop-up window minimizes and disappears from the display area. The pop-up screen may not reappear if you re-access this page. Consumers may miss the disclosure, especially if they do not understand how to display a minimized pop-up window (by clicking on its button at the bottom of the screen).



# Quick DDRIP

### Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP

"This product is AWESOME!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"

– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."

-- Evelyn M., concerned daughter in Detroit, MI

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie I want any time I want and the quality is great. When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening. And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."

-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle from daddy, . . . ."

-- Sam and Nancy, new parents in Tallahassee, FL

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET NOW Conference. I bought one as soon as they came out and it more than lives up to the hype. No more problems with stop and start video feeds and I've never been "disconnected" from the Internet during a live event because of slow transmission speeds. Heck, I've never been disconnected during a download of a movie for that matter - which may be because movies download 8 times faster with **Quick DDRIP** than they did before."

-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software and hardware in my day and the **Quick DDRIP** really delivers. I frequently listen to Blues radio stations on the Internet and have always had problems with fidelity and distortion. Not any more -- with QD's higher speeds, I get hi-fidelity, Dolby-quality sound at analog prices. And it's so fast and reliable!"

-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on the Internet is incredible.   No more of those irritating jerky delays when I'm watching my favorite games (you know, where the missing frame is the part showing the completion of the pass) - and the picture is sharp enough to tell if the running back's foot was out of bounds when he caught that long pass (no instant replay needed!!) And the best part is I'm no longer limited to watching East Coast games broadcast on TV - but can keep up with the Big 12. (GO WILDCATS!!)"

-- Jerry W., transplanted K-State fan, Baltimore, MD

"**Quick DDRIP** outperforms the other equipment on the market. I listen to a lot of high fidelity symphonic recordings and I must say that Quick DDRIP really lives up to its reputation. I can download performances of the Berlin Symphony Orchestra off the Internet in just a few minutes and the sound quality is unbeatable. Without Quick DDRIP, I just didn't have the patience to wait for the entire symphony to download. Now there's a whole new world of music for me to explore!"

– Curt D., music lover in Mobile, AL

## QuickDDRIP - POP-UP

**Important Information About Quick DDRIP's Performance:**

Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions.  You should not expect to achieve results as good as those described in the testimonials.

Because many of the experiences described in the testimonials may not be typical of what consumers generally will experience with the product, a disclosure regarding this fact is needed. Consumers visiting this site might read the testimonials, reach a conclusion about the product based on them, click on and review numerous other pages on the site, and then finally decide to buy the product. They therefore might not relate a disclosure placed on the ordering page to the claims on the testimonial page.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP

**Order Now**

"This product is AWESOME!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"

– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."

-- Evelyn M., concerned daughter in Detroit, MI     **Order Now**

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie anytime I want and the quality is great. When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening. And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."

-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle

from daddy, . . . ."

-- Sam and Nancy, new parents in Tallahassee, FL

**Order Now**

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET NOW Conference. I bought one as soon as they came out and it more than lives up to the hype. No more problems with stop and start video feeds and I've never been "disconnected" from the Internet during a live event because of slow transmission speeds. Heck, I've never been disconnected during a download of a movie for that matter - which may be because movies download 8 times faster with **Quick DDRIP** than they did before."

-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software and hardware in my day and the **Quick DDRIP** really delivers. I frequently listen to Blues radio stations on the Internet and have always had problems with fidelity and distortion. Not any more -- with QD's higher speeds, I get hi-fidelity, Dolby-quality sound at analog prices. And it's so fast and reliable!"

-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on the Internet is incredible.   No more of those irritating jerky delays when I'm watching my favorite games (you know, where the missing frame is the part showing the completion of the pass) - and the picture is sharp enough to tell if the running back's foot was out of bounds when he caught that long pass (no instant replay needed!!) And the best part is I'm no longer limited to watching East Coast games broadcast on TV - but can keep up with the Big 12. (GO WILDCATS!!)"

-- Jerry W., transplanted K-State fan, Baltimore, MD

**Order Now**

"**Quick DDRIP** outperforms the other equipment on the market. I listen to a lot of high fidelity symphonic recordings and I must say that Quick DDRIP really lives up to its reputation. I can download performances of the Berlin Symphony Orchestra off the Internet in just a few minutes and the sound quality is unbeatable. Without Quick DDRIP, I just didn't have the patience to wait for the entire symphony to download. Now there's a whole new world of music for me to explore!"

– Curt D., music lover in Mobile, AL

**Order Now**

Click-through page

# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |

**Please Note:  Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions. You should not expect to achieve results as good as those described in the testimonials.**

## Order Form

| | |
|---|---|
| **Name:** | |
| **Address:** | |
| **Address2:** | |
| **City:** | |
| **State:** | |
| **Zip Code:** | |
| **Telephone Home:** | |
| **Telephone Work:** | |
| **Quantity:** | |
| **Price:** | $ |
| **Tax:** | |
| **Total Price:** | $ |



The banner ad indicates that there are shipping and handling costs associated with receiving the "free" flowers.  The actual costs are described on the click-through page.







## SANDY'S BOUQUET-OF-THE-MONTH CLUB

Sandy's Bouquet-of-the-Month Club delivers fresh, beautiful
flowers every month right to your door.  We believe that you'll
like Sandy's Bouquet-of-the-Month Club so much that we're
offering you the opportunity to receive one of our beautiful
bouquets free. All you pay is $5.95 shipping & handling
(continental US only). Along with your bouquet, you'll receive
information about how to enroll on-line or by phone in our
Bouquet-of-the-Month Club. As a member you'll receive a
fresh seasonal bouquet each month - for a low club fee
of $15.00 per month (plus shipping and handling).

If you'd like to receive a free trial bouquet, please fill out the
information below. You will receive your free bouquet in
5 to 7 days.

**Privacy Policy**

**NAME**

**EMAIL**

**TELEPHONE**

**ADDRESS**

**CITY**          **STATE**          **ZIP**

**Submit**

**CLICK HERE TO ENTER
SANDY'S FLOWER SHOP**

The disclosure in this ad is placed in blue text, which contrasts with the background and helps make it stand out.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|--------------|--------------------|---------|----------------|

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP *

**\* Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions. You should not expect to achieve results as good as those described.**

"This product is AWESOME!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"

– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."

-- Evelyn M., concerned daughter in Detroit, MI

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie anytime I want and the quality is great.  When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening.  And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."

-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle from daddy, . . . ."

-- Sam and Nancy, new parents in Tallahassee, FL

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET
NOW Conference. I bought one as soon as they came out and it more than lives
up to the hype. No more problems with stop and start video feeds and I've never
been "disconnected" from the Internet during a live event because of slow
transmission speeds. Heck, I've never been disconnected during a download of a
movie for that matter - which may be because movies download 8 times faster with
**Quick DDRIP** than they did before."

-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software and hardware
in my day and the **Quick DDRIP** really delivers. I frequently listen to Blues radio
stations on the Internet and have always had problems with fidelity and distortion.
Not any more -- with QD's higher speeds, I get hi-fidelity, Dolby-quality sound at
analog prices. And it's so fast and reliable!"

-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on the
Internet is incredible.   No more of those irritating jerky delays when I'm watching
my favorite games (you know, where the missing frame is the part showing the
completion of the pass) - and the picture is sharp enough to tell if the running
back's foot was out of bounds when he caught that long pass (no instant replay
needed!!) And the best part is I'm no longer limited to watching East Coast games
broadcast on TV - but can keep up with the Big 12. (GO WILDCATS!!)"

-- Jerry W., transplanted K-State fan, Baltimore, MD

"**Quick DDRIP** outperforms the other equipment on the market. I listen to a lot of
high fidelity symphonic recordings and I must say that Quick DDRIP really lives up
to its reputation. I can download performances of the Berlin Symphony Orchestra
off the Internet in just a few minutes and the sound quality is unbeatable. Without
Quick DDRIP, I just didn't have the patience to wait for the entire symphony to
download. Now there's a whole new world of music for me to explore!"

– Curt D., music lover in Mobile, AL

The disclosure in this ad is placed in grey text, which blends in with the background and is hard to read. The disclosure is not prominent and is therefore easy to miss.



# Quick DDRIP

## Stop the Waiting - Get in the Game

| Home | How QD Works | What Customers Say | Experts | Privacy Policy |
|------|-------------|-------------------|---------|---------------|

## SEE WHAT OUR SATISFIED CUSTOMERS HAVE TO SAY ABOUT QUICK DDRIP *

\* Speed Improvements and Audio/Video Quality will vary depending on your individual computer equipment and phone line conditions. You should not expect to achieve results as good as those described.

"This product is AWESOME!!!!!!!!!!!!!!! I like the Internet again. Speeds are up by 90-95%. Now, I'm downloading from the Web in much less than 1/16 the time, which is important in my line of work. The install was flawless and now, so are my downloads. Thanks **Quick DDRIP**!"

– AlphaGeek, Silicon Alley ;^)

"My elderly father has had trouble reading ever since cataract surgery two years ago. I've tried sending him books on tape, but it was always a cumbersome process and I was never sure if he'd like my selections. We tried downloading audio books from the Internet, but the process took FOREVER. Last month I sent him the **Quick DDRIP** and he's never been happier. He has instant (well, about 10 to 15 minutes as opposed to an hour or more before) access to digital quality sound recordings of all his favorites, and new releases too. Now Mom is threatening to move his LazyBoy to the PC."

-- Evelyn M., concerned daughter in Detroit, MI

"WOW! With **Quick DDRIP** I can watch any pay-per-view movie anytime I want and the quality is great.  When I tried to watch a pay-per-view movie streamed over the Internet before, I experienced lost or delayed movie frames. No more. Now it's just like watching my own personal screening.  And whatever movie I choose starts playing in seconds. The convenience and quality can't be beat."

-- Joe H., Movie Buff in Dubuque, IA

"**Quick DDRIP** is amazing! I converted the home video of my son's birth to a digital file and sent it via email to all the relatives. Almost all of them had problems downloading the attached video file. But my Mom has a QD unit. Thanks to QD, she was able to download the whole 9 hours of my son's delivery in less than a half hour, and then watch it just as if she was there. And we've got more video files on the way - baby's first smile, his first bath, his first visit from grandma, his first trip to the doctor, his first bottle from daddy, . . . ."

-- Sam and Nancy, new parents in Tallahassee, FL

"Where can I invest? I've been sold since I saw a demonstration at the INTERNET NOW Conference. I bought one as soon as they came out and it more than lives up to the hype. No more problems with stop and start video feeds and I've never been "disconnected" from the Internet during a live event because of slow transmission speeds. Heck, I've never been disconnected during a download of a movie for that matter - which may be because movies download 8 times faster with **Quick DDRIP** than they did before."

-- Hugo P, Las Vegas, NV

"WHAT A CONCEPT! I've seen a lot of computer products, software and hardware in my day and the **Quick DDRIP** really delivers. I frequently listen to Blues radio stations on the Internet and have always had problems with fidelity and distortion. Not any more -- with QD's higher speeds, I get hi-fidelity, Dolby-quality sound at analog prices. And it's so fast and reliable!"

-- Skip J., audiophile, St Louis, MO

"**Quick DDRIP** is a life saver - its real time access to football games on the Internet is incredible.   No more of those irritating jerky delays when I'm watching my favorite games (you know, where the missing frame is the part showing the completion of the pass) - and the picture is sharp enough to tell if the running back's foot was out of bounds when he caught that long pass (no instant replay needed!!) And the best part is I'm no longer limited to watching East Coast games broadcast on TV - but can keep up with the Big 12. (GO WILDCATS!!)"

-- Jerry W., transplanted K-State fan, Baltimore, MD

"**Quick DDRIP** outperforms the other equipment on the market. I listen to a lot of high fidelity symphonic recordings and I must say that Quick DDRIP really lives up to its reputation. I can download performances of the Berlin Symphony Orchestra off the Internet in just a few minutes and the sound quality is unbeatable. Without Quick DDRIP, I just didn't have the patience to wait for the entire symphony to download. Now there's a whole new world of music for me to explore!"

– Curt D., music lover in Mobile, AL

The disclosure on this click-through page is buried in the middle of text and is surrounded by large graphics that may distract consumers' attention away from the disclosure.







# HOT  HOT  HOT!!!

Over 40,000 satisfied customers - and the numbers keep growing!

* D.J. Blackhand has been involved in the gaming world since he was 12 years old.  After purchasing Quick DDRIP, he rapidly ascended the Wrath of Thor tournament levels to become the intergalactic champion several years running. D.J. loves all kinds of games and plays several hours daily. His interests also include playing with his Briard dog, Thunder, and running on the beach.  QuickDDRIP, Inc. has paid D.J. Blackhand for his endorsement.

Reviewers  in **Web Surfer Pro**, **Families Online**, and **Moviemag.com** are unanimous in their praise of QD:

"Easy setup, good performance, reasonable price -   what more could you want?" **Moviemag.com**  Click here to read review

"Quick DDRIP is truly revolutionary.  It will turn the PC into the Family Entertainment Center" **Families Online** (February 21, 1999)  Click here to read review

"A great alternative to waiting for hi-speed phone or cable Internet services to reach your neighborhood."
**Web Surfer Pro** (March 1999)  Click here to read review



Federal Trade Commission
May 2000
www.ftc.gov

# EXHIBIT BB

1   BRIAN M. DAUCHER, Cal. Bar No. 174212
2   ROBERT S. BEALL, Cal. Bar. No. 132016
    JOSEPH H. TADROS, Cal. Bar. No. 239379
3   ASHLEY E. MERLO, Cal. Bar No. 247997
4   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
5       Including Professional Corporations
6   650 Town Center Drive, 4th Floor
    Costa Mesa, California 92626-1925
7   Telephone: (714) 513-5100
    Facsimile: (714) 513-5130
8   bdaucher@sheppardmullin.com

9
10  Attorneys for Defendants

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14  TRAFFICSCHOOL.COM, INC., a          Case No. CV067561 PA (CWx)
    California corporation; DRIVERS ED   *The Hon. Percy Anderson*
15  DIRECT, LLC., a California limited
    liability company,
16                                        **DECLARATION OF**
            Plaintiffs,                   **BRUCE TOGNAZZINI**
17
        v.                               *[Defendants' Objection To Proposed*
18                                       *Judgment And Permanent Injunction*
    EDRIVER, INC., ONLINE GURU,          *and Proposed Revised Judgment lodged*
19  INC., FIND MY SPECIALIST, INC.,      *concurrently herewith]*
    and SERIOUSNET, INC., California
20  corporations; RAVI K. LAHOTI, an     Complaint Filed:   November 28, 2006
    individual; RAJ LAHOTI, an           Trial Commenced: November 6, 2007
21  individual, and DOES 1 through 10.

22          Defendants.

23

24

25

26

27

28

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 87 of 105   Page ID
#:2700
Case 2:06-cv-07561-PA-CW   Document 212-2   Filed 06/18/08   Page 4 of 9   Page ID #:973

**DEFINITIONS**

8.      **"Landing Page":** The first page a given user encounters upon entering a website. It could be an initial splash page, an acknowledgement splash page, a home page, or any other page on the website.  The term is used in the art because that page's importance: Whatever page it may be, the user will judge the entire website by its contents. If the page is not responsive to their needs, users will usually click the Back button and select an alternate site.

9.      **"Initial Splash Page":** An initial splash page, or "splash screen," precedes the domain-name page.  In the case in point, an initial splash page would be invoked by linking to WWW.DMV.ORG.  It, in turn, would lead to the current home page, which would actually then be a sub-page on the site.

10.      **"Acknowledgement Splash Page":** An acknowledgement splash screen differs from an initial splash screen in a key way: It is presented to the user regardless of the user's entry point.  Any harm or good that flows from such a page is thus visited upon all users.

**HARM OF SPLASH**

11.      **Initial Splash Pages:** Websites with initial splash pages typically lose 25% of their visitors at the splash page. They also frustrate those users who do eventually penetrate into the site. Those that continue to survive this high loss do so because most people do not actually enter a site via the home page. Landing on any sub-page on the site circumvents such initial splash pages.

12.      **Acknowledgement Splash Pages:** A site like DMV.ORG can not only expect to lose a minimum of 25% of its users arriving at the home page, it can

-3-

Case 2:06-cv-07561-PA-CW  Document 306-6  Filed 09/06/11  Page 88 of 105  Page ID
#:2701
Case 2:06-cv-07561-PA-CW  Document 212-2  Filed 06/18/08  Page 5 of 9  Page ID #:974

1  expect to lose a minimum of 25% of its users arriving at every single page on the
2  entire site since the acknowledgement splash page would be invoked for all visitors.

3

4  **Guilt by association**

5       13.    Acknowledgement splash screens are almost exclusively the province
6  of websites devoted to vices: pornography, alcohol, and gambling.  Such sites
7  survive what should be a high loss because of the paradoxical nature of their
8  offerings:  The more forbidden it is, the more enticing it becomes.  For example, the
9  pornographic film industry responded to the Motion Picture Association of America
10 (MPAA) rating of X, by voluntarily trumpeting their movies as not just X, but
11 Triple-X, website pornographers happily provide acknowledgement splash screens
12 with the most dire of warnings. Other vices, such as drinking and gambling, also
13 have an aura of the forbidden about them, if somewhat attenuated.

14

15      14.    Requiring DMV.ORG to use a similar device will tend to paint
16 DMV.ORG with the stained brush reserved for vice, driving away a far higher
17 percentage of users than the 25% that might otherwise be expected.

18

19 **IMPACT OF SPLASH UPON CONSUMERS**
20 **Visitors will be lost and page-counts will be reduced**

21      15.    In 1993, many websites featured a splash page. This grew directly from
22 the web's initial metaphor, literally, a "home."  The splash page was the foyer to the
23 home, inviting visitors in.

24

25      16.    Splash pages initially were thought of as not only benign, but
26 beneficial. As it turned out, nothing could have been further from the truth. By
27 1994, a scant year later, studies of website logs found splash screens were driving
28

-4-

TOGNAZZINI DECLARATION

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 89 of 105   Page ID
#:2702
Case 2:06-cv-07561-PA-CW   Document 212-2   Filed 06/18/08   Page 6 of 9   Page ID #:975

1  off 25% of visitors.[1]  Researchers further found that people would view a fixed
2  number of pages on a site regardless of whether a splash page was present or not.
3  That meant that visitors that would have viewed, for example, three active pages on
4  a site would only view the splash page plus two active pages, directly reducing site
5  revenues by one-third, and so forth. Visitors who would only have visited one page,
6  the home page, took one look at the splash page and left, accounting for the direct
7  25% loss repeatedly reported.

8

9      17.    With the publication of this research in 1994, people immediately
10  looked at their own log files and reacted in horror: Splash pages disappeared almost
11  overnight.  They remain almost exclusively on sites designed by people with no HCI
12  knowledge (typically, graphic designers who want to play with animation) and
13  pornographic websites.

14

15  **Landing page will cease to be an attractant**

16      18.    The current landing pages on the DMV.ORG site typically feature
17  between 140 and 245 links leading further into the site or one of its
18  sponsors/affiliates.  The only path leading away from the site is the Back button.
19  This is the way websites are typically structured.

20

21      19.    The proposed replacement landing page, the acknowledgement page,
22  features one link in to the site, the Continue button. This changes the ratio of 140+
23  ways in and one way out (the Back button) to an even split.  The question in the

24

25  ─────────────────────
   [1]  I replicated the original research at Healtheon, now WebMD, in 1998 when
26  Marketing insisted on adding a splash screen to our design.  We lost
   approximately 26% of users when the splash screen went into effect. This
27  research was, of course, not published—we eliminated the splash screen instead,
   and I no longer have a citation for the original research.
28

# EXHIBIT CC

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 91 of 105   Page ID
#:2704
Case 2:06-cv-07561-PA-CW   Document 282   Filed 01/20/09   Page 1 of 15   Page ID #:2199

1  BRIAN M. DAUCHER, CAL. BAR NO. 174212
   ASHLEY E. MERLO, CAL. BAR NO. 247997
2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
     Including Professional Corporations
3  650 TOWN CENTER DRIVE, 4th FLOOR
   COSTA MESA, CA 92626-1993
   TELEPHONE:     714.513.5100
4  FACSIMILE:     714.513.5130
   bdaucher@sheppardmullin.com
5  amerlo@sheppardmullin.com

   PAMELA L. JOHNSTON, CAL. BAR NO. 132558
6  JAIME B. GUERRERO, CAL. BAR NO. 192211
   FOLEY & LARDNER LLP
   555 SOUTH FLOWER STREET
7  LOS ANGELES, CA 90071-2300
   TELEPHONE:     213.972.4500
   FACSIMILE:     213.486.0065
8  pjohnston@foley.com
   jguerrero@foley.com
9
   ANDREW B. SERWIN, CAL. BAR NO. 179493
10 FOLEY & LARDNER LLP
   402 W. BROADWAY, SUITE 2100
   SAN DIEGO, CA 92101-3542
11 TELEPHONE:     619.234.6655
   FACSIMILE:     619.234.3510
12 aserwin@foley.com

13 ATTORNEYS FOR DEFENDANTS

14             UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16 TRAFFICSCHOOL.COM, INC., A CALIFORNIA   ) CASE NO: CV 06-7561 PA (CWx)
   CORPORATION; DRIVERS ED DIRECT, LLC, A )
17 CALIFORNIA LIMITED LIABILITY COMPANY,  ) DECLARATION OF DAVID GRAY IN
                                          ) SUPPORT OF DEFENDANTS'
18             PLAINTIFFS,                 ) OPPOSITION TO PLAINTIFFS'
                                          ) MOTION FOR CONTEMPT
19       VS.                              )
                                          ) DATE:      FEBRUARY 2, 2009
20 EDRIVER, INC.; ONLINE GURU, INC.; FIND ) TIME:      1:30 P.M.
   MY SPECIALIST, INC., AND SERIOUSNET,   ) PLACE:     COURTROOM OF HON. PERCY
21 INC., CALIFORNIA CORPORATIONS; RAVI K. ) ANDERSON
   LAHOTI, AN INDIVIDUAL; RAJ LAHOTI, AN  )
22 INDIVIDUAL; AND DOES 1 THROUGH 10,     )
                                          )
23             DEFENDANTS.                )
                                          )
24 _____

25       I, David Gray, hereby declare the following:

26       1.      I am the Director of Technology at Online Guru, Inc. ("Online Guru").  I

27 have personal knowledge of the facts hereinafter stated and hereby testify competently

28 thereto as a witness in the above-captioned matter.

                                          1

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 92 of 105   Page ID
#:2705
Case 2:06-cv-07561-PA-CW   Document 282   Filed 01/20/09   Page 2 of 15   Page ID #:2200

2.     Online Guru is responsible for managing the business operations and content of the website located at www.dmv.org (the "DMV.ORG").

## BACKGROUND

3.     I hold a Bachelors of Science degree in electrical engineering from Purdue University with concentrations in micro-controller programming and Digital Signal Processing applications. I am also certified as a Microsoft Certified Solutions Developer (MCSD).

4.     During the course of my professional career, I have worked on the development of client server applications, e-commerce, content management applications, consumer portals, and network analysis tools.

5.     As Online Guru's Director of Technology, I am responsible for and oversee the company's information technology department, which in turn, is responsible for, among other things, development and technological planning (including that of DMV.ORG), and support of network systems and applications.

6.     In my capacity as Director of Technology, I was personally involved in the deployment, implementation and support of the splash page as ordered by this Court's August 26, 2008 Judgment and Permanent Injunction ("Injunction"). Specifically, I participated in the discussions, analysis and decision-making regarding the implementation plan for the splash page and oversaw the team responsible for implementation of the page.

## IMPLEMENTATION OF THE SPLASH PAGE

7.     Even prior to the issuance of the Injunction at the end of August 2008, Online Guru began researching and analyzing the implementation of a splash page on DMV.ORG. This was done in light of the Court's Proposed Injunction in June 2008. As a result of this work over the summer, when the injunction was served upon defendants on August 28, 2008, we were able to take the splash page live the next day, August 29, 2008. The implementation of a splash page for a website such as DMV.ORG is a very difficult task for several reasons.

1    8.    First, the DMV.ORG website has nearly 120,000 pages, and the
2  deployment of the splash page across those pages presented a significant challenge
3  because each of those pages is a potential "entry" or arrival page. As a result, any splash
4  page deployment would have to both function on each of those pages when those pages
5  serve as entry pages, but not function on those pages when they are viewed in a sequence
6  after the entry page by a specific visitor.

7    9.    Second, users access DMV.ORG's content and information primarily
8  through the use of search engines. A splash page, if not implemented properly, will
9  prevent users from finding DMV.ORG's content through the use of search engines such
10  as Google and Yahoo!. This is because search engines index websites based on their
11  content, and the content of the splash page can replace or mask the website's true content.
12  As a result, with the wrong type of splash page, the accessibility of a website's true
13  content will drop, and every page will appear to have the same content (*i.e.*, merely the
14  language in the splash page). This problem is well recognized in the web page design
15  industry and has led many designers to recommend against the use of splash pages
16  altogether:

17         a.    Larissa Thomason, *Promotion Tip: Splash Pages May Drown Your*
18         *Website* at http://www.ewebarchitecture.com/tip.php?id=83 ("Most search engine
19         algorithms rank pages based on a combination of HTML Code Elements, page
20         content, and link popularity. Splash pages, deficient in all three areas, often turn
21         away spiders [programs that index web pages for search engines] as efficiently as
22         they turn away visitors. Furthermore, . . . . [a] splash page hides some of your
23         content from search engines by adding another level without adding much value to
24         the site.");

25         b.    Aaron Wall, *Why Splash Pages are Bad for Rankings* at
26         http://www.search-marketing.info/traps/splash.htm ("Many search engines cannot
27         effectively navigate through and index flash [splash pages]. This means that you
28         have little to no content to optimize and more than likely will not be able to

1　　achieve top rankings.")

2　　　　　　c.　　Jennifer Kyrnin, *About.com: Web Design/HTML Splash Pages: Pros*

3　　*and Cons* at http://webdesign.about.com/od/navigation/a/aa020303a.htm ("Splash

4　　pages break search engines. Since many splash pages only include a flash

5　　animation there isn't a lot for search engines to optimize on. And if you add

6　　content to the page in comments you can be penalized for spamdexing.");

7　　　　　　d.　　Helen Faber, *Why Avoid a Splash Page* at

8　　http://www.webfuel.ca/Why-avoid-a-splash-page ("Often splash pages turn away

9　　spiders just like their site visitors. Without direct access to the URL structure

10　　search engines find it difficult to crawl and index a site. Lack of a proper link

11　　structure to internal web pages (usually only one link that goes to one page)

12　　hinders these pages from getting indexed. This will *of course* hurt your potential

13　　search engine ranking.") (emphasis in original).

14　Attached hereto as Exhibits 18 - 21 respectively are true and correct copies of these

15　articles. A splash page that masks DMV.ORG's content from search engines would be

16　catastrophic and would prevent users from finding its content through search engines.

17　Simply put, DMV.ORG would cease to generate meaningful results for users of search

18　engines such as Google and Yahoo!.

19　　　　　　　　**JAVASCRIPT AND COOKIES**

20　　　　10.　　In developing and deploying the splash page for DMV.ORG, Online Guru

21　had to consider several technical requirements and the continued viability of the website.

22　　　　11.　　As mentioned above, Online Guru had to deploy the splash page in a

23　manner that would still allow users to search for and find DMV.ORG's information

24　through search engines.

25　　　　12.　　Furthermore, a splash page would require DMV.ORG servers to maintain

26　"state" with a user's visit (to track that specific visitor's prior page visits). This is

27　necessary to ensure the splash page is displayed upon a user's first entry to the website,

28　and that it is not again displayed on other pages for the user's length of the visit to the

Case 2:06-cv-07561-PA-CW Document 306-6 Filed 09/06/11 Page 95 of 105 Page ID
#:2708
Case 2:06-cv-07561-PA-CW Document 282 Filed 01/20/09 Page 5 of 15 Page ID #:2203

1  website.

2      13.    To cope with these issues, Online Guru employed widely used and accepted
3  technologies including JavaScript and Cookies.

4      14.    JavaScript was chosen as a solution because it assures that the splash page
5  is not displayed to search engines. JavaScript is able to accomplish this because it is a
6  client side technology. In other words, JavaScript is interpreted and run by a user's
7  browser. Thus, a programmer using JavaScript is able to assure that a browser performs
8  certain functions, such as the display of an image or text, only if certain parameters are
9  met. To assure, the continued existence of DMV.ORG it was imperative for us to be able
10  to do the following: display the splash page to users, while not displaying the splash
11  page to search engines. A specific trait that search engines share is that they do not
12  accept cookies when crawling and indexing web pages. Consequently, JavaScript was
13  the ideal technology. In our case, JavaScript was used to specify that the browser display
14  the splash page (the "function") based on the presence of a cookie (the "parameter").

15      15.    Client side technologies are distinct from server side technologies which
16  are executed on the server. In the case of client side technology, a cookie is sent from
17  the server to the browser which is accessible from JavaScript. Search engines do not
18  accept cookies, so if the JavaScript program does not find the cookie locally, it is highly
19  likely that the request is from a search engine and the splash page will not be displayed.
20  On the other hand, if the JavaScript program has access to the cookie, the request is
21  highly likely to be coming from a user and the splash page will be displayed.

22      16.    As Director of Technology for Online Guru, I routinely monitor and review
23  other websites for usage statistics concerning users to those sites. Two websites which I
24  have visited and reviewed for their user statistics are www.w3schools.com and
25  www.thecounter.com.

26          a.    www.w3schools.com ("w3schools") is an internet site providing
27          free information and resources targeted at web developers. *See*
28          http://www.w3schools.com/about/about_pagehits.asp. In January 2008, the site

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 96 of 105   Page ID
#:2709
Case 2:06-cv-07561-PA-CW   Document 282   Filed 01/20/09   Page 6 of 15   Page ID #:2204

1  had 11,571,428 unique visitors and 81,768,558 page views. *Id.* w3schools tracks
2  several user statistics and compiles statistics by using its own log-files and
3  monitoring other resources around the Internet. Among these statistics are yearly
4  figures for w3schools visitors using web browsers with JavaScript turned on from
5  January 2000 through January 2008. *See*
6  http://www.w3schools.com/browsers/browsers_stats.asp. According to such
7  figures, the percentage of user with JavaScript turned on has gone up every single
8  year from 2000, reaching 95% in 2008. Attached hereto as Exhibit 22 is a true and
9  correct copy of a screenshot of w3schools displaying such figures.

10     b.   www.thecounter.com ("TheCounter") is a third-party website
11  providing web analytic tools. Like w3schools, TheCounter tracks and compiles a
12  number of user statistics for visitors to its site. Among these statistics is a figure
13  tracking the percentage of site visitors using JavaScript enabled web browsers
14  from February 1, 2008 through December 31, 2008. *See*
15  http://www.thecounter.com/stats/2008/December/javas.php. According to such
16  figure, over 93% of the site's 50,185,204 visitors for that time period had
17  JavaScript enabled browsers. *Id.* Attached hereto as Exhibit 23 is a true and
18  correct copy of a screenshot of TheCounter displaying such figure.

19     c.   While different web sites attract different types of users and target
20  different audiences, the above figures are compatible and supported by Online
21  Guru's own statistics pertaining to its own visitors and users as set forth in the
22  Declaration of Scott Annett In Support of Defendants' Opposition to Plaintiffs'
23  Motion for Contempt.

24    17.   Cookies are mere text files placed on the user's system as a method to
25  maintain a user's "state" – *i.e.*, remember whether or not the user was shown a splash
26  page upon entry to DMV.ORG. The cookies that DMV.ORG uses are not permanent
27  files deposited to track broader use, but rather are mere "session" cookies, used to track
28  only that specific session on the site. As a result, if a visitor initiates a new "session" or

Case 2:06-cv-07561-PA-CW   Document 306-6   Filed 09/06/11   Page 97 of 105   Page ID
#:2710
Case 2:06-cv-07561-PA-CW   Document 282   Filed 01/20/09   Page 7 of 15   Page ID #:2205

1   new visit to DMV.ORG, the visitor will again see the splash page first and a new

2   "session" cookie will be established.

3       18.     As discussed in the paragraph 14, cookie technology is also used as a

4   method to determine if an access request was coming from a search engine or a user.

5   This is because search engines do not accept cookies. As a result, if a cookie is enabled,

6   this mechanism will assume that the access request is coming from a user's web browser,

7   and then run JavaScript to display the splash page. In this way, search engines, whose

8   purpose is to seek true content, are allowed to see the site, while users when they click

9   through first see the splash page.

10      19.     In preparing this declaration, I conducted a review of numerous well-

11   known websites to determine whether or not they relied on the use of cookies. Examples

12   of websites that use cookie technology include, without limitation:

13              a.     http://www.amazon.com

14              b.     http://www.webmd.com

15              c.     http://www.apple.com

16              d.     http://www.yahoo.com

17      20.     I also reviewed Plaintiffs' website at http://www.trafficschool.com

18   ("Trafficschool") to determine whether or not it relies on the use of JavaScript and

19   Cookies. To do so, I first visited Trafficschool with **both** JavaScript and cookies **enabled**

20   on my browser. Attached hereto as Exhibit 11 is a true and correct copy of a screenshot I

21   took of that website with JavaScript enabled on my web browser. I then visited

22   Trafficschool with **JavaScript disabled** on my web browser. Upon doing so, it became

23   apparent that Trafficschool is a website largely driven by JavaScript. Specifically, I was

24   not able to view most of the content I viewed when JavaScript was enabled and also

25   unable to use it properly. For example, with JavaScript **disabled**, I was unable to: (1)

26   sign up for traffic school; (2) sign up for defensive driving; (3) sign up for drivers

27   education; (4) start a course; and (5) re-enter a course. Attached hereto as Exhibit 12 is a

28   true and correct copy of a screenshot I took of that website with **JavaScript disabled** on

7

Case 2:06-cv-07561-PA-CW  Document 306-6  Filed 09/06/11  Page 98 of 105  Page ID
#:2711
Case 2:06-cv-07561-PA-CW  Document 282  Filed 01/20/09  Page 8 of 15  Page ID #:2206

1 | my web browser. Finally, I again visited Trafficschool with cookies **disabled** on my web

2 | browser. Upon doing so, I received an error message stating the following: "The

3 | Trafficschool.com website requires that cookies be enabled in order to proceed."

4 | Attached hereto as Exhibit 13 is a true and correct copy of a screenshot I took of that

5 | website with **cookies disabled** on my web browser.

6 |      21.     Another example of a website that will not function properly when

7 | JavaScript is disabled is http://www.webmd.com ("WebMD"). I attempted to access

8 | WebMD with JavaScript disabled on my web browser. When doing so, a large click box

9 | on the webpage stopped functioning – *i.e.*, any attempt to click on it and complete it did

10 | not succeed. When I accessed the same website with JavaScript enabled, the very same

11 | "click-box" was functional and responsive to my inputs. Attached hereto as Exhibit 14

12 | is a true and correct copy of a screenshot I took of that website displaying the "click-box"

13 | in the middle of the page.

14 |      22.     Based on our internal discussions and planning as set forth above, it is my

15 | belief that the implementation of a splash page through the use of JavaScript and cookies

16 | was the best solution available that would allow DMV.ORG to still be accessible to

17 | search engines. Furthermore, this was determined to be the best solution to reach the

18 | largest spectrum of users given the widespread use and acceptance of these technologies

19 | as set forth above. This solution was also favored because DMV.ORG assumes

20 | JavaScript capabilities for numerous other aspects of its website. For instance, if a user

21 | has JavaScript disabled the following portions of DMV.ORG will not function:

22 |           a.      The State Drop Down Menu – The state drop down menu is one of

23 |      the primary means for getting to content for a specific state. Without JavaScript

24 |      this menu does not even appear. This effects approximately 120,000 pages.

25 |           b.      The Websites Search Function – Visitors without JavaScript are

26 |      unable to search our site using our search box. Nearly 1/3 of visitors use our site

27 |      search function. This effects approximately 120,000 pages.

28 |           c.      Answers.dmv.org – Visitors without JavaScript cannot ask questions

1   at our question and answer product at http://answers.dmv.org.

2       d.   Rate this Page – Users without JavaScript are unable to provide
3   feedback in our suggestion tool.

4       e.   Purchase Insurance – Visitors without JavaScript are unable to
5   purchase insurance at our advertisers' Esurance, Progressive Insurance, and
6   Liberty Mutual's sites. This is one of our revenue streams.

7       f.   Purchase Defensive Driving Courses – Visitors without JavaScript
8   are unable to purchase Defensive Driving courses at our advertiser's site
9   iDriveSafely.com. This is one of our revenue streams.

10      g.   Purchase Practice Tests – Visitors without JavaScript are unable to
11  purchase practice tests at our advertiser's site iDriveSafely.com. This is one of
12  our revenue streams.

13      h.   Purchase Driving Records – Visitors without JavaScript are unable
14  to purchase driving records at our advertiser's site DrivingRecords.com. This is
15  one of our revenue streams.

16  23.   Between June 2008 (when the proposed injunction was issued) and August
17  2008 (when the Injunction was issued), we spent hundreds of hours analyzing our
18  options, seeking an option which would both meet the mandate of this Court but not also
19  destroy the accessibility of the content of the site. In this process, we spent significant
20  time and resources researching, brainstorming, analyzing, testing, and troubleshooting
21  different mechanisms for the display of a splash page in compliance with the Injunction.
22  For example, we considered several other methods including, without limitation, IP
23  Tracking, URL Query String (as suggested by plaintiffs), Hidden Form Fields, and
24  Adobe Flash. However, each method has its own imperfections, drawbacks, and would
25  present problems in terms of user adoption and penetration.

26      a.   IP Tracking involves storing IP information from the request on the
27  server. IP Tracking would have allowed us to know if a request from an
28  individual IP was the first request and whether a splash page should be displayed.

1    The difficulty with this solution is that IP addresses are not unique per user.

2    Thousands of users can share the same IP address through an Internet Service

3    Provider. Thus, this method would be completely unreliable and would not allow

4    us to determine if a splash page had been shown or not.

5         b.    URL Query Strings embed visitor information in the URL for each

6    request. This solution would have required us to amend each request with a Token

7    consisting of 16-32 characters. Each Token would represent a unique visitor and

8    would be stored on a database that tracks the visitor. The Token would also be

9    used to determine whether or not to display a splash page. The problem with this

10   solution is that Tokens are indexed by search engines. This means that when our

11   website shows up in a search engine result the Token would be displayed, harming

12   our users' ability to discern the relevance of our information. We currently have

13   very clean URLS. For example, the link on our website to driving records

14   information in the state of Alabama is: http://www.dmv.org/al-alabama/driving-

15   records.php. The addition of a Token would make the URL look similar to this:

16   http://www.dmv.org/al-alabama/driving records.php? refid =175W065ACQPTS

17   W S873SD. This would decrease the readability of the URL and harm the

18   website's visibility to search engines because search engines credit websites with a

19   clean URL structure.

20        c.    Hidden Form Fields embed "state" information into the HTML of a

21   page. There are several problems with this solution. First, anytime a user hits the

22   "back" button, the "state" information would be lost and the splash page would

23   display again. Second, this would impact the internal linking on the website by

24   changing every link to a form. Search engines do not follow these forms in the

25   same way that links are followed, and would not be able to navigate our site as

26   well.

27        d.    Adobe Flash is extremely similar to JavaScript in that it is a client-

28   side technology. If we had used Flash, it would have operated in the same way as

Case 2:06-cv-07561-PA-CW  Document 306-6  Filed 09/06/11  Page 101 of 105  Page ID
#:2714
Case 2:06-cv-07561-PA-CW  Document 282  Filed 01/20/09  Page 11 of 15  Page ID #:2209

1    our JavaScript and would test if the request came from a search engine and if the

2    request did not would display a splash page. We felt that any issues with Flash

3    would be the same as with JavaScript, and ultimately chose to use JavaScript

4    because it is a technology that is more widely deployed than Flash, and because

5    Online Guru had superior expertise with JavaScript given that it was already used

6    on DMV.ORG Therefore, it was determined that JavaScript would allow for a

7    faster and more efficient implementation of the splash page.

8                              **MOBILE DEVICES**

9        24.    I understand that Plaintiffs contend that the splash page is not visible to

10   users of mobile devices such as RIM BlackBerries and Palm Treos.

11       25.    The device per se (*i.e.*, RIM BlackBerry, Palm Treo, Apple iPhone) is not

12   as relevant as the combination of the device's operating system and web browser type.

13       26.    In choosing a solution, we tested over 130 combinations of operating

14   systems and web browsers with the goal of obtaining as much coverage as possible

15   without destroying accessibility of the site content to the search engines.

16       27.    Omniture, Inc. is a third party company that sells web analytics software.

17   Omniture software is an industry standard tool used for tracking website internet traffic

18   and related statistics. Online Guru has a license to use Omniture's web analytics

19   software. Online Guru is therefore able to access a variety of forms of traffic data for the

20   DMV.ORG website through Omniture. I personally review reports from Omniture on a

21   regular basis to analyze the performance of the DMV.ORG website.

22       28.    I have reviewed an Omniture report identifying the types of web browsers

23   used to access DMV.ORG for December of 2008. Attached hereto as Exhibit 15 is a true

24   and correct copy of this report.

25       29.    According to these figures, individuals used a total of 159 different types of

26   web browsers to access DMV.ORG. Of these, our records show that 139 of those

27   browsers supported display of the splash page. Furthermore, of the remaining 20 web

28   browsers which did not support display of the splash page, this represented only 0.02%

**EXHIBIT** DD

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

| Case No. | CV 06–7561 PA (CWx) | Date | February 2, 2009 |
|---|---|---|---|
| Title | TrafficSchool.com, Inc., et al. v. eDriver, Inc., et al. | | |

| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Paul Songco | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**          IN CHAMBERS—COURT ORDER

Before the Court is a motion for contempt ("Motion") filed by plaintiffs TrafficSchool.com, Inc. and Drivers Ed Direct, LLC ("Plaintiffs") against defendants eDriver, Inc., Online Guru, Inc., Find My Specialist, Inc., Seriousnet, Inc., Ravi K. Lahoti, and Raj Lahoti ("Defendants"). (Docket No. 261.) Plaintiffs seek to have Defendants held in contempt for violating the Court's injunction. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. The hearing calendared for February 2, 2009 is vacated, and the matter taken off calendar.

## I.    FACTUAL & PROCEDURAL BACKGROUND

In this action, Plaintiffs alleged that Defendants engaged in false advertising by using the term "DMV" in conjunction with their website, even though that website is not endorsed by any state's department of motor vehicles. After a bench trial, the Court entered judgment for Plaintiffs and imposed an injunction on Defendants. (See Docket Nos. 210, 215.) The injunction states, in relevant part:

> 1.    The Defendants eDriver, Inc., Online Guru, Inc., Find My Specialist, Inc., Seriousnet, Inc., Ravi K. Lahoti, and Raj Lahoti, (collectively "Defendants"), their owners, officers, directors, assignees, transferees, employees, agents and representatives, and all other persons, firms or entities acting in concert or participating with them, who receive notice of the injunction, are enjoined as follows:
>
>> (a)    Defendants shall employ an acknowledgment splash page, or "splash screen," that every visitor to any entry webpage on the DMV.ORG domain shall see prior to viewing any webpage content;
>> (b)    Visitors to any webpage on the DMV.ORG domain need only view the acknowledgment splash page once, and need not be presented with the

**SEND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

| Case No. | CV 06–7561 PA (CWx) | Date | February 2, 2009 |
|---|---|---|---|

| Title | TrafficSchool.com, Inc., _et al._ v. eDriver, Inc., _et al._ |
|---|---|

> acknowledgment splash page again when navigating to different webpages within the DMV.ORG domain;
>
>       (c)     The acknowledgment splash page shall state: "YOU ARE ABOUT TO ENTER A **PRIVATELY OWNED** WEBSITE THAT IS **NOT** OWNED OR OPERATED BY ANY STATE GOVERNMENT AGENCY.  TO CONTINUE, CLICK 'CONTINUE' BELOW."   Below this disclaimer shall be a "click-through" button that the visitor must affirmatively click to continue to the webpage on the DMV.ORG domain;
>
>       (d)     The statement in paragraph (c) shall appear in all capital letters;
>
>       (e)     Nothing other than the content in paragraph (c) and the DMV.ORG logo shall be visible to the visitor when viewing the acknowledgment splash page;
>
>       (f)     The statement in paragraph (c) shall appear in fourteen (14) point font, and shall be in larger font size than that used in the DMV.ORG logo and the 'continue' button.

Plaintiffs assert that Defendants violated the injunction in several ways, discussed below.

## II.      STANDARD GOVERNING MOTIONS FOR CONTEMPT

Federal Rule of Civil Procedure 70(e) states that the Court may hold a party in contempt for failure to comply with a judgment.  "The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court.  The burden then shifts to the contemnors to demonstrate why they were unable to comply."  In re Bennett, 298 F.3d 1059, 1069 (9th Cir. 2002) (internal citation omitted).  While "there is no good faith exception to the requirement of obedience of a court order[,] . . . a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the [court's order]."  In Re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993) (internal citations and quotation omitted).

## III.      ANALYSIS

Plaintiffs allege several violations of the injunction.  First, they allege that Defendants violated paragraph (f) by making the lettering in the DMV.ORG logo larger than the lettering used in the splash screen statement in paragraph (c).  Second, they allege that Defendants display "title tags" at the top of the splash screen in violation of paragraph 1(e).  Third, the splash screen is not presented to many users of mobile devices, computer users with browsers without "Java Script" enabled, and computer users that

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES - GENERAL

| Case No. | CV 06–7561 PA (CWx) | Date | February 2, 2009 |
|---|---|---|---|
| Title | TrafficSchool.com, Inc., et al. v. eDriver, Inc., et al. | | |

reject "cookies."  In addition to having Defendants held in contempt, Plaintiffs seek attorneys' fees and costs for policing Defendants' compliance and having to bring the Motion.  They further seek Defendants' profits for the period of time in which they were not in compliance.  Finally, they seek for Defendants to be ordered to come into compliance within ten days, and to face sanctions of $10,000 per day of non-compliance thereafter, or in the alternative for the Court to retain an expert to design the splash screen that Defendants must use.

Defendants counter that the disclaimer is in fourteen (14) pixels rather than fourteen (14) point font, because pixels is the measure used to define text size for web pages in order to ensure that it displays in a consistent size among different users.  Making the logo smaller than the disclaimer would make the small text in the logo illegible.[1/]  Defendants further argue that they reasonably interpreted the injunction not to apply to title tags, as the title tags appear above the splash screen, and above the browser controls.  Moreover, deleting the title tags would remove them from every page on Defendants' website, not just the splash screen.  Finally, with respect some users' inability to view the splash screen, Defendants state that (1) using a technology other than Java Script would prevent search engines from reviewing the material on the DMV site in order to create organic search engine listings, (2) if a user has Java Script disabled, they cannot use DMV.ORG's drop down menus, search function, or purchase anything from most of the advertisers, and (3) 97% of visitors to DMV.ORG have Java Script & cookies enabled.  Defendants also assert that they added disclaimers to every page on their website, and that visitors can view these disclaimers even if they do not see the splash page.  Defendants also added an affirmative acknowledgment checkbox when a user tries to send a communication to DMV.ORG.

The Court finds that Defendants have substantially complied with the injunction, and Defendants' actions "appear[] to be based on a good faith and reasonable interpretation of the [court's order]."  In Re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d at 695.

### Conclusion

For the forgoing reasons, Plaintiffs' Motion is denied.

IT IS SO ORDERED.

_____ : _____

Initials of Preparer

_____

cc:

---

[1/]    Ordinarily, the Court might modify paragraph (f) of the injunction to require that the lettering in paragraph (c) appear larger than any lettering used in the DMV.ORG logo, without specifying the size of the language in paragraph (c).  However, the injunction is currently on appeal, and therefore the Court declines to modify the injunction in the absence of a stipulation from the parties.